RECEIVED

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | |
|---|---|
| BERNETHIA JOHNSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| -v.- | ) Civil Action No. 2:06-CV-397-WKW |
| | ) 2:07-CV-59-WKW |
| MICHAEL J. ASTRUE, | ) |
| COMMISSIONER OF | ) |
| SOCIAL SECURITY, et al., | ) |
| | ) |
| Defendants. | ) |

---

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

---

LEURA G. CANARY
United States Attorney for the
Middle District of Alabama

JAMES J. DUBOIS
Assistant United States Attorney
Georgia Bar No. 231445
United States Attorney's Office
Post Office Box 197
Montgomery, AL 36101-0197
Telephone: (334) 223-7280
Counsel for Defendants

## TABLE OF CONTENTS

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Citations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    I.    General Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    II.   Actions Challenged in Plaintiff's First Complaint and Relevant Facts . . . . . . . . . . . 5

         A.    Plaintiff's Request to work at home in April 2004 . . . . . . . . . . . . . . . . . . 5

         B.    April 30, 2004 Oral Warning for Insubordination . . . . . . . . . . . . . . . . . . 6

         C.    May 27, 2004, Written Reprimand . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    III.  Actions Challenged in Plaintiff's Second Complaint and Relevant Facts . . . . . . . . . 12

         A.    Suspension for Giving Supervisor the Middle Finger . . . . . . . . . . . . . . . 12

         B.    Plaintiff's Request for 4 1/4 Leave on June 27, 2005 . . . . . . . . . . . . . . . 15

         C.    Miscellaneous Allegations Absent From EEO Complaints . . . . . . . . . . . . 16

               1.    October 14, 2003 voting leave . . . . . . . . . . . . . . . . . . . . . . . . 16

               2.    July 21, 2004, time sheets found with Plaintiff's documents . . . 16

               3.    November 2004 emails regarding harassment, Plaintiff's contention that management ignored her complaint, and Plaintiff's allegation regarding Lamar allegedly grabbing arm . . . . . . . . . . . . . . . . . . 17

               4.    Hardship transfer requests denied by the Regional Office on October 7, 2004; December 3, 2004; and February 25, 2005 . . . . . . . . . . . 18

               5.    January 27, 2005, request to not park in handicap spot . . . . . . . . 20

               6.    February 23, 2005, possible "keying" of car by unknown person and Reams' denial of Plaintiff's request Government pay for damage   21

7.    April 4, 2005, request by Lamar for Lead Legal Assistant to read document aloud at meeting instead of Plaintiff . . . . . . . . . . . . . 21

8.    June 2005 Reams' request that Plaintiff open office door . . . . . . 22

9.    July 15, 2005, Plaintiff set off alarm while in bathroom and Reams sent email to office reminding employees of alarm policy . . . . . 22

10.   September 2, 2005, co-worker's car almost hit Plaintiff . . . . . . . 23

11.   Plaintiff's allegations raised during deposition but omitted from complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Argument and Citation of Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

I.   Plaintiff's Failure to Exhaust Her Mandatory Administrative Remedies . . . . . . . . . 26

     A.    Plaintiff's Unexhausted Claims in First Lawsuit . . . . . . . . . . . . . . . . . . . 27

     B.    Plaintiff's Unexhausted Claims in Second Lawsuit  . . . . . . . . . . . . . . . . 28

II.  Plaintiff's Race Discrimination Claims Fail as a Matter of Law . . . . . . . . . . . . . . 31

     A.    Plaintiff Did Not Suffer Any Adverse Employment Actions  . . . . . . . . . . 31

     B.    No Evidence Similarly-Situated White Employees Treated Better . . . . . . 33

III. Plaintiff's Retaliatory Disparate Treatment Claims Fail As a Matter of Law . . . . . . . 34

     A.    Plaintiff Cannot Show All Challenged Acts are Adverse Actions . . . . . . 35

     B.    Plaintiff Cannot Show Causation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

IV.  Plaintiff Cannot Show Defendants' Legitimate, Non-Discriminatory Reasons for the Challenged Actions Are Pretext for Discrimination or Retaliation . . . . . . . . . . . . . 42

     A.    Actions Challenged in Plaintiff's First Complaint  . . . . . . . . . . . . . . . . . 43

           1.    Plaintiff's request to work at home in April 2004 . . . . . . . . . . . . 43

           2.    April 30, 2004, oral warning for insubordination . . . . . . . . . . . . 43

           3.    May 27, 2004, written reprimand . . . . . . . . . . . . . . . . . . . . . . .  45

B.    Actions Challenged in Plaintiff's Second Complaint . . . . . . . . . . . . . . . 46

1.    July 2005 three-day suspension . . . . . . . . . . . . . . . . . . . . . . . . . .    46

2.    Question about Plaintiff's June 27, 2005, time sheet . . . . . . . . .    48

3.    Miscellaneous allegations absent from EEO complaints . . . . . . . . 48

a.    October 14, 2003, voting leave . . . . . . . . . . . . . . . . . . . .    48

b.    July 21, 2004 time sheet incident . . . . . . . . . . . . . . . . . .    48

c.    Plaintiff's June/November 2004 complaints . . . . . . . . . .    49

d.    Hardship transfer requests . . . . . . . . . . . . . . . . . . . . . . .    49

e.    Request to move car from handicap spot . . . . . . . . . . . .    50

f.    Keying of car and Reams' refusal to pay . . . . . . . . . . . .    50

g.    Lamar's request for McAnnally to read document . . . . .    51

h.    Request by Reams that Plaintiff open office door . . . . . .    51

i.    July 15, 2005, email regarding alarm policy . . . . . . . . . .    52

j.    September 2, 2005, car almost hitting Plaintiff . . . . . . . .    52

V.    Plaintiff's Hostile Work Environment Claims Fail as a Matter of Law . . . . . . . . . . .    52

A.    Plaintiff Cannot Show Causation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    54

B.    Plaintiff Cannot Show That She Endured An Abusive Environment . . . .    56

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    60

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    61

## TABLE OF AUTHORITIES

**FEDERAL CASES**

Allen v. Am. Signature, Inc., 2008 U.S. App. LEXIS 7714 (7th Cir. March 31, 2008) . . . . . . . 36

Andrews-Willmann v. Paulson, 2008 U.S. App. LEXIS 14682 (11th Cir. July 8, 2008)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 29, 30, 53, 54

Ausby v. Fla., 2008 U.S. Dist. LEXIS 44929 (M.D. Fla. June 6, 2008) . . . . . . . . . . . . . . . . . 37

Baloch v. Norton, 517 F. Supp. 2d 345, 356-358 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . 39

Bickham v. Miller, 584 F.2d 736 (5th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Bozeman v. Per-Se Tech., Inc., 456 F. Supp. 2d 1282 (N.D. Ga. 2006) . . . . . . . . . . 30, 53, 54, 60

Brantley v. Kempthorne, 2008 U.S. Dist. LEXIS 38406 (D.D.C. May 13, 2008) . . . . . . . . . . . 59

Broadway v. UPS, Inc., 499 F. Supp. 2d 992 (M.D. Tenn. 2007) . . . . . . . . . . . . . . . . . . . . . . . 54

Brown v. American Honda Motor Co., 939 F.2d 946 (11th Cir. 1991) . . . . . . . . . . . . . . . . 44, 56

Brown v. Snow, 440 F.3d 1259 (11th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 12, 28

Brungart v. BellSouth Comms., Inc., 231 F.3d 791 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . 39

Bryan v. Chertoff, 2007 U.S. App. LEXIS 1915 (5th Cir. Jan. 2007) . . . . . . . . . . . . . . . . . . . . 53

Burlington N. & Sante Fe Ry. Co. v. White, 126 S.Ct. 2405 (2006) . . . . . . . . . . . . . . . 35, 37, 60

Bush v. Regis Corp., 2007 U.S. App. LEXIS 28210 (11th Cir. Dec. 3, 2007) . . . . . 36, 37, 39, 60

Byrd v. AUM, 2007 U.S. Dist. LEXIS 28411 (M.D. Ala. April 17, 2007) . . . . . . . . . . . . . . . . 37

Cain v. Geren, 2008 U.S. App. LEXIS 352 (11th Cir. Jan. 7, 2008) . . . . . . . . . . . . . . . . . . . . . 35

Canino v. United States EEOC, 707 F.2d 468 (11th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . 26

Cantrell v. Jay R. Smith Mfg. Co., 248 F. Supp. 2d 1126 (M.D. Ala. 2003) . . . . . . . . . . . . . . . 31

Celotex v. Catrett, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

-iv-

Chang v. Safe Horizons, 2007 U.S. App. LEXIS 25752 (2d Cir. Nov. 5, 2007) . . . . . . . . . . . . . 36

Chapman v. AI Transport, 229 F.3d 1012 (11th Cir. 2000) . . . . . . . . . . . . . 42, 43, 49, 50, 51, 52

Clark County School District v. Breeden, 532 U.S. 268 (2001) . . . . . . . . . . . . . . . . . . . . . . . . 41

Clayton v. Rumsfeld, 2003 U.S. Dist. LEXIS 27725 (W.D. Tx. Aug. 8, 2003) . . . . . . . . . . . . 29

Clegg v. Ark. Dep't of Corr., 496 F.3d 922 (8th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Collier v. City of Opelika, 374 F. Supp.2d 1098 (M.D. Ala. 2004) . . . . . . . . . . . . . . . . . . . . . . 53

Combs v. Plantation Patterns, 106 F.3d 1519 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . 42

Cooper v. Diversicare Mgmt. Servs., 115 F. Supp. 2d 1311 (M.D. Ala. 1999) . . . . . . . . . . . . 44

Crawford v. Babbitt, 186 F.3d 1322 (11th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Crumpton v. Runyon, 1998 U.S. Dist. LEXIS 3373 (M.D. Pa. March 19, 1998) . . . . . . . . . . . 29

Davis v. Coca-Cola Bottling Co., 516 F.3d 955 (11th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . 30

Davis v. Town of Lake Park, Fla., 245 F.3d 1232 (11th Cir. 2001) . . . . . . . . . . . . . . . . . . . 31, 32

Dehart v. Baker Hughes Oilfield Op., Inc., 214 Fed. Appx. 437 (5th Cir. 2007) . . . . . . . . . 36, 39

Delgado v. Triborough Bridge and Tunnel Auth., 485 F. Supp. 2d 453 (S.D.N.Y. 2007) . . . . . 55

Devin v. Schwan's Home Serv., Inc., 491 F.3d 778 (8th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . 36

Drago v. Jenne, 453 F.3d 1301 (11th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Edwards v. EPA, 456 F. Supp. 2d 72 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

EEOC v. Total System Servs., Inc., 221 F.3d 1171 (11th Cir. 2000) . . . . . . . . . . . . . . 47, 50, 51

Elrod v. Sears, Roebuck & Co., 939 F.2d 1466 (11th Cir. 1991) . . . . . . . . . . . 42, 44, 46, 47, 50

Evers v. General Motors Corp., 770 F.2d 984 (11th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . 55

Faragher v. City of Boca Raton, 524 U.S. 775 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56, 57

Garcia-Cabrera v. Cohen, 81 F. Supp. 2d 1272 (M.D. Ala. 2000) . . . . . . . . . . . . . . . . . . . . . . 47

-v-

Gregory v. Widnall, 153 F.3d 1071 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Grier v. Sec'y of the Army, 799 F.2d 721 (11th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . 26

Grube v. Lau Industs., Inc., 257 F.3d 723 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . 52

Gupta v. Fla. Bd. of Regents, 212 F.3d 571 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . . . 42, 54

Harding v. Newburgh Enlarged Sch. Dist., 2008 U.S. Dist. LEXIS 17744 (S.D.N.Y. March 7, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Harris v. Forklift Sys., Inc., 510 U.S. 17 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Hewlett v. Waffle House, Inc., 2006 U.S. Dist. LEXIS 36269 (M.D. Ga. June 5, 2006) . . . . . . 53

Higdon v. Jackson, 393 F.3d 1211 (11th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 41

Holden v. Ill. Tool Works, Inc., 2007 U.S. Dist. LEXIS 94470 (S.D. Tx. Dec. 27, 2007) . . . . . 37

Holifield v. Reno, 115 F.3d 1555 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Hooks v. Bank of America, 183 Fed. Appx. 833 (11th Cir. 2006) . . . . . . . . . . . . . . . . . . . . 32

Houston v. Army Fleet Servs., Inc., 509 F. Supp. 2d 1033 (M.D. Ala. 2007) . . . . . . . . . . . . . 29

Howell v. Dep't of the Army, 975 F. Supp. 1293, 1299 (M.D. Ala. 1997) . . . . . . . . . . . . . . . 27

Jackson v. St. Joseph State Hosp., 840 F.2d 1387 (8th Cir. 1988) . . . . . . . . . . . . . . . . . . . . 39

James v. Metropolitan Gov't of Nashville, 243 Fed. Appx. 74 (6th Cir. 2007) . . . . . . . . . . . . 37

Jones v. Bessemer Carraway Med. Ctr., 137 F.3d 1306 (11th Cir.), modified, 151 F.3d 1321 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Keel v. Roche, 256 F. Supp. 2d 1269 (M.D. Ala. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Keeley v. Small, 391 F. Supp. 2d 30 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Khoury v. Meserve, 268 F. Supp. 2d 600 (D. Md. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Kincade v. Snow, 2003 U.S. Dist. LEXIS 20758 (D. Ct. Nov. 10, 2003) . . . . . . . . . . . . . . . . 55

Knight v. Baptist Hosp. of Miami, Inc., 330 F.3d 1313 (11th Cir. 2003) . . . . . . . . . . . . . . 33, 34

-vi-

Ledbetter v. Goodyear Tire & Rubber Co., Inc., 127 S.Ct. 2162 (2007) . . . . . . . . . . . . . . . 27, 30

Lucas v. W.W. Grainger, Inc., 257 F.3d 1249 (11th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . 32

Macuba v. DeBoer, 193 F.3d 1316 (11th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Malladi v. Brown, 987 F. Supp. 893 (M.D. Ala. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Maniccia v. Brown, 171 F.3d 1364 (11th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Manning v. Carlin, 786 F.2d 1108 (11th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Marshall v. Western Grain Co., 838 F.2d 1165 (11th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . 34

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) . . . . . . . . . . . . . . . . . 26

McAlindin v. County of San Diego, 192 F.3d 1226 (1999), amended 201 F.3d 1211 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

McCann v. Tillman, 526 F.3d 1370 (11th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . 30, 53, 57, 58

Mendoza v. Borden, Inc., 195 F.3d 1238 (11th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . 54, 59, 60

Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . 57

National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002) . . . . . . . . . . . . . . . . . . 30, 58

Nix v. WLCY Radio/Rahall Communs., 738 F.2d 1181 (11th Cir. 1984) . . . . . . . . . . . . . . . . . 42

Oest v. Ill. Dep't of Corrections, 240 F.3d 605 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . 32

Parker v. Dep't of Pub. Safety, 11 F. Supp. 2d 467 (D.Del. 1998) . . . . . . . . . . . . . . . . . . . . . . 58

Peace v. Harvey, 2006 U.S. App. LEXIS 26784 (5th Cir. Oct. 26, 2006) . . . . . . . . . . . . . . . . 38

Pelletier v. Reedy Creek Improv. Dist., 2007 U.S. Dist. LEXIS 29625 (M.D. Fla. April 23, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Ramsey v. Henderson, 286 F.3d 264 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Rattigan v. Gonzales, 503 F. Supp. 2d 56 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Ray v. Freeman, 626 F.2d 439 (5th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

<u>Recio v. Creighton Univ.</u>, 521 F.3d 934 (8th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

<u>Robinson v. Chao</u>, 403 F. Supp. 2d 24 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

<u>Rojas v. Florida</u>, 285 F.3d 1339 (11th Cir. 2002) . . . . . . . . . . . . . . 42, 44, 45, 47, 48, 49, 50, 51

<u>Sanders v. City of Montgomery</u>, 319 F. Supp. 2d 1296 (M.D. Ala. 2004) . . . . . . . . . . . . . . . . 41

<u>Sasser v. State of Ala. Dep't of Corrections</u>, 373 F. Supp. 2d 1276 (M.D. Ala. 2005) . . . . . 32, 33

<u>Satchel v. School Bd. of Hillsborough Cty</u>, 2007 U.S. Dist. LEXIS 11696 (M.D. Fla. Feb. 20, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

<u>Scott v. Lee Cty. Youth Dev. Ctr.</u>, 232 F. Supp. 2d 1289 (M.D. Ala. 2002) . . . . . . . . . . . . . . . 53

<u>Somoza v. Univ. of Denver</u>, 513 F.3d 1206 (10th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . 39, 60

<u>Stewart v. Ind. Sch. Dist. No. 196</u>, 481 F.3d 1034 (8th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . 54

<u>Sullivan v. City of Satsuma</u>, 2005 U.S. Dist. LEXIS 33017 (S.D. Ala. Sept. 9, 2005) . . . . . . . . 38

<u>Thomas v. Cooper Lighting, Inc.</u>, 506 F.3d 1361 (11th Cir. 2007) . . . . . . . . . . 34, 39, 40, 41, 54

<u>Thompson v. West</u>, 883 F. Supp. 1502 (M.D. Ala. 1995) . . . . . . . . . . . . . . . . . . . . . . . . 27, 28, 29

<u>Trujillo v. Univ. of Col.</u>, 157 F.3d 1211 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 57, 59

<u>Turlington v. Atlanta Gas Light Co.</u>, 135 F.3d 1428 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . . 31

<u>Watkins v. Sverdrup Tech., Inc.</u>, 153 F.3d 1308 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . 42

<u>Williams v. Glover</u>, 2006 U.S. Dist. LEXIS 15536 (M.D. Ala. March 31, 2006) . . . . . . . . . . . 32

<u>Wilson v. B/E Aero., Inc.</u>, 376 F.3d 1079 (11th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

**FEDERAL STATUTES**

42 U.S.C. § 2000e . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**FEDERAL REGULATIONS**

29 C.F.R. § 1614.105(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| BERNETHIA JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:06-CV-397-WKW |
| | ) | 2:07-CV-59-WKW |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**COME NOW** Defendants, by and through Leura G. Canary, United States Attorney for the Middle District of Alabama, and file this Memorandum showing that there are no genuine disputes of material fact and that they are entitled to judgment as a matter of law on all Plaintiff's claims.

## STATEMENT OF THE CASE

Plaintiff, a former Legal Assistant at the Social Security Administration's Hearing Office ("Hearing Office") in Montgomery, Alabama, alleges that Defendants discriminated against her due to her race and retaliated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et. seq. Plaintiff's allegations are contained in a May 2, 2006, Complaint ("First Complaint") and a January 18, 2007, Complaint ("Second Complaint"), which have been consolidated by this Court.

