# EXHIBIT A

Bernethia Johnson v. Jo Ann B. Barnhart, et al.                    10/23/2007
DEPOSITION OF BERNETHIA JOHNSON

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

BERNETHIA JOHNSON,

     Plaintiff,

vs.                                    CASE NO. 2:06-cv-397-WKW
                                                2:07-cv-59-WKW
JO ANN B. BARNHART,
Commissioner,

SOCIAL SECURITY
ADMINISTRATION,

     Defendants.


* * * * * * * * * *

DEPOSITION OF BERNETHIA JOHNSON, taken

pursuant to stipulation and agreement before Dee Coker

and Heather Barnett, Certified Court Reporters and

Commissioners for the State of Alabama at Large, in

the Office of the United States Attorney for the

Middle District of Alabama, 131 Clayton Street,

Montgomery, Alabama, commencing at 9:50 a.m. on

Tuesday, October 23, 2007, and continuing on

Wednesday, October 24th, 2007.

* * * * * * * * * *

Bernethia Johnson v. Jo Ann B. Barnhart, et al.                    10/23/2007
DEPOSITION OF BERNETHIA JOHNSON

2 (Pages 2 to 5)

---

**Page 2**

```
1              APPEARANCES
2    FOR THE PLAINTIFF:
3    Ms. Juraldine Battle-Hodge
     Attorney at Law
4    207 Montgomery Street
     Suite 215 Bell Building
5    Montgomery, Alabama 36104
6    FOR THE DEFENDANTS:
7    Mr. James J. Dubois
     Assistant United States Attorney
8    OFFICE OF THE UNITED STATES ATTORNEY
     FOR THE MIDDLE DISTRICT OF ALABAMA
9    131 Clayton Street
     Montgomery, Alabama 36104
10
     Mr. Reginald V. Speegle
11   Assistant Regional Counsel
     SOCIAL SECURITY ADMINISTRATION
12   61 Forsyth Street, S.W.
     Suite 20T45
13   Atlanta, Georgia 30303
14            * * * * * * * * * *
15         EXAMINATION INDEX
16   BERNETHIA JOHNSON
       BY MR. DUBOIS          5
17
18
19
20
21
22
23
24
25
```

---

**Page 3**

```
1           EXHIBIT INDEX
2    DEFENDANTS' EXHIBIT NO.:
3    1  10/21/03 Acknowledgment        26,27
        Statement for Bernethia
4       Johnson, Legal Assistant,
        signed by Paul Johnson
5       with attached Sanctions for
        Unauthorized Access Violations
6    2  Sanctions for Unauthorized     28
7       Access Violations with
        attached Acknowledgment
8       Statement for Bernethia
        Johnson, Legal Assistant,
9       signed by Cynthia Lamar
10   3  Application for Federal        48,49
        Employment
11
     4  Montgomery Workflow,           64,83
12      Revised March 25, 2004
13   5  10/29/03 memo to Legal         66,73,77
        Assistants from Paul Johnson,
14      Subj: Ready to Hear File
        Cabinets
15
     6  1/26/04 memo from Paul Reams,  80,81,82
16      Subj: Case assignment for
        pulling
17
     7  Partnership Agreement          90,126
18
     8  4/26/04 AFGE/OHA Flexiplace    91,94
19      Program Request form
20   9  Complaint                      100,133
21   10 4/13/04 memo to Bernethia      127,131,132
        Johnson from Paul Reams,
22      Subj: Work at Home on
        Thursday
23
     11 4/14/04 and 4/15/04 Serial     128,129
24      Time and Attendance Roster
25
```

---

**Page 4**

```
1    DEFENDANTS' EXHIBITS continued:
2    12 4/20/04 and 4/21/04 Serial     131,132
        Time and Attendance Roster
3
     13 4/19/04 note by Lynda Hall     145
4       at 3:45
5    14 4/19/04 note by Lynda Hall     148,150,151
        at 4:00
```
```
6
7             * * * * * * * * * *
8             STIPULATIONS
9       It is hereby stipulated and agreed by and
10   between counsel representing the parties that the
11   deposition of BERNETHIA JOHNSON is taken pursuant to
12   the Federal Rules of Civil Procedure and that said
13   deposition may be taken before Dee Coker, Registered
14   Professional Reporter and Commissioner for the State
15   of Alabama at Large, without the formality of a
16   commission; that objections to questions other than
17   objections as to the form of the questions need not be
18   made at this time but may be reserved for a ruling at
19   such time as the deposition may be offered in evidence
20   or used for any other purpose as provided for by the
21   Federal Rules of Civil Procedure.
22       It is further stipulated and agreed by and
23   between counsel representing the parties in this case
24   that said deposition may be introduced at the trial of
25   this case or used in any manner by either party hereto
```

---

**Page 5**

```
1    provided for by the Federal Rules of Civil Procedure.
2             * * * * * * * * * *
3       MS. BATTLE-HODGE:  We're going -- we will not
4    have to read and sign.
5       BERNETHIA JOHNSON
6       The witness, having first been sworn to speak
7    the truth, the whole truth and nothing but the truth,
8    testified as follows:
9             EXAMINATION
10   BY MR. DUBOIS:
11      Q.  Good morning, Ms. Johnson.  My name is Jim
12   Dubois, and I'm an Assistant U.S. Attorney
13   representing the defendants in the two lawsuits you
14   have filed.  I'll be asking you some questions about
15   your lawsuits today.  If at any point in time you
16   don't understand any of my questions, please let me
17   know; and I'll attempt to rephrase them so that they
18   will be understandable.  Is that all right?
19      A.  That's fine.
20      Q.  And if at any point in time I'm asking a
21   question, I ask that you wait until I finish until
22   before you start so we can get an accurate
23   transcription.  At the same time, I'll wait for you to
24   finish your answers before I ask another question.
25      A.  That's fine.
```

Bernethia Johnson v. Jo Ann B. Barnhart, et al.                    10/23/2007
DEPOSITION OF BERNETHIA JOHNSON

3 (Pages 6 to 9)

---

Page 6

1    Q.  All right.  And unless you tell me otherwise,
2  I'll assume you understand the question.
3    A.  Okay.
4    Q.  And since we have a court reporter here
5  trying to get an accurate transcript, I'll ask that
6  you answer my questions with a yes or no, if that's
7  what's called for, as opposed to shaking your head,
8  just to make sure we get the accurate record.  Is that
9  okay?
10   A.  Yes.
11   Q.  And, then, this isn't any type of endurance
12 contest or anything.  I'll be taking frequent breaks.
13 But if at any point in time you need a break, just let
14 me know; and I'll find a convenient place to stop and
15 we'll take a break.
16   A.  Okay.  I am on some medication that requires
17 me to drink a lot of liquid; and, therefore, I will be
18 taking quite a few breaks because it does cause me to
19 go to the restroom quite a bit.
20   Q.  Okay.
21   A.  Okay?
22   Q.  Well, whenever you believe you need a break,
23 let me know.  And one thing, I'd prefer if you did not
24 take a break when there's a pending question.
25   A.  Okay.

---

Page 7

1    Q.  So what I'd like to do is get the answer to
2  the question, then we can take a break.
3    A.  Okay.  That would be fine.
4    Q.  So just give me a little bit of advance
5  notice that you need a break, and we'll take it.
6    A.  Okay.
7    Q.  Ms. Johnson, do you understand that you're
8  giving testimony under oath and the penalties of
9  perjury apply?
10   A.  Yes.
11   Q.  Are you aware of any reason that you won't be
12 able to give complete and honest answers to the
13 questions I'm asking?
14   A.  No.
15   Q.  And are you presently taking any medication
16 that you believe will interfere with your ability to
17 answer the questions?
18   A.  I am on medication, but I don't see why that
19 would interfere.  So --
20   Q.  And besides these two consolidated lawsuits
21 I'll be asking you about today, have you ever been a
22 party to another lawsuit?
23   A.  Yes.
24   Q.  Can you tell me how many other lawsuits?
25   A.  When you say lawsuits, I need to understand

---

Page 8

1  what you mean by lawsuit, because there have been
2  previous action against the agency for promotion.
3  Would that be considered a lawsuit?
4    Q.  That would be -- I believe what you're
5  referring to is administrative proceedings.  By
6  lawsuit, I mean a document filed in federal court.
7  Does that clarify for you?
8    A.  This is the first time I've actually filed
9  something in the federal court.
10   Q.  Okay.  These two lawsuits that we're talking
11 about today?
12   A.  Yes, to the best of my -- okay.  Wait a
13 minute.  I don't know.  Let me just say years ago I
14 had a vehicle that I purchased from someone else, and
15 it was a total lemon that I purchased, and I did
16 file -- go to court because -- well, so would that be
17 like a lawsuit?
18   Q.  Do you know what court you went to?
19   A.  No.  I'm sorry.  I don't know what court I
20 went to.
21   Q.  All right.  Did you file something in court
22 seeking some kind of recovery in relation to the car?
23   A.  Yes.
24   Q.  When approximately was that?  A rough date.
25   A.  Gosh.  Maybe within the last 15 years.  I

---

Page 9

1  can't remember.  It's been a long time.
2    Q.  Did you have an attorney for it, or did you
3  file it yourself?
4    A.  It was -- it had to be a small claim, okay,
5  because -- yeah, a small claim.
6    Q.  What was the resolution?
7    A.  I didn't -- I -- I -- well, the thing is let
8  me -- let me -- I took my car several times to this
9  particular business; and every time I made a left
10 turn, my axles in the front would fall -- come apart.
11 So I don't -- I didn't -- nothing happened out of it,
12 nothing --
13   Q.  I was just wondering did you get some money?
14 Did you recover -- if you don't recall, that's fine.
15   A.  I really don't.  It's been, ooh, so long.
16   Q.  All right.  Besides that incident regarding
17 the car, can you recall any other time?
18   A.  No.  That was it.
19   Q.  Now, have you ever been a witness in another
20 person's lawsuit in federal court?
21   A.  In a lawsuit?  Never, to the best of my
22 ability, can I recall.
23   Q.  Now, I believe you testified under oath in
24 two administrative proceedings that you have filed; is
25 that right?

Bernethia Johnson v. Jo Ann B. Barnhart, et al.                                    10/23/2007
DEPOSITION OF BERNETHIA JOHNSON

4 (Pages 10 to 13)

| Page 10 |
| --- |

1    A.  Yes.
2    Q.  One in approximately 1999?  Does that sound
3  right?
4    A.  Possibly, yes.
5    Q.  And then another in 2005?
6    A.  I'm so bad with dates.  Hold on.
7    Okay.  I guess the hearing was in 1999.  And was
8  that 2005?  You said 2005?
9    Q.  Yes.
10    A.  It was just -- I don't know if it was 2005,
11  but it was -- it was in --
12    Q.  Was it here in Montgomery?  Is that right?
13    A.  Yes.
14    Q.  And that was in relation to your nonselection
15  to a paralegal position?
16    A.  That is correct.  Was that held in 2005?
17    Q.  I believe it was March of 2005.  Does that
18  sound right?
19    A.  Okay.  Okay.  That sounds right.  Okay.
20    Q.  And the one in 1999, was that in relation to
21  an EEOC -- EEO charge that you filed --
22    A.  Yes.
23    Q.  -- regarding nonpromotion to a position?  Is
24  that what it was?
25    A.  Yes.

| Page 11 |
| --- |

1    Q.  Now, other than those two times, have you
2  ever testified under oath in a proceeding?
3    A.  Not that I can recall.
4    Q.  For example, have you ever given a deposition
5  before?
6    A.  Other than to the -- those two times you're
7  talking about?
8    Q.  Yes.
9    A.  I don't think I've ever given a -- I've never
10  given a deposition before.
11    Q.  And who was your attorney in those two -- did
12  you have an attorney when you testified at those two
13  hearings?
14    A.  The first one, I did not.
15    Q.  Okay.  How about the second one?
16    A.  The first -- well, all of mine, I depend on
17  the Lord.  Let me see.  The second one in 2005, okay,
18  that was Mr. Morrell represented me, Adam Morrell.
19    Q.  And at what point did you first obtain the
20  services of Mr. Morrell?  Do you recall a date?
21    A.  No.  I'm -- I can't recall a date.
22    Q.  Have you ever declared bankruptcy?
23    A.  Never.
24    Q.  Have you ever been convicted of a crime other
25  than a minor traffic offense?

| Page 12 |
| --- |

1    A.  Never.
2    Q.  Ever been arrested or charged with a crime
3  other than a minor traffic offense?
4    A.  Never.
5    Q.  Did you talk to anyone besides your counsel
6  about the testimony you would be giving today?
7    A.  Not about the testimony I'd be giving today.
8    Q.  Did you talk to anyone before today --
9    A.  And when you say -- you said talk about the
10  testimony I'll be giving today, as far as like what?
11    Q.  Did you talk to anyone --
12    A.  I mean, I don't know enough about what to
13  expect.  Okay.  Is that what you're talking about?
14    Q.  Yeah.  Did you talk to anyone before coming
15  here today about the fact that you were coming
16  today to give testimony and what you might be talking
17  about?
18    A.  Definitely, I did, to several people.
19    Q.  All right.  Who did you talk to?
20    A.  Anybody that could possibly help me to find
21  someone to care for my daughter, who's in Chattanooga,
22  where I don't know anyone; but I had to leave her with
23  someone because she's in school.  So I talked to many
24  people that could.
25    Q.  Okay.  Aside from talking to people about

| Page 13 |
| --- |

1  maybe the logistics of traveling here, did you talk to
2  anyone about the allegations in your lawsuit?
3    MS. BATTLE-HODGE:  May I?
4    MR. DUBOIS:  Besides you.
5    MS. BATTLE-HODGE:  I guess -- and correct me
6  if I'm wrong.  If I may, I guess he's asking you did
7  anyone help you in preparing legally for questions or
8  testimony that you might be giving today other than
9  me.
10    THE WITNESS:  No.  Just prayer partners and
11  things like that.
12    MR. DUBOIS:  That's a fair restatement.
13    MS. BATTLE-HODGE:  Is it?
14    MR. DUBOIS:  That was.  That's what I was
15  trying to get at.
16    Q.  Okay.  So the answer is no?
17    A.  Prayer partners.
18    Q.  What do you mean by prior partners?
19    A.  Prayer.  Pray.
20    Q.  Prayer partners.
21    A.  Pray.
22    Q.  Oh, okay.
23    A.  Like to Christ, you know, to be covered in
24  that manner, things like that.
25    Q.  Okay.  Did you review any documents or listen

Bernethia Johnson v. Jo Ann B. Barnhart, et al.                    10/23/2007
DEPOSITION OF BERNETHIA JOHNSON

5 (Pages 14 to 17)

Page 14

1  to any tapes in preparation for your testimony today?
2      A.  I reviewed documents. I listened to tapes.
3  Yes.
4      Q.  Do you recall what documents you reviewed?
5      A.  Anything -- probably the same documents that
6  you-all have, everything that was sent to you.
7      Q.  These are documents that you provided to your
8  attorney that you reviewed that were --
9      A.  Everything that was submitted from the time
10  that I initiated the action.
11      Q.  Okay. Documents like you submitted with your
12  EEO complaint?
13      A.  Yes, from the very initial stage.
14      Q.  And you referenced also you had listened to
15  some tapes?
16      A.  Just tapes. Yes.
17      Q.  All right. Now, you produced four audio
18  cassette tapes in this lawsuit.
19      A.  Probably the same thing. Did I put -- I
20  couldn't quite remember what was on them, but they're
21  probably the same ones.
22      Q.  All right. Do you have any audiotapes,
23  besides those four, in your possession?
24      A.  Let me tell you. If they were, they're all
25  messed up now because they fell in a puddle of water,

Page 15

1  because it was raining really hard here. So they're
2  probably no good.
3      Q.  When did you drop them?
4      A.  Yesterday. It rained so hard when I was
5  trying to pack my car. So --
6      Q.  Well, how many tapes did you have in your
7  possession?
8      A.  I just had a bunch of tapes. I had CD
9  Christian tapes. I just had tapes. I just brought
10  stuff with me, religious music, just a combination,
11  preaching from my pastors -- pastor. I just picked up
12  a bunch of things. So I don't know what was damaged
13  or if they're any good now when they fell in the
14  puddle of water. Just a combination.
15      Q.  Let me rephrase the question.
16      A.  Okay.
17      Q.  Do you have any tape recordings of any
18  meetings or conversations at the Social Security
19  Administration other than the four that your counsel
20  produced in this lawsuit?
21      A.  I think I have what I submitted to you-all,
22  but that would be it, pretty much.
23      Q.  All right. Now, those four tape cassettes
24  you produced were your standard audio cassette tapes.
25  Did you record those using a standard tape deck?

Page 16

1      A.  I used several tape decks. I used a small
2  one, but I think I transferred it over to big ones.
3      Q.  What did you --
4      A.  And I think that's the one that you-all have.
5      Q.  Do you have any more of the small tape
6  cassettes in your possession?
7      A.  Right now?
8      Q.  Yes.
9      A.  Yes, I do.
10      Q.  And are those the originals of what was put
11  on the larger audio cassettes?
12      A.  No. I don't think any of them are the
13  original because I also had -- used to have tapes
14  similar to this. And that's where it was transferred
15  from this type to the little small kind or to the
16  bigger kind.
17      Q.  And you're referring to you had a little
18  digital recorder?
19      A.  Yes.
20      Q.  Okay.
21      A.  So none of them are original.
22      Q.  Do you have any of the original recordings?
23      A.  I don't have --
24      Q.  Do you have any original recordings of any
25  meetings or conversations at the Social Security

Page 17

1  Administration?
2      A.  I don't think I have any original because I
3  think most of them were from this type and then
4  transferred, so only the original would have been on
5  this.
6      Q.  And did you retape over the original?
7      A.  The original -- the machine is no good
8  anymore. I don't even think I have the machine. It
9  just quit playing.
10      Q.  Were all the recordings made with a digital
11  recorder?
12      A.  No, not all of them were. I used -- I used
13  different kinds. I used this kind. Then I purchased
14  one that actually used the small one. But before
15  that, I may -- I -- I may have purchased -- well, I
16  purchased one that used the small one, and then I
17  purchased one that used the regular one.
18      Q.  So you used three different types of
19  recording devices --
20      A.  Yes.
21      Q.  -- to record meetings and conversations?
22      A.  Yes.
23      Q.  First a digital, then a smaller one, and then
24  a regular size?
25      A.  I can't say. The first one was this type;

Page 18

1   that's what I know.  But I can't say whether the
2   second was the -- the small one or the medium.  I
3   can't remember which order.
4       Q.  But your testimony is that you no longer have
5   any original tapes in your possession?
6       A.  I can't say.  No, I'm not going to say I
7   don't have any original in my possession.  I can't
8   say.  To be honest with you, you might have the
9   original.  I can't remember that.  The ones that I
10  sent may have been the original.  Now, they actually
11  came from my first attorney, I believe.  I don't even
12  know what's on the tapes anymore, really.
13      Q.  Did you --
14      A.  I just can't recall.
15      Q.  Did you listen to any tapes of any meetings
16  or conversations recorded at the Social Security
17  Administration --
18      A.  Yes, I did.
19      Q.  -- before today?
20      A.  Yes, definitely.
21      Q.  In preparation for today?
22      A.  I always listen to them, not just --
23  everything is in preparation for not just today, but
24  for going as far as we need to go, but I always kind
25  of listen to them periodically.

Page 19

1       Q.  And the tapes you've listened to, you've
2   given all those to your attorney?
3       A.  I've given to the best of my knowledge.  I --
4   to be honest with you, I don't know what's on the
5   tapes.  I think what I did was just combined them all
6   to maybe one or two tape or three tape or four.  I
7   think that's what I did.  I don't know.  To keep from
8   giving all the small -- the little ones or, like I
9   said, from -- from -- I don't have the original.  The
10  ones that I think I sent to my attorney was the one
11  that actually I may have sent to my first attorney.
12  So I don't know.  I think I just put a bunch of them
13  on there together.  I just can't even recall what's on
14  it anymore.
15      Q.  Okay.  I just ask that after this deposition,
16  when you return home, you check your house to make
17  sure you've produced all the original tape
18  recordings --
19      A.  Okay.
20      Q.  -- to your attorney.  If you have any
21  remaining original tapes, just provide them to your
22  attorney.  Is that acceptable?
23      A.  Let me ask this.  Is there any way I can
24  listen to what was given to you-all so that I won't
25  duplicate what has been sent?

Page 20

1       Q.  I imagine your attorney has retained a copy.
2           MS. BATTLE-HODGE:  I don't have a copy.
3       A.  We don't have a copy.
4           MR. DUBOIS:  I can make a copy and get it to
5   you.  We'll get you a copy.
6           MS. BATTLE-HODGE:  Okay.  Thank you.
7       A.  Okay.  That was one of my biggest concern.  I
8   just didn't --
9       Q.  At any point, did you make any transcripts or
10  try to have any transcripts made of any of the
11  recordings that you had made?
12      A.  By some other person?
13      Q.  By yourself or by another person.
14      A.  I think I would sit down from time to time
15  and try to do it, yes.
16      Q.  All right.  Do you have any of those notes
17  that you took or any possible transcripts in your
18  possession?
19      A.  I may have already sent what -- let me tell
20  you.  On my move to Chattanooga, I lost a lot of
21  stuff.  My original computer that I had, that was
22  eventually thrown away.  I think that was a Tandy I
23  had.  So there was material in there.
24      My second one that I purchased, when I moved from
25  Montgomery and I was turning in certain things like

Page 21

1   to -- I don't remember.  Like in Chattanooga, we
2   called it Comcast.  I can't remember.  But like a
3   little black box of things if you have like DSL or
4   something like that.  I don't know the proper place.
5   But when I was trying to move, I turned things in; and
6   I turned in the cards to my computer.  So that was no
7   good.  So I end up getting another computer.
8       Q.  When did you get rid of your old computer?
9       A.  When?
10      Q.  When.
11      A.  When I moved to Chattanooga.
12      Q.  Did you make any backup disks or copies?
13      A.  No.
14      Q.  All right.  Did you print out everything that
15  was on it?
16      A.  No.
17      Q.  Are you aware, sitting here today, of any
18  transcriptions or notes that you took of any of your
19  tape recordings that you haven't provided to your
20  attorney?
21      A.  I'm not aware of that.  Now -- okay.  Let me
22  go back on that, because as far as some tapes -- but I
23  can't say.  I do have some floppies; but on those
24  floppies, I would say like they're for my -- like for
25  my application packet and things.  So, now, I did a

Bernethia Johnson v. Jo Ann B. Barnhart, et al.                    10/23/2007
DEPOSITION OF BERNETHIA JOHNSON

7 (Pages 22 to 25)

---

Page 22

1  lot of that. There may be some on there, and I've
2  just not gone back to even think of that. I don't
3  know.
4       MR. DUBOIS: I just request that --
5       MS. BATTLE-HODGE: If anything that you have,
6  will you get it -- if you -- whatever you have, if you
7  will get it to me.
8    A.  A lot of things are still in my storage,
9  heavy stuff I can't move by myself.
10   Q.  Do you believe you have files or documents
11 that might relate to the time period of your
12 employment here in Montgomery?
13   A.  In storage.
14   Q.  In storage.
15   A.  I don't know. I very seldom go to the
16 storage, very, very seldom go to the storage. It
17 could be something. I doubt it, though. I don't
18 know. I moved from a house that was like 16 -- 1,620
19 square feet into a two-bedroom apartment. So --
20      MS. BATTLE-HODGE: So can we agree that --
21   A.  I don't know.
22      MS. BATTLE-HODGE: Can we agree that when you
23 go back to Chattanooga, you will check to see if you
24 have anything? If you have anything additional, just
25 get it to me; and I will get it to Mr. Dubois. Can we

---

Page 23

1  agree on that?
2       THE WITNESS: Yeah. I can check that. I
3  need to check.
4       MS. BATTLE-HODGE: I'll make notes for you.
5       THE WITNESS: Okay.
6    Q.  All right. Now, during your employment with
7  the Social Security Administration, did you keep any
8  journal or notebook or take notes of conversations you
9  were having?
10   A.  Yes.
11   Q.  All right. Do you still have that in your
12 possession today?
13   A.  Yes. I thought I sent you-all -- okay.
14   Q.  Now, I have not seen that, I don't believe.
15 So I'd ask that you provide that to your attorney as
16 well.
17      MS. BATTLE-HODGE: I didn't hear the
18 question. I'm sorry.
19      MR. DUBOIS: Oh, if she had any notebook or
20 journal that she took notes during her employment with
21 the Social Security Administration.
22   Q.  So I'd ask you to provide that to your
23 attorney.
24   A.  Oh, okay. I have a question. Are you
25 talking about like also for my day-to-day things that

---

Page 24

1  I did, like what cases I touched, what I did with
2  those? I recorded all of that.
3    Q.  I'd like any notebook or journal you have
4  that you took notes regarding your employment.
5    A.  Any of them?
6    Q.  If you have a journal. Do you have separate
7  notebooks or journals that you took notes of different
8  things in?
9    A.  No, I did not. It's everything, my
10 appointments, doctors' appointments. Everything is
11 just combined.
12   Q.  Is it in a like note pad --
13   A.  No.
14   Q.  -- or is it a bound notebook?
15   A.  It's in like my -- they're in -- they're in
16 composition book. They're in legal pads. They're in
17 that type. They're in stenographer's pad. They're in
18 a calendar like this. They're in different things.
19   Q.  Okay.
20   A.  So --
21   Q.  I'd ask for all of that to be produced in one
22 request.
23   A.  Let me ask you. Only that's pertaining to
24 this? Not like my personal appointments or anything
25 like that?

---

Page 25

1    Q.  No, I don't need the personal appointments.
2    A.  Okay.
3    Q.  Anything relating to the employment -- your
4  employment.
5    A.  Okay. I thought I provided that, though.
6    Q.  Now --
7    A.  Now, and, see, we're talking about -- you
8  mean day-to-day work and all of that every day?
9    Q.  If you -- if you kept a journal or a notebook
10 where you took notes regarding your employment in
11 Montgomery at the Social Security Office, yeah, I'd
12 ask you to provide that to me.
13   A.  Okay.
14      MR. DUBOIS: Go off the record for a second.
15          (Off-the-record discussion)
16   Q.  Did you ever remove from the Social Security
17 Office any documents or files concerning social
18 security claimants to assist you in any of your EEO
19 claims?
20   A.  Yes.
21   Q.  What kind of documents did you remove?
22   A.  I'm trying to think of the proper term.
23 Lists. They were lists, like printouts. That's what
24 I was trying to think of, printouts.
25   Q.  Printouts of what type of information?

Bernethia Johnson v. Jo Ann B. Barnhart, et al.                    10/23/2007
DEPOSITION OF BERNETHIA JOHNSON

8 (Pages 26 to 29)

Page 26

1    A.  Of -- it's the information that you-all
2  should have a copy of is what I took.
3    Q.  Okay.  Did you produce all the printouts and
4  records that you have in your possession of any social
5  security claimants you got to assist you in preparing
6  your EEO cases?
7    A.  Now, repeat that.  Did I produce --
8    MR. DUBOIS:  Strike that.  That was a
9  horrible question.
10   Q.  Did you provide to your attorney any and all
11 records that you may have at your house regarding
12 social security claimants that you thought related to
13 any of your EEO claims?
14   A.  Social security claimant.  Let me make --
15 okay.  I want to make sure I understand what you're
16 saying.  I -- I took documents that would show -- or
17 that I planned to show how the agency discriminated
18 against me.  Those are the documents I took.  And I
19 supplied them.
20   Q.  You provided all the documents you took to
21 your attorney?
22   A.  To the best of my knowledge.  Now -- yeah, to
23 the best my knowledge.
24   MR. DUBOIS:  I'm going to mark this as
25 Defendant's Exhibit #1.

Page 27

1    Q.  Ms. Johnson, I hand you a document that's
2  been marked as Defendant's Exhibit #1.  Can you tell
3  me if you recognize this document?
4    A.  Yes.
5    Q.  All right.  And this is a copy of the Social
6  Security Administration's policy regarding
7  unauthorized system access, correct?
8    A.  That is correct.
9    Q.  All right.  And did Paul Johnson provide you
10 a copy of this in October of 2003?
11   A.  Yes.
12   Q.  All right.  And are those -- let's see.
13 Underneath, if you look right above the exhibit
14 sticker, it looks like there's some initials and
15 10/21/03.  Is that your handwriting?
16   A.  That is correct.
17   Q.  Your initials and the date you received it?
18   A.  That is correct.
19   Q.  And is there a reason you refused to sign
20 this document?
21   A.  Because at a union steward meeting, we were
22 told that -- to be careful on these type of documents
23 because of the agency's interpretation and the union
24 interpretation.  They don't always match.
25   Q.  Are you aware of any other legal assistants

Page 28

1  who refused to sign this policy?
2    A.  No.
3    Q.  And were you provided a copy of this policy
4  every year by your supervisor?
5    A.  I can't recall if we were provided one every
6  year or not, if I was provided one every year or not.
7    Q.  Were you ever told that you were required to
8  sign as part of the Social Security's policy?
9    A.  I don't know.  I cannot recall.
10   Q.  I'm handing you a document that's been marked
11 as Defendant's Exhibit #2.
12   A.  Okay.
13   Q.  And if you flip to the last page, do you
14 recall Cynthia Lamar providing you a copy of this
15 document in October of 2004?
16   A.  Yes.  It's dated 10/29/04 by her initials.
17   Q.  Do you recall receiving a copy?
18   A.  I don't know if I actually received a copy.
19 I don't know if I received it or not, but -- I don't
20 know.  I can't say I received it or not.
21   Q.  But, again, you didn't sign that document,
22 correct?
23   A.  There's no signature.
24   Q.  All right.  Since you filed the EEO
25 complaints prior to this lawsuit, have you sent any

Page 29

1  e-mails to anyone besides your attorney regarding the
2  allegations in your lawsuit?
3    A.  Have I sent -- I have sent e-mail -- an
4  e-mail to several people.
5    Q.  Okay.  Do you have copies of those e-mails?
6    A.  I may.  I'm -- I'm not sure.
7    Q.  Okay.  I'll ask that you check to see if you
8  have any more -- or any of those e-mails retained and
9  provide them to your attorney.
10   Do you recall who you sent those e-mails to?
11   A.  I sent them to several of the employees at
12 OHA Montgomery.  I can't recall all of them that I
13 sent it to, no.
14   Q.  Okay.  What individuals do you recall?
15   A.  I think I sent -- I think I sent a copy to
16 Valerie Cooper.  I think I sent a copy to -- hold on.
17 Let me just write down -- I'll just have to write
18 their names down and then -- let me see.  I have -- I
19 don't remember.  I'm forgetting a lot of them.
20   Okay.  Valerie Cooper, Freida Goldsmith, Tresalyn
21 Collier, David Wilder, Karen Burton, Renee Bridges.
22   Q.  I'm sorry.  What was that last name?
23   A.  Bridges.  Kathy Cotten.  Those -- those -- I
24 think those -- those are only ones that I can recall.
25   Q.  And when you said earlier you sent a copy, a

Bernethia Johnson v. Jo Ann B. Barnhart, et al.                    10/23/2007
DEPOSITION OF BERNETHIA JOHNSON

9 (Pages 30 to 33)

Page 30

1  copy of what were you referring to there?
2      A.  Excuse me.  What was your question?  I may be
3  answering the wrong thing, then.
4      Q.  Have you sent any e-mails to anyone regarding
5  the allegations in your lawsuit?
6      A.  Okay.  To make sure I understand, let me just
7  tell you what I was thinking and then -- when you say
8  making allegation, say, for instance, when the appeals
9  counsel overturned the judgment of the administrative
10  judge, that's what I'm talking about.  I just sent
11  them just an e-mail.  Christine Smith.
12      Q.  Okay.  You're talking -- you're saying --
13      A.  So I did not --
14      Q.  Let me see if I understand.
15      A.  Okay.
16      Q.  You're saying regarding your -- this is the
17  nonselection to a paralegal position?
18      A.  Yeah.
19      Q.  You sent a copy of the final decision to a
20  number of individuals by e-mail?
21      A.  No, not the final decision.  It was just --
22  just a brief e-mail saying that the case -- that was
23  in my favor.  That's what you're talking about?
24  That's the only thing I've sent to them that I know
25  of.

Page 31

1      Q.  Have you sent any e-mails to anyone else --
2      A.  No.
3      Q.  -- soliciting information, asking them if
4  they recall things relating to your employment that
5  may relate to your allegations?
6      A.  I recall -- now, so strike that.  Because
7  these people I did not.  These people I actually sent
8  that little notice saying that the case was
9  overturned.  That's what I sent to them.
10      Q.  By e-mail?
11      A.  By e-mail.  That's why I gave those names.
12      Q.  Did you send any other e-mails?
13      A.  I don't recall -- did I send an e-mail
14  requesting any information?  I don't think I've sent
15  an e-mail to anyone.
16      Q.  Well, let me just --
17      A.  It may have -- Linda Tamplin.  I'm sorry.
18  I'm sorry.  I'm trying to remember these people.
19  Linda Tamplin.  Now, Linda Tamplin was the union
20  steward.  I may have -- I'm not sure.  I may have sent
21  something to her, because we did correspond.  And
22  basically, the only time I really talked to Linda was
23  regarding the case.  So, Linda Tamplin.
24      Q.  All right.  Do you recall anyone else you
25  sent any e-mails to --

Page 32

1      A.  Sent an e-mail?
2      Q.  -- about the allegations in the lawsuit?
3      A.  I just don't -- I just can't recall.
4      Q.  All right.  Like the previous request, I
5  request that you go home and check your computer; and
6  if you have any e-mails on there to anyone regarding
7  the allegations in your lawsuit, I'd ask you to
8  provide them to your attorney.
9      A.  Okay.
10      Q.  Now, since you filed this lawsuit, have you
11  thrown away, shredded, or destroyed any documents or
12  tapes?
13      A.  If they were destroyed, they were not
14  destroyed intentionally.  I told you that when I was
15  packing to come here and I was taking my things out to
16  the car, they fell in a puddle of water; but these are
17  just all my tape, music tapes and everything.  So I
18  can't say whether they were destroyed or not.
19      Q.  Do you know if any of those tapes related to
20  your employment with the Social Security
21  Administration, that fell in the puddle?
22      A.  Yes, they probably are.  I'm saying they
23  probably are.
24      Q.  All right.  And do you have those with you
25  today?

