Page 157

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


BERNETHIA JOHNSON,

    Plaintiff,

vs.                  CASE NO. 2:06-CV-397-WKW
                        2:07-CV-59-WKW
MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY, et al.,

    Defendants.



* * * * * * * * * *


CONTINUATION OF THE DEPOSITION OF BERNETHIA

JOHNSON, taken pursuant to stipulation and agreement

before Mallory M. Johnson, Court Reporter and

Commissioner for the State of Alabama at Large, at the

U.S. Attorney's Office, 131 Clayton Street,

Montgomery, Alabama, on Tuesday, July 8, 2008,

commencing at approximately 9:16 a.m.


* * * * * * * * * *

Page 158

```
1              APPEARANCES
2  FOR THE PLAINTIFF:
3  Ms. Juraldine Battle-Hodge
   LAW OFFICES OF JURALDINE BATTLE-HODGE
4  Attorney at Law
   318 N. Decatur Street
5  Montgomery, Alabama 36104
6  FOR THE DEFENDANTS:
7  Mr. James J. DuBois
   UNITED STATES ATTORNEY'S OFFICE
8  MIDDLE DISTRICT OF ALABAMA
   131 Clayton Street
9  Montgomery, Alabama 36104
10 Mr. Richard Blake
   SOCIAL SECURITY ADMINISTRATION
11 OFFICE OF GENERAL COUNSEL
   61 Forsyth Street
12 Atlanta, Georgia 30303
13        * * * * * * * * * * *
14             STIPULATIONS
15       It is hereby stipulated and agreed by and
16 between counsel representing the parties that the
17 deposition of BERNETHIA JOHNSON is taken pursuant to
18 the Federal Rules of Civil Procedure and that said
19 deposition may be taken before Mallory M. Johnson,
20 Court Reporter and Commissioner for the State of
21 Alabama at Large, without the formality of a
22 commission; that objections to questions other than
23 objections as to the form of the questions need not be
24 made at this time but may be reserved for a ruling at
25 such time as the deposition may be offered in evidence
```

Page 159

```
1  or used for any other purpose as provided for by the
2  Federal Rules of Civil Procedure.
3        It is further stipulated and agreed by and
4  between counsel representing the parties in this case
5  that said deposition may be introduced at the trial of
6  this case or used in any manner by either party hereto
7  provided for by the Federal Rules of Civil Procedure.
8        * * * * * * * * * * *
9        COURT REPORTER: Usual stipulations?
10       MS. BATTLE-HODGE: Yes.
11       MR. DUBOIS: Do you want to read and sign?
12       MS. BATTLE-HODGE: Usual -- well, do you want
13 to read and sign?
14       MR. DUBOIS: Well, it's up to Ms. Johnson if
15 you want her to read and sign it. I think last time
16 you declined.
17       MS. BATTLE-HODGE: I did. The whole
18 deposition.
19       MR. DUBOIS: Yeah. Just read it through,
20 looking for grammatical errors. You get an errata
21 sheet.
22       MS. BATTLE-HODGE: I usually don't, but if
23 you want to, you can. For grammatical errors? I know
24 what you're saying.
25       MR. DUBOIS: You don't have to decide now.
```

Page 160

```
1  You can let us know at the end of the deposition.
2              BERNETHIA JOHNSON
3        The witness, having first been sworn to speak
4  the truth, the whole truth and nothing but the truth,
5  testified as follows:
6              EXAMINATION
7  BY MR. DUBOIS:
8    Q.  Now, Ms. Johnson, this is a continuation of a
9  deposition in two lawsuits you had filed that we began
10 on October 23rd and 24th, 2007. You've just been
11 sworn in again. I'm going to repeat some of the basic
12 ground rules since it's been a while. First, I'm
13 going to try to ask questions that are clear. If you
14 don't understand them, please let me know; I'll
15 rephrase them or I'll repeat them. If you answer the
16 question or don't ask me to rephrase, I'll assume you
17 understand it. Is that okay?
18   A.  Yes.
19   Q.  And when I'm asking a question, please wait
20 until I'm finished before you answer so we don't talk
21 over each other at the same time. I'll try to wait
22 until you're done with your answer before I ask
23 another question. All right?
24   A.  Yes.
25   Q.  Another thing is answering questions --
```

Page 161

```
1  you're doing it good so far -- say yes or no. Don't
2  shake your head. The court reporter has to get the
3  answers down, so verbalize the answers.
4        And finally, breaks. I'm fine with breaks. Any
5  time you need one, just please let me know. The only
6  thing I ask is that if I have a question pending on
7  the table, answer it, and then I'll let you take a
8  break.
9    A.  Okay.
10   Q.  Now, are you aware of any reason today that
11 you will not be able to give complete and honest
12 answers to the questions I'm asking you?
13   A.  No.
14   Q.  Did you take any medication this morning?
15   A.  Across the counter medication but that's for
16 hot flashes. And I've been taking that for a while.
17   Q.  Okay. Do you know the name of that over-the-
18 counter medication you took?
19   A.  It's Black --
20       MS. BATTLE-HODGE: Black cohosh.
21   A.  Cohosh. I was going to say what, but I knew
22 it wasn't -- black cohosh. So you're familiar with
23 that. Okay.
24   Q.  Is that the only medication you took this
25 morning?
```

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/8/2008
DEPOSITION  OF BERNETHIA JOHNSON

3 (Pages 162 to 165)

Page 162

1    A.  Yes.
2    Q.  All right.  Are you currently taking any
3  prescription medication?
4    A.  I take Prevacid.
5    Q.  Is that the only prescription medication
6  you're currently on?
7    A.  Yes.  I wanted to make sure everything else
8  was out of my system when I come here.
9    Q.  Now, previously, I believe, on October 24th
10  you testified you were taking Cymbriax; is that right?
11    A.  Some what?
12    Q.  Cymbriax?
13    A.  Oh, that's correct.
14    Q.  Okay.  Have you stopped taking that
15  medication?
16    A.  Yes.
17    Q.  When did you stop taking it?
18    A.  The day I left here.
19    Q.  Okay.  So October 24th is the last day you
20  took that medication?
21    A.  If that's the day I left here, yes.
22    Q.  Have you been to the doctor who prescribed it
23  since that time?
24    A.  No.
25    Q.  Have you been to any doctors since the day

Page 163

1  October 24th, the last -- day of our last deposition?
2    A.  I can't recall.  If I've gone -- I know I
3  haven't gone to one since I've been in North Carolina
4  but I can't recall if I've gone to -- I've had medical
5  check-ups and things like that.  So yes, I have gone
6  to doctors.
7    Q.  Okay.  Since October 24th you've had some
8  medical check-ups?
9    A.  I've had some medical check-ups.  I know I
10  did prior to leaving Chattanooga, Tennessee.
11    Q.  Okay.  Do you know what doctors you went to?
12    A.  No.  No, I don't.
13    Q.  Do you know approximately -- when did you
14  leave Chattanooga, Tennessee?
15    A.  December 20th, 2007.
16    Q.  All right.  And who was the doctor who had
17  prescribed the Cymbriax?
18    A.  Dr. Smith, I think is -- I think that's his
19  name.
20    Q.  And were you also seeing -- were you also
21  seeing a Dr. Ray?
22    A.  Yes.
23    Q.  Okay.  Did you go to either Dr. Smith or
24  Dr. Ray for that, the medical check-ups you testified
25  about that

Page 164

1    A.  I saw Dr. Ray.  I'm glad you said that.  I
2  did see Dr. Ray.  I continued to see Dr. Ray up until
3  when I left Chattanooga, Tennessee.
4    Q.  Okay.  How many times did you see him between
5  October 24th --
6    A.  I don't know how many times.
7    Q.  Did he -- was he the one that prescribed the
8  Cymbriax?
9    A.  Dr. Smith.
10    Q.  Dr. Smith had.  Okay.  Did you ever go see
11  Dr. Smith?
12    A.  No.  Not that I can recall.
13    Q.  Okay.  Did you take -- did any doctor
14  prescribe any medication to replace the Cymbriax?  Did
15  you switch to another medication?
16    A.  No.  I didn't want to take anything after
17  that.
18    Q.  Did you switch to another medication?
19    A.  I just wanted to make sure that the
20  medication was out of my system when I came back to
21  you all.
22    Q.  Do you know what dosage of Cymbriax you were
23  taking?
24    A.  No.
25    Q.  All right.  So besides Prevacid, are you

Page 165

1  taking -- you're not taking any other prescription
2  medication at this time?
3    A.  No.
4    Q.  Have you taken any in the past month?
5    A.  I've not taken any prescribed medication
6  since I last left here to the best of my knowledge.
7    Q.  Okay.  And you believe you saw Dr. Ray up
8  until the time you left for North Carolina on
9  December 20th, 2007; at least you saw him at least
10  once before that time?
11    A.  To the best of my knowledge that is correct.
12    Q.  Since you moved to North Carolina, have you
13  seen any health care providers?
14    A.  Not that I'm aware of.  Not that I can
15  recall.
16    Q.  Now, have you spoken to anybody about the
17  testimony you gave at your deposition besides your
18  attorney?
19    A.  Not that I'm aware of.
20    Q.  Now, I received a supplemental set of
21  documents from your attorney last week and another one
22  today.  Have you provided to your attorney all of the
23  documents you have in your possession that relate to
24  the allegations in your lawsuit?
25    A.  To the best of my knowledge, I have provided

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                      7/8/2008
DEPOSITION  OF BERNETHIA JOHNSON

4 (Pages 166 to 169)

<table>
<tr><td>

Page 166

1  everything that I have.
2      Q.  At your last deposition you mentioned you had
3  a storage facility in Chattanooga.  Is that -- have
4  you emptied that storage facility?
5      A.  That is correct.
6      Q.  And when you emptied it, did you search to
7  see if you had any documents relating to your
8  employment at the Social Security office in
9  Montgomery?
10     A.  I have searched it since I've left that
11 storage, yes, to see if I have any.
12     Q.  And you gave everything to your attorney?
13     A.  To the -- yes, everything that I had.
14     Q.  Now, you also produced before, and a couple
15 more last week, some microcassettes and some regular
16 sized cassette tapes?
17     A.  Yes.
18     Q.  Have you given to your attorney all the
19 cassette tapes, both sizes, that relate to your
20 employment at the Montgomery Social Security office?
21     A.  Yes.  To the best of my knowledge, I have
22 given everything that I had regarding that.
23     Q.  Okay.  Now, how did you transfer the
24 microcassettes to the regular size tapes?
25     A.  Micro.  Oh.  Just using a tape recorder.

</td><td>

Page 168

1      A.  I may have since I left.  I'm not certain.  I
2  cannot recall.  But --
3      Q.  Okay.  Now, you produced, I believe, a
4  microcassette recorder.
5      A.  Okay.
6      Q.  Your attorney provided one last week.
7      A.  Okay.
8      Q.  Did you start using a digital tape recorder
9  after that one?
10     A.  I don't -- I think I had a digital.  I don't
11 recall.  I had a digital tape recorder at one time,
12 and that messed up.  Then I went -- I purchased
13 another one that messed up.  Then -- I don't know at
14 what point, but then I went to just a regular one that
15 used the tapes.
16     Q.  You went back to a microcassette recorder?
17     A.  I was going and forth.  So I can't say at
18 what point which was used.
19     Q.  Okay.  But currently you don't have one on
20 you?
21     A.  That is correct.
22     Q.  Or in your purse?
23     A.  That is correct.
24     Q.  Now, I understand your address has changed
25 since we last talked.  You've left Chattanooga?

</td></tr>
<tr><td>

Page 167

1      Q.  Did you play the microcassette and put it
2  next to a regular tape recorder?
3      A.  Yes.
4      Q.  Now, have you tried to transcribe any of
5  those tape recordings?
6      A.  No.
7      Q.  And have you given to your attorney all legal
8  pads, notebooks, any piece of paper that you took
9  notes on relating to any of the allegations in your
10 complaint?
11     A.  To the best of my knowledge I have.
12     Q.  Okay.  And when you say to the best of your
13 knowledge, is there anywhere else that you could check
14 that you haven't checked?
15     A.  No.
16     Q.  Now, do you have a tape recorder with you
17 today or a digital recorder?
18     A.  No, I do not.
19     Q.  When was the last time you taped any
20 conversation or telephone call with a digital or tape
21 recorder?
22     A.  Since I left Montgomery.
23     Q.  Okay.  So you never tape-recorded any
24 conversations after you left the Montgomery Social
25 Security office?

</td><td>

Page 169

1      A.  That is correct.
2      Q.  Where do you currently live?
3      A.  Gorman, North Carolina.
4      Q.  And what is your address there?
5      A.  25 -- 2125 Dartmouth Glen Drive.
6      Q.  Dartmouth Glen Drive.  All right.
7      A.  Apartment 106, Gorman, North Carolina.
8      Q.  Okay.  Are you renting that apartment?
9      A.  That is correct.
10     Q.  And did anyone share that apartment with you?
11     A.  Yes.  My girls.
12     Q.  Okay.  Your daughters?
13     A.  Yes.  And I say my daughters because my
14 oldest daughter come over and stay whenever she want
15 to, so I call it sharing it.
16     Q.  Okay.
17     A.  Okay.
18     Q.  Now, you're currently employed?
19     A.  No.
20     Q.  All right.  What date did you retire from the
21 Social Security Administration?
22     A.  November 30th, 2007.
23     Q.  Do you know what percentage of your income
24 you still get as part of that retirement?
25     A.  No.

</td></tr>
</table>

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                                    7/8/2008
DEPOSITION   OF BERNETHIA JOHNSON

Page 170

1    Q.  Have you looked for any jobs since you
2  retired?
3    A.  I recently did put in some applications.
4    Q.  Where did you apply to?
5    A.  I -- I couldn't tell you.  I was just putting
6  in applications.
7    Q.  Have you gotten any income other than your
8  Social Security payments since you retired?
9    A.  No.
10   Q.  All right.  Now, I want to direct your
11  attention back to April of 2004, which is the time
12  period we were at when we stopped last October talking
13  about the allegations.
14   A.  Okay.
15   Q.  When we took a break, we had just talked
16  about a meeting you held with Paul Johnson, Cynthia
17  Lamar and Linda Tamplin in Ms. Lamar's office.
18   A.  Okay.
19   Q.  On April 19th, 2004.  Do you recall that
20  meeting?
21   A.  I recall meeting with them.  I cannot recall
22  the date.
23   Q.  Okay.  Do you recall after that particular
24  meeting coming in to work the following day and going
25  to Paul Reams to make a complaint against Paul

Page 171

1  Johnson?
2    A.  I recall going and making a complaint against
3  Paul Johnson, yes.
4    Q.  What do you recall -- well, when you made
5  that complaint against Paul Johnson, Lynda Hall was in
6  Paul Reams' office as well?
7    A.  Let me ask you, let's go -- if you don't
8  mind, take me back to where we were in the meeting
9  with Cynthia Lamar, Paul Johnson, Linda Tamplin, and
10  myself.  What was that question you asked me?  Or -- I
11  can't recall what all was said -- what I said or
12  what questions were asked from the first time I was
13  here or anything like that.
14   Q.  Okay.  I'm moving on to another meeting.  But
15  that meeting on April 19th, 2004, you don't recall
16  anything about it?
17   A.  Yes, I do.
18   Q.  Okay.
19   A.  But I don't recall what was said.
20   Q.  Well, what do you recall about it now?
21   A.  That I went in to get -- I went in to ask for
22  some cases.
23   Q.  Okay.  And who was with you at the time?
24   A.  I was by myself.
25   Q.  Okay.  And what happened at that point?