In Plaintiff's First Complaint, she alleges that she was subjected to discrimination and retaliation when she: (1) was issued an oral warning for insubordination after she refused to answer work-related questions from her supervisor; and (2) was issued a written reprimand for falsely claiming work had been completed. (First Comp. ¶¶ 22, 26, 27, 36-37; Pl. Dep. 135:22-25). Plaintiff also

alleges that her supervisors did not allow her to work at home under an Alternative Duty Station ("ADS") program for two days in April 2004, even though she now admits this allegation is false and she did work at home. (First Comp. ¶¶ 31, 33; Pl. Dep. 135:22-25, 137:3-25). Finally, Plaintiff claims that these acts created a hostile environment in retaliation for her filing EEO complaints challenging hiring decisions in October 1997 and May 2003. (First Comp. ¶¶ 11, 18, 36-37).

In Plaintiff's Second Complaint, she alleges that she was retaliated against when she: (1) was charged an extra 1/4 hour of leave, even though she now admits that this allegation is false and she was not charged this leave; and (2) received a 3-day suspension for giving her supervisor the middle finger. (Second Comp. ¶¶ 31-34, 52). She also alleges that these acts were part of a retaliatory hostile work environment created by her managers for the filing of EEO complaints in 1997, May 2003, and June 2004. (Id. at ¶¶ 50, 56-57). Plaintiff's Second Complaint also appears to challenge other acts, either independently or as part of her hostile environment claim.[1] (Id. at ¶¶ 12, 13, 14, 20-25, 37-39 & 45).

When settled law is applied to the undisputed facts, this Court should grant summary judgment on Plaintiff's claims for multiple reasons. First, Plaintiff did not comply with the mandatory Title VII exhaustion requirements for all her claims except her challenges to her written reprimand, alleged charging of 1/4 hour extra leave, and three-day suspension. Second, Plaintiff cannot establish a prima facie case of discrimination or retaliation on any exhausted or unexhausted claims. More specifically,

---

[1]These other acts include allegations that: (1) she was denied voting leave in a local election; (2) unknown co-workers tried to "frame her" by placing time sheets with her documents; (3) several hardship transfer requests were denied; (4) she was asked to move her car from a handicap parking spot; (5) an unknown person "keyed" her car and the Agency would not pay for the damage; (6) she was embarrassed when her supervisor had another employee read a document during a meeting because she thought it implied she was illiterate; (7) she was not allowed to talk to supervisors who she now claims were harassing her alone in their offices with the door shut, (8) she was embarrassed after her supervisor sent an email to the office about the alarm policy after Plaintiff accidently set it off; and (9) a co-worker's car almost hit her in the parking lot. (Second Comp., generally).

Plaintiff's race discrimination claims fail because she did not suffer any adverse employment actions and cannot show that she was treated differently from similarly-situated white employees. Plaintiff's retaliation claims fail because she either did not suffer an adverse action or she cannot show that any adverse actions were casually related to her EEO complaints. Third, even assuming <u>arguendo</u> Plaintiff could establish a <u>prima facie</u> case of discrimination or retaliation, Defendants acted pursuant to legitimate, non-discriminatory reasons which Plaintiff cannot show are pretext. Finally, Plaintiff cannot show that she endured a retaliatory hostile environment because the trivial acts she challenges lack any causal relation to her EEO complaints and did not create an abusive environment. In short, there are no genuine disputes of material fact and Plaintiff's claims fail as a matter of law.

## STATEMENT OF THE FACTS[2]

### I.    General Background.

Plaintiff, an African-American, worked as a Legal Assistant with the Social Security Hearing Office in Montgomery from approximately 1998 through her transfer to Chattanooga, Tennessee, in October 2005. (Pl. Dep. 51:3-6, 52:13-56:3, 100:17-18). The Hearing Office handles claims filed by claimants seeking Social Security disability benefits and assists administrative law judges who conduct hearings. (Reams Dec. ¶ 1). Paul Reams has been the Hearing Office Director since December 1999, supervising three Group Supervisors who manage Legal Assistants. (Reams Dec. ¶ 1). Paul Johnson was Plaintiff's Group Supervisor from April 2000, to May 1, 2004, and Cynthia Lamar was her Group Supervisor from May 2, 2004, to October 2005. (Pl. Dep. 53:23-54:6; Johnson Dep. 26:5-18).

---

[2]Depositions and declarations are attached to Defendants' Evidentiary Submission, and are cited as follows: Witness last name; Dep. or Dec.; and page(s):line(s) or paragraph number.

Plaintiff's primary job duty as a Legal Assistant was to "work-up" social security cases to prepare them for a hearing. (Pl. Dep. 60:16-61:7; Reams Dep. 12:16-14:20). Cases assigned to a Legal Assistant for work-up were tracked in a computer system known as the Hearing Office Tracking System ("HOTS"). (Pl. Dep. 62:18-21; Johnson Dep. 65:25-67:6). To work-up a case, a Legal Assistant would take the file; remove duplicate documents; arrange the medical records and other documents from claimants, hospitals, and doctors in chronological order; type an exhibit list in WORD; and place the exhibit list in the case file. (Pl. Dep. 61:13-19; Reams Dep. 12:18-13:9; Johnson Dec. ¶ 3). After the Legal Assistant finished the work-up process, she would change the status of the case in HOTS to indicate that work-up was finished and the case was ready for the next status (known as Ready to Hear (RTH) or Ready to Schedule (RTS)).[3] (Pl. Dep. 63:1-465:22-25; Reams Dec. ¶ 10). The Legal Assistant would then place the worked up files in a RTS/RTH file cabinet. (Pl. Dep. 63:20-64:2).

The Hearing Office tracked the number of cases each Legal Assistant worked up on a monthly basis in HOTS, and Plaintiff was consistently the least-productive Legal Assistant. (Reams Dec. ¶ 10; Johnson Dep. 69:7-24). In October 2003, Johnson performed a routine audit and discovered a number of Plaintiff's cases that had been moved from work-up status even though they had not been fully worked up. (Johnson Dep. 88:12-25). Johnson did not know of any other Legal Assistants in his Group moving incomplete cases from work-up status. (Johnson Dep. 90:5-18). Johnson talked to Plaintiff about his findings, and she told him that another employee, whom she refused to name, had told her it was okay to move the incomplete cases. (Pl. Dep. 74:4-75:5; Johnson Dep. 88:12-90:4). Johnson advised Plaintiff, and all the Legal Assistants in his Group, both in a meeting and by email,

_____

[3] HOTS would automatically enter the Legal Assistants' initials and the date when the Legal Assistant indicated that he or she had finished working up the case. (Reams Dep. 38:5-25).

- 4 -

that: "It is important to remember that you should not move a case from WKUP unless you have completely worked up a file. This includes typing the exhibit list and completing the information in the ALJ folder. This procedure has been in place for a very long time and would not have changed without written notice." (Pl. Dep. 66:1-67:23, Ex. 5; Johnson Dep. 91:6-92:2). Plaintiff received this email after talking to Johnson, and she understood that it was the policy not to move cases from work-up status until they were worked up, including having typed exhibit lists. (Pl. Dep. 79:12-15, Ex. 5).

## II.    Actions Challenged in Plaintiff's First Complaint and Relevant Facts.[4]

### A.    Plaintiff's Request to work at home in April 2004 (First Comp. ¶¶ 22, 33).

In March 2004, Plaintiff, as part of a rotating Legal Assistant assignment, handled receptionist duties at the front-desk. (Pl. Dep. 122:1-125:1). During an audit that month, Johnson discovered that Plaintiff had indicated in HOTS that she had worked up some cases but he found the cases on her desk missing the required exhibit lists.[5] (Johnson Dep. 55:16-56:14; Johnson Dec. ¶ 5). Johnson suspected that Plaintiff was again trying to boost her productivity by falsely claiming credit for incomplete work and began to consider taking disciplinary action against her. (Johnson Dec. ¶ 5). Johnson left notes for Plaintiff with questions about the cases, but he was not able to meet with her to discuss them before she took leave in late March and early April. (Johnson Dep. 60:14-25; Johnson Dec. ¶ 6).

On April 12, 2004, Plaintiff approached Johnson and told him that she wanted to work two days at home that week. (Pl. Dep. 123:2-19; Johnson Dep. 33:19-25). The Hearing Office was following

---

[4]The scope of a lawsuit is governed by the acts challenged in the complaint. See Brown v. Snow, 440 F.3d 1259, 1266 (11th Cir. 2006). The acts challenged in Plaintiff's First Complaint, and the relevant undisputed facts related to each, are discussed in this Section.

[5]Johnson also could not find exhibit lists for the cases anywhere in the office's word-processing system. (Johnson Dep. 58:19-50:2. 95:21-96:20; Johnson Dec. ¶ 5).

an ADS Agreement with the Union which allowed enrolled Legal Assistants to work at home one day

a week on a Monday, Tuesday, or Wednesday, though Plaintiff had not used this Program in a long

time. (Pl. Dep. 89:11-92:20, 94:1-14, 123:6-9, Exs. 7, 8; Johnson Dep.33:4-17). Reams had also

adopted a policy of giving an extra ADS day to Legal Assistants in the month following a month of

front-desk duties. (Pl. Dep. 94:19-25; Reams Dec. ¶ 2). Johnson initially denied the request as he had

forgotten about the extra ADS day awarded for front desk duty. (Johnson Dep. 33:4-34:19). A short

time later, Reams talked to Plaintiff and told her that her request to work at home two days was

approved and that Johnson had forgotten that she was eligible for two ADS days as a result of having

worked the front desk in March. (Pl. Dep. 124:20-125:5; Johnson Dep. 33:19-35:5; Reams Dec. ¶ 3).

Plaintiff then asked Reams to work at home on Wednesday and Thursday, instead of Tuesday

and Wednesday. (Pl. Dep. 125:10-16). Thursday was a core day under the ADS Agreement with the

Union, and no Legal Assistant had ever worked at home on a Thursday. (Pl. Dep. 125:24-127:16, Ex.

7; Reams Dec. ¶¶ 2-3). Reams told Plaintiff that everybody had to be in the office on Thursdays, but

she asserted that the ADS Agreement allowed an employee to work at home on core days under

"special circumstances." (Pl. Dep. 125:10-17, 127:14-16, 135:10-18; Reams Dec. ¶ 3). Reams, after

reviewing the ADS Agreement, sent Plaintiff an email approving her request and she proceeded to

work at home that Wednesday and Thursday. (Pl. Dep. 125:17-18, 127:17-129:20, Exs. 10, 11; Reams

Dec. ¶ 3). Plaintiff admits that she suffered no harm in relation to having to talk to Reams before she

was able to work at home her requested days in April 2004. (Pl. Dep. 139:20-140:3).

**B.      April 30, 2004 Oral Warning for Insubordination (First Comp. ¶¶ 26, 31, 33).**

On Monday, April 19, 2004, Plaintiff went to Lamar, who was in charge of assigning new cases

to Legal Assistants for the month, and asked for some additional cases to bring with her to work at

- 6 -

home.[6]  (Pl. Dep. 140:15-141:9).  Johnson, who was in Lamar's office, reminded her that she was

supposed to get work on Fridays, and Plaintiff said "okay, no problem" and returned to her desk where

she began typing a note regarding "what had just taken place." (Pl. Dep. 141:1-9, 144:6-11).  Plaintiff

then went to Linda Hall, a union representative, and asked Hall to call Lamar and ask Lamar if Plaintiff

had just come by her office asking for work. (Pl. Dep. 144:20-145:4).  Lamar, who could hear Plaintiff

in the background telling Hall what questions to ask, told Hall to tell Plaintiff to come by her office so

they could straighten things out.  (Pl. Dep. 146:10-14; Lamar Dec. ¶ 2).

    Plaintiff subsequently came to Lamar's office with Hall as a union representative.[7]  (Pl. Dep.

147:17-25).  Johnson told Plaintiff that she was supposed to ask for cases on Fridays, but that he would

give her more cases if she needed them. (Pl. Dep. 185:23-186:6).  He also asked Plaintiff if she needed

more work.  (Pl. Dep. 150:1-5; Johnson Dec.¶ 7).  Plaintiff, however, refused to speak and did not

answer Johnson's questions.  (Pl. Dep. 147:23-25; Johnson Dec. ¶ 7; Lamar Dec.¶ 3).  Eventually,

Plaintiff claims she conferred in private with Hall and Plaintiff believes Hall told Johnson and Lamar

"to have a nice day" and that Plaintiff did not want more cases. (Pl. Dep. 151:21-152:9, 184:2-185:9).

    The next day, Plaintiff secretly hid a taper recorder on her person and entered Reams' office

with Hall, where she complained to Reams that Johnson had stood up and yelled at her the previous

_____

    [6]In January 2004, the Hearing Office issued a written policy that new cases would be assigned
to Legal Assistants on Fridays, in groups of ten, by a Group Supervisor. (Pl. Dep. 79:23-81:25, Ex.
6; Reams Dep. 53:19-55:10).  The policy was designed to ensure fairness in the distribution of new
cases. (Reams Dep. 54:9-20; Johnson Dep. 70:20-711:2).  In unusual circumstances, such as when
a Legal Assistant was out of work or would be out of town on Friday, they could request work on
another day. (Johnson Dep. 70:7-72:22).  Plaintiff never ran out of work and admits she always had
cases to work-up.  (Pl. Dep. 81:19-25).  Despite the written policy, Plaintiff claims that Lamar told
her it was okay to request cases on days other than Fridays.  (Pl. Dep. 142:9-144:5).

    [7]Plaintiff had no right to union representation at this work meeting. (Johnson Dec. ¶ 7).

day.[8] (Pl. Dep. 187:3-190:21, 191:2-192:6; Reams Dep. 61:13-18). This was the first time Plaintiff

complained about Johnson, and she did not give Reams any reason why Johnson might have yelled or

stood up. (Pl. Dep. 192:3-9; Reams Dec. ¶ 4). Reams asked Plaintiff if she wanted to change

supervisors, but Plaintiff told him she did not want to work for anyone else because the other

supervisors were "liars." (Pl. Dep. 192:10-194:6). She also told Reams that "to be honest, I am

perfectly happy, I think I have always told you that."[9] (Pl. Dep. 38:22-25). At the end of the meeting,

Reams told Plaintiff he would investigate the complaint. (Pl. Dep. 195:12-15; Reams Dec. ¶ 4).

The next day, Reams talked to those employees who may have witnessed the alleged standing

or yelling by Johnson and gathered statements. (Reams Dec. ¶ 5). Lamar, Hall, and Johnson told

Reams that Johnson had not stood up or yelled. (Reams Dec. ¶ 5, Ex. B; Johnson Dec. ¶ 8; Lamar Dec.

¶ 8). Furthermore, other employees who were nearby told Reams they had not heard Johnson yelling.

(Reams Dec. ¶ 5, Ex. B). Lamar, Johnson, and Hall also advised Reams that Plaintiff had refused to

answer direct questions from Johnson about her work during the meeting. (Reams Dec. ¶ 6). Reams

evaluated the evidence and concluded that Plaintiff's allegation that Johnson had stood up and yelled

at her was false and that Plaintiff had been insubordinate during the meeting by refusing to answer

work-related questions.[10] (Reams Dep. 61:19-25; Reams Dec. ¶¶ 5-6, Ex. B).

---

[8]While Plaintiff claims that she began recording conversations to protect herself and management, she asserts that this protection was best served if only she knew about the secret recording. (Pl. Dep. 188:20-190:2). Moreover, even though she secretly tape recorded numerous meetings and conversations during her employment, she objected to the union tape recording meetings and filed a complaint about it the one time it occurred. (Id. at 196:19-25, 315:3-18).

[9]Previously, Plaintiff admitted to BJ Thomas, an office auditor, in November 2003, that she "loved" working for Johnson. (Pl. Dep. 195:4-11; Reams Dec. ¶ 4).

[10]Besides the fact that no one supported Plaintiff's story, Reams found Plaintiff's accusations inconsistent with her desire to remain working for Johnson. (Reams Dec. ¶ 5). Moreover, Lynda

On April 30, 2004, Reams held a follow-up meeting with Plaintiff to give her the results of his investigation. (Reams Dec. ¶ 7; Pl. Dep. 197:3-7). He had Lamar attend the meeting as a witness, and Carl Warren, the Union Vice President, was present as a union representative by speaker phone. (Pl. Dep. 196:6-14). Reams advised Plaintiff that he had talked to witnesses and that no one had heard Johnson yell or seen him stand up. (Reams Dec. ¶ 7; Pl. Dep. 197:3-7). He also told her that his investigation had revealed that Plaintiff had been insubordinate during the meeting at issue by refusing to answer her supervisor's work-related questions. (Reams Dec. ¶ 7; Pl. Dep. 197:8-13 ).

After Warren was off the telephone, Reams, who was concerned that Plaintiff had a different view of events than everyone else, suggested that she contact the Employee Assistance Program ("EAP") and gave her a brochure. (Reams Dep. 62:5-12, 65:2-25; Reams Dec. ¶ 8; Pl. Dep. 199:21-201:13). Although Reams told Plaintiff that EAP was a private matter and discipline was not at issue, Plaintiff asked for union representation. (Pl. Dep. 201:1-22, 204:16-19; Reams Dep. 62:17-24; Reams Dec. ¶¶ 8-9). Plaintiff left to use the restroom, but she did not make any effort to find a union representative or call Warren. (Pl. Dep. 204:24-205:4). Instead, she returned with a statement that she asked Reams and Lamar to sign stating they had denied her union representation. (Pl. Dep. 205:15-207:21, Ex. 16). Reams called Warren back, in what Plaintiff claims was slow-motion, but he did not answer. (Pl. Dep. 206:13-25, 209:1-210:4; Reams Dep. 62:13-63:21). Plaintiff later asserted that she was "mentally terrorized and abused" during this meeting and that it was like being "abducted and raped ... by known and respected management." (Pl. Dep. Ex. 41; Reams Dep. 85:20-86:7).

---

Tamplin, a union representative, also told Reams that Carl Warren, Union Vice President, mentioned that an employee's failure to answer work questions was insubordination. (Reams Dec. ¶ 6).

**C.    May 27, 2004, Written Reprimand (First Comp. ¶¶ 27, 31, 33).**

Reams subsequently reassigned Plaintiff to Lamar's Group. (Pl. Dep. 211:2-18, Ex. 17; Reams Dec. ¶ 11). Johnson, who had been preparing to discipline Plaintiff for falsely claiming credit for incomplete work before she accused him of yelling at her, submitted a report to Reams regarding his findings. (Johnson Dep. 96:16-97:12; Johnson Dec. ¶¶ 9-10; Reams Dec. ¶ 11, Ex. C). The report detailed how Johnson, after counseling Plaintiff about the issue in October 2003, had discovered cases in March and April 2004 where Plaintiff had indicated in HOTS that the case was worked-up but he had later seen the cases on her desk missing exhibit lists. (Reams Dec. ¶ 11, Ex. C). Johnson attached to his report HOTS case histories and WORD screen shots showing the "date of creation" of the exhibit lists as corroboration that Plaintiff had created the exhibit lists after she had indicated the cases had been worked-up in HOTS.[11] (Johnson Dec. ¶ 10; Reams Dec. ¶ 11, Ex. C; Johnson Dep. 98:4-100:16).