Page 33

1      A.  I can't even -- yes, I have some, but I can't
2  even say if they're the ones, but --
3      Q.  Well, I ask that even the ones that fell in
4  the puddle, provide those to your attorney.
5          MR. DUBOIS:  I'd ask for copies.
6      A.  Okay.
7      Q.  All right.  Where were you born?
8      A.  Knoxville, Tennessee.
9      Q.  And when?
10      A.  October the 16th, 1955.
11      Q.  All right.  And you currently reside in
12  Chattanooga, Tennessee; is that right?
13      A.  Yes.
14      Q.  All right.  What is your current address
15  there?
16      A.  6220 Shallowford Road -- that's one word --
17  Apartment 132, Chattanooga, Tennessee, 37421.
18      Q.  And do you own or rent that dwelling?
19      A.  I rent.
20      Q.  Does anyone live there with you?
21      A.  Yes.
22      Q.  All right.  Who resides there with you?
23      A.  On a full-time basis, my youngest daughter;
24  and whenever my oldest daughter come home from
25  college, my oldest daughter.

Bernethia Johnson v. Jo Ann B. Barnhart, et al.                    10/23/2007
DEPOSITION OF BERNETHIA JOHNSON

10 (Pages 34 to 37)

Page 34

1    Q.  Okay.  So you have two daughters?
2    A.  That is correct.
3    Q.  And how old are they?
4    A.  20 -- one is 22 today, and Saturday she'll be
5  23.  And then the youngest one is 15.  15.
6    Q.  All right.  Does either of them reside in
7  Alabama?
8    A.  Yes, my youngest daughter.  If you want to
9  call staying on campus residing, so is that -- okay.
10   Q.  Yeah.  Where does your youngest daughter
11 attend college?
12   A.  My youngest daughter?  When does she?
13   Q.  Does she attend college in Montgomery?  Is
14 that what you said?
15   A.  My youngest daughter is in school.  She's 15
16 years old.  She's in high school.
17   Q.  All right.  I jumped ahead.  Let me jump
18 back.  How many children do you have?
19   A.  I have two.
20   Q.  Okay.  And your oldest is 23?
21   A.  22.
22   Q.  22.
23   A.  She'll be 23 Saturday.
24   Q.  And where does she live?
25   A.  She lives on -- in Jacksonville, Alabama.

Page 35

1    Q.  Jacksonville, Alabama.  And what is her full
2  name?
3    A.  Daria Amalinda Johnson.
4    Q.  Okay.  And is she married?
5    A.  No.
6    Q.  And then you have a second child?
7    A.  Yes.
8    Q.  All right.  And how old is she?
9    A.  She's 15.
10   Q.  And does she live with you in Tennessee?
11   A.  That is correct.
12   Q.  Now, what was the last address you lived here
13 in Montgomery?
14   A.  225 Garden Homes Circle.
15   Q.  And how long did you live at that address?
16   A.  For -- okay.
17   Q.  Approximately.
18   A.  I've been gone away for two years.  Maybe
19 like 16 years.
20   Q.  Are you currently married?
21   A.  No.
22   Q.  Were you married previously?
23   A.  Yes.
24   Q.  All right.  And what was your spouse's name?
25   A.  Frederick Johnson.

Page 36

1    Q.  And how long were you married?
2    A.  14 years.
3    Q.  And did you have a divorce?
4    A.  Yes.
5    Q.  Approximately when was that?
6    A.  I'm so bad with numbers or dates.  I'm going
7  to say -- was it in 1995?
8        Now, what was that question?  I'm sorry.  What
9  was your question?
10   Q.  Approximately when were you divorced?
11   A.  Oh, 1995.
12   Q.  Do you know where --
13   A.  Approximately.
14   Q.  Do you know where Mr. Frederick Johnson
15 resides?  Does he live in Alabama?  Do you know?
16   A.  Yes.
17   Q.  Does he live in Montgomery?
18   A.  No, he does not.
19   Q.  Where does he live?
20   A.  Birmingham.
21   Q.  And what is your maiden name?
22   A.  Thompkins.
23   Q.  Have you been married any other time besides
24 to Mr. Frederick Johnson?
25   A.  No.

Page 37

1    Q.  Do you have any nicknames or aliases you go
2  by?
3    A.  No.
4    Q.  Now, do you have any relatives -- and by
5  that, I mean parents, in-laws, cousins or siblings --
6  who reside in Alabama?
7    A.  No.
8    Q.  Now, when you lived and worked in Montgomery,
9  Alabama, did you belong to any social clubs or
10 churches?
11   A.  Yes.
12   Q.  And tell me what church you belonged to.
13   A.  Freewill Missionary Baptist Church.
14   Q.  Okay.  How about what social clubs you
15 belonged to?
16   A.  No social clubs.
17   Q.  And do you still have friends at the Social
18 Security Office in Montgomery that you correspond
19 with?
20   A.  Yes.
21   Q.  All right.  And who is that?
22   A.  Well, I wouldn't say friends.  I still talk
23 with people there.
24   Q.  Acquaintances?
25   A.  Okay.  That's better.

Page 38

1   Q.  All right.  Who do you still contact or
2   correspond with?
3   A.  When you say that -- because every now and
4   then I call and just talk to them.  I've -- I've
5   talked to Valerie Cooper.  I've talked to Christine
6   briefly.
7   Did you say call -- I'm sorry.  Ask me that
8   question again.
9   Q.  Are there any -- do you have any friends or
10  acquaintances at the Social Security office here in
11  Montgomery that you still correspond with?
12  A.  Yes.
13  Q.  On nonwork-related matters.  For example, you
14  call to talk about anything.  It doesn't have to do
15  with work.
16  A.  Yes.  I've talked with Christine briefly.  I
17  keep saying briefly because, you know, just when I
18  call the office --
19  Q.  What is Christine's last name?
20  A.  Smith.
21  Q.  Valerie Cooper, you mentioned.
22  A.  Valerie Cooper.  I've talked with Freida
23  Goldsmith.  I've talked with Bonita McWilliams.  I
24  talk with Tresalyn Collier.  And I've briefly talked
25  with -- what is her name?  Hmm.  oh, what is that

Page 39

1   girl's name?  God, I see her face.
2   Beverly Warner.  I have talked with -- briefly
3   talked with her.
4   Q.  Okay.  Have you ever discussed your lawsuits
5   with any of those individuals?
6   A.  I probably have, but not with Beverly
7   Warner.  Christine Smith, it all depends.  I can't say
8   whether I really discuss -- I briefly discussed --
9   see, I don't really want to classify that as
10  discussing it, but I did talk to her about something.
11  Q.  If your lawsuit or any of your allegations
12  came up in any way in those conversations, that's what
13  I'm looking for.
14  A.  So I would have to say yes to Christine
15  Smith.  Yes, yes, to -- yes.  I would say yes.  But
16  not to -- what did that girl -- what's that girl's --
17  what was the last name I gave you?
18  Q.  Beverly Warner.
19  A.  Beverly.  But not to Beverly.
20  Q.  How about the other individuals you
21  mentioned:  Valerie Cooper, Freida, Bonita McWilliams,
22  and Tresalyn Collier?
23  A.  I don't know if I really -- I probably have.
24  I -- you talking about even when I was in Montgomery,
25  right?  When I was living here, when I was working

Page 40

1   there?  Is that what you're talking about?
2   Q.  Anytime after you filed the lawsuit.  Well,
3   that would be -- since you left.  I'm asking since you
4   left the office.
5   A.  Since I left.  Okay.  Then I've not -- oh,
6   I -- yes, I talked to Christine Smith.  I did ask
7   Christine Smith -- I -- I -- but you -- that's not
8   what you asked me, though.  Okay.  Never mind.  Never
9   mind.  I was getting ready --
10  Q.  So since you left the Montgomery Social
11  Security office, is your testimony the only person you
12  talked to about the allegations in your lawsuit would
13  be Christine Smith?
14  A.  Since I left?  No, that was before I left.
15  No.  I've talked to Val -- God.  I talked to Freida.
16  I talked to Tresalyn.  I talked to Bonita.  Oh, I
17  didn't put her name down.  I talked to Bonita
18  McWilliams.  Oh, God.  Well, I -- I haven't really
19  gone and -- did I?  Maybe it was mentioned.  Okay.  I
20  can't say how -- okay.  These were people I talked
21  with.  I'll just leave it like that.
22  Q.  When was the last time you talked to anyone
23  there?
24  A.  Oh, gosh, when did I talk.  I talked to
25  Tresalyn.  When did -- when was the last time I talked

Page 41

1   to Tresalyn.  Having to do about this?  Having to do
2   about my case?
3   Q.  Yes.
4   A.  Because we talk about children and schools
5   and everything else.  I talked to Tresalyn -- the last
6   time I talked to her was probably last week.  I can't
7   give a date, just last week.  I talked to Bonita
8   McWilliams.  If I had to -- oh, when was the last time
9   I was down here?
10  MS. BATTLE-HODGE:  About the lawsuit.
11  A.  I talked to Tresalyn.  Me and Tresalyn talk
12  about children.  We talk --
13  MS. BATTLE-HODGE:  No, no.  He's asking -- if
14  I may.  May I?
15  MR. DUBOIS:  You may.
16  MS. BATTLE-HODGE:  I think he's asking you
17  when was the last time you talked to someone in the
18  office here about your lawsuit.
19  THE WITNESS:  In the office or from the
20  office?  In the office?
21  MS. BATTLE-HODGE:  Here in Montgomery.
22  THE WITNESS:  I've talked to Tresalyn.  I've
23  talked to Bonita McWilliams.
24  MS. BATTLE-HODGE:  About your lawsuit?
25  THE WITNESS:  And, see, that's what -- I

Bernethia Johnson v. Jo Ann B. Barnhart, et al.                    10/23/2007
DEPOSITION OF BERNETHIA JOHNSON

12 (Pages 42 to 45)

---

Page 42

1  don't want to say I talked to her about the lawsuit;
2  but when she's -- when she brought up some information
3  to me --
4      MS. BATTLE-HODGE: So part of the
5  conversation was about the lawsuit.
6      THE WITNESS: Yeah. That's why I really --
7      MS. BATTLE-HODGE: So just answer it, then.
8  It would be the lawsuit in addition to other things?
9      THE WITNESS: Yes.
10     MS. BATTLE-HODGE: But a portion of the
11 conversation was about the lawsuit?
12     THE WITNESS: Yes.
13     MS. BATTLE-HODGE: So answer that, then. Can
14 you answer that?
15     A. Yes. So, to Bonita McWilliams, to Tresalyn,
16 to Freida. I think to Freida. And maybe Linda
17 Tamplin. I just don't know. But those would be the
18 ones that I would say I talked with them about it.
19 And it was very, very general, because I don't trust
20 any of them.
21     Q. Did you record any of those conversations?
22     A. I don't think so.
23     Q. When was the last time you recorded any
24 conversation or meeting?
25     A. Probably when I was here.

---

Page 43

1      Q. Do you have any recording equipment on you
2  today?
3      A. No, I do not. Yes, I do. On me like in my
4  purse? Is that what you're talking about?
5      Q. Yeah. Do you have a recording device with
6  you today?
7      A. Yes, in my purse.
8      Q. In your purse. What is it? Is it a tape
9  recorder?
10     A. It's a tape recorder.
11     Q. Is it on?
12     A. No. I just -- I just carry a tape recorder
13 because my memory is getting so bad.
14     Q. When was the last time you've used that tape
15 recorder to record a conversation?
16     A. Gosh. Any kind of conversation?
17     Q. Yes.
18     A. I can't say.
19     Q. Is that because you haven't used it in a
20 while or --
21     A. I haven't -- I bought one to try to listen to
22 the little tapes and things because the other one is
23 no good, but then I couldn't find it.
24 No, that's my telephone. Hold on.
25 Here it is. Yes, this is it. I bought it to try

---

Page 44

1  to listen to tapes to see and -- because the other one
2  wasn't any good anymore, I guess. I don't know. It
3  just wasn't any good or I couldn't find it. So I said
4  I need to try to listen to some tapes, so I purchased
5  one. And I just purchased this not too long ago. I'm
6  going to say about two months ago. Maybe two months.
7  I'm not sure.
8      Q. And you don't believe you tape-recorded any
9  of your conversations with social security employees
10 in Montgomery; is that right?
11     A. No, I don't think so. No, not at all.
12     Q. And did you attend high school?
13     A. Yes.
14     Q. All right. Where did you attend high school?
15     A. Austin East High School.
16     Q. Is that in Knoxville, Tennessee?
17     A. That is correct.
18     Q. And when did you graduate?
19     A. 1973.
20     Q. All right. And did you attend college?
21     A. Yes.
22     Q. All right. Did you graduate from college?
23     A. Eventually, yes.
24     Q. All right. Tell me, what's the first college
25 you attended and when?

---

Page 45

1      A. The first college I attended was the
2  University of Alaska. No, I take that back. I'm
3  sorry. I -- I'm so sorry. I was in the military.
4  Let me just list the name of the colleges I've
5  attended, and maybe they'll come to me in the order
6  that I attended them.
7      Q. Okay.
8      A. Okay. Here I go. I always have to write
9  everything down. Fairfield State. University of
10 Alaska. Maryland, University of Maryland.
11 Louisville, I think, or Kentucky. There was a private
12 institution I went to. I can't remember them all.
13 And I -- I've traveled so much.
14     THE WITNESS: Is it in there?
15     MR. DUBOIS: Let's go off the record for a
16 second.
17     (Off-the-record discussion)
18     Q. Did you attend the University of the State of
19 New York in Albany? Do you recall attending there?
20     A. I did not attend it. I received my degree
21 from there.
22     Q. Okay. Was that an online degree?
23     A. No, it was not. It was like a regent type
24 degree.
25     Q. And what was that degree in?

Bernethia Johnson v. Jo Ann B. Barnhart, et al.                    10/23/2007
DEPOSITION OF BERNETHIA JOHNSON

13 (Pages 46 to 49)

Page 46

1    A.  Business.
2    Q.  Okay.  So that's the college degree you
3  received was from University of the State of New York?
4    A.  Yes.
5    Q.  And your testimony was before that, you
6  attended various courses --
7    A.  Yes.  I traveled extensively.
8    Q.  Let me finish the question.  Before that, you
9  had taken courses at other colleges at various
10 locations?
11   A.  Yes.
12   Q.  But the only degree is the one from the
13 University of the State of New York?
14   A.  Both degrees.
15   Q.  What's your other degree?
16   A.  Associate's degree.
17   Q.  Associate's degree in what?
18   A.  I think -- is it not on there?  It was --
19 it's an Associate of Science.
20   Q.  Associate of Science?
21   A.  Yes.
22   Q.  Now, you served in the military, correct?
23   A.  That is correct.
24   Q.  And you were in the U.S. Army?
25   A.  That is correct.

Page 47

1    Q.  And what was the highest rank you achieved?
2    A.  Sergeant.
3    Q.  And was that in the administrative supply or
4  administrative division?
5    A.  I was in supply and administration,
6  administrative field.
7    Q.  Okay.  And when you were in the military, was
8  it from February 15th, 1974, through June 17th, 1980?
9  Does that sound right?
10   A.  Yes, that sounds about right.
11   Q.  And what type of discharge did you have?
12   A.  Honorable.
13   Q.  All right.  I want to talk now about your
14 employment history.
15   A.  Okay.
16   Q.  You started working for the Social Security
17 Administration in September '93, right?
18   A.  '93, yes.
19   Q.  Now, I want to know about the jobs, briefly,
20 you held between 1980, when you left the military, and
21 '93, when you joined the Social Security
22 Administration.
23   A.  Okay.
24   Q.  Now, to facilitate that, I think I'm going to
25 give you this exhibit.  We'll take a short break and

Page 48

1  you can read through it.
2    A.  Okay.
3      MR. DUBOIS:  Can you mark this Defendant's
4  Exhibit #3?
5    Q.  All right.  I'm handing you a document --
6      MR. DUBOIS:  And, Juraldine, I don't think I
7  have -- well, I might.  No, I don't have another one.
8    Q.  I'm handing you a document I've marked --
9  that's been marked as Defendant's Exhibit #3.  And if
10 you turn to the last page, is that your signature at
11 the bottom?  And it looks like the date signed, August
12 21st, 1992?
13   A.  That is correct.
14   Q.  And this appears to be an application for a
15 clerk typist position you filed out at that time; is
16 that right?
17   A.  Yes, clerk typist.
18   Q.  Now, I'll ask that you look through this --
19 well, strike that.
20     When you filled this out, did you try to be as
21 accurate as possible?
22   A.  To the -- yes, to the best of my knowledge, I
23 did.
24   Q.  I'll ask that you look through this and tell
25 me if it accurately lists all the jobs that you held

Page 49

1  between 1980 and 19 -- until the time you filled out
2  the application, if it accurately lists the jobs and
3  the dates of employment.  And we'll take a short break
4  while you read through it.
5      (Brief recess)
6    Q.  Have you had a chance to review Defendant's
7  Exhibit #3?
8    A.  Yes.
9    Q.  Do you believe that accurately lists all the
10 jobs you had held between the time you left the Army
11 and the time you filled out the application?
12   A.  Yes, from the time I left the Army.
13   Q.  Now, when you filled out the application, it
14 looks like you had a job with the Social Security
15 Administration; is that right?
16   A.  I'm so sorry.
17   Q.  I'm sorry.  Strike that.  Department Veterans
18 Affairs.
19   A.  No.  I have to say, no, not from the time I
20 left the Army.
21   Q.  Okay.  You don't believe that accurately
22 lists all the jobs you held between the time you left
23 the Army and the time you filled out the application?
24   A.  I worked at a store in Radcliff, Kentucky.
25 It's not on here.  Radcliff, Kentucky.

Page 50

1    Q.  Okay.  Approximately when was that?
2    A.  Maybe like from 1980 to 1981. I'm
3  thinking -- from the time I got out of the military
4  until 1981.
5    Q.  Okay.  Aside from that, you believe this
6  accurately lists all the jobs?
7    A.  Yes.
8    Q.  Now, prior to joining the Social Security
9  Administration in September of '93, were you working
10  at the Department of Veterans Affairs?
11    A.  Yes.
12    Q.  And what position did you hold there?
13    A.  Clerk typist.
14    Q.  Do you know approximately how long you were
15  in that position?
16    A.  Okay.  Maybe four months, maybe -- let me say
17  six months or less.
18    Q.  Have you ever been fired or asked to leave
19  any job?
20    A.  No.
21        MR. DUBOIS:  Just go off record for a second.
22            (Off-the-record discussion)
23    Q.  Now, did you file any EEO complaints of
24  discrimination or retaliation against any of the
25  employers you had prior to working for Social

Page 51

1  Security?
2    A.  Never.
3    Q.  And is the first position you held with the
4  Social Security Administration a hearing office clerk?
5    A.  Yes, the hearing office was -- I guess -- I
6  think it was a clerk typist.
7    Q.  Okay.  You believe it was a clerk typist was
8  your first job?
9    A.  And then I think it became a hearing office
10  clerk.
11    Q.  Okay.  Do you know how long you were a
12  typist?
13    A.  Oh, God.  I'm going to say maybe a year.
14  Maybe not.
15    Q.  You're not sure.  All right.  At some point,
16  you became a hearing --
17    A.  I hate that.
18    Q.  At some point, did you become a hearing
19  office clerk?
20    A.  Yes.
21    Q.  All right.  Do you know who your supervisor
22  was in that position?
23    A.  Jerotha Poss.
24    Q.  Jerotha Poss?
25    A.  I want to say Jerotha Poss.  P-O-S-S, Poss.

Page 52

1  I think she was the first one I had.
2    Q.  And really briefly, what were your job duties
3  as a hearing office clerk?
4    A.  I filed records.  I typed decisions for the
5  judges and for the writers.  I add -- I added
6  exhibits.  I sat in hearings and did the recording.
7    Q.  All right.
8    A.  I sat at the -- no, we didn't have to do
9  that.  We didn't have to do that.
10    Q.  I'm looking for a brief description.  Is that
11  a brief summary?
12    A.  That's good enough.  I'm digging hard.
13    Q.  And after the hearing office clerk position,
14  you became a legal assistant; is that right?
15    A.  Yes.
16    Q.  And do you recall when that was that you
17  moved into a legal assistant position?
18    A.  Oh, God.  I joined them in 1993.  Hearing
19  office clerk.  A legal assistant?  That's what you
20  said, a legal assistant?
21    Q.  Yeah.  When did you become a legal assistant?
22    A.  I think I became a legal assistant in -- I
23  think it was in 1998, but I think that was the one
24  that was awarded to me, and that was when I became a
25  legal assistant.  I think that's the way it went.

Page 53

1    Q.  Okay.  And who was your first supervisor when
2  you became a legal assistant?
3    A.  Jerotha Poss.
4    Q.  As a legal assistant?
5    A.  Okay.  I'm sorry.  Okay.  I'm sorry.  I've
6  got to make a correction.  My very first supervisor I
7  believe was Martha Harper when I first came on with
8  the agency, Martha Harper.  I think she was it.
9    Q.  And was that when you were a hearing office
10  clerk or typist?
11    A.  Hearing office clerk and typist.  I think --
12  I think she was.  And then Jerotha Poss was my next
13  supervisor.
14    Q.  And then as a legal assistant, was your next
15  supervisor Carmen Beasley?
16    A.  Jerotha Poss, I believe was my first
17  supervisor as a legal assistant.
18    Q.  Okay.  Did it subsequently change and you had
19  a different supervisor?
20    A.  Yes.
21    Q.  And who was your next supervisor after her?
22    A.  Carmen Beasley.
23    Q.  And in April 2000, did Paul Johnson become
24  your supervisor?
25    A.  Yes.  And then Paul Johnson, yes.

Bernethia Johnson v. Jo Ann B. Barnhart, et al.                    10/23/2007
DEPOSITION OF BERNETHIA JOHNSON

15 (Pages 54 to 57)

Page 54

1    Q.   And then May 1st, 2004, Cynthia Lamar became
2    your direct supervisor?
3    A.   And then Cynthia, yes.
4    Q.   And you never worked for Pam Davenport,
5    right?
6    A.   No.
7    Q.   Now, when you worked for Paul Johnson from
8    April 2000 to May 1st, 2004, who were the other legal
9    assistants reporting directly to him, if you recall?
10   A.   Some of them.  For Paul Johnson, it was
11   Bonita McWilliams, me.  I want to say Christine.
12   Q.   You're not sure?
13   A.   I'm not sure.  Maybe Denise Crowell.  I don't
14   know.  Maybe -- I don't know.  No.  I am -- I'm --
15   no.  I think those are -- I want to say -- I can't say
16   for sure.  I can't say for sure.
17   Q.   Okay.  When you worked for Cynthia Lamar from
18   May 1st, 2004, to October 1st of 2005, do you recall
19   who were the legal assistants who worked in the same
20   group?
21   A.   Yes.  Cynthia Lamar.  Okay.  God forgive me I
22   cannot remember these things.  Cynthia Lamar.  There
23   was Beverly Warren.  Me, of course.  Christine Smith.
24   Okay.  I'm sorry.  But I -- I do recall that Brenda
25   McAnnally worked for Paul Johnson.  She was the lead.

Page 55

1    And for Cynthia Lamar, it was Debbie Rambo, the lead.
2    Q.   Okay.
3    A.   Okay.  So it was Debbie, me, Bonita,
4    Christine.
5    Q.   Well, just step back.  Are you talking about
6    when you worked for Paul Johnson or Cynthia Lamar?
7    A.   Okay.  I added Brenda McAnnally's name for
8    Paul Johnson.  She was the lead.
9    Q.   Okay.
10   A.   Now --
11   Q.   Previously, you had listed Bonita McWilliams
12   as working with Paul Johnson.
13   A.   She did.
14   Q.   Now let's go under Cynthia Lamar.  You
15   mentioned Debbie Rambo as the lead, Christine Smith,
16   Beverly Warner.  Did Louise Chevalier and Tammy
17   Martin --
18   A.   Oh, yes, Louise worked for her, yes.
19   Q.   And Tammy Martin?  Does that sound right?
20   A.   And Tammy, yes.  I'm sorry.  I can't remember
21   all of their names.
22   Q.   Do you recall anybody else besides those
23   individuals?
24   A.   I can't recall anybody else's name.
25   Q.   All right.  Now, in approximately December

Page 56

1    '99, Paul Reams became the hearing office director
2    here in Montgomery, right?
3    A.   That's correct.
4    Q.   Do you know who he replaced?
5    A.   Oh, God.  Who did he replace?  I don't know
6    if Paul Reams actually replaced anyone because the
7    organization was going through a re -- a new
8    reconstruction.  So I don't think he replaced anyone.
9    I'm sorry.  Shoot.  Forgive me.  I'm so sorry.
10   Jake Shanahan.
11   Q.   Jake Shanahan?
12   A.   Yes.  So, now, I'm sorry.
13   Q.   Now --
14   A.   Please ask that question again because I
15   can't remember the question, the one that I said Jake
16   Shanahan to.
17   Q.   My question was, do you know who Paul Reams
18   replaced when he became hearing office director?
19   A.   Okay.  I can't say Paul Reams actually
20   replaced Jake Shanahan.  Because the organization went
21   through a new reconstruction, so I can't -- so I can't
22   say he actually replaced him.
23   Q.   Okay.  Now, is it your understanding that the
24   HOD, which is the hearing office director, was the
25   supervisor of the group supervisors?

Page 57

1    A.   Paul Reams used to be a group -- oh, God.  So
2    much has happened.
3    Q.   Let me take that back.  Your first level
4    supervisor would be the group supervisor, which was
5    Paul Johnson for a period of time and then Cynthia
6    Lamar, right?
7    A.   Yes.  Yes.
8    Q.   And their supervisor was Paul Reams?
9    A.   That is correct.
10   Q.   Now, on a daily basis as a legal assistant,
11   how often would you interact with your second level
12   supervisor, which would be the hearing office
13   director?
14   A.   I interacted with Paul Reams all the time.
15   Q.   Did you interact with him before you became a
16   legal assistant?
17   A.   Yes.  I -- yes.
18   Q.   And what position did he hold at that time?
19   A.   Did he hold?
20   Q.   Yeah, did he hold.
21   A.   He hold.  Paul Reams became -- became the HOD
22   in 2000 -- in 1999 or in 2000.  Okay.  Your question
23   to me was how often did I interact with Paul Reams.
24   Doing what?  Doing --
25   Q.   Before he became HOD.

Page 58

1   A. Oh, before he became HOD. I don't -- I just
2 would talk to him just in casual conversation from
3 time to time.
4   Q. And how about after he became HOD?
5   A. I -- I was in frequent conversation with
6 him. I was frequently talking with him.
7   Q. And by frequently, how many times a week do
8 you think you would be talking with him?
9   A. Oh, it was so hard to say. I talked with him
10 all the time.
11   Q. And would that be on work-related matters?
12   A. Basically, that's the only reason I really
13 talked with him.
14   Q. And what would be the reason for going above
15 your direct supervisor to talk to the HOD about a
16 work-related matter?
17   A. I was the union steward for a while.
18   Q. So when you went to the HOD to talk about
19 work, was it usually about union matters?
20   A. Yes.
21   Q. Now, how often would you talk to your direct
22 supervisors on a weekly basis? Would it be every day?
23   A. I would say I was -- he was my supervisor, so
24 I would say we -- I can't say. It was frequently that
25 we talked.

Page 59

1   Q. Did you find Paul Johnson to be available to
2 provide assistance and answer any questions you might
3 have?
4   A. Okay. Hold on. I did not. I don't think I
5 talked with Paul Johnson that much being my
6 supervisor. I did not really talk to him that much.
7 I didn't have that many questions for him.
8   Q. Did you talk more or less to Cynthia Lamar
9 when she was your direct supervisor?
10   A. Cynthia frightened me. I tried not to talk
11 to her very -- well, let me see how -- how often did I
12 talk to Cynthia? That's your question?
13   Q. Yes.
14   A. Cynthia was -- oh, God.
15   Q. The question is simply, I mean, how often on
16 average do you think you talked to Cynthia Lamar? Can
17 you give any -- daily, weekly, three times a week? Do
18 you have any -- I'm just looking for an approximation
19 here.
20   A. So many times a day, I don't know.
21   Q. All right. So you generally talked to her on
22 a daily basis?
23   A. She made sure that she talked with me. She
24 always had something to say.
25   Q. Well, did you have, then, more interaction

Page 60

1 with Cynthia Lamar than Paul Johnson? Was she more a
2 hands-on? I'm just trying -- what I'm trying to get
3 here was what your relationship was like in terms of
4 working on a daily basis with your direct supervisor.
5   A. I am so sorry. Forgive me.
6   We're talking about Cynthia or -- or Paul
7 Johnson?
8   Q. We're talking Paul Johnson now.
9   A. Okay. We're talking about Paul. Okay. I
10 did not really talk to Paul Johnson that much, really.
11   Q. You just -- you didn't need to, to perform
12 your job? Is that --
13   A. I didn't need to perform my job, but then
14 every -- yeah. I'm going to leave it -- I didn't talk
15 to him that much to perform my job.
16   Q. Now, as a legal assistant, one of your job
17 duties was to work up social security disability
18 cases, right?
19   A. Yes.
20   Q. And these are cases where individuals --
21   A. So are we -- were we through with Cynthia
22 Lamar?
23   Q. I'm going to go back to that later.
24   A. Oh, okay.
25   Q. The question now is the social security cases

Page 61

1 you were dealing with were individuals seeking
2 disability benefits from the government, right?
3   A. That's correct.
4   Q. All right. And working them up is the
5 process of getting those cases ready for an
6 administrative law judge hearing?
7   A. That's correct.
8   Q. So a social security case would come into the
9 office with medical records and other documents from
10 the claimant, hospital, doctors, all that information,
11 right?
12   A. That is correct.
13   Q. And then when a case is assigned to a legal
14 assistant to work up the file, you would take all the
15 information that came in, arrange it in chronological
16 order and in various portions of the file, remove
17 duplicates, and prepare an exhibit list for the
18 hearing?
19   A. That is correct.
20   Q. All right. And what else does the working up
21 process entail, if you recall?
22   A. Oh, God, here we go again. I'm trying to
23 remember. Okay?
24   Q. Or that basically describes it to your
25 satisfaction? Does that sound like a rough

Bernethia Johnson v. Jo Ann B. Barnhart, et al.                    10/23/2007
DEPOSITION OF BERNETHIA JOHNSON

17 (Pages 62 to 65)

---

Page 62

1  description of what that working up process involves?
2      A.  Yes.
3      Q.  Now, are you familiar with the HOT system?
4      A.  Yes.
5      Q.  And that's the hearing office tracking
6  system?
7      A.  Yes.
8      Q.  And that was a computer system that was in
9  place for a certain period of time to track cases that
10 came into the office, right?
11     A.  That is correct.
12     Q.  And that was in place in 2003 and 2004,
13 right?
14     A.  Here we go with dates again.  2003, 2004.  I
15 would say yes.
16     Q.  Okay.  So when a case --
17     A.  It was in there for the longest, yes.
18     Q.  When a case was assigned to you as a legal
19 assistant, it would show up as assigned to you in HOT,
20 right?
21     A.  Yes.
22     Q.  And then when you finished working up the
23 case, you would take the case and you would enter it
24 in the HOT as being finished?
25     A.  Say that again.  I'm sorry.

---

Page 63

1      Q.  All right.  When you were finished working up
2  a case, you would make an entry in the HOT system to
3  indicate you were finished working up the case?
4      A.  Yes.
5      Q.  And then you would take the case and walk it
6  over to some physical file cabinets that were in the
7  office and put it there?
8      A.  I -- I don't want to say yes or no because I
9  need to say something in -- about that.
10     Q.  Now, is this -- do you not understand the
11 question?
12     A.  I understand the question, but I want to make
13 sure that you-all understand my answer.
14     Q.  Well, answer the question and then --
15     A.  Then I can't -- I don't know how to answer
16 it, then.
17     Q.  All right.  Do you recall --
18     A.  Because it can be yes and it can be no.
19 That's why I wanted to --
20     Q.  Well, were there some physical -- were there
21 some file cabinets in the office marked "ready to
22 hear, ready to schedule"?
23     A.  Yes.
24     Q.  And generally, the worked up cases would go
25 in those file cabinets, right?

---

Page 64

1      A.  The worked up cases would eventually go in
2  the file cabinet, that is correct.
3      Q.  All right.
4          MR. DUBOIS:  Let's make this Defendant's
5  Exhibit #4.  Let's go off the record for a second.
6          (Off-the-record discussion)
7      Q.  I hand you a document that's marked as
8  Defendant's Exhibit #4.  Do you recognize this
9  document?
10     A.  Yes, I do.  Yes.
11     Q.  And this is a document called Montgomery Work
12 Flow, correct?
13     A.  Yes.
14     Q.  And this describes basically how the cases, I
15 guess, work through -- strike that.
16     Is it a fair statement to say that to your
17 understanding, this is how the cases worked through
18 the system once they came into the Social Security
19 Office?
20     A.  I see that this document was revised on March
21 25th, 2004.
22     Q.  Yeah.
23     A.  That's what I understand.
24     Q.  Okay.  Do you know -- do you know when you've
25 seen this document?