Page 172

1    A.  I opened the door and I asked Cynthia for
2  some more cases, and Paul Johnson was in there.
3    Q.  Okay.  And then what happened?
4    A.  And Paul Johnson, he was -- I opened the
5  door.  Paul Johnson was sitting to the left of the
6  door, the chair at the far end.  And when I asked
7  Cynthia for some cases, because Cynthia was the
8  supervisor that was in control of issuing out work-up
9  cases, I don't recall what day that was but it was not
10  on a Friday.
11   And the reason I went to Cynthia on a day that
12  was not on a Friday is because Cynthia had just told
13  me the day before or just a few days before that I did
14  not have to wait on -- for Fridays to get cases.  So
15  that was why I went there and asked her for more
16  cases.  So, then, when I asked her for cases, Paul
17  Johnson started saying, Bernethia, you know you're
18  supposed to get cases on Fridays.  And I said, okay,
19  no problem, no problem.  And I don't need cases, and I
20  left.
21   Q.  Okay.  Did you subsequently go back to
22  Cynthia Lamar's office with Lynda Hall?
23   A.  I went to my desk and I started write --
24  typing up what happened, and when I was typing up what
25  happened, Paul Johnson came to my desk.  I'm sitting

Page 173

1  at my desk, and so my back is to the entrance of my
2  office.  Now, when Paul Johnson came, he stood right
3  outside of the entrance of my office, and I don't know
4  how long he had been there.  But Paul said, are you
5  writing about us?  I did not even turn around.  I just
6  stopped talking -- stopped typing and I said, yes, I
7  am.  He said, you come to Cynthia's office.  I said, I
8  have to go to the restroom.  He said, well, after you
9  go to the restroom, you come to Cynthia's office.  I
10  said, I'll be there, or something.  I'm not quoting
11  this but --
12   Q.  So at that point --
13   A.  -- I said something to the point that after I
14  go to the restroom, I'll be there at her office.  Went
15  to the restroom, then I stopped by -- that wasn't
16  Linda Tamplin.  I don't think that was Linda Tamplin.
17   Q.  Was it Lynda Hall?
18   A.  That was Lynda Hall.
19   Q.  Okay.  And then what happened?  You stopped
20  by Lynda Hall's --
21   A.  I stopped by --
22   Q.  -- cubicle?
23   A.  -- Lynda Hall's office.
24   Q.  Office.
25   A.  And I asked Lynda Hall if she could

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/8/2008
DEPOSITION OF BERNETHIA JOHNSON

6 (Pages 174 to 177)

---

Page 174

1  accompany -- no, I asked Lynda could she call
2  Cynthia's office and ask Cynthia if I came there to
3  ask for cases. And Lynda called, and Cynthia told
4  Lynda I did not come and ask for cases. I asked Lynda
5  to ask Cynthia if Paul Johnson was still in her
6  office. And Paul Johnson was still in her office, and
7  Lynda -- and Cynthia said, Tell Bernethia to come to
8  my office so -- and we'll get the situation straight,
9  or something to that effect. Lynda and I then went to
10 Cynthia's office.
11     Q.  Okay. And what do you recall --
12     A.  On the way there, I told Lynda that --
13 because I knew that they were upset, and I did not --
14 I was -- I was upset. I did not like the way he --
15 Paul Johnson talked to me. I told Lynda that I was
16 not going to say anything in the meeting.
17     MS. BATTLE-HODGE: May I interject? Just --
18 just allow Mr. Dubois to ask questions and you just
19 answer just the questions he asks.
20     THE WITNESS: Okay.
21     MS. BATTLE-HODGE: Instead of giving a
22 narrative.
23     THE WITNESS: Okay. That's fine. Thank you.
24     MS. BATTLE-HODGE: Okay.
25     Q.  All right. When you got to Cynthia Lamar's

---

Page 175

1  office with Ms. Hall, do you recall what took place at
2  that meeting?
3      A.  Yes.
4      Q.  Okay. What do you recall taking place?
5      A.  We knocked on the door. We went inside. I
6  sat at the -- well, Lynda sat at the chair right next
7  to the door, and I sat next to Lynda. Paul Johnson
8  had moved from the far end and he was now sitting to
9  the right against the wall.
10     Q.  Now, you didn't speak at that meeting,
11 correct?
12     A.  That is correct.
13     Q.  All right. And let me give you -- this is
14 Defendants' Exhibit #14. This is a memo that Lynda
15 Hall prepared about that meeting.
16     A.  Okay.
17     Q.  Can you take a look at that and tell me if
18 that memo accurately describes the meeting that took
19 place at that point in Cynthia Lamar's office?
20     A.  Okay. Okay. I'm sorry. But you told me to
21 take a look at this and do what?
22     Q.  The one question I have is does it accurately
23 reflect the meeting that took place in Cynthia Lamar's
24 office?
25     A.  No.

---

Page 176

1      Q.  What is inaccurate about Lynda Hall's
2  memorandum?
3      A.  Right here where it says Paul Johnson stated
4  that the meeting was regarding ADS. That is
5  inaccurate. I do not recall that happening.
6      Q.  You don't remember ADS coming up at the
7  meeting?
8      A.  No, I do not.
9      Q.  Do you remember Paul Johnson stating what
10 that meeting was about?
11     A.  I'm thinking -- no.
12     Q.  Okay. What else is inaccurate, if anything,
13 about Defendants' Exhibit #14?
14     A.  He -- the statement, he stated that he asked
15 Bernethia last week if she wanted to participate in
16 ADS and she waved him off and did not answer. That is
17 incorrect. I do not recall that.
18     Q.  Okay. What else is incorrect about that
19 statement? You don't recall him asking you?
20     A.  I don't recall him asking me.
21     Q.  Okay. What else about Defendants'
22 Exhibit #14?
23     A.  Also -- well -- okay. Now, what was your
24 statement?
25     Q.  I wanted to know the next thing, if anything,

---

Page 177

1  that's -- that you believe is inaccurate about
2  Defendants' Exhibit 14.
3      A.  The next statement, I do not recall that.
4      Q.  Now, if you don't -- I guess what I'm asking
5  is when you read the memo, the things you believe are
6  inaccurate as opposed to things you don't remember.
7  This is a general summary of a meeting. What I'm more
8  looking for is things -- you're saying that did not
9  happen, this is inaccurate, it's wrong as opposed to
10 you don't remember. Do you see what I'm saying?
11     A.  What are you asking me to do?
12     Q.  I'm asking you when you read Defendants'
13 Exhibit #14, is there anything in there you believe is
14 wrong --
15     A.  Afternoons. That's what --
16     Q.  -- that you don't believe happened, as
17 opposed to if you don't remember everything that took
18 place in the meeting, that's one thing.
19     A.  Okay.
20     Q.  But reading that, are there things you read
21 and say, well, that didn't happen, Ms. Hall got that
22 wrong?
23     A.  That is correct. That's what I was doing.
24 The things I was saying, it did not happen.
25     Q.  You're saying Mr. Johnson did not bring up

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                                7/8/2008
DEPOSITION OF BERNETHIA JOHNSON

7 (Pages 178 to 181)

---

Page 178

1  ADS?
2      A.  That is correct.
3      Q.  Okay.  What else --
4      A.  He did not bring up -- he did not bring up
5  ADS.
6      Q.  What else about that memorandum are you
7  saying is incorrect in anything?
8      A.  He did not explain that the ADS rules states
9  that you're entitled to one day off per week with one
10  extra day.  No.  The next statement.
11     Q.  Which is?
12     A.  He explained the ADS rules states that you're
13  entitled to one day per week with one extra day per
14  week the week following your tour at the front desk.
15     Q.  Okay.  So you don't believe or don't recall
16  ADS coming up at all at that meeting?
17     A.  That is correct.
18     Q.  Okay.  So what else about that memorandum?  I
19  know there's a whole paragraph on ADS.
20     A.  He stated -- oh, the next statement is -- he
21  did state.  So I don't have to --
22     Q.  Okay.  Which one do you remember him saying?
23     A.  He stated that you must request your cases on
24  Fridays.
25     Q.  Okay.  You remember that taking place.  Okay.

---

Page 179

1  Go further down.  Is there anything else in that
2  memorandum you believe is inaccurate?
3      A.  It is -- I'm still on the same statement.
4  The part that is inaccurate, but that Cynthia did
5  offer to pull cases, and Bernethia declined.
6      Q.  What about that statement?
7      A.  The statement where it says that Cynthia did
8  offer to pull cases.
9      Q.  And Bernethia declined.  You don't remember
10  Paul Johnson saying that?  Can I see Defendants'
11  Exhibit #14?
12     A.  Cynthia did not offer to pull cases.
13     Q.  Now, previously -- I'm sorry.  After you got
14  this memorandum, Defendants' Exhibit #14 from Lynda
15  Hall, did you ever go talk to her about this paragraph
16  and tell her, I don't think this is accurate?
17     A.  To the best of my knowledge, I -- I have gone
18  and -- I can't recall.
19     Q.  In this particular instance, you don't recall
20  any conversation with Lynda Hall to tell her you
21  didn't think this accurately summarized what took
22  place in this meeting?
23     A.  I -- I have to answer I may have, because --
24  I may have.
25     Q.  Okay.  Well, if you say you may have, what

---

Page 180

1  makes you think you may have?
2      A.  Because I've gone to Lynda before, and I
3  try -- I'd say, Lynda -- I said, Lynda, this is not
4  what was said in the meeting.  And I explained to her
5  what was said and explained to her why I know it was
6  said.  So at that point, I would not go back to
7  them -- I'm saying them, Lynda Hall or Linda Tamplin,
8  to try to correct anything.
9      Q.  But on this particular meeting, you don't
10  know whether or not you spoke to her?
11     A.  I can't recall if I went back to her.
12     Q.  And do you know whether this -- this
13  reference to ADS, are you saying this was not
14  discussed before this meeting like at a previous
15  time?  I mean, reading this paragraph, are you reading
16  it saying that this is something that all took place
17  at this meeting on April 19th, or Paul Johnson
18  summarizing stuff that took place previously?  You see
19  what I'm saying?
20     A.  Well, what I'm saying --
21     Q.  Previously, you had spoken to Paul Johnson
22  about ADS, right?
23     A.  Thank you.
24     Q.  Before this meeting?
25     A.  No.  I had not -- I'm going to say yes.

---

Page 181

1      Q.  Okay.  And you understood that ADS, the way
2  it worked is you get one day off per week and then an
3  extra day per week following when you work a full
4  month at the front desk?
5      A.  That is not -- okay.  Ask me again, please.
6          MR. DUBOIS:  Would you repeat the question?
7          (The court reporter read the
8           pending question.)
9      A.  That was not the way that the ADS was set up
10  by the union agreement as -- by the union and
11  management.
12     Q.  At what point in time?
13     A.  At what point in time what?
14     Q.  Okay.  Strike that.  What is inaccurate about
15  that statement?
16     A.  The inaccurate part is where it talked about
17  working one -- getting one extra day after you work
18  the front desk.
19     Q.  Okay.  That was not -- previously at out last
20  deposition we talked, you said that was the policy.
21  If you worked the front desk for a month, the
22  following month you get an extra day.  And I think
23  there's even an allegation to that effect in the
24  complaint.  So you're saying that's not accurate?
25     A.  I'm saying that's not the way the policy of

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/8/2008
DEPOSITION  OF BERNETHIA JOHNSON

8 (Pages 182 to 185)

Page 182

1  the ADS worked.
2     Q.  What do you mean by that?
3     A.  Paul -- Paul -- to the best of my knowledge,
4  Paul Reams is the one that add that stipulation.  That
5  was not an agreed upon procedure that AFGE members and
6  management members at the regional level or whatever
7  level it is that they describe what procedures were
8  followed, that was not the way it was supposed to have
9  been.
10    Q.  Okay.  You're saying the union agreement that
11 set forth ADS for legal assistance just provided for
12 one day a week, Monday, Tuesday or Wednesday.  And
13 then the extra day following the month was something
14 that was adopted at a local office, not in the union
15 contract.  Is that just a summary of what you're
16 saying?
17    A.  I am not saying that the union agreement and
18 management agreement is saying that all we could work
19 was one day.  That's not what I'm saying.  But what I
20 am saying is that -- that to get an extra day after we
21 work the front desk, that was implemented by Paul
22 Reams.
23    Q.  Okay.  Let me go back to Defendants'
24 Exhibit #14.  There's three sentences at the bottom.
25 Can you tell me if you believe any of those three

Page 183

1  sentences at the end of that memo are inaccurate?
2     A.  Are inaccurate?
3     Q.  Yes.
4     A.  Not that I recall but are inaccurate.
5     Q.  Okay.  You don't believe they're inaccurate?
6        MS. BATTLE-HODGE:  That you don't believe are
7  accurate.
8        MR. DUBOIS:  Yeah, I think I have a double
9  negative.
10    A.  That's what I'm sitting up here going, double
11 negative, what am I supposed to say?
12    Q.  Okay.  I'm going to strike that.
13    A.  Okay.
14    Q.  Do you believe those last three sentences are
15 accurate?
16    A.  The statement here, Cynthia stated that
17 Bernethia replied that she will not go home.  That is
18 accurate.
19    Q.  Okay.  The next sentence.
20    A.  Paul stated that Bernethia left not wanting
21 any cases.  That is accurate.
22    Q.  Okay.  Next sentence.
23    A.  He stated that there will be no exceptions
24 such as sickness, but she would have to follow
25 procedures.  I can't recall that.

Page 184

1     Q.  Okay.  How about the last sentence?
2     A.  Bernethia did not speak during the meeting
3  but acknowledged to me that she did not want any more
4  cases.  And I let Paul and Cynthia know when they
5  asked Bernethia.  I'm trying to find the way to answer
6  this question because there's more to it than just
7  this.
8     Q.  Well, take the first part.  Bernethia did not
9  speak during the meeting.  That part is accurate,
10 right?
11    A.  That is accurate.
12    Q.  Acknowledged to me -- this being Lynda
13 Hall -- that she did not want any more cases.  Did you
14 let Lynda Hall know that you didn't want any more
15 cases?
16    A.  What I don't understand or I have to get
17 clarity on is, is this saying that in that meeting
18 while we sat in the presence of everyone that this
19 statement was made.
20    Q.  Okay.  I believe this came up in your last
21 deposition.  Your recollection was you asked to step
22 into the hallway.  You spoke with Lynda Hall in the
23 hallway --
24    A.  That is correct.
25    Q.  -- and told her, Tell them I don't want any

Page 185

1  more cases; have a nice day?
2     A.  Yes.  That is correct.
3     Q.  And she went in and did she say that to them?
4     A.  She did not go -- I think she just stood out
5  in the hall and said --
6     Q.  And said it?
7     A.  Yes.
8     Q.  Okay.  And was that the end of the meeting?
9     A.  That was the end of the meeting.
10    Q.  All right.  Is there anything else you recall
11 from the meeting, this April 19th meeting that's not
12 in this memo?  I know we went through this and you
13 told me what you believe was accurate.  Is there
14 anything else that took place that you believe should
15 have been in this memo that isn't?
16    A.  Yes.
17    Q.  Okay.  And what is that?
18    A.  When Lynda and I knocked on the door and we
19 were invited in, Paul Johnson saw Lynda and he made a
20 statement.  He said, Oh, so this is the way it's going
21 to be.  Okay.
22    Q.  Anything besides that?
23    A.  That was not in that statement.  We took our
24 seats.  And then Paul started talking about me having
25 to ask for cases on Fridays.