Reams read the report and talked to Johnson about the cases Plaintiff had indicated were worked-up in HOTS that Johnson had seen on her desk without exhibit lists. (Reams Dec. ¶ 12). He also talked to Davenport and Tamplin, two other employees who told him they had seen cases on Plaintiff's desk that Plaintiff had indicated in HOTS had been worked up but were missing exhibit lists. (Reams Dec. ¶ 12; Tamplin Dec. ¶ 2). In addition to hearing from witnesses, Reams reviewed computer records. (Reams Dec. ¶ 13). The HOTS case histories revealed when Plaintiff had moved cases from work-up, and the WORD screen shots had a "date of creation" suggesting that Plaintiff had created the exhibit lists at a later time.[12] (Reams Dec. ¶ 13). After review, Reams concluded that

---

[11]Johnson found a case in May that Plaintiff had claimed in HOTS was finished but was missing its exhibit list and also brought the case to Reams' attention. (Reams Dec. ¶ 14, Ex. D).

[12]Every employee has a HOTS pin-number and password, and when she changes a case status in HOTS the program automatically enters her initials and the date. (Reams Dep. 36:14-38:25).

- 10 -

Plaintiff had falsely claimed work was completed when it was not, and he decided a written reprimand

was appropriate since Johnson had already addressed the issue in October with her. (Reams Dec. ¶ 15).

Reams issued Plaintiff the written reprimand on May 27, 2004. (Pl. Dep. 233:2-23, Ex. 18).

Plaintiff was given time to respond to the reprimand, and Reams provided her with 11 relevant HOTS

case histories. (Pl. Dep. 239:3-9, 243:16-21, Ex. 20). Plaintiff subsequently questioned some of the

computer records, namely whether the "date of creation" for the exhibit lists in WORD was accurate

since WORD also had a "creation date" for the exhibit lists which was sometimes different. (Pl. 250:6-

251:18, Ex. 23). On June 21, 2004, Plaintiff, Reams, and Tamplin reviewed a number of documents

and discussed the difference between the "date of creation" and "creation date" in WORD. (Pl. Dep.

251:19-259:12, 261:22-263:25, 265:15-266:9, 270:1-24, Exs. 23, 24, 25; Tamplin Dec. ¶ 3, Ex. A).

Reams concluded that the "date of creation" in WORD appeared to be unreliable and that he could not

use it to show the date an exhibit list had first been created in WORD.[13]  (Pl. Dep. 270:2-23, Ex. 24;

Reams Dep. 89:11-90:8; Reams Dec. ¶ 16).  Nevertheless, after talking again to the employees who

had seen the incomplete files on Plaintiff's desk and reviewing the computer records, Reams concluded

that there was ample evidence to support his written reprimand other than the "date of creation" in

WORD and wrote Plaintiff an email to that effect.[14] (Pl. Dep. 277:6-279:20, Ex. 27; Reams Dec. ¶ 17).

--------

[13]Plaintiff never presented evidence that other Legal Assistants had moved cases from work-up in HOTS without having completed the exhibit lists. (Pl. Dep. 269:23-270:11, 276:17-21, 297:2-298:14; Reams Dep. 26:2-29:9; Reams Dec. ¶ 18; Johnson Dec. ¶ 12). This was the first time Reams personally disciplined a Legal Assistant for engaging in such conduct. (Reams Dec. ¶ 19).  He is aware, however, that Lamar issued written reprimands to Debbie Rambo, a Lead Legal Assistant, and Michael Chamlee, an attorney, for claiming credit for incomplete work. (Reams Dec. ¶ 19).  He is also aware that Davenport, a Group Supervisor, once counseled Karen Burton, a Legal Assistant, for changing the status of incomplete cases and she never did it again. (Reams Dec. ¶ 19).

[14]Reams concluded that even though he could not rely on the WORD "date of creation" to show the exact date an exhibit list had first been created, other information on the WORD screen

- 11 -

He explained that he was relying upon the fact that there had been files that she listed as worked-up in HOTS that had been missing from the RTS cabinets, that the files were later found on her desk with no exhibit lists, and that computer records showed she had worked on the files after she had indicated in HOTS that she was done with them. (Pl. Dep. 279:2-11, Ex. 27; Reams Dec. ¶ 17, Ex. E). Plaintiff and Reams had no further discussion about the matter.[15] (Pl. Dep. 279:17-20; Reams Dec. ¶ 17).

On June 29, 2004, Plaintiff made informal contact with an EEO counselor about her written reprimand, her request to work at home, and her April 30, 2004, oral warning. (Pl. Dep. 283:1-286:19, Ex. 30). She claimed that these acts were discriminatory and retaliation for EEO complaints she filed in October 1997 and May 2003 challenging hiring decisions.[16] (Pl. Dep. 108:11-109:1, Exs. 29, 30).

## III.    Actions Challenged in Plaintiff's Second Complaint and Relevant Facts.[17]

### A.    Suspension for Giving Supervisor the Middle Finger (Second Comp. ¶¶ 31, 52).

On or about June 13, 2005, Lamar gave Plaintiff a Proposal to Suspend her for five-days. (Pl. Dep. 317:18-319:17, Ex. 32; Lamar Dec. ¶¶ 11-13). The Proposal stated that during a meeting on June 7, 2005, Plaintiff had "forcibly gestured [her] erect middle finger towards [Lamar's] face in a malicious and vindictive manner." (Pl. Dep. 318:9-16, Ex. 32). The Proposal noted that Plaintiff had been

---

shots (such as the "date last saved") showed that Plaintiff had continued to work on exhibit lists after she had indicated cases had been fully worked-up in HOTS. (Reams Dec. ¶ 17).

[15]The reprimand had no effect on Plaintiff's compensation, benefits, job, or performance reviews and was removed from her file after a year. (Pl. Dep. 230:23-231:5; Reams Dec. ¶ 17).

[16]Plaintiff signed the informal counseling report indicating that it correctly listed the issues she wanted addressed on July 30, 2004, and filed a formal complaint regarding the same issues on September 3, 2004. (Pl. Dep. 283:1-18, 287:3-8, Exs. 29, 30).

[17]A lawsuit's scope is governed by the complaint. See Brown, 440 F.3d at 1266. The acts in Plaintiff's Second Complaint and the relevant undisputed facts are discussed in this Section.

advised of the need to be more respectful to her supervisor in a meeting in April 2005, and that Lamar

was proposing that Plaintiff be suspended for "willful and indecent conduct on the job inconsistent with

the standards of ethical conduct for government employees." (Pl. Dep., Ex. 32; Lamar Dec. ¶ 12).

Plaintiff, who claims she does not know what it means to give somebody the middle finger and did not

think the Proposal adequately described the gesture, asked Lamar to show her what it meant to gesture

with an erect middle finger but Lamar refused to do so. (Pl. Dep. 320:1-321:21; Lamar Dec. ¶ 13).

Plaintiff understood that she had ten days to provide a response to Reams, the deciding official

who would make a final decision regarding disciplinary action. (Pl. Dep. 321:22-322:2, Ex. 32). She

prepared a Response and submitted it to Reams on or about June 16, 2005. (Pl. Dep. 322:7-323:8, Ex.

33). Plaintiff stated in her Response that "I deny the allegation and strongly demand that substantial

evidence be provided" and gave her account of the meeting. (Pl. Dep. 323:23-324:14). Plaintiff wrote

that she entered Lamar's office on June 7, 2005, to discuss a case and shut the door. (Pl. Dep. 324:21-

325:12, Ex. 33). Plaintiff claims that Lamar then opened the door, prompting Plaintiff to ask her if

Lamar was afraid of her. (Pl. Dep. 325:13-326:2, Ex. 33). Plaintiff claims that Lamar then stated

"afraid, afraid."[18] (Pl. Dep. 326:1-2). After Lamar opened the door, they talked about the case. (Pl.

Dep. 326:19-327:16, Ex. 33). Lamar than asked Plaintiff to leave the case file with her because she

needed to review it. (Pl. Dep. 327:17-20, Ex. 33; Lamar Dec.¶ 11). Plaintiff asked to make a copy of

the file, and Lamar advised Plaintiff that making a copy was a waste of time and resources. (Pl. Dep.

328:10-12; Lamar Dec. ¶ 11). Plaintiff wrote that at that point she saw Lamar push herself away from

---

[18]Plaintiff now claims that Plaintiff was the one who was in fact afraid of Lamar, even though
Plaintiff always shut the door behind her when talking to Lamar. (Pl. Dep. 325:13-326:14). Plaintiff
asserts that everyday she would prepare her children how they were to handle things if she did not
return alive from work because she lived in such fear of Lamar. (Pl. Dep. 326:3-14).

- 13 -

her desk and believed that Lamar was getting angry or frustrated with her. (Pl. Dep. 328:4-25, Ex. 33).

Plaintiff also wrote that she was afraid of Lamar because Lamar had grabbed her arm on November 5,

2004, during an audit. (Pl. Dep. 338:10-18, Ex. 33). Plaintiff claimed that she then took the case at

issue and quickly left the office. (Pl. Dep. 328:1-329:2, Ex. 33). Plaintiff suggested that Lamar, in her

anger, mistakenly saw Plaintiff giving her an erect middle finger. (Pl. Dep. 329:4-331:7, Ex. 33).

Reams, as the deciding official, had to make a determination regarding what, if any, discipline

to administer. (Reams Dec. ¶ 26). He reviewed the Proposal and Plaintiff's Response, and concluded

that he believed that Plaintiff had, in fact, given Lamar the middle finger. (Reams Dec. ¶ 27). In

making this decision, he took into account Lamar's flustered demeanor when she had

uncharacteristically barged into his office to first report the matter on June 7, 2005. (Reams Dec. ¶ 27).

He did not find Plaintiff's assertions credible, including her claim that she was afraid of Lamar because

Lamar had grabbed her arm on November 5, 2004, as Plaintiff had never previously mentioned this

alleged incident.[19] (Pl. Dep. 336:3-6; Reams Dec. ¶ 27). Reams was not aware of any other employee

ever being accused of giving a supervisor the middle finger. (Reams Dec. ¶¶ 27-28; Pl. Dep. 346:19-

22). After consultation with the Regional Office, he concluded that a three-day suspension was

sufficient to impart the seriousness of the offense.[20] (Reams Dec. ¶ 28).

---

[19]In fact, just a few days after November 5, 2004, Plaintiff wrote Reams an email on November 8, 2004, where she had claimed she worked in a hostile environment and that the "most recent" act had been in June 2004, when a co-worker had taken her picture, without making any mention of Lamar grabbing her arm. (Reams Dec. ¶ 27; Pl. Dep. 410:1-23, Ex. 46). Reams also factored into his decision about Plaintiff's credibility that Plaintiff had made an allegation against Johnson in April 2004, that was contrary to what everyone else had experienced. (Reams Dec. ¶ 27).

[20]In making his decision, Reams also considered that Lamar had counseled Plaintiff on the need to be more respectful in April 2005. (Reams Dec. ¶ 27; Pl. Dep. 314:8-24, 315:19-317:17).

- 14 -

Reams met with Plaintiff and gave her his final decision suspending her for three days.  (Pl. Dep. 339:2-340:14, Ex. 34).  Plaintiff asked Reams to show her what it was she was being accused of because she did not know what it meant to give a person the middle finger, and Reams told her he would not repeat the derogatory gesture.  (Pl. Dep. 341:10-22).  Plaintiff then raised her middle finger to Reams and asked him if her gesture was the one that Lamar was alleging she had made during the meeting.  (Pl. Dep. 341:23-342:19; Reams Dec. ¶ 28; Tamplin Dec. ¶ 6).  Afterward the meeting, Plaintiff understood that Reams had found Lamar's allegation to be more credible than Plaintiff's account, and she served her three-day suspension from July 25-27, 2005.  (Pl. Dep. 342:20-343:18).

**B.**     **Plaintiff's Request for 4 1/4 Leave on June 27, 2005.  (Second Comp. ¶¶ 34, 52).**

On or about June 27, 2005, Plaintiff submitted a leave request to Lamar seeking 4 1/4 hours of leave since she had been absent from work from 9:30 AM to 10 AM and 12:20 to 4:05 PM.  (Pl. Dep. 348:2-19, 351:4-24,  Exs. 35-36).  One of Lamar's supervisory duties was to monitor employee time and leave requests to ensure they were accurate.  (Lamar Dec. ¶ 16).  When Lamar received Plaintiff's request, she inquired whether Plaintiff had arrived after 10 AM so that her total leave should be 4½ hours instead of 4 1/4 hours, and Plaintiff responded that she had arrived before 10 AM and that 4/1/4 hours was accurate.  (Pl. Dep. 352:14-354:7, Ex. 37; Lamar Dec. ¶ 16).  Lamar then granted Plaintiff's request for 4 1/4 hours leave.  (Pl. Dep. 353:22-354:17, Ex. 36; Lamar Dec. ¶ 16).  Plaintiff was not charged an extra 1/4 hour leave and had no loss of unrequested leave.[21]  (Pl. Dep. 356:7-19, 360:6-8).

Plaintiff's fourth EEO complaint was commenced on June 29, 2005, when she made informal contact with an EEO counselor regarding the alleged charging of an additional 1/4 hour of leave and

---

[21]Plaintiff now claims that Lamar accused her of cheating so she could fire her, but she admits that a supervisor can request that employees accurately complete time sheets and that she has no evidence that Lamar did not question other employees' arrival times.  (Pl. Dep. 358:19-359:9).

the possible suspension for making an obscene gesture. (Pl. Dep. 361:20-362:4, Ex. 38). Plaintiff filed her formal complaint on August 9, 2005, explicitly incorporating the EEO counselor's description of the issues presented. (Pl. Dep. 360:10-363:10, Ex. 38). On September 21, 2005, the Agency's EEO Office notified Plaintiff that it had accepted her two alleged instances of retaliation (the alleged charging of 1/4 hour leave and the 3-day suspension) for investigation. (Pl. Dep. 363:11-17, Ex. 39).

**C.     Miscellaneous Allegations Absent From EEO Complaints.**[22]

**1.     October 14, 2003 voting leave (Second Comp. ¶ 12).**

On October 14, 2003, Plaintiff took an hour leave to vote in local Montgomery elections. (Pl. Dep. 366:4-16, Ex. 40). Johnson advised her that Reams had not authorized administrative leave for anyone to vote in the city elections and converted Plaintiff's administrative leave to annual leave. (Pl. Dep. 366:4-367:11, Ex. 40). Reams adopted this policy because all the employees who were voting in the local election lived within Montgomery and he believed that they had sufficient time to vote at the local polls before or after work. (Reams Dep. 88:12-89:5). No employee was granted administrative leave to vote in the local elections in 2003.[23] (Reams Dep. 88:12-89:5).

**2.     July 21, 2004, time sheets found with Plaintiff's documents (Second Comp. ¶ 13).**

On or about July 21, 2004, Plaintiff found the time sheets of two co-workers (Theresia Weeks and Beverly Warner) among her documents at her house. (Pl. Dep. 371:5-22). Plaintiff has no idea how the time sheets ended up with her documents, who put them there, or why anyone would put them

---

[22]Plaintiff's Second Complaint includes various allegations that were not mentioned in her EEO charge. Defendant addresses them in this section, along with the relevant undisputed facts.

[23]Plaintiff and Tamplin were the only two employees who sought administrative leave to vote that day, and neither employee was granted it. (Reams Dec. ¶ 32, Ex. H). Tamplin, who never filed any EEO charges, was treated the same as Plaintiff. (Reams Dec. ¶ 32, Ex. H; Tamplin Dec. ¶ 7).

there. (Pl. Dep. 371:15-22, 373:23-374:3). Plaintiff, however, told Johnson that she had found the time sheets among her documents and that someone might be trying to frame her.[24] (Pl. Dep. 374:4-7, 376:8-377:11). Plaintiff was not disciplined for having the time sheets among her documents at home, and she never found time sheets among her documents again. (Pl. Dep. 375:25-377:11).

>   **3.    November 2004 emails regarding harassment, Plaintiff's contention that management ignored her complaint, and Plaintiff's new allegation regarding Lamar allegedly grabbing arm (Second Comp. ¶¶ 16, 19).**

In November 2004, Reams investigated a complaint that an employee had brought a gun into the parking lot and threatened another employee. (Reams Dep. 78:4-79:18; Reams Dec. ¶ 20). He sent Plaintiff an email seeking any information she might have about the incident. (Reams Dec. ¶ 20; Pl. Dep. 386:15-391:18, Ex. 46). In a November 8, 2004, email, Plaintiff refused to cooperate in his investigation. (Pl. Dep. 389:22-391:18, Ex. 46). She did, however, assert in her email that a "hostile environment" existed in the office; that the "most recent incident" had occurred around June 2004, when a co-worker (Warner) had taken her picture; and that management had ignored her complaint. (Pl. Dep. 409:19-411:25, Ex. 46). Plaintiff did not mention in her November 8, 2004 email that Lamar had grabbed her arm just three days earlier on November 5, 2004, a charge Plaintiff chose not to make until Lamar proposed she be suspended in June 2005.[25] (Pl. Dep. 336:3-6; 409:1-18, Ex. 46).

---

[24]Plaintiff claims Johnson told her that Warner had accused her of taking the time sheets and that she said nothing to him in response to this allegation. (Pl. Dep. 375:5-24).

[25]Plaintiff now claims that on November 5, 2004, she and Lamar were doing an inventory in Plaintiff's cubicle, Lamar was throwing files on the floor, Plaintiff told Lamar that she had years of logistical experience and better ways of doing the inventory, and Plaintiff began putting the files on a cart. (Pl. Dep. 331:8-335:17). She claims that she and Lamar were talking about something, and Lamar said "Bernethia, look here" and grabbed her left arm for a few seconds, immediately releasing it when Plaintiff told her to "turn me loose" but leaving marks. (Pl. Dep. 332:2-3, 335:11-336:2). In June 2005, Plaintiff was not sure if she had gone to a doctor about her arm, but by the time of her deposition in 2008 she was sure she had been to multiple doctors about it. (Pl. Dep. 336:7-338:6).