---

Page 65

1      A.  During the time I was working in -- in
2  Montgomery as -- yeah, as a legal assistant.
3      Q.  Okay.  And the process that we talked about
4  where cases were assigned to a legal assistant to be
5  worked up is described in paragraphs four, five, and
6  six of this document, right?
7      A.  Okay.  Yes.
8      Q.  And to your understanding, is RTS and RTH
9  basically the same thing, ready to schedule and ready
10 to hear?
11     A.  They are the same thing?
12     Q.  Well, is it -- are they the same thing?  Did
13 that terminology change or --
14     A.  I'm thinking there's a big difference in
15 them.
16     Q.  What's your understanding of the term "RTS"
17 and "RTH"?
18     A.  Legal assistant place -- the process -- I'm
19 thinking that the process is different.
20     Q.  What process are we talking about?
21     A.  The RTS and RTH cases.
22     Q.  What do you think is different about them?
23 Would you agree that RTS and RTH are both the stage
24 after the case has been worked up?
25     A.  That is correct, yes.

Bernethia Johnson v. Jo Ann B. Barnhart, et al.                    10/23/2007
DEPOSITION OF BERNETHIA JOHNSON

18 (Pages 66 to 69)

Page 66

1    Q.  Let me make this Defendant's Exhibit #5.  I
2  hand you a document that's been marked Defendant's
3  Exhibit #5.  And would you look at that and tell me if
4  you've seen that before.
5    A.  Yes, I have.
6    Q.  All right.  And is this an e-mail dated
7  October 29th, 2003, from Paul Johnson?
8    A.  Yes.
9    Q.  And did you receive it on that day?
10    A.  I cannot say that I actually received it
11  on -- okay.  I can see that Paul -- Paul Johnson sent
12  this out to -- to these people or to the organization
13  on October 29th, 2003.  That's what I see.
14    Q.  And you would be included in the addressees
15  that are listed here, correct?
16    A.  That is correct.
17    Q.  But you just don't recall receiving this
18  other than -- strike that.
19      Do you recall receiving this?
20    A.  There you go.  I recall receiving this, yes.
21    Q.  Okay.  But you don't know when?
22    A.  I cannot say when.
23    Q.  Do you believe it was about October 29th,
24  2003?
25    A.  There you go.  Around that time, yes.

Page 67

1    Q.  All right.  Now, the e-mail, in the second
2  paragraph states it's important to remember you should
3  not move a case from WKUP -- and that means work up,
4  correct.  WKUP?
5    A.  That is correct.
6    Q.  -- unless you have completely worked up the
7  file?
8    A.  I'm sorry.  I'm trying to follow you.  Where
9  are you?
10    Q.  Let me point you to the second paragraph.
11    A.  Okay.  I'm sorry.  I'm trying to read the
12  first one.
13    Q.  This includes typing the exhibit list and
14  completing the information on the ALJ folder.  This
15  procedure has been in place for a very long time and
16  would not be changed without written notice.
17      Do you see that?
18    A.  Yes.
19    Q.  All right.  Did you read that when you -- did
20  you read this e-mail when you received it?
21    A.  Yes.
22    Q.  All right.  Did you understand it?
23    A.  Yes.
24    Q.  Did you have any questions, or did you talk
25  to anyone about this e-mail?

Page 68

1    A.  I don't know if I talked to anyone about this
2  e-mail or not.
3    Q.  All right.
4    A.  When you say did I talk to anyone about it,
5  say, for instance, if people were talking about it or
6  something -- okay.  I'm going to say -- I'm going to
7  say yes, I talked to someone about it.
8    Q.  Okay.  Who do you think you talked to?
9    A.  Tammy Martin.
10    Q.  And when do you think you talked to -- yeah,
11  don't write on the original exhibit.
12    A.  I'm sorry.  Okay.
13    Q.  When do you believe you spoke to Ms. Martin
14  about this e-mail?
15    A.  Well, it was before this e-mail actually came
16  out.
17    Q.  All right.  Prior to this e-mail coming out,
18  do you recall having a discussion with Paul Johnson
19  about him not being able to locate 17 files on your
20  desk?
21    A.  I don't even -- yes, Paul -- I do.
22    Q.  All right.  What do you recall about that
23  conversation?
24    A.  I'm not going to say -- what was your
25  statement -- what was your question?

Page 69

1    Q.  Do you recall -- prior to this e-mail coming
2  out, do you recall Paul Johnson talking to you about
3  17 files that he could not find, 17 of your files that
4  he could not locate?
5    A.  I'm -- I'm not going to say 17.  If you take
6  that number out, I might can talk about it; but I
7  can't say 17.
8    Q.  So you recall Paul Johnson talking to you
9  about some of your cases that he could not locate, but
10  you can't recall the exact number?
11    A.  I recall Paul Johnson writing a lot of lies
12  about -- that's why I said it so much to this.  I --
13  I want to answer, but it's like there were lies that
14  were written up, so I can't --
15    Q.  Did Paul Johnson come to you before you
16  received this e-mail and talk to you about some files
17  that he could not locate, some of your files?
18    A.  Oh, God.  How do you -- I want to make a
19  statement, but I don't know how.  I don't --
20    Q.  Just can you answer --
21      MR. DUBOIS:  Can you repeat the question?
22    Q.  Just try to answer the question.
23        (The court reporter read the
24        pending question.)
25    A.  I know what you're talking about; but to

Bernethia Johnson v. Jo Ann B. Barnhart, et al.                    10/23/2007
DEPOSITION OF BERNETHIA JOHNSON

19 (Pages 70 to 73)

---

Page 70

1  answer that the way you phrased it, I can't answer it;
2  because there was so much that -- I can't answer it
3  the way you phrased it.
4    Q.  Is that because he didn't come talk to you?
5    A.  He did talk to me, but I can't -- he talked
6  to me, but there's more to it I want to say.  But what
7  Paul Johnson wrote was bunches of lies, and that's why
8  I can't answer your question.  Because --
9    Q.  My question right now is simply relating to a
10 conversation October of 2003.  I want to see what you
11 recall about that conversation.
12   A.  Okay.
13   Q.  So Paul Johnson came to talk to you --
14   A.  Yes.
15   Q.  -- in October of 2003?
16   A.  Yes.  I was at my desk.
17   Q.  And it was about some cases of yours that he
18 could not locate?
19   A.  I can't say it was about cases that he could
20 not locate.  It was not about that.
21   Q.  Okay.  What do you recall Paul Johnson
22 talking to you about in October of 2003?
23   A.  Make it easier.  Okay.  Paul Johnson came and
24 he asked for my cases, and I gave them to him.
25   Q.  He asked for some cases?

---

Page 71

1    A.  Yes.
2    Q.  Were these cases that he could not locate?
3    A.  He asked me for the cases, and I gave them to
4  him.
5    Q.  All right.  Did he indicate why he was asking
6  you for the cases?
7    A.  He was doing an audit.
8    Q.  Do you know if the cases you provided to him
9  had the exhibit lists in them?
10   A.  He received several types of cases from me in
11 different drawers of -- from my file cabinet as well
12 as from the cart that I had them on.  I cannot say
13 that all of them had the exhibit lists if they were in
14 the pre-stage.  And the pre-stage does not mean that
15 they're all worked up, that they have been worked up.
16   Q.  Did he make any comment during this
17 conversation that he was concerned you were trying to
18 hide incomplete cases from him?
19   A.  I don't think when Paul talked to me, no.  I
20 was shocked to read that he put all those things
21 there.  No, he did not.
22   Q.  And when you say shocked to read, what are
23 you referring to?
24   A.  Paul wrote a bunch of lies.  Paul wrote a
25 bunch of lies in his response to the EEO question or

---

Page 72

1  something.  Now, that was when I read it.  I think it
2  was in the file and I read that.
3    Q.  Are you referring to some information that
4  Paul Johnson supplied to the EEO investigator in
5  relation to your nonselection complaint regarding your
6  job performance?
7    A.  Yes.
8    Q.  All right.  And you're saying you disagree
9  with what he submitted?
10   A.  I'm saying he put so many lies in there.
11 It's hard to even really talk about that.  And I'm not
12 saying for me to discuss it.  Just like I wanted to
13 give you answers, but --
14   Q.  At what point did you receive that material
15 that Paul Johnson had submitted in relation to your
16 nonselection EEO complaint?
17   A.  At what point did I receive what?
18   Q.  The information that Paul Johnson had
19 submitted to the EEO investigator.
20   A.  Once the report of investigation file was
21 all -- fixed, and then they -- I can't say what date,
22 what month or anything; but once it was all compiled,
23 then I received a copy of that.
24   Q.  Do you know if that was -- strike that.
25   A.  Okay.

---

Page 73

1    Q.  Aside from that, what I'm trying to do is go
2  back to a conversation in October of 2003 --
3    A.  Okay.
4    Q.  -- that you had with Paul Johnson.
5    A.  Okay.
6    Q.  Do you recall him, during that conversation,
7  making a comment about you trying to hide incomplete
8  work from him?
9    A.  No.  To the best of my knowledge, I do not
10 recall that.
11   Q.  Do you recall any discussion about any of the
12 contents of this e-mail that was -- that, I'm
13 referring here to Defendant's Exhibit #5.  Did any of
14 the subjects covered in Defendant's Exhibit #5 come up
15 in your conversation with Paul Johnson?
16   A.  Yes.
17   Q.  All right.  What came up in your conversation
18 with Paul Johnson that also appears in this e-mail,
19 Defendant's Exhibit #5?
20   A.  That appears in it?  What came up that appear
21 in it?
22   Q.  Or that relates to it.
23   A.  Relating to it meaning it's not in here?  Is
24 that what you're saying?
25   Q.  Either way, relates -- you have a

Bernethia Johnson v. Jo Ann B. Barnhart, et al.                    10/23/2007
DEPOSITION OF BERNETHIA JOHNSON

20 (Pages 74 to 77)

Page 74

1  conversation with Paul Johnson. This e-mail comes
2  out.
3     A. Yes.
4     Q. Did you discuss anything with Paul Johnson --
5     A. Yes, I did.
6     Q. -- that later came up in this e-mail or
7  relates to what's in this e-mail?
8     A. Yes.
9     Q. All right. And what do you recall
10 discussing?
11    A. Okay. I recall discussing with Paul some
12 cases that had been moved from one category to
13 another. I never gave the name Tammy Martin to them,
14 but Tammy Martin said that we can move -- that we
15 could put them in another category. So I put them in
16 that category.
17    Q. And what categories are we talking about?
18    A. Oh, God. I don't remember what category it
19 was I put it in, but Tammy said we could do it. Now,
20 about this, what brought this e-mail on was he
21 questioned why did I change those -- the category. I
22 did not give Tammy Martin name.
23    Q. Did you tell him someone had told you, you
24 could?
25    A. Yes.

Page 75

1     Q. All right. Why didn't you give him the name?
2     A. Because I don't -- at that point, I don't
3  know why I did not give the name, but -- okay. That's
4  it. I did not give them the name, but I did tell them
5  that someone said I could move it. That's how that
6  went.
7        MR. DUBOIS: I have a request for a break.
8  Let's take a short break here. We can like take up to
9  a five-minute break; and then we can go a half hour,
10 45 minutes; then we'll take lunch.
11       MR. SPEEGLE: We'll take lunch at 12:15,
12 12:30.
13       MS. BATTLE-HODGE: 12:15?
14       MR. DUBOIS: 12:15, 12:20, in there.
15       MS. BATTLE-HODGE: Yeah, 12:30 would be good.
16 All right.
17            (Brief recess)
18    Q. So did you ever talk to Tammy Martin -- your
19 testimony is Tammy Martin told you, you could move
20 some cases from one category to another?
21    A. Yes.
22    Q. Did you ever talk to her after you received
23 this e-mail that's marked as Exhibit #5?
24    A. I don't know if I talked to her after we
25 received that, but I talked to her about it -- about

Page 76

1  what she told me we could do.
2     Q. And what did she say in response?
3     A. She apologized to me: Bernethia, I'm sorry.
4  I told her, I said, You got me in trouble, girl.
5     Q. Did she indicate she had been wrong?
6     A. She said they -- she said they did it, they
7  do -- they -- she does it all the time.
8     Q. And who did she work for?
9     A. What was the question?
10    Q. Who did -- who did Tammy Martin work for?
11    A. Social -- who did -- Social Security
12 Administration.
13    Q. Who was her supervisor?
14    A. Cynthia Lamar.
15    Q. All right. And why didn't you tell Paul
16 Johnson that Tammy Martin had told you that?
17    A. I -- I don't know. I didn't -- maybe I
18 didn't want to get Tammy in trouble. I don't know why
19 I told -- didn't tell it or -- or that they lie so
20 much. Management lied so much. I don't trust
21 management. And I did not give him that -- her name.
22    Q. All right. So is it your testimony that you
23 didn't tell Paul Johnson her name because you didn't
24 trust him? Is that what you're saying?
25    A. Possibly is what I'm saying, yes. That's

Page 77

1  possibly what I'm saying. I do not trust them.
2     Q. Well, only you know why you didn't tell Paul
3  Johnson.
4     A. Because I don't trust them, management.
5     Q. Did you subsequently --
6     A. This was October 2003? Okay. I'm sorry. I
7  have to --
8     Q. Did you --
9     A. Yes.
10    Q. -- later tell Paul Johnson that the person
11 who had told you that you could move the cases had
12 told you she was wrong and apologized?
13    A. I -- I think I recall telling -- giving them
14 Tammy's name. I think I recall giving them Tammy's
15 name. I don't know how much I said about that.
16    Q. All right. Around the time this e-mail came
17 out, Defendant's Exhibit #5, do you recall Paul
18 Johnson also holding a group meeting during which he
19 advised all the legal assistants about the work-up
20 procedure and when cases should be moved from
21 different statuses?
22    A. Yes.
23    Q. And were you in attendance at that meeting?
24    A. Oh, gosh. I don't know if I was. I don't
25 know if I was. I may have been. I may -- I don't

Page 78

1  know if I was.
2     Q.  But you recall there being a meeting; you
3  just don't recall if you were there?
4     A.  I don't -- I don't know if Paul told me that
5  there had been a meeting.  Did he put something out in
6  the meeting other than this e-mail?  I don't recall if
7  I was -- I don't know.  I can't -- I can't recall.
8  When -- I don't know.  When -- when was the meeting
9  supposed to have been?  Do you know?
10    Q.  October 2003.
11    A.  It had to be -- the meeting had to then be
12  after October 29th, 2003, then?
13    Q.  My question is, do you recall attending a
14  meeting in October 2003 when Paul Johnson discussed
15  proper work-up procedures, including what's in this
16  e-mail, which is marked as Defendant's Exhibit #5?
17    A.  I don't know if I attended the meeting or
18  not.  I don't know.
19    Q.  But you believe --
20    A.  But I know that I received this.  I know
21  that.
22    Q.  You received the e-mail.
23    A.  Yes.
24    Q.  And someone told you there had been a
25  meeting?

Page 79

1     A.  I don't know, but I -- I don't know if Paul
2  told me or what.
3     Q.  At any point in time, did you tell Paul
4  Johnson that Tammy Martin -- or what Tammy Martin had
5  told you?
6     A.  I may -- I believe -- God -- that I did tell
7  Paul Johnson that it was Tammy Martin that told me.  I
8  know I end up calling her name to Paul Johnson.
9     Q.  Do you know when?
10    A.  Oh, God.  No.
11    Q.  Did Tammy Martin -- strike that.
12    After you received this e-mail of October 29th,
13  2003, did you understand that was the policy that was
14  in effect in the office?
15    A.  Yes.
16    Q.  Now, by January 2004, cases would generally
17  be assigned to legal assistants on Fridays by one of
18  the group supervisors, correct?
19    A.  Rephrase that, please.
20    Q.  All right.
21    A.  Or just repeat it so that I can make sure I'm
22  answering it correctly.
23    Q.  By January 2004, cases would generally be
24  assigned to a legal assistant on Fridays by one of the
25  group supervisors, correct?

Page 80

1     A.  That was the way it was supposed to have
2  been.
3        MR. DUBOIS:  Let me give you out an e-mail here.
4  Let's make this Defendant's #6.
5     Q.  I'm handing you a document that's been marked
6  as Defendant's Exhibit #6.
7     A.  Okay.
8     Q.  Tell me if you recognize that e-mail.
9     A.  Yes.
10    Q.  And this is an e-mail dated Monday, January
11  26th, 2004, from Paul Reams, correct?
12    A.  Yes.
13    Q.  And did you receive a copy of this e-mail
14  about --
15    A.  Yes.
16    Q.  -- that time?  Let me finish the question.
17    A.  Oh, I'm sorry.  I'm sorry.
18    Q.  You received an e-mail -- about this time,
19  you received this e-mail, right?
20    A.  Yes.
21    Q.  And this stated the policy for assigning
22  cases to legal assistants.  Is that your
23  understanding?
24    A.  Repeat that.  I'm sorry.
25    Q.  When you received this e-mail, was it your

Page 81

1  understanding that this was explaining the policy that
2  would apply to obtaining cases?
3     A.  Yes.  To obtain cases, yes.
4     Q.  And the supervisor -- the group supervisor
5  who would assign the cases would rotate each month so
6  it would be a different group supervisor?
7     A.  Yes.
8     Q.  Would you receive an e-mail telling you what
9  group supervisor would be assigning cases each month?
10    A.  I don't -- I can't recall.
11    Q.  Now, going back to Defendant's Exhibit #6.
12    A.  Okay.
13    Q.  Was there any reason why you would need to
14  request cases on a day other than Friday?
15    A.  Was there any reason why I needed to request
16  cases other than on Friday?
17    Q.  Yeah.
18    A.  Is that the question to me?
19    Q.  Well, strike that.  Did you ever run out of
20  work and not have any cases to work on?
21    A.  I never ran out of -- I never ran out of
22  work, to have cases to work up.
23    Q.  You always had --
24    A.  To work up, not work on.  Because we always
25  had cases to work on.

Page 82

```
 1    Q.  Okay.
 2    A.  Okay.
 3    Q.  Did you always have cases you were working
 4  up?
 5    A.  I always had cases I was working up, yes,
 6  always. But there has -- I have to say this. Even
 7  having one case is having a case to work up; but if
 8  I'm going to go home, one case -- it would take more
 9  than one case. At least, I would think. So I always
10  had cases to work up.
11    Q.  Now, when you're working up cases, do you
12  generally have an idea, when you're going through
13  them, that you might be running out within the next
14  week?
15    A.  Within the next week?
16    Q.  I mean you know how many cases you have at a
17  given time, correct?
18    A.  I have access to know how many cases I have
19  at a given time, correct.
20    Q.  And this Defendant's Exhibit #6 says on
21  Friday, every Friday after this, you can go to a
22  supervisor and request more cases, correct?
23    A.  That's what this says, correct.
24    Q.  Now, what -- what other legal assistant job
25  duties were there besides working up cases for
```

Page 83

```
 1  administrative law judge hearings?
 2    A.  We ordered consultant examinations. We order
 3  school records, hospital records. We -- we notify the
 4  claimant that -- gosh, there was so much that we did.
 5    Q.  I'm just looking for a rough description.
 6  Does that fairly describe the other duties?
 7    A.  The other duties were we prepared cases
 8  for -- we prepared notice of -- we mailed out notices
 9  of hearing. We added new -- new exhibits, new
10  proposed exhibits that came in. Whatever the judge
11  requested for us to do, we did.
12    Q.  Now, at some point, did manning the front
13  desk become a rotating assignment among the legal
14  assistants?
15    A.  Yes.
16    Q.  Do you recall when that became a rotating
17  duty?
18    A.  No.
19    Q.  Do you recall how often it would rotate among
20  the different legal assistants; for example, daily,
21  weekly, monthly?
22    A.  Exhibit #4.
23    Q.  That's the only exhibit I'm missing. Okay.
24  What are you referring to on Exhibit #4?
25    A.  I am referring to this Montgomery Work Flow
```

Page 84

```
 1  as a whole.
 2    Q.  Okay.
 3    A.  This day, March 25th, 2004, this was the way
 4  management said that they would do things. This is
 5  the way. Let's say the next week, we could have a
 6  staff meeting and some of these things would have
 7  changed. In two weeks from this date, March 25, 2004,
 8  everything could change.
 9    Q.  My question was simply --
10    A.  So --
11    Q.  Let me state the question.
12    A.  Okay. Go ahead.
13    Q.  The question is, how often did the front desk
14  duty rotate among legal assistants?
15    A.  Possibly weekly.
16    Q.  Okay.
17    A.  Possibly monthly.
18    Q.  Are you saying it changed over time?
19    A.  That's what I'm trying -- nothing was steady
20  in the office. Nothing was.
21    Q.  My question relates solely to the front desk
22  duties.
23    A.  So, then, the front desk duty was not steady
24  neither. It changed. The procedure of it changed
25  constantly.
```

Page 85

```
 1    Q.  You don't recall when it started, the legal
 2  assistants rotating to the front desk?
 3    A.  No.
 4    Q.  And at some point, it became a monthly duty;
 5  is that correct?
 6    A.  At some point, yes, it did.
 7    Q.  Do you have any idea when that was?
 8    A.  Was that in -- wait a minute. 2004. No, I
 9  would be just guessing. I can't -- no.
10    Q.  And what were the general duties when you
11  manned the front desk?
12    A.  To answer the telephone, to pull cases, to --
13  gosh. Answer the phone, pull cases, prepare -- I
14  think -- oh, gosh. I don't know. Answer the phone,
15  pull cases, assist claimants that came in the office,
16  answer questions.
17    And when I say pull cases, I'm talking about,
18  say, for instance, an attorney would come in and would
19  want to copy cases, upcoming cases. Then we would go
20  and get those cases.
21    Q.  All right. Is it fair to say that the front
22  desk was located -- when you walked in the Social
23  Security Office, it was located to the left, behind
24  some glass; is that right?
25    A.  That is correct.
```

Bernethia Johnson v. Jo Ann B. Barnhart, et al.                              10/23/2007
DEPOSITION OF BERNETHIA JOHNSON

23 (Pages 86 to 89)

|  | Page 86 |
| --- | --- |

1    Q.  All right. And basically, would your job be,
2  at the front desk, dealing with the public either on
3  the phone or when they came in the office?
4    A.  Yes.
5    Q.  Now, you generally worked at a cubicle at the
6  Social Security Office, right?
7    A.  That is correct.
8    Q.  All right. And did you occupy the same
9  cubicle during your entire time at the location on
10 Atlanta Highway?
11   A.  Yes.
12   Q.  And was that cubicle on -- come to the front
13 of the building, closer to Atlanta Highway?
14   A.  Yes.
15   Q.  And who shared the cubicles near you?
16   A.  There was Christine Smith, Tamika Watkins,
17 Tammy Martin. I don't remember who that other --
18   Q.  Is that all you remember?
19   A.  Right. I don't recall.
20   Q.  And did the entrance to your cubicle face the
21 front windows of the office?
22   A.  Yes.
23   Q.  All right. And was your computer facing
24 those front windows, or was it facing away from the
25 entrance to your cubicle?

|  | Page 87 |
| --- | --- |

1    A.  Facing away from it.
2    Q.  All right. Who did you generally eat lunch
3  with at the Social Security Office? Was there someone
4  you generally ate lunch with? Did you generally eat
5  alone?
6    A.  Generally? I think most of the time it was
7  always alone.
8    Q.  Is there someone you considered your closest
9  friend or acquaintance at the Social Security Office
10 in Montgomery?
11   A.  I am so sorry. Certain things just hurt.
12 No. What was your question.
13      MR. DUBOIS: Could you repeat it?
14         (The court reporter read the
15            pending question)
16   A.  No.
17   Q.  What were the --
18   A.  My closest -- I'm sorry. Repeat that again.
19         (The court reporter read the
20            pending question)
21   A.  While I was there?
22   Q.  Yes.
23   A.  While I was there. Acquaintance. Let me --
24 I talked to people, but -- I talked to people.
25   Q.  Is there someone you talked to more than

|  | Page 88 |
| --- | --- |

1  others?
2    A.  Yes.
3    Q.  Who was that?
4    A.  I talked to Bonita McWilliams. I talked
5  to -- I would talk to Tammy. I would talk to
6  Christine. I would talk to Freida. I would just
7  talk. I would talk to Val. I would talk to Karen. I
8  would talk to Debbie. I would talk to Brenda. I
9  mean, I would just talk to people.
10   Q.  Okay. Did you generally work I guess 9:30 to
11 six? Were those your general office hours --
12   A.  Yes.
13   Q.  Let's me finish my question -- at the Social
14 Security Office in Montgomery?
15   A.  Yes.
16   Q.  Did that change over time, or was that the
17 flex time schedule you have throughout your employment
18 at the Atlanta Highway office?
19   A.  Did it change over time?
20   Q.  Yeah. Was that the time you always reported
21 to work at the Atlanta Highway office?
22   A.  The majority of the time, yes.
23   Q.  And if you were going to change your flex
24 time from the 9:30 to six time, would you fill out a
25 form to change it?

|  | Page 89 |
| --- | --- |

1    A.  No.
2    Q.  Okay. How would you change it if you were
3  going to change it?
4    A.  We just knew we had to be in there by a
5  certain time.
6    Q.  What were the general office hours? Not your
7  hours, but the office open for the flexing schedule?
8    A.  They could come in at 6:30.
9    Q.  And what time would they work until?
10   A.  Eight hours, from 6:30 to -- eight, yeah.
11   Q.  Now, the Social Security Office also offered
12 the alternative duty station for legal assistants,
13 right?
14   A.  Yes.
15   Q.  And do you know when that program went into
16 effect?
17   A.  No.
18   Q.  And is it your understanding you had to sign
19 up -- as a legal assistant, you had to sign up for
20 that program at certain times during the year?
21   A.  Yes.
22   Q.  Do you know how often a year the sign up
23 period would be?
24   A.  I -- I think at least twice. I think it was
25 twice.

Bernethia Johnson v. Jo Ann B. Barnhart, et al.                    10/23/2007
DEPOSITION OF BERNETHIA JOHNSON

24 (Pages 90 to 93)

---

Page 90

1    Q.  And the ADS program would allow you
2  essentially work at home one day a week, generally?
3    A.  Oh, gosh.  How -- repeat that again,
4  because --
5    Q.  All right.  Let me hand you a document that's
6  marked as Defendant's Exhibit #7.
7    A.  Okay.
8    Q.  And tell me if you recognize that document.
9    A.  Yes.
10    Q.  All right.  Is this document a partnership
11  agreement between the AFGE, which is the American
12  Federation of Government Employees, and the Social
13  Security Office OHA --
14    A.  Yes.
15    Q.  -- regarding the ADS policy?
16    A.  Yes.
17    Q.  And AFGE is a union, correct?
18    A.  Yes.
19    Q.  And as a legal assistant, you are a member of
20  that union?
21    A.  Yes.
22    Q.  Now, if you look at this document, Section 3,
23  which is on page 3, is that your understanding -- is
24  that the provision that applies to signing up for the
25  ADS?

---

Page 91

1    A.  Hold on.  Okay.  Office.
2    Q.  And Section 3 indicates there's a month --
3  beginning two months before the start of the
4  flexiplace period -- you would make a request two
5  months before the start of the flexiplace period.  It
6  says February is the employee's request period for
7  April through September, and August is the request
8  period for the October through March period.  Do you
9  see that?
10    A.  Okay.  Yes.
11    Q.  Is that your understanding of the policy?
12    A.  That's two times a year.
13    Q.  Two times a year.
14    A.  That's what I said, yes.
15    Q.  And you fill out a form when you wanted to
16  work it, correct?
17    A.  That's correct.
18    Q.  Let me hand you a document that's been marked
19  as Defendant's Exhibit #8.  Do you recognize that
20  document?
21    A.  Yes.
22    Q.  Is this a request form to work the flexiplace
23  program, ADS?
24    A.  Yes.
25    Q.  And is that your signature on the signature

---

Page 92

1  line?
2    A.  Yes.
3    Q.  And it's dated April 26, 2004, correct?
4    A.  Yes.
5    Q.  Is that the date you completed this form?
6    A.  Yes.  I don't know.  Shoot.  I would say yes,
7  but --
8    Q.  Is there any reason to think you would
9  complete it on a day other than the day on the form,
10  4/26/04?
11    A.  4/26/04.  That I signed it?  I signed it on
12  this date.  Yes, I did sign it on this date.
13    Q.  Okay.  And you indicate on this form that
14  you're selecting Wednesday as your work at home day,
15  correct?
16    A.  Yes.
17    Q.  Now, prior to completing this form on April
18  26th, 2004, do you know when you had previously
19  enrolled in the ADS program?
20    A.  Not without seeing it, no.
21    Q.  Did you retain a copy of your ADS
22  application?
23    A.  I may have a copy.  I've lost so much in my
24  move.  I've lost a lot of things.  So I may have a
25  copy.  I'm not sure.

---

Page 93

1    Q.  And you don't recall when you had signed up
2  before this time to participate in the program?
3    A.  No.
4    Q.  Is that -- is the flexiplace ADS program
5  something you frequently participated in?
6    A.  When you say participated in, because I
7  always signed up for it.  I just want to make sure
8  you're not saying signed up for it or -- I always
9  signed up for this.
10    Q.  Is it your testimony that two times a year,
11  you completed a form to sign up for the ADS program?
12    A.  Yes.
13    Q.  And you don't have a copy of any of those
14  forms?
15    A.  I may.  I would just have to look through
16  what I have at the house or -- yeah.  I may have a
17  copy of it.
18    Q.  I'll ask you if you have any flexiplace
19  application forms, to provide those.
20    A.  Oh, the application forms.  Oh, I'm thinking
21  you're talking about have a copy of this.
22    Q.  I'm asking if you have a copy of a flexiplace
23  program request completed by you other than this one,
24  which is dated April 26th, 2004.
25    A.  So you need the application packet?

Bernethia Johnson v. Jo Ann B. Barnhart, et al.                    10/23/2007
DEPOSITION OF BERNETHIA JOHNSON

25 (Pages 94 to 97)

Page 94

1    Q.  Anything that you submitted to work ADS prior
2  to this date of February 26th, 2004, if you have it.
3  That's what I'm asking.  If you can check and provide
4  it to your attorney.
5    A.  Okay.  So you -- that's the application
6  packet itself that you're looking for?
7    Q.  A form like Defendant's Exhibit #8 that has
8  your signature and the date.
9    A.  Oh, okay.  That's what you want.  Okay.
10   Q.  If you retained a copy and if you have any.
11  And is it your understanding that the ADS program
12  allowed you to select Monday and Tuesday and Wednesday
13  as a day to work at home?
14   A.  Yes.
15   Q.  And then Thursday and Friday were considered
16  core days, when employees had to be in the office; is
17  that correct?
18   A.  That is correct.  Yeah.
19   Q.  Now, at some point, did you become aware or
20  was it announced that if you worked the front desk for
21  a month, you would get an extra ADS day the following
22  month?
23   A.  Yes.
24   Q.  Do you know when that was announced?
25   A.  No.

Page 95

1    Q.  And you don't know when they went to a
2  monthly policy at the front desk?
3    A.  Everything in the office changed frequently.
4    Q.  How did you learn that if you worked the
5  front desk, you got an extra ADS day the following
6  month?
7    A.  It had to be put out in some way, because I
8  was aware of it.  I don't know if it was possibly --
9  it could have -- could have possibly been put out in
10  a -- a meeting.  We were always having meetings.
11   Q.  So do you believe you heard it at a meeting?
12   A.  That was a form of putting out, yes, I would
13  think.
14   Q.  I'm not asking you to guess or speculate
15  here.  Do you know how you found out about the policy
16  that if you worked the front desk as a legal
17  assistant, you'd get an extra ADS the following
18  month.
19   A.  I would think that it was put out in a
20  meeting.  I think that would be the way that they
21  would put it out.
22   Q.  Do you know when that meeting was?
23   A.  No.
24   Q.  Are you aware of any written document that
25  states that policy?

Page 96

1    A.  I'm not aware of any.
2      MR. DUBOIS:  All right.  Juraldine, you want
3  to take a break for lunch now?
4      MS. BATTLE-HODGE:  Yeah, let's do that.
5      MR. DUBOIS:  Oh, one last question.
6    Q.  While I'm on ADS, when you returned to the
7  office after being out for ADS, would you go to your
8  time sheet and there would be an ADS entry on the time
9  sheet and you would sign below it.  Is that your
10  understanding of how that worked?
11   A.  I think that was how it was done.
12   Q.  Because when you were out on ADS, you
13  couldn't fill out the time sheet; so you would do it
14  when you returned?
15   A.  Right.  Yes.  I think that was how they
16  wanted it done.
17      MR. DUBOIS:  Let's break for lunch.  An
18  hour?  Is that enough?
19      MS. BATTLE-HODGE:  Yes, that's fine.
20      MR. DUBOIS:  So it's 12:20.  1:20.  And at
21  3:15, you got to go, or three?
22      MS. BATTLE-HODGE:  Yeah, 3:15.
23        (Lunch recess)
24   Q.  Ms. Johnson, at some point, you were union
25  steward for the AFGE, correct?