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/8/2008
DEPOSITION  OF BERNETHIA JOHNSON

---

Page 186

1    Q.  Okay.  Anything else?
2    A.  And that was it.  Oh, I will -- okay.
3    Q.  Did he ask you during the meeting if you
4  wanted more case?
5    A.  I recall them saying, Now, if you want more
6  cases, we'll give you more cases.  I recall that.
7    Q.  Now, after this meeting on April 19th, do you
8  recall coming in the following day and going to Paul
9  Reams to make a complaint against Paul Johnson, or
10  about Paul Johnson?
11    A.  I have to make a -- okay.  No, I probably
12  can't say it.
13    Can I talk to you about something?
14      MS. BATTLE-HODGE:  Yeah.  Can we take a
15  break?
16      MR. DUBOIS:  Yeah, let's take a 30-minute
17  break.
18      MS. BATTLE-HODGE:  We need 30 minutes?
19      MR. DUBOIS:  No.  I meant 30 seconds.
20      (Brief recess)
21    Q.  All right.  Back on the record.  We just took
22  a break, and I think you had something you wanted to
23  add to the record about Defendants' Exhibit #14 and
24  the meeting you held on April 19th.  Is there
25  something?  You believe we discussed everything you

---

Page 187

1  recall about that meeting?
2    A.  For -- for that day, yes.
3    Q.  All right.  So April 20th, the next day, do
4  you recall coming in -- you were on ADS that day --
5  coming into the office and going to speak to Paul
6  Reams about Paul Johnson?
7    A.  That is correct.
8    Q.  And was that meeting in Paul Reams' office?
9    A.  That is correct.
10    Q.  And was Lynda Hall as union rep present?
11    A.  Yes.
12    Q.  Did you ask her to attend?
13    A.  Yes.
14    Q.  Did you ask her to take notes?
15    A.  I don't recall her -- no.
16    Q.  Is it generally the union rep's role to take
17  notes at meetings?
18    A.  Yes.
19    Q.  Now, you tape-recorded this meeting in Paul
20  Williams' office, right?
21    A.  Yes.
22    Q.  And I believe you produced a copy of that
23  tape?
24    A.  I don't know what all I produced.
25    Q.  Okay.  Did you use a microcassette recorder

---

Page 188

1  at that time?
2    A.  I don't -- I can't say which one it was.
3    Q.  Did you place the recorder on Paul Reams'
4  desk or in the open so --
5    A.  No.
6    Q.  Why not?
7    A.  Because I did not want them to know that I
8  was recording the meeting.
9    Q.  And why did you not want them to know you
10  were recording the meeting?
11    A.  Because I wanted the true them to be seen --
12  heard.
13    Q.  And you're suggesting that it wouldn't be the
14  true them if they knew it was being recorded?
15    A.  Possibly.
16    Q.  But you knew it was being recording?
17    A.  Yes.
18    Q.  Were you trying to be the true you?
19    A.  Yes.
20    Q.  Wouldn't putting it in the open have produced
21  a better quality recording?
22    A.  Yes.
23    Q.  Were you not interested in getting the best
24  quality recording you could?
25    A.  That's not correct.  That's not true.

---

Page 189

1    Q.  What was your purpose of recording it,
2  period?
3    A.  What was my -- management -- I had gone
4  through so much with management that it was getting
5  worse.  And the purpose of my recording it, is that
6  what you were saying?
7    Q.  Yes.
8    A.  For protection.
9    Q.  Okay.  What kind of protection?
10    A.  For me as well as for them.
11    Q.  And you believe this protection for you and
12  for them would be better if you secretly recorded it
13  as opposed to recording it in the open so --
14    A.  That is correct.
15    Q.  -- everyone knew about it.  Let me finish --
16  so everyone knew about it?
17    A.  So what?
18      MR. DUBOIS:  Would you repeat the question?
19      (The court reporter read the
20          pending question.)
21    A.  I felt there was --
22      (Off-the-record discussion)
23    Q.  Go ahead.
24      THE WITNESS:  Read that again, please.
25      (The court reporter read the

Page 190

1           pending question.)
2     A.  That is correct.
3     Q.  Did anyone suggest you secretly tape-record
4  this meeting?
5     A.  Not that I know of.
6     Q.  Did you consult with the union about the
7  union's position on recording meetings?
8     A.  I consulted -- oh, recording that meeting?
9     Q.  Recording meetings in general.
10    A.  I did.
11    Q.  All right.  The union generally opposes
12 recorded meetings, right?
13    A.  The meeting -- I mean, the union opposes the
14 union steward recording.
15    Q.  Okay.  And you believe -- strike that.  Do
16 you know why the union opposes a union steward
17 recording meetings?
18    A.  No.
19    Q.  Did you tell anyone you were going to be
20 recording this meeting?
21    A.  Did I tell anyone, no.
22    Q.  Now, since you're recording it, you were
23 being extra careful about what you said, right?
24    A.  No.
25    Q.  You weren't?

Page 191

1     A.  No.
2     Q.  Now, back to the meeting.  What do you recall
3  from that meeting?  What did you tell Paul Reams about
4  Paul Johnson?
5     A.  I told Paul that I was coming to him because
6  Paul was yelling at me, and I asked Paul to just
7  please ask Paul Johnson to not yell at me and to just,
8  you know, watch -- watch that.
9     Q.  Okay.  Did you tell Paul Reams that he
10 yelled -- Paul Johnson yelled at you at the
11 meeting on April 19th, the previous meeting you had
12 had?
13    A.  I -- not that I recall.
14    Q.  Okay.  What details did you give him besides
15 telling him that Paul Johnson had yelled at you?
16    A.  I told him of the situation where Paul
17 Johnson came to my desk and stood behind me.
18    Q.  So the yelling, you told him the yelling took
19 place at your desk when he stood behind you and then
20 again in Cynthia Lamar's office?
21    A.  I know I recall telling him that he yelled at
22 me at my desk.  I recall telling him that Paul stood
23 up in the meeting in Cynthia's office.
24    Q.  Did you also tell him he raised his voice at
25 the meeting in Cynthia's office?

Page 192

1     A.  I don't recall -- I don't recall him
2  saying -- I don't know if I -- I don't recall that.
3     Q.  Okay.  Now, is this the first time you've
4  complained to Paul Reams about anything Paul Johnson
5  did?
6     A.  To the best of my knowledge, yes.
7     Q.  And you didn't give Paul Reams any reason why
8  Paul Johnson might have done this, did you?
9     A.  No.
10    Q.  All right.  Now, after you told Paul Reams
11 about Paul Johnson yelling and standing up, did he ask
12 if you wanted to switch groups or switch supervisors?
13    A.  Yes.
14    Q.  And you told him you didn't want to switch
15 groups, right?
16    A.  That is correct.
17    Q.  Why did you not want to switch groups?
18    A.  Because I know that Cynthia Lamar is a great
19 liar.  And I know that -- I'll leave it like that,
20 that Cynthia Lamar is a -- is a liar.
21    Q.  Okay.  That --
22    A.  I'm sorry, you --
23    Q.  At that point in time, and this is
24 April 20th, 2004 --
25    A.  I'm sorry.

Page 193

1     Q.  -- what made you think Cynthia Lamar was a
2  liar?
3     A.  I don't think I was through answering the
4  question that you asked me.
5     Q.  I believe the question was why did you not
6  want to switch groups?
7     A.  And that's what I was trying to answer.
8     Q.  You told me you believe Cynthia Lamar was a
9  liar?
10    A.  That is correct, but I was not through.
11    Q.  Why didn't you want to work for Pam
12 Davenport?  Is that what you were about to tell me
13 next?
14    A.  Yes.
15    Q.  Why didn't --
16    A.  But I can wait for you to ask me if you need
17 that.
18    Q.  That's fine.  I want to know why didn't you
19 want to work for anyone besides Paul Johnson.
20    A.  Okay.  Because Pam Davenport, she lied also
21 on me.
22    Q.  Okay.  So --
23    A.  And I don't know if -- if at that time
24 that -- oh, okay.  I'll just leave it.  I'll just
25 leave it like that.

Page 194

1    Q.   Okay.  So you didn't want to work for either
2  of them because you thought they were liars at that
3  time?
4    A.   Yes.
5    Q.   All right.  Did you tell Paul Reams that?
6    A.   Yes.
7    Q.   And as an aside, what had Cynthia Lamar done
8  prior to April 20th that made you think she was a
9  liar?
10    A.   I used to be the rep -- the union -- well,
11  Cynthia, I think this was November the 11th or
12  November the 7th, somewhere, November 2000.  Cynthia
13  used to be over assigning us closed cases to purge.
14  Cynthia assigned everybody four filing cabinets.  I
15  think Rosey Howell was listed in front of me.  She
16  gave Rosey Howell three cases and assigned me five
17  cases, and then everybody else had four cases.
18    Q.   Okay.  And how did Cynthia Lamar -- how do
19  you believe Cynthia Lamar lied in that event of
20  November 2000?  About the number of cases she gave
21  out?
22    A.   There are other things that -- I used to be
23  union steward and I've helped bargaining union
24  employees, and there were lies involved in that.
25    Q.   Okay.  Do you recall telling Paul Reams at

Page 195

1  this meeting on April 20th, To be honest, I'm
2  perfectly happy; I think I've always told you that?
3    A.   Yes.
4    Q.   And had you told -- do you know who BJ Thomas
5  is?
6    A.   Yes.
7    Q.   She is an EEO officer, correct?
8    A.   Was, yes.
9    Q.   Was.  Did you tell her in November 2003 that
10  you loved working for Paul Johnson?
11    A.   Yes.
12    Q.   Now, at the end of this meeting on
13  April 20th, did Paul Reams tell you he would
14  investigate your complaint against Paul Johnson?
15    A.   Yes.
16    Q.   And at some point, did he ask you who might
17  have heard the yelling or who might have been around
18  or who he should talk to?
19    A.   He did not ask me.  What was your question?
20    Q.   At some point during this April 20th meeting,
21  did he ask you who might have been around, who might
22  have heard it or who he should talk to during his
23  investigation?
24    A.   Not that I recall.
25    Q.   Did you give him any names of people to talk

Page 196

1  to?
2    A.   No.
3    Q.   Do you recall anything else being discussed
4  at that April 20th meeting?
5    A.   No.
6    Q.   Okay.  Now, do you recall a later meeting
7  with Paul Reams -- this is on April 30th, 2004, in the
8  Social Security hearing room with Cynthia Lamar and
9  Karl Warren, the union vice president, present on
10  speakerphone?
11    A.   Yes.
12    Q.   And at this meeting, Paul Reams gave you the
13  results of his investigation, right?
14    A.   Yes.
15    Q.   Now, between the April 20th meeting and the
16  April 30th meeting, did you talk to Paul Reams at all?
17    A.   Not that I can recall.
18    Q.   All right.  And you tape-recorded this
19  April 30th, 2004 meeting; is that right?
20    A.   I guess.  I recorded it.  But I can't -- I
21  don't know.  I may have.  I don't know.
22    Q.   All right.  And when you recorded it, you
23  recorded it in secret?
24    A.   That is correct.
25    Q.   Did you tell Karl Warren you'd be tape-

Page 197

1  recording it?
2    A.   No.
3    Q.   Now, do you recall Paul Reams advising during
4  the meeting that he had interviewed witnesses and
5  could not find any that substantiated your complaint
6  that Paul Johnson had stood up or yelled at you?
7    A.   That is correct.
8    Q.   And did he also tell you that you refusing to
9  answer Paul Johnson's questions at that meeting on
10  April 19th was insubordination?
11    A.   That is what --
12    Q.   Or his work-related questions?
13    A.   That is correct.
14    Q.   And what, if anything, did you say in
15  response to these statements by Paul Reams?
16    A.   I tried to ask Cynthia to say in front of
17  Paul what she told me about me not having to work --
18  wait for Fridays to get cases.  She said she could
19  not -- she did not recollect.
20    Q.   Okay.  Anything else you recall?
21    A.   During -- this is during the meeting with
22  Karl on the phone?
23    Q.   Yes.
24    A.   With Karl on the phone?
25    Q.   Yes.

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                               7/8/2008
DEPOSITION OF BERNETHIA JOHNSON

12 (Pages 198 to 201)

Page 198

1    A.  I recall saying -- no.  Unh-unh.  Because I
2  have to say I think I recall saying.  Okay.  I see how
3  y'all -- I see -- I think I said, okay, I see how
4  y'all want -- want to do or something like that.  It's
5  not a quote.  It was something like, okay, I see
6  Cynthia don't want to answer the question.  So I see
7  how -- what kind of game y'all playing or something
8  like that.
9    Q.  Did Paul Reams give you a memo or any written
10  results of his investigation or did he just read
11  something?
12    A.  Yes.
13    Q.  He gave you a copy of a memo?
14    A.  Yes.
15    Q.  Do you know if it had a heading on the top
16  saying findings of investigation of allegations made
17  by Bernethia Johnson against Paul Johnson?
18    A.  Yeah.
19    Q.  Let's make this Defendants' Exhibit #15.  And
20  if you can tell me, did Paul Reams give you
21  Defendants' Exhibit #15 at that meeting on
22  April 20th -- April 30th.  I'm sorry.  April 30th,
23  2004.
24    MS. BATTLE-HODGE:  Thank you.
25    A.  Yes.  He gave this to me.

Page 199

1    Q.  Did you say anything in response to Paul
2  Johnson -- I'm sorry -- Paul Reams' statement that you
3  had been insubordinate at the April 19th meeting?
4    A.  Repeat that.
5    Q.  When Paul Reams read his findings and stated
6  that he had concluded that you had been insubordinate
7  because you hadn't answered work-related questions
8  that Paul Johnson had asked, did you have any response
9  to that?
10    A.  I may have -- I may have -- may have said
11  something to the point that -- but Lynda Simmons
12  gave -- Lynda Simmons -- Lynda Simmons and Lynda Hall
13  are the same people.  But Lynda Simmons gave -- gave
14  Paul Reams my answer.
15    Q.  Okay.  You may have said that but you don't
16  know?
17    A.  No.
18    Q.  All right.  Do you recall anything else of
19  that meeting before Karl Warren got off the phone?
20    A.  No.
21    Q.  All right.  Now, after Karl Warren hung up,
22  did Paul Reams say he wanted to talk to you about
23  something else in private?
24    A.  I don't -- I don't know if he said in
25  private.