Regarding the "most recent incident" of alleged "hostile environment" Plaintiff referenced in her November 8, 2004, email, Plaintiff claims she was driving to lunch in approximately June 2004 and she saw Warner in front of the building taking her picture. (Pl. Dep. 411:8-25). Plaintiff, who only talked to Warner about work, had no idea why Warner would take her picture and never asked her. (Pl. Dep. 412:1-413:2). Instead, Plaintiff complained to Johnson and Jimmy Brown, a manager who was temporarily filling in for Reams, that Warner took her picture and that she did not like her doing so.[26] (Pl. Dep. 413:3-25; Johnson Dec. ¶14). Plaintiff did not ask Johnson or Brown to do anything, and she has no idea whether they talked to Warner (Pl. Dep. 416:1-11). After Plaintiff made this complaint, both Johnson and Reams separately met with Warner, asked her about the incident, instructed her not to take Plaintiff's picture, and told her to leave Plaintiff alone. (Johnson Dep. 80:6-82:9; Reams Dep. 77:18-78:3). Warner never took pictures of Plaintiff again or caused her harm. (Pl. Dep. 416:15-21).

### 4. Hardship transfer requests denied by the Regional Office on October 7, 2004; December 3, 2004; and February 25, 2005 (Second Comp. ¶¶ 15, 35, 44).

During her employment, Plaintiff submitted four hardship transfer requests to Gloria Bozeman, the Social Security Regional Management Official. (Pl. Dep. Exs. 41, 43, 48, 52; Bozeman Dec. ¶¶ 1-5). Plaintiff did not know the criteria relied upon by Bozeman to determine whether to grant such requests, but believes other employees were granted them to be closer to spouses or shorten commutes. (Pl. Dep. 378:10-380:14). In fact, Bozeman based hardship transfer decisions on analysis of the reason for the request as well as the staffing and budget situations of the offices.[27] (Bozeman Dec. ¶ 1).

---

[26]Plaintiff also claims that she told Johnson and Brown another employee told her that Warner had been in Plaintiff's work area and had said she was going to do something to her. (Pl. Dep. 414:1-415:25, Ex. 46). Johnson recalls Plaintiff stating Warner might hire a hit man, but found nothing to substantiate this statement. (Johnson Dep. 76:6-82:4; Johnson Dec. ¶ 14, Ex. C).

[27]Reams, as an HOD, did not make hardship transfer decisions. (Reams Dep. 46:15-18).

- 18 -

Plaintiff first asked on August 9, 2004, to be transferred to Atlanta, and then changed her requested destination to Birmingham. (Pl. Dep. 377:15-378:16, Ex. 41; Bozeman Dec. ¶ 2). Plaintiff based this request on what she alleged was a hostile environment in Montgomery.[28] (Pl. Dep., Ex. 41). Bozeman asked Reams to respond to Plaintiff's allegations and she checked the staffing and budget situations at both offices. (Bozeman Dec. ¶ 2; Reams Dep. 44:20-45:22). Upon review, Bozeman denied Plaintiff's request because she determined that Montgomery had a greater need for Legal Assistants than Birmingham, and she found no basis to support Plaintiff's allegations that there was a hostile environment in Montgomery. (Pl. Dep. 382:1-383:14, Ex. 42; Bozeman Dec. ¶ 2).

Plaintiff submitted her second hardship transfer request on October 8, 2004, asking to be transferred to Atlanta. (Pl. Dep. 383:15-18, Ex. 43). In a November 2004 email to Bozeman, Plaintiff claimed that there had been another incident that made the Montgomery office hostile, in that an employee had brought a gun onto the property and threatened to shoot a coworker.[29] (Pl. Dep. 386:5-18, Ex. 43). Bozeman asked Reams for a report and employee statements on this incident, and Reams sent the information to her. (Reams Dep. 78:4-79:18; Reams Dec. ¶ 20, Ex. F). On December 3, 2004, Bozeman notified Plaintiff that she had investigated and concluded there was no threat to employees in Montgomery and thus denied the transfer request. (Pl. Dep. 392:2-9, Ex. 47; Bozeman Dec. ¶ 3).

Plaintiff submitted her next hardship transfer request to Bozeman on February 17, 2005, seeking to transfer to the Atlanta North office to be closer to her mother. (Pl. Dep. 393:10-24, Ex. 48;

---

[28]Among other things, Plaintiff claimed that her meeting with Reams and Lamar on April 30, 2004, where they had talked to her about EAP, had been akin to being raped. (Pl. Dep., Ex. 41).

[29]Plaintiff was referring to the fact that she had heard from Tresalyn Collier, a co-worker, that another co-worker, Valerie Cooper, had made a comment about a gun, but Plaintiff had not personally heard Cooper make any threats. (Pl. Dep. 386:20-389:18).

Bozeman Dec. ¶ 4). Bozeman reviewed the Atlanta North office's staffing and determined that it had a critical shortage of case technicians and not senior case technicians like Plaintiff. (Bozeman Dec. ¶ 4; Pl. Dep. 395:4-14, Ex. 49). Bozeman denied the request but advised Plaintiff that she could re-submit a request when the new fiscal year's staffing allocations came out. (Bozeman Dec. ¶ 4).

Plaintiff submitted her final hardship transfer request on June 29, 2005, asking for a transfer to Chattanooga for personal reasons. (Pl. Dep. 396:5-10, Ex. 50). Reams, after Tamplin told him Plaintiff's mother was ill, wrote a letter to Bozeman indicating he had no opposition to the request. (Pl. Dep. 396:22-397:3, Ex. 51; Reams Dec. ¶ 29). Plaintiff supplemented her request in August 2005 with details about her mother's health. (Pl. Dep.397:9-17, Ex. 52; Bozeman Dec. ¶ 5). On September 19, 2005, Bozeman granted Plaintiff's request for a hardship transfer to Chattanooga and Plaintiff transferred there on October 3, 2005. (Pl. Dep. 397:18-398:10, Ex. 53; Bozeman Dec. ¶ 5).

### 5.  January 27, 2005, request to not park in handicap spot (Second Comp. ¶ 20).

Reams knew that two Hearing Office employees had handicap parking permits and that they regularly used two handicap spaces on one side of the employee parking lot.[30] (Reams Dep.82:6-24; Reams Dec.¶¶ 21-22 ). The two employees were Lamar, who had a knee injury, and Weeks/Frazer. (Reams Dep. 82:6-24; Reams Dec.¶¶ 21-22; Tamplin Dec. ¶ 4) Plaintiff is not handicapped and does not have a handicap parking permit. (Pl. Dep. 417:21-23). On January 27, 2005, though she had never parked in a handicap spot before, Plaintiff decided to park in one of the handicapped spots usually used by her supervisor Lamar. (Pl. Dep. 417:10-418:6, 433:14-19; Reams Dep. 81:10-82:5). Reams, who expected Lamar at work that day, saw Plaintiff parked in the handicap spot and asked her to move her

---

[30]Since Reams was aware of only two employees with handicap parking rights, Reams would allow employees to use another block of three handicap spaces on the other end of the building on a first-come, first-serve basis. (Reams Dec. ¶ 21; Reams Dep. 85:8-15; Tamplin Dec. ¶ 4).

car.[31] (Reams Dep. 81:8-82:5; Pl. Dep. 418:3-419:24). Plaintiff, who claims Reams was angry, moved

her car to another spot in the employee parking lot. (Pl. Dep. 420:2-7, 424:2-14, 429:19-24).

   **6.    February 23, 2005, possible "keying" of car by unknown person and Reams'
           denial of Plaintiff's request Government pay for damage (Second Comp. ¶ 24).**

   On February 23, 2005, Plaintiff parked a car she had just purchased in the employee parking

lot. (Pl. Dep. 438:24-441:10, 442:8-11). During lunch she noticed a scratch on the car which she

attributed to someone keying her car and called the police to file a report. (Pl. Dep. 439:18-441:21, Ex.

55). She has no idea who may have keyed her car. (Pl. Dep. 439:6-7). The police estimated damages

at $150. (Pl. Dep. 411:18-442:3, Ex. 55). Plaintiff advised Reams by email that someone had keyed

her newly-purchased car and asked the Agency to pay to repair it. (Pl. Dep. 443:3-444:17, Ex. 56).

   Reams advised Plaintiff in a reply email that there was no evidence that the car had been

damaged in the employee parking lot. (Reams Dep. 76:5-16; Pl. Dep., Ex. 56). He also noted that he

was not aware of any Government obligation to pay for damage caused by criminal acts in the parking

lot. (Reams Dep. 76:5-16; Pl. Dep. 444:2-24, Ex. 56). Reams, who has never heard of other cars being

damaged in the employee parking lot, has never authorized payment to any employee for any damage

to a car and does not even think he has the authority to do so. (Reams Dec.¶ 23).

   **7.    April 4, 2005, meeting where document was read to Plaintiff (Second Comp. ¶ 25).**

   On April 4, 2005, Plaintiff attended a meeting with Lamar, Tamplin, and Brenda McAnnally,

during which Lamar asked McAnnally, a Lead Legal Assistant, to read from a document to Plaintiff.

(Pl. Dep. 449:4-22; Lamar Dec.¶ 9). Plaintiff claims that by asking McAnnally to read the document,

---

   [31]When Reams noticed employees parked in those two spots on days he knew Lamar or
Weeks were going to be at work, he asked the employees to move their cars. (Reams Dep. 82:25-
85:16). He recalls asking Warner and Judge Anderson to move their cars. (Reams Dep. 83:5-24).

Lamar suggested that Plaintiff was illiterate and that it was "extremely degrading, belittling, and tremendously humiliating." (Pl. Dep. 449:20-450:7, 452:452:20-453:15). Lamar, who knew that Plaintiff could read, asked McAnnally to read and explain the document at issue to assist in training, facilitate discussion, and help ensure Plaintiff understood the materials. (Lamar Dec. ¶ 9).

**8.      June 2005 Reams' request that Plaintiff open office door (Second Comp. ¶ 28).**

On June 3, 2005, Plaintiff entered Reams' office alone and closed the door behind her. (Pl. Dep. 456:8-457:11). Reams asked Plaintiff to open the door. (Pl. Dep. 457:12-14). Plaintiff asked Reams what was wrong, and he told her that Plaintiff might do something to him and that she was not to come into his office and close the door without a witness.[32] (Pl. Dep. 457:12-458:23). Plaintiff was always able to discuss work-related matters with Reams with the office door open or with another person present. (Pl. Dep. 459:17-461:2). Plaintiff, however, was upset that she could no longer enter Reams' office to talk to him alone with the door shut whenever she wanted. (Pl. Dep. 460:3-6).

**9.      July 15, 2005, Plaintiff set off alarm while in bathroom and Reams sent email to office reminding employees of alarm policy (Second Comp. ¶¶ 37-39).**

On July 15, 2005, Plaintiff set off the after-hours alarm at the Social Security building because she was in the restroom when Reams left the building and set the alarm for the evening. (Pl. Dep. 456:14-466:17). Reams, who had a routine of checking the building and employee parking lot before setting the evening alarm, had not known Plaintiff was still in the building because she had parked her

---

[32]Reams did not want to be alone in an office, with the door shut, with Plaintiff because of concerns that Plaintiff might make false accusations against him. (Reams Dep. 85:16-87:4). In Reams' opinion, Plaintiff had made false allegations against Johnson in April 2004; she had characterized a meeting he had with Lamar and him in April 2004 as akin to being raped; and Plaintiff had a general tendency to remember things differently than everyone else. (Reams Dep. 85:16-87:4). In addition, Lamar had recently told Reams that Plaintiff had been disrespectful to her on two recent occasions when Plaintiff had used Lamar's phone without permission and grabbed a file out of her hands, and she did not appear to be above making false claims. (Reams Dep. 86:1-16).

- 22 -

car in front of a business next door and had been in the women's restroom. (Reams Dec. ¶ 30; Pl. Dep. 465:14-466:17). This was the only time Reams had set the alarm only to have an employee still inside the building set it off, leading to a false alarm to Federal Protective Services. (Reams Dec. ¶ 30). The following day, Reams sent an email to everyone in the Hearing Office advising them that the building closed at 6 PM, that hourly employees were to leave the building at that time, and that the alarm had been set off the day before by an unnamed employee. (Pl. Dep. 468:7-14, Ex. 57).

Plaintiff claims that she was humiliated, embarrassed, and degraded by Reams' email because, even though it did not mention her, two co-workers came to her, laughing, and said "it was you, wasn't it." (Pl. Dep. 468:17-469:18). She has no idea how they found out that she set off the alarm. (Pl. Dep. 473:1-3). Plaintiff asked Reams why he sent the email, and he responded that his job was to secure the building at night and he wanted to remind employees when the building closed so Federal Protective Services would only be called when there was an actual emergency. (Pl. Dep., Ex. 57).

**10.     September 2, 2005, co-worker's car almost hit Plaintiff (Second Comp. ¶ 45).**

On September 2, 2005, Plaintiff was walking across the parking lot when Renita Barnett-Jefferson, an attorney, turned off the road and stopped her car near her. (Pl. Dep. 475:12-477:5). Afterwards, Plaintiff was talking to a guard when Barnett-Jefferson told her she was driving stick-shift and that her gas pedal had gotten stuck. (Pl. Dep. 480:2-23). Plaintiff claims that Barnett-Jefferson then stated, "you don't think I tried to hit you, do you," and Plaintiff responded that she did not know what was going on, that they were both mothers, and that Barnett-Jefferson looked "really pretty." (Pl. Dep. 480:1-481:6). Plaintiff never talked to Reams or Lamar about this incident. (Pl. Dep. 481:7-12).

Plaintiff, however, claims that Lamar is the Godmother of Barnett-Jefferson's children, and that

- 23 -

Barnett-Jefferson stopped her car near her as an act of retaliation.[33] (Pl. Dep. 477:6-24). She filed a complaint with Federal Protective Services against Barnett-Jefferson but never heard anything further. (Pl. Dep. 481:21-482:10, Ex. 58). Reams subsequently learned from Federal Protective Services that they had concluded that there was nothing to the incident other than a pedestrian had been walking across the parking lot and a person driving a car had stopped. (Reams Dep. 73:12-75:7). He thus concluded no action on his part was necessary. (Reams Dep. 74:7-75:7; Reams Dec.¶ 31).

### 11.    Plaintiff's allegations raised during deposition but omitted from Complaints.

Finally, Plaintiff listed some additional incidents during her deposition that she claims contributed to her managers' creation of a hostile work environment in Montgomery which can be classified "work-related matters," "conversations with co-workers," and "supervisor actions." (First Comp. ¶¶ 36-39; Second Comp. ¶¶ 56-58; Pl. Dep. 112:6-113:1, 307:16-309:2, 483:21-25, 484:10-546:6). Plaintiff's "work-related" allegations include her contention that at some unknown time between May 2004 and October 2005, she was talking to Lamar in Lamar's office, the telephone rang, she left the office, Barnett-Jefferson came to Lamar's office, and Lamar talked to Barnett-Jefferson before finishing her meeting with Plaintiff, thus causing Plaintiff "humiliation, frustration, embarrassment, and continued anxiety."[34] (Pl. Dep. 484:22-489:7). Plaintiff's "conversations with co-

---

[33]Plaintiff's sole "evidence" that Barnett-Jefferson acted on purpose is her assertion that Barnett-Jefferson just sat in her car and stared at Plaintiff after stopping. (Pl. Dep. 478:11-33, 479:1-4). In fact, Reams and Lamar had nothing to do with this incident. (Barnett-Jefferson Dec. ¶¶ 2-4).

[34]Plaintiff's other "work-related" allegations include her claims that, at unknown times: (1) two of her cases were found in Lamar's office and Plaintiff did not know how one of them got there; (2) Lamar told her she could work in the IVT room but later told her she had to remove her work from the room; (3) Johnson once assigned Plaintiff ten cases that were bigger than cases he assigned a co-worker, though Plaintiff did not talk to him about it and has no idea how the cases were selected for assignment; and (4) Reams issued an award to a Lead Legal Assistant and did not mention that Plaintiff received a similar award in the past; and (5) in 2001 or 2002, Reams reduced the ADS days

worker" allegations include her contention that McWilliams, another Legal Assistant, once told her at an unknown time that she had seen Warner going through some of Plaintiff's files and talked to Johnson and Reams about it.[35] (Pl. Dep. 492:13-498:2). Plaintiff's "supervisor actions" allegations include her claim that in May 2003, Davenport called her and Collier either "bitty winches" or "bidding wenches."[36] (Pl. Dep. 119:11-121:17). Plaintiff had no idea what this meant, prompting her to look up the terms in the dictionary and email Davenport that she did not appreciate the forms of address and wanted to be called by her name.[37] (Pl. Dep. 119:11-121:17, 499:10-501:15, Ex. 59).

---

for Legal Assistants but did not inform everyone that Plaintiff, as union representative, had opposed the action. (Pl. Dep. 489:8-492:2, 503:10-506:25, 508:15-510:16, 510:16-511:16, 517:11-519:9).

[35] Plaintiff also complains that at some unknown time: (1) McWilliams told Plaintiff that she had talked to Lamar and Davenport about one of Plaintiff's cases; (2) an employee told Plaintiff that when Plaintiff picked up new assignments on one occasion she was the only one who had multiple members of management in the room; (3) a co-worker told Plaintiff she had been asked to clean Plaintiff's desk, and Plaintiff could not find a journal afterwards; (4) Collier said that Davenport told her not to socialize with Plaintiff without giving a reason; and (5) Plaintiff heard from other employees that Reams allowed two co-workers to take extended lunches though she has no evidence that Reams knew of anyone not reporting accurate lunch times. (Pl. Dep. 498:3-499:9; 501:16-503:9, 511:22-517:5, 519:11-521:19, 527:1-528:12, 529:6-9, 532:9-11; Reams Dep. 91:11-93:8).

[36]Collier has never filed an EEO complaint. (Reams Dec. ¶ 33). Reams, who knew Davenport often used odd nicknames for employees and had heard her call other employees "biddy wenches" previously, learned about this incident when Davenport told him Plaintiff was upset. (Reams Dec. ¶ 33). He told Davenport not to call Plaintiff nicknames anymore. (Reams Dec. ¶ 33).