Page 97

1    A.  Yes.
2    Q.  What period of time were you the union
3  steward?
4    A.  I think it was from --
5    Q.  Does June '98 through November 2002 sound
6  about right?
7    A.  I started to say 1998 to 2002, yes.
8    Q.  And what was the reason for your departure
9  from that position?
10   A.  The only thing I know is that other people
11  were selected to be union steward.
12   Q.  All right.  And who were -- who was selected?
13   A.  Oh, wait a minute.  Yes.  They had a lot of
14  complaints about me.  That was it.
15   Q.  Okay.  Do you know the nature of those
16  complaints?
17   A.  No, I really don't.
18   Q.  Do you know who made them?
19   A.  I don't know anything about those complaints.
20   Q.  And who replaced you as union steward?
21   A.  Rosey Howell.
22   Q.  And how long -- do you know -- did she hold
23  that position?
24   A.  Maybe less than a year.
25   Q.  At some point, did Linda Tamplin become union

Bernethia Johnson v. Jo Ann B. Barnhart, et al.                    10/23/2007
DEPOSITION OF BERNETHIA JOHNSON

26 (Pages 98 to 101)

Page 98

1  steward?
2    A. Yes.
3    Q. And was Lynda Hall her assistant? I guess it
4  was Lynda Simmons at the time; later she became Lynda
5  Hall.
6    A. Yes. Lynda Simmons was her -- Lynda Hall,
7  whoever. I don't know which one, at what time she --
8    Q. Is it your understanding that Lynda Simmons
9  and Lynda Hall are the same person?
10   A. Are the same, yes.
11   Q. And you currently work now in Chattanooga; is
12 that right?
13   A. That is correct.
14   Q. And you transferred there on October 3rd,
15 2005; is that right?
16   A. Yes.
17   Q. What is your current position?
18   A. Paralegal specialist.
19   Q. And have you been in that position since
20 approximately December 2005?
21   A. January.
22   Q. January 2005?
23   A. Wait a minute. No, no, no, no, no. Ask that
24 question again.
25   Q. How long have you been in the paralegal

Page 99

1  specialist position?
2    A. Since January the 7th, 2007.
3    Q. January 7, 2007?
4    A. Yes.
5    Q. And who is your current supervisor?
6    A. Kim McClain Leashure (phonetic), something
7  like that. It's Kim McClain Leashure.
8    Q. Has she been your supervisor since you
9  transferred to Chattanooga?
10   A. No.
11   Q. What other supervisors?
12   A. Susan Britton.
13   Q. Susan Britter?
14   A. Susan Britton.
15   Q. Any other supervisor since you transferred?
16   A. No.
17   Q. Are you happy in your current position?
18   A. No.
19   Q. Have you filed any EEO complaints against any
20 of your supervisors in Chattanooga?
21   A. No.
22   Q. Have you filed any union grievances against
23 any of your supervisors?
24   A. No.
25     MR. DUBOIS: All right. Let's mark this as

Page 100

1  Defendant's Exhibit #9.
2    Q. I'd like to hand you a document that's been
3  marked as Defendant's Exhibit #9. Do you recognize
4  that document?
5    A. Yes.
6    Q. Is this a copy of the first lawsuit you filed
7  in federal court here in Montgomery on May 2nd, 2006?
8    A. May 2nd, 2006? Okay. That's what it says.
9    Q. All right. In this lawsuit, you allege you
10 were discriminated against due to your race and in
11 reprisal for filing EEO complaints; is that right?
12   A. Now, state that --
13     MR. DUBOIS: Repeat that.
14       (The court reporter read the
15        pending question)
16   A. For race and retaliation.
17   Q. Okay. And for the record, what's your race?
18   A. Black, African-American.
19   Q. And who are you claiming discriminated
20 against you because of your race in this first
21 lawsuit?
22   A. Whom I -- the first one? I have to really
23 see which one this is.
24   Q. Yeah.
25   A. Is that where Paul Reams -- I would say

Page 101

1  management.
2    Q. All right. And when you say management, who
3  are you referring to?
4    A. Paul Reams and Paul Johnson. This is the
5  very first one? Yes, this is the very first one.
6    Q. Anyone else besides those two in this first
7  lawsuit?
8    A. On this one?
9    Q. Yes. The first lawsuit.
10   A. Well, let me just look at this for one
11 second. Yes.
12   Q. And are those the same individuals you allege
13 retaliated against you?
14   A. Yes.
15   Q. Are you alleging anyone retaliated against
16 you in this first lawsuit?
17   A. In this first one? I would say management as
18 a whole retaliated, the management team.
19   Q. When you say the management team, who are you
20 referring to?
21   A. Retaliated against me.
22   Q. But who are the members? When you say the
23 management team, are you referring to specific
24 individuals?
25   A. Am I -- I am referring to specific

Page 102

1  individuals.
2      Q.  Okay.  Who are those individuals?
3      A.  When was this filed?  It was filed in May
4  2000 -- it was filed in May 2006?
5      Q.  You want to take a short break and you can
6  read through that?
7      A.  Thank you.  Because I'm -- thank you.
8          MR. DUBOIS:  Let's go off the record for a
9  minute.
10         (Brief recess)
11     Q.  I believe right before we took a break, I had
12  asked you who were the managers you are alleging
13  retaliated against you in this first lawsuit.
14     A.  Paul Reams.
15     Q.  Okay.
16     A.  Paul Johnson.
17     Q.  Okay.
18     A.  Cynthia Lamar.
19     Q.  Okay.
20     A.  Gloria Boseman.
21     Q.  Anyone else?
22     A.  This is retal -- you said discriminated or
23  retaliated?  What was your question?
24     Q.  Retaliation I think is the pending question.
25     A.  Retaliation, yes.

Page 103

1      Q.  Those four individuals you just listed?
2      A.  Yes.
3      Q.  All right.  Now I want to direct your
4  attention to paragraph 31 of the complaint.  This is
5  the race discrimination count.  Do you see that
6  paragraph?  It's on page 8.
7      A.  Yes.
8      Q.  There were three acts of harassment listed,
9  which were the denial of the right to work at home
10  during April of 2004, receipt of a reprimand on April
11  29th, 2004, and receipt of a written reprimand on May
12  27, 2004.  Besides these three acts which are
13  specifically identified in that paragraph, are you
14  seeking to challenge any other acts as discriminatory
15  in this first lawsuit?
16     A.  Am I seeking more acts that were done?
17     Q.  Besides -- you list three acts in paragraph
18  31.
19     A.  Yes.
20         MR. DUBOIS:  Can you read the question I
21  asked?
22         (The court reporter read the
23           pending question.)
24     A.  Any other acts like the things that they did
25  to me?  Is that the things that were done to me?  Is

Page 104

1  that what you're talking about?  The things that
2  management or whoever did things against -- to -- to
3  me?
4      Q.  Are there other acts -- your complaint lists
5  these three specific acts that you allege were
6  discriminatory.  My question is are you seeking to
7  challenge other acts as racially discriminatory in
8  this first lawsuit besides the three that you've
9  listed in paragraph 31.
10     A.  I don't understand what you're asking me.  I
11  just don't understand what you're asking me.
12     Q.  All right.  Let me rephrase it.  In paragraph
13  31, you allege that these three acts here -- denial of
14  the right to work at home, receipt of the reprimand,
15  and receipt of the written reprimand -- were taken due
16  to your race.  That's what you're alleging, correct?
17     A.  Yes.
18     Q.  All right.  Other than those three acts which
19  are listed in paragraph 31, are there any other acts
20  that you're challenging as racially discriminatory in
21  this first lawsuit?
22     A.  Such as -- I just don't know how to answer.
23  I don't -- like when Paul Reams made me take -- to
24  move -- move my car from a parked place that he
25  allowed everybody else to be -- to remain there?  I

Page 105

1  don't -- I don't know.  I don't -- I don't know.  I
2  don't know how to answer that.  I --
3      Q.  I'm trying to understand what acts you're
4  alleging are discriminatory.  And there's three
5  listed.  Sitting here today, can you think of any
6  others in this first lawsuit you're alleging were
7  taken because of racial discrimination?  You mentioned
8  something to do with the parking space.  I believe
9  that's an allegation you have in the second lawsuit,
10  which we'll talk about probably tomorrow.  But in this
11  first lawsuit, besides these three here, are there any
12  other alleged acts of discrimination?
13     A.  I could name like when my -- like when my
14  overhead desk lamp broke and I brought it to
15  management's attention, it took almost nine months to
16  get fixed; and I had to work in somewhat of a dim
17  area.  I don't know if that's what you're talking
18  about, things of that nature.
19     Q.  Are you alleging that was because of racial
20  discrimination?
21     A.  No.  It probably was for retaliation.  No.
22  Okay.  Retaliation maybe.
23     Q.  Sitting here today, can you think of any
24  other acts besides the three in paragraph 31 that you
25  are challenging in this first lawsuit only as

Bernethia Johnson v. Jo Ann B. Barnhart, et al.                    10/23/2007
DEPOSITION OF BERNETHIA JOHNSON

28 (Pages 106 to 109)

Page 106

1   discriminatory?
2       A. I was denied -- and I don't know the time
3   frame, but I think it -- I think it was August 2004
4   when I request for hardship transfer. I don't know if
5   I mentioned that or not. I request hardship transfer
6   and --
7       Q. Do you know if that was covered in your
8   second lawsuit?
9       A. I don't know.
10      Q. I believe there's an allegation in the second
11  lawsuit about that.
12      A. I don't know. I get so many things confused
13  right now.
14      Q. All right. Can you think of any others?
15      A. Not sitting here, I cannot. I'm not saying
16  that there are no others, but right now I cannot.
17      Q. Well, is there anything besides your
18  complaint that would help you to recall what other
19  acts there might be? I'm just trying to understand
20  the nature of your allegations so I can ask you about
21  them. Is there some other document you believe that
22  would refresh your memory as to what your claims are?
23      A. Is the file itself here? It's so much that
24  has happened. I just can't remember everything.
25      Q. Well, is every claim of race discrimination

Page 107

1   that you allege, is it alleged somewhere in this
2   complaint? Are there any acts of race discrimination
3   that you seek to challenge in this first lawsuit that
4   aren't listed in the complaint?
5       A. Are there any acts. Like with me
6   transferring?
7       MS. BATTLE-HODGE: That was in the second
8   one.
9       A. Oh, God. I'm just getting confused. There's
10  so much that has happened, I can't remember.
11      Q. Would they be listed in one of the two
12  complaints?
13      A. Yes.
14      Q. Is everything you're alleging that was
15  discriminatory and retaliatory at Social Security
16  Administration in Montgomery in one of the two
17  lawsuits that you filed, in your complaint?
18      A. Yes, I would think everything -- I would
19  think everything is. There's so much, I can't say for
20  sure that they are, but --
21      Q. All right. Let me direct your attention to
22  paragraph 33 of this complaint, in which you allege
23  you were subjected to retaliation because you filed --
24      MS. BATTLE-HODGE: Before you ask the
25  question, she has to run to the restroom.

Page 108

1       MR. DUBOIS: That's fine. Take a break.
2       (Brief recess)
3       Q. All right. Directing your attention to
4   paragraph 33 of the complaint, which is in the
5   retaliation count, you allege you were subjected to
6   retaliation because you filed two EEO complaints,
7   correct?
8       A. Yes.
9       Q. And what EEO complaints are you referring to
10  there?
11      A. The prior two EEO actions when I -- I applied
12  for a -- for a legal -- legal assistant position and
13  five employee -- five white employees were selected
14  and I wasn't. And I questioned that, and no one could
15  give me answers, so I sought for answers by way of
16  EEOC. That was the first one.
17      Q. And when did you file that one?
18      A. I believe it was in 1990 -- okay. Okay.
19  Yes, this one in 1997.
20      Q. Yeah. Let me direct your attention to
21  paragraph 11 and 18 of the complaint. Are those the
22  two EEO complaints you're alleging you were retaliated
23  against for filing?
24      A. Yes, those two. The one October 28th, 1997,
25  and also the one in May, May 14th, 2003. Yes, those

Page 109

1   were the two.
2       Q. Now, back to 33 again. You list three
3   specific actions you believe were retaliatory, which
4   are the denial of right to work at home in April 2004,
5   the receipt of the reprimand on April 29th, 2004, and
6   receipt of a written reprimand on May 27th, 2004.
7   Other than those three acts, are you alleging in this
8   first lawsuit other acts that were retaliatory?
9       A. Before 2006, I think -- I just get the two
10  confused.
11      Q. All right. Is every act of alleged
12  retaliation detailed in one of the paragraphs in
13  either this first lawsuit or the second lawsuit?
14      A. I don't know if the one where
15  Ms. Barnett-Jefferson tried to hit me with her car is
16  in there.
17      MS. BATTLE-HODGE: That's in the second.
18      Q. That's alleged in the second lawsuit.
19      A. Okay. Then it may be -- that was the very
20  last act that was ever committed by someone at the --
21  in Montgomery.
22      Q. Now, earlier you referenced something about
23  an overhead desk lamp. Are you alleging that was
24  retaliatory?
25      A. Yes.

Bernethia Johnson v. Jo Ann B. Barnhart, et al.                          10/23/2007
DEPOSITION OF BERNETHIA JOHNSON

29 (Pages 110 to 113)

Page 110

1    Q. When did that take place?
2    A. Perhaps in 2004.
3    Q. When in 2004?
4    A. I would say -- I don't know when I told Paul
5  about it, but he eventually -- after about seven to
6  nine months, he repaired it for me.
7    Q. This is the overhead lamp --
8    A. Desk lamp.
9    Q. The desk lamp that went with your desk?
10   A. Yes.
11   Q. All right. The bulb in your desk lamp burned
12 out sometime in 2004?
13   A. It broke.
14   Q. And who did you mention it was broken to?
15   A. Paul Reams.
16   Q. Anybody else?
17   A. I don't know if I mentioned it -- I don't
18 know if I mentioned it to anyone else.
19   Q. Okay. Did you ask Paul Reams to do anything?
20   A. I just let him know that it was broken and
21 that I used it daily and -- because I know that they
22 have to send in a purchase order or put in -- I don't
23 know. But I mentioned -- excuse me. I mentioned to
24 him that my desk lamp was broken and that I used it
25 daily.

Page 111

1    Q. Were you still able to do your work?
2    A. I was still able to do it, yes.
3    Q. All right. And what makes you believe that
4  Paul Reams acted with any retaliatory motive regarding
5  your desk lamp being broken?
6    A. The first thing I did was turn on my desk
7  lamp because I needed the light to see. And I was
8  able to do my work; it was just with it being a little
9  dimmer than -- without that lamp, it made it a little
10 difficult for me to do, but --
11   Q. Are you aware of any other legal assistants
12 who had broken desk lamps?
13   A. I really -- no.
14   Q. All right. Now I want to direct your
15 attention to count three, which is the hostile work
16 environment count. You allege that defendants created
17 a hostile work environment in paragraph 37. Are you
18 alleging this hostile work environment was due to your
19 race or for retaliation?
20   A. Retaliation.
21   Q. Okay. And what -- other than the various
22 acts that you have alleged in the complaint, are there
23 any other ways you believe you were subjected to a
24 hostile work environment?
25   A. Is that such as like when I asked to be re --

Page 112

1  to receive -- I -- I asked for a transfer and it took
2  almost a year to get it. I think that was a hostile.
3  I think -- I think that the work that constantly came
4  back to me or -- I think -- well, I don't know how to
5  answer. What was your question?
6    Q. I'm asking, besides the various acts that
7  you've included as allegations in the paragraphs in
8  your two complaints, are you alleging anything else
9  caused you to be subjected to a hostile working
10 environment?
11   A. Like for me because I was a union steward
12 or -- at one time, I was a union steward. And I
13 believe that that had a lot of -- a lot to do with why
14 I was being retaliated against.
15   Q. Okay. What I'm trying to get at is you have
16 an allegation you were subjected to a hostile work
17 environment.
18   A. Yes.
19   Q. What are you alleging was done that made that
20 work environment hostile?
21   A. Okay.
22   Q. Is there anything besides the specific -- we
23 have a number of allegations in the two complaints.
24 Other than those things, is there anything else?
25   A. Other than those things, I don't think so. I

Page 113

1  don't think so.
2    Q. Okay. Now, during your employment at the
3  Social Security Office in Montgomery, you never heard
4  any supervisors make any racially derogatory jokes,
5  comments, or anything like that, correct?
6    A. I heard comments that were made, but it
7  wasn't by a supervisor, but the supervisor was
8  present.
9    Q. Okay. What comment did you hear?
10   A. It was a comment that Paul Johnson had
11 asked -- oh, gosh. It's been so long. Paul Johnson
12 had asked for assistance in doing something in his
13 office. Well, I didn't hear the whole thing. I heard
14 my name called, and then I heard them laugh. That's
15 what I heard. I did not hear the statement that was
16 actually made. I heard my name called, and then
17 every -- everybody bust out laughing -- laughing. And
18 I think it was -- I think it was Connie Williams,
19 Lynda Simmons, and Paul Johnson in his office. I
20 think they were hanging -- trying to hang something.
21   Q. So what comment are you alleging was made
22 that was racially offensive?
23   A. I did not hear what was made. I heard my
24 name called.
25   Q. All right. What --

Page 114

1    A.  And then I heard them laugh.
2    Q.  And what makes you think that it had anything
3  to do with race?
4    A.  Excuse me?
5    Q.  What makes you think it had anything to do
6  with race if you never heard the comment and only
7  heard some laughing and your name?
8    A.  What made me think that?
9    Q.  Yes.
10   A.  I knew that they were trying to hang
11 something.  And I heard my name called, and they
12 busted out laughing.  That made me think that they
13 were -- they made a comment about me.
14   Q.  How do you know they were trying to hang
15 something?
16   A.  If I'm not mistaken, I think Paul Johnson
17 asked -- I don't -- I know -- I think Paul Johnson
18 asked Lynda Simmons to come in there and give him some
19 assistance.  Lynda was there, Connie Williams was
20 there, and Paul Johnson was there.
21   Q.  So you heard Paul Johnson ask Lynda Simmons
22 to come in and give him some assistance?
23   A.  Yes.
24   Q.  What specifically did he say to her?
25   A.  I don't know what specific -- I cannot quote

Page 115

1  it.
2    Q.  You had heard -- okay.  You heard Paul
3  Johnson ask Lynda Simmons to come in and give him some
4  assistance?
5    A.  Yes.
6    Q.  How do you know they were hanging something
7  up in the office?
8    A.  Well, I'm thinking -- I'm thinking he asked
9  her for assistance to help him do something.  Maybe
10 they weren't -- I don't know.  I don't know.  But he
11 asked her for assistance, and Lynda Simmons went in
12 there.  And I think Connie was already in there.  I
13 don't know.  But I know that I heard my name called
14 and then they -- they all laughed.
15   Q.  But you don't know what they were doing in
16 the office?
17   A.  No.  Because I was not standing right there
18 in the doorway.
19   Q.  Okay.  And other than hearing your name and
20 the laughter, did you hear any discussion from the
21 office?
22   A.  Not the discussion.  I heard my name called.
23   Q.  And when was that?
24   A.  It was -- it was probably in 2003.  Maybe --
25 Paul became my supervisor in 2000.  Hmm.  It was

Page 116

1  probably -- it was -- I'm saying probably.  I don't
2  know.  I'm --
3    Q.  Probably sometime in 2003?
4    A.  No.  It was -- I think it was well before
5  2003, really.
6    Q.  You don't recall the year, though?
7    MS. BATTLE-HODGE:  If you don't, you don't.
8    A.  No, I don't recall the year.
9    Q.  And who said your name?
10   A.  I believe it was Connie Williams.
11   Q.  Did you ever ask Connie Williams about what
12 was going on in the office?
13   A.  No, I did not.
14   Q.  Did you ever ask Paul Johnson about what was
15 going on in the office?
16   A.  No, I did not.
17   Q.  And how about Lynda Simmons?  Did you ever
18 ask her?
19   A.  No, I did not.
20   Q.  Did you ever talk to anybody else?
21   A.  About that?
22   Q.  About that.
23   A.  I eventually talked to Paul Johnson about it.
24   Q.  When was that?
25   A.  I talked to Paul Johnson -- I can't recall

Page 117

1  the date, but I talked to Paul Johnson about it.
2    Q.  What specifically do you recall from that
3  conversation?
4    A.  Paul Johnson was talking to me about -- oh,
5  okay.  Paul Johnson was talking to me about why Judge
6  Carnes' case was not ready, and I told him why.  And
7  one thing just led to another, and so that came up in
8  the conversation.  I told Paul Johnson that I did not
9  trust -- why should I come to management and tell
10 management anything when management discuss things
11 with the employees or something like that or laughed
12 with the employees -- yeah, that they would laugh
13 with -- about -- they would talk and discuss things
14 with other employees, something like that.
15   Q.  Did you mention this incident where you had
16 heard your name and laughter?
17   A.  I told him something and -- and I remember
18 him -- Paul Johnson doing an e-mail to me or he -- I
19 think he did an e-mail to me, but he put what he
20 recalled.  And I told Paul Johnson that was not the
21 entire conversation or that was not what I said.  And
22 then I wrote -- it's -- I sent -- I think we've got it
23 in the file somewhere.  Then I told him what -- what
24 was said, and then he responded to me again.  So, yes,
25 I discussed it with Paul Johnson.

Bernethia Johnson v. Jo Ann B. Barnhart, et al.                    10/23/2007
DEPOSITION OF BERNETHIA JOHNSON

31 (Pages 118 to 121)

Page 118

1    Q.  When you say discussed it, what -- what did
2  you tell him you had heard?  What did you discuss with
3  him?
4    A.  I think that was when I talked to him about
5  me being in a hostile work environment.
6    Q.  Did you tell him you thought that you heard a
7  racial comment?
8    A.  I know I talked to him about Paul -- Paul
9  Reams calling me a bitch, and then I talked to him
10  about Pam Davenport telling employees that I lied to
11  get the union steward position.  I know I talked to
12  him about that.
13    Q.  Do you recall anything else that you talked
14  to him about?
15    A.  And I think Paul may have said for --
16  something about me need to -- I can't remember.
17  Those -- those are -- that's what I remember.
18    Q.  Okay.  Is there any other incident -- or
19  strike that.
20    Did you ever hear any supervisors make any
21  racially derogatory jokes or comments during your
22  employment?
23    A.  Jokes or comments?  I'm so sorry.  Did I hear
24  any employees at all or management?
25    Q.  Supervisors.

Page 119

1    A.  Any supervisors.  Well, I know that Paul
2  Reams told me that -- oh, but that was -- I know Paul
3  Reams told me that I was not wanted in Chattanooga,
4  Tennessee, that nobody wanted me in Chattanooga,
5  Tennessee.
6    Q.  And you perceived that comment as a racially
7  derogatory joke or comment?
8    A.  Oh, that's what I have to -- as a racial?
9    Q.  Yeah, did --
10    A.  No, not racial.
11    Q.  Okay.  The question -- just listen to the
12  question.  During your employment with the Social
13  Security Office in Montgomery, did you hear any
14  supervisors make any racially offensive comments or
15  jokes?
16    A.  Pam Davenport.  She called me and Tresalyn
17  Collier benny wenches or something.  And then, of
18  course, where Paul Reams called me a bitch.  Is a
19  bitch a racial -- okay.  Anyway --
20    Q.  Are you alleging those were racial comments?
21    A.  Benny wench I think is a racial comment.
22    Q.  Do you know what a benny wench is?
23    A.  I tried to ask Pam about it.
24    Q.  Did you answer?  Do you know what a benny
25  wench is?

Page 120

1    A.  No.  I -- no.
2    Q.  Did you ask Pam Davenport what it was?
3    A.  Yes.
4    Q.  What did she say?
5    A.  She told me she always called everybody in
6  her -- she -- something like -- this is not a quote:
7  well, I call them a benny wench.  I said, what is a
8  benny wench?  I don't even know if she know, but I
9  don't know.  I later sent her an e-mail about benny
10  wenches.  And I think benny wench is like -- well,
11  anyway, I later sent her an e-mail about her calling
12  me a -- something other than my name.
13    Q.  Did she respond to that e-mail?
14    A.  Yes.
15    Q.  How did she respond?
16    A.  She said -- let me see.  I think she did
17  not -- she said she did not mean to -- I did not mean
18  to -- I can't recall.
19    Q.  Did you tell her you thought it was a
20  racially offensive term?
21    A.  Yes.  I -- I recall -- I think I -- in the
22  e-mail, I said something about like I looked up --
23  tried to look up what the term was.  And I think it
24  was something like you hook on the back of a -- of a
25  truck or something and you drag it.  And it has to do

Page 121

1  something with the chain, and it's pulled.  So that
2  was offensive to me because -- well, that was very
3  offensive to me.
4    Q.  The question is did you -- did you advise Pam
5  Davenport that you thought it was a racially offensive
6  comment?
7    A.  I sent her an e-mail with what I had to say
8  about that.
9    Q.  Did you produce that e-mail?
10    A.  Yes, I think I did.  I think I did.
11    Q.  Did you file any EEO complaint regarding that
12  comment?
13    A.  Did I -- no.
14    Q.  When was that comment made again?
15    A.  Maybe like 2000 -- maybe between 2002, 2004.
16    Q.  And who was present when it was made?
17    A.  Pam Davenport, Tresalyn Collier, and myself.
18    Q.  All right.  Did you ever see any racially
19  offensive pictures or receive any racially offensive
20  e-mails during your employment in Montgomery?
21    A.  No.
22    Q.  All right.  Let me direct your attention now
23  to early 2004, when you were a legal assistant working
24  for Paul Johnson.
25    A.  Okay.

Bernethia Johnson v. Jo Ann B. Barnhart, et al.                     10/23/2007
DEPOSITION OF BERNETHIA JOHNSON

32 (Pages 122 to 125)

Page 122

1    Q.  Do you recall working the front desk for the
2  first three weeks of March 2004?
3    A.  Yes.
4    Q.  Prior to that time, when was the last time
5  you had worked the front desk?  Do you recall?
6    A.  Prior to that?  I cannot recall.
7    Q.  Do you know who had worked the front desk
8  before you in February?
9    A.  No.  I cannot recall.
10   Q.  Do you recall Paul Johnson coming up to you
11 while you were working the front desk and telling you
12 he could not locate some of the cases that you had
13 listed as worked up in HOT?
14   A.  No.
15   Q.  Do you recall him coming up to you when you
16 were working the front desk and telling you that he
17 could not locate some of your cases or wanting to talk
18 to you about some of your cases?
19   A.  No.
20   Q.  Did you talk to him at all about any of your
21 cases while you were working the front desk in March
22 of 2004?
23   A.  No.
24   Q.  And you were absent on annual leave the last
25 week of March of 2004, right?

Page 123

1    A.  Yes.
2    Q.  And on or about Monday, April 12th, do you
3  recall approaching Paul Johnson and telling him you
4  wanted to work at home for two days that week?
5    A.  I recall that.
6    Q.  Prior to that time, when was the last time
7  you had worked at home?
8    A.  I can't recall, because I did not work at
9  home that often.
10   Q.  Okay.  What do you recall from your
11 conversation with Paul Johnson on that day about
12 working at home?
13   A.  I asked Paul if I could work at home.  Was
14 it -- for two days.  I just recall that I asked -- I
15 asked Paul about me working at home and for two days,
16 Monday and Tuesday -- I mean Tuesday and Wednesday.
17 And he said -- I think he said no.  I can't recall.
18 And I just said no problem and left it like that.
19 Then -- well, anyway, that's it.
20   Q.  That's all you recall from the conversation?
21   A.  From Paul Johnson's conversation, yes.
22   Q.  Was anyone else present during that
23 conversation?
24   A.  No.
25   Q.  Where was it held?

Page 124

1    A.  I think it was held at my -- I know it was
2  held at my cubicle.
3    Q.  Did Paul Reams' name ever come up in that
4  conversation?
5    A.  Paul -- I don't think Paul's name came up
6  during the conversation.
7    Q.  All right.  After speaking to Paul Johnson,
8  did you go then and talk to Paul Reams and ask to work
9  at home?
10   A.  No.  Paul Reams?  No.
11   Q.  All right.  Did you subsequently talk to Paul
12 Reams about working at home?
13   A.  Paul Reams came and talked to me.
14   Q.  He came and talked to you?
15   A.  Yes.
16   Q.  At your cubicle?
17   A.  Yes.
18   Q.  All right.  And what do you recall of that
19 conversation?
20   A.  He asked me.  He said, Bernethia, would you
21 come in my office, please.  And I said, yes.  So I
22 followed him in his office.  So then we left my
23 cubicle and went into his office.  And he told me that
24 Paul Johnson approached him about a -- or questioned
25 him about working at home for two days, where I

Page 125

1  requested it.  And I said yes.  And he said something
2  like Paul had forgotten that if we work the front
3  desk, that we were able to work at home for two days.
4  And so -- so he said that he was -- he apologized for
5  that misunderstanding.
6    And then I -- okay.  And that was it.  Well,
7  there was more to that conversation.  Did you want --
8  you said what could I remember?
9    Q.  What else do you recall of that conversation?
10   A.  And then I asked Paul if I could work at
11 home, then, on Wednesday and Thursday.  And Paul said,
12 no, that nobody could -- that everybody had to be in
13 the office on Thursday.  And I said, well -- I
14 think we talked.  I think he said he would -- I said,
15 I think I can work at home on Thursday.  And he said,
16 well, I'll call LMR and see what they say.
17   And then Paul Reams came back to me and told me
18 that I could work at home Wednesday and Thursday.
19   Q.  What's LLMR?
20   A.  LMR.
21   Q.  What does that stand for?
22   A.  Labor Management Relation.
23   Q.  All right.  And it's your understanding under
24 the ADS contract with the union, Thursday and Friday
25 are core days, correct?

Bernethia Johnson v. Jo Ann B. Barnhart, et al.          10/23/2007
DEPOSITION OF BERNETHIA JOHNSON

33 (Pages 126 to 129)

Page 126

1    A.  Core days?
2    Q.  Core days.
3    A.  Yes.
4    Q.  So it was your understanding, even though
5  they were core days, management had the discretion to
6  let you work at home?
7    A.  Like on -- on Thursday or something?
8    Q.  Yes.
9    A.  Yes.
10    Q.  Let me just direct your attention to
11  Defendant's Exhibit #7.
12    A.  Exhibit #7?
13    Q.  Yes.  Exhibit #7, Section 1.
14    A.  Okay.
15    Q.  Do you see on paragraph C and D?
16    A.  Yes.
17    Q.  C talks about core days Thursday and Friday.
18  It says, Employees are not authorized to work on ADS
19  for these two days.  And then D says -- let's see --
20  Management may approve alternative work schedule
21  requests to depart from the core day requirement noted
22  in C to meet special circumstances or bona fide needs
23  of the employees in the office.  Do you see that?
24    A.  Yes.
25    Q.  Did you discuss that subsection with Paul

Page 127

1  Reams at all?
2    A.  I did not pull this out to discuss it with
3  him.
4    Q.  Did you tell him that you believed there were
5  special circumstances that should allow you to work at
6  home on Thursday?
7    A.  Yes.
8    Q.  What were those special circumstances?
9    A.  I did not go into detail with that.
10    Q.  You just told him you thought there were
11  special circumstances?
12    A.  Yes, something to that effect, not those
13  words.
14    Q.  Are you aware of other employees being
15  allowed to work ADS days on Thursdays?
16    A.  No.
17    Q.  I hand you a document I've marked as
18  Defendant's Exhibit #10.  And tell me, do you
19  recognize that document.
20    A.  Yes.
21    Q.  All right.  And is this an e-mail you
22  received from Paul Reams on Tuesday, April 13th, 2004?
23    A.  Yes.
24    Q.  And this e-mail advises you that you can work
25  at home on Thursday, April 15th, correct?

Page 128

1    A.  Yes.
2    Q.  So he allowed you to work at home on April
3  14th and 15th, correct?
4    A.  Yes.
5    Q.  And did you, in fact, work at home on those
6  two days?
7    A.  I believe I did.
8    Q.  I hand you a document I've marked as
9  Defendant's Exhibit #11.  Do you recognize this
10  document?
11    A.  Yes.
12    Q.  Defendant's Exhibit #11 is a time and
13  attendance roster that was used at the Social Security
14  Office on Atlanta Highway, correct?
15    A.  Yes.
16    Q.  And this is the sheet where when you arrive
17  in the morning, you would write your name in column
18  four and the time when you arrived, correct?
19    A.  The time that I started working, not arrived.
20    Q.  Strike that.  There was a time and attendance
21  roster where you would sign in, generally, at work,
22  right?
23    A.  Yes.
24    Q.  And this particular document, Defendant's
25  Exhibit #11, is the time and attendance roster for

Page 129

1  April 14th, 2004 and April 15th, 2004, correct?
2    A.  Yes.
3    Q.  All right.  And turn to the first page.  ADS
4  is written on line seven.  Do you see that?
5    A.  Yes.
6    Q.  All right.  And five lines below that, line
7  12, is that your initials?
8    A.  That is correct.
9    Q.  And that indicates that you worked ADS on
10  April 14th, 2004, correct?
11    A.  I don't know.  About my initials, I really
12  don't know.  I write similar to that, but that does
13  not really look like my initials.
14    Q.  Is your testimony those are not your
15  initials?
16    A.  I don't know.
17    Q.  You did work ADS on April 14th, 2004,
18  correct?
19    A.  I think I did go home and work Thursday
20  and -- Wednesday and Thursday, yes.
21    Q.  All right.  And Defendant's Exhibit #11, the
22  first page, April 14th, 2004, is Wednesday, correct?
23    A.  Yes.
24    Q.  And the form indicates -- there's initials
25  there that you're not sure are yours or not, but

Bernethia Johnson v. Jo Ann B. Barnhart, et al.                    10/23/2007
DEPOSITION OF BERNETHIA JOHNSON

34 (Pages 130 to 133)

---

Page 130

1    they're under ADS, correct?
2        A.  That is correct.
3        Q.  And is it your testimony that you do not know
4    if you made that entry?
5        A.  I could have made it.
6        Q.  It would make sense that you would make it
7    because you did work ADS that day, didn't you?
8        A.  If I worked ADS that day, yes, I made it.
9        Q.  And you did work ADS that day?
10       A.  I know, but -- yes, I -- I swear I can't
11   think.  It's like I know we talked about it, and I'm
12   sure he let me go home and work those cases, so
13   perhaps this is my signature, but it just doesn't look
14   like my signature.  On page 2, under column 16, and on
15   page 1, under column 16, that look more like my
16   signature than the one over in -- on page -- on page 1
17   and page 2, line item 12.
18       Q.  So the only signature --
19       A.  Number four.
20       Q.  -- that you're not sure is yours would be the
21   one on the first page, line 12?
22       A.  Gosh.  I'm -- I'm saying that -- well,
23   perhaps I did.  That's how I'll leave it.  Perhaps
24   I'm -- perhaps I did sign it like this.
25       Q.  So you did work at home on April 14th and

---

Page 131

1    15th, 2004.  And you did fill out these ADS time
2    sheets to indicate you had worked that time?
3        A.  I -- I'm -- I'm almost certain I worked at
4    home on April the 4 -- 14th and 15th.  Okay.  Yeah.  I
5    would say -- I'm looking at the -- okay.  Perhaps I
6    did.
7        Q.  All right.  And do you recall also working at
8    home ADS on Tuesday, April 20th, and Wednesday, April
9    21st?
10       A.  Yes, I do recall that.
11       Q.  Okay.  Let's go back to Defendant's Exhibit
12   #10, which is the e-mail from Paul Reams dated April
13   13th.
14       A.  I'm sorry.  May I ask a question?  The other
15   two days that you just asked me about, do we have
16   those time sheets here?
17       Q.  I've marked as Defendant's Exhibit #12 --
18   it's a time and attendance roster dated April 20th,
19   2004, and April 21st, 2004.  Do you recognize this
20   document, Ms. Johnson?
21       A.  Yes.
22       Q.  And do you see on the first page, which is
23   for Tuesday, April 20th, line seven has ADS and then
24   line 12 has your initials, correct?
25       A.  Yes.