Page 200

1    Q.  He told you he wanted to talk to you about
2  something else?
3    A.  Yes.
4    Q.  And Cynthia Lamar was still in the office?
5    A.  Yes.
6    Q.  This is -- actually, I'm sorry.  Not office.
7  Social Security hearing room?
8    A.  Yes.
9    Q.  Now, at that point, did he tell you again
10  that your account of what had happened with Paul
11  Johnson was different from everybody else's and
12  suggest that you contact the Employee Assistance
13  Program?
14    A.  Did he tell me that?
15    Q.  Yeah.
16    A.  Again?
17    Q.  Yes.  Do you recall that coming up again?
18  Strike all that.  What do you recall happening after
19  Karl Warren got off the phone?  Paul Reams says he
20  wants to talk to you about something.
21    A.  I was clearing -- yes.
22    Q.  What happened at that point?
23    A.  I said, What is this about?  And at some
24  point, he pushed over that EAP paper to me.  I said
25  union rep -- I said union -- union rep or union

Page 201

1  steward.  I was asking for representation, that he
2  call for the union.  He continued to talk and I said,
3  union steward.  He continued to talk as though he did
4  not -- he continued to talk.  I said, Paul, I'm asking
5  for union.  I'm asking for union, Paul.  Paul, I'm
6  asking for representation.
7    Q.  Okay.  So he placed the EAP brochure in front
8  of you and was talking and you were asking for union
9  representation?
10    A.  He slid it across to me.
11    Q.  Okay.  Do you know what the Employee
12  Assistance Program is?
13    A.  I have an idea as to what it is.
14    Q.  Now, what made you think you were entitled to
15  union representation at this meeting?
16    A.  Because I asked for union representation.  I
17  was in with two management officials, and I had no one
18  to witness what was said.
19    Q.  You weren't being disciplined, though, right?
20    A.  I asked for union representation, and I knew
21  that they could say anything they wanted to with me
22  not having anyone in there to witness what I said.
23    Q.  All right.  Do you believe there's anything
24  in any union document that says every time a union
25  employee talks to management about anything, they're

Page 202

1  entitled to have a union representative?
2    A.  As long as I felt -- yes.
3    Q.  Okay.  Where does it say that?
4    A.  Where does it say it?
5    Q.  Uh-huh.
6    A.  All I can say is somewhere in -- within the
7  agreement.
8    Q.  All right.  Every time a union employee talks
9  to management about anything, it's your position the
10  union agreement says the union rep has to be present?
11   A.  No.
12   Q.  What's your position on union representation?
13  It's only when discipline is being implemented, right?
14  Strike all that.  What was your basis for requesting
15  union rep at that meeting?
16   A.  Because I had already been in there.  I knew
17  how I was being treated by management.  I knew that
18  they could take what was being said and re -- reword
19  it or even say things that were not true.  So I needed
20  someone to at least hear what was being said.
21   Q.  Okay.  And can you point me to any provision
22  or do you know of any off the top of your head that
23  entitles a union member to a representation anytime
24  management talks to them about anything?
25   A.  If a person believe that they are being

Page 203

1  disciplined or that it can be used, then they have the
2  right to request union representation.
3    Q.  So you're pointing to -- you were trying to
4  invoke your Weingarten Rights; is that what you're
5  saying?  Are you familiar with the term Weingarten?
6    A.  I was asking for union representation, and
7  that's what it's called, Weingarten Rights.
8    Q.  Did you believe you were about to be
9  disciplined?
10   A.  I believe that I knew how they were treating
11  me, and I knew that they could use anything, say
12  anything, and that it was two management officials
13  against one bargaining union employee without
14  representation.  And no one could validate actually
15  what was being said.
16   Q.  You were tape-recording that meeting, weren't
17  you?
18   A.  To be honest with you, I really forgot about
19  me actually tape-recording it because I was so
20  nervous.
21   Q.  Besides giving you the EAP brochure, did Paul
22  Reams say anything else at that meeting?
23   A.  He talked about the time when I was in the
24  military.  He talked about -- and when I say that, he
25  talked about direct orders, indirect orders.  He was

Page 204

1  talking about things like that.
2    Q.  He was talking about direct and indirect
3  orders?
4    A.  Yes.
5    Q.  Do you know what he was referring to?  This
6  is after Karl Warren --
7    A.  Military.
8    Q  -- after Karl Warren got off the phone?
9    A.  That is correct.
10   Q.  He was talking about the military and direct
11  and indirect orders?
12   A.  Yes.
13   Q.  What else do you recall Paul Reams saying?
14   A.  I can't recall too much because I was so
15  nervous.
16   Q.  Did Paul Reams tell you it was a private
17  matter so you had no entitlement to union
18  representation?
19   A.  He may have said that.
20   Q.  Do you think that discussing something like
21  the Employee Assistance Program should be a private
22  matter?
23   A.  No.
24   Q.  All right.  So you didn't have any privacy
25  concerns and you wanted -- you didn't mind having

Page 205

1  additional people present if you discussed the
2  Employee Assistance Program with them?
3    A.  Okay.  What was your question?
4    MR. DUBOIS:  Could you repeat my question?  I
5  don't know if I could repeat it.  It's not the most
6  artful question.
7        (The court reporter read the
8        pending question.)
9    A.  Not additional people.  I wanted union
10  representation.
11   Q.  You didn't mind having a union rep present
12  when Paul Reams discussed the Employee Assistance
13  Program with you?
14   A.  That is correct.
15   Q.  Now, at some point, you asked to be excused
16  from that meeting for a second to use the restroom,
17  right?
18   A.  That is correct.
19   Q.  And, then, did you go use the restroom?
20   A.  To the best of my knowledge, I did.
21   Q.  And you returned to the meeting?
22   A.  And on my way from the restroom, I eventually
23  returned to the meeting, correct.
24   Q.  Now, before returning to the meeting, did you
25  try to go get Lynda Hall or Linda Tamplin?

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                          7/8/2008
DEPOSITION  OF BERNETHIA JOHNSON

14 (Pages 206 to 209)

Page 206

1     A.  No, I did not.
2     Q.  Did you try to call Karl Warren
3  independently?
4     A.  No, I did not. I'm sorry. I have to wait
5  for you to finish your sentences.
6     Q.  Now, during the meeting with Paul Reams
7  before you left, Paul Reams had actually tried to call
8  Karl Warren but no one answered, right?
9     A.  That is not correct.
10     Q.  You don't recall him dialing Karl Warren's
11  number at some point?
12     A.  Repeat that statement.
13     Q.  During the meeting, this Karl Warren gets off
14  the speakerphone, Paul Reams talks to you about the
15  Employee Assistance Program, you ask for union rep.
16  At some point after that, Paul Reams did try to call
17  Karl Warren back, but Karl Warren didn't answer; is
18  that right?
19     A.  Finally.
20     Q.  Now, was that before or after you took your
21  restroom break; do you recall?
22     A.  After.
23     Q.  After. When you came back from the restroom,
24  Paul Reams tried to call Karl Warren?
25     A.  Yeah.

Page 207

1          (Off-the-record discussion)
2     Q.  Let me hand you a document we're going to
3  mark as Defendants' Exhibit #16. Can you tell me if
4  Defendants' Exhibit #16 is a statement you put
5  together during that meeting?
6     A.  During the meeting? Yes.
7     Q.  Okay. You wrote this. Did you ask Paul
8  Reams and Cynthia Lamar to sign it?
9     A.  Yes.
10     Q.  And they didn't sign it, right?
11     A.  Correct.
12     Q.  Now, it says -- this is a statement. This is
13  supposed to be a P-R-I-V thing. This is not supposed
14  to be -- do you see that? It's kind of at the bottom
15  of the page?
16     A.  Yes.
17     Q.  What are you saying there?
18     A.  That's what Paul was saying or something.
19  That's what Paul was saying. This is supposed to be a
20  private thing. This is not supposed to be dah, dah,
21  dah, dah, dah.
22     Q.  Okay. And this meeting, it looks like you
23  have ending at 11:23; is that right?
24     A.  Yes.
25     Q.  Did you tell Paul Reams or Cynthia Lamar why

Page 208

1  you wanted them to sign this Defendants' Exhibit #16?
2     A.  No.
3     Q.  Now, there was no yelling or screaming in
4  this meeting, was there?
5     A.  The entire meeting?
6     Q.  After Karl Warren got off the phone, you
7  talked to Paul Reams and Cynthia Lamar?
8     A.  Paul made a statement, but I can't say at
9  what point whether Karl was on -- no, Paul made a
10  statement that I was yelling.
11     Q.  That you were yelling?
12     A.  Yes.
13     Q.  Do you believe there was any yelling or
14  screaming going on at that meeting?
15     A.  No. I wasn't yelling.
16     Q.  Was anyone else yelling?
17     A.  Not that I can recall.
18     Q.  Do you recall anything else from this
19  April 30th meeting that we haven't talked about?
20     A.  Yes.
21     Q.  All right. What else do you recall?
22     A.  I recall that when I kept asking -- okay. It
23  was after I gave this to Paul and Cynthia.
24     Q.  All right. This, you're referring to
25  Defendants' Exhibit #16?

Page 209

1     A.  Yes. After I gave it to them and asked
2  them to please sign it, then Paul Reams started -- he
3  said -- Cynthia said no, thank you, and Paul said, I'm
4  not going to sign this, this is saying that I refused
5  to give you union representation. Bernethia, I asked
6  you four times -- and then he stopped.  He -- and
7  then -- so he then act -- he then -- I don't know how
8  to say this. He then started calling -- Paul Reams in
9  a slow motion like this (indicating) Okay. I'm going
10  to call them. Let's just say this is the phone. Paul
11  Reams said, Okay. I'm going to call them. I'm going
12  to call Karl Warren. Are you sure you want -- are you
13  sure you want Paul -- Karl? I'm telling you,
14  Bernethia, I'm going to say Ms. Johnson want me to
15  call.  And I had to answer. I had to say something
16  every time Paul said something because Paul said -- he
17  made a statement in the meeting, Are you not answering
18  any questions? You're not going to answer the
19  question? I said, Yes, Paul, I have to answer the
20  questions. So every time Paul made a statement, I
21  made some kind of response so that he would not turn
22  around and accuse me again of not answering or being
23  insubordinate to management. While he was going,
24  Okay. I'm going to call. Are you sure? I'm going to
25  say Ms. Johnson -- Mr. Warren, Ms. Johnson said --

Page 210

1  okay. You sure? I said, Paul, you know I've asked
2  for union representation. Okay. I'm going to. All
3  right. And then he finally got to the phone and
4  dialed the number.
5     Q. Did Paul Reams ask you any other questions
6  besides whether you wanted union representation?
7     A. Did he ask me any other questions during that
8  meeting whether I -- other than did I want union.
9  He -- when he was talking to me about military, direct
10 orders and things, he may have questioned me to
11 that -- to that -- to that degree.
12    Q. But you don't recall?
13    A. No. I think he did. He said, you know what
14 direct order is. So that was a question. Yes, he did
15 ask me that.
16    Q. Do you believe your secret tape-recording
17 captured any of this conversation?
18    A. I -- I believed it had, yes. I believe it
19 did.
20    Q. Have you ever tried to listen to it to see if
21 you can actually hear all the voices?
22    A. I think I tried to listen to it, but I can't
23 remember if it was -- if it was clear or not.
24    Q. Do you recall anything else from this
25 April 30th meeting other than what we talked about?

Page 211

1     A. No.
2     Q. All right. Now, after that meeting on
3  April 30th, do you recall receive an e-mail from Paul
4  Reams reassigning you to Cynthia Lamar in group B?
5     A. Ask me that question again.
6        MR. DUBOIS: Can you repeat it?
7        (The court reporter read the
8           pending question.)
9     A. Yes.
10    Q. Okay. I'm going to hand you Defendants'
11 Exhibit #17, which is an e-mail from Paul Reams
12 advising you that you're now a member of group B and
13 Cynthia Lamar is your supervisor effective May 2nd,
14 2004. Do you recall receiving that e-mail?
15    A. Yes.
16    Q. And did you receive it on or about Friday,
17 April 30th at 4:01 p.m., I think it says?
18    A. On or about, yes.
19    Q. Now, after you received this e-mail which is
20 marked as Defendants' Exhibit #17, did you talk to
21 Paul Reams about this reassignment at all?
22    A. Repeat that question.
23       MR. DUBOIS: Would you repeat it?
24       (The court reporter read the
25          pending question.)

Page 212

1     A. I may have.
2     Q. What do you mean you may have?
3     A. At some point, and I don't know at what
4  point, I asked him could I go -- could I be -- could I
5  stay -- I recall asking Paul Reams about something
6  about I did not -- it was the fact that I did not want
7  to be under either of the two supervisors. So I did
8  make a statement to that. The other two supervisors,
9  Cynthia Lamar or Pam Davenport.
10    Q. Okay. I know you previously stated you told
11 them that during the April 30th meeting. Do you
12 believe you talked to them again about that after you
13 received Defendants' Exhibit #17?
14    A. I don't -- I can't recall.
15    Q. Now, going back to Defendants' Exhibit #17,
16 Karl Warren is the union vice president, right?
17    A. Yes.
18    Q. And I'm looking at the CC line. And where is
19 he based?
20    A. Mobile.
21    Q. And Sue Burton, is she the union president?
22    A. Yes.
23    Q. And where is she based?
24    A. I'm not sure.
25    Q. Now, after you were reassigned from Paul

Page 213

1  Johnson to Cynthia Lamar effective May 2nd, 2004, how
2  much interaction did you have with Paul Johnson after
3  that date?
4     A. I don't think -- I don't -- I can't recall
5  how much. I don't think -- well, I can't recall.
6        MR. DUBOIS: Can we take a one-minute break?
7  A short break?
8        (Brief recess)
9     Q. All right. Ms. Johnson, I'm handing you a
10 copy of the complaint in the first lawsuit you have
11 filed that's been previously marked as Defendants'
12 Exhibit #9. And directing your attention to that, in
13 paragraphs 31 and 33, you have allegations that -- it
14 has receipt of a reprimand. You have an allegation
15 that you were given, I guess, an oral warning by Paul
16 Reams due to your race and because of your prior EEO
17 complaints. Do you see where I'm referring to?
18    A. Yes.
19    Q. It's also paragraph 26. There's some
20 allegations in this complaint where you allege that
21 you were given this oral warning because of your race
22 and retaliation; is that right?
23    A. Yes.
24    Q. So you are alleging in this first lawsuit
25 that that oral warning was due to your race and

Page 214

1  because of retaliation?
2     A.  Are you saying only?  You didn't say only, so
3  no.
4     Q.  Right.  I guess I'm just trying to understand
5  the allegation of the lawsuit.  You're alleging that
6  you were given that oral warning because of your race
7  and for retaliation, right?  Or is it -- is it only
8  one, is it both?  That's what I'm trying to
9  understand.
10    A.  Yes.
11    Q.  Okay.  Let's start with race.  What makes you
12  believe you were given that oral warning on April 30th
13  for insubordination because of your race?
14    A.  It was given to me after I applied numerous
15  times for paralegal specialist position.
16    Q.  Okay.  You're saying you believe you were
17  given this oral warning on April 30th because of your
18  race because you had previously applied for a
19  paralegal position?
20    A.  Yes.
21    Q.  Any other reasons or any other basis for you
22  to allege that you were given this oral warning due to
23  your race besides the fact you had previously applied
24  for a paralegal position?
25    A.  Yes.