[37]Plaintiff also contends that: (1) in 1999 Davenport told employees that Plaintiff had lied to obtain her union position; (2) during 2003 or 2004 Reams failed to promptly fix a broken desk lamp, though Plaintiff was able to perform her work; (3) in 2003 or 2004 Reams once told Plaintiff and McWilliams that someone complained they were talking excessively and they should get back to work; (4) Caffey, a co-worker, was fired for giving Plaintiff documents in mid 2004, though Plaintiff admits she was not involved in management conversations regarding why Coffey was fired and management has explained that Caffey was fired for reasons having nothing to do with Plaintiff; and (5) Reams told her the Chattanooga office did not want her after she requested a hardship transfer but before it was granted, thus somehow causing her to retire from Chattanooga in November 2007, two years after she left Montgomery, though her only interaction with management in Montgomery after she left was a single email to Reams asking him a question and no one in Montgomery

- 25 -

## ARGUMENT AND CITATION OF AUTHORITY

This Court should grant summary judgment to Defendants because Plaintiff's allegations, based on speculation and delusion, are entirely insufficient as a matter of law. The Federal Rules of Civil Procedure dictate that summary judgment be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56; Celotex v. Catrett, 477 U.S. 317, 322 (1986). Once a defendant moving for summary judgment demonstrates a lack of any genuine issues of material fact, the plaintiff must come forward with specific and admissible facts in support of its case. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Macuba v. DeBoer, 193 F.3d 1316, 1322 (11th Cir. 1999). If the admissible record "taken as a whole" could not lead a reasonable juror to find for the plaintiff, then there is no "genuine issue for trial" and summary judgment should be entered. See Matsushita, 475 U.S. at 587. When this standard is applied to the present case, Defendants are entitled to judgment as a matter of law.[38]

## I.    Plaintiff's Failure to Exhaust Her Mandatory Administrative Remedies.

As an initial matter, the Court should dismiss those claims that Plaintiff attempts to present that are barred by her failure to exhaust her mandatory administrative remedies. Before a federal employee can proceed with a Title VII lawsuit, she must satisfy certain administrative procedures. See Grier v. Sec'y of the Army, 799 F.2d 721, 724 (11th Cir. 1986); Bickham v. Miller, 584 F.2d 736, 738 (5th Cir. 1978). These requirements "are not mere technicalities, but are integral parts of Congress' statutory scheme of achieving a careful blend of administrative and judicial enforcement powers." See

---

management talked to anyone in Chattanooga about her. (Pl. Dep. 105:13-22, 109:22-111:13, 507:1-508:9, 534:1-535:10, 535:11-539:7; Reams Dep. 29:17-30:16, 52:20-53:16; Lamar Dec. ¶ 18).

[38]This Court should also dismiss Plaintiff's claims against Defendant SSA because it is not a proper party. See Canino v. United States EEOC, 707 F.2d 468, 469-472 (11th Cir. 1983).

Thompson v. West, 883 F. Supp. 1502, 1507 (M.D. Ala. 1995). These mandatory administrative procedures require, among other things, that the employee informally consult with an agency EEO counselor within 45 days of each allegedly discriminatory or retaliatory discrete act or the last act of a hostile environment. See 29 C.F.R. § 1614.105(a). See also Ledbetter v. Goodyear Tire & Rubber Co., Inc., 127 S.Ct. 2162, 2175 (2007); Ramsey v. Henderson, 286 F.3d 264, 269 (5th Cir. 2002); Howell v. Dep't of the Army, 975 F. Supp. 1293, 1299, 1300 (M.D. Ala. 1997). If an employee files a lawsuit without complying with these requirements, then her claims must generally be dismissed for failure to exhaust. See Crawford v. Babbitt, 186 F.3d 1322, 1326 (11th Cir. 1999); Manning v. Carlin, 786 F.2d 1108, 1108-1109 (11th Cir. 1986). Furthermore, any lawsuit is limited by the issues the employee's agency accepts for investigation and the scope of the investigation that "can reasonably be expected to grow out of the [timely] charge..." See Andrews-Willmann v. Paulson, 2008 U.S. App. LEXIS 14682, at *11-12 (11th Cir. July 8, 2008). As set forth below, Plaintiff has only exhausted disparate treatment claims regarding her May 27, 2004, written reprimand; her June 27, 2005, 1/4 hour leave incident; and her July 2005, suspension. (First Comp. ¶ 27; Second Comp. ¶¶ 31-34).

A.    **Plaintiff's Unexhausted Claims in First Lawsuit.**

Plaintiff did not exhaust the claims in her First Complaint regarding her April 14, 2004, request to work at home, and her April 30, 2004, oral warning, because she did not timely initiate contact with an EEO counselor. (First Comp. ¶¶ 22, 26, 31, 33). Plaintiff first made an informal complaint about these discrete acts on June 29, 2004, more than 45 days after they had occurred. (Pl. Dep. 286:17-19, Ex. 30). Since Plaintiff waited more than 45 days after these acts to assert her claims administratively, she cannot pursue any claims regarding these two discrete acts in federal court. See Manning, 786 F.2d

- 27 -

at 1108; Thompson, 883 F. Supp. at 1507 ("a federal employee's unexcused failure to timely initiate

an administrative discrimination complaint results in dismissal of the suit.").

**B.     Plaintiff's Unexhausted Claims in Second Lawsuit.**

Plaintiff did not exhaust any retaliatory disparate treatment claims in her Second Complaint

other than her claims relating to an alleged charging of an extra 1/4 hour of leave on June 27, 2005, and

a 3-day suspension in mid-July 2005, because she did not file timely EEO complaints for any other

discrete acts and did not reference them in the one complaint she did eventually file. (Second Comp.

¶ 52; Pl. Dep. 360:10-363:10, Ex. 38).  The additional discrete acts in Plaintiff's Second Complaint

allegedly occurred between October 14, 2003, and September 2, 2005.[39]  (Second Comp. ¶¶ 12-14, 20-

25, 37-39, 45-46).  Plaintiff, however, did not consult an EEO counselor to file an informal complaint

until June 29, 2005, when she alleged that she was being subjected to retaliation the form of being

charged an extra 1/4 hour leave and receiving a Proposal to Suspend. (Pl. Dep. 361:20-362:4, Ex. 38).

Plaintiff subsequently adopted the Agency's informal counseling report regarding these two acts (the

proposal to suspend was converted to the suspension) as her formal complaint on August 9, 2005. (Pl.

Dep. 360:10-363:10, Ex. 38).  Plaintiff's failure to institute a timely EEO charge for the other discrete

---

[39]Plaintiff did not file an EEO charge within 45 days of the following acts:  (1) on October 14, 2003, she was denied voting leave for a local election; (2) on July 21, 2004, she found employee time sheets among her documents; (3) on October 7, 2004, December 3, 2004, and February 25, 2005, her hardship transfer requests were denied by the Regional Office; (4) on January 27, 2005, she was not allowed to park in a handicap parking space; (5) on February 23, 2005, an unknown person "keyed" her car and Reams denied her request for the Agency to pay for the damage; (6) on April 4, 2005, Lamar asked a Lead Legal Assistant to read a document to her; and (7) on September 2, 2005, a co-worker's car almost hit her. (Second Comp. ¶¶ 12, 13, 14, 16, 19-25, & 45-46).  Nor for that matter did she file one within 45 days of her retirement from Chattanooga, a discrete act which is not even in Plaintiff's Second Complaint or in this lawsuit. See Brown, 440 F.3d at 1266.

acts in her Second Complaint means that she cannot challenge them in Court. See Ray v. Freeman, 626

F.2d 439, 442 (5th Cir. 1980); Thompson, 883 F. Supp. 2d at 1507.

Furthermore, Plaintiff has no grounds to somehow argue that the EEO complaint she did

eventually file somehow preserved claims regarding every discrete act that occurred before that date.

See Houston v. Army Fleet Servs., L.L.C., 509 F. Supp. 2d 1033, 1045-1046 (M.D. Ala. 2007)

(discussing administrative exhaustion requirements).  The Agency's EEO Office notified Plaintiff on

September 21, 2005, that it was accepting the two issues that she had raised for investigation in her

formal complaint (the charging of 1/4 hour leave and her 3-day suspension) and advised her she must

notify the Agency within ten days if it had incorrectly described the issues. (Pl. Dep. 363:11-17, Ex.

39).  Plaintiff did not advise the Agency that there were additional acts of alleged harassment that

should have also been issues in the EEO investigation and thus abandoned claims regarding other

acts.[40]  See Andrews-Willmann, 2008 U.S. App. LEXIS 14682, at *11-12 (plaintiff failed to exhaust

retaliatory failure-to-promote claim when she did not object to agency's framing of five discrete issues

of alleged retaliatory harassment that did not include such a claim); Robinson v. Chao, 403 F. Supp.

2d 24, 31 (D.D.C. 2005); Clayton v. Rumsfeld, 2003 U.S. Dist. LEXIS 27725, at *9 (W.D. Tx. Aug.

8, 2003) ("Failure to object to the framing of the issue [by the Agency] constitutes an abandonment of

the claim."); Crumpton v. Runyon, 1998 U.S. Dist. LEXIS 3373, at *5 (M.D. Pa. March 19, 1998).

Finally, Plaintiff cannot escape her failure to file timely EEO charges regarding the discrete acts

alleged in her Second Complaint by alleging a broad hostile work environment claim that purports to

---

[40]In addition to the acts listed in the prior footnote, these omitted incidents also include
Plaintiff's allegations that:  (1) on June 5, 2005 Reams refused to meet with her in his office alone
with the door closed; and (2) Plaintiff was embarrassed after she set off the work alarm on July15,
2005, and Reams sent an email about alarm procedures. (Second Comp. ¶¶ 28, 37-39).

cover everything that occurred during her employment. See National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 112 (2002). To the extent such a claim exists, a retaliatory-hostile-environment claim is separate and distinct from a traditional disparate-treatment retaliation claim and it cannot be used to challenge discrete acts. See McCann v. Tillman, 526 F.3d 1370, 1378 (11th Cir. 2008); Bozeman v. Per-Se Tech., Inc., 456 F. Supp. 2d 1282, 1344 n.149 (N.D. Ga. 2006). The Supreme Court has created a distinction for statute-of-limitations purposes between discrete acts which are temporally distinct and hostile environments which do not occur on any particular day but develop over time. See Ledbetter, 127 S.Ct. at 2175; Morgan, 536 U.S. at 113-114; Davis v. Coca-Cola Bottling Co., 516 F.3d 955, 971-972 (11th Cir. 2008). The Court has held that when a plaintiff seeks to challenge a discrete act such as a denial of a transfer she has to file a timely charge for each such act. See Ledbetter, 127 S.Ct. at 2175. Plaintiff's Second Complaint contains discrete and unexhausted acts that occurred on specific days that cannot be part of a hostile environment claim.[41] See McCann, 526 F.3d at 1378. The law is clear that such "discrete ... acts are not actionable if time barred even when they are related to acts alleged in timely filed charges." See Morgan, 536 U.S. at 112. Moreover, to the extent Plaintiff may have meant to raise a separate "hostile work environment" claim administratively as opposed to challenging discrete acts of harassment, the Agency did not accept such a broad claim for investigation and Plaintiff abandoned it by not objecting to the issues investigated. See Andrews-Willmann, 2008 U.S. App. LEXIS 14682, at *11-12; Robinson, 403 F. Supp. 2d at 31.

---

[41]The discrete acts include the denial of a request for leave to vote on October 14, 2003; the denial of requests for hardship transfers on October 7, 2004, December 3, 2004, and February 25, 2005; the inability to park in a handicap parking spot on January 27 2005; and the keying of her car and refusal of the Government pay for it on February 27, 2005. (Second Comp. ¶¶ 12-14, 16, 19-25).

## II.    Plaintiff's Race Discrimination Claims Fail as a Matter of Law.

Assuming arguendo they were all exhausted, this Court should grant summary judgment on Plaintiff's race discrimination claims because they fail as a matter of law.  Pursuant to the burden-shifting scheme applicable to Title VII, a plaintiff alleging race discrimination must first establish a prima facie case. See Turlington v. Atlanta Gas Light Co., 135 F.3d 1428, 1432 (11th Cir. 1998). To make the necessary prima facie showing, a plaintiff must offer evidence that: (1) she is in a protected class; (2) she suffered an adverse employment action; and (3) her employer treated similarly-situated employees outside her protected class more favorably.  See Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997).  Plaintiff bases her discrimination claims on her April 30, 2004, oral warning, and her May 27, 2004, written reprimand.[42]  (First Comp. ¶¶ 22, 26, 27, 31).  She cannot show that these acts were adverse actions or that she was treated differently from similarly-situated White employees.[43]

### A.    Plaintiff Did Not Suffer Any Adverse Employment Actions.

The Court should grant summary judgment on Plaintiff's discrimination claims because she did not suffer any adverse employment actions.  To constitute an adverse action, an employer's conduct must cause a "serious and material change in the terms, conditions, or privileges" of a plaintiff's employment that a reasonable person would view as materially adverse.  See Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1239 (11th Cir. 2001).  To meet this high threshold of substantiality, a challenged action must involve a reduction in compensation or benefits or a material and negative change in job duties.  See id. at 1238-40, 1244; Cantrell v. Jay R. Smith Mfg. Co., 248 F. Supp. 2d

---

[42]While Plaintiff's First Complaint alleged that she was denied the right to work at home in April 2004 due to her race, she abandoned this claim at her deposition.  (Pl. Dep. 135:22-25).

[43]Plaintiff's race claims also fail because, as discussed in Section IV, infra, she cannot show that Defendants' legitimate, non-discriminatory reasons for their actions were pretext.

1126, 1136-1137 (M.D. Ala. 2003).  The loss of self-esteem, humiliation, or "bruised ego" that may

accompany being embarrassed is not sufficient.  See Davis, 245 F.3d at 1242; Williams v. Glover, 2006

U.S. Dist. LEXIS 15536, at *13 (M.D. Ala. March 31, 2006); Malladi v. Brown, 987 F. Supp. 893, 918

(M.D. Ala. 1997).  This standard is designed to prevent lawsuits by "irritable, chip-on-the-shoulder

employee[s]" regarding every minor and trivial act that they experience.  See Davis, 245 F.3d at 1242.

In Davis, for example, the plaintiff alleged that he suffered an adverse employment action in

the form of allegedly unfounded negative memoranda in his personnel file.  See id. at 1240-1241.  The

Eleventh Circuit soundly rejected his argument, holding that a negative memoranda was not actionable

because it caused no tangible consequence such as lost pay or benefits.  See id.  In reaching this

conclusion, the court explained that the protections of Title VII did not extend to "everything that

makes an employee unhappy," and that employer criticism was an "ordinary and appropriate part of

the workplace" even if an employee did not welcome it, thought that it was unjustified, and suffered

loss of self-esteem or prestige due to it.  See id. at 1242-1243.  Following this authority, courts have

routinely held that oral and written reprimands do not constitute adverse employment actions absent

some direct and material impact on an employee's terms and conditions of employment.  See Hooks

v. Bank of America, 183 Fed. Appx. 833, 836 (11th Cir. 2006); Lucas v. W.W. Grainger, Inc., 257 F.3d

1249, 1261 (11th Cir. 2001); Oest v. Ill. Dep't of Corrections, 240 F.3d 605, 613 (7th Cir. 2001); Sasser

v. State of Ala. Dep't of Corrections, 373 F. Supp. 2d 1276, 1288-1289 (M.D. Ala. 2005).

Plaintiff cannot show that her oral warning and written reprimand constituted adverse

employment actions because they had no material and negative impact.  See Hooks, 183 Fed. Appx.

at 836; Oest, 240 F.3d at 613; Sasser, 373 F. Supp. 2d at 1288-1289.  Plaintiff admits that neither the

oral warning nor the written reprimand caused her to suffer any loss or change to her compensation,

- 32 -

benefits, job duties, or hours. (Pl. Dep. 231:2-5, 303:16-23). Plaintiff also admits that neither the warning nor reprimand had any impact on her annual performance evaluations. (Pl. Dep. 231:14-21, 304:10-12). In short, Plaintiff's oral warning and written reprimand simply had no material repercussions on any aspect of her employment and thus they did not constitute adverse employment actions. See Davis, 245 F.3d at 1243-1246; Sasser, 373 F. Supp. 2d at 1288-1289.

**B.    No Evidence Similarly-Situated White Employees Treated Better.**

This Court should also grant summary judgment on Plaintiff's discrimination claims because she cannot show she was treated differently due to her race. To establish the inference of discrimination required by a prima facie case, a plaintiff must identify a similarly-situated employee outside her protected class who engaged in the same misconduct and was treated more favorably. See Jones v. Bessemer Carraway Med. Ctr., 137 F.3d 1306, 1311 (11th Cir.), modified, 151 F.3d 1321 (11th Cir. 1998). To provide a basis of comparison, the plaintiff must identify a comparator who is similarly situated "in all relevant respects." See Wilson v. B/E Aero., Inc., 376 F.3d 1079, 1091-1092 (11th Cir. 2004); Knight v. Baptist Hosp. of Miami, Inc., 330 F.3d 1313, 1316 (11th Cir. 2003). Thus, an employee who holds a different job, reports to a different supervisor, has a different disciplinary record, or engages in different misconduct is not similarly situated. See Knight, 330 F3d. at 1317; Jones, 137 F.3d at 1312, n.7. See also Maniccia v. Brown, 171 F.3d 1364, 1368-69 (11th Cir. 1999) ("We require that the quantity and quality of the ... misconduct be nearly identical to prevent courts from second-guessing employer's reasonable decisions and confusing apples with oranges.").

Plaintiff cannot identify any similarly-situated White employees who Reams treated better than her when making a disciplinary decision. Plaintiff admits that she has no evidence of other Legal Assistants who refused to answer work-related questions from their supervisors. (Pl. Dep. 218:4-7). She also admits that she has no evidence that Reams received complaints about other Legal Assistants

- 33 -

who, like her, had moved cases in HOTS from WORK-UP status before completing the exhibit lists. (Pl. Dep. 297:2-298:14). Indeed, Reams, who made the final decisions to issue the oral warning and written reprimand after independent investigation, was not aware of any other Legal Assistants whom he believed had refused to answer work-related questions from a supervisor or who had moved incomplete cases from HOTS after having been previously warned against such conduct. (Reams Dec. ¶¶ 6, 18). It follows that Plaintiff cannot meet this element of her prima facie case. See Knight, 330 F.3d at 1316-1317; Marshall v. Western Grain Co., 838 F.2d 1165, 1168 (11th Cir. 1988) ("the question of whether the plaintiffs are similarly-situated with non-minority members is crucial.")

### III.    Plaintiff's Retaliatory Disparate Treatment Claims Fail As a Matter of Law.

Assuming arguendo they were all exhausted, this Court should grant summary judgment on Plaintiff's disparate treatment retaliation claims because they fail as a matter of law. Pursuant to the applicable burden-shifting scheme, a plaintiff alleging retaliation must first establish a prima facie case. See Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1363 (11th Cir. 2007). To establish a prima facie case of retaliation, a plaintiff must show that:  (1) she engaged in protected activity; (2) she suffered an adverse action; and (3) there was a causal relation between the protected activity and the adverse action. See id. Plaintiff specifically bases her retaliation claims on the alleged denial of her request to work at home in April 2004; the April 30, 2004, oral warning; the May 27, 2004, written reprimand; the alleged charging of an extra 1/4 hour of leave in June 2005; and the three-day suspension in July 2005. (First Comp. ¶¶ 22, 26, 27, 33; Second Comp. ¶¶ 34, 42, 52). Plaintiff cannot establish a prima face case for these acts or for any of the other acts in her Second Complaint that she also contends were retaliatory and may also be part of such claims.[44] (Second Comp. ¶¶ 12-16, 19-25, 28, 37-39, 45-46).