---

Page 132

1        Q.  And then the second page of Defendant's
2    Exhibit #12 is for Wednesday, April 21st, 2004,
3    correct?
4        A.  I'm sorry.  Will you repeat that?
5        Q.  The second page of Defendant's Exhibit #12 is
6    a time and attendance roster for April 21st, 2004,
7    correct?
8        A.  Yes.
9        Q.  And line eight has ADS; and on line 11, those
10   are your initials, correct?
11       A.  Unless I changed how I did my initials -- I
12   mean, I did work the days.  I really did.  I know I
13   worked the days.
14       Q.  Did you ever ask anyone else to write your
15   initials for you?
16       A.  We could not do that.
17       Q.  But Defendant's Exhibit #12 accurately
18   reflects that you did work ADS on April 20th and April
19   21st, 2004?
20       A.  I -- I recall working at home, yes.  I do
21   recall working at home.
22       Q.  All right.  Let's go back to Defendant's
23   Exhibit #10, which is the e-mail from Paul Reams dated
24   April 13th.
25       A.  Okay.

---

Page 133

1        Q.  This e-mail instructs you to see Cynthia
2    Lamar on that day, which was Tuesday, April 13th, so
3    she could assign you some cases, correct?  It's in the
4    second paragraph.  Do you see that?
5        A.  Yes, that's what it says.
6        Q.  Did you go ahead and talk to Ms. Lamar that
7    day?
8        A.  Yes, more than likely, I did.
9        Q.  Did she give you additional cases?
10       A.  I don't recall if Cynthia gave me the cases
11   or not.
12       Q.  Do you recall anything about your
13   conversation with her that day?
14       A.  April.  I recall having a conversation.  I
15   recall going into Cynthia's office, but I'm trying
16   to -- I don't know if it was that day or not.  It may
17   have been that day, because I went home to work.
18       Q.  All right.  Let me direct your attention now
19   back to Defendant's Exhibit #9, which is the complaint
20   in that first lawsuit that you filed.  I want to refer
21   you to page 8, paragraph 31.
22       Now, in that paragraph, you have an allegation
23   that you were denied the right to work at home during
24   2004.  And my question, is that what you allege in
25   this lawsuit?  Because you were, in fact -- as we

Bernethia Johnson v. Jo Ann B. Barnhart, et al.          10/23/2007
DEPOSITION OF BERNETHIA JOHNSON

35 (Pages 134 to 137)

Page 134

1  discussed previously, you did work at home on April
2  14th, 15th, 20th and 21st.
3      A.  And your question again?
4      Q.  The question is what are you alleging was
5  done that was discriminatory since you were actually
6  allowed to work at home in April 2004?
7      A.  The fact that other people could work at home
8  and be given that time and not get hassled; but when I
9  want to work at home, I get -- I'm hassled about
10  that.  It's like Paul Reams -- Paul Johnson denies me,
11  but he go and he talk to Paul Reams, and then Paul
12  Reams come to me and then tell me Paul -- that Paul
13  Johnson just forgot that you could work at home two
14  days.  And then when we go in the office, he tells me,
15  well, I'll call LMR and see if you can indeed work at
16  home.  And then I'm given this e-mail.
17      I don't think anybody ever had trouble with
18  working at home after they worked the front desk but
19  me.
20      Q.  So your allegation is not that you were not
21  allowed to work at home; it's just that you had some
22  additional hassle before you were allowed to work at
23  home?
24      A.  Yes.
25      Q.  And is that hassle just having to talk to

Page 135

1  Paul Reams before you're allowed to work at home?  Is
2  that what you're alleging here?
3      A.  It was just that I should have -- seemed
4  like, you know, I should have gone to my supervisor
5  and asked permission with what I did; and when he said
6  no, I said okay and I left it alone.  But then Paul
7  Reams come and confront me about Paul Johnson
8  confronting him.  I was going to leave it alone like
9  that; but it just seemed like the things I wanted to
10  do, which was within the scope of the agreement and
11  things, it wasn't ever that easy.  It's like I had to
12  go through so much just to --
13      Q.  In regard to working at home in April 2004,
14  are you challenging simply that Paul Johnson didn't
15  say yes when you first approached him?  Is that what
16  you're claiming, that that was discriminatory?
17      A.  Is that under the discriminatory or
18  retaliation?  I thought that was under retaliation.
19      Q.  Are you alleging that's retaliatory and
20  not --
21      A.  I think it's retaliatory.
22      Q.  All right.  So you're not alleging there was
23  any racial discrimination in relation to your request
24  to work at home in April 2004?
25      A.  No.  I think that was retaliatory.

Page 136

1      Q.  And what about that process was retaliatory?
2      A.  The fact that other people could work at home
3  without going through those changes and I had to go
4  through, seemed like, the chain-of-command to get to
5  work at home because of management's own policy.
6  Management came up with that policy, that if you
7  worked the front desk the prior month, then the next
8  month you could go home and work for two days.
9      Q.  Which you were allowed to do.  So is your
10  claim that other assistants simply didn't have to talk
11  to Paul Reams?
12      A.  No.  I'm just getting so many things I'm
13  thinking about.  God.  Is this the time when I went to
14  ask for more cases and -- there was so much that
15  happened.  I went -- I don't know if these are the
16  days when I went to ask for more cases and Paul
17  Johnson was in there and he got on me because -- I'm
18  getting confused.  I'm getting so confused.
19      Q.  My question --
20      A.  I'm wondering are these the two days that I
21  asked for more cases?  And I went into Cynthia Lamar's
22  office to get more cases, and Paul Johnson was in
23  there.  And when I asked for the cases, Paul Johnson
24  told me, Bernethia, you know you're supposed to get
25  cases on Fridays only.  I don't know what dates those

Page 137

1  were, though, that I asked for more cases.  So I don't
2  know if these are the days or not.
3      Q.  What I'm trying to understand is you have an
4  allegation in the complaint that you were denied the
5  right to work at home during April of 2004.
6      A.  Yes.
7      Q.  And you did in fact work at home during April
8  of 2004.
9      A.  Yes.
10      Q.  So are you alleging -- what are you alleging
11  was discriminatory in regards to working at home in
12  April of 2004 or retaliatory?
13      A.  The manner in which it took me to be able to
14  go and work at home.
15      Q.  And that's simply that Paul Johnson didn't
16  say yes right away and you had to talk to Paul Reams?
17      A.  The fact that when I asked my supervisor and
18  he denied me and then later on -- I think that was the
19  next day or something -- Paul Reams come to me to
20  discuss the matter in his office, the fact that he had
21  to call LMR -- I -- call LMR to see if it was okay for
22  me to work at home on a Thursday.
23      Q.  Are you aware of any other legal assistants
24  who asked Paul Reams to work at home on a Thursday?
25      A.  No.

Bernethia Johnson v. Jo Ann B. Barnhart, et al.                                    10/23/2007
DEPOSITION OF BERNETHIA JOHNSON

36 (Pages 138 to 141)

Page 138

1    Q.  Were you involved in any conversation or
2  discussion between Paul Johnson or Paul Reams and any
3  other legal assistants about them working at home
4  through ADS?
5    A.  Was I -- am I aware of any?
6    Q.  Were you involved in any discussion?  Were
7  you present when any other legal assistant requested
8  of Paul Johnson to work at home?
9    A.  I can't ever -- I can't -- ever being in the
10  presence of another legal assistant asking to work at
11  home.
12    Q.  Were you ever in Paul Reams' presence when he
13  talked to another legal assistant about working at
14  home?
15    A.  No, not that I recall.
16    Q.  Do you have any personal knowledge of what
17  other legal assistants have timely completed their ADS
18  request forms and what days they worked ADS?
19    A.  No.
20    Q.  Do you know when other legal assistants
21  worked -- strike that.
22    You don't know when the month -- the monthly
23  rotation for front desk duties started, do you?
24    A.  No.
25    Q.  Do you know what other legal assistants

Page 139

1  worked the front desk for a month?
2    A.  No.
3    Q.  Do you have any idea if any of those legal
4  assistants took a week off during the month they were
5  working the front desk?
6    A.  No.
7    Q.  What makes you believe that any action by
8  Paul Johnson or Paul Reams regarding your request to
9  work at home in April of 2004 was in retaliation for
10  any EEO complaints you had filed?
11    A.  Because it did not happen until after I filed
12  my EEO action that things became more noticeable what
13  they were doing.
14    Q.  Other than the fact that you had previously
15  filed an EEO complaint, is there any evidence that
16  made you believe that Paul Johnson or Paul Reams made
17  any decisions regarding your request to work at home
18  for retaliatory reasons?
19    A.  No.
20    Q.  All right.  And how are you claiming you were
21  harmed by having to talk to Paul Reams?  Did you
22  suffer any loss of pay?
23    A.  By just talking to him?
24    Q.  Yeah.
25    A.  About -- about not being -- about being --

Page 140

1  about working at home?
2    Q.  Yes.  My question is how were you harmed.
3    A.  I did not suffer anything at that point.
4    MR. DUBOIS:  Let's take like a very short
5  break, and then we'll go for another half hour, and
6  then we'll stop.
7    MS. BATTLE-HODGE:  Okay.  Great.
8    (Brief recess)
9    Q.  All right.  In April 2004, Cynthia Lamar was
10  the group supervisor who was assigning legal
11  assistants cases, correct?
12    A.  In April of 2004?
13    Q.  Yes.
14    A.  Yes.  Okay.
15    Q.  And do you recall approaching Ms. Lamar on
16  Monday, April 19th, 2004, to request some additional
17  cases?
18    A.  Yes, I recall that incident.  I recall the
19  incident.
20    Q.  All right.  And this was in Ms. Lamar's
21  office, correct?
22    A.  I went to her office, and I stood at -- at
23  the door.
24    Q.  All right.  And what do you recall being
25  discussed?

Page 141

1    A.  I recall asking -- first of all, I went to
2  see if Paul -- well, shoot.  I recall just asking
3  Cynthia for more cases so that I could work at home.
4  And Paul Johnson was still in there.  And I said, oh,
5  Paul, I didn't know you were still here; I thought you
6  were gone.  And he -- that's when he said, well,
7  Bernethia, you know you are supposed to get cases on
8  Friday.  And I said, oh, okay, no problem.  So I
9  went back to my desk and I sat down.
10    Q.  Okay.  Before you get to that --
11    A.  Oh, okay.
12    Q.  -- do you recall anything else being
13  discussed at that meeting in Ms. Lamar's office?
14    A.  With me asking for cases?
15    Q.  Yeah.
16    A.  I just remember when I went there, I knocked
17  on the door; and Cynthia said that, you know, I could
18  come in or whatever.  And I -- when I opened the door,
19  I said, oh, Paul, I thought you were gone.  I think I
20  may have asked Cynthia for a case first, and then I
21  realized Paul was sitting over in the corner, and then
22  I said -- but anyway, I asked for cases.  And then
23  Paul said, Bernethia, you know, you're supposed to get
24  cases on Friday only.  I said, oh, okay, no problem.
25    Q.  And how many case --

Bernethia Johnson v. Jo Ann B. Barnhart, et al.                    10/23/2007
DEPOSITION OF BERNETHIA JOHNSON

37 (Pages 142 to 145)

Page 142

1    A. And so --
2    Q. Go ahead.
3    A. And so I recall going back to my desk.
4    Q. Okay. How many cases did you have at that
5  time, if you know?
6    A. I -- no, I would be thinking again.
7    Q. You don't know how many you had?
8    A. I want to -- no.
9    Q. Is there any reason why you didn't request
10  cases on Friday, April 16th, 2004?
11   A. I can't recall why I didn't. Yes, I can.
12  Cynthia Lamar told me that I did not have to wait
13  until Friday. This was a conversation where Cynthia
14  was -- Cynthia and I were walking side by side. And
15  Cynthia said, well, Bernethia, you do not have to wait
16  until Friday to ask for cases. That is why I did not
17  wait for that Friday. She told me I could ask for
18  them anytime. So then I was surprised that -- of the
19  response that I got when I went to ask for cases from
20  Cynthia, because she had just a few days ago told me I
21  could get cases anytime.
22   Q. When did you have that conversation --
23   A. The week prior.
24   Q. Let me finish the question. When did you
25  have that conversation with Cynthia?

Page 143

1    A. The week prior.
2    Q. And where did that conversation take place?
3    A. We were -- we were just walking side by side.
4    Q. And who else was present?
5    A. No one else was present, just the two of us.
6    Q. And at that point in time, did you ask her
7  for more cases?
8    A. At that -- I don't know how we got -- came up
9  on that conversation, but she said I did not have to
10  wait until Friday to get cases.
11   Q. Did you ask her at that point to get more
12  cases?
13   A. At the time when we were holding that
14  discussion?
15   Q. Yes.
16   A. No. Well, let me say I cannot recall,
17  because all I recall is the conversation that we had.
18   Q. Did she tell you, you could get cases on
19  Fridays, but you could request them on other days if
20  you ran out of work?
21   A. No.
22   Q. She just told you that she would give you
23  cases on days other than Friday? Is that your
24  testimony?
25   A. She said I did not have to wait until Fridays

Page 144

1  to ask for cases.
2    Q. Okay. Did you mention that conversation on
3  April 19th, 2004, Monday, when you went to her office
4  to ask for more cases?
5    A. No, I did not.
6    Q. All right. You say after that conversation,
7  you went back to your desk?
8    A. That's correct.
9    Q. What did you do at your desk?
10   A. I sat down, got on the computer and started
11  typing up what -- what had just taken place.
12   Q. Do you have a copy of what you typed up?
13   A. I don't know if I still have a copy or not,
14  but I'll look and see.
15   Q. Did you at some point go to Lynda Hall's
16  office and ask her to call Cynthia Lamar?
17   A. Yes.
18   Q. What do you recall of your conversation with
19  Ms. Hall?
20   A. I -- I'm sorry. I asked Lynda if she could
21  come and -- would she call -- I -- I think I asked
22  Cynthia would -- Lynda if she would call Cynthia and
23  ask Cynthia if I came into her office to ask for
24  cases. That's what I asked Lynda to do.
25   Q. Why did you ask Lynda to do that?

Page 145

1    A. Because she was the union steward. Linda
2  Tamplin was not there, so I went to Lynda.
3    Q. Did Lynda Hall go ahead and do that?
4    A. She did.
5    Q. All right. Let me hand you a copy of
6  Defendant's Exhibit #13. All right. Let me direct
7  your attention to Defendant's Exhibit #13, which I've
8  just handed you. Do you recognize this document?
9    A. Yes.
10   Q. Now, is this a statement that was written up
11  by Lynda Hall and given to you?
12   A. Yes.
13   Q. And is it Lynda Hall's practice as union rep
14  to type up statements regarding meetings and provide
15  them to employees?
16   A. I don't know about other -- what take place
17  with other employees.
18   Q. But she did that for you?
19   A. Yes.
20   Q. Okay. And does this -- this memo, which is
21  dated April 19th, 2004, accurately describe what took
22  place?
23   A. Yes.
24   Q. And this indicates --
25   A. Let me just read this for a second. I'm just

Page 146

1  wondering about this part where it said Bernethia
2  declined. I know we end up going back to Cynthia
3  Lamar's office. On the fourth sentence on this page?
4  I mean the fourth -- yeah, the fourth line down, it
5  says Bernethia declined. But we end up going back to
6  Cynthia Lamar's office.
7      Q. Did you go immediately?
8      A. We left Lynda's office and went into Cynthia
9  Lamar's office.
10     Q. So when you had Lynda Hall call Cynthia
11  Lamar, she requested, through Lynda Hall, that you
12  return to her office to straighten things out,
13  correct?
14     A. Yes.
15     Q. And at that point, you're saying you went
16  straight to Cynthia Lamar's office?
17     A. We left Lynda's office and we went to -- we
18  went to Cynthia's office together.
19     Q. Do you recall Paul Johnson coming to your
20  cubicle and asking you to go to Cynthia Lamar's
21  office --
22     A. Yes.
23     Q. -- that you hadn't in fact gone straight
24  there?
25     A. Say that again.

Page 147

1      Q. Is it your testimony that when Cynthia Lamar
2  asked, through Lynda Hall, for you to come to her
3  office to straighten it out, did you go straight to
4  Cynthia Lamar's office or did you go to your cubicle
5  and Paul Johnson came by your cubicle and asked you to
6  come to Cynthia Lamar's office?
7      A. Paul Johnson had come to my cubicle and asked
8  me to come to Cynthia Lamar's office.
9      Q. So you didn't go straight to Cynthia Lamar's
10  office after this request on the phone call from
11  Cynthia Lamar to come to her office?
12     A. I needed to go to the restroom. And I told
13  him that I needed to go to the restroom, and then I
14  went to the restroom. And I -- on my way to Cynthia's
15  office, I stopped by Lynda Simmons' office to get her
16  to accompany me there.
17     Q. And the two of you went to Cynthia Lamar's
18  office?
19     A. And the two of us went to Cynthia's office.
20     Q. Okay. Now, in the meeting in Cynthia Lamar's
21  office, do you know how long that meeting took place?
22     A. No, I do not.
23     Q. And you didn't say anything at the meeting,
24  did you?
25     A. No, I did not.

Page 148

1      Q. Did Paul Johnson ask at that meeting if you
2  needed more cases?
3      A. I'm going to say -- I'm going to say that
4  yes, he did ask did I need more cases.
5      Q. Let's mark this as Defendant's Exhibit #14.
6  And do you recognize this document?
7      A. Yes.
8      Q. All right. And this is a memo prepared by
9  Lynda Hall about that meeting in Cynthia Lamar's
10  office on April 19th, 2004, correct?
11     A. Yes.
12     Q. And she provided this to you?
13     A. She provided it to me.
14     Q. All right. And do you believe it accurately
15  summarizes the meeting you held in the office on that
16  day?
17     A. I do not.
18     Q. All right. And what about this memo,
19  Defendant's Exhibit #14, do you believe is inaccurate?
20     A. Okay. She's -- okay. Paul Johnson -- the
21  second paragraph, the first sentence, Paul Johnson did
22  not say that the meeting had anything to do with ADS.
23  I was totally confused on this that Lynda had given
24  me.
25     Q. Did flexiplace or ADS come up at all in the

Page 149

1  April 19th meeting in Cynthia Lamar's office?
2      A. No, not that I can recall.
3      Q. What do you recall from the conversation in
4  Cynthia Lamar's office?
5      A. I recall that I -- I recall when we went back
6  to Lynda's -- to Cynthia Lamar's office, Cynthia was
7  sitting at her desk; Paul was sitting -- if you face
8  Lynda -- Cynthia's desk, Paul sit to the left of it,
9  of Cynthia's desk. I took the chair in the far corner
10  facing Cynthia's desk. And -- and Linda Tamplin sat
11  in the chair next to the door.
12     Q. And what do you recall from what was
13  discussed at that meeting?
14     A. The one thing that I do recall that's not on
15  here is -- is when I walked in Cynthia's office with
16  Lynda Hall, Paul Green -- Paul Johnson said, Oh, so it
17  come to this, huh? I did not say anything. And so I
18  just kept quiet during the meeting.
19     Q. Okay. Is there anything else you recall
20  about the meeting?
21     A. That Paul Johnson stood up, but he did not
22  take any steps or anything towards us or anything, but
23  he did stand up. And I know that Lynda -- Lynda
24  Simmons was -- Lynda Hall was taking notes.
25     Q. Do you recall anything else from the meeting?

Bernethia Johnson v. Jo Ann B. Barnhart, et al.                    10/23/2007
DEPOSITION OF BERNETHIA JOHNSON

39 (Pages 150 to 153)

---

Page 150

1    A.  In that meeting, I do recall Paul Green --
2  Paul -- I'm sorry. I keep getting Paul Green and Paul
3  Johnson mixed up. I do recall Paul Johnson asking if
4  I wanted more cases. I think that's the only question
5  he asked me. And I asked could I talk to Lynda.
6  Lynda and I stepped out. And I told Lynda just tell
7  them that's okay, that I do not need any more cases,
8  and for them to have a nice day.
9    Q.  And did Lynda tell them that?
10   A.  Yes, Lynda did.
11   Q.  All right. Looking at Defendant's Exhibit
12  #14, is there anything else -- you say you don't
13  recall the ADS coming up. Anything else in this
14  little memo that looks inaccurate or anything else you
15  recall from the meeting?
16   A.  Okay. Yes. The second sentence where he --
17  it states, He stated that he asked Bernethia last week
18  if she wanted to participate in ADS and she waved him
19  off and did not answer, that's a lie.
20   Q.  You don't recall that coming up at this
21  meeting on April 14th, 2004?
22   A.  No, I do not.
23   Q.  Anything else in this memo that looks
24  inaccurate or anything else you recall about this
25  meeting other than what you've told me?

---

Page 151

1    A.  The next sentence, where it says, He asked
2  her this week and she answered that she will
3  participate, I don't recall him talking to me about
4  that. And this was in April. And he had -- he
5  explained that the ADS was -- I recall Paul talking
6  about I could only get my cases on Fridays.
7    Q.  Okay. And that's in Defendant's Exhibit
8  #14. My question is, is there anything else -- you
9  indicated you don't recall the discussion about the
10  ADS.
11   A.  Okay.
12   Q.  Is there anything else that looks inaccurate
13  about this memo or anything else you recall being
14  discussed at the meeting that's not in this memo?
15   MR. DUBOIS: And then we'll stop for the day.
16   A.  He stated that you either participate in the
17  program or you don't. I don't recall that.
18   Q.  All right. And that's in the second
19  paragraph. You don't recall that. Okay. Anything
20  else?
21   A.  This statement where -- where -- where Lynda
22  has, Bernethia did not speak during the meeting, that
23  is correct; but acknowledged to me that she did not
24  want any more cases, that did not take place inside of
25  Cynthia's office. I asked if I could talk to Lynda,

---

Page 152

1  and we stepped out, and I talked to Lynda and told her
2  to tell them that I did not want any more cases and --
3  and to have a nice day. And she told them that. So I
4  don't understand that, but acknowledged to me, if --
5  that part right there, if she was saying acknowledged
6  to her in the meeting or whether we stepped out.
7    Q.  But you're saying that took place outside in
8  the hallway?
9    A.  Outside, yes.
10   Q.  Anything else about this memo other than what
11  you've told me you believe is inaccurate?
12   A.  I think that might be it.
13   MR. DUBOIS: Okay. This would be a good
14  point to stop for the day.
15   MS. BATTLE-HODGE: Okay.
16     (Deposition recessed at 3:17 p.m.)
17     (Deposition resumed at 9:17 a.m.,
18      on Wednesday, October 24, 2007,
19      all parties present as follows:)
20     EXAMINATION continuing
21  BY MR. DUBOIS:
22   Q.  Ms. Johnson, I remind you you're still under
23  oath from yesterday. Do you understand that?
24   A.  Yes.
25   Q.  I want to start off this morning by asking

---

Page 153

1  you if you're on any medication.
2    A.  I am.
3    Q.  What medication are you on?
4    A.  Symbyas.
5    Q.  Can you spell that for the record?
6    A.  S-Y-M-B-Y-A-S. And I'm on Prevacid. And I'm
7  on -- there's another medication. And there's one I
8  didn't bring with me, but I don't have it here. I
9  left it at home by accident.
10   Q.  Do you know, is that a prescription
11  medication?
12   A.  Prescription.
13   Q.  Do you know what it's for?
14   A.  Oh. Pain.
15   Q.  Do you have any reason to believe that any of
16  the medications you're taking will interfere with your
17  ability to answer the questions I'm asking you
18  truthfully and accurately?
19   A.  It's a possibility, I would say.
20   Q.  And what makes you think it's a possibility?
21   A.  I can't remember things and it hurts. I
22  can't even remember what really -- it's like -- even
23  when you ask me, it's like I can't remember. I can't
24  connect. I just can't remember things.
25   Q.  How long have you been on this Symbyas?

Bernethia Johnson v. Jo Ann B. Barnhart, et al.                                    10/23/2007
DEPOSITION OF BERNETHIA JOHNSON

40 (Pages 154 to 157)

Page 154

1    A.  Since September.
2    Q.  September of this year?
3    A.  Yes.
4    Q.  And who was the prescribing doctor for that?
5    A.  Dr. Smith.
6    Q.  And what is --
7    A.  William Smith.  He's my practitioner.  But
8  it's for depression and -- I have to look for
9  something for a minute.
10     It's for depression disorder, panic disorder, and
11  generalized anxiety.  And my practitioner prescribed
12  it to me.  I go to a psychologist, and he cannot
13  prescribe medication, so Dr. Smith prescribes my
14  medication.
15     Q.  And is that a drug you take daily?
16     A.  Yes.
17     Q.  Did Dr. Smith tell you that one of the side
18  effects might be memory loss?
19     A.  No.  No.  And then I had an appointment I
20  think it was week before last or last week with my
21  gynecologist, and you have to write down medications
22  that you're on.  I did not take my medicine with that
23  to show her, but I told her -- I tried to spell it.  I
24  say it's S-Y-M, and it ends in an S.  And then she
25  wasn't familiar with it, so she went and she looked it

Page 155

1  up.  And she said, oh, it's so new on the market.  She
2  said, that's why we're not familiar with that; it's
3  just so new.
4     Q.  Have you found your memory to be worse after
5  you started taking the pill than before?
6     A.  Real -- seems like it's getting worse.  It's
7  like I can't remember things that I should remember.
8     Q.  How long are you supposed to be on this
9  medication?
10     A.  We don't know how long.
11     MR. DUBOIS:  Let's go off the record for a
12  second.
13     (Off-the-record discussion)
14     MR. DUBOIS:  After discussion, Ms. Johnson's
15  counsel and I have agreed to attempt to reschedule
16  this deposition at a later time.  Ms. Johnson appears
17  to be on some medication that she believes may impact
18  her ability to answer the questions or impact her
19  memory.  She's not sure.  We're going to have her --
20  she's going to look into that and meet with her
21  doctors, and we're going to see if we can reschedule
22  this deposition at a later time.
23     If not, we may need to stay the case.
24     Anything to else to add?
25     MS. BATTLE-HODGE:  No.  That accurately

Page 156

1  reflects what we have.
2     MR. DUBOIS:  That's all for today.
3        (The deposition concluded at
4          9:28 a.m.)
5          * * * * * * * * * *
6        FURTHER DEPONENT SAITH NOT
7          * * * * * * * * * *

Page 157

1        REPORTERS' CERTIFICATE
2  STATE OF ALABAMA
3  AT LARGE
4     We, Dee Coker and Heather Barnett, Certified
5  Court Reporters and Commissioners for the State of
6  Alabama at Large, hereby certify that on Tuesday and
7  Wednesday, October 23 and 24, 2007, we reported the
8  deposition of BERNETHIA JOHNSON, who was first duly
9  sworn or affirmed to speak the truth in the matter of
10  the foregoing cause, and that pages 5 through 156
11  contain a true and accurate transcription of the
12  examination of said witness by counsel for the parties
13  set out herein.
14     We further certify that we are neither kin nor of
15  counsel to any of the parties to said cause, nor in
16  any manner interested in the results thereof.
17     This 17th day of January, 2008.
18
19
20  DEE COKER, CCR,RPR    HEATHER BARNETT, CCR
    Commissioner for the   Commissioner for the
21  State of Alabama       State of Alabama
    ABCR NO. 85            ABCR NO. 436
22
    COMMISSION EXPIRES:    COMMISSION EXPIRES:
23  1/25/09                3/30/11
24
25

Bernethia Johnson v. Jo Ann B. Barnhart, et al.
DEPOSITION OF BERNETHIA JOHNSON

**A**

ABCR 157:21,21
ability 7:16 9:22
  153:17 155:18
able 7:12 68:19
  111:1,2,8 125:3
  137:13
absent 122:24
acceptable 19:22
access 3:5,7 27:7
  82:18
accident 153:9
accompany 147:16
accurate 5:22 6:5,8
  48:21 157:11
accurately 48:25
  49:2,9,21 50:6
  132:17 145:21
  148:14 153:18
  155:25
achieved 47:1
acknowledged
  151:23 152:4,5
Acknowledgment
  3:3,7
acquaintance 87:9
  87:23
acquaintances
  37:24 38:10
act 109:11,20
acted 111:4
action 8:2 14:10
  139:7,12
actions 108:11
  109:3
acts 103:8,12,14,16
  103:17,24 104:4
  104:5,7,13,18,19
  105:3,12,24
  106:19 107:2,5
  109:7,8 111:22
  112:6
Adam 11:18
add 52:5 155:24
added 52:5 55:7
  83:9

addition 42:8
additional 22:24
  133:9 134:22
  140:16
address 33:14
  35:12,15
addressees 66:14
administration
  1:11 2:11 15:19
  17:1 18:17 23:7
  23:21 32:21 47:5
  47:17,22 49:15
  50:9 51:4 76:12
  107:16
Administration's
  27:6
administrative 8:5
  9:24 30:9 47:3,4
  47:6 61:6 83:1
ADS 90:1,15,25
  91:23 92:19,21
  93:4,11 94:1,11
  94:21 95:5,17
  96:6,7,8,12
  125:24 126:18
  127:15 129:3,9
  129:17 130:1,7,8
  130:9 131:1,8,23
  132:9,18 138:4
  138:17,18 148:22
  148:25 150:13,18
  151:5,10
advance 7:4
advise 121:4
advised 77:19
advises 127:24
Affairs 49:18
  50:10
affirmed 157:9
AFGE 90:11,17
  96:25
AFGE/OHA 3:18
African-American
  100:18
agency 8:2 26:17
  53:8
agency's 27:23

ago 8:13 44:5,6
  142:20
agree 22:20,22
  23:1 65:23
agreed 4:9,22
  155:15
agreement 1:17
  3:17 90:11
  135:10
ahead 34:17 84:12
  133:6 142:2
  145:3
Alabama 1:2,19,21
  1:22 2:5,8,9 4:15
  34:7,25 35:1
  36:15 37:6,9
  157:2,6,21,21
Alaska 45:2,10
Albany 45:19
aliases 37:1
ALJ 67:14
allegation 30:8
  105:9 106:10
  112:16 133:22
  134:20 137:4
allegations 13:2
  29:2 30:5 31:5
  32:2,7 39:11
  40:12 106:20
  112:7,23
allege 100:9
  101:12 104:5,13
  107:1,22 108:5
  111:16 133:24
alleged 105:12
  107:1 109:11,18
  111:22
alleging 101:15
  102:12 104:16
  105:4,6,19
  107:14 108:22
  109:7,23 111:18
  112:8,19 113:21
  119:20 134:4
  135:2,19,22
  137:10,10
allow 90:1 127:5

allowed 94:12
  104:25 127:15
  128:2 134:6,21
  134:22 135:1
  136:9
alternative 89:12
  126:20
Amalinda 35:3
American 90:11
ANN 1:9
announced 94:20
  94:24
annual 122:24
answer 6:6 7:1,17
  13:16 42:7,13,14
  59:2 63:13,14,15
  69:13,20,22 70:1
  70:1,2,8 85:12,13
  85:14,16 104:22
  105:2 112:5
  119:24 150:19
  153:17 155:18
answered 151:2
answering 30:3
  79:22
answers 5:24 7:12
  72:13 108:15,15
anxiety 154:11
anybody 12:20
  55:22,24 110:16
  116:20 134:17
anymore 17:8
  18:12 19:14 44:2
anytime 40:2
  142:18,21
anyway 119:19
  120:11 123:19
  141:22
apart 9:10
apartment 22:19
  33:17
apologized 76:3
  77:12 125:4
appeals 30:8
appear 73:20
APPEARANCES
  2:1

appears 48:14
  73:18,20 155:16
application 3:10
  21:25 48:14 49:2
  49:11,13,23
  92:22 93:19,20
  93:25 94:5
applied 108:11
applies 90:24
apply 7:9 81:2
appointment
  154:19
appointments
  24:10,10,24 25:1
approached
  124:24 135:15
approaching 123:3
  140:15
approve 126:20
approximately
  8:24 10:2 35:17
  36:5,10,13 50:1
  50:14 55:25
  98:20
approximation
  59:18
April 53:23 54:8
  91:7 92:3,17
  93:24 103:10,10
  109:4,5 123:2
  127:22,25 128:2
  129:1,1,10,17,22
  130:25 131:4,8,8
  131:12,18,19,23
  132:2,6,18,18,24
  133:2,14 134:1,6
  135:13,24 137:5
  137:7,12 139:9
  140:9,12,16
  142:10 144:3
  145:21 148:10
  149:1 150:21
  151:4
area 105:17
Army 46:24 49:10
  49:12,20,23
arrange 61:15