Page 215

1     Q.  Okay.  What else?
2     A.  I had been informed that Mr. -- Mr. Reams had
3  no intention on promoting any blacks in the
4  organization.  I had a prior EEO action for that.
5  And -- well, that was a part of why I felt that
6  because with me being a black individual that made the
7  list and I was informed that Mr. Reams had no
8  intention on promoting any blacks.  The EEO action of
9  my prior claim was a part of -- was a part of it.
10    Q.  All right.  Let me see if I understand this.
11  You had previously applied for a paralegal position?
12    A.  For -- for paralegal positions.
13    Q.  And do you know when you made those
14  applications?
15    A.  No.
16    Q.  And then you --
17    A.  Yes.  One was in 2003.
18    Q.  Okay.  Do you know who the final
19  decisionmaker on that was?
20    A.  Judge Thigpen.
21    Q.  Judge Thigpen?
22    A.  Yes.
23    Q.  And you filed that -- was it May of 2003 you
24  filed an EEO complaint about not getting that
25  position?

Page 216

1     A.  I'm going to say May/June, in that 2003, yes.
2     Q.  Now, you made a statement that someone had
3  told you Paul Reams would not hire a black person to
4  be a paralegal?
5     A.  Correct.
6     Q.  Who told you that?
7     A.  Teresa Weeks.
8     Q.  And who is Ms. Weeks?
9     A.  Administrative assistant.
10    Q.  Did she tell you how she -- why she thought
11  that?
12    A.  No.
13    Q.  Did you ask her?
14    A.  I may have, but I -- I can't recall.
15    Q.  Are there any black paralegals in the office
16  in Montgomery?
17    A.  Yes.
18    Q.  Who?
19    A.  Paula Jackson.
20    Q.  Anybody else?
21    A.  That's it.
22    Q.  How many paralegals are in that office?  I'm
23  going back to the time you worked there back in 2003.
24    A.  I don't know.
25    Q.  You don't know?  Was anyone else present when

Page 217

1  Teresa Weeks made this comment about Paul Reams?
2     A.  No.
3     Q.  Where did that conversation take place?
4     A.  In Teresa's office.
5     Q.  Besides the fact that Teresa Weeks had told
6  you this and you had applied for a paralegal job and
7  not gotten it in 2003, what makes you believe you
8  received this oral warning in April of 2004 due to
9  your race?
10    A.  That was a part of why.
11    Q.  All right.  Is there any other evidence or
12  anything else you point to that supports your
13  allegation?
14    A.  Why Paul -- Paul Johnson would -- gave me
15  the -- like I was the union steward or something?  Is
16  that what -- I --
17    Q.  Let me step back.  There's an allegation in
18  the lawsuit that Paul Reams gave you this oral warning
19  because of your race.  I'm just trying to understand
20  everything that you point to that makes you believe or
21  makes you make that allegation.  So you pointed to the
22  fact that you applied for a paralegal position and
23  hadn't received it, and that Teresa Weeks had made
24  this statement.  Is there anything else that made you
25  believe or that you relied upon to support the

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                                          7/8/2008
DEPOSITION  OF  BERNETHIA  JOHNSON

Page 218

1  allegation that Paul Reams gave you an oral warning
2  because of your race?
3      A.  I can't recall anything else right now.
4      Q.  Do you have any other -- any evidence of
5  other legal assistants who didn't answer work-related
6  questions from their supervisors?
7      A.  No.
8      Q.  All right.  Now, how about -- you also allege
9  in this lawsuit, which has been marked as Defendants'
10  Exhibit #9, that you were give this oral warning for
11  retaliatory reasons.  And you allege that I guess it
12  was due to your prior EEO complaints which were
13  1997 and --
14      A.  I'm sorry.  I'm sorry.  Okay.  Go ahead.  I'm
15  sorry.
16      Q.  You need to take a break?
17      A.  No.
18          MS. BATTLE-HODGE:  What time is it?
19          MR. DUBOIS:  It's 10:45.  What time you want
20  to take lunch?
21          MS. BATTLE-HODGE:  You okay?
22          THE WITNESS:  I'm fine.
23          MS. BATTLE-HODGE:  Let's just push through.
24          MR. DUBOIS:  All right.
25      Q.  Going back to Defendants' Exhibit #9, there's

Page 219

1  an allegation, I believe it's in paragraph 33.  You
2  allege that because of your two prior EEO complaints
3  you were given this oral warning in April 2004.  You
4  see that in paragraph 33?
5      A.  Yes.
6      Q.  And the two prior EEO complaints were ones I
7  believe you filed in 1997 and the May/June 2003; is
8  that right?
9      A.  Yes.
10      Q.  Okay.  Now, what makes you believe you were
11  given this oral warning because of those two prior EEO
12  complaints?
13      A.  They wanted to get rid of me.
14      Q.  And what makes you believe they wanted to get
15  rid of you?
16      A.  By the way they were doling out the work.  I
17  was being treated differently.
18      Q.  Now, in connection to this particular oral
19  warning you received --
20      A.  Wait a minute.  Hold --
21      Q.  -- what makes you believe that oral
22  warning -- what supports your allegation that oral
23  warning was retaliation for these two prior EEO
24  complaints?
25      A.  What support the allegation of these -- of

Page 220

1  the -- what support the allegation for my getting
2  this --
3      Q.  Let me try to see if I can rephrase it.
4      A.  -- oral warning?
5      Q.  Yeah.  You allege in the complaint you
6  received the oral warning in retaliation for filing
7  these two prior EEO complaints; is that right?
8      A.  Yes.
9      Q.  And my question is, basically why are you
10  making that allegation?  What makes you believe that
11  you received that oral warning because you had
12  received these two EEO complaints?  Or because -- I'm
13  sorry.  Strike that.  What makes you believe you had
14  received this oral warning because you had made those
15  two prior EEO complaints in May/June 2003 and in 1997?
16      A.  I believe Paul -- I believe management wanted
17  to get rid of me and that by giving an employee an
18  EEO -- an oral warning was the beginning, the initial
19  process for doing further disciplinary actions.
20      Q.  And did Paul Reams state when he gave you the
21  oral warning that if you did -- if you were
22  insubordinate again, there would be additional
23  disciplinary action?
24      A.  I think that was written down in the --
25  something he gave me.  It was -- oh, I'm sorry.  I

Page 221

1  can't recall what he said.
2      Q.  All right.  What makes you believe that
3  management was trying to get rid of you?
4      A.  Because of the prior EEO actions I had taken
5  on the agency.
6      Q.  Okay.  So you filed an EEO complaint in 1997
7  and another one in May/June 2003; and you believe
8  because of those, the agency was trying to get rid of
9  you?
10      A.  Because of prior EEO complaints that I put
11  in, I believe that management was -- that was why they
12  were trying to get rid of me.
13      Q.  And what makes you believe that?
14      A.  Paul Reams made a statement to me once.  He
15  called Karen Burton big mouth.  Matter of fact he said
16  with her big mouth.
17      Q.  Called Karen Burton, made a comment about
18  Karen Burton's big mouth?
19      A.  Yes.
20      Q.  When was this?
21      A.  During the time I was a union steward.
22      Q.  And when did you cease being a union steward?
23      A.  November 2002.
24      Q.  So sometime prior to November 2002 Paul Reams
25  made a comment about Karen Burton having a big mouth?

Page 222

1    A.  Correct.
2    Q.  Was it after Paul Reams became hearing
3  officer -- hearing office director in 1999?
4    A.  It was after Paul Reams -- yes.
5    Q.  Okay.  So sometime between December 1999 and
6  November 2002, Paul Reams made a comment about Karen
7  Burton having a big mouth?
8    A.  I would say that that took place about -- oh,
9  that's -- okay.  Yes, he did.  You're correct.  Yes.
10    Q.  Sometime in that time frame?
11    A.  Yes.
12    Q.  And who is Karen Burton?
13    A.  A legal assistant.  Senior case technician.
14    Q.  And was anyone else present when he made this
15  comment?
16    A.  No.
17    Q.  And where was it made?
18    A.  In his office.
19    Q.  Was the door open or shut?
20    A.  I can't recall.
21    Q.  And what was being discussed when he made
22  this comment?
23    A.  I would say it was shut because normally when
24  I conducted business, I always shut the door.
25    And what was being discussed when he made

Page 223

1  this comment?
2    A.  It may -- I can't -- I would have to -- I --
3  I can't say for sure.
4    Q.  So you don't remember the context of the
5  comment, you just remember him making the statement?
6    A.  I went to Paul Reams evidently about a
7  situation.  And I recall Paul Reams telling me that
8  Teresa Week and Karen Burton and Rosey Howell's name
9  was involved, that they were trying to get to the
10  union meeting.  That's possibly how Karen Burton's
11  name came up.  And then he made the statement, "With
12  her big mouth."
13    Q.  Yeah.  That's -- that's what I can recall
14  right now.
15    Q.  So you went to Paul Reams about some
16  employees at the Montgomery Social Security office
17  trying to get into a union meeting?
18    A.  No.  I think -- it was so much involved,
19  but -- I think I went to Paul to see about whether or
20  not he received a list from the union giving me
21  permission to be present at -- at a union meeting
22  that -- I can't remember where that meeting was held,
23  being held.  It was like a national union -- or
24  regional union meeting or national.  It wasn't in the
25  office or anything.  But I went to Paul Reams, and

Page 224

1  that's how we got on the conversation.  Yeah.
2    Q.  Did he say what he meant when he said Karen
3  Burton had a big mouth or made some reference to Karen
4  Burton's big mouth?
5    A.  No.
6    Q.  Did you ask him what he meant?
7    A.  I knew what he meant, so I didn't -- I'm
8  sorry.  No.
9    Q.  And what did you assume he meant?
10    A.  I assumed he -- that he meant because of a
11  situation that happened in about -- the situation that
12  happened with prior management and Karen was the one
13  who let the cat out of the bag, so to speak.
14    Q.  Do you believe Karen Burton had made a
15  complaint about prior management before Paul Reams
16  became hearing office director?
17    A.  A situation occurred prior to Paul Reams
18  becoming the hearing office manager that -- that I
19  questioned.
20    Q.  What kind of situation?
21    A.  All award -- awards were being given in the
22  organization, and only the white people receive
23  awards.
24    Q.  And when was this?
25    A.  That was before Paul -- before Paul Reams

Page 225

1  became the hearing office director.
2    Q.  Do you know who issued those awards?
3    A.  Jake Shanahan was involved in that.
4    Q.  And he was the hearing office director before
5  Paul Reams?
6    A.  Hearing office manager.
7    Q.  What type of awards were these?
8    A.  Monetary awards.
9    Q.  And how did -- did you make a complaint about
10  this?
11    A.  Yes.
12    Q.  Who did you complain to?
13    A.  Who did I contact.  Who did I contact.  I
14  don't remember who I contacted.
15    Q.  Do you know who received the awards?
16    A.  Thirteen white people is all I know.
17  Approximately 13 white people.
18    Q.  And what does Karen Burton have anything to
19  do with this -- or how does Karen Burton have anything
20  to do with that situation?
21    A.  Karen, I asked Karen what would make people
22  lie.  What would make adults lie.
23    Q.  You had asked her back around the time of
24  these awards what would make adults lie?
25    A.  Yes.

Page 226

1    Q.  And what did she say?
2    A.  She said, Bernethia, all I know is management
3  told me that if anybody asked us about the awards,
4  deny it.
5    Q.  Did she say who told her that?
6    A.  Jake Shanahan.
7    Q.  If anyone asked her about the awards, deny
8  it.  Deny what they had been given or deny what?  Did
9  she elaborate or give any additional detail?
10   A.  If anybody asked her whether they -- whether
11  she received an award -- no -- I'm not -- I recall
12  Karen saying that Jake Shanahan told her if anybody
13  asked about awards that they were to deny them.  And
14  that's all I can say on that.
15   Q.  Is Karen Burton white or black?
16   A.  White.
17   Q.  Do you know if she received an award?
18   A.  I can't recall.  I can't --
19   Q.  Okay.
20   A.  I can't recall.
21   Q.  Now, going back to this conversation you had
22  with Paul Reams sometime between December '99 and
23  November of 2002 when she made a reference about Karen
24  Burton's big mouth --
25   A.  Yes.

Page 227

1    Q.  You thought he was referring back to you
2  talking to Karen Burton back in the 1990s?  What did
3  you think he was referring to again?
4    A.  He was -- I thought he was referring to the
5  fact that Karen Burton is the one that told me that
6  management gave the white -- all the white people --
7  not all.  I thought Paul Reams was referring to the
8  time when Karen Burton informed me that only white
9  people received awards in that local organization.
10   Q.  Do you have any evidence that Paul Reams knew
11  about that conversation or had ever talked to Karen
12  Burton about any conversation you had with her?
13   A.  No.
14   Q.  And you never asked him what he meant when he
15  said -- made a comment about her big mouth?
16   A.  No.
17   Q.  Do you know if Karen Burton has ever filed an
18  EEO complaint?
19   A.  No, she hasn't.
20   Q.  She has not filed one?
21   A.  She has not.
22   Q.  Going back to a previous question, what makes
23  you believe that management is trying to get rid of
24  you or gave you that oral warning in April 2004
25  because of your EEO complaints other than what you've

Page 228

1  told me so far?
2    A.  Okay.  Repeat the question.
3      MR. DUBOIS:  Could you repeat it?
4        (The court reporter read the
5         pending question.)
6    Q.  Let's just strike that and I'll re-ask.  All
7  right.  Other than what you've told me so far, is
8  there any other thing you can point me to that makes
9  you believe or supports your allegation that you were
10  given that verbal warning in April 2004 to retaliate
11  against you?
12   A.  Other than what I told you, that's what I
13  believe at this time.
14   Q.  Now, when you say at this time, what does
15  that mean?
16   A.  Perhaps once I keep thinking on it,
17  meditating on it or whatever, maybe something else
18  will come up in my mind as far as things happening
19  that will -- that point me to believe other reasons
20  that Mr. Reams gave me that oral warning.
21   Q.  All right.
22   A.  The oral warning.  Yes.  The oral.
23   Q.  All right.  Is there anything in particular
24  you can think of right now that you can look at that
25  would refresh any memory you might have on that

Page 229

1  warning?
2    A.  No.
3    Q.  All right.  So as far as you know at this
4  point, you've told me all the reasons you believe that
5  oral warning was given to you for retaliation?
6    A.  I believe Mr. Reams gave me that oral warning
7  because this -- I think I've already told you.  This
8  was the beginning of an action that he could just add
9  on, add on, add on, and get to a certain point to say
10  you are fired.  That's what I believe, that he would
11  be able to do progressive actions, disciplinary
12  actions on me.
13   Q.  And you never received any additional -- or
14  strike that.  Now, is a verbal warning considered
15  discipline under the union contract?
16   A.  It could be the beginning of disciplinary
17  actions.
18   Q.  And no record of it is kept, right?
19   A.  Excuse me?
20   Q.  No record of a verbal warning is kept in the
21  personnel file or anything?
22   A.  No actions of a verbal warning is kept?  I
23  don't know.  They may have kept them.
24   Q.  Is it your -- do you have any idea one way or
25  the other -- or strike that.  Is it your belief

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                           7/8/2008
DEPOSITION   OF BERNETHIA JOHNSON

20 (Pages 230 to 233)

Page 230

1  there's any record of an oral warning kept anywhere or
2  is it just an oral warning?
3      A.  I don't know what another person would do.
4      Q.  Now, as union steward, were you aware of how
5  the union contract works in the different levels of
6  discipline in the grievance system?
7      A.  Yes.
8      Q.  All right.  Now, the union contract doesn't
9  list an oral warning as a disciplinary step, does it?
10     A.  It did not list it as a disciplinary step.  I
11  keep saying that it could be the beginning of
12  progressive actions.
13     Q.  Do you --
14     A.  Progressive disciplinary actions.
15     Q.  Were any additional, I guess, disciplinary
16  actions taken against you for insubordination after
17  you received this verbal warning?
18     A.  Were any additional?
19     Q.  Did you receive any discipline --
20     A.  I --
21     Q.  Strike that.  I'm thinking.
22     A.  Okay.
23     Q.  Strike that.  Do you have any evidence that
24  any record of this verbal warning that Paul Reams gave
25  to you is placed in your personnel file?