_____

[44]Plaintiff's retaliation claims also fail because, as discussed in Section IV, infra, she cannot show that Defendants' legitimate, non-discriminatory reasons for its actions were pretext.

- 34 -

### A.    Plaintiff Cannot Show All Challenged Acts are Adverse Actions.

Plaintiff's retaliation claims fail as a matter of law because she cannot show that she endured any adverse actions other than her July 2005, three-day suspension, and her October 14, 2003, denial of voting leave. (Second Comp. ¶¶ 12, 31, 52). For an action to be adverse in the retaliation context, a plaintiff must show "that a reasonable employee would have found the challenged action materially adverse," meaning that it would "have dissuaded a reasonable worker from making ... a charge of discrimination." See Burlington N. & Sante Fe Ry. Co. v. White, 126 S.Ct. 2405, 2415 (2006). This objective standard recognizes that Title VII's anti-retaliation provision only protects employees from material "injury or harm" and does not "immunize" an employee "from those petty slights and minor annoyances that often take place at work and that all workers experience," "personality conflicts at work that generate antipathy," "lack of good manners," and "snubbing by supervisors and co-workers." See id. at 2414-15. The Supreme Court has further emphasized that Title VII does not set forth "a general civility code for the American workplace" and that "it is important to separate significant from trivial harms." See id. at 2414-2415. In short, a plaintiff must show a significant harm from the challenged action. See, e.g., Cain v. Geren, 2008 U.S. App. LEXIS 352, *3-5 (11th Cir. Jan. 7, 2008) (no adverse action when negative review did not affect ability to receive promotion, raise, or other benefit and thus reasonable employee would not have been dissuaded). As set forth below, the vast majority of Plaintiff's allegations are textbook examples of an employee improperly trying to turn every petty work-place slight and annoyance into federal litigation in the absence of any significant harm.

Plaintiff first challenges an alleged inability to work at home pursuant to the Hearing Office's ADS policy in April 2004. (First Comp. ¶ 33). Plaintiff admits, however, that contrary to her allegation in her First Complaint she was able to work at home in April 2004 on the days she requested. (Pl. Dep. 128:5-129:20, Ex. 11). She now claims that she is instead challenging the fact that she had

- 35 -

to endure some "additional hassle," such as talking to Reams, before her request was approved. (Pl. Dep. 134:4-24, 137:3-25). The fact that Plaintiff had to talk to her supervisors to be able to work at home under the ADS program on specific days is nothing but a minor annoyance, at most, and falls well short of being materially adverse. See Clegg v. Ark. Dep't of Corr., 496 F.3d 922, 929 (8th Cir. 2007) (holding any harm plaintiff suffered because she had to talk to supervisors to obtain employment resources, learn new policies, and attend various meetings was at most trivial). Indeed, when Plaintiff was asked how she was harmed by having to talk to Reams before she was able to work at home, Plaintiff admitted that "I did not suffer anything at that point." (Pl. Dep. 139:20-140:3).

Plaintiff next challenges her April 30, 2004, oral warning, and her May 27, 2004, written reprimand. (First Comp. ¶ 33). As discussed supra, however, in Section II (A), Plaintiff's oral warning and written reprimand caused her no real harm. Indeed, she admits that neither the warning nor the reprimand caused her to suffer any loss or change to her compensation, benefits, job duties, hours, or annual performance reviews. (Pl. Dep. 231:2-21, 303:16-304:12). Moreover, there was no record of the verbal warning maintained in her personnel file, and the written warning was removed from her file after a year with no impact on her. (Pl. Dep. 230:23-231:21, 304:2-9; Reams Dec. ¶ 17). Courts have consistently held that oral and written warnings, absent some additional and material impact on an employee, would not dissuade a reasonable person from filing a complaint and are not adverse actions for purposes of a retaliation claim. See Bush v. Regis Corp., 2007 U.S. App. LEXIS 28210, at *7 (11th Cir. Dec. 3, 2007) (two written warnings would not have dissuaded reasonable person from filing complaint and were not materially adverse); Devin v. Schwan's Home Serv., Inc., 491 F.3d 778, 786 (8th Cir. 2007) (written warning, which caused no significant harm, was not retaliatory adverse action). See also Allen v. Am. Signature, Inc., 2008 U.S. App. LEXIS 7714, at *8 (7th Cir. March 31, 2008); Chang v. Safe Horizons, 2007 U.S. App. LEXIS 25752, at *2 (2d Cir. Nov. 5, 2007); Dehart v. Baker

- 36 -

Hughes Oilfield Op., Inc., 214 Fed. Appx. 437, 442 (5th Cir. 2007); Ausby v. Fla., 2008 U.S. Dist. LEXIS 44929, at *33-35 (M.D. Fla. June 6, 2008); Pelletier v. Reedy Creek Improv. Dist., 2007 U.S. Dist. LEXIS 29625, at *23 (M.D. Fla. April 23, 2007). Accordingly, Plaintiff's warning and reprimand are simply not adverse actions. See Bush, 2007 U.S. App. LEXIS 28210, at *7.

Plaintiff next claims that she was charged an additional 1/4 hour leave on June 27, 2005, for retaliatory reasons. (Second Comp. ¶ 52). Plaintiff admits, however, that this allegation is false and that she was not charged any leave other than the 4 1/4 hours she requested. (Pl. Dep. 352:2-354:3, 356:7-22, 360:6-8). Plaintiff now claims that what she meant to allege is that Lamar questioned her arrival time before granting her the requested leave. (Pl. Dep. 356:7-357:1). A supervisor questioning an employee's arrival time, and then accepting the employee's story as true, is simply not materially adverse. See, e.g., Byrd v. AUM, 2007 U.S. Dist. LEXIS 28411, at *46 (M.D. Ala. April 17, 2007) (being treated with hostility and criticized by supervisor and receiving emails and directives were nothing more than "petty slights" and "minor inconveniences" that would not have dissuaded a reasonable person), aff'd, 2008 U.S. App. LEXIS 5239 (11th Cir. March 20, 2008).

Furthermore, even if Plaintiff meant to include the various acts listed in her Second Complaint in her disparate treatment retaliation claims, the only additional act that would arguably be an adverse action would be the denial of voting leave on October 14, 2003. (Second Comp. ¶¶ 12, 13, 14, 16, 19-25, & 45-46). The rest of the acts are simply trivial and petty slights scattered over several years that no reasonable person would find materially adverse. See Burlington, 126 S.Ct. at 2415 ("We speak of material adversity because we believe it is important to separate significant from trivial harms."). Indeed, courts have held that the denials of lateral transfers that have no material negative consequences on a plaintiff are not adverse actions. See James v. Metropolitan Gov't of Nashville, 243 Fed. Appx. 74, at *12-13 (6th Cir. 2007); Holden v. Ill. Tool Works, Inc., 2007 U.S. Dist. LEXIS

- 37 -

94470, at *13-15 (S.D. Tx. Dec. 27, 2007). Courts have also held that a request not to park in a certain parking spot and a refusal to pay for damage to an employee's car are simply ordinary tribulations of the workplace. See Peace v. Harvey, 2006 U.S. App. LEXIS 26784, at *5-6 (5th Cir. Oct. 26, 2006); Harding v. Newburgh Enlarged City Sch. Dist., 2008 U.S. Dist. LEXIS 17744, at *21-22 (S.D.N.Y. March 7, 2008); Sullivan v. City of Satsuma, 2005 U.S. Dist. LEXIS 33017, at *14-15, 47-48 (S.D. Ala. Sept. 9, 2005). Plaintiff's remaining allegations, such as Lamar asking a Lead Legal Assistant to read a document to Plaintiff, Reams asking her to leave his office door open when they talked, or Reams sending an email to the office about the alarm policy, are nothing more than inconveniences or hassles that every employee endures on the job.[45] See Recio v. Creighton Univ., 521 F.3d 934, 939-941 (8th Cir. 2008) (listing petty and non-actionable slights that are ordinary part of job).

In conclusion, Plaintiff suffered no material harm and none of these trivial acts, either alone or collectively, would have dissuaded a reasonable person from filing a charge of discrimination. See Clegg, 496 F.3d at 929. The fact that these actions were not materially adverse for purposes of a retaliation claim is further illustrated by the fact that Plaintiff was undeterred in her EEO activities and filed EEO complaints in 2004 and 2005, after almost every act that she now contends in these two lawsuits were adverse actions. (Pl. Dep., Exs. 29, 30, 38, 39). The Eleventh Circuit has taken into account whether a plaintiff actually filed subsequent EEO complaints when deciding whether a

---

[45]Indeed, while Plaintiff complains about her inability to meet with Reams alone, behind closed doors, she remained able to talk to him about work-related matters with the door open. (Pl. Dep. 459:17-461:2). Plaintiff's other alleged acts are petty and based solely on speculation as shown by the following examples: (1) while Plaintiff found some time sheets among her belongings at home, she has no idea who placed them there or why and suffered no discipline (Pl. Dep. 371:15-22, 373:23-374:3, 375:25-377:11); (2) while Plaintiff contends that management ignored her complaint about Warner taking her picture in June 2004, Plaintiff never asked management to take any action and has no knowledge what was done after she complained (Pl. Dep. 416:6-17;544:21-545:5); and (3) while Plaintiff complains about a co-worker almost hitting her with a car, she was not hit by the car and has no evidence that the incident was intentional. (Pl. Dep. 480:2-481:12).

challenged act was materially adverse enough to have dissuaded a reasonable person from pursuing Title VII remedies. See Bush, 2007 U.S. App. LEXIS 28210, at *7 (noting plaintiff had not been deterred from filing a charge of discrimination due to two written reprimands when concluding those acts were not adverse actions). See also Somoza v. Univ. of Denver, 513 F.3d 1206, 1214 (10th Cir. 2008) ("the fact that an employee continues to be undeterred in ... her pursuit of a remedy ... may shed light as to whether the actions are sufficiently material and adverse to be actionable."); Dehart, 214 Fed. Appx. at 442; Baloch v. Norton, 517 F. Supp. 2d 345, 356-358 (D.D.C. 2007). Accordingly, Plaintiff cannot show that these challenged actions were materially adverse and her retaliation claims fail. See Bush, 2007 U.S. App. LEXIS 28210, at *7; Dehart, 214 Fed. Appx. at 442.

**B.    Plaintiff Cannot Show Causation.**

Plaintiff's retaliation claims fail for the additional reason that she cannot establish a causal connection between her EEO complaints and all her challenged actions. See Thomas, 506 F.3d at 1364. To demonstrate the requisite causal connection, a plaintiff must show that "the decision-makers [were] aware of the protected conduct," and "that the protected activity and the adverse action were not wholly unrelated." See id.; Brungart v. BellSouth Comms., Inc., 231 F.3d 791, 799 (11th Cir. 2000). To suggest that a protected activity and an adverse action are not completely unrelated, a plaintiff must show that a decision maker had "knowledge of the protected expression" and that there was "a close temporal proximity between this awareness and the adverse ... action." See Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004). When more than a few months pass between a protected activity and a challenged action it negates any inference of causation. See Thomas, 506 F.3d at 1364. In short, a plaintiff cannot automatically establish a causal link simply because at some point during her career she filed an EEO complaint. Cf. Jackson v. St. Joseph State Hosp., 840 F.2d 1387, 1391 (8th Cir. 1988) ("protection from retaliation for filing a complaint does not clothe the complainant with

- 39 -

immunity for past and present inadequacies, unsatisfactory performance, and uncivil conduct...").  In this case, Plaintiff's sole "evidence" of causation is that various acts occurred after she filed EEO Complaints in October 1997, May 2003, June 2004, and June 2005.  (Pl. Dep. 221:2-12, 298:20-299:1, 398:17-399:4).  The large passage of time between Plaintiff's EEO complaints and the actions she claims were retaliatory, however, negates any suggestion of causation.  See Thomas, 506 F.3d at 1364.

Plaintiff first alleges that the acts in her First Complaint (having to talk with Reams before her April 2004, request to work at home was granted; her April 30, 2004, oral warning; and her May 27, 2004, written reprimand) were retaliation for EEO complaints she filed in October 1997 and May 2003.  (Pl. Dep. 108:3-109:1; First Comp. ¶¶ 11, 18, 33).  These challenged acts, however, took place more than ten months after Plaintiff's EEO complaints.  Plaintiff next asserts that the acts she lists in her Second Complaint (being questioned about her time on June 27, 2005, and a three-day suspension in July 2005) were retaliation for the EEO complaints she filed in October 1997, May 2003, and June 2004.  (Pl. Dep. 307:21-308:5; Second Comp. ¶ 52 ).  These challenged acts took place more than a year after Plaintiff's prior EEO complaints.  Finally, Plaintiff lists a number of additional acts in her Second Complaint which she claims were retaliatory even though she omits them from her retaliatory disparate treatment count.  (Second Comp.¶¶ 12-16, 19-25, 45-46, 52).  Even if the Court were to consider these acts as part of a retaliatory disparate treatment claim, all but two (the July 15, 2005, email from Reams reminding employees about the office alarm policy and the September 2005 incident where Barnett-Jefferson's car almost hit Plaintiff) took place between three and eleven months after Plaintiff's prior EEO complaints.[46]  (Second Comp. ¶¶ 12, 13, 14, 16, 19-25, & 45-46).

---

[46]Plaintiff's denial of voting leave on October 14, 2003, was more than five months after her May 2003 EEO complaint.  (Pl. Dep. 366:4-367:11).  Plaintiff's hardship transfer requests were denied on October 7, 2004; December 3, 2004; and February 25, 2005, which was more than three months, five months, and seven months, respectively, after her June 2004 EEO complaint. (Pl. Dep.

Courts have consistently held that a plaintiff cannot show causation by the mere fact of filing an EEO complaint when more than three months passes between the complaint and the alleged retaliatory act. See Thomas, 506 F.3d at 1364 (3-month gap too great to show causation); Drago v. Jenne, 453 F.3d 1301, 1308 (11th Cir. 2006) (three-month gap too large); Higdon, 393 F.3d at 1220 (3-month gap too large). See also Clark County School District v. Breeden, 532 U.S. 268, 273 (2001)(citing with approval cases in which 3-4 months was too long to show causation). In this case, the passage of three or more months between Plaintiff's EEO complaints and the various acts she challenges in her two lawsuits negates any suggestion of causation.[47] See Thomas, 506 F.3d at 1364 ("in absence of other evidence... if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law."); Drago, 453 F.3d at 1308; Sanders v. City of Montgomery, 319 F. Supp. 2d 1296, 1316-1317 (M.D. Ala. 2004). In short, Plaintiff has nothing but speculation to support her contentions that anything that happened to her was related to her EEO complaints. Plaintiff's speculation is insufficient to meet her burden, and her retaliation claims fail as a matter of law. See Thomas, 506 F.3d at 1364; Drago, 453 F.3d at 1308.

---

Exs. 42, 47, 49). Reams asked Plaintiff to move her car from a handicap parking spot on January 27, 2005, more than six months after Plaintiff had commenced an EEO complaint in June 2004. (Pl. Dep. 417:2-9). Plaintiff's car was keyed any an unknown person and Reams refused to pay for the damage on February 23, 2005, more than seven months after Plaintiff's June 2004 EEO complaint. (Pl. Dep. 445:6-446:25). Lamar asked a Lead Legal Assistant to read a document to Plaintiff on April 5, 2005, more than eight months after Plaintiff's June 2004 EEO complaint. (Pl. Dep. 448:17-449:18). Finally, Reams asked Plaintiff to open his office door on or about June 3, 2005, more than eleven months after Plaintiff's June 2004 EEO complaint. (Pl. Dep. 456:8-462:5).

[47]Furthermore, to the extent Plaintiff claims that Barnett-Jefferson, a co-worker, almost hit her with a car to retaliate against her two and ½ months after he June 2005 EEO complaint, Plaintiff has no evidence that Barnett-Jefferson knew of her when this act occurred. See Higdon, 393 F.3d at 1220 (noting plaintiff must show that a decision maker had "knowledge of the protected expression" and that there was "a close temporal proximity between this awareness and the adverse ... action" to suggest causation). She thus cannot show causation for this incident.

- 41 -

IV.    **Plaintiff Cannot Show Defendants' Legitimate, Non-Discriminatory Reasons for the Challenged Actions Are Pretext for Discrimination or Retaliation.**

This Court should also grant summary judgment on Plaintiff's discrimination and retaliation claims because Defendants have articulated legitimate, non-discriminatory reasons for all their actions that Plaintiff cannot show are pretext. See Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 590 (11th Cir. 2000). A defendant's articulation of legitimate, non-discriminatory reason for its actions removes any presumption of discrimination or retaliation created by a prima facie case. See Chapman v. AI Transport, 229 F.3d 1012, 1028 (11th Cir. 2000) (en banc). Once a defendant offers such reasons for its actions, a plaintiff can avoid summary judgment only by offering sufficient evidence for a reasonable jury to disbelieve the proffered reasons and conclude they were not what actually motivated the employer. See id. at 1024-25; Watkins v. Sverdrup Tech., Inc., 153 F.3d 1308, 1316-17 & n. 8 (11th Cir. 1998); Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997).

Importantly, settled authority holds that courts are not to be used as super-personnel boards to second-guess employment decisions. See Combs, 106 F.3d at 1543; Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991). Instead, the sole inquiry at the pretext stage is whether the employer gave an honest explanation for its decision. See Chapman, 229 F.3d at 1030-1031; Elrod, 939 F.2d at 1470-1471. It follows that a plaintiff cannot re-cast the reason given by the employer to one that is more susceptible to attack or question the wisdom behind it. See Chapman, 229 F.3d at 1030-1031. See also Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir. 2002) ("We are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision."); Nix v. WLCY Radio/Rahall Communs., 738 F.2d 1181, 1187 (11th Cir. 1984) (an employer can make a decision "for a good reason, a bad reason, a reason based on erroneous facts, or no reason at all, as long

- 42 -

as its action is not for a discriminatory reason."). Instead, the plaintiff must meet the proffered reason

head on and show that it was not what actually motivated the employer. See Chapman, 229 F.3d at

1030. As set forth below, Defendants have articulated legitimate, non-discriminatory reasons for all

the challenged actions in these two lawsuits and Plaintiff cannot show that they are pretextual.

### A.    Actions Challenged in Plaintiff's First Complaint.

### 1.    Plaintiff's request to work at home in April 2004 (First Comp. ¶¶ 21-22, 31, 33).

Johnson explained that he initially denied Plaintiff's request to work at home because he had

forgotten about Reams' policy that Legal Assistants who worked the front desk received an additional

day to work at home the next month and he had not understood her request. (Johnson Dep. 33:4-35:5).