Bernethia Johnson v. Jo Ann B. Barnhart, et al.     10/23/2007
DEPOSITION OF BERNETHIA JOHNSON
Page 2

**arrested** 12:2
**arrive** 128:16
**arrived** 128:18,19
**Aside** 12:25 50:5
  73:1
**asked** 40:8 50:18
  70:24,25 71:3
  102:12 103:21
  111:25 112:1
  113:11,12 114:17
  114:18 115:8,11
  123:13,14,15
  124:20 125:10
  131:15 135:5
  136:21,23 137:1
  137:17,24 141:20
  141:22 144:20,21
  144:24 147:2,5,7
  150:5,5,17 151:1
  151:25
**asking** 5:14,20
  7:13,21 13:6 31:3
  40:3 41:13,16
  71:5 93:22 94:3
  95:14 104:10,11
  112:6 138:10
  141:1,2,14
  146:20 150:3
  152:25 153:17
**assign** 81:5 133:3
**assigned** 61:13
  62:18,19 65:4
  79:17,24
**assigning** 80:21
  81:9 140:10
**assignment** 3:16
  83:13
**assist** 25:18 26:5
  85:15
**assistance** 59:2
  113:12 114:19,22
  115:4,9,11
**assistant** 2:7,11 3:4
  3:8 5:12 52:14,17
  52:19,20,21,22
  52:25 53:2,4,14
  53:17 57:10,16

60:16 61:14
62:19 65:2,4,18
79:24 82:24
89:19 90:19
95:17 98:3
108:12 121:23
138:7,10,13
**assistants** 3:13
  27:25 54:9,19
  77:19 79:17
  80:22 83:14,20
  84:14 85:2 89:12
  111:11 136:10
  137:23 138:3,17
  138:20,25 139:4
  140:11
**Associate** 46:19,20
**Associate's** 46:16
  46:17
**assume** 6:2
**ate** 87:4
**Atlanta** 2:13 86:10
  86:13 88:18,21
  128:14
**attached** 3:5,7
**attempt** 5:17
  155:15
**attend** 34:11,13
  44:12,14,20
  45:18,20
**attendance** 3:24
  4:2 77:23 128:13
  128:20,25 131:18
  132:6
**attended** 44:25
  45:1,5,6 46:6
  78:17
**attending** 45:19
  78:13
**attention** 103:4
  105:15 107:21
  108:3,20 111:15
  121:22 126:10
  133:18 145:7
**attorney** 1:20 2:3,7
  2:8 5:12 9:2
  11:11,12 14:8

18:11 19:2,10,11
19:20,22 20:1
21:20 23:15,23
26:10,21 29:1,9
32:8 33:4 85:18
94:4
**audio** 14:17 15:24
  16:11
**audiotapes** 14:22
**audit** 71:7
**August** 48:11 91:7
  106:3
**Austin** 44:15
**authorized** 126:18
**available** 59:1
**average** 59:16
**awarded** 52:24
**aware** 7:11 21:17
  21:21 27:25
  94:19 95:8,24
  96:1 111:11
  127:14 137:23
  138:5
**axles** 9:10
**a.m** 1:22 152:17
  156:4

**B**
**B** 1:9
**back** 21:22 22:2,23
  34:18 45:2 55:5
  57:3 60:23 73:2
  81:11 109:2
  112:4 120:24
  125:17 131:11
  132:22 133:19
  141:9 142:3
  144:7 146:2,5
  149:5
**backup** 21:12
**bad** 10:6 36:6
  43:13
**bankruptcy** 11:22
**Baptist** 37:13
**Barnett** 1:18 157:4
  157:20
**Barnett-Jefferson**

109:15
**BARNHART** 1:9
**basically** 31:22
  58:12 61:24
  64:14 65:9 86:1
**basis** 33:23 57:10
  58:22 59:22 60:4
**Battle-Hodge** 2:3
  5:3 13:3,5,13
  20:2,6 22:5,20,22
  23:4,17 41:10,13
  41:16,21,24 42:4
  42:7,10,13 75:13
  75:15 96:4,19,22
  107:7,24 109:17
  116:7 140:7
  152:15 155:25
**Beasley** 53:15,22
**beginning** 91:3
**believe** 6:22 7:16
  8:4 9:23 10:17
  18:11 22:10
  23:14 44:8 49:9
  49:21 50:5 51:7
  53:7,16 66:23
  68:13 78:19 79:6
  95:11 102:11
  105:8 106:10,21
  108:18 109:3
  111:3,23 112:13
  116:10 128:7
  139:7,16 148:14
  148:19 152:11
  153:15
**believed** 127:4
**believes** 155:17
**Bell** 2:4
**belong** 37:9
**belonged** 37:12,15
**benefits** 61:2
**benny** 119:17,21
  119:22,24 120:7
  120:8,9,10
**Bernethia** 1:6,15
  2:16 3:3,8,21
  4:11 5:5 76:3
  124:20 136:24

141:7,23 142:15
146:1,5 150:17
151:22 157:8
**best** 8:12 9:21 19:3
  26:22,23 48:22
  73:9
**better** 37:25
**Beverly** 39:2,6,18
  39:19,19 54:23
  55:16
**big** 16:2 65:14
**bigger** 16:16
**biggest** 20:7
**Birmingham** 36:20
**bit** 6:19 7:4
**bitch** 118:9 119:18
  119:19
**black** 21:3 100:18
**bona** 126:22
**Bonita** 38:23 39:21
  40:16,17 41:7,23
  42:15 54:11 55:3
  55:11 88:4
**book** 24:16
**born** 33:7
**Boseman** 102:20
**bottom** 48:11
**bought** 43:21,25
**bound** 24:14
**box** 21:3
**break** 6:13,15,22
  6:24 7:2,5 47:25
  49:3 75:7,8,9
  96:3,17 102:5,11
  108:1 140:5
**breaks** 6:12,18
**Brenda** 54:24 55:7
  88:8
**Bridges** 29:21,23
**brief** 30:22 49:5
  52:10,11 75:17
  102:10 108:2
  140:8
**briefly** 38:6,16,17
  38:24 39:2,8
  47:19 52:2
**bring** 153:8

Bernethia Johnson v. Jo Ann B. Barnhart, et al.
10/23/2007
DEPOSITION OF BERNETHIA JOHNSON

Britter 99:13
Britton 99:12,14
broke 105:14
  110:13
broken 110:14,20
  110:24 111:5,12
brought 15:9 42:2
  74:20 105:14
building 2:4 86:13
bulb 110:11
bunch 15:8,12
  19:12 71:24,25
bunches 70:7
burned 110:11
Burton 29:21
business 9:9 46:1
bust 113:17
busted 114:12

### C

C 126:15,17,22
cabinet 64:2 71:11
cabinets 3:14 63:6
  63:21,25
calendar 24:18
call 34:9 38:4,7,14
  38:18 120:7
  125:16 134:15
  137:21,21 144:16
  144:21,22 146:10
  147:10
called 6:7 21:2
  64:11 113:14,16
  113:24 114:11
  115:13,22 119:16
  119:18 120:5
calling 79:8 118:9
  120:11
campus 34:9
car 8:22 9:8,17
  15:5 32:16
  104:24 109:15
cards 21:6
care 12:21
careful 27:22
Carmen 53:15,22
Carnes 117:6

carry 43:12
cart 71:12
case 1:8 3:16 4:23
  4:25 30:22 31:8
  31:23 41:2 61:8
  61:13 62:16,18
  62:23,23 63:2,3,5
  65:24 67:3 82:7,7
  82:8,9 117:6
  141:20,25 155:23
cases 24:1 26:6
  60:18,20,25 61:5
  62:9 63:24 64:1
  64:14,17 65:4,21
  69:9 70:17,19,24
  70:25 71:2,3,6,8
  71:10,18 74:12
  75:20 77:11,20
  79:16,23 80:22
  81:2,3,5,9,14,16
  81:20,22,25 82:3
  82:5,10,11,16,18
  82:22,25 83:7
  85:12,13,15,17
  85:19,19,20
  122:12,17,18,21
  130:12 133:3,9
  133:10 136:14,16
  136:21,22,23,25
  137:1 140:11,17
  141:3,7,14,22,24
  142:4,10,16,19
  142:21 143:7,10
  143:12,18,23
  144:1,4,24 148:2
  148:4 150:4,7
  151:6,24 152:2
cassette 14:18
  15:24
cassettes 15:23
  16:6,11
casual 58:2
categories 74:17
category 74:12,15
  74:16,18,21
  75:20
cause 6:18 157:10

157:15
caused 112:9
CCR 157:20
CCR,RPR 157:20
CD 15:8
certain 20:25 62:9
  87:11 89:5,20
  131:3
CERTIFICATE
  157:1
Certified 1:18
  157:4
certify 157:6,14
chain 121:1
chain-of-comma...
  136:4
chair 149:9,11
challenge 103:14
  104:7 107:3
challenging 104:20
  105:25 135:14
chance 49:6
change 53:18
  65:13 74:21 84:8
  88:16,19,23,25
  89:2,3
changed 67:16
  84:7,18,24,24
  95:3 132:11
changes 136:3
charge 10:21
charged 12:2
Chattanooga
  12:21 20:20 21:1
  21:11 22:23
  33:12,17 98:11
  99:9,20 119:3,4
check 19:16 22:23
  23:2,3 29:7 32:5
  94:3
Chevalier 55:16
child 35:6
children 34:18
  41:4,12
Christ 13:23
Christian 15:9
Christine 30:11

38:5,16 39:7,14
  40:6,7,13 54:11
  54:23 55:4,15
  86:16 88:6
Christine's 38:19
chronological
  61:15
church 37:12,13
churches 37:10
Circle 35:14
circumstances
  126:22 127:5,8
  127:11
Civil 4:12,21 5:1
claim 9:4,5 106:25
  136:10
claimant 26:14
  61:10 83:4
claimants 25:18
  26:5,12 85:15
claiming 100:19
  135:16 139:20
claims 25:19 26:13
  106:22
clarify 8:7
classify 39:9
Clayton 1:21 2:9
clerk 48:15,17
  50:13 51:4,6,7,10
  51:19 52:3,13,19
  53:10,11
closer 86:13
closest 87:8,18
clubs 37:9,14,16
Coker 1:17 4:13
  157:4,20
college 33:25 34:11
  34:13 44:20,22
  44:24 45:1 46:2
colleges 45:4 46:9
Collier 29:21
  38:24 39:22
  119:17 121:17
column 128:17
  130:14,15
combination 15:10
  15:14

combined 19:5
  24:11
Comcast 21:2
come 9:10 32:15
  33:24 45:5 61:8
  69:15 70:4 73:14
  85:18 86:12 89:8
  114:18,22 115:3
  117:9 124:3,21
  134:12 135:7
  137:19 141:18
  144:21 147:2,6,7
  147:8,11 148:25
  149:17
comes 74:1
coming 12:14,15
  68:17 69:1
  122:10,15 146:19
  150:13,20
commencing 1:22
comment 71:16
  73:7 113:9,10,21
  114:6,13 118:7
  119:6,7,21 121:6
  121:12,14
comments 113:5,6
  118:21,23 119:14
  119:20
commission 4:16
  157:22,22
Commissioner 1:9
  4:14 157:20,20
Commissioners
  1:19 157:5
committed 109:20
compiled 72:22
complaint 3:20
  14:12 72:5,16
  103:4 104:4
  106:18 107:2,4
  107:17,22 108:4
  108:21 111:22
  121:11 133:19
  137:4 139:15
complaints 28:25
  50:23 97:14,16
  97:19 99:19

Bernethia Johnson v. Jo Ann B. Barnhart, et al.                    10/23/2007
DEPOSITION OF BERNETHIA JOHNSON
Page 4

100:11 107:12
108:6,9,22 112:8
112:23 139:10
**complete** 7:12 92:9
**completed** 92:5
93:11,23 138:17
**completely** 67:6
**completing** 67:14
92:17
**composition** 24:16
**computer** 20:21
21:6,7,8 32:5
62:8 86:23
144:10
**concern** 20:7
**concerned** 71:17
**concerning** 25:17
**concluded** 156:3
**confront** 135:7
**confronting** 135:8
**confused** 106:12
107:9 109:10
136:18,18 148:23
**connect** 153:24
**Connie** 113:18
114:19 115:12
116:10,11
**considered** 8:3
87:8 94:15
**consolidated** 7:20
**constantly** 84:25
112:3
**consultant** 83:2
**contact** 38:1
**contain** 157:11
**contents** 73:12
**contest** 6:12
**continued** 4:1
**continuing** 1:23
152:20
**contract** 125:24
**convenient** 6:14
**conversation** 42:5
42:11,24 43:15
43:16 58:2,5
68:23 70:10,11
71:17 73:2,6,15

73:17 74:1 117:3
117:8,21 123:11
123:20,21,23
124:4,6,19 125:7
125:9 133:13,14
138:1 142:13,22
142:25 143:2,9
143:17 144:2,6
144:18 149:3
**conversations**
15:18 16:25
17:21 18:16 23:8
39:12 42:21 44:9
**convicted** 11:24
**Cooper** 29:16,20
38:5,21,22 39:21
**copies** 21:12 29:5
33:5
**copy** 20:1,2,3,4,5
26:2 27:5,10 28:3
28:14,17,18
29:15,16,25 30:1
30:19 72:23
80:13 85:19
92:21,23,25
93:13,17,21,22
94:10 100:6
144:12,13 145:5
**core** 94:16 125:25
126:1,2,5,17,21
**corner** 141:21
149:9
**correct** 10:16 13:5
27:7,8,16,18
28:22 34:2 35:11
44:17 46:22,23
46:25 48:13 56:3
57:9 61:3,7,12,19
62:11 64:2,12
65:25 66:15,16
67:4,5 79:18,25
80:11 82:17,19
82:22,23 85:5,25
86:7 90:17 91:16
91:17 92:3,15
94:17,18 96:25
98:13 104:16

108:7 113:5
125:25 127:25
128:3,14,18
129:1,8,10,18,22
130:1,2 131:24
132:3,7,10 133:3
140:11,21 144:8
146:13 148:10
151:23
**correction** 53:6
**correctly** 79:22
**correspond** 31:21
37:18 38:2,11
**Cotten** 29:23
**counsel** 2:11 4:10
4:23 12:5 15:19
30:9 155:15
157:12,15
**count** 103:5 108:5
111:15,16
**course** 54:23
119:18
**courses** 46:6,9
**court** 1:1,18 6:4
8:6,9,16,18,19,21
9:20 69:23 87:14
87:19 100:7,14
103:22 157:5
**cousins** 37:5
**covered** 13:23
73:14 106:7
**created** 111:16
**crime** 11:24 12:2
**Crowell** 54:13
**cubicle** 86:5,9,12
86:20,25 124:2
124:16,23 146:20
147:4,5,7
**cubicles** 86:15
**current** 33:14
98:17 99:5,17
**currently** 33:11
35:20 98:11
**Cynthia** 3:9 28:14
54:1,3,17,21,22
55:1,6,14 57:5
59:8,10,12,14,16

60:1,6,21 76:14
102:18 133:1,10
136:21 140:9
141:3,17,20
142:12,13,14,15
142:20,25 144:16
144:22,22,23
146:2,6,8,10,16
146:20 147:1,4,6
147:8,9,11,17,20
148:9 149:1,4,6,6
**Cynthia's** 133:15
146:18 147:14,19
149:8,9,10,15
151:25

**D**

**D** 126:15,19
**daily** 57:10 59:17
59:22 60:4 83:20
110:21,25 154:15
**damaged** 15:12
**Daria** 35:3
**date** 8:24 11:20,21
27:17 41:7 48:11
72:21 84:7 92:5
92:12,12 94:2,8
117:1
**dated** 28:16 66:6
80:10 92:3 93:24
131:12,18 132:23
145:21
**dates** 10:6 36:6
49:3 62:14
136:25
**daughter** 12:21
33:23,24,25 34:8
34:10,12,15
**daughters** 34:1
**Davenport** 54:4
118:10 119:16
120:2 121:5,17
**David** 29:21
**day** 25:8 58:22
59:20 66:9 81:14
84:3 90:2 92:9,9
92:14 94:13,21

95:5 123:11
126:21 130:7,8,9
133:2,7,13,16,17
137:19 148:16
150:8 151:15
152:3,14 157:17
**days** 94:16 123:4
123:14,15 124:25
125:3,25 126:1,2
126:5,17,19
127:15 128:6
131:15 132:12,13
134:14 136:8,16
136:20 137:2
138:18 142:20
143:19,23
**day-to-day** 23:25
25:8
**dealing** 61:1 86:2
**Debbie** 55:1,3,15
88:8
**December** 55:25
98:20
**decision** 30:19,21
**decisions** 52:4
139:17
**deck** 15:25
**decks** 16:1
**declared** 11:22
**declined** 146:2,5
**Dee** 1:17 4:13
157:4,20
**defendants** 1:12
2:6 3:2 4:1 5:13
111:16
**Defendant's** 26:25
27:2 28:11 48:3,9
49:6 64:4,8 66:1
66:2 73:13,14,19
77:17 78:16 80:4
80:6 81:11 82:20
90:6 91:19 94:7
100:1,3 126:11
127:18 128:9,12
128:24 129:21
131:11,17 132:1
132:5,17,22

Bernethia Johnson v. Jo Ann B. Barnhart, et al.
DEPOSITION OF BERNETHIA JOHNSON

133:19 145:6,7
148:5,19 150:11
151:7
**definitely** 12:18
18:20
**degree** 45:20,22,24
45:25 46:2,12,15
46:16,17
**degrees** 46:14
**denial** 103:9
104:13 109:4
**denied** 106:2
133:23 137:4,18
**denies** 134:10
**Denise** 54:13
**depart** 126:21
**Department** 49:17
50:10
**departure** 97:8
**depend** 11:16
**depends** 39:7
**DEPONENT**
156:6
**deposition** 1:16
4:11,13,19,24
11:4,10 19:15
152:16,17 155:16
155:22 156:3
157:8
**depression** 154:8
154:10
**derogatory** 113:4
118:21 119:7
**describe** 83:6
145:21
**described** 65:5
**describes** 61:24
64:14
**description** 52:10
62:1 83:5
**desk** 68:20 70:16
83:13 84:13,21
84:23 85:2,11,22
86:2 94:20 95:2,5
95:16 105:14
109:23 110:8,9,9
110:11,24 111:5

111:6,12 122:1,5
122:7,11,16,21
125:3 134:18
136:7 138:23
139:1,5 141:9
142:3 144:7,9
149:7,8,9,10
**destroyed** 32:11,13
32:14,18
**detail** 127:9
**detailed** 109:12
**device** 43:5
**devices** 17:19
**difference** 65:14
**different** 17:13,18
24:7,18 53:19
65:19,22 71:11
77:21 81:6 83:20
**difficult** 111:10
**digging** 52:12
**digital** 16:18 17:10
17:23
**dim** 105:16
**dimmer** 111:9
**direct** 54:2 58:15
58:21 59:9 60:4
103:3 107:21
108:20 111:14
121:22 126:10
133:18 145:6
**Directing** 108:3
**directly** 54:9
**director** 56:1,18,24
57:13
**disability** 60:17
61:2
**disagree** 72:8
**discharge** 47:11
**discretion** 126:5
**discriminated**
26:17 100:10,19
102:22
**discrimination**
50:24 103:5
105:7,12,20
106:25 107:2
135:23

**discriminatory**
103:14 104:6,7
104:20 105:4
106:1 107:15
134:5 135:16,17
137:11
**discuss** 39:8 72:12
74:4 117:10,13
118:2 126:25
127:2 137:20
**discussed** 39:4,8
78:14 117:25
118:1 134:1
140:25 141:13
149:13 151:14
**discussing** 39:10
74:10,11
**discussion** 25:15
45:17 50:22 64:6
68:18 73:11
115:20,22 138:2
138:6 143:14
151:9 155:13,14
**disks** 21:12
**disorder** 154:10,10
**District** 1:1,2,21
2:8
**division** 1:3 47:4
**divorce** 36:3
**divorced** 36:10
**doctor** 154:4
**doctors** 24:10
61:10 155:21
**document** 8:6 27:1
27:3,20 28:10,15
28:21 48:5,8 64:7
64:9,11,20,25
65:6 66:2 80:5
90:5,8,10,22
91:18,20 95:24
100:2,4 106:21
127:17,19 128:8
128:10,24 131:20
145:8 148:6
**documents** 13:25
14:2,4,5,7,11
22:10 25:17,21

26:16,18,20
27:22 32:11 61:9
**doing** 57:24,24
71:7 113:12
115:15 117:18
139:13
**door** 140:23
141:17,18 149:11
**doorway** 115:18
**doubt** 22:17
**Dr** 154:5,13,17
**drag** 120:25
**drawers** 71:11
**drink** 6:17
**drop** 15:3
**drug** 154:15
**DSL** 21:3
**Dubois** 2:7,16 5:10
5:12 13:4,12,14
20:4 22:4,25
23:19 25:14 26:8
26:24 33:5 41:15
45:15 48:3,6
50:21 64:4 69:21
75:7,14 80:3
87:13 96:2,5,17
96:20 99:25
100:13 102:8
103:20 108:1
140:4 151:15
152:13,21 155:11
155:14 156:2
**due** 100:10 104:15
111:18
**duly** 157:8
**duplicate** 19:25
**duplicates** 61:17
**duties** 52:2 60:17
82:25 83:6,7
84:22 85:10
138:23
**duty** 83:17 84:14
84:23 85:4 89:12
**dwelling** 33:18

——— E ———

**earlier** 29:25

109:22
**early** 121:23
**easier** 70:23
**East** 44:15
**easy** 135:11
**eat** 87:2,4
**EEO** 10:21 14:12
25:18 26:6,13
28:24 50:23
71:25 72:4,16,19
99:19 100:11
108:6,9,11,22
121:11 139:10,12
139:15
**EEOC** 10:21
108:16
**effect** 79:14 89:16
127:12
**effects** 154:18
**eight** 89:10,10
132:9
**either** 4:25 34:6
73:25 86:2
109:13 151:16
**else's** 55:24
**employee** 108:13
**employees** 29:11
44:9 90:12 94:16
108:13 117:11,12
117:14 118:10,24
126:18,23 127:14
145:15,17
**employee's** 91:6
**employers** 50:25
**employment** 3:10
22:12 23:6,20
24:4 25:3,4,10
31:4 32:20 47:14
49:3 88:17 113:2
118:22 119:12
121:20
**ends** 154:24
**endurance** 6:11
**enrolled** 92:19
**entail** 61:21
**enter** 62:23
**entire** 86:9 117:21

Bernethia Johnson v. Jo Ann B. Barnhart, et al.                    10/23/2007
DEPOSITION OF BERNETHIA JOHNSON
Page 6

entrance 86:20,25
entry 63:2 96:8
  130:4
environment
  111:16,17,18,24
  112:10,17,20
  118:5
equipment 43:1
essentially 90:2
eventually 20:22
  44:23 64:1 110:5
  116:23
everybody 104:25
  113:17 120:5
  125:12
evidence 4:19
  139:15
exact 69:10
examination 2:15
  5:9 152:20
  157:12
examinations 83:2
example 11:4
  38:13 83:20
excuse 30:2 110:23
  114:4
exhibit 3:1,2 26:25
  27:2,13 28:11
  47:25 48:4,9 49:7
  61:17 64:5,8 66:1
  66:3 67:13 68:11
  71:9,13 73:13,14
  73:19 75:23
  77:17 78:16 80:6
  81:11 82:20
  83:22,23,24 90:6
  91:19 94:7 100:1
  100:3 126:11,12
  126:13 127:18
  128:9,12,25
  129:21 131:11,17
  132:2,5,17,23
  133:19 145:6,7
  148:5,19 150:11
  151:7
exhibits 4:1 52:6
  83:9,10

expect 12:13
EXPIRES 157:22
  157:22
explained 151:5
explaining 81:1
extensively 46:7
extra 94:21 95:5
  95:17
e-mail 29:3,4 30:11
  30:20,22 31:10
  31:11,13,15 32:1
  66:6 67:1,20,25
  68:2,14,15,17
  69:1,16 73:12,18
  74:1,6,7,20 75:23
  77:16 78:6,16,22
  79:12 80:3,8,10
  80:13,18,19,25
  81:8 117:18,19
  120:9,11,13,22
  121:7,9 127:21
  127:24 131:12
  132:23 133:1
  134:16
e-mails 29:1,5,8,10
  30:4 31:1,12,25
  32:6 121:20

**F**
face 39:1 86:20
  149:7
facilitate 47:24
facing 86:23,24
  87:1 149:10
fact 12:15 128:5
  133:25 134:7
  136:2 137:7,17
  137:20 139:14
  146:23
fair 13:12 64:16
  85:21
Fairfield 45:9
fairly 83:6
fall 9:10
familiar 62:3
  154:25 155:2
far 12:10 18:24

21:22 149:9
favor 30:23
February 47:8
  91:6 94:2 122:8
federal 3:10 4:12
  4:21 5:1 8:6,9
  9:20 100:7
Federation 90:12
feet 22:19
fell 14:25 15:13
  32:16,21 33:3
fide 126:22
field 47:6
file 3:14 8:16,21
  9:3 50:23 61:14
  61:16 63:6,21,25
  64:2 67:7 71:11
  72:2,20 106:23
  108:17 117:23
  121:11
filed 5:14 8:6,8
  9:24 10:21 28:24
  32:10 40:2 48:15
  52:4 99:19,22
  100:6 102:3,3,4
  107:17,23 108:6
  133:20 139:10,11
  139:15
files 22:10 25:17
  68:19 69:3,3,16
  69:17
filing 100:11
  108:23
fill 88:24 91:15
  96:13 131:1
filled 48:20 49:1
  49:11,13,23
final 30:19,21
find 6:14 12:20
  43:23 44:3 59:1
  69:3
fine 5:19,25 7:3
  9:14 96:19 108:1
finish 5:21,24 46:8
  80:16 88:13
  142:24
finished 62:22,24

63:1,3
fired 50:18
first 5:6 8:8 11:14
  11:16,19 17:23
  17:25 18:11
  19:11 44:24 45:1
  51:3,8 52:1 53:1
  53:6,7,16 57:3
  67:12 100:6,20
  100:22 101:5,5,6
  101:9,16,17
  102:13 103:15
  104:8,21 105:6
  105:11,25 107:3
  108:16 109:8,13
  111:6 122:2
  129:3,22 130:21
  131:22 133:20
  135:15 141:1,20
  148:21 157:8
five 65:5 108:13,13
  129:6
five-minute 75:9
fixed 72:21 105:16
flex 88:17,23
flexing 89:7
flexiplace 3:18
  91:4,5,22 93:4,18
  93:22 148:25
flip 28:13
floppies 21:23,24
Flow 64:12 83:25
folder 67:14
follow 67:8
followed 124:22
following 94:21
  95:5,17
follows 5:8 152:19
foregoing 157:10
forgetting 29:19
forgive 54:21 56:9
  60:5
forgot 134:13
forgotten 125:2
form 3:19 4:17
  88:25 91:15,22
  92:5,9,13,17

93:11 94:7 95:12
  129:24
formality 4:15
forms 93:14,19,20
  138:18
Forsyth 2:12
found 95:15 155:4
four 14:17,23
  15:19,23 19:6
  50:16 65:5 103:1
  128:18 130:19
fourth 146:3,4,4
frame 106:3
Frederick 35:25
  36:14,24
Freewill 37:13
Freida 29:20 38:22
  39:21 40:15
  42:16,16 88:6
frequent 6:12 58:5
frequently 58:6,7
  58:24 93:5 95:3
Friday 81:14,16
  82:21,21 94:15
  125:24 126:17
  141:8,24 142:10
  142:13,16,17
  143:10,23
Fridays 79:17,24
  136:25 143:19,25
  151:6
friend 87:9
friends 37:17,22
  38:9
frightened 59:10
front 9:10 83:12
  84:13,21,23 85:2
  85:11,21 86:2,12
  86:21,24 94:20
  95:2,5,16 122:1,5
  122:7,11,16,21
  125:2 134:18
  136:7 138:23
  139:1,5
full 35:1
full-time 33:23
further 4:22 156:6

Bernethia Johnson v. Jo Ann B. Barnhart, et al.                    10/23/2007
DEPOSITION OF BERNETHIA JOHNSON

Page 7

157:14

**G**

**Garden** 35:14
**general** 42:19
  85:10 88:11 89:6
**generalized** 154:11
**generally** 59:21
  63:24 79:16,23
  82:12 86:5 87:2,4
  87:4,6 88:10 90:2
  128:21
**Georgia** 2:13
**getting** 21:7 40:9
  43:13 61:5 107:9
  136:12,18,18
  150:2 155:6
**girl** 39:16 76:4
**girl's** 39:1,16
**give** 7:4,12 12:16
  41:7 47:25 59:17
  72:13 74:22 75:1
  75:3,4 76:21 80:3
  108:15 114:18,22
  115:3 133:9
  143:22
**given** 11:4,9,10
  19:2,3,24 82:17
  82:19 134:8,16
  145:11 148:23
**giving** 7:8 12:6,7
  12:10 13:8 19:8
  77:13,14
**glass** 85:24
**Gloria** 102:20
**go** 6:19 8:16 18:24
  21:22 22:15,16
  22:23 25:14 32:5
  37:1 45:8,15
  50:21 55:14
  60:23 61:22
  62:14 63:24 64:1
  64:5 66:20,25
  73:1 75:9 82:8,21
  84:12 85:19 96:7
  96:21 102:8
  124:8 127:9

129:19 130:12
131:11 132:22
133:6 134:11,14
135:12 136:3,8
137:14 140:5
142:2 144:15
145:3 146:7,20
147:3,4,9,12,13
154:12 155:11
**God** 39:1 40:15,18
  51:13 52:18
  54:21 56:5 57:1
  59:14 61:22
  69:18 74:18 79:6
  79:10 107:9
  136:13
**going** 5:3 18:6,24
  26:24 36:6 44:6
  47:24 51:13 56:7
  58:14 60:14,23
  68:6,6,24 69:5
  81:11 82:8,12
  88:23 89:3
  116:12,15 133:15
  135:8 136:3
  142:3 146:2,5
  148:3,3 155:19
  155:20,21
**Goldsmith** 29:20
  38:23
**good** 5:11 15:2,13
  17:7 21:7 43:23
  44:2,3 52:12
  75:15 152:13
**gosh** 8:25 40:24
  43:16 77:24 83:4
  85:13,14 90:3
  113:11 130:22
**government** 61:2
  90:12
**graduate** 44:18,22
**Great** 140:7
**Green** 149:16
  150:1,2
**grievances** 99:22
**group** 54:20 56:25
  57:1,4 77:18

79:18,25 81:4,6,9
  140:10
**guess** 10:7 13:5,6
  44:2 51:5 64:15
  88:10 95:14 98:3
**guessing** 85:9
**gynecologist**
  154:21

**H**

**half** 75:9 140:5
**Hall** 4:3,5 98:3,5,6
  98:9 144:19
  145:3,11 146:10
  146:11 147:2
  148:9 149:16,24
**hallway** 152:8
**Hall's** 144:15
  145:13
**hand** 27:1 64:7
  66:2 90:5 91:18
  100:2 127:17
  128:8 145:5
**handed** 145:8
**handing** 28:10
  48:5,8 80:5
**hands-on** 60:2
**handwriting** 27:15
**hang** 113:20
  114:10,14
**hanging** 113:20
  115:6
**happen** 139:11
**happened** 9:11
  57:2 106:24
  107:10 136:15
**happy** 99:17
**harassment** 103:8
**hard** 15:1,4 52:12
  58:9 72:11
**hardship** 106:4,5
**harmed** 139:21
  140:2
**Harper** 53:7,8
**hassle** 134:22,25
**hassled** 134:8,9
**hate** 51:17

**head** 6:7
**hear** 3:14 23:17
  63:22 65:10
  113:9,13,15,23
  115:20 118:20,23
  119:13
**heard** 95:11 113:3
  113:6,13,14,15
  113:16,23 114:1
  114:6,7,11,21
  115:2,2,13,22
  117:16 118:2,6
**hearing** 10:7 51:4
  51:5,9,16,18 52:3
  52:13,18 53:9,11
  56:1,18,24 57:12
  61:6,18 62:5 83:9
  115:19
**hearings** 11:13
  52:6 83:1
**Heather** 1:18
  157:4,20
**heavy** 22:9
**held** 10:16 47:20
  48:25 49:10,22
  51:3 123:25
  124:1,2 148:15
**help** 12:20 13:7
  106:18 115:9
**hereto** 4:25
**hide** 71:18 73:7
**high** 34:16 44:12
  44:14,15
**highest** 47:1
**Highway** 86:10,13
  88:18,21 128:14
**history** 47:14
**hit** 109:15
**Hmm** 38:25 115:25
**HOD** 56:24 57:21
  57:25 58:1,4,15
  58:18
**hold** 10:6 29:16
  43:24 50:12
  57:18,19,20,21
  59:4 91:1 97:22
**holding** 77:18

143:13
**home** 3:22 19:16
  32:5 33:24 82:8
  90:2 92:14 94:13
  103:9 104:14
  109:4 123:4,7,9
  123:12,13,15
  124:9,12,25
  125:3,11,15,18
  126:6 127:6,25
  128:2,5 129:19
  130:12,25 131:4
  131:8 132:20,21
  133:17,23 134:1
  134:6,7,9,13,16
  134:18,21,23
  135:1,13,24
  136:2,5,8 137:5,7
  137:11,14,22,24
  138:3,8,11,14
  139:9,17 140:1
  141:3 153:9
**Homes** 35:14
**honest** 7:12 18:8
  19:4
**Honorable** 47:12
**hook** 120:24
**horrible** 26:9
**hospital** 61:10 83:3
**hostile** 111:15,17
  111:18,24 112:2
  112:9,16,20
  118:5
**HOT** 62:3,19,24
  63:2 122:13
**hour** 75:9 96:18
  140:5
**hours** 88:11 89:6,7
  89:10
**house** 19:16 22:18
  26:11 93:16
**Howell** 97:21
**huh** 149:17
**hurt** 87:11
**hurts** 153:21