Page 231

1      A.  No.
2      Q.  Okay.  And you didn't suffer any loss of pay,
3  and your job wasn't changed because of this verbal
4  warning; is that right?
5      A.  No.  That's correct.
6      Q.  And it didn't have an impact on your
7  performance rating; isn't that right?
8      A.  I don't know.
9      Q.  Well, you received the same performance
10  rating before and after you received this verbal
11  warning, didn't you?
12     A.  This was in 2004?  Repeat that question
13  again.
14     Q.  You received the same performance rating for
15  I guess your 2004 annual review as you received in
16  2003?
17     A.  Correct.
18     Q.  So there was no adverse effect on your annual
19  evaluation because of this oral warning; is that
20  right?
21     A.  Correct.
22     Q.  Now, how are you claim -- how do you claim
23  you were harmed by this warning?
24     A.  How was I -- how was I harmed?  It was just a
25  continual of what I had been going through with

Page 232

1  management and what they were doing.  The disciplinary
2  action -- the oral warning I felt was not warranted.
3  I felt that they overlooked the fact that that -- that
4  Linda gave them my response of needing more records or
5  not.  I felt like -- and just they were being -- there
6  was no justice at all to that warning -- for that
7  warning.
8      Q.  Okay.  You disagreed with the decision to
9  give you that oral warning?
10     A.  That is correct.
11     Q.  All right.  Besides disagreeing with it, is
12  there any other way you say you were harmed by
13  receiving it?
14     A.  I could say I was harmed because my health
15  started decaying even more.  I was not getting any
16  sleep.
17     Q.  Are you saying --
18     A.  I worked in fear.  I became more depressed.
19  Anxiety.  Lack of interest in doing anything.
20     Q.  And you attributed all of that to receiving
21  this oral warning?
22     A.  Because -- yes.  I will say yes.
23     Q.  Let me hand you a document I'm going to mark
24  as Defendants' Exhibit #18.  Can you tell me if you
25  recognize Defendants' Exhibit #18?

Page 233

1      A.  I do.
2      Q.  Now, this is a written reprimand you received
3  on May 27th, 2004 from Paul Reams, correct?
4      A.  Yes.
5      Q.  All right.  And did you read this reprimand
6  when you received it?
7      A.  No, I did not.
8      Q.  Okay.  Do you recall there being a meeting on
9  May 27th, 2004 in Paul Reams' office where he gave
10  you --
11     A.  Yeah.
12     Q.  -- where he gave you this reprimand that's
13  being marked as Defendants' Exhibit #18?
14     A.  Yes.
15     Q.  Who else was present at that meeting?
16     A.  The union -- there was union representation
17  there.
18     Q.  Is that Lynda Hall?
19     A.  Yes.
20     Q.  Was Cynthia Lamar also present?
21     A.  I can't recall.
22     Q.  Did you tape-record this meeting?
23     A.  I don't know.
24     Q.  Let me give you a document that's marked as
25  #19 and tell me if you've seen Defendants' Exhibit #19

Page 234

1  before.
2    A.  Yes.
3    Q.  Okay.  Is Defendants' Exhibit #19 a memo that
4  Lynda Hall put together generally summarizing that
5  May 27th, 2004 meeting you had with Paul Reams where
6  he gave you the written reprimand?
7    A.  Yes.
8    Q.  Now, is the time -- I'm directing you now to
9  Defendants' Exhibit #19.  She has the time of the
10  meeting being 3:15 to 3:45.  Does that generally look
11  accurate?
12    A.  Yes.
13    Q.  And have you read this memorandum before
14  that's marked as Defendants' Exhibit #19?
15    A.  I've read it before.
16    Q.  Do you believe it accurately summarizes the
17  meeting?  Obviously, it's not going to capture
18  everything.  But do you believe it accurately
19  summarizes the meeting on May 24th, 2004?
20    A.  Let me read it again.
21    MR. DUBOIS:  And while you're reading it
22  we're going to go off the record.
23    (Off-the-record discussion)
24    Q.  Back on the record.  I gave you Defendants'
25  Exhibit #19 to read through.  This is a memorandum

Page 235

1  that Lynda Hall had typed up generally summarizing,
2  from her perspective, a meeting held on May 27th,
3  2004.  I asked you to read it and go through and tell
4  me if you believed it accurately summarized that
5  meeting, if there were parts you disagreed with.
6    A.  I -- I disagree with --
7    Q.  Let me strike that.  Instead of disagree,
8  what I mean is you don't believe is accurate is a
9  better word.
10    A.  Okay.
11    Q.  And what I want to know is she put together
12  this memo regarding the meeting.  I want to know what
13  took place during the meeting.  So if you believe
14  anything in here is inaccurate, that's what I want to
15  know about.
16    A.  Okay.  I believe that the statement, it is --
17  okay.  Give me a second.  It's the statement in the
18  second paragraph.  It is the third sentence from --
19    MS. BATTLE-HODGE:  This, I think you're
20  counting -- I think you counted the first couple of
21  lines as the first.  That's not right.
22    THE WITNESS:  Oh, I'm sorry.  One, two,
23  three.  Is this the third paragraph?
24    MS. BATTLE-HODGE:  If you count the first two
25  lines.

Page 236

1    Q.  How about tell me the first word of the
2  paragraph you're referring to, the first two words.
3    A.  Paul continues.
4    Q.  Okay.  So we're going to the paragraph in the
5  middle of Defendants' Exhibit #19 that said Paul
6  continued.  Okay.  What about that paragraph?
7    A.  Okay.  The sentence is counting from the last
8  sentence in that paragraph is the third line.  From
9  the -- and it starts with Paul said she.
10    Q.  There's a sentence that said Paul said she
11  could have worked Friday --
12    A.  There you go.
13    Q.  -- through Monday or she could work when
14  she's here talking instead of working, she being you,
15  Ms. Johnson?
16    A.  That is correct.  Okay.
17    Q.  What about that sentence is inaccurate?
18    A.  It's inaccurate.
19    Q.  What about the sentence?  Did Paul not say
20  that?
21    A.  Paul said she could have worked Saturday.
22    Q.  Okay.  So if I cross out Friday and put
23  Saturday, you recall him saying that?
24    A.  Yes.
25    Q.  Okay.  Anything else about that sentence

Page 237

1  that's inaccurate?
2    A.  No.
3    Q.  Now, what else about Ms. Hall's memo that you
4  believe?
5    A.  The next paragraph.
6    Q.  And this being the paragraph that starts
7  Bernethia said at the bottom of the first page of
8  Defendants' Exhibit #19?
9    A.  Correct.
10    Q.  What part of that paragraph?
11    A.  It's the fifth sentence.  I'm sorry.  The
12  fifth line.  The fifth line.
13    Q.  Okay.
14    A.  The sentence that read -- reads Bernethia
15  said she was not told until February 20th.
16    Q.  Okay.  What about that sentence is
17  inaccurate?  Did you not say that?
18    A.  It was not February the 20th.  It was
19  last day of the month.  That should have been the 27th
20  I believe.  It was not February the 20th.
21    Q.  Okay.  You believe it was later than
22  February 20th?
23    A.  Yes.
24    Q.  Okay.  And what else do you believe is
25  inaccurate about Defendants' Exhibit #19?

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/8/2008
DEPOSITION  OF BERNETHIA JOHNSON

22 (Pages 238 to 241)

---

Page 238

1    A.  Those -- those are the two that I believe are
2  inaccurate.
3    Q.  Okay.  The rest of it looks to be a fairly
4  accurate summary of everything?
5    A.  Fairly accurate.
6    Q.  Besides what's in Defendants' Exhibit #19, do
7  you recall anything else being discussed when Paul
8  Reams gave you the written reprimand that's marked as
9  Defendants' Exhibit #18?
10   A.  No.
11   Q.  Now, did Paul Reams give you time to respond
12 to the reprimand?
13   A.  Yes.
14   Q.  How many days?  Do you recall?
15   A.  Fifteen days, I suppose.
16   Q.  And is the number for under the union
17 grievance procedure is generally 15 days?
18   A.  I don't know about that.  I was trying to
19 make a statement before you went on with what you just
20 said.
21   Q.  Okay.  What is your statement relating to?
22   A.  I believe that I received an extension to
23 that.
24   Q.  Okay.  Originally he gave you 15 days and
25 then subsequently you got an extension of additional

---

Page 239

1  time to respond?
2    A.  Yes.
3    Q.  Okay.  Now, after this meeting on May 27th,
4  2004, where Mr. Reams gave you the written reprimand
5  as Defendants' Exhibit #18, did you ask him for some
6  case histories relating to the reprimand?
7    A.  Correct.
8    Q.  And did he provide those to you?
9    A.  Yes.
10   Q.  I'm going to hand you exhibit marked as
11 Defendants' Exhibit #20.  And can you tell me, is --
12 are those the case histories that Paul Reams gave you
13 after that May 27th, 2004 meeting?  And I will comment
14 that these case histories have been redacted because
15 it's a public deposition transcript to remove the
16 address and Social Security numbers and most of the
17 last names leaving the first initials of these
18 individual Social Security claimants.  So in the
19 format when you received it back in 2004, it wouldn't
20 have been redacted back then.
21   A.  My -- my response is these may have been.
22   Q.  Okay.  But you can't recall today whether or
23 not this is what Paul Reams gave you?
24   A.  I can't recall if these are the actual one he
25 gave me.

---

Page 240

1    Q.  Do you have any reason to think they're not
2  the ones he gave you?
3    A.  Yes.
4    Q.  Okay.  And what makes you think they may not
5  be the ones he gave you?
6    A.  Because the file contains some more of these
7  but with a different date.
8    Q.  And which date are you pointing to?
9    A.  The 5/28/2004.
10   Q.  Now, you had a meeting with him on May 27th,
11 2004. 5/27/2004, where he gave you the written
12 reprimand, right?
13   A.  Correct.
14   Q.  And then you asked for him to give you the
15 case histories, right?
16   A.  Okay.
17   Q.  And 5/28/2004 is the following day?
18   A.  That is correct.
19   Q.  And so if he printed out the case histories
20 and gave them to you the next day, this date -- what
21 about the date again that your --
22   A.  I'm not certain if these are the actual cases
23 that he gave me or did he gave me another set with a
24 different date on it, on them.
25   Q.  Okay.  I go on to the first page of

---

Page 241

1  Defendants' Exhibit #20.  The note.  Do you see that?
2  Bernethia, these are the HOTS records that you
3  requested yesterday.  Do you see that?  And signed
4  Paul?
5    A.  Yes.  Yes.
6    Q.  Does that look to be Paul's handwriting?
7    A.  This is Paul's handwriting.
8    Q.  You're just saying you've seen some other
9  case histories that have a different date at the top
10 left corner?
11   A.  That is correct.
12   Q.  Do you know what date they have?
13   A.  I think they may say April '04.
14   Q.  And is it your understanding that date on the
15 top left corner of this HOTS case history is the day
16 it's printed?
17   A.  I understand that what I'm looking at 5/28 --
18 yes.
19   Q.  That's the date and time it's printed from
20 the HOTS system?
21   A.  Yes.
22   Q.  Do you know other than the fact that you've
23 seen some documents with a April 2004 date in the top
24 left corner, is there anything else that makes you
25 think this may not be a set of records Paul Reams gave

---

Page 242

1   to you the day after the May 27th meeting?
2       A.  I've -- I've seen some more that were
3   submitted that bears a different date.
4       Q.  Okay.  And when did you see these?  Did you
5   see these other ones in the EEO file, is that where
6   you saw them?
7       A.  Yes.
8       Q.  Did you see them when you were getting ready
9   for this deposition?
10      A.  Yes.
11      Q.  And there was something -- do you know where
12  those records came from that were in the EEO file?
13      A.  Evidently management submitted them.  Now,
14  either management -- yes.  Evidently management
15  submitted them.
16      Q.  Now, the HOTS case histories that Paul Reams
17  gave you after this May 27th meeting, there were I
18  think 11 of them; is that right?
19      A.  Correct.
20      Q.  And they were for the same individuals as in
21  Defendants' Exhibit #20.  You're just not sure if the
22  date is the same?
23      A.  Correct.
24      Q.  The date it was printed?
25      A.  That is correct.

---

Page 243

1       Q.  So let me go now and see.  But these could be
2   the documents, you're just not sure?
3       A.  Correct.
4       Q.  Let me just make this stack of documents here
5   Defendants' Exhibit #21, is that what we're on?  Let
6   me just hand you a stack of documents marked as
7   Defendants' Exhibit #21.  And if you could just tell
8   me is this the stack of documents you saw in the EEO
9   file with a different date in the top left corner?
10      A.  Correct.
11      Q.  And you don't know where the April 27th, 2004
12  set of documents came, other than it came from
13  management and was given to the EEO file?
14      A.  What I'm saying is I don't know if Paul Reams
15  actually gave me the 4/27/2004 or the 5/28/2004.
16      Q.  Okay.  But the ones he gave you were for 11,
17  I guess Social Security claims?
18      A.  That is correct.
19      Q.  Okay.  And let me direct you now back to
20  Defendants' Exhibit #20.
21      A.  #20.  Okay.
22      Q.  Let's go to the second page.  If you look in
23  the center of that page, approximately in the center
24  there's a place where it says, WKUPEMP.  Do you see
25  that line?

---

Page 244

1       A.  Yes.
2       Q.  And that stands for work up employee,
3   correct?
4       A.  Yes.
5       Q.  And the initials there are BTJ?
6       A.  Correct.
7       Q.  And those are your initials, right?
8       A.  Wait a minute.  BTJ, correct.
9       Q.  And on the same line there's a heading that
10  says one over to the left.  It says end work up, do
11  you see that?
12      A.  Yes.
13      Q.  And there's a date there; is that correct?
14      A.  Yes.
15      Q.  And is it your understanding that's the date
16  that's been entered in the HOTS system as the case
17  having been worked up?  In other words, when an
18  employee is assigned the case, finishes work up, then
19  they can enter in the HOTS system and the work up's
20  completed and that's the date that goes right there;
21  is that right?
22      A.  What I see is that -- I see 4/17/04 and that
23  this was the end of work up.  Yes.  The end work up
24  date.
25      Q.  And that's what the 4/17/04 is the date

---

Page 245

1   that's entered into the system by the employee who's
2   working up the case to indicate that they have worked
3   it up?
4       A.  It -- no.
5       Q.  Okay.  What's your understanding of the end
6   work up date that's in the HOTS system?
7       A.  My -- my understanding is that it I could
8   have put -- since it says BTJ, I could have put this
9   date there or anyone else could have gone and put that
10  date there.
11      Q.  Okay.  You're saying that anyone could have
12  made that entry?
13      A.  That is correct.
14      Q.  But that date -- generally how the HOTS case
15  system worked is that it assigned an employee and when
16  that employee worked it up, they go in the HOTS system
17  and they enter an end work up date; is that correct?
18      A.  That is the way, yes, it should be or should
19  have been.
20      Q.  And that end work up date would be reflected
21  in the HOTS case history in the middle of the page
22  after end work up?
23      A.  After it's worked up.  Yes.
24      Q.  All right.  Let me direct your attention to
25  the bottom of the second page.  Actually it's a third

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/8/2008
DEPOSITION OF BERNETHIA JOHNSON

24 (Pages 246 to 249)

Page 246

1  page of Defendants' Exhibit #20. The initials at the
2  top are RE?
3      A.  Okay.
4      Q.  You see at the bottom -- bottom right corner
5  there's a last update entry?
6      A.  Yes.
7      Q.  And there's initials BTJ. Are those your
8  initials?
9      A.  Correct.
10     Q.  And what's your understanding of the last
11 update line on the HOTS case history?
12     A.  My understanding is that my initial BTJ with
13 04/23 is there.
14     Q.  Do you know what that means, last update?
15     A.  That that was the last time an update was
16 made to the case.
17     Q.  Okay. And it indicates who made the update
18 with the initials, correct?
19     A.  That is correct.
20     Q.  How would you log into the HOTS case
21 history? Did you have your own unique password?
22     A.  I can't recall if we -- I can't recall.
23     Q.  Okay. Now, at some point, did Paul Reams
24 also provide you some words, screen shot that showed a
25 date of creation or creation date?