He allowed Plaintiff to work at home once Reams reminded him of this policy. (Johnson Dep. 34:20-

35:5; Reams Dec. ¶¶ 2-3). Reams explained that he had to review the ADS agreement after Plaintiff

asked to work at home on a Thursday because it was a core day under the ADS Agreement, he never

had a Legal Assistant work at home on a Thursday, and he had to read the Agreement to make sure it

provided an exception as Plaintiff claimed it did to allow her to work at home. (Reams Dec. ¶ 3). After

confirming that the ADS Agreement allowed Legal Assistants to work at home on core days under

"special circumstances," Reams allowed Plaintiff to work at home on Wednesday and Thursday, April

14 and 15, 2004. (Reams Dec. ¶ 3; Pl. Dep. 125:10-128:7, Exs. 10, 11). Plaintiff cannot show that

these explanations are false. See Chapman, 229 F.3d at 1030-1031 (noting sole consideration for court

is whether defendant gave "an honest explanation for its behavior.")

### 2.    April 30, 2004, oral warning for insubordination.  (First Comp. ¶¶ 26, 31, 33).

Reams explained that he gave Plaintiff an oral warning for insubordination after he discovered

that she had refused to answer direct, work-related questions from her supervisor at a meeting on April

19, 2004. (Reams Dec. ¶ 6). Reams learned about Plaintiff's failure to answer work-related questions

- 43 -

during his investigation of Plaintiff's complaint that Johnson had stood up and yelled at her. (Reams Dec. ¶ 6). He talked to seven employees during his investigation and none of them supported her account.[48] (Reams Dec. ¶ 5, Ex. B). Furthermore, Johnson, Lamar, and Hall all told him that Plaintiff had not spoken during the meeting and had not answered Johnson's questions about whether she needed work. (Reams Dec. ¶ 6). Reams believed that employees have an obligation to answer work-related questions from a supervisor, it was not the role of a union representative to answer such questions, and Plaintiff's failure to answer such questions was insubordination. (Reams Dec. ¶ 6).

A supervisor's belief, based on statements from witnesses after investigation, that an employee failed to answer work-related questions is clearly a legitimate, non-discriminatory ground for an oral warning. See Elrod, 939 F.2d at 1470-1471. While Plaintiff may believe that it was okay for her to not personally speak or answer questions during the meeting, her opinion is irrelevant.[49] See Brown v. American Honda Motor Co., 939 F.2d 946, 951 (11th Cir. 1991) ("the court's responsibility [is] not to second guess the wisdom of [an employer's] reasoning, but to determine if the reasons given were merely a cover for a discriminatory intent."). In short, Plaintiff cannot show that Reams did not honestly believe that she had been insubordinate at the meeting. See Rojas, 285 F.3d at 1342. See also Cooper v. Diversicare Mgmt. Servs., 115 F. Supp. 2d 1311, 1320 (M.D. Ala. 1999) (no pretext when plaintiff failed to offer evidence that decision-maker did not honestly rely on complaint filed against the plaintiff and witness statements when making disciplinary decision).

---

[48]Because Plaintiff's account was contradicted by everyone else, Reams later suggested Plaintiff contact the EAP program. (Reams Dec. ¶¶ 8-9). He made this suggestion without a union representative present because Plaintiff had no right to union representation and he was trying to respect her privacy regarding what he considered to be a personal matter. (Reams Dec. ¶ 9).

[49]Plaintiff admits that Johnson asked her at the meeting if she needed more cases, that she did not speak during the meeting, and that she has no evidence of any other Legal Assistants who refused to answer work-related questions from a supervisor. (Pl. Dep. 147:23-148:4, 218:4-7).

### 3.    May 27, 2004, written reprimand (First Comp. ¶¶ 27,31, 33).

Reams explained that he issued Plaintiff a written reprimand for claiming credit for incomplete work because he believed she had listed incomplete cases as having been worked-up in HOTS. (Reams Dec. ¶¶ 10-19). Reams based his disciplinary decision on an investigation that included reviewing HOTS screen histories, talking to employees, and examining WORD screen shots. (Reams Dec. ¶¶ 11-15). Reams knew the dates that Plaintiff had moved the cases from work-up in HOTS from the case histories. (Reams Dec. ¶ 13 ). He was told by Johnson, Davenport, and Tamplin that they had seen cases that Plaintiff had listed as worked-up in HOTS on her desk lacking the required exhibit lists. (Reams Dec. ¶ 12). Finally, Reams reviewed WORD screen shots that showed that Plaintiff continued to work on exhibit lists in the cases after she had indicated in HOTS that they were worked-up.[50] (Reams Dec. ¶ 13). Based on this evidence and his understanding that Plaintiff had been counseled in October 2003 that files were not to be moved from work-up until the exhibit list was complete, Reams decided that a written reprimand was appropriate. (Reams Dec. ¶¶ 11-15).

While Plaintiff may disagree with Reams and assert that the WORD "date of creation" cannot show when she actually created an exhibit list, she offers nothing to show that Reams is not giving an honest explanation for his decisions. See Rojas, 285 F.3d at 1342 ("We are not interested in whether [the decisionmaker's] conclusion is a correct one, but whether is an honest one.."). Indeed, Plaintiff admits that she understood that cases were not to be moved from work-up status until an exhibit list

---

[50]Reams initially thought he could rely upon the WORD "date of creation" to show when the exhibit lists had first been created, but he discovered at a June 21, 2004, meeting with Plaintiff and Tamplin that WORD also had a "date created" that was sometimes different. (Reams Dec. ¶ 17). As a result, he deemed the "date of creation" unreliable as a tool to determine the exact date when Plaintiff first created the exhibit lists. (Reams Dec. ¶ 17). He concluded, however, that the WORD records, while not showing when Plaintiff had first created a document, did show that Plaintiff had continued to work on exhibit lists after she claimed they were finished in HOTS and thus corroborated the witness testimony regarding the incomplete files. (Reams Dec. ¶ 17).

- 45 -

had been completed and that she has no evidence that Reams knew of other Legal Assistants whom he believed had moved cases from work-up without having completed the exhibit lists. (Pl. Dep. 66:1-67:23, 297:2-298:14, Ex. 5). In short, Plaintiff simply cannot show that Reams is lying when he explains the reasonable basis for his disciplinary decision and thus she cannot show pretext. See Elrod, 939 F.2d at 1470. See also Keel v. Roche, 256 F. Supp. 2d 1269, 1287 (M.D. Ala. 2003) (no evidence of pretext when plaintiff had offered "no evidence to establish that at the time the decision to [discipline him] was made...the decision-maker did not [discipline] him on the grounds that he believed that Plaintiff had engaged in the ... misconduct of which Plaintiff was accused.").

**B.    Actions Challenged in Plaintiff's Second Complaint.**

**1.    July 2005 three-day suspension (Second Comp. ¶¶ 31, 52).**

Reams explained that he suspended Plaintiff for three days because he believed that she had given her direct supervisor the middle finger during a meeting. (Reams Dec. ¶¶ 26-28). Reams based his disciplinary decision on an investigation that included hearing a complaint from Lamar, reading Lamar's Proposal to Suspend Plaintiff for five days, and reading Plaintiff's Response. (Reams Dec. ¶¶ 27-28). Reams believed that Plaintiff had, in fact, given Lamar the middle finger based on Lamar's flustered demeanor when she uncharacteristically barged into his office, interrupting a meeting with another employee, to tell him that Plaintiff had given her the middle finger. (Reams Dec. ¶ 27). Reams did not find Plaintiff's assertions in her Response credible or persuasive, including her claim that she had been afraid of Lamar because Lamar had grabbed her arm on November 5, 2004, because Plaintiff had never previously complained about such an incident and had made accusations against her former supervisor in April 2004 that were contrary to other witnesses' accounts. (Reams Dec. ¶ 27). Reams was also aware that Lamar had recently counseled Plaintiff about the need to be more respectful toward

- 46 -

her supervisor. (Reams Dec. ¶ 28). He reduced the proposed suspension to three days because he thought that was sufficient time to impart to Plaintiff the seriousness of her offense. (Reams Dec. ¶ 28).

Reams' belief that Plaintiff had given her direct supervisor the middle finger is a legitimate, non-discriminatory reason for a 3-day suspension. See EEOC v. Total System Servs., Inc., 221 F.3d 1171, 1176 (11th Cir. 2000) ("When an employer is told of improper conduct at its workplace, the employer can lawfully ask: is the accusation true? When the resulting employer's investigation ... produces contradictory accounts of significant historical events, the employer can lawfully make a choice between the conflicting versions – that is, to accept one as true and to reject one as fictitious – at least, as long as the choice is an honest one"); Garcia-Cabrera v. Cohen, 81 F. Supp. 2d 1272, 1280-81 (M.D. Ala. 2000) ("It is beyond question that ... caustic or rude behavior is a legitimate, non-discriminatory reason for an employment decision."). Plaintiff may dispute whether she actually gave Lamar the middle finger, claim that she has no idea what it means to give someone the middle finger, and assert Lamar must have been mistaken in what she saw. (Pl. Dep. 320:1-321:21, 323:23-324:14, 329:4-331:7, Ex. 33). Plaintiff, however, has no evidence that Reams did not honestly believe that Plaintiff gave Lamar the middle finger when he decided to impose a 3-day suspension and cannot show pretext.[51] See Rojas, 285 F.3d at 1342; Total Systems Servs., 221 F.3d at 1177-1178; Cooper, 115 F. Supp. 2d at 1320; Garcia-Cabrera, 81 F. Supp. 2d at 1282-1283. See also Elrod, 939 F.2d at 1470 ("We can assume ... that the complaining employees ... were lying through their teeth. The [pretext] inquiry ... is limited to whether [the decisionmaker] believed that [the plaintiff] was guilty of the alleged [misconduct], and if so, whether this belief was the reason behind [the disciplinary decision].").

---

[51]Plaintiff also has no evidence that Reams was aware of any other employee who gave the middle finger to a supervisor and took no disciplinary action. (Pl. Dep. 346:19-22).

2.      **Question about Plaintiff's June 27, 2005, time sheet (Second Comp. ¶¶ 34, 52).**

Lamar explained that she questioned Plaintiff's leave request on June 27, 2005, because she

thought she saw Plaintiff arrive after 10 AM, and one of her job duties was to ensure her employees

were accurate in time-keeping. (Lamar Dec. ¶ 16). In any event, she credited Plaintiff's version of her

arrival time and granted her leave request as submitted. (Lamar Dec. ¶ 16; Pl. Dep. 353:22-354:3, Exs.

36, 37). Plaintiff cannot show that Lamar's explanation is false. See Rojas, 285 F.3d at 1342.

3.      **Miscellaneous allegations absent from EEO complaints.**

a.      **October 14, 2003, voting leave (Second Comp. ¶ 12).**

Reams explained that he did not grant Plaintiff, or any other employee, voting leave on October

14, 2003, to vote in local elections in Montgomery because the polls were open before and after work

and he believed employees had sufficient time to vote. (Reams Dep. 88:12-89:5). Plaintiff was treated

the same as everyone else and her disagreement with Reams' decision regarding office voting policy

for this local election does not show pretext.[52] See Rojas, 285 F.3d at 1342 ("This kind of inquiry –

whether a business decision is wise or nice or accurate – is precluded...").

b.      **July 21, 2004 time sheet incident (Second Comp. ¶ 13).**

Johnson explained that after employees notified him some time sheets were missing, Plaintiff

told him that she had found the time sheets among her documents at home. (Johnson Dec. ¶ 13). He

investigated but took no disciplinary action. (Johnson Dec. ¶ 13). Plaintiff admits that she was not

disciplined regarding this matter and that she has no idea who might have put the time sheets with her

---

[52]Indeed, Tamplin, like Plaintiff, voted on October 14, 2003, and sought voting leave but had her request for voting leave converted to annual leave like Plaintiff. (Reams Dec. ¶ 32, Ex. H). Tamplin has never filed an EEO complaint. (Tamplin Dec. ¶ 7).

documents, how they got placed there, or why they might have been placed there. (Pl. Dep. 371:15-22, 373:23-374:3, 375:25-377:11). Plaintiff cannot show anything is pretext. See Rojas, 285 F.3d at 1342.

### c.    Plaintiff's June/November 2004 Complaints (Second Comp. ¶¶ 16, 19).

Johnson and Reams both explained that Plaintiff's June 2004, complaint about Warner taking her picture in the parking lot was not ignored.   (Johnson Dep. 80:6-82:9; Reams Dep. 77:18-78:3). Johnson investigated by talking to Plaintiff and Warner about the incident. (Johnson Dec. ¶ 14, Ex. C). He found no basis to think there was any threat to Plaintiff, but explicitly told Warner to not take Plaintiff's picture and to leave Plaintiff alone. (Johnson Dep. 80:6-82:9). Reams, who was out of the office at the time, spoke to Warner when he returned and instructed her not to take Plaintiff's picture. (Reams Dec. 77:18-78:3). Plaintiff admits that she has no evidence that Johnson and Reams did not talk to Warner and instruct her to leave Plaintiff alone and not take her picture. (Pl. Dep. 416:6-17; 544:21-545:5). Accordingly, she cannot show pretext. See Chapman, 229 F.3d at 1030-1031.

### d.    Hardship transfer requests (Second Comp. ¶¶ 15, 35, 44).

Bozeman explained that she denied Plaintiff's hardship transfer requests based on her analyses of the reasons for the requests and budget/staffing issues relating to the affected offices. (Bozeman Dec. ¶ 1). More specifically, Bozeman denied Plaintiff's first request to transfer to Birmingham on October 7, 2004, because in her opinion the Montgomery hearing office had a greater need for legal assistants than the Birmingham office and she found no basis to Plaintiff's allegations of a hostile environment in Montgomery.[53] (Bozeman Dec. ¶ 2). Bozeman denied Plaintiff's next request for a hardship transfer on December 3, 2004, because, after investigation into Plaintiff's allegations concerning an employee bringing a gun onto the property, she found no basis to believe there was a

---

[53]Bozeman asked Reams to respond to Plaintiff's allegations of harassment and considered the response when making her decision. (Bozeman Dec. ¶ 2; Reams Dec. ¶ 20).

dangerous environment in Montgomery.[54] (Bozeman Dec. ¶ 3). Finally, Bozeman denied Plaintiff's

February 15, 2005, request for a hardship transfer because the office in question had a greater need for

case technicians than senior case technicians like Plaintiff. (Bozeman Dec. ¶ 4). Plaintiff has no

evidence that Bozeman is lying and cannot show pretext. See Elrod, 939 F.2d at 1470 ("our inquiry

is limited to whether the employer gave an honest explanation"). See also Total Sys. Servs., 221 F.3d

at 1176 (employer can base decision on belief that plaintiff's allegations of harassment were false).

### e. Request to move car from handicap spot (Second Comp. ¶ 20).

Reams explained that he asked Plaintiff to move her car from a handicap parking space on

January 27, 2005, because she was not handicapped and she parked in a spot used by Lamar, Plaintiff's

direct supervisor, who was handicapped and was coming to work that day. (Reams Dep. 81:10-82:5;

Reams Dec. ¶¶ 22-23). Plaintiff, who admits that she did not have a handicapped placard and that she

parked in a spot often used by Lamar, cannot show this reason is false. See Chapman, 229 F.3d at

1030-1031 (sole consideration is whether the defendant gave "an honest explanation for its behavior.").

### f. Keying of car and Reams' refusal to pay (Second Comp. ¶ 24).

Reams explained that he denied Plaintiff's request for the Agency to pay for the alleged keying

damage to Plaintiff's car because there was no evidence that an employee had damaged it and he was

not aware of any duty for the Agency to pay for criminal acts in the parking lot. (Reams Dep. 76:5-21;

Pl. Dep., Ex. 56). Plaintiff admits that she had no idea who might have damaged her car, and

Defendants have shown they had nothing to do with it. (Pl. Dep. 439:6-7; Reams Dec. ¶ 23; Lamar

Dec. ¶ 7). Plaintiff has no evidence Ream's explanation is pretext. See Rojas, 285 F.3d at 1342.

---

[54]Bozeman asked Reams for a report and employee statements on this incident, and she considered them in making her decision. (Bozeman Dec. ¶ 3; Reams Dep. 72:19-24, 78:12-79:18). Plaintiff refused to submit a statement to Reams about this matter when he was conducting his investigation. (Pl. Dep. 398:22-391:18, Ex. 46; Reams Dec. ¶ 20).

**g.      Lamar's request for McAnnally to read document (Second Comp. ¶ 25).**

Lamar explained that she asked McAnally, a Lead Legal Assistant, to explain a document to Plaintiff during a meeting in April 2005, to provide refresher training to Plaintiff on properly routing documents to offices, facilitate discussion, and ensure Plaintiff understood the procedures. (Lamar Dec. ¶ 9). Lamar explained that she knew Plaintiff could read, and did not mean to imply that Plaintiff was illiterate by having McAnnally read and explain the document. (Lamar Dec. ¶ 9). While Plaintiff may have preferred to silently read the document, her preference about how Lamar chose to conduct training is irrelevant and she cannot show Lamar's explanation is false. See Rojas, 285 F.3d at 1342.

**h.      Request by Reams that Plaintiff open office door (Second Comp. ¶ 28).**

Reams explained that he asked Plaintiff to open the door to his office on June 3, 2005, because he did not want to be alone in the office with her based on his belief that she had made false accusations against management and due to recent complaints about her behavior by Lamar. (Reams Dep. 85:16-87:4). At the time, Reams was aware that Plaintiff had accused Johnson of standing and yelling at her in April 2004, though every witnesses contradicted her account; had described a 2004 meeting with him and Lamar as being "raped;" and had recently been accused by Lamar of using Lamar's phone without permission and grabbing a file out of her hand. (Reams Dep. 85:16-87:4; Reams Dec. ¶ 25). Whether Reams kept his door open or shut did not affect Plaintiff's ability to do her job, and Reams was available to meet with her regarding work or any other issues with his door open. (Reams Dec. ¶ 25). While Plaintiff may have preferred to meet alone with her supervisors (and alleged harassers), behind closed doors, (Pl. Dep. 460:3-6), Plaintiff's preferences about open or closed doors during meetings are irrelevant and do not show pretext. See Chapman, 229 F.3d at 1030-1031. See also Total Clover Sys., 221 F.3d at 1176 (noting employer could base decision on conclusion that plaintiff had made false allegations in the past); Khoury v. Meserve, 268 F. Supp. 2d 600, 615 (D. Md. 2003).

- 51 -

     **i.**      **July 15, 2005, email regarding alarm policy (Second Comp. ¶¶ 37-39).**

Reams explained that he sent an email to Hearing Office employees on July 15, 2005, reminding them about the alarm policy because his job was to secure the building at night, he wanted to remind employees when the building closed so Federal Protective Services would only be called when there was a real emergency, and Plaintiff had set the alarm off. (Reams Dec. ¶ 30; Pl. Dep., Ex. 57). While Plaintiff might not have sent this email, her opinion as to how to run the Hearing Office is irrelevant and she cannot show his explanation is false. See Chapman, 229 F.3d at 1030-1031.