**I**

Bernethia Johnson v. Jo Ann B. Barnhart, et al.                    10/23/2007
DEPOSITION OF BERNETHIA JOHNSON
Page 8

**idea** 82:12 85:7 139:3
**identified** 103:13
**imagine** 20:1
**immediately** 146:7
**impact** 155:17,18
**important** 67:2
**inaccurate** 148:19 150:14,24 151:12 152:11
**incident** 9:16 117:15 118:18 140:18,19
**included** 66:14 112:7
**includes** 67:13
**including** 78:15
**incomplete** 71:18 73:7
**INDEX** 2:15 3:1
**indicate** 63:3 71:5 76:5 92:13 131:2
**indicated** 151:9
**indicates** 91:2 129:9,24 145:24
**individuals** 29:14 30:20 39:5,20 55:23 60:20 61:1 101:12,24 102:1 102:2 103:1
**information** 25:25 26:1 31:3,14 42:2 61:10,15 67:14 72:3,18
**initial** 14:13
**initials** 27:14,17 28:16 129:7,11 129:13,15,24 131:24 132:10,11 132:15
**initiated** 14:10
**inside** 151:24
**instance** 30:8 68:5 85:18
**institution** 45:12
**instructs** 133:1
**intentionally** 32:14

**interact** 57:11,15 57:23
**interacted** 57:14
**interaction** 59:25
**interested** 157:16
**interfere** 7:16,19 153:16
**interpretation** 27:23,24
**introduced** 4:24
**investigation** 72:20
**investigator** 72:4 72:19
**involved** 138:1,6
**involves** 62:1
**in-laws** 37:5
**item** 130:17

**J**

**J** 2:7
**Jacksonville** 34:25 35:1
**Jake** 56:10,11,15 56:20
**James** 2:7
**January** 79:16,23 80:10 98:21,22 99:2,3 157:17
**Jerotha** 51:23,24 51:25 53:3,12,16
**Jim** 5:11
**JO** 1:9
**job** 49:14 50:19 51:8 52:2 60:12 60:13,15,16 72:6 82:24 86:1
**jobs** 47:19 48:25 49:2,10,22 50:6
**Johnson** 1:6,16 2:16 3:4,4,8,13 3:21 4:11 5:5,11 7:7 27:1,9 35:3 35:25 36:14,24 53:23,25 54:7,10 54:25 55:6,8,12 57:5 59:1,5 60:1 60:7,8,10 66:7,11

68:18 69:2,8,11 69:15 70:7,13,21 70:23 72:4,15,18 73:4,15,18 74:1,4 76:16,23 77:3,10 77:18 78:14 79:4 79:7,8 96:24 101:4 102:16 113:10,11,19 114:16,17,20,21 115:3 116:14,23 116:25 117:1,4,5 117:8,18,20,25 121:24 122:10 123:3,11 124:7 124:24 131:20 134:10,13 135:7 135:14 136:17,22 136:23 137:15 138:2,8 139:8,16 141:4 146:19 147:5,7 148:1,20 148:21 149:16,21 150:3,3 152:22 155:16 157:8
**Johnson's** 123:21 155:14
**joined** 47:21 52:18
**joining** 50:8
**joke** 119:7
**jokes** 113:4 118:21 118:23 119:15
**journal** 23:8,20 24:3,6 25:9
**journals** 24:7
**judge** 30:10 61:6 83:1,10 117:5
**judges** 52:5
**judgment** 30:9
**jump** 34:17
**jumped** 34:17
**June** 47:8 97:5
**Juraldine** 2:3 48:6 96:2

**K**

**Karen** 29:21 88:7

**Kathy** 29:23
**keep** 19:7 23:7 38:17 150:2
**Kentucky** 45:11 49:24,25
**kept** 25:9 149:18
**Kim** 99:6,7
**kin** 157:14
**kind** 8:22 16:15,16 17:13 18:24 25:21 43:16
**kinds** 17:13
**knew** 89:4 114:10
**knocked** 141:16
**know** 5:17 6:14,23 8:13,18,19 10:10 12:12,22 13:23 15:12 18:1,12 19:4,7,12 21:4 22:3,15,18,21 28:9,18,19,20 30:24 32:19 36:12,14,15 38:17 39:23 42:17 44:2 47:19 50:14 51:11,21 54:14,14 56:4,5 56:17 59:20 63:15 64:24,24 66:21 68:1 69:19 69:25 71:8 72:24 75:3,24 76:17,18 77:2,15,24,25 78:1,4,7,8,9,17 78:18,20,20 79:1 79:1,8,9 82:16,18 85:14 89:15,22 92:6,18 94:24 95:1,8,15,22 97:10,15,18,19 97:22 98:7 104:22 105:1,1,2 105:17 106:2,4,7 106:9,12 109:14 110:4,17,18,20 110:21,23 112:4 114:14,17,25

115:6,10,10,13 115:13,15 116:2 118:8,11 119:1,2 119:22,24 120:8 120:8,9 122:7 124:1 129:11,12 129:16 130:3,10 130:11 132:12 133:16 135:4 136:15,24,25 137:2 138:20,22 138:25 141:5,7 141:17,23 142:5 142:7 143:8 144:13 145:16 146:2 147:21 149:23 153:10,13 155:10
**knowledge** 19:3 26:22,23 48:22 73:9 138:16
**Knoxville** 33:8 44:16

**L**

**Labor** 125:22
**Lamar** 3:9 28:14 54:1,17,21,22 55:1,6,14 57:6 59:8,16 60:1,22 76:14 102:18 133:2,6 140:9,15 142:12 144:16 146:11 147:1,11
**Lamar's** 136:21 140:20 141:13 146:3,6,9,16,20 147:4,6,8,9,17,20 148:9 149:1,4,6
**lamp** 105:14 109:23 110:7,8,9 110:11,24 111:5 111:7,9
**lamps** 111:12
**Large** 1:19 4:15 157:3,6
**larger** 16:11

Bernethia Johnson v. Jo Ann B. Barnhart, et al.                    10/23/2007
DEPOSITION OF BERNETHIA JOHNSON

Page 9

**laugh** 113:14 114:1
  117:12
**laughed** 115:14
  117:11
**laughing** 113:17
  113:17 114:7,12
**laughter** 115:20
  117:16
**law** 2:3 61:6 83:1
**lawsuit** 7:22 8:1,3
  8:6,17 9:20,21
  13:2 14:18 15:20
  28:25 29:2 30:5
  32:2,7,10 39:11
  40:2,12 41:10,18
  41:24 42:1,5,8,11
  100:6,9,21 101:7
  101:9,16 102:13
  103:15 104:8,21
  105:6,9,11,25
  106:8,11 107:3
  109:8,13,13,18
  133:20,25
**lawsuits** 5:13,15
  7:20,24,25 8:10
  39:4 107:17
**lead** 54:25 55:1,8
  55:15
**learn** 95:4
**Leashure** 99:6,7
**leave** 12:22 40:21
  50:18 60:14
  122:24 130:23
  135:8
**led** 117:7
**left** 9:9 40:3,4,5,10
  40:14,14 47:20
  49:10,12,20,22
  85:23 123:18
  124:22 135:6
  146:8,17 149:8
  153:9
**legal** 3:4,8,13
  24:16 27:25
  52:14,17,19,20
  52:21,22,25 53:2
  53:4,14,17 54:8

54:19 57:10,16
  60:16 61:13
  62:18 65:2,4,18
  77:19 79:17,24
  80:22 82:24
  83:13,20 84:14
  85:1 89:12,19
  90:19 95:16
  108:12,12 111:11
  121:23 137:23
  138:3,7,10,13,17
  138:20,25 139:3
  140:10
**legally** 13:7
**lemon** 8:15
**let's** 27:12 45:15
  55:14 64:4,5 75:8
  80:4 84:5 88:13
  96:4,17 99:25
  102:8 126:19
  131:11 132:22
  140:4 148:5
  155:11
**level** 57:3,11
**lie** 76:19 150:19
**lied** 76:20 118:10
**lies** 69:11,13 70:7
  71:24,25 72:10
**light** 111:7
**Linda** 31:17,19,19
  31:22,23 42:16
  97:25 145:1
  149:10
**line** 92:1 129:4,6
  130:17,21 131:23
  131:24 132:9,9
  146:4
**lines** 129:6
**liquid** 6:17
**list** 45:4 61:17
  67:13 103:17
  109:2
**listed** 55:11 66:15
  103:1,8 104:9,19
  105:5 107:4,11
  122:13
**listen** 13:25 18:15

18:22,25 19:24
  43:21 44:1,4
  119:11
**listened** 14:2,14
  19:1
**lists** 25:23,23 48:25
  49:2,9,22 50:6
  71:9,13 104:4
**little** 7:4 16:15,17
  19:8 21:3 31:8
  43:22 111:8,9
  150:14
**live** 33:20 34:24
  35:10,15 36:15
  36:17,19
**lived** 35:12 37:8
**lives** 34:25
**living** 39:25
**LLMR** 125:19
**LMR** 125:16,20
  134:15 137:21,21
**locate** 68:19 69:4,9
  69:17 70:18,20
  71:2 122:12,17
**located** 85:22,23
**location** 86:9
**locations** 46:10
**logistics** 13:1
**long** 9:1,15 35:15
  36:1 44:5 50:14
  51:11 67:15
  97:22 98:25
  113:11 147:21
  153:25 155:8,10
**longer** 18:4
**longest** 62:17
**look** 27:13 48:18
  48:24 66:3 90:22
  93:15 101:10
  120:23 129:13
  130:13,15 144:14
  154:8 155:20
**looked** 120:22
  154:25
**looking** 39:13
  52:10 59:18 83:5
  94:6 131:5

150:11
**looks** 27:14 48:11
  49:14 150:14,23
  151:12
**Lord** 11:17
**loss** 139:22 154:18
**lost** 20:20 92:23,24
**lot** 6:17 20:20 22:1
  22:8 29:19 69:11
  92:24 97:13
  112:13,13
**Louise** 55:16,18
**Louisville** 45:11
**lunch** 75:10,11
  87:2,4 96:3,17,23
**Lynda** 4:3,5 98:3,4
  98:4,6,6,8,9
  113:19 114:18,19
  114:21 115:3,11
  116:17 144:15,20
  144:22,24,25
  145:2,3,11,13
  146:10,11 147:2
  147:15 148:9,23
  149:8,16,23,23
  149:24 150:5,6,6
  150:9,10 151:21
  151:25 152:1
**Lynda's** 146:8,17
  149:6

— M —
**machine** 17:7,8
**maiden** 36:21
**mailed** 83:8
**majority** 88:22
**making** 30:8 73:7
**management**
  76:20,21 77:4
  84:4 101:1,2,17
  101:18,19,23
  104:2 117:9,10
  117:10 118:24
  125:22 126:5,20
  136:6
**management's**
  105:15 136:5

**managers** 102:12
**manned** 85:11
**manner** 4:25 13:24
  137:13 157:16
**manning** 83:12
**March** 3:12 10:17
  64:20 84:3,7 91:8
  122:2,21,25
**mark** 26:24 48:3
  99:25 148:5
**marked** 27:2 28:10
  48:8,9 63:21 64:7
  66:2 75:23 78:16
  80:5 90:6 91:18
  100:3 127:17
  128:8 131:17
**market** 155:1
**married** 35:4,20
  35:22 36:1,23
**Martha** 53:7,8
**Martin** 55:17,19
  68:9,13 74:13,14
  74:22 75:18,19
  76:10,16 79:4,4,7
  79:11 86:17
**Maryland** 45:10
  45:10
**match** 27:24
**material** 20:23
  72:14
**matter** 58:16
  137:20 157:9
**matters** 38:13
  58:11,19
**McAnnally** 54:25
**McAnnally's** 55:7
**McClain** 99:6,7
**McWilliams** 38:23
  39:21 40:18 41:8
  41:23 42:15
  54:11 55:11 88:4
**mean** 8:1,6 12:12
  13:18 25:8 37:5
  59:15 71:14
  82:16 88:9
  120:17,17 123:16
  132:12 146:4

meaning 73:23
means 67:3
medical 61:9
medication 6:16
  7:15,18 153:1,3,7
  153:11 154:13,14
  155:9,17
medications
  153:16 154:21
medicine 154:22
medium 18:2
meet 126:22
  155:20
meeting 27:21
  42:24 77:18,23
  78:2,5,6,8,11,14
  78:17,25 84:6
  95:10,11,20,22
  141:13 147:20,21
  147:23 148:1,9
  148:15,22 149:1
  149:13,18,20,25
  150:1,15,21,25
  151:14,22 152:6
meetings 15:18
  16:25 17:21
  18:15 95:10
  145:14
member 90:19
members 101:22
memo 3:13,15,21
  145:20 148:8,18
  150:14,23 151:13
  151:14 152:10
memory 43:13
  106:22 154:18
  155:4,19
mention 110:14
  117:15 144:2
mentioned 38:21
  39:21 40:19
  55:15 105:7
  106:5 110:17,18
  110:23,23
messed 14:25
Middle 1:2,21 2:8
military 45:3

46:22 47:7,20
  50:3
mind 40:8,9
mine 11:16
minor 11:25 12:3
minute 8:13 85:8
  97:13 98:23
  102:9 154:9
minutes 75:10
missing 83:23
Missionary 37:13
mistaken 114:16
misunderstanding
  125:5
mixed 150:3
Monday 80:10
  94:12 123:2,16
  140:16 144:3
money 9:13
Montgomery 1:22
  2:4,5,9 3:11
  10:12 20:25
  22:12 25:11
  29:12 34:13
  35:13 36:17 37:8
  37:18 38:11
  39:24 40:10
  41:21 44:10 56:2
  64:11 65:2 83:25
  87:10 88:14
  100:7 107:16
  109:21 113:3
  119:13 121:20
month 72:22 81:5
  81:9 91:2 94:21
  94:22 95:6,18
  136:7,8 138:22
  139:1,4
monthly 83:21
  84:17 85:4 95:2
  138:22
months 44:6,6
  50:16,17 91:3,5
  105:15 110:6
morning 5:11
  128:17 152:25
Morrell 11:18,18

11:20
motive 111:4
move 20:20 21:5
  22:9 67:3 74:14
  75:5,19 77:11
  92:24 104:24,24
moved 20:24 21:11
  22:18 52:17
  74:12 77:20
music 15:10 32:17

_____

**N**

name 5:11 29:22
  35:2,24 36:21
  38:19,25 39:1,17
  40:17 45:4 55:7
  55:24 74:13,22
  75:1,3,4 76:21,23
  77:14,15 79:8
  105:13 113:14,16
  113:24 114:7,11
  115:13,19,22
  116:9 117:16
  120:12 124:3,5
  128:17
names 29:18 31:11
  55:21
nature 97:15
  105:18 106:20
near 86:15
need 4:17 6:13,22
  7:5,25 18:24 23:3
  25:1 44:4 60:11
  60:13 63:9 81:13
  93:25 118:16
  148:4 150:7
  155:23
needed 81:15
  111:7 147:12,13
  148:2
needs 126:22
neither 84:24
  157:14
never 9:21 11:9,23
  12:1,4 40:8,8
  51:2 54:4 74:13
  81:21,21 113:3

114:6
new 45:19 46:3,13
  56:7,21 83:9,9,9
  155:1,3
nice 150:8 152:3
nicknames 37:1
nine 105:15 110:6
nonpromotion
  10:23
nonselection 10:14
  30:17 72:5,16
nonwork-related
  38:13
NORTHERN 1:3
note 4:3,5 24:12
notebook 23:8,19
  24:3,14 25:9
notebooks 24:7
noted 126:21
notes 20:16 21:18
  23:4,8,20 24:4,7
  25:10 149:24
notice 7:5 31:8
  67:16 83:8
noticeable 139:12
notices 83:8
notify 83:3
November 97:5
number 30:20 69:6
  69:10 112:23
  130:19
numbers 36:6

_____

**O**

oath 7:8 9:23 11:2
  152:23
objections 4:16,17
obtain 11:19 81:3
obtaining 81:2
occupy 86:8
October 1:23,24
  27:10 28:15
  33:10 54:18 66:7
  66:13,23 70:10
  70:15,22 73:2
  77:6 78:10,12,14
  79:12 91:8 98:14

108:24 152:18
  157:7
offense 11:25 12:3
offensive 113:22
  119:14 120:20
  121:2,3,5,19,19
offered 4:19 89:11
office 1:20 2:8
  25:11,17 37:18
  38:10,18 40:4,11
  41:18,19,20,20
  51:4,5,9,19 52:3
  52:13,19 53:9,11
  56:1,18,24 57:12
  61:9 62:5,10 63:7
  63:21 64:19
  79:14 84:20
  85:15,23 86:3,6
  86:21 87:3,9
  88:11,14,18,21
  89:6,7,11 90:13
  91:1 94:16 95:3
  96:7 113:3,13,19
  115:7,16,21
  116:12,15 119:13
  124:21,22,23
  125:13 126:23
  128:14 133:15
  134:14 136:22
  137:20 140:21,22
  141:13 144:3,16
  144:23 146:3,6,8
  146:9,12,16,17
  146:18,21 147:3
  147:4,6,8,10,11
  147:15,15,18,19
  147:21 148:10,15
  149:1,4,6,15
  151:25
Off-the-record
  25:15 45:17
  50:22 64:6
  155:13
oh 13:22 23:19,24
  36:11 38:25 40:5
  40:16,18,24 41:8
  51:13 52:18

Bernethia Johnson v. Jo Ann B. Barnhart, et al.
DEPOSITION OF BERNETHIA JOHNSON

55:18 56:5 57:1
58:1,9 59:14
60:24 61:22
69:18 74:18
77:24 79:10
80:17 85:14 90:3
93:20,20 94:9
96:5 97:13 107:9
113:11 117:4
119:2,8 141:4,8
141:11,19,24
149:16 153:14
155:1
**OHA** 29:12 90:13
**okay** 6:3,9,16,20
6:21,25 7:3,6
8:10,12 9:4 10:7
10:19,19,19
11:15,17 12:13
12:25 13:16,22
13:25 14:11
15:16 16:20
19:15,19 20:6,7
21:21 23:5,13,24
24:19 25:2,5,13
26:3,15 28:12
29:5,7,14,20 30:6
30:12,15 32:9
33:6 34:1,9,20
35:4,16 37:14,25
39:4 40:5,8,19,20
45:7,8,22 46:2
47:7,15,23 48:2
49:21 50:1,5,16
51:7,11 53:1,5,5
53:18 54:17,21
54:24 55:2,3,7,9
56:19,23 57:22
59:4 60:9,9,24
61:23 62:16
64:24 65:3,7
66:11,21 67:11
68:6,8,12 70:12
70:21,23 72:25
73:3,5 74:11 75:3
77:6 80:7 81:12
82:1,2 83:23 84:2

84:12,16 88:10
89:2 90:7 91:1,10
92:13 94:5,9,9
97:15 100:8,17
102:2,15,17,19
105:22 108:18,18
109:19 110:19
111:21 112:15,21
113:2,9 115:2,19
117:5 118:18
119:11,19 121:25
123:10 125:6
126:14 131:4,5
131:11 132:25
135:6 137:21
140:7,14 141:8
141:10,11,24
142:4 144:2
145:20 147:20
148:20,20 149:19
150:7,16 151:7
151:11,19 152:13
152:15
**old** 21:8 34:3,16
35:8
**oldest** 33:24,25
34:20
**once** 64:18 72:20
72:22
**ones** 14:21 16:2
18:9 19:8,10
29:24 33:2,3
42:18
**online** 45:22
**ooh** 9:15
**open** 89:7
**opened** 141:18
**opposed** 6:7
**order** 18:3 45:5
61:16 83:2
110:22
**ordered** 83:2
**organization** 56:7
56:20 66:12
**original** 16:13,21
16:22,24 17:2,4,6
17:7 18:5,7,9,10

19:9,17,21 20:21
68:11
**originals** 16:10
**outside** 152:7,9
**overhead** 105:14
109:23 110:7
**overturned** 30:9
31:9

_____

## P

**pack** 15:5
**packet** 21:25 93:25
94:6
**packing** 32:15
**pad** 24:12,17
**pads** 24:16
**page** 28:13 48:10
90:23 103:6
129:3,22 130:14
130:15,16,16,17
130:21 131:22
132:1,5 133:21
146:3
**pages** 157:10
**Pain** 153:14
**Pam** 54:4 118:10
119:16,23 120:2
121:4,17
**panic** 154:10
**paragraph** 67:2,10
103:4,6,13,17
104:9,12,19
105:24 107:22
108:4,21 111:17
126:15 133:4,21
133:22 148:21
151:19
**paragraphs** 65:5
109:12 112:7
**paralegal** 10:15
30:17 98:18,25
**parents** 37:5
**parked** 104:24
**parking** 105:8
**part** 28:8 42:4
146:1 152:5
**participate** 93:2

150:18 151:3,16
**participated** 93:5
93:6
**particular** 9:9
128:24
**parties** 4:10,23
152:19 157:12,15
**partners** 13:10,17
13:18,20
**partnership** 3:17
90:10
**party** 4:25 7:22
**pastor** 15:11
**pastors** 15:11
**Paul** 3:4,13,15,21
27:9 53:23,25
54:7,10,25 55:6,8
55:12 56:1,6,17
56:19 57:1,5,8,14
57:21,23 59:1,5
60:1,6,8,9,10
66:7,11,11 68:18
68:21 69:2,8,11
69:15 70:7,13,21
70:23 71:19,24
71:24 72:4,15,18
73:4,15,18 74:1,4
74:11 76:15,23
77:2,10,17 78:4
78:14 79:1,3,7,8
80:11 100:25
101:4,4 102:14
102:16 104:23
110:4,15,19
111:4 113:10,11
113:19 114:16,17
114:20,21 115:2
115:25 116:14,23
116:25 117:1,4,5
117:8,18,20,25
118:8,8,15 119:1
119:2,18 121:24
122:10 123:3,11
123:13,15,21
124:3,5,7,8,10,11
124:13,24 125:2
125:10,11,17

126:25 127:22
131:12 132:23
134:10,10,11,11
134:12,12 135:1
135:6,7,14
136:11,16,22,23
137:15,16,19,24
138:2,2,8,12
139:8,8,16,16,21
141:2,4,5,19,21
141:23 146:19
147:5,7 148:1,20
148:21 149:7,8
149:16,16,21
150:1,2,2,2,3
151:5
**Paul's** 124:5
**pay** 139:22
**penalties** 7:8
**pending** 6:24
69:24 87:15,20
100:15 102:24
103:23
**people** 12:18,24,25
29:4 31:7,7,18
37:23 40:20
66:12 68:5 87:24
87:24 88:9 97:10
134:7 136:2
**perceived** 119:6
**perform** 60:11,13
60:15
**performance** 72:6
**period** 22:11 57:5
62:9 89:23 91:4,5
91:6,8,8 97:2
**periodically** 18:25
**perjury** 7:9
**permission** 135:5
**person** 20:12,13
40:11 77:10 98:9
**personal** 24:24
25:1 138:16
**person's** 9:20
**pertaining** 24:23
**phone** 85:13,14
86:3 147:10

Bernethia Johnson v. Jo Ann B. Barnhart, et al.                    10/23/2007
DEPOSITION OF BERNETHIA JOHNSON
Page 12

phonetic 99:6
phrased 70:1,3
physical 63:6,20
picked 15:11
pictures 121:19
pill 155:5
place 6:14 21:4
  62:9,12 65:18
  67:15 104:24
  110:1 143:2
  144:11 145:16,22
  147:21 151:24
  152:7
Plaintiff 1:7 2:2
planned 26:17
playing 17:9
please 5:16 56:14
  79:19 124:21
point 5:15,20 6:13
  11:19 20:9 51:15
  51:18 67:10
  72:14,17 75:2
  79:3 83:12 85:4,6
  94:19 96:24
  97:25 140:3
  143:6,11 144:15
  146:15 152:14
policy 27:6 28:1,3
  28:8 79:13 80:21
  81:1 90:15 91:11
  95:2,15,25 136:5
  136:6
portion 42:10
portions 61:16
position 10:15,23
  30:17 48:15
  50:12,15 51:3,22
  52:13,17 57:18
  97:9,23 98:17,19
  99:1,17 108:12
  118:11
Poss 51:23,24,25
  51:25 53:3,12,16
possession 14:23
  15:7 16:6 18:5,7
  20:18 23:12 26:4
possibility 153:19

153:20
possible 20:17
  48:21
possibly 10:4
  12:20 76:25 77:1
  84:15,17 95:8,9
practice 145:13
practitioner 154:7
  154:11
Pray 13:19,21
prayer 13:10,17,19
  13:20
preaching 15:11
prefer 6:23
preparation 14:1
  18:21,23
prepare 61:17
  85:13
prepared 83:7,8
  148:8
preparing 13:7
  26:5
prescribe 154:13
prescribed 154:11
prescribes 154:13
prescribing 154:4
prescription
  153:10,12
presence 138:10
  138:12
present 113:8
  121:16 123:22
  138:7 143:4,5
  152:19
presently 7:15
pretty 15:22
Prevacid 153:6
previous 8:2 32:4
previously 35:22
  55:11 92:18
  134:1 139:14
pre-stage 71:14,14
print 21:14
printouts 25:23,24
  25:25 26:3
prior 13:18 28:25
  50:8,25 68:17

69:1 92:17 94:1
  108:11 122:4,6
  123:6 136:7
  142:23 143:1
private 45:11
probably 14:5,19
  14:21 15:2 32:22
  32:23 39:6,23
  41:6 42:25
  105:10,21 115:24
  116:1,1,3
problem 123:18
  141:8,21
procedure 4:12,21
  5:1 67:15 77:20
  84:24
procedures 78:15
proceeding 11:2
proceedings 8:5
  9:24
process 61:5,21
  62:1 65:3,18,19
  65:20 136:1
produce 26:3,7
  121:9
produced 14:17
  15:20,24 19:17
  24:21
Professional 4:14
program 3:19
  89:15,20 90:1
  91:23 92:19 93:2
  93:4,11,23 94:11
  151:17
promotion 8:2
proper 21:4 25:22
  78:15
proposed 83:10
provide 19:21
  23:15,22 25:12
  26:10 27:9 29:9
  32:8 33:4 59:2
  93:19 94:3
  145:14
provided 4:20 5:1
  14:7 21:19 25:5
  26:20 28:3,5,6

71:8 148:12,13
providing 28:14
provision 90:24
psychologist
  154:12
public 86:2
puddle 14:25
  15:14 32:16,21
  33:4
pull 85:12,13,15,17
  127:2
pulled 121:1
pulling 3:16
purchase 110:22
purchased 8:14,15
  17:13,15,16,17
  20:24 44:4,5
purpose 4:20
purse 43:4,7,8
pursuant 1:17 4:11
put 14:19 16:10
  19:12 40:17 63:7
  71:20 72:10
  74:15,15,19 78:5
  95:7,9,19,21
  110:22 117:19
putting 95:12
P-O-S-S 51:25
p.m 152:16

    Q
question 5:21,24
  6:2,24 7:2 15:15
  23:18,24 26:9
  30:2 36:8,9 38:8
  46:8 56:14,15,17
  57:22 59:12,15
  60:25 63:11,12
  63:14 68:25
  69:21,22,24 70:8
  70:9 71:25 76:9
  78:13 80:16
  81:18 84:9,11,13
  84:21 87:12,15
  87:20 88:13 96:5
  98:24 100:15
  102:23,24 103:20

103:23 104:6
  107:25 112:5
  119:11,12 121:4
  131:14 133:24
  134:3,4 136:19
  140:2 142:24
  150:4 151:8
questioned 74:21
  108:14 124:24
questions 4:16,17
  5:14,16 6:6 7:13
  7:17 13:7 59:2,7
  67:24 85:16
  153:17 155:18
quiet 149:18
quit 17:9
quite 6:18,19 14:20
quote 114:25 120:6

    R
race 100:10,16,17
  100:20 103:5
  104:16 106:25
  107:2 111:19
  114:3,6
racial 105:7,19
  118:7 119:8,10
  119:19,20,21
  135:23
racially 104:7,20
  113:4,22 118:21
  119:6,14 120:20
  121:5,18,19
Radcliff 49:24,25
rained 15:4
raining 15:1
Rambo 55:1,15
ran 81:21,21
  143:20
rank 47:1
read 5:4 48:1 49:4
  67:11,19,20
  69:23 71:20,22
  72:1,2 87:14,19
  100:14 102:6
  103:20,22 145:25
ready 3:14 40:9

Bernethia Johnson v. Jo Ann B. Barnhart, et al.
DEPOSITION OF BERNETHIA JOHNSON

10/23/2007

Page 13

61:5 63:21,22
65:9,9 117:6
**Real** 155:6
**realized** 141:21
**really** 9:15 15:1
18:12 31:22 39:8
39:9,23 40:18
42:6 52:2 58:12
59:6 60:10,10
72:11 97:17
100:22 111:13
116:5 129:11,13
132:12 153:22
**Reams** 3:15,21
56:1,6,17,19 57:1
57:8,14,21,23
80:11 100:25
101:4 102:14
104:23 110:15,19
111:4 118:9
119:2,3,18 124:3
124:8,10,12,13
125:17 127:1,22
131:12 132:23
134:10,11,12
135:1,7 136:11
137:16,19,24
138:2,12 139:8
139:16,21
**reason** 7:11 27:19
58:12,14 81:13
81:15 92:8 97:8
142:9 153:15
**reasons** 139:18
**recall** 9:14,17,22
11:3,20,21 14:4
18:14 19:13 28:5
28:9,14,17 29:10
29:12,14,24 31:4
31:6,13,24 32:3
45:19 52:16 54:9
54:18,24 55:22
55:24 61:21
63:17 66:17,19
66:20 68:18,22
69:1,2,8,10,11
70:11,21 73:6,10

73:11 74:9,11
77:13,14,17 78:2
78:3,6,7,13 81:10
83:16,19 85:1
86:19 93:1
106:18 116:6,8
116:25 117:2
118:13 120:18,21
122:1,5,6,9,10,15
123:3,5,8,10,14
123:17,20 124:18
125:9 131:7,10
132:20,21 133:10
133:12,14,15
138:15 140:15,18
140:18,24 141:1
141:2,12 142:3
142:11 143:16,17
144:18 146:19
149:2,3,5,5,12,14
149:19,25 150:1
150:3,13,15,20
150:24 151:3,5,9
151:13,17,19
**recalled** 117:20
**receipt** 103:10,11
104:14,15 109:5
109:6
**receive** 66:9 72:14
72:17 80:13 81:8
112:1 121:19
**received** 27:17
28:18,19,20
45:20 46:3 66:10
67:20 69:16
71:10 72:23
75:22,25 78:20
78:22 79:12
80:18,19,25
127:22
**receiving** 28:17
66:17,19,20
**recess** 49:5 75:17
96:23 102:10
108:2 140:8
**recessed** 152:16
**recognize** 27:3

64:8 80:8 90:8
91:19 100:3
127:19 128:9
131:19 145:8
148:6
**reconstruction**
56:8,21
**record** 6:8 15:25
17:21 25:14
42:21 43:15
45:15 50:21 64:5
100:17 102:8
153:5 155:11
**recorded** 18:16
24:2 42:23
**recorder** 16:18
17:11 43:9,10,12
43:15
**recording** 17:19
43:1,5 52:6
**recordings** 15:17
16:22,24 17:10
19:18 20:11
21:19
**records** 26:4,11
52:4 61:9 83:3,3
**recover** 9:14
**recovery** 8:22
**refer** 133:20
**referenced** 14:14
109:22
**referring** 8:5 16:17
30:1 71:23 72:3
73:13 83:24,25
101:3,20,23,25
108:9
**reflects** 132:18
156:1
**refresh** 106:22
**refused** 27:19 28:1
**regard** 135:13
**regarding** 9:16
10:23 24:4 25:10
26:11 27:6 29:1
30:4,16 31:23
32:6 72:5 90:15
111:4 121:11

139:8,17 145:14
**regards** 137:11
**regent** 45:23
**Reginald** 2:10
**Regional** 2:11
**Registered** 4:13
**regular** 17:17,24
**relate** 22:11 31:5
**related** 26:12
32:19
**relates** 73:22,25
74:7 84:21
**relating** 25:3 31:4
70:9 73:23
**relation** 8:22 10:14
10:20 72:5,15
125:22 135:23
**relationship** 60:3
**relatives** 37:4
**religious** 15:10
**remain** 104:25
**remaining** 19:21
**remember** 9:1
14:20 18:3,9 21:1
21:2 29:19 31:18
45:12 54:22
55:20 56:15
61:23 67:2 74:18
86:17,18 106:24
107:10 117:17
118:16,17 125:8
141:16 153:21,22
153:23,24 155:7
155:7
**remind** 152:22
**remove** 25:16,21
61:16
**Renee** 29:21
**rent** 33:18,19
**rep** 145:13
**repaired** 110:6
**repeat** 26:7 69:21
79:21 80:24
87:13,18 90:3
100:13 132:4
**rephrase** 5:17
15:15 79:19