Page 247

1      A.  No, he did not.
2      Q.  Did you look up that information yourself?
3      A.  Some of them I did.
4      Q.  Let me hand you Defendants' Exhibit #22.
5  Tell me if you recognize that e-mail.
6      A.  Oh, I recognize it. I'm sorry.
7      Q.  And this is an e-mail -- actually it's a
8  chain of e-mails. The bottom one is June 14th, 2004
9  from you to Paul Reams and it's asking for evidence to
10 substantiate the reprimand he gave on May 27th, right?
11 Do you see that?
12     A.  Right.
13     Q.  And then he indicates he has information
14 ready and you write on June 15th the top e-mail I
15 received the information from you yesterday. Do you
16 know what information you received from him on
17 June 14th?
18     A.  I received some case histories.
19     Q.  Okay. Different than the ones that are
20 Defendants' Exhibit #20?
21     A.  I don't know. The reason I say I don't know
22 is going back to the date. 05/28, 04/27.
23     Q.  Okay. But just to summarize, after this
24 May 27th meeting Paul Reams gave you case histories
25 for 11 different people?

Page 248

1      A.  That is correct.
2      Q.  And the ones he gave you you're saying are
3  either -- it's either Defendants' Exhibit #20 or #21,
4  you're not sure of which one though?
5      A.  That is correct.
6      Q.  Okay. Now, if -- just referring to the note
7  that's at the top of Defendants' Exhibit #20, it says,
8  these are the HOTS records you requested yesterday.
9  Do you see that?
10     A.  Yes.
11     Q.  Do you know if these case histories, did he
12 give them to you in response to that June e-mail which
13 is Defendants' Exhibit -- strike that. Do you know
14 when you received the case histories from him? Was it
15 the day after your May 27th meeting or was it a few
16 weeks later?
17     A.  After my May 27th meeting. I mean --
18     Q.  Was it the day after or was it a few weeks?
19     A.  No, it was the day after or so.
20     Q.  So the day after he gave you some records.
21 This e-mail is dated in June. Did he give you
22 something else?
23     A.  Well, then let me answer that question with
24 shortly thereafter.
25     Q.  Okay. Shortly thereafter you got case

Page 249

1  histories from him?
2      A.  Yes.
3      Q.  Which are either Defendants' Exhibit #20 or
4  #21?
5      A.  Correct.
6      Q.  Do you recall give getting anything else from
7  him besides those case histories?
8      A.  All I received were the case histories.
9      Q.  Now, let me hand you Defendants'
10 Exhibit #23. Can you tell me if you recognize
11 Defendants' Exhibit #23?
12     A.  Yes. I recognize them.
13     Q.  Now, these were attached to one of your EEO
14 submissions. Did you prepare these?
15     A.  Yes.
16     Q.  And Defendants' Exhibit #23, appears to be
17 the 11 individuals with case histories who were given
18 copies of the word General screen shot and the word
19 Summary screen shot; is that correct?
20     A.  Correct.
21     Q.  Did anyone help you prepare this document as
22 Defense Exhibit #23?
23     A.  The Holy Spirit.
24     Q.  Anyone else?
25     A.  That's it.

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/8/2008
DEPOSITION  OF BERNETHIA JOHNSON

25 (Pages 250 to 253)

---

Page 250

1    Q.  And what do you believe Defendants'
2  Exhibit #23 shows?
3    A.  It shows -- it's hard for me to actually read
4  this now but -- it shows the create date, the modified
5  date, and the assessed date.
6    Q.  Okay.  Referring to the first page of
7  Defendants' Exhibit #23, under the created, modified
8  and accessed date which is all shown to pull up in a
9  General word tab in the computer; is that right?
10   A.  I don't know if it's General or Summary.  I
11  don't know which one is which.
12   Q.  But one of them shows a created, modified and
13  access date and the other one shows -- if you flip the
14  page, second page of Defendants' Exhibit #23 a date of
15  creation.  Do you see that?
16   A.  That is correct.  Okay.
17   Q.  So it's your understanding that when you go
18  into work, you can pull up two different tabs.  One
19  has created, modified and access dates and the other
20  one has a date of creation?
21   A.  Yes.
22   Q.  And what were you trying to show when you put
23  together Defendants' Exhibit #23?
24   A.  I was trying to figure out what was going on
25  and what I -- what was I being accused of.

---

Page 251

1    Q.  What's your understanding of -- what -- what
2  does it mean in the word General or the word tab and
3  has a created, modified and accessed date?  Do you
4  know what those dates mean?
5    A.  No.
6    Q.  And going to the second page, do you know
7  what the date of creation means?
8    A.  No.
9    Q.  Did you talk to Linda Tamplin about those
10  dates?
11   A.  Yes.
12   Q.  And what did she tell you about them?
13   A.  She told me that she called the help desk to
14  find out because she did not know.
15   Q.  Did she ever get back to you and tell you --
16   A.  No.
17   Q.  -- what they meant?  The answer is no?
18   A.  No.
19   Q.  Okay.  Now, do you recall having a second
20  meeting with Paul Reams about your written reprimand
21  where you give him a copy of Defendants' Exhibit #23
22  and discussed it with him?
23   A.  Yes.
24   Q.  And Linda Tamplin was also present at that
25  meeting?

---

Page 252

1    A.  Yes.
2    Q.  And who requested that second meeting?
3    A.  I may have -- because -- I may have.
4    Q.  And was that second meeting on June 21st,
5  2004?
6    A.  I can't say what date it was.
7    Q.  Let me hand you Defendants' Exhibit #24.
8  Tell me if you've seen this document before.
9    A.  Yes.
10   Q.  Okay.
11      MR. DUBOIS:  I don't have --
12      MS. BATTLE-HODGE:  It's okay.
13   Q.  Is Defendants' Exhibit #24 a memorandum
14  prepared by Linda Tamplin that summarizes from her
15  perspective a June 21st meeting you had with Paul
16  Reams?
17   A.  According to what I see, yes.
18   Q.  Have you seen this document before?
19   A.  Yes.
20   Q.  Did Ms. Tamplin give you a copy after the
21  meeting?
22   A.  Yes.
23   Q.  And I -- I'm going to ask you do again what
24  you've done previously.  Can you read through this
25  memorandum, which is Defendants' Exhibit #24, and tell

---

Page 253

1  me if you believe it accurately summarizes that
2  meeting that was held on June 21st.
3      (Off-the-record discussion)
4    Q.  Okay.  Back on the record.  You just finished
5  reading Defendants' Exhibit #24?
6    A.  Yes.
7    Q.  And this memorandum is one prepared by Linda
8  Tamplin in the course to summarize a meeting you had
9  with Paul Reams and with Ms. Tamplin present as union
10  steward on June 21st, 2004, right?
11   A.  Yes.
12   Q.  And I asked you to read it and go through and
13  tell me if there are any parts that looked
14  inaccurate.
15   A.  Yes.
16   Q.  And point me to any parts that you believe
17  are inaccurate?
18   A.  Yes.  On page 2 of three.
19   Q.  Okay.  Second page of Defendants'
20  Exhibit #24.
21   A.  The third paragraph from the last sentence.
22   Q.  Just the one that starts Ms. Johnson said?
23   A.  That start -- yes.
24   Q.  What about that sentence is inaccurate?
25   A.  This part where it says I came in on Saturday

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/8/2008
DEPOSITION OF BERNETHIA JOHNSON

26 (Pages 254 to 257)

Page 254

1  and did them because Monique said there was an audit.
2  Monique never told me that there was an audit. Never.
3  I did not even have knowledge of one. Until I was --
4  well, let me just leave it. Monique never told me
5  there was an audit.
6      Q. Okay. Anything else that's inaccurate about
7  that sentence?
8      A. Yes. This can be taken two ways.
9      Q. I'm not asking you how things can be taken.
10 I'm just trying to figure out --
11     A. Well, because I don't want to --
12     Q. Let me finish. I'm trying to figure out what
13 was said at the meeting. Now, you're saying you don't
14 recall this being said or you recall it being said
15 differently. That's what I'm trying to understand.
16     A. Well, I -- that's what I'm -- I'm sorry.
17 That's what I'm trying to make sure of, that there is
18 an understanding that I have. I came in on Saturday
19 and did them because Monique said there was to be an
20 audit. No. According to the way I read it. That was
21 not the way it was said.
22     Q. Okay. How do you believe that was said at
23 this meeting?
24     A. The way I -- I know that -- that it happened
25 is the way I'm going to say it.

Page 255

1      Q. Well, I'm trying to --
2      A. I mean, I just want to --
3      Q. I'm trying to get what you said at this
4  meeting. What I want to know is what you said at this
5  meeting.
6      A. I don't know actually what I said. I know
7  what happened.
8      Q. Okay. What happened?
9      A. I worked that Saturday. And when I got in, I
10 carried some file to the file cabinet. And I saw
11 Monique going through the file cabinet. And I did not
12 put anything in the file cabinet. I took them back to
13 my desk because I did not want to mess Monique Caffey
14 up with whatever she was doing.
15     Q. Do you know what date this was?
16     A. I think like the 24th.
17     Q. Of which month?
18     A. No. I can't -- I don't know.
19     Q. Okay. At some point you came in on a
20 Saturday and you saw Monique there doing an audit?
21     A. I did not know Monique was doing an audit.
22     Q. You saw her at the file cabinet?
23     A. Yes.
24     Q. So you don't know what you said about that at
25 this meeting on June 21st, 2004?

Page 256

1      A. I will say that I told them I came in on
2  Saturday. But I did not say and did -- because
3  Monique said there was to be an audit. I know that I
4  did not say that. I did not know there was an audit.
5      Q. Okay. So you came in on Saturday, you recall
6  saying that but you don't recall saying anything else
7  in that sentence?
8      A. Yes.
9      Q. Okay. Is there anything else in Defendants'
10 Exhibit #24 you believe is inaccurate?
11     A. Page 3 of three.
12     Q. Okay. What about page 3 of three?
13     A. I don't recall that being said.
14     Q. All right. What are you pointing to?
15     A. I'm sorry. The first paragraph. Mr. -- the
16 first paragraph.
17     Q. Mr. Reams stated?
18     A. Yes.
19     Q. You don't recall him saying that?
20     A. No.
21     Q. Are you saying he didn't say it or you just
22 don't recall?
23     A. I don't recall him saying that.
24     Q. Does that mean you don't remember or he
25 didn't say it?

Page 257

1      A. I don't recall him saying it.
2      Q. Could he have said it and you just don't
3  remember?
4      A. I don't recall him saying that.
5      Q. So you don't know one way or another whether
6  he said it. You have no recollection of it at this
7  time?
8      A. That is correct.
9      Q. Okay. Going back to Defendants' Exhibit --
10     A. Okay. I have no recollection of it at this
11 time.
12     Q. Going back to Defendants' Exhibit #24, is
13 there anything else you believe is inaccurate?
14     A. I would have to say that that first paragraph
15 was not said. Mr. Reams stated, that first paragraph
16 was not said.
17     Q. Now, you secretly tape-recorded this meeting
18 on June 21st, 2004, didn't you?
19     A. Yes. I'm saying yes. I guess I typed -- I
20 taped -- I tried to tape some but when they didn't
21 sound -- where I couldn't make out anything, no, I
22 didn't try to sit down to try to figure out what was
23 being said. No.
24     Q. Do you recall secretly tape-recording this
25 meeting on June 21st, 2004?

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/8/2008
DEPOSITION  OF BERNETHIA JOHNSON

27 (Pages 258 to 261)

Page 258

1      A.  I taped meetings.  I can't say which ones
2  were taped or not.
3      Q.  But if you produced a tape-recording of this
4  meeting, that would be one that you made secretly at?
5      A.  Yes, that is correct.  If I produced it, yes.
6      Q.  And you didn't tell anyone that you were
7  tape-recording it?
8      A.  That is correct.
9      Q.  And you're not sure whether or not it's clear
10 enough to listen to?
11     A.  No, I'm not sure.
12     Q.  Going back to Defendants' Exhibit #24, is
13 there anything else that you believe is inaccurate?
14     A.  No.  I think that was it.
15     Q.  Okay.  Now, where was this meeting on --
16 strike that.  Where was this meeting on June 21st,
17 2004, was it in Paul Reams' office?
18     A.  Yes.
19     Q.  And the time looks pretty accurate there?
20 5:50 to 6:45 p.m., does that look generally accurate?
21     A.  Yes.
22     Q.  Now, this memo refers to some documents that
23 you looked at this meeting when you were having
24 this conversation with Mr. Reams and I want to make
25 sure I understand which ones you actually discussed at

Page 259

1  the meeting.  First it refers to some MS Word
2  documents summary properties.  Do you see what I'm
3  referring to on Defendants' Exhibit #24?
4      A.  The first paragraph?
5      Q.  The one where it says, Mr. Reams and
6  Ms. Johnson each had copies of the screen shots taken
7  of MS Word document summary properties of cases done
8  by Ms. Johnson?
9      A.  Yes.
10     Q.  Now, is that referring to Defendants'
11 Exhibit #23?
12     A.  This is referring -- yes.
13     Q.  So you brought Defendants' Exhibit #23 with
14 you to the meeting and discussed that?
15     A.  Not all of them.  I don't -- wait.  Let me
16 just look at this before I say not all of them.
17 Because I -- I don't think I brought the ones that
18 management did.  Management -- I did not bring all of
19 #23.  I did not take all of Exhibit #23 to Mr. Reams.
20     Q.  Okay.  Exhibit #23 is one that you prepared
21 all of these screen shots yourself, right?
22     A.  No.
23     Q.  I thought you had previously testified you
24 prepared Defendants' Exhibit #23?
25     A.  No.  Not all of them.  If this is more than

Page 260

1  11 sheets here, than the other sheets that -- other
2  than the 11 sheets I took to him were not done by me.
3      Q.  And I'll try to understand your answer.  So I
4  guess I'll ask again.  Is Defendants' Exhibit #23
5  which we talked about earlier is for 11 different
6  individuals that you had given cases for, is a print
7  of a General Word screen shot and a Summary Word
8  screen shot for each of them.  Is that what your
9  understanding of Defendants' Exhibit #23 is?
10     A.  Yes.
11     Q.  And did you print each of those Word screens
12 for each of those 11 people?
13     A.  No.  I did not print this entire packet here.
14 Exhibit #23, I did not print all of them.
15     Q.  Which part of it did you print?
16     A.  The ones I printed are the ones that shows
17 created, modified, and accessed.
18     Q.  Okay.  So you're saying you printed the Word
19 screen shots from the General tab that had the
20 created, modified and accessed dates?
21     A.  If that's -- if it comes under General, the
22 ones that bear these three are the ones that I did.
23     Q.  Created -- the ones you printed had created,
24 modified and accessed dates?
25     A.  That is correct.