     **j.**      **September 2, 2005, car almost hitting Plaintiff (Second Comp. ¶ 45).**

Barnett-Jefferson explains that she turned into the parking lot and Plaintiff stepped in front of her but she was able to stop her car on time without hitting Plaintiff. (Barnett-Jefferson Dec. ¶ 2). She explains there was nothing intentional about the matter and that it was purely a near accident. (Barnett-Jefferson Dec. ¶¶ 2-3). Reams and Lamar explained that they had nothing to do with this near-accident. (Reams ¶ 31; Lamar ¶ 17). The Federal Protective Services Agent advised Reams that Plaintiff had filed a complaint about the incident, that he had taken statements, and that there was nothing to the incident other than there had been a pedestrian walking across the parking lot and a car had stopped without hitting her. (Reams Dep. 74:7-75:7; Reams Dec. ¶ 31). Reams found no reason to take any action on this matter because Federal Protective Services told him there was nothing to the incident. (Reams Dec. ¶ 31). Plaintiff has no evidence that this incident was anything other than a near-accident, and her speculation otherwise does not show pretext. See Grube v. Lau Industs., Inc., 257 F.3d 723, 730 (7th Cir. 2001) ("Quite simply, [plaintiff's] speculation ... cannot stand to demonstrate pretext.").

**V.**     **Plaintiff's Hostile Work Environment Claims Fail as a Matter of Law.**

Finally, assuming arguendo they were exhausted and present a recognizable cause of action, this Court should grant summary judgment on Plaintiff's claims that she endured a retaliatory hostile

work environment due to the actions of Reams, Johnson, Davenport, and Bozeman, because they fail as a matter of law.[55] (First Comp. ¶¶ 36-39; Second Comp. ¶¶ 56-58; Pl. Dep. 102:11-103:2, 524:1-525:24). Plaintiff appears to base these claims on the acts discussed supra, that she included in her two Complaints, as well as a laundry list of work-matters, conversations with co-workers, and actions by supervisors that she recalled during her deposition. (First Comp. ¶¶ 36-39; Second Comp. ¶¶ 56-58; Pl. Dep. 112:6-113:1, 307:16-309:2, 483:21-25, 484:10-546:6). A hostile environment consists of "a series of separate acts ... [which] collectively constitute one 'unlawful employment practice.'" See McCann, 526 F.3d at 1378 (citation omitted); Bozeman, 456 F. Supp. 2d at 1344 n.149; Scott v. Lee Cty. Youth Dev. Ctr., 232 F. Supp. 2d 1289, 1292 n.1 (M.D. Ala. 2002). To establish such a claim, a plaintiff must show that (1) she engaged in protected activity; (2) she was subjected to unwelcome harassment; (3) because of reprisal; (4) that was subjectively and objectively severe and pervasive enough to alter a term, condition, or privilege of employment and create an abusive work environment; and (5) that the employer is responsible for the abusive environment. See McCann, 526 F.3d at 1378; Collier v. City of Opelika, 374 F. Supp.2d 1098, 1101 (M.D. Ala. 2004). Plaintiff cannot show that the acts she contends made her environment hostile were causally related to her EEO complaints or that she endured the severe or pervasive conduct necessary to create an objectively abusive environment.

---

[55]The Eleventh Circuit recently noted that it has not explicitly recognized the existence of a retaliatory hostile work environment theory under Title VII. See Andrews-Willmann, 2008 U.S. App. LEXIS 14682, at * 12-13, n.4 ("there are threshold questions whether a plaintiff can even bring a 'retaliatory harassment claim'" separate from a traditional retaliation claim). See also Bryan v. Chertoff, 2007 U.S. App. LEXIS 1915, at *11 (5th Cir. Jan. 2007) (questioning whether a retaliatory hostile work environment was a cause of action); Hewlett v. Waffle House, Inc., 2006 U.S. Dist. LEXIS 36269, at *28-29 (M.D. Ga. June 5, 2006). To the extent Plaintiff's claims are treated as traditional retaliation claims, they fail for the reasons discussed in Sections I-V of his Memorandum.

- 53 -

### A.    Plaintiff Cannot Show Causation.

This Court should first grant summary judgment on Plaintiff's claims because she cannot show that the acts she claims created a hostile environment were causally related to any EEO complaints. See Andrews-Willmann, 2008 U.S. App. LEXIS 14682, at *12-14 (dismissing retaliatory harassment claim when plaintiff failed to show causal link between protected activity and alleged retaliatory acts of harassment); Mendoza v. Borden, Inc., 195 F.3d 1238, 1248 n.5 (11th Cir. 1999) (noting employee "must show that but for the fact of her [protected class], she would not have been the object of harassment") (en banc). As with a traditional retaliatory disparate-treatment claim, a plaintiff alleging retaliatory harassment must show that the "the decision-makers [were] aware of the protected conduct," and "that the protected activity and the adverse action were not wholly unrelated." See Andrews-Willmann, 2008 U.S. App. LEXIS 14682, at *12-14; Stewart v. Ind. Sch. Dist. No. 196, 481 F.3d 1034, 1044-1046 (8th Cir. 2007); Broadway v. UPS, Inc., 499 F. Supp. 2d 992, 1005 (M.D. Tenn. 2007). As set forth below, Plaintiff cannot show this required causation for a number of reasons.

As an initial matter, to the extent that Plaintiff relies upon the acts in her Complaints discussed supra in Defendants' analysis of her disparate treatment claims, she cannot show that any of them were causally related to her EEO complaints. Defendants explicitly explained Plaintiff's inability to link most of these acts to her EEO complaints in Section III(B), supra, because they took place between three and eleven months after Plaintiff's EEO complaints. See Thomas, 506 F.3d at 1364. Defendants also explained in Section IV, supra, that Plaintiff cannot show that the legitimate, non-discriminatory reasons for these acts were pretext. See Gupta, 212 F.3d at 590; Bozeman, 456 F. Supp. 2d at 1347-1353. Since Plaintiff cannot show that these acts were motivated by a retaliatory animus, she cannot rely upon them to support her retaliatory hostile environment claim. See Andrews-Willmann, 2008 U.S. App. LEXIS 14682, at *12-14; Stewart, 481 F.3d at 1046. See also Gupta, 212 F.3d at 583

- 54 -

(holding before acts can be considered in determining whether severe or pervasive requirement is satisfied, the plaintiff must show "statements and conduct" were connected to protected class); Gregory v. Widnall, 153 F.3d 1071, 1075 (9th Cir. 1998) (rejecting "retaliation-based hostile work environment" claim because "none of the incidents described [by plaintiff] shows retaliatory animus.").

Furthermore, to the extent Plaintiff relies upon the various additional incidents she recalled during her deposition relating to "work-related matters," "conversations with co-workers," or "actions by supervisors," she also cannot show causation for these acts. (Pl. Dep. 112:6-113:1, 307:16-309:2, 483:21-25, 484:10-546:6). Plaintiff could not provide the exact month or even year when all but one of these alleged incidents (a May 2003 reference to Davenport saying something to her and Collier discussed infra) allegedly occurred. (Pl. Dep. 110:1-6, 487:21-22, 490:2-5, 494:4-9, 499:1-499:9, 503:20-22, 508:15-510:16, 513:3-6, 518:3-4, 519:22-24, 541:16-543:6). Plaintiff's vague and conclusory testimony regarding when these alleged conversations or acts took place is insufficient to meet her burden of showing causation. See Delgado v. Triborough Bridge and Tunnel Auth., 485 F. Supp. 2d 453, 462 (S.D.N.Y. 2007) ("[T]o use temporal causation as the sole demonstration of causation [plaintiff] must give specific dates of retaliatory acts."); Satchel v. School Bd. of Hillsborough Cty., 2007 U.S. Dist. LEXIS 11696, at *11-12, n.3 (M.D. Fla. Feb. 20, 2007) ("Without knowing the dates that these events occurred, the Court cannot determine whether there is an inference of a causal connection...."); Kincade v. Snow, 2003 U.S. Dist. LEXIS 20758, at *10 (D. Ct. Nov. 10, 2003). Moreover, Plaintiff relies solely on speculation and conjecture for most of these allegations, and

- 55 -

there is absolutely no evidence of any retaliatory animus. [56]  See, e.g., Evers v. General Motors Corp.,

770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations ... have no probative value.").

Finally, Plaintiff cannot show a causal connection in relation to any acts where she was treated

the same as employees who had not filed EEO complaints.  The Eleventh Circuit has recognized that

"[i]t is difficult to hold that a practice which affects applicants of all [protected characteristics] in the

same manner is actually designed to conceal a ...[retaliatory] motive."  See Brown, 939 F.2d at 951.

Plaintiff, for example, complains that Davenport called her and Collier, an employee who has never

filed any EEO complaints, either "bitty winches" or "biddy wenches" in May 2003.  (Pl. Dep. 119:11-

121:17, 499:10-501:15, Ex. 591 Reams Dec. ¶ 33).  Since Plaintiff was treated the same as Collier, she

cannot show that this comment had anything to do with her EEO complaints.  See Brown, 939 F.2d at

951.  See also McAlindin v. County of San Diego, 192 F.3d 1226, 1239 (1999), amended 201 F.3d

1211 (9th Cir. 2000) (no causality when employer treated plaintiff same as other employees).

**B.**     **Plaintiff Cannot Show That She Endured An Abusive Environment.**

This Court should also grant summary judgment on Plaintiff's retaliatory hostile environment

claims because she cannot show that the challenged actions were objectively and subjectively severe

or pervasive enough to create an abusive work environment.  See Faragher v. City of Boca Raton, 524

U.S. 775, 788 (1998) (noting "conduct must be extreme" to create abusive work environment);

---

[56]Plaintiff, for instance, claims that she heard from other people that Reams allowed co-workers to take extended lunches but has no evidence to refute Reams testimony that he was not aware of these employees taking extended lunches and not requesting leave for the extra time. (Pl. Dep. 529:6-9, 532:5-11; Reams Dep. 91:11-93:8).  Plaintiff also claims that Reams took too long to fix a broken desk lamp but has no evidence that the delay had anything to do with her EEO complaints or to refute Reams legitimate explanation for the delay in fixing it. (Pl. Dep. 109:22-111:13; Reams Dep. 66:4-68:4).  Finally, Plaintiff claims Caffey, a co-worker, was fired for giving her some audit documents, but was not involved in any management discussions regarding Caffey's termination and cannot refute Reams explanation that Caffey was fired for threatening him and not for anything having to do with Plaintiff. (Pl. Dep. 534:10-20; Reams Dep. 29:17-30:16).

Bozeman, 456 F. Supp. 2d at 1345 ("A claim for retaliatory harassment ... still requires proof of

harassing acts so severe or pervasive that they altered the terms and conditions of the Plaintiff's

employment."). To make this showing, a plaintiff must demonstrate that the "workplace [was]

permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe to alter

the conditions" of employment. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 (1993). When

analyzing the environment, a court should examine "the frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether

it unreasonably interferences with an employee's work performance." See Faragher, 524 U.S. at 788.

This highly-demanding standard is designed to prevent Title VII from becoming a "general civility

code" that applies to the "ordinary tribulations of the workplace." See id. at 787; Keeley v. Small, 391

F. Supp. 2d 30, 51 (D.D.C. 2005). See also Trujillo v. Univ. of Col., 157 F.3d 1211, 1214 (10th Cir.

1998) ("The hostile work environment that Plaintiff portrays is simply a work environment that exhibits

the monitoring and job stress typical of life in the real world. Normal job stress does not constitute a

hostile or abusive work environment."). Plaintiff falls well short of meeting this high standard.

 As an initial matter, the Eleventh Circuit has specifically noted that, unlike disparate treatment

claims, "a hostile work environment claim addresses acts 'different in kind' whose 'very nature

involves repeated conduct,' such as 'discriminatory intimidation, ridicule, and insult" that make the

plaintiff's day-to-day job severely abusive." See McCann, 526 F.3d at 1378. Plaintiff's hostile

environment claims, however, contain none of the slurs, derogatory statements, intimidation, insults,

or ridicule that are characteristic of such claims. Compare Miller v. Kenworth of Dothan, Inc., 277

F.3d 1269, 1275-1276 (11th Cir. 2002) (finding abusive environment when plaintiff was subjected to

multiple severe, offensive, intimidating, and humiliating ethnic slurs on a daily basis by supervisor,

who often shouted them in course of berating plaintiff's performance or taunting him) with Trujillo,

- 57 -

157 F.3d at 1214 (finding no hostile environment when Plaintiff's "list of grievances include none of the [biased] comments or ridicule that are hallmarks of hostile work environment claims."). Indeed, Plaintiff admits that she never heard any of the alleged harassers (Reams, Johnson, Davenport, or Bozeman) make offensive or derogatory comments about the EEO process. (Pl. Dep. 545:23-546:2).

Instead, Plaintiff appears to be impermissibly attempting to string a number of discrete events throughout her career together and collectively label them a hostile environment. See Rattigan v. Gonzales, 503 F. Supp. 2d 56, 82 (D.D.C. 2007) ("[C]obbling together a number of distinct, disparate acts will not create a hostile work environment."). The Eleventh Circuit has explicitly rejected such a tactic, holding that "a series of discrete acts, such as disciplinary decisions and failures to transfer, "cannot be brought under a hostile work environment claim..." See McCann, 536 F.3d at 1379 (emphasis added); Edwards v. EPA, 456 F. Supp. 2d 72, 96 (D.D.C. 2006). Indeed, to allow a plaintiff to contend that a number of separate discrete acts also created a hostile environment would eviscerate the statute of limitations and exhaustion requirements for disparate treatment claims. See Rattigan, 503 F. Supp. 2d at 82l; Parker v. Dep't of Pub. Safety, 11 F. Supp. 2d 467, 475 (D.Del. 1998). See also Morgan, 536 U.S. at 117 (discussing exhaustion requirements for discrete acts and hostile environment claims). For the reasons discussed supra, in sections I-IV, Plaintiff cannot assert any retaliation claims on the discrete acts in her two Complaints under a disparate treatment theory and she cannot somehow resurrect these acts to form the basis of a harassment claim.[57] See McCann, 536 F.3d at 1379.

---

[57]The discrete acts in Plaintiff's First Complaint include her alleged inability to work at home in April 2004; her April 30, 2004, oral warning; and her May 27, 2004, written reprimand. (First Comp. ¶¶ 23, 26, 27). The discrete acts in Plaintiff's Second Complaint include her denial of a request for leave to vote on October 14, 2003; the denial of requests for hardship transfers on October 7, 2004, December 3, 2004, and February 25, 2005; the January 27, 2005, inability to park in a handicap parking spot; and the February 27, 2005, keying of her car by an unknown person and denial of her request that the Government pay for it. (Second Comp. ¶¶ 12-14, 16, 19-25).

Nevertheless, even if everything is considered, Plaintiff presents a laundry list of petty slights and inconveniences that are part of the ordinary tribulations of the workplace spread over eight years of employment. See Trujillo, 157 F.3d at 1214. She endured nothing severe or pervasive.[58] See Mendoza, 195 F.3d at 1248. See also Brantley v. Kempthorne, 2008 U.S. Dist. LEXIS 38406, at *27 (D.D.C. May 13, 2008) ("the acts that plaintiff complains about are simply common work-place grievances and are not the type of 'extreme' conduct necessary to support a [retaliatory] hostile work environment claim..."); Edwards, 456 F. Supp. 2d at 97 ("plaintiff's reliance on discrete acts that are neither severe and pervasive nor ... [retaliatory] falls short of the showing [she] must make to state a viable hostile work environment claim."). Indeed, not only do Plaintiff's alleged acts fall short of showing an objectively abusive environment, but Plaintiff's admissions further underscore that no reasonable person in her situation would have believed the work environment was abusive. Plaintiff admits that in the midst of this alleged harassment : (1) she told an EEO auditor in November 2003 that she "loved" working for Johnson; (2) she told Reams in April 2004 "to be honest, I am perfectly happy, I think I have always told you that;"(3) nothing happened that Plaintiff considered part of a hostile environment between June 2004 and November 8, 2004; and (4) although Plaintiff claims she was afraid for her life and advised her kids that she might not come home alive each day she left for work, she always preferred meeting with her alleged harassers (Reams and Lamar) alone, behind closed doors, whenever she could, and was upset that they asked her to keep their office doors open. (Pl. Dep. 194:25-195:11, 325:13-17; 326:5-14, 410:11-411:25, 460:3-9, Exs. 44-46).

---

[58]Even assuming, contrary to Plaintiff's admission in her November 8, 2004, email that nothing had happened in the prior six months, that Lamar had grabbed Plaintiff's arm for a second on November 5, 2004, this minor touching was not severe or threatening and does nothing to create a hostile environment. See Mendoza, 195 F.3d at 1247-1249 (supervisor rubbing hip against plaintiff while touching shoulder, combined with other acts, did not create abusive environment).

- 59 -

Finally, as discussed <u>supra</u>, in Section III(B), Plaintiff was never dissuaded by the work environment from filing any EEO complaints and no reasonable person working in such an environment would have been so dissuaded. <u>See</u> <u>Somoza</u>, 513 F.3d at 1214; <u>Bush</u>, 2007 U.S. App. LEXIS 28210, at *7. <u>See also</u> <u>Burlington</u>, 126 S.Ct. at 2415 ("An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights and minor annoyances that often take place at work and that all employees experience."). Accordingly Plaintiff simply cannot show that she endured the severe and pervasive harassment necessary to establish create an abusive environment. <u>See</u> <u>Mendoza</u>, 195 F.3d at 1248; <u>Bozeman</u>, 456 F. Supp. 2d at 1345-1346.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant this Motion for Summary Judgment and enter an appropriate Order dismissing these lawsuits with prejudice.

Respectfully submitted this 21st day of August, 2008.

<div style="margin-left:40%">

LEURA G. CANARY
United States Attorney

By: _____

JAMES J. DUBOIS
Assistant United States Attorney
Georgia Bar No. 231445
United States Attorney's Office
Post Office Box 197
Montgomery, AL 36101-0197
Telephone: (334) 223-7280
Facsimile: (334) 223-7418
E-mail: james.dubois2@usdoj.gov

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2008, I filed the foregoing with the Clerk of the Court and

I hereby certify that I have mailed, by United States Postal Service, a copy of same to the following:

> Juraldine Battle-Hodge, Esq.
> Law Offices of Battle-Hodge
> 318 N. Decatur Street
> Montgomery, AL 36104

Dated this 21st day of August, 2008.

Assistant United States Attorney