104:12
**replace** 56:5
**replaced** 56:4,6,8
56:18,20,22
97:20
**report** 72:20
**reported** 88:20
157:7
**reporter** 4:14 6:4
69:23 87:14,19
100:14 103:22
**Reporters** 1:18
157:1,5
**reporting** 54:9
**represented** 11:18
**representing** 4:10
4:23 5:13
**reprimand** 103:10
103:11 104:14,15
109:5,6
**reprisal** 100:11
**request** 3:19 22:4
24:22 32:4,5 75:7
81:14,15 82:22
91:4,6,7,22 93:23
106:4,5 135:23
138:18 139:8,17
140:16 142:9
143:19 147:10
**requested** 83:11
125:1 138:7
146:11
**requesting** 31:14
**requests** 126:21
**required** 28:7
**requirement**
126:21
**requires** 6:16
**reschedule** 155:15
155:21
**reserved** 4:18
**reside** 33:11 34:6
37:6
**resides** 33:22
36:15
**residing** 34:9
**resolution** 9:6

Bernethia Johnson v. Jo Ann B. Barnhart, et al.                    10/23/2007
DEPOSITION OF BERNETHIA JOHNSON
Page 14

**respond** 120:13,15
**responded** 117:24
**response** 71:25
    76:2 142:19
**restatement** 13:12
**restroom** 6:19
    107:25 147:12,13
    147:14
**results** 157:16
**resumed** 152:17
**retain** 92:21
**retained** 20:1 29:8
    94:10
**retal** 102:22
**retaliated** 101:13
    101:15,18,21
    102:13,23 108:22
    112:14
**retaliation** 50:24
    100:16 102:24,25
    105:21,22 107:23
    108:5,6 109:12
    111:19,20 135:18
    135:18 139:9
**retaliatory** 107:15
    109:3,8,24 111:4
    135:19,21,25
    136:1 137:12
    139:18
**retape** 17:6
**return** 19:16
    146:12
**returned** 96:6,14
**review** 13:25 49:6
**reviewed** 14:2,4,8
**revised** 3:12 64:20
**rid** 21:8
**right** 5:18 6:1 8:21
    9:16,25 10:3,12
    10:18,19 12:19
    14:17,22 15:23
    16:7 20:16 21:14
    23:6,11 27:5,9,12
    27:13 28:24
    31:24 32:4,24
    33:7,11,12,14,22
    34:6,17 35:8,24

37:21 38:1 39:25
    44:10,14,20,22
    44:24 47:9,10,13
    47:17 48:5,16
    49:15 51:15,21
    52:7,14 54:5
    55:19,25 56:2
    57:6 59:21 60:18
    61:2,4,11,20
    62:10,13,20 63:1
    63:17,25 64:3
    65:6 66:6 67:1,19
    67:22 68:3,17,22
    70:9 71:5 72:8
    73:17 74:9 75:1
    75:16 76:15,22
    77:16 79:20
    80:19 85:21,24
    86:1,6,8,19,23
    87:2 89:13 90:5
    90:10 96:2,15
    97:6,12 98:12,15
    99:25 100:9,11
    101:2 102:11
    103:3,9 104:12
    104:14,18 106:13
    106:14,16 107:21
    108:3 109:4,11
    110:11 111:3,14
    113:25 115:17
    121:18,22 122:25
    124:7,11,18
    125:23 127:21
    128:22 129:3,6
    129:21 131:7
    132:22 133:18,23
    135:22 137:5,16
    139:20 140:9,20
    140:24 144:6
    145:5,6 148:8,14
    148:18 150:11
    151:18 152:5
**Road** 33:16
**Rosey** 97:21
**roster** 3:24 4:2
    128:13,21,25
    131:18 132:6

**rotate** 81:5 83:19
    84:14
**rotating** 83:13,16
    85:2
**rotation** 138:23
**rough** 8:24 61:25
    83:5
**RTH** 65:8,17,21,23
**RTS** 65:8,16,21,23
**Rules** 4:12,21 5:1
**ruling** 4:18
**run** 81:19 107:25
**running** 82:13

---

**S**

**S** 154:24
**SAITH** 156:6
**Sanctions** 3:5,6
**sat** 52:6,8 141:9
    144:10 149:10
**satisfaction** 61:25
**Saturday** 34:4,23
**saying** 26:16 30:12
    30:16,22 31:8
    32:22 38:17 72:8
    72:10,12 73:24
    76:24,25 77:1
    84:18 93:8
    106:15 116:1
    130:22 146:15
    152:5,7
**says** 82:20,23 91:6
    100:8 126:18,19
    133:5 146:5
    151:1
**schedule** 63:22
    65:9 88:17 89:7
    126:20
**school** 12:23 34:15
    34:16 44:12,14
    44:15 83:3
**schools** 41:4
**Science** 46:19,20
**scope** 135:10
**second** 11:15,17
    18:2 20:24 25:14
    35:6 45:16 50:21

57:11 64:5 67:1
    67:10 101:11
    105:9 106:8,10
    107:7 109:13,17
    109:18 132:1,5
    133:4 145:25
    148:21 150:16
    151:18 155:12
**Section** 90:22 91:2
    126:13
**security** 1:10 2:11
    15:18 16:25
    18:16 23:7,21
    25:11,16,18 26:5
    26:12,14 27:6
    32:20 37:18
    38:10 40:11 44:9
    47:16,21 49:14
    50:8 51:1,4 60:17
    60:25 61:8 64:18
    76:11 85:23 86:6
    87:3,9 88:14
    89:11 90:13
    107:15 113:3
    119:13 128:13
**Security's** 28:8
**see** 7:18 11:17
    22:23 25:7 27:12
    29:7,18 30:14
    39:1,9 41:25 44:1
    59:11 64:20
    66:11,13 67:17
    70:10 91:9
    100:23 103:5
    111:7 120:16
    121:18 125:16
    126:15,19,23
    129:4 131:22
    133:1,4 134:15
    137:21 141:2
    144:14 155:21
**seeing** 92:20
**seek** 107:3
**seeking** 8:22 61:1
    103:14,16 104:6
**seen** 23:14 64:25
    66:4

**seldom** 22:15,16
**select** 94:12
**selected** 97:11,12
    108:13
**selecting** 92:14
**send** 31:12,13
    110:22
**sense** 130:6
**sent** 14:6 18:10
    19:10,11,25
    20:19 23:13
    28:25 29:3,3,10
    29:11,13,15,15
    29:16,25 30:4,10
    30:19,24 31:1,7,9
    31:14,20,25 32:1
    66:11 117:22
    120:9,11 121:7
**sentence** 146:3
    148:21 150:16
    151:1
**separate** 24:6
**September** 47:17
    50:9 91:7 154:1,2
**Sergeant** 47:2
**Serial** 3:23 4:2
**served** 46:22
**services** 11:20
**set** 157:13
**seven** 110:5 129:4
    131:23
**shaking** 6:7
**Shallowford** 33:16
**Shanahan** 56:10
    56:11,16,20
**shared** 86:15
**sheet** 96:8,9,13
    128:16
**sheets** 131:2,16
**she'll** 34:4,23
**shocked** 71:20,22
**shoot** 56:9 92:6
    141:2
**short** 47:25 49:3
    75:8 102:5 140:4
**show** 26:16,17
    62:19 154:23

Bernethia Johnson v. Jo Ann B. Barnhart, et al.
DEPOSITION OF BERNETHIA JOHNSON

shredded 32:11
siblings 37:5
side 142:14,14
  143:3,3 154:17
sign 5:4 27:19 28:1
  28:8,21 89:18,19
  89:22 92:12
  93:11 96:9
  128:21 130:24
signature 28:23
  48:10 91:25,25
  94:8 130:13,14
  130:16,18
signed 3:4,9 48:11
  92:11,11 93:1,7,8
  93:9
signing 90:24
similar 16:14
  129:12
Simmons 98:4,6,8
  113:19 114:18,21
  115:3,11 116:17
  147:15 149:24
simply 59:15 70:9
  84:9 135:14
  136:10 137:15
sit 20:14 149:8
sitting 21:17 105:5
  105:23 106:15
  141:21 149:7,7
six 50:17 65:6
  88:11,24
size 17:24
small 9:4,5 16:1,5
  16:15 17:14,16
  18:2 19:8
smaller 17:23
Smith 30:11 38:20
  39:7,15 40:6,7,13
  54:23 55:15
  86:16 154:5,7,13
  154:17
social 1:10 2:11
  15:18 16:25
  18:16 23:7,21
  25:11,16,17 26:4
  26:12,14 27:5

28:8 32:20 37:9
  37:14,16,17
  38:10 40:10 44:9
  47:16,21 49:14
  50:8,25 51:4
  60:17,25 61:8
  64:18 76:11,11
  85:22 86:6 87:3,9
  88:13 89:11
  90:12 107:15
  113:3 119:12
  128:13
solely 84:21
soliciting 31:3
somewhat 105:16
sorry 8:19 23:18
  29:22 31:17,18
  36:8 38:7 45:3,3
  49:16,17 53:5,5
  54:24 55:20 56:9
  56:9,12 60:5
  62:25 67:8,11
  68:12 76:3 77:6
  80:17,17,24
  87:11,18 118:23
  131:14 132:4
  144:20 150:2
sought 108:15
sound 10:2,18 47:9
  55:19 61:25 97:5
sounds 10:19
  47:10
space 105:8
speak 5:6 151:22
  157:9
speaking 124:7
special 126:22
  127:5,8,11
specialist 98:18
  99:1
specific 101:23,25
  104:5 109:3
  112:22 114:25
specifically 103:13
  114:24 117:2
speculate 95:14
Speegle 2:10 75:11

spell 153:5 154:23
spoke 68:13
spouse's 35:24
square 22:19
staff 84:6
stage 14:13 65:23
stand 125:21
  149:23
standard 15:24,25
standing 115:17
start 5:22 91:3,5
  152:25
started 47:16 85:1
  97:7 128:19
  138:23 144:10
  155:5
state 1:19 4:14
  45:9,18 46:3,13
  84:11 100:12
  157:2,5,21,21
stated 80:21
  150:17 151:16
statement 3:3,8
  64:16 68:25
  69:19 113:15
  145:10 151:21
statements 145:14
states 1:1,20 2:7,8
  67:2 95:25
  150:17
station 89:12
statuses 77:21
stay 155:23
staying 34:9
steady 84:19,23
stenographer's
  24:17
step 55:5
stepped 150:6
  152:1,6
steps 149:22
steward 27:21
  31:20 58:17
  96:25 97:3,11,20
  98:1 112:11,12
  118:11 145:1
sticker 27:14

stipulated 4:9,22
stipulation 1:17
STIPULATIONS
  4:8
stood 140:22
  149:21
stop 6:14 140:6
  151:15 152:14
stopped 147:15
storage 22:8,13,14
  22:16,16
store 49:24
straight 146:16,23
  147:3,9
straighten 146:12
  147:3
Street 1:21 2:4,9
  2:12
strike 26:8 31:6
  48:19 49:17
  64:15 66:18
  72:24 79:11
  81:19 118:19
  128:20 138:21
stuff 15:10 20:21
  22:9
Subj 3:14,16,22
subjected 107:23
  108:5 111:23
  112:9,16
subjects 73:14
submitted 14:9,11
  15:21 72:9,15,19
  94:1
subsection 126:25
subsequently
  53:18 77:5
  124:11
suffer 139:22
  140:3
Suite 2:4,12
summarizes
  148:15
summary 52:11
supervisor 28:4
  51:21 53:1,6,13
  53:15,17,19,21

53:24 54:2 56:25
  57:4,4,8,12 58:15
  58:23 59:6,9 60:4
  76:13 81:4,4,6,9
  82:22 99:5,8,15
  113:7,7 115:25
  135:4 137:17
  140:10
supervisors 56:25
  58:22 79:18,25
  99:11,20,23
  113:4 118:20,25
  119:1,14
supplied 26:19
  72:4
supply 47:3,5
supposed 78:9
  80:1 136:24
  141:7,23 155:8
sure 6:8 19:17
  26:15 29:6 30:6
  31:20 44:7 51:15
  54:12,13,16,16
  59:23 63:13
  79:21 92:25 93:7
  107:20 129:25
  130:12,20 155:19
surprised 142:18
Susan 99:12,13,14
swear 130:10
sworn 5:6 157:9
Symbyas 153:4,25
system 27:7 62:3,6
  62:8 63:2 64:18
S-Y-M 154:24
S-Y-M-B-Y-A-S
  153:6
S.W 2:12

**T**

take 6:15,24 7:2,5
  23:8 45:2 47:25
  49:3 57:3 61:14
  62:23 63:5 69:5
  75:8,8,10,11 82:8
  96:3 102:5
  104:23 108:1

Bernethia Johnson v. Jo Ann B. Barnhart, et al.                          10/23/2007
DEPOSITION OF BERNETHIA JOHNSON
Page 16

| | | | | |
|---|---|---|---|---|
| 110:1 140:4 | 30:12,23 39:24 | 127:4,18 134:12 | 17:8 19:5,7,10,12 | 103:8,12,17 |
| 143:2 145:16 | 40:1 43:4 55:5 | 143:18 150:6,9 | 20:14,22 22:2 | 104:5,8,13,18 |
| 149:22 151:24 | 58:6,8 60:6,8,9 | 152:2 154:17 | 25:22,24 29:15 | 105:4,11,24 |
| 154:15,22 | 65:20 68:5 69:2,8 | **telling** 77:13 81:8 | 29:15,16,24 | 109:2,7 111:15 |
| **taken** 1:16 4:11,13 | 69:25 70:22 | 118:10 122:11,16 | 31:14 41:16 | 122:2 |
| 46:9 104:15 | 74:17 85:17 | 123:3 | 42:16,22 44:11 | **thrown** 20:22 |
| 105:7 144:11 | 93:21 104:1 | **tells** 134:14 | 45:11 46:18 | 32:11 |
| **talk** 12:5,8,9,11,14 | 105:17 117:4,5 | **Tennessee** 33:8,12 | 47:24 48:6 51:6,9 | **Thursday** 3:22 |
| 12:19 13:1 37:22 | 139:23 151:3,5 | 33:17 35:10 | 52:1,22,23,23,25 | 94:15 125:11,13 |
| 38:4,14,24 39:10 | **talks** 16:17 119:4,5 | 44:16 119:4,5 | 53:8,11,12 54:15 | 125:15,18,24 |
| 40:24 41:4,11,12 | **Tamika** 86:16 | **term** 25:22 65:16 | 56:8 58:8 59:4,16 | 126:7,17 127:6 |
| 47:13 58:2,15,18 | **Tammy** 55:16,19 | 120:20,23 | 65:22 68:8,10 | 127:25 129:19,20 |
| 58:21 59:6,8,10 | 55:20 68:9 74:13 | **terminology** 65:13 | 71:19 72:1 77:13 | 137:22,24 |
| 59:12 60:10,14 | 74:14,19,22 | **terms** 60:3 | 77:14 82:9 85:14 | **Thursdays** 127:15 |
| 67:24 68:4 69:6 | 75:18,19 76:10 | **testified** 5:8 9:23 | 87:6 89:24,24 | **time** 3:24 4:2,18,19 |
| 69:16 70:4,5,13 | 76:16,18 79:4,4,7 | 11:2,12 | 92:8 95:13,19,20 | 5:15,20,23 6:13 |
| 72:11 75:18,22 | 79:11 86:17 88:5 | **testimony** 7:8 12:6 | 96:11,15 97:4 | 8:8 9:1,9,17 14:9 |
| 88:5,5,6,7,7,7,8,8 | **Tammy's** 77:14,14 | 12:7,10,16 13:8 | 102:24 105:5,23 | 20:14,14 22:11 |
| 88:9 105:10 | **Tamplin** 31:17,19 | 14:1 18:4 40:11 | 106:3,3,14 | 31:22 36:23 |
| 116:20 117:13 | 31:19,23 42:17 | 46:5 75:19 76:22 | 107:18,19 109:9 | 40:22,25 41:6,8 |
| 122:17,20 124:8 | 97:25 145:2 | 93:10 129:14 | 112:2,3,3,4,25 | 41:17 42:23 |
| 124:11 133:6 | 149:10 | 130:3 143:24 | 113:1,18,18,20 | 43:14 48:15 49:1 |
| 134:11,25 136:10 | **Tandy** 20:22 | 147:1 | 114:2,5,8,12,16 | 49:10,11,12,19 |
| 137:16 139:21 | **tape** 15:17,23,25 | **thank** 20:6 102:7,7 | 114:17 115:12 | 49:22,23 50:3 |
| 150:5 151:25 | 16:1,5 19:6,6,17 | **thereof** 157:16 | 116:4 117:19,22 | 57:5,14,18 58:3,3 |
| **talked** 12:23 31:22 | 21:19 32:17 43:8 | **thing** 6:23 9:7 | 118:4,15 119:21 | 58:10 62:9 65:1 |
| 38:5,5,16,22,23 | 43:10,12,14 | 14:19 30:3,24 | 120:10,16,21,23 | 66:25 67:15 76:7 |
| 38:24 39:2,3 40:6 | **tapes** 14:1,2,15,16 | 65:9,11,12 97:10 | 121:10,10 123:17 | 77:16 79:3 80:16 |
| 40:12,15,15,16 | 14:18 15:6,8,9,9 | 111:6 113:13 | 124:1,5 125:14 | 80:18 82:17,19 |
| 40:16,17,20,22 | 15:24 16:13 18:5 | 117:7 149:14 | 125:14,15 129:19 | 84:18 86:9 87:6 |
| 40:24,25 41:5,6,7 | 18:12,15 19:1,5 | **things** 13:11,24 | 130:11 134:17 | 88:16,17,19,20 |
| 41:11,17,22,23 | 19:21 21:22 | 15:12 20:25 21:3 | 135:21,25 137:18 | 88:22,24,24 89:5 |
| 42:1,18 58:9,13 | 32:12,17,19 | 21:5,25 22:8 | 141:19 144:21 | 89:9 93:2 96:8,8 |
| 58:25 59:5,16,21 | 43:22 44:1,4 | 23:25 24:8,18 | 150:4 152:12 | 96:13 97:2 98:4,7 |
| 59:23 65:3 68:1,7 | **tape-recorded** | 31:4 32:15 42:8 | 153:20 154:20 | 106:2 112:12 |
| 68:8,10 70:5 | 44:8 | 43:22 54:22 | **thinking** 30:7 50:3 | 122:4,4 123:6,6 |
| 71:19 75:24,25 | **team** 101:18,19,23 | 71:20 84:4,6 | 65:14,19 93:20 | 128:12,18,19,20 |
| 87:24,24,25 88:4 | **telephone** 43:24 | 87:11 92:24 | 115:8,8 136:13 | 128:25 131:1,2 |
| 88:4 116:23,25 | 85:12 | 103:24,25 104:1 | 142:6 | 131:16,18 132:6 |
| 117:1 118:4,8,9 | **tell** 6:1 7:24 14:24 | 104:2 105:18 | **Thompkins** 36:22 | 134:8 136:13 |
| 118:11,13 124:13 | 20:19 27:2 30:7 | 106:12 112:24,25 | **thought** 23:13 25:5 | 142:5 143:6,13 |
| 124:14 125:14 | 37:12 44:24 | 117:10,13 135:9 | 26:12 118:6 | 155:16,22 |
| 130:11 138:13 | 48:24 66:3 74:23 | 135:11 136:12 | 120:19 121:5 | **timely** 138:17 |
| 152:1 | 75:4 76:15,19,23 | 139:12 146:12 | 127:10 135:18 | **times** 9:8 11:1,6 |
| **talking** 8:10 11:7 | 77:2,10 79:3,6 | 153:21,24 155:7 | 141:5,19 | 58:7 59:17,20 |
| 12:13,16,25 | 80:8 90:8 117:9 | **think** 11:9 15:21 | **three** 17:18 19:6 | 89:20 91:12,13 |
| 23:25 25:7 30:10 | 118:2,6 120:19 | 16:2,4,12 17:2,3 | 59:17 96:21 | 93:10 |

**today** 5:15 7:21 8:11 12:6,7,8,10 12:15,16 13:8 14:1 18:19,21,23 21:17 23:12 32:25 34:4 43:2,6 105:5,23 156:2
**told** 27:22 28:7 32:14 74:23 75:19 76:1,4,16 76:19 77:11,12 78:4,24 79:2,5,7 110:4 117:6,8,17 117:20,23 119:2 119:3 120:5 124:23 125:17 127:10 136:24 142:12,17,20 143:22 147:12 150:6,25 152:1,3 152:11 154:23
**tomorrow** 105:10
**total** 8:15
**totally** 148:23
**touched** 24:1
**track** 62:9
**tracking** 62:5
**traffic** 11:25 12:3
**transcript** 6:5
**transcription** 5:23 157:11
**transcriptions** 21:18
**transcripts** 20:9,10 20:17
**transfer** 106:4,5 112:1
**transferred** 16:2 16:14 17:4 98:14 99:9,15
**transferring** 107:6
**traveled** 45:13 46:7
**traveling** 13:1
**Tresalyn** 29:20 38:24 39:22 40:16,25 41:1,5

41:11,11,22
42:15 119:16
121:17
**trial** 4:24
**tried** 59:10 109:15 119:23 120:23 154:23
**trouble** 76:4,18 134:17
**truck** 120:25
**true** 157:11
**trust** 42:19 76:20 76:24 77:1,4 117:9
**truth** 5:7,7,7 157:9
**truthfully** 153:18
**try** 20:10,15 43:21 43:25 44:4 48:20 69:22
**trying** 6:5 13:15 15:5 21:5 25:22 25:24 31:18 60:2 60:2 61:22 67:8 67:11 71:17 73:1 73:7 84:19 105:3 106:19 112:15 113:20 114:10,14 133:15 137:3
**Tuesday** 1:23 94:12 123:16,16 127:22 131:8,23 133:2 157:6
**turn** 9:10 48:10 111:6 129:3
**turned** 21:5,6
**turning** 20:25
**twice** 89:24,25
**two** 5:13 7:20 8:10 9:24 11:1,6,11,12 19:6 34:1,19 35:18 44:6,6 84:7 91:3,4,12,13 93:10 101:6 107:11,16 108:6 108:11,22,24 109:1,9 112:8,23 123:4,14,15

124:25 125:3
126:19 128:6
131:15 134:13
136:8,20 143:5
147:17,19
**two-bedroom** 22:19
**type** 6:11 16:15 17:3,25 24:17 25:25 27:22 45:23 47:11 145:14
**typed** 52:4 144:12
**types** 17:18 71:10
**typing** 67:13 144:11
**typist** 48:15,17 50:13 51:6,7,12 53:10,11

___

**U**

**unauthorized** 3:5 3:6 27:7
**Underneath** 27:13
**understand** 5:16 6:2 7:7,25 26:15 30:6,14 63:10,12 63:13 64:23 67:22 79:13 104:10,11 105:3 106:19 137:3 152:4,23
**understandable** 5:18
**understanding** 56:23 64:17 65:8 65:16 80:23 81:1 89:18 90:23 91:11 94:11 96:10 98:8 125:23 126:4
**union** 27:21,23 31:19 58:17,19 90:17,20 96:24 97:2,11,20,25 99:22 112:11,12 118:11 125:24

145:1,13
**United** 1:1,20 2:7,8
**University** 45:2,9 45:10,18 46:3,13
**upcoming** 85:19
**usually** 58:19
**U.S** 5:12 46:24

___

**V**

**V** 2:10
**Val** 40:15 88:7
**Valerie** 29:16,20 38:5,21,22 39:21
**various** 46:6,9 61:16 111:21 112:6
**vehicle** 8:14
**Veterans** 49:17 50:10
**Violations** 3:5,7
**vs** 1:8

___

**W**

**wait** 5:21,23 8:12 85:8 97:13 98:23 142:12,15,17 143:10,25
**walk** 63:5
**walked** 85:22 149:15
**walking** 142:14 143:3
**want** 26:15 34:8 39:9 42:1 47:13 47:19 51:25 54:11,15 63:8,12 69:13,18 70:6,10 76:18 85:19 93:7 94:9 96:2 102:5 103:3 111:14 125:7 133:20 134:9 142:8 151:24 152:2,25
**wanted** 63:19 72:12 91:15 96:16 119:3,4 123:4 135:9

150:4,18
**wanting** 122:17
**Warner** 39:2,7,18 55:16
**Warren** 54:23
**wasn't** 44:2,3 108:14 113:7 135:11 154:25
**water** 14:25 15:14 32:16
**Watkins** 86:16
**waved** 150:18
**way** 19:23 39:12 52:25 70:1,3 73:25 80:1 84:3,5 95:7,20 108:15 147:14
**ways** 111:23
**Wednesday** 1:24 92:14 94:12 123:16 125:11,18 129:20,22 131:8 132:2 152:18 157:7
**week** 41:6,7 58:7 59:17 82:14,15 84:5 90:2 122:25 123:4 139:4 142:23 143:1 150:17 151:2 154:20,20
**weekly** 58:22 59:17 83:21 84:15
**weeks** 84:7 122:2
**wench** 119:21,22 119:25 120:7,8 120:10
**wenches** 119:17 120:10
**went** 8:18,20 45:12 52:25 56:20 58:18 75:6 89:15 95:1 110:9 115:11 124:23 133:17 136:13,15 136:16,21 140:22

Bernethia Johnson v. Jo Ann B. Barnhart, et al.                    10/23/2007
DEPOSITION OF BERNETHIA JOHNSON
Page 18

141:1,9,16
142:19 144:3,7
145:2 146:8,15
146:17,18 147:14
147:17,19 149:5
154:25
**weren't** 115:10
**we'll** 6:15 7:5 20:5
47:25 49:3 75:10
75:11 105:10
140:5,6 151:15
**we're** 5:3 8:10 25:7
60:6,8,9 155:2,19
155:21
**we've** 117:22
**white** 108:13
**Wilder** 29:21
**William** 154:7
**Williams** 113:18
114:19 116:10,11
**windows** 86:21,24
**witness** 5:6 9:19
13:10 23:2,5
41:19,22,25 42:6
42:9,12 45:14
157:12
**WKUP** 67:3,4
**wondering** 9:13
136:20 146:1
**word** 33:16
**words** 127:13
**work** 3:22 25:8
38:15 58:19
60:17 61:14
64:11,15 67:3
73:8 76:8,10
81:20,20,22,22
81:24,24,25 82:7
82:10 83:25
88:10,21 89:9
90:2 91:16,22
92:14 94:1,13
98:11 103:9
104:14 105:16
109:4 111:1,8,15
111:17,18,24
112:3,16,20

118:5 123:4,8,13
124:8 125:2,3,10
125:15,18 126:6
126:18,20 127:5
127:15,24 128:2
128:5,21 129:17
129:19 130:7,9
130:12,25 132:12
132:18 133:17,23
134:1,6,7,9,13,15
134:21,22 135:1
135:24 136:2,5,8
137:5,7,14,22,24
138:8,10 139:9
139:17 141:3
143:20
**worked** 37:8 49:24
54:4,7,17,19,25
55:6,18 63:24
64:1,17 65:5,24
67:6 71:15,15
86:5 94:20 95:4
95:16 96:10
122:5,7,13 123:7
129:9 130:8
131:2,3 132:13
134:18 136:7
138:18,21 139:1
**Workflow** 3:11
**working** 39:25
47:16 50:9,25
55:12 60:4 61:4
61:20 62:1,22
63:1,3 65:1 82:3
82:5,11,25 112:9
121:23 122:1,11
122:16,21 123:12
123:15 124:12,25
128:19 131:7
132:20,21 134:18
135:13 137:11
138:3,13 139:5
140:1
**work-related**
58:11,16
**work-up** 77:19
78:15

**worse** 155:4,6
**wouldn't** 37:22
**write** 29:17,17
45:8 68:11
128:17 129:12
132:14 154:21
**writers** 52:5
**writing** 69:11
**written** 67:16
69:14 95:24
103:11 104:15
109:6 129:4
145:10
**wrong** 13:6 30:3
76:5 77:12
**wrote** 70:7 71:24
71:24 117:22

**Y**

**yeah** 9:5 12:14
23:2 25:11 26:22
30:18 34:10 42:6
43:5 52:21 57:20
60:14 64:22 65:2
68:10 75:15
81:17 88:20
89:10 93:16
94:18 96:4,22
100:24 108:20
117:12 119:9
131:4 139:24
141:15 146:4
**year** 28:4,6,6 51:13
89:20,22 91:12
91:13 93:10
97:24 112:2
116:6,8 154:2
**years** 8:13,25
34:16 35:18,19
36:2
**yesterday** 15:4
152:23
**York** 45:19 46:3
46:13
**youngest** 33:23
34:5,8,10,12,15
**you-all** 14:6 15:21

16:4 19:24 23:13
26:1 63:13

**#**

**#1** 26:25 27:2
**#10** 127:18 131:12
132:23
**#11** 128:9,12,25
129:21
**#12** 131:17 132:2,5
132:17
**#13** 145:6,7
**#14** 148:5,19
150:12 151:8
**#2** 28:11
**#3** 48:4,9 49:7
**#4** 64:5,8 83:22,24
**#5** 66:1,3 73:13,14
73:19 75:23
77:17 78:16
**#6** 80:4,6 81:11
82:20
**#7** 90:6 126:11,12
126:13
**#8** 91:19 94:7
**#9** 100:1,3 133:19

**1**

**1** 3:3 126:13
130:15,16
**1st** 54:1,8,18,18
**1,620** 22:18
**1/25/09** 157:23
**1/26/04** 3:15
**1:20** 96:20
**10** 3:21
**10/21/03** 3:3 27:15
**10/29/03** 3:13
**10/29/04** 28:16
**100,133** 3:20
**11** 3:23 108:21
132:9
**12** 4:2 129:7
130:17,21 131:24
**12th** 123:2
**12:15** 75:11,13,14
**12:20** 75:14 96:20

**12:30** 75:12,15
**127,131,132** 3:21
**128,129** 3:23
**13** 4:3
**13th** 127:22 131:13
132:24 133:2
**131** 1:21 2:9
**131,132** 4:2
**132** 33:17
**14** 4:5 36:2
**14th** 108:25 128:3
129:1,10,17,22
130:25 131:4
134:2 150:21
**145** 4:3
**148,150,151** 4:5
**15** 8:25 34:5,5,15
35:9
**15th** 47:8 127:25
128:3 129:1
131:1,4 134:2
**156** 157:10
**16** 22:18 35:19
130:14,15
**16th** 33:10 142:10
**17** 68:19 69:3,3,5,7
**17th** 47:8 157:17
**18** 108:21
**19** 49:1
**19th** 140:16 144:3
145:21 148:10
149:1
**1955** 33:10
**1973** 44:19
**1974** 47:8
**1980** 47:8,20 49:1
50:2
**1981** 50:2,4
**1990** 108:18
**1992** 48:12
**1993** 52:18
**1995** 36:7,11
**1997** 108:19,24
**1998** 52:23 97:7
**1999** 10:2,7,20
57:22

Bernethia Johnson v. Jo Ann B. Barnhart, et al.                    10/23/2007
DEPOSITION OF BERNETHIA JOHNSON

Page 19

---

**2**

**2** 3:6 130:14,17
**2nd** 100:7,8
**2:06-cv-397-WK...** 1:8
**2:07-cv-59-WKW** 1:8
**20** 34:4
**20th** 131:8,18,23 132:18 134:2
**20T45** 2:12
**2000** 53:23 54:8 57:22,22 102:4 115:25 121:15
**2002** 97:5,7 121:15
**2003** 27:10 62:12 62:14 66:7,13,24 70:10,15,22 73:2 77:6 78:10,12,14 79:13 108:25 115:24 116:3,5
**2004** 3:12 28:15 54:1,8,18 62:12 62:14 64:21 79:16,23 80:11 84:3,7 85:8 92:3 92:18 93:24 94:2 103:10,11,12 106:3 109:4,5,6 110:2,3,12 121:15,23 122:2 122:22,25 127:22 129:1,1,10,17,22 131:1,19,19 132:2,6,19 133:24 134:6 135:13,24 137:5 137:8,12 139:9 140:9,12,16 142:10 144:3 145:21 148:10 150:21
**2005** 10:5,8,8,10 10:16,17 11:17 54:18 98:15,20 98:22

---

**2006** 100:7,8 102:4 109:9
**2007** 1:23,24 99:2 99:3 152:18 157:7
**2008** 157:17
**207** 2:4
**21st** 48:12 131:9 131:19 132:2,6 132:19 134:2
**215** 2:4
**22** 34:4,21,22
**225** 35:14
**23** 1:23 34:5,20,23 157:7
**24** 152:18 157:7
**24th** 1:24
**25** 3:12 84:7
**25th** 64:21 84:3
**26** 92:3
**26th** 80:11 92:18 93:24 94:2
**26,27** 3:3
**27** 103:12
**27th** 109:6
**28** 3:6
**28th** 108:24
**29th** 66:7,13,23 78:12 79:12 103:11 109:5

---

**3**

**3** 3:10 90:22,23 91:2
**3rd** 98:14
**3/30/11** 157:23
**3:15** 96:21,22
**3:17** 152:16
**3:45** 4:4
**30303** 2:13
**31** 103:4,18 104:9 104:13,19 105:24 133:21
**33** 107:22 108:4 109:2
**36104** 2:5,9
**37** 111:17

---

**37421** 33:17

---

**4**

**4** 3:11 131:4
**4/13/04** 3:21
**4/14/04** 3:23
**4/15/04** 3:23
**4/19/04** 4:3,5
**4/20/04** 4:2
**4/21/04** 4:2
**4/26/04** 3:18 92:10 92:11
**4:00** 4:5
**436** 157:21
**45** 75:10
**48,49** 3:10

---

**5**

**5** 2:16 3:13 157:10

---

**6**

**6** 3:15
**6:30** 89:8,10
**61** 2:12
**6220** 33:16
**64,83** 3:11
**66,73,77** 3:13

---

**7**

**7** 3:17 99:3
**7th** 99:2

---

**8**

**8** 3:18 103:6 133:21
**80,81,82** 3:15
**85** 157:21

---

**9**

**9** 3:20
**9:17** 152:17
**9:28** 156:4
**9:30** 88:10,24
**9:50** 1:22
**90,126** 3:17
**91,94** 3:18
**93** 47:17,18,21 50:9

---

**98** 97:5
**99** 56:1