Page 261

1      Q.  So that would be on the first page.  So
2  turning to the second page of Defendants' Exhibit #23
3  we have a screen shot that shows date of creation.  Do
4  you know where that page came from?
5      A.  No.
6      Q.  Do you believe you were provided copies of
7  the screen shots from somebody?
8      A.  Hold on.  Okay, give me a second.  Let me
9  look through this for a moment.  I apologize.  I
10 apologize.  I do apologize.  Because I'm just having a
11 hard time trying to see these things.  But date of
12 creation.  Yes.  I did.  I did these.  Yes.
13     Q.  Okay.  So just to clarify the record,
14 Defendants' Exhibit #23 are Word screen shots that you
15 prepared, the whole packet?
16     A.  I'm going to have to look through each one
17 of them and I'm just having a hard time trying to read
18 them because they're -- well, anyway, I'll try to do
19 my best.  Yes, these are the ones.  Yes.  I owe you
20 apologize.  These are the ones that I actually did.
21 Yes, they are.
22     Q.  Okay.  And did you bring Defendants'
23 Exhibit #23 with you to the meeting on June 21st,
24 2004?
25     A.  More than likely these are the ones that I

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/8/2008
DEPOSITION  OF BERNETHIA JOHNSON

28 (Pages 262 to 265)

| Page 262 |
|---|
| 1  took to the meeting with me, yes. |
| 2      Q.  Okay.  Do you recall going through these |
| 3  screen shots with Mr. Reams and Ms. Tamplin and |
| 4  discussing the created date and the date of creation |
| 5  and what those dates meant? |
| 6      A.  I recall talking to Paul Reams in the |
| 7  presence of Linda.  Yes.  Yes.  That's -- that's |
| 8  correct. |
| 9      Q.  Okay.  And what was your understanding at |
| 10  that meeting what these different dates mean? |
| 11      A.  My understanding was to show that just what |
| 12  it says.  That -- that I was trying to get them -- I |
| 13  had questions myself.  But I took them to Paul Reams |
| 14  to try to show him that what they -- what -- I don't |
| 15  know.  I took them to try to show Paul Reams -- oh, I |
| 16  asked Paul -- I don't know.  I can't recall.  I just |
| 17  can't recall. |
| 18      Q.  Do you recall going through Defendants' |
| 19  Exhibit #23 at this meeting on June 21st and |
| 20  discussing those different Word screen shots? |
| 21      A.  Yes. |
| 22      Q.  Now, if you go back to Defendants' |
| 23  Exhibit #24, which is a memo by Linda Tamplin.  She |
| 24  also mentions -- I'm on the first full paragraph. |
| 25  There's a line that says, Ms. Johnson also had a sheet |

| Page 264 |
|---|
| 1      A.  What I did, I actually drew up this little |
| 2  form here.  And I put each of the legal assistant, |
| 3  lead or anyone that was -- that did the same type of |
| 4  work as I did, I put their initials up here.  And then |
| 5  I would just go in -- |
| 6      Q.  Just to step by step, so it makes sense for |
| 7  the record. |
| 8      A.  Okay. |
| 9      Q.  So you created this chart with these headings |
| 10  that said leads, CLT, last four Social Security |
| 11  number, created, modified, accessed, date last saved. |
| 12  Do you see that column at the top? |
| 13      A.  Yes. |
| 14      Q.  So you put together an empty chart? |
| 15      A.  Yes. |
| 16      Q.  And then what did you do? |
| 17      A.  And then I just went in the system and just |
| 18  called up -- just whatever came up, I just used that |
| 19  and I just wrote the -- the claimant's name, the last |
| 20  four Social Security number, and like the same thing |
| 21  that Exhibit #23 was showing, the created date, the |
| 22  modified date, the accessed date and then create date. |
| 23  Date of creation. |
| 24      Q.  Okay.  Going back to Defendants' Exhibit #25, |
| 25  the created, modified and accessed date on this |

| Page 263 |
|---|
| 1  with approximately 11 samples of each of the other |
| 2  cases showing somewhat similar dates and times.  Do |
| 3  you see that? |
| 4      A.  I really don't see it.  But that is correct. |
| 5  That's what I did. |
| 6      Q.  Do you recall bringing another document? |
| 7      A.  Yes. |
| 8      Q.  Let me hand you Defendants' Exhibit #25.  And |
| 9  tell me if this is the other sample that's being |
| 10  referred to in Linda Tamplin's memo on June 21st, 2004 |
| 11  meeting? |
| 12      A.  Correct. |
| 13      Q.  All right.  So you brought Defendants' |
| 14  Exhibit #25 to that meeting? |
| 15      A.  Yes. |
| 16      Q.  And you recall discussing it with Mr. Reams? |
| 17      A.  Yes. |
| 18      Q.  And did you prepare Defendants' Exhibit #25? |
| 19      A.  Yes. |
| 20      Q.  And what -- how did you prepare this |
| 21  document? |
| 22      A.  I just went in the system and all I did was |
| 23  like when I saw -- how did I prepare it?  That's what |
| 24  you want to know? |
| 25      Q.  Yes. |

| Page 265 |
|---|
| 1  document you got from the word screen shot for these |
| 2  Social Security claimants? |
| 3      A.  Yes. |
| 4      Q.  And you entered them in your chart? |
| 5      A.  Yes. |
| 6      Q.  And then the date created you got from I |
| 7  guess the Word Summary screen tab for each of these |
| 8  claimant's word tab? |
| 9      A.  Yes |
| 10      Q.  Where did you get the date last saved from? |
| 11  Was that also on the Word summary screen shot? |
| 12      A.  It may -- yes.  Last saved?  Yes.  That -- |
| 13  that came from the chart.  I mean, not the chart.  It |
| 14  came from the snapshot. |
| 15      Q.  And did you tell Mr. Reams what you thought |
| 16  Defendants' Exhibit #25 showed, or why you were |
| 17  showing it to him at that meeting? |
| 18      A.  Yes. |
| 19      Q.  What did you tell him? |
| 20      A.  I told him that the same -- that the same |
| 21  thing that the screen shot is showing is the same |
| 22  thing that is written on these charts that I provided |
| 23  him.  That they were created with different months. |
| 24  They were modified with a variety of months in between |
| 25  them.  As many as -- well, I can't say as many because |

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/8/2008
DEPOSITION  OF BERNETHIA JOHNSON

Page 266

1  there's some that went eight and nine months showing
2  that the created date and the date of creation were
3  two different times.
4      Q.  Okay.  So you told him that this document
5  showed that for other, I guess, employees of the
6  office, the screen shots for some other cases had
7  different date created and -- date created dates on
8  the Word screen than the date of creation dates on the
9  other Word screen?
10     A.  Yes.
11     Q.  How did you pick the Social Security claimant
12 files for these other employees?
13     A.  If you look at Exhibit #23, I'll just use the
14 top page.  You'll see that there's some more
15 information.  These are claimants' names and
16 information regarding the claimants.
17     Q.  Okay.
18     A.  And all you have to do is just highlight the
19 one you want.
20     Q.  Okay.  How did you pick these -- the
21 particular ones that you listed for each of the
22 employees in Defendants' Exhibit #25?  Did you just
23 start randomly going through the records until you
24 found ones with different dates in those two Word
25 screens or how -- is it random?  Do you see my

Page 267

1  question?
2      A.  It was randomly done.  Using Exhibit #23, and
3  I'm using this as an example only, there are
4  approximately -- well, I can count them.  There are 15
5  names here.
6      Q.  The first page of Defendants' Exhibit #23?
7      A.  Yes.  There are 15 names here.
8      Q.  Okay.
9      A.  All I have to do -- all I had to do was just
10 highlight that and information would come up.
11 Whatever -- if it was Renee Bridges, if I highlighted
12 that first case and it was Renee Bridges, because I
13 already had drafted a chart with her initials on it,
14 Renee Bridges, RB -- okay.  If I created -- okay.
15 Say, for instance, that first one was Renee Bridges.
16 All I took was the claimant's name, the last four
17 Social Security number.  I took the date that it
18 showed that it was created, the date that it was
19 modified, the date that it was accessed; and then I
20 also took the date -- the creation date and the date
21 last saved.
22     Q.  Okay.
23     A.  I went to the very next one and I just did
24 them one after another, one after another.  I --
25     Q.  So you went into each of the legal assistants

Page 268

1  and just pulled 11 individuals and wrote down that
2  information from the Word screens?
3      A.  I went into search, and I searched for the
4  ones that Paul -- I was being accused of.  When I got
5  to the ones that I was being accused of --
6      Q.  Okay.  And let me just --
7      A.  Okay.
8      Q.  Page -- the fourth page in.
9      A.  Fourth page, okay.
10     Q.  These are the 11 case histories or
11 individuals where you had been accused of claiming
12 credit for work that wasn't completed, right?
13     A.  Yes.
14     Q.  These are the case histories that Paul Reams
15 had provided to these individuals?
16     A.  Yes.
17     Q.  So you took the information from the Word
18 screens for those and entered them in here for
19 yourself?
20     A.  Yes.
21     Q.  My question is, how did you come up with the
22 other individuals you listed for the other people who
23 worked in the Social Security office?  So when I turn
24 the page LC -- turn the next page after yours.
25 There's LC there.  Who is LC?

Page 269

1      A.  Louise Chevalier.
2      Q.  And is she a legal assistant?
3      A.  Yes.
4      Q.  And who did she report to at that time?
5      A.  Cynthia Lamar.
6      Q.  Okay.  And then you have a list of Social
7  Security claimants that are beginning with M?
8      A.  Yes.
9      Q.  Ending with H?
10     A.  Correct.
11     Q.  How did you pick those 11 individuals?  Or
12 how did you find those files?
13     A.  I would just go in and just whatever I saw, I
14 just called it up.  I didn't go -- I did not use a
15 case file or anything.  Again, using Exhibit #23,
16 page 1, I could see just there was more than the list
17 that I was interested in, which was mine.  Trying to
18 prove my innocence.  So if I saw -- oh, here's another
19 one.  I'll just call that.  Just call that.  That's
20 what I did.  I did not know which legal assistant
21 would come up or anything.  There was no -- there was
22 no method, no certain particular method I used.
23     Q.  Okay.  Now, there was no column, or you
24 didn't have any information on Defendants' Exhibit #25
25 regarding the HOTS status of these cases, right?

Page 270

1    A.  Excuse me?  Say that again.
2    Q.  There was no column regarding what status
3  these cases were in HOTS, right?
4    A.  No.  I did not.  You're talking about on what
5  I created?
6    Q.  Yes.
7    A.  No, I did not.
8    Q.  And you have no idea one way or another
9  whether any of these claimants' files have the exhibit
10  listing on them, do you?
11    A.  No.
12    Q.  What do you recall, if anything, about your
13  discussion with Paul Reams about Defendants'
14  Exhibit #25 at that meeting on June 21st?
15    A.  I asked Paul Reams why did he not do
16  everyone.  Why was he just -- why did he just choose
17  to do me.  He told me he was not interested in anybody
18  else but me.
19    Q.  Did he say why?
20    A.  No.
21    Q.  What else do you recall?
22    A.  That they could not explain the difference in
23  create date and date of creation.
24    Q.  Okay.  Anything else?
25    A.  I recall Paul Reams saying, and I -- I hope

Page 271

1  I'm not getting the meetings dates mixed up.  But I
2  recall Paul Reams saying that what he would do is he
3  would go back.  He would go back to the supervisors
4  and see if they could come up with other reasons then
5  or other things.  And I said other things.  I said,
6  Paul, you mean to tell me you're going to look for
7  other reasons to -- and he said, I'll go back to the
8  supervisors and see what I can find.
9    Q.  Did he tell you if he was going to the
10  supervisors with the same files on your desk without
11  the exhibit list?
12    A.  No, he never told me he would go back to the
13  supervisors who had saw files on my desk.  He did not
14  say that.
15    Q.  You're saying he said I'll go back to the
16  supervisors?
17    A.  That's what he said, to the best of my
18  knowledge.
19    Q.  What else do you recall being discussed at
20  this June 21st, 2004 meeting besides what's in this
21  memo to the extent you said?
22    A.  Besides --
23    Q.  All the parts -- other than the parts you
24  highlighted in the Exhibit #24, is there anything else
25  you recall being discussed at the meeting?

Page 272

1    A.  I can't recall anything.
2    Q.  Okay.  And besides, it looks like there
3  was -- we have Defendants' Exhibit #23 and Defendants'
4  Exhibit #25 which are both stacks of documents that
5  you brought to that meeting and discussed with Paul
6  Reams.  Were there any other documents you brought to
7  the meeting?
8    A.  Not that I know of.  No, not that I know of.
9  Not that I can recall.  Yes.  Hold on.  I don't know
10  if it was at that meeting.  No.  Not that I can
11  recall.
12    Q.  Do you recall having a discussion -- other
13  than this June 21st meeting, did you have any other
14  discussions with Paul Reams about this written
15  reprimand after he gave it to you on May 27th, 2004?
16    A.  I recall taking the audit report that Monique
17  Caffey had given to me.
18    Q.  Okay.  Do you believe you brought it to this
19  June 21st meeting?
20    A.  I don't know.  I can't -- June 21st.  Hold
21  on.  No.  I know I did not bring it to that June 21st
22  meeting.
23    Q.  Okay.  Let me -- let me hand you what's been
24  marked as Defendants' Exhibit #26.  This was the
25  document you provided in the EEO process.  Is this the

Page 273

1  audit record of Ms. Caffey you're referring to?
2    A.  I'm sorry.  I'm sorry.  It was just getting
3  too -- now, what was your question?
4    Q.  You referred to some audit report from
5  Monique Caffey.  You may or may not have brought to
6  this June 21st meeting.  I'm asking you if Defendants'
7  Exhibit #26 which is something you submitted in the
8  EEO process is what you're referring to?
9    A.  I think there was another one also.  I think
10  I had two of them.  There's another one out here
11  somewhere.
12    Q.  Okay.  But do you know whether or not you
13  discussed these with Paul Reams?
14    A.  I know I discussed them with Paul Reams.
15    Q.  Do you think it was at this June 21st
16  meeting?
17    A.  I don't think so.
18    Q.  Let me refer you to the second page.
19    A.  Okay.  The second page of --
20    Q.  Second page of Exhibit #24.
21    A.  Okay.
22    Q.  Third paragraph up, which is the paragraph we
23  previously talked about, says, Neither of you --
24  Ms. Johnson said neither were the others on Monique's
25  list and handed him --