BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/8/2008
DEPOSITION  OF BERNETHIA JOHNSON

31 (Pages 274 to 277)

---

Page 274

1    A. I'm sorry, what page?
2    Q. Second page of Defendants' Exhibit #24.
3    A. And third one up. Okay.
4    Q. Third sentence from the bottom. It mentions
5  you handing Paul Reams a typed list. Do you know what
6  that refers to?
7    A. Ms. Johnson said neither were the others on
8  Monique's list and handed him a typed list. So,
9  then -- Ms. Johnson said neither were the others on
10 Monique's list and handed him a typed list.
11   Q. My question, is Defendants' Exhibit #26 the
12 typed list you handed to Paul Reams at that meeting?
13   A. I handed him -- I can't say. I cannot say
14 whether it was at that meeting or not, or if I took
15 them in -- let me see something. Unh-unh. I don't
16 think this was done at that time.
17   Q. Okay. It was afterwards?
18   A. I think I handed Paul Reams -- I think I took
19 these, this and another list that Monique Caffey gave
20 to me. I did take them and ask Paul Reams about them.
21 I don't think it was at the meeting, though.
22   Q. Do you know when it was?
23   A. No.
24   Q. Are these other cases list -- our cases, what
25 was this list of that Monique Caffey had given you?

---

Page 275

1    A. Of -- of the audit report.
2    Q. Cases that she hadn't found in the RTF
3  cabinets?
4    A. I don't know what all they were. If you
5  don't mind, could you find the other list, please?
6    Q. I'm not sure I've seen it.
7    A. There's another list that I submitted.
8    Q. Okay. So you gave Paul Reams some lists that
9  Monique Caffey gave you?
10   A. Yes.
11   Q. And what did you tell him those lists showed?
12   A. That other legal assistants, that their list
13 was not -- that their -- I took the list to Paul and
14 said something like Paul, are these -- are these the
15 ones you're talking about. Did -- this -- what
16 Monique gave me showed that it was an audit and that
17 other legal assistants' names of cases were missing
18 from the file.
19   Q. Okay.
20   A. That's what this was.
21   Q. So the document -- the list that -- Monique
22 Caffey had given you the list of cases that were
23 missing from the RTF or RTH cabinets?
24   A. Yes.
25   Q. That's what Monique Caffey told you it was?

---

Page 276

1  That's what Monique Caffey told you the list was?
2    A. Monique Caffey told me, she said, well,
3  Bernethia, I -- I was the one that did that audit.
4  She said, I'll give you a copy of what I gave to
5  management.
6    Q. All right. And you gave that list to Paul
7  Reams?
8    A. And then I went and asked him about the list.
9    Q. What did he say when you asked him about it?
10   A. I asked him, I said -- I don't recall. I
11 recall saying, Paul, these are the same things -- I
12 said -- I can't recall because I'm getting everything.
13 I can't recall.
14   Q. Do you recall -- you don't recall when that
15 discussion was?
16   A. No.
17   Q. And you have no evidence one way or another
18 whether or not any of these missing files on the list
19 Monique Caffey give you had exhibit lists on
20 them, do you?
21   A. No.
22   Q. Do you recall anything else being discussed
23 at that June 21st meeting with Mr. Reams?
24   A. No.
25   Q. After that meeting --

---

Page 277

1        MR. DUBOIS: We are on Defendants'
2  Exhibit #27?
3        COURT REPORTER: Yes, we are.
4        MR. DUBOIS: And we'll take lunch very
5  shortly.
6    Q. Let me give you Defendants' Exhibit #27,
7  which is a series of e-mails. Can you tell me if
8  you've seen the e-mails on Defendants' Exhibit #27
9  before?
10   A. Yes.
11   Q. And these are a series of e-mails exchanged
12 between you and Mr. Reams between June 22nd, 2004 and
13 June 28th, 2004?
14   A. Correct.
15   Q. And if we go to the bottom one, this is the
16 first one that starts the chain. It's from Paul Reams
17 to you dated June 22nd and it says, I have reviewed
18 the evidence in the matter. I've concluded there's
19 ample evidence supporting the reason for the
20 reprimand. I extend the time period for you to
21 respond to this reprimand until Monday, June 28th. Do
22 you recall receiving that e-mail?
23   A. Yes.
24   Q. Did you talk to him about it? After you
25 received that e-mail, did you have any further

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/8/2008
DEPOSITION  OF BERNETHIA JOHNSON

32 (Pages 278 to 281)

|  | Page 278 |
|--|--|
| 1 | discussion with Mr. Reams or did you just write him |
| 2 | back an e-mail? |
| 3 | A. I don't -- I don't know if I talked to him |
| 4 | anymore about it. I don't know if I talked to him |
| 5 | anymore about it. Because -- well, I don't know if I |
| 6 | talked to him anymore about it. |
| 7 | Q. Okay. Did you send him the next e-mail up, |
| 8 | which looks like -- it says from Bernethia Johnson to |
| 9 | Paul Reams, dated Monday, June 28th, 2004? |
| 10 | A. Did I do what? |
| 11 | Q. Did you send him that e-mail? I'm going a |
| 12 | little bit up on Defendants' Exhibit #27. |
| 13 | A. Yes. |
| 14 | Q. There's an e-mail from you dated June 28th, |
| 15 | 2004 to Paul Reams, that says: Will you be using the |
| 16 | same evidence or did you, as you stated you would, |
| 17 | search for new evidence to use? If you have received |
| 18 | new evidence, please provide it to me immediately. I |
| 19 | must meet the deadline. Period. Did you send Paul |
| 20 | Reams that e-mail? |
| 21 | A. Yes. |
| 22 | Q. And then, is the e-mail at the top dated |
| 23 | June 28th, 2004 at 3:37 p.m. -- looks to be about a |
| 24 | half hour after you sent the e-mail below it -- from |
| 25 | Paul Reams to you, his response to that e-mail? |

|  | Page 279 |
|--|--|
| 1 | A. That's his response I received. |
| 2 | Q. You received that response. Okay. And that |
| 3 | response said, The evidence used in the reprimand is - |
| 4 | - it's got three sentences there, right? First, your |
| 5 | files that were in the RTS category missing from the |
| 6 | RTS file. Files found on your desk in the RTS |
| 7 | category with no exhibit list on file. And computer |
| 8 | records showing work done by you on these file after |
| 9 | you said you were finished working on it. You receive |
| 10 | that e-mail? |
| 11 | A. Correct. |
| 12 | Q. And after you received that e-mail, did you |
| 13 | have any discussion with Paul Reams about what he's |
| 14 | referring to, or any further discussion at all about |
| 15 | the written reprimand? |
| 16 | A. I can't recall. I don't -- I can't recall. |
| 17 | Q. Do you believe you did? You say you can't |
| 18 | recall. |
| 19 | A. I don't recall having any further |
| 20 | conversation about the e-mail. |
| 21 | Q. Okay. You don't recall ever asking what |
| 22 | evidence he was referring to or -- I'm not aware of |
| 23 | any further discussion. I'm just wondering. |
| 24 | A. I just don't recall anymore, having anymore |
| 25 | conversations with him. |

|  | Page 280 |
|--|--|
| 1 | Q. Now, did you ever provide a written response |
| 2 | to a reprimand? |
| 3 | A. Yes. |
| 4 | Q. Did you submit it to Paul Reams? |
| 5 | A. Yes. |
| 6 | Q. Do you know when you did that? |
| 7 | A. Either I submitted it to Paul Reams or Judge |
| 8 | Thigpen. |
| 9 | Q. Do you recall preparing some written response |
| 10 | to the reprimand but you're not sure who you submitted |
| 11 | it to? |
| 12 | A. Yes. |
| 13 | Q. Let's mark this as Defendants' Exhibit -- |
| 14 | once we cover this we'll take a break for lunch. |
| 15 | MR. DUBOIS: Defendants' Exhibit #28 now? |
| 16 | COURT REPORTER: Yes. |
| 17 | Q. And this is a document that was produced in |
| 18 | discovered. I only have one copy of it. Is |
| 19 | Defendants' Exhibit #28 the written response you |
| 20 | prepared to the May 27th, 2004 reprimand? |
| 21 | A. Yes. |
| 22 | Q. Did you ever sign it? In other words, is |
| 23 | there a signed copy somewhere? |
| 24 | A. I don't know. I don't know. |
| 25 | Q. Do you know for sure if you ever submitted |

|  | Page 281 |
|--|--|
| 1 | this response? |
| 2 | A. I know I submitted a response. |
| 3 | Q. Okay. You do recall submitting the response? |
| 4 | A. Yes. |
| 5 | Q. Do you know when you submitted it? |
| 6 | A. No, I don't. |
| 7 | Q. And you're not sure who you gave it to, |
| 8 | Judge Thigpen or Paul Reams? |
| 9 | A. No. |
| 10 | Q. I may have already asked you. Do you have |
| 11 | any idea when this Defendants' Exhibit #28 was |
| 12 | prepared? |
| 13 | A. Excuse me? |
| 14 | Q. Do you know when Defendants' Exhibit #28 was |
| 15 | prepared? |
| 16 | A. No. |
| 17 | Q. Do you know when Ms. Caffey was fired? |
| 18 | A. Ms. Caffey was fired I think in April or May |
| 19 | of 2004. It had to be after I showed Paul Reams what |
| 20 | Ms. Caffey submitted to me. |
| 21 | Q. Ms. Caffey's termination date was mid July |
| 22 | 2004. Do you think you prepared Defendants' |
| 23 | Exhibit #28 after mid July of 2004? |
| 24 | A. Her termination date was that but that was |
| 25 | not the date that they proposed that she be |

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/8/2008
DEPOSITION   OF BERNETHIA JOHNSON

33 (Pages 282 to 285)

Page 282

1  terminated. Her terminate -- there was a period in
2  there that Ms. Caffey had waited.
3     Q.  Okay.  And you're not sure what date that
4  was?
5     A.  I don't know the actual date that Ms. Caffey
6  was terminated.
7     Q.  Do you know, have you ever received a
8  response to Defendants' Exhibit #28?
9     A.  Everything I have, I have submitted to
10 you-all.
11    MR. DUBOIS:  All right.  Now is a good time
12 to stop for lunch.
13       (Lunch recess)
14    MR. DUBOIS:  Let's start with Defendants'
15 Exhibit #29.
16    MS. BATTLE-HODGE:  #28.  Did we do #28?
17    MR. DUBOIS:  Yeah, we did #28.
18    MS. BATTLE-HODGE:  What was #28?
19    MR. DUBOIS:  #28 was --
20    MS. BATTLE-HODGE:  Oh, I just need a copy.
21 That's right.  You didn't have enough.
22    THE WITNESS:  This helps you by leaving it
23 where you can see it, doesn't it?
24    MR. DUBOIS:  Yeah.  We can put it like this.
25    Q.  I'm now going to give you two at once.  I'm

Page 283

1  going to give you #29 and #30 just to speed things up.
2  And let me direct your attention first to Defendants'
3  Exhibit #29.  Do you recognize that document?
4     A.  Yes.
5     Q.  Okay.  Is this the formal complaint of
6  discrimination you filed with the Social Security
7  agency --
8     A.  Yes.
9     Q.  -- regarding the May 27th written reprimand,
10 allegations regarding your request to work at home in
11 April of 2004, and the April 30th, 2004 oral
12 reprimand?
13    A.  Yes.
14    Q.  Okay.  Now, turning to the last page, is that
15 your signature there?
16    A.  Yes.
17    Q.  Do you know why it's signed twice?
18    A.  Yes.
19    Q.  And why is it signed twice?
20    A.  Because one of the signature was a copy and I
21 wanted an original.  So, I signed it again with an
22 original.
23    Q.  What was the signature a copy of?
24    A.  It -- the signature was my signature and the
25 very first time I signed it then I made copies of it

Page 284

1  so the copied signature was there but I wanted an
2  original signature there.
3     Q.  Okay.  So, so basically you signed it twice?
4     A.  Yes.
5     Q.  And did you sign it on September 3rd, 2004
6  when you submitted it?
7     A.  That was -- let me see.  This -- it was one
8  of them was signed on that date.  Yes.  One of these
9  signature was signed on that date.  Yes.
10    Q.  And do you recall when you first made contact
11 with an EEO counselor?
12    A.  I don't know the date or the month.
13    Q.  Okay.  Let me refer you to Defendants'
14 Exhibit #30?
15    A.  Okay.
16    Q.  And have you seen this, the first page you
17 see as a letter dated August 10th, 2004 to you, the
18 first two pages, do you see that?
19    A.  No.
20    Q.  And attached to that letter which was mailed
21 to a copy of the EEO final counseling report; is that
22 right?
23    A.  Yes.
24    Q.  Do you recall receiving Defendants'
25 Exhibit #30?

Page 285

1     A.  Yes.
2     Q.  And see, if you look at the first letter, it
3  asks you to sign and return a copy of that formal
4  complaint that's attached.  Do you see that?
5     A.  No.
6     Q.  See the first sentence, enclosed original and
7  three copies of the final counseling report for your
8  review and signature?
9     A.  I'm sorry.  Where are you reading?
10    Q.  The first paragraph of the August 10th
11 letter.
12    A.  Enclosed -- I see it.
13    Q.  This is to inform.  Do you see that?
14    A.  Yes.
15    Q.  Okay.  And did you sign it?  If you flip to
16 the last page it looks like you signed it on
17 September 3rd. 2004.  Is that your signature on the
18 last page?
19    A.  Yes.
20    Q.  Okay.  So did you sign a copy and mail it
21 back in?
22    A.  Yes.  I did whatever they requested me to do.
23    Q.  And if you look at the -- the counseling
24 report which is attached?
25    A.  A counseling report is attached?

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                                    7/8/2008
DEPOSITION  OF BERNETHIA JOHNSON

34  (Pages 286 to 289)

Page 286

1   Q.  Yeah.  It's -- the first two pages of
2   Defendants' Exhibit #30 is the letter --
3   A.  Oh, okay.
4   Q.  -- and then it's the report that's attached.
5   The first page of that says date counseling first
6   sought June 29th, 2004.  Do you see that?
7       MS. BATTLE-HODGE:  Actually the third page.
8       THE WITNESS:  What page is he saying?
9       MS. BATTLE-HODGE:  Actually the third page.
10      THE WITNESS:  Okay.
11  Q.  The first page of the counseling report, the
12  third page of the exhibit?
13  A.  Okay.
14  Q.  Sorry.  Okay.  You on the third page which is
15  the EEO counseling report?
16  A.  That is correct.
17  Q.  The date counseling first sought is June
18  29th, 2004.  Do you believe that's accurate?
19  A.  Yes.
20  Q.  And see on line 13?
21  A.  Line 13 or item 13?
22  Q.  Item 13?
23  A.  Okay.
24  Q.  Item 13 is EEO counseling report.
25  A.  Item 13.  12.  Okay.

Page 287

1   Q.  And is that your signature on item 13?
2   A.  Yes.
3   Q.  And that signature is acknowledging receipt
4   of the rights and description of the issues to be
5   counseled, right?  That's what it says?
6   A.  That's correct.
7   Q.  And you signed it July 30th, 2004?
8   A.  Yes.
9   Q.  Now, turning back to the May 27th, 2004
10  written reprimand we talked about previously.  In this
11  formal complaint which is Defendants' Exhibit #29 in
12  the lawsuit you filed, you allege that that was due to
13  you received that written reprimand because of your
14  race and for retaliation; is that right?
15  A.  Yes.
16  Q.  Those are the two grounds you claim you
17  received it for?
18  A.  I know that race and retaliation I felt was
19  involved, yes.
20  Q.  Okay.  First going to race.  Can you tell me
21  what made you believe you were issued a written
22  reprimand because of your race?
23  A.  I was issued that written reprimand -- I
24  mean, because of my race because of the way I was
25  being treated.  I felt like from the -- from the first

Page 288

1   time that Paul called me that bitch, that he was
2   always after me.  I never understood why.  Then there
3   was Teresa Week who had given me information that said
4   that Paul was not going to promote any more blacks.
5   Because of things that happened when I was an EEO
6   union representative.  Happened to be a black union
7   representative and I just feel like that everything he
8   did, he did towards me because of my race has been a
9   part of why he was doing that.
10  Q.  Okay.  Referring to a couple of things there.
11  The comment Teresa Weeks made, you previously
12  testified about that?
13  A.  Yes.
14  Q.  And what where the other things you
15  mentioned?
16  A.  When, just a minute ago?
17  Q.  Yeah.  Could you repeat those?  Read that
18  back.  I'm sorry.  I wrote them down but I can't
19  remember it.  Oh, I'm sorry.  I got it now.  You
20  mentioned Paul Reams calling you a bitch, or making a
21  comment about you a bitch.  When did that take place?
22  A.  December the 10th, 1999.
23  Q.  And what do you recall about that incident?
24  A.  That I was humiliated, embarrassed, degraded
25  and everything else when I heard him call me that,

Page 289

1   that bitch.
2   Q.  Did he call you that bitch or make the
3   comment or say that something you said was bitchy?
4   A.  He called me that bitch.  He made that
5   statement to other employees sitting at a table in a
6   formal training.
7   Q.  And did you confront him about that comment?
8   A.  Yes, I did.
9   Q.  What did he say -- or what did you say to
10  him?
11  A.  I told him that I would like to talk to him
12  about a comment I heard.
13  Q.  All right.  And what else did you say?
14  A.  I want to know why did he call me that bitch.
15  Q.  And what did he say in response?
16  A.  He was surprised that I heard it.
17  Q.  Anything else?
18  A.  He said, Bernethia, you heard that?  I said,
19  yes.  He said, but you were sitting way across the
20  room over on the other side.  I said, I know.
21  Q.  And what else was discussed?
22  A.  I think he apologized for calling me a bitch
23  I think.
24  Q.  Do you recall receiving his e-mail apology as
25  well?

Page 290

1    A.  I e-mailed him regarding that.
2    Q.  And he e-mailed and apologized?
3    A.  Excuse me?
4    Q.  Do you recall receiving an apology from him
5  by e-mail or was that in person?
6    A.  I can't -- I can't recall if he apologized in
7  person, he was so shocked that I heard it.  But I do
8  know that I received -- that we did correspond by way
9  of e-mail regarding the statement he made.
10    Q.  Okay.  And you believe he apologized?
11    A.  Do I believe that --
12    Q.  Do you believe he apologized for it?  Do you
13  recall?
14    A.  In the statement?
15    Q.  At any point in time?
16    A.  Do I believe he apologized for calling me
17  that bitch, is that what you're asking me?
18    Q.  Yeah.  Do you recall him apologizing?
19    A.  I think in the e-mail it says something about
20  he would not -- he would be careful not to do that
21  again.  So if that's an apology, I guess that was it.
22    Q.  And you never heard him call you that again
23  or make any comment about bitch again?
24    A.  I never heard him say that again.
25    Q.  And then you referred to some EEO activity or

Page 291

1  something when you were a union rep.  What are you
2  referring to then?
3    A.  There were some things that Paul was doing
4  that he should not have done, that I would bring to
5  his attention.  And there would be times when he'd
6  say, big deal, grieve me.  So I would grieve him.
7    Q.  Can you recall any particular instances
8  you're referring to?
9    A.  I know that I had to confront him about not
10  putting people in -- oh, I confronted him one time
11  about -- no, Paul and I had a meeting.  We sat down
12  and we put people in a group, in certain groups.  And
13  the following workday Paul Reams went back, undid what
14  we agreed upon and did it his way.  So when I tried to
15  talk to him about it, he said big deal, grieve me.  So
16  I contact -- contact the union and the union sent him
17  a letter stating that something to the fact that he
18  was not allowed to do what he did and that he would
19  have to cease and desist.  Let me see.
20    Q.  Any other instances?
21    A.  Monique Caffey.  I represented Monique.  He
22  accused Monique of not calling her -- of not calling
23  the agency and Monique said that she did.  And so
24  where we did a grievance action at that time.
25    Q.  What was the result of that grievance?

Page 292

1    A.  Monique -- I would have to say I think.  I
2  can't recall.
3    Q.  Any other union activity or that you believe
4  supports your allegation that you received this
5  reprimand because of your race?
6    A.  Paul Reams did not -- I tried to talk to Paul
7  Reams.  Paul Reams, he would allow -- at the end of
8  the month they would allow the employees to take two
9  additional hour for lunch -- hours for lunch.  And I
10  talked to Paul Reams about that.  And he did not like
11  that.
12    Q.  And when was that?
13    A.  Then -- oh, gosh, what year?
14    Q.  What year?
15    A.  I don't know.  I can't recall the year.  And
16  then when the agency had a inspection, they -- oh.  In
17  order for us to take the two hour leave, Paul Reams --
18  management would give us leave slips that we would
19  have to turn back in to them.  And when the agency did
20  their inspection, they found out what Mr. Reams was
21  doing and they asked Mr. Reams to stop.  So then
22  Mr. Reams called a meeting and said, okay, well, they
23  asked us not to do that.  So what we're going to do is
24  we're not going to use leave slip anymore.  We just
25  want you-all to tell us when you go to take leave so

Page 293

1  we can do it.  Just we won't use the leave slip.  That
2  way the agency will not be able to know what was going
3  on.  I told him that -- you know, we had talked about
4  that.  But Tresalyn Collier wanted to get out of
5  Cynthia Lamar's group.  Paul Reams and I had a
6  discussion about that.
7    Q.  Do you recall when that was?
8    A.  The year, the month, no.
9    Q.  This all would have been when you were union
10  rep, right?
11    A.  Yes.  So it was before November 2002.
12    Q.  And what was the result of Ms. Weeks' request
13  to be removed?
14    A.  Ms. Who?
15    Q.  Ms. Weeks?  Did you say Ms. Weeks?
16    A.  No.
17    Q.  Who did you say?
18    A.  Tresalyn Collier.
19    Q.  Collier.  I'm sorry.  Ms. Collier asked to be
20  removed from Cynthia Lamar's supervision?
21    A.  Yes.  She eventually was removed.
22    Q.  Okay.  Any other union activity that you --
23    A.  I was involved with --
24    Q.  Let me finish the question -- supports your
25  claim that this written reprimand was given because of

Page 294

1  your race?
2      A.  I was involved with -- what is his name.
3  He's an attorney.  David Wilder.  There was some
4  action that had taken place between David Wilder and
5  Cynthia Lamar.  And I was involved in that.  Cynthia
6  Lamar withdrew her accusation and -- Cynthia Lamar
7  withdrew her accusation; therefore, Mr. Wilder dropped
8  his grievance and they allowed Mr. Wilder to go into
9  another group.  I was involved in that.
10     Q.  And who had filed the grievance, Cynthia
11 Lamar or David Wilder?
12     A.  David Wilder, because again, Cynthia --
13     Q.  Cynthia?
14     A.  -- was supposed to have lied on him.
15     Q.  Okay.  Any other union activity beliefs that
16 support your claim?
17     A.  I can't think of any others right now.  But
18 I'm certain there are others.
19     Q.  Oh.  Is there anything -- when you say you're
20 certain there's others, is there anything that would
21 refresh your memory on that point?
22     A.  I questioned management about how did they
23 know -- there was a process that met -- I'm sorry.
24 How did they know that the people that were being --
25 okay.  Yes.  Okay.  Before Paul Reams and them --

Page 295

1  okay.  Before Paul Reams and them actually started
2  giving us leave slips to take the two hours -- two
3  hour lunch break, they used to award a one person per
4  group two hours lunch break.  I had individuals who
5  come to me complaining about that because they
6  wanted -- they worked just as hard, they felt and they
7  wanted to know what process were they using to say
8  this person above everybody else in their group
9  deserved the additional two hour leave.  So I had to
10 confront management about that.  When I confronted
11 Paul Reams about it, he said he did not know.  But I
12 said, so are you saying that I need to talk -- he said
13 all I know, I asked the supervisor to give me a name
14 from each group and they give me the name so we award
15 the additional leave.  So I had to go and talk to each
16 of the -- each of the supervisors.  Cynthia Lamar,
17 Paul Johnson and what is her name, Pam Davenport as
18 well as Judge Thigpen I believe.  I talked to him
19 about it.
20     Q.  Okay.  Anything else?
21     A.  Not that I know of.
22     Q.  In relation to this written reprimand you
23 received, are you claiming any other legal assistants
24 were treated better than you?
25     A.  Yes.

Page 296

1      Q.  Who?
2      A.  All of them.
3      Q.  Okay.  And what's your basis for saying that?
4      A.  Because one of the basis is that just by
5  asking for work.  Although management put out e-mails
6  saying that we could not get your cases, we could not
7  get work up cases until Fridays, management were
8  allowing other employees to get them anytime they
9  needed them.  I had to wait until Fridays.  When
10 management would say okay, it's time for us to change
11 our work, you give -- you give your work to this
12 person, you give your work to that person, that person
13 will give their work to this person.  Well, when I was
14 getting other people work, their work was incompleted.
15 And I went to management to try to show management,
16 Paul Reams would say, are you trying to make a point.
17 Or do you not want to do what you're being told to do.
18 I said, no, okay, I'll leave out and go and do it.
19     Q.  And what are you referring to in particular
20 now?
21     A.  Whenever management would change our duties.
22     Q.  You complained to Paul Reams?
23     A.  Yes.
24     Q.  And you don't believe your complaints were
25 taken seriously; is that what you're saying?

Page 297

1      A.  That is correct.
2      Q.  Do you have any evidence that Paul Reams
3  received any complaints about other legal assistants
4  besides you who would enter a case as worked up in
5  HOTS but yet had not completed the exhibit list?
6      A.  Do I have that evidence?
7      Q.  Yeah.
8      A.  I don't have evidence.  I just know of it.
9      Q.  You never discussed --
10     A.  Oh, yes, I do have evidence right here.  Yes,
11 I do have evidence.  That's the answer.
12     Q.  And what is your evidence of that?
13     A.  If you don't mind, I submitted Monique
14 Caffey's audit.  There's one in here, but there's
15 another one that I need to show you.  Could you get
16 the other one?  There's one in here but then there's
17 another one.
18     Q.  I don't have another one.
19     A.  I submitted two.  It should have been.  Well,
20 okay, if you don't have it, you don't have it.
21     Q.  Okay.
22     A.  I'll just use this one.  I submitted this
23 along with another one.
24     Q.  Okay.
25     A.  And this was evidence that -- that --

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/8/2008
DEPOSITION OF BERNETHIA JOHNSON

Page 298

1    Q.  What do you believe Defendants' Exhibit #26
2  shows?
3    A.  I think it shows that some people work was
4  not in the file cabinet.
5    Q.  Okay.  But you have no evidence whether or
6  not their exhibit lists in those particular files, do
7  you?
8    A.  I do not have the evidence, no.
9    Q.  And that was my question.  Do you have any
10  evidence that Paul Reams knew of any other legal
11  assistants who had entered cases in HOTS as worked up
12  but yet had not finished the exhibit list?
13    A.  Other than -- but had not -- no.  But had not
14  finished the exhibit list, no.
15    Q.  Now, have you told me every reason you
16  believe you received the written reprimand due to your
17  race?
18    A.  Probably not.  But what I can think of right
19  now I have.
20    Q.  What makes you believe that you received that
21  written reprimand in retaliation for your prior EEO
22  complaints?
23    A.  Okay.  I'm sorry.  Let me just think about
24  this.  Management was angry.  I believe that
25  management was angry with me.  Because I had submitted

Page 299

1  previous EEO actions and they wanted me out of there.
2    Q.  And these previous EEO actions have been the
3  one in 1997 and the one in May or June of 2003?
4    A.  As well as the one where all the white people
5  received awards and no black person was given award.
6    Q.  Did you file an EEO complaint about that?
7    A.  I don't -- oh, that was not an EEO action.
8  No, I did not file a complaint about it.
9    Q.  Well, what makes you believe that management
10  was angry at you for filing these EEO complaints?
11    A.  Because I was informed that -- well, no.  No.
12  I don't know right now.
13    Q.  Well, when you say you don't know right
14  now --
15    A.  I can't --
16    Q.  -- is there something that would refresh your
17  memory?
18    A.  Not that I can recall.
19    Q.  So sitting here today -- strike that.
20    A.  Okay.
21    Q.  Have you told me all the reasons you believe
22  you received that written reprimand for retaliation?
23    A.  I think it was in April 2004 that I went to
24  Paul Reams about -- it was April 2004.  Let me get
25  this together.  I want it to be the right way.  After

Page 300

1  I had pulled receptionist duty, Paul Johnson came by
2  my desk and I told Paul that I would like to work at
3  home Tuesday and Wednesdays.  He said, well,
4  Bernethia, people only work one day at home.  I said,
5  oh, okay then.  And left it like that.  Paul Reams
6  came to me the next day and said, oh, there you are, I
7  need to talk with you.  And I went into his office.
8  He said, Paul Johnson came to me wondering why would
9  you request to work at home two days out of the month.
10  He said, I told Paul because you -- Paul Johnson --
11  Paul Reams told -- said I told Paul Johnson that
12  because you work the front desk that you were to work
13  at home two days a week.  I said -- I said -- oh, and
14  he said -- and I said okay or something like that.
15  And so I said, well, I would like to work at home on
16  Wednesday, this was on a Tuesday when I talked to Paul
17  Reams.  I said, well, I would like to work at home on
18  a -- I'm sorry for skipping around.  But, this was on
19  a Tuesday when Paul called me into the office -- into
20  his office and it was maybe around ten o'clock,
21  somewhere like that.  So when I went in his office he
22  told me about Paul Johnson coming to him about my
23  wanting to work at home two days a week.  And so he
24  said, so, what -- if you want to, Bernethia, you can
25  go home right now and go ahead and work at home today

Page 301

1  and tomorrow.  I said, well, had I worked at home, I
2  would have started at 6:30.  I said, so therefore
3  since it's almost ten o'clock, I would prefer to work
4  at home on Tues -- Wednesday and Thursday.  He said
5  Thursday.  I said yes.  He said Bernethia, people do
6  not -- a week cannot work at home on Thursdays.  And I
7  said, yes, people can work at home on Thursday if they
8  are correcting an action, something to that point.  He
9  said, well, I will call LMR and I'll get back with
10  you.
11    Q.  And he did eventually let you work on
12  Wednesday and Thursday, correct?
13    A.  He eventually did.
14    Q.  And I believe we talked about that the first
15  day of your deposition?
16    A.  Okay.  I don't recall.  I'm sorry.
17    Q.  Is there anything else that made you think
18  you received this written reprimand for retaliation
19  for filing the prior EEO complaints?
20    A.  Thereafter I think -- I want -- I want to say
21  it was April 13th when all of this started taking
22  place, April 13th.  No.  No.  That's it.
23    Q.  Nothing else that you recall?
24    A.  Yes.  After I -- after -- there was a -- I'm
25  sorry.  I sometimes have to just write to get my

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/8/2008
DEPOSITION OF BERNETHIA JOHNSON

38 (Pages 302 to 305)

Page 302

1  thoughts together. Okay. In May 2003 there was --
2  someone had been promoted for a paralegal specialist
3  position. That was May '03. I made the list. When
4  Paul Reams called me into his office to talk about my
5  not making it I asked him a question and he told me to
6  just wait and come back in two weeks and he'll be
7  happy to answer anything. Thereafter things were
8  already -- I was already being treated differently.
9  But things had just -- so much had happened. In --
10  I'm so bad with years and dates. But I believe it was
11  in 2002 when Paul Reams asked Paul Johnson to
12  scrutinize my work as well as Brenda McAnnally.
13      Q.  Were you present in that conversation?
14      A.  No, I was not. Was I present at that time of
15  what?
16      Q.  Any conversation between Paul Reams and Paul
17  Johnson.
18      A.  No, I was not.
19      Q.  What makes you believe that Paul Reams told
20  Paul Johnson that in 2002 to scrutinize your work?
21      A.  Paul Johnson told me.
22      Q.  Paul Johnson told you --
23      A.  Yes.
24      Q.  -- that Paul Reams had asked him to
25  scrutinize your work?

Page 303

1      A.  Paul Johnson told me that Paul Reams asked
2  him and Brenda McAnnally to scrutinize my work.
3      Q.  Was anyone present for that conversation?
4      A.  No.
5      Q.  Did he say why Paul Reams had asked him to do
6  that?
7      A.  I can't recall if he told me why they -- that
8  request was made.
9      Q.  Did you ask why?
10      A.  No. I did not ask Paul Johnson. No.
11      Q.  Anything else that you believe supports your
12  allegation that you received this written reprimand as
13  retaliation for prior EEO complaints?
14      A.  There probably is, I just probably can't
15  think of them right now.
16      Q.  Now, when you received this written reprimand
17  you didn't lose any pay, right?
18      A.  That is correct.
19      Q.  And no lost benefits?
20      A.  That is correct.
21      Q.  No change in job duties and no reduction of
22  hours?
23      A.  That is correct.
24      Q.  And after a year a written reprimand is
25  removed from your file, right?

Page 304

1      A.  Excuse me?
2      Q.  How long is it your understanding that a
3  written reprimand remains in your personnel file?
4      A.  A year.
5      Q.  And then it's removed?
6      A.  It supposed to be.
7      Q.  Do you have any evidence that this written
8  reprimand wasn't removed after a year?
9      A.  No.
10      Q.  And your performance ratings were always the
11  same each year; is that right?
12      A.  That is correct.
13      Q.  Did you grieve this written reprimand through
14  the union?
15      A.  No.
16          MR. HODGE:  Let's take a short break.
17              (Brief recess)
18      Q.  Let me -- back on the record. Let me hand
19  you Defendants' Exhibit #31.
20          MS. BATTLE-HODGE:  Just a second.
21          MR. DUBOIS:  Yes.
22      Q.  This is a copy of the second complaint you
23  filed in Civil Action Number 07 -- CV-059 filed on
24  January 18th -- January 18th, 2007; is that right?
25      A.  January the 10th.

Page 305

1      Q.  January 18th?
2      A.  Oh, January 18th. I thought you said 10th.
3  That's correct.
4      Q.  Have you seen this document before?
5      A.  Yes.
6      Q.  And on paragraph 50 --
7      A.  Paragraph 50. Okay.
8      Q.  -- you have an allegation this harassment
9  retaliation taken against plaintiff was based on
10  plaintiff's participation in statutorily protected
11  activity. You see that?
12      A.  Yes.
13      Q.  And then you have count one, retaliation and
14  count two, hostile environment. Do you see that?
15      A.  Yes.
16      Q.  Is this second lawsuit purely alleging
17  retaliation?
18      A.  Sure. Yes.
19      Q.  In other words, is there any claim of race
20  discrimination in this second lawsuit or are you just
21  alleging the things you challenge in the second
22  lawsuit were taken in retaliation for your prior EEO
23  complaints?
24      A.  This is -- this -- is -- unless I sit down
25  and read everything, is this the one that I got

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/8/2008
DEPOSITION OF BERNETHIA JOHNSON

39 (Pages 306 to 309)

Page 306

1  suspended for by Cynthia Lamar?
2      Q.  Yes.  This allegation -- let me point out.
3  Go to count one which is on page 14 of the second
4  complaint?
5      A.  Page 14.  Oh, I was already on page 14.  I'm
6  sorry.
7      Q.  Paragraph 52 in there alleges that you were
8  suspended for three days and you were charged an
9  additional quarter hour leave?
10     A.  I need to correct something.  When I
11 submitted paperwork, when I first submitted paperwork
12 regarding this, I submitted paperwork that showed
13 where Cynthia Lamar attempted to accuse me of lying on
14 a sign-in sheet.  I think somewhere in my paperwork I
15 put in there something to the fact that because the
16 security guard contacted his supervisor and the
17 supervisor -- his supervisor contacted management,
18 that they accepted the fact that I did not lie up on
19 the time sheet.  Now --
20     Q.  This is one of the allegations --
21     A.  I don't --
22     Q.  I'll be asking you later about some of the
23 allegations.  My sole question now is this second
24 lawsuit, are you alleging -- is it solely a
25 retaliation lawsuit?

Page 307

1      A.  Yes.
2      Q.  There's no -- you're not alleging anything
3  that's listed in the second allegation was taken due
4  to your race?
5      A.  Oh, that is correct.
6      Q.  Okay.  And then paragraph 52, you list those
7  two things so I'll ask you about further, the
8  suspension and the issue about this quarter hour
9  leave.  Besides those two acts, are you alleging any
10 other act was retaliatory for this lawsuit?
11     A.  I'm alleging that the fact that she called --
12 that she asked Brenda McAnnally to come into her
13 office and read to me as retaliation of hostile
14 embarrassment, humiliation, all of that.  I don't know
15 if I put that in there or not.
16     Q.  I believe it's in there.  Let me ask it this
17 way.  Is everything that you're alleging with
18 retaliation in the second lawsuit covered somewhere in
19 this complaint?
20     A.  I think so, yes.
21     Q.  And you're alleging these acts in
22 paragraph 52 it says because plaintiff filed a number
23 of EEO complaints.  And I guess there you're referring
24 to the one you filed in 1997, the May/June 2003 one
25 and then are you also referring to the one we talked

Page 308

1  about previously you filed I guess in June 2004
2  regarding your oral warning --
3      A.  Yes.
4      Q.  -- and your written reprimand?
5      A.  Yes.
6      Q.  Those are the three EEO complaints you filed?
7      A.  Those are the three EEO complaints I filed.
8      Q.  Now, on count two of this lawsuit, you have a
9  hostile work environment complaint.  Do you see that?
10     A.  Yes.
11     Q.  Is everything you claim created this hostile
12 work environment listed in this complaint?
13     A.  I don't know -- I don't know if my talking
14 about Paul Johnson is listed here in this complaint,
15 in this number two complaint that we're talking about.
16 I don't know if it's listed here.
17     Q.  What are you referring to when you say my
18 talking about Paul Johnson?
19     A.  Oh, when I asked for cases and I asked
20 Paul -- that's going back to this case.  I don't know
21 if it's in here.
22     Q.  Okay.  We'll cover that.  This whole work
23 thing, work environment complaint is you're alleging
24 that there's a hostile work environment because you
25 had filed EEO complaints, right?  There was no race,

Page 309

1  it's just retaliation?
2      A.  Retaliation.
3      Q.  Now, let me direct your attention now to
4  spring of 2005 and that's when you were working as a
5  legal assistant under Cynthia Lamar.
6      A.  Okay.
7      Q.  Now, how long had you known Cynthia Lamar?
8      A.  Ever since she had come to the agency.
9      Q.  When was that?
10     A.  I can't remember what year or month.
11     Q.  How would you characterize her as a
12 supervisor compared to Paul Johnson?
13     A.  Cynthia Lamar -- how do I compare them?
14     Q.  Yeah, how would you characterize her as a
15 supervisor compared to Paul Johnson?
16     A.  Cynthia was a -- ugh -- how do -- how would I
17 compare her.  Okay.  Paul Johnson was the better
18 supervisor.
19     Q.  Okay.  What made him a better supervisor?
20     A.  He knew about the work.  He knew more -- let
21 me rephrase that.  He knew more about the work than
22 Cynthia did.
23     Q.  And by work, are you saying that Social
24 Security cases that came in and the job of the legal
25 assistant or what are you saying he knew more about?

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/8/2008
DEPOSITION  OF BERNETHIA JOHNSON

40 (Pages 310 to 313)

Page 310

1    A.  He knew more about what was going on in the
2  agency, the jobs, the duties that we were to do.
3  That's what I'm saying.
4    Q.  Did you ever record any meetings or telephone
5  conversations with Cynthia Lamar?
6    A.  Oh, yes, I did.  Yes.
7    Q.  Do you know what conversations or meetings
8  you recorded?
9    A.  No.
10    Q.  Did you produce those?  Have you recorded
11  those and produce them?
12    A.  I produced everything I had with exception of
13  maybe two or three.  Those were the ones when I first
14  came here and they fell into puddles -- a puddle of
15  water and I was trying to listen to them.  They got
16  wrapped around my -- the metal part of the tape-
17  recorder and I tried to get them out easily but they
18  wouldn't come out.
19    Q.  Do you still have a copy of those tapes?
20    A.  No.  They were all just mutilated.  So I
21  just --
22    Q.  What did you do with them?
23    A.  I just threw them away.  They weren't any
24  good.
25    Q.  Do you know what was on those tapes?

Page 311

1    A.  No, because it would start out (indicating
2  noise) and then when I went to open it up, it was just
3  raveled on the inside.
4    Q.  Okay.  So are you saying if you had any
5  conversations or meetings that you tape-recorded or
6  digitally recorded with Cynthia Lamar, you would have
7  produced them?
8    A.  Yes.
9    Q.  Or they were destroyed when they fell into
10  the puddle?
11    A.  Yes.
12    Q.  Do you specifically recall any meeting where
13  you secretly placed a tape-recorder on your person and
14  walked into a meeting with Cynthia Lamar?
15    A.  I recall that I would place a tape-recorder
16  on me and go into meetings with Cynthia.
17    Q.  So you don't recall what meetings?
18    A.  No.  No.
19    Q.  And if you had them, you would have produced
20  them?
21    A.  Yes.
22    Q.  How often would Cynthia Lamar meet with you
23  regarding your work?
24    A.  Every day.
25    Q.  And what kind of things would she discuss

Page 312

1  with you?
2    A.  Bernethia -- she would tell me to redo this
3  or say, for instant, I sent a notice out to a
4  claimant.  I did not get a response.  I sent a second
5  request out.  And what I did was I will write -- let
6  me see.  The first one was typed in.  The date was
7  typed in.  Then my second request, I will write the
8  date on there and say, second request.  She said,
9  Bernethia, this is inappropriate.  You need to redo it
10  and send a better one out.  I talked to her about
11  that.  I said, well -- well, that was one that I can
12  remember.  The Amy Ward case, I did everything I was
13  supposed to do.  She would send it back.  I would talk
14  to my lead or I would talk to leads.  Have them to
15  review thing.  They said as far as I can see
16  everything is right, everything is done.  So, I would
17  try to talk to her about it.  Finally, I did something
18  that I should not have done but it seemed as though
19  that was what they wanted me to do.  Since Judge
20  Thigpen was asking for a psychological vocational
21  expert, one that had not been -- was asking for a
22  psychological expert, he wasn't asking -- oh, God.
23  How did that go.  I think Judge Thigpen wanted me to
24  send -- send something out to a psychological expert.
25  Well, there was -- there had not been a psychological

Page 313

1  expert on that case.  I went to Cynthia to try to talk
2  to her about it.  So eventually I -- I called a Nancy
3  Sack, who is a psychological expert and we made
4  arrangement for her to come and review the case.
5  Ms. Sack reviewed -- Dr. Sack reviewed it.  And she
6  also told me that it should not have gone to her, but
7  it should have gone to a vocational expert, which I
8  also had a vocational expert to do it.  Gosh, I'm
9  forgetting why I'm talking about this.  I'm sorry.
10  Why am I talking about this?
11    Q.  Why don't we move on to the next question?
12  Did you recall Cynthia Lamar meeting with you in
13  January of 2005 regarding what she perceived as an
14  inordinately long amount of time for you to close
15  cases?  In other words, meeting with you and telling
16  you it was taking you too long or very long to close
17  cases?
18    A.  To close cases?
19    Q.  Yeah.
20    A.  I don't know if it was to close cases, but I
21  was in her office for everything.
22    Q.  Do you remember her talking to you around
23  that time about using Porche and a CPMS system to help
24  you manage your workload and get your work done
25  quicker?

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.     7/8/2008
DEPOSITION OF BERNETHIA JOHNSON

41 (Pages 314 to 317)

Page 314

1     A.  I can't say that.  Now, are you asking for a
2   specific time frame?
3     Q.  Yes.
4     A.  Okay.  I don't know the time frame.
5     Q.  Okay.  But you recall her talking to you
6   about that?
7     A.  Yes.
8     Q.  Do you recall there being a meeting with
9   Cynthia Lamar when you used Cynthia Lamar's phone to
10  page Linda Tamplin over the office speaker system?
11    A.  Yes.
12    Q.  What was the office policy regarding using
13  office page?  Were you aware of it at the time?
14    A.  Yes.
15    Q.  Did Cynthia Lamar ask you not to use her
16  phone?
17    A.  Yes.
18    Q.  So why did you use the phone anyway?
19    A.  I used the phone because Cynthia had me going
20  back and forth, back and forth.  I said, Cynthia, I
21  just want to use -- call her.  What did she say.  And
22  I think I said, well, I'm sorry.  I don't know.  I
23  can't recall actually.  But I know she did not want me
24  to use the phone.
25    Q.  Did you snatch the phone out of her hand?

Page 315

1     A.  I have never snatched a phone out of her
2   hand.
3     Q.  When Ms. Tamplin arrived in Cynthia Lamar's
4   office after you paged her, do you recall her setting
5   a tape-recorder in clear view to tape-record the
6   meeting?
7     A.  That is correct.
8     Q.  And did you subsequently complain to the
9   union about Linda Tamplin using a tape-recorder?
10    A.  I definitely did.
11    Q.  Why is it wrong in your opinion for her to
12  openly record a meeting but it's okay for you to
13  secretly record it?
14    A.  Because I did not trust Linda Tamplin.
15    Q.  And what was the union's response after you
16  complained about Linda Tamplin using the tape-
17  recorder?
18    A.  She was not to use a tape-recorder.
19    Q.  Now, on April of 2005, do you recall having a
20  mid year performance review where Cynthia Lamar
21  discussed your job performance?
22    A.  I remember having a mid year review with
23  Ms. Lamar.
24    Q.  At some point during that review, do you
25  recall taking a copy of your 7B personnel file from

Page 316

1   Ms. Lamar to copy it?
2     A.  Did I take it from her?
3     Q.  Yes.
4     A.  I did not take it from her.
5     Q.  Did you take it from her office?
6     A.  I -- when I went to make a copy, the copier
7   is not in her office so I took it from her office.
8     Q.  Where was it when you took it to leave the
9   office to go make a copy?
10    A.  It was on her desk.
11    Q.  Did you ask her if you could take it before
12  you took it?
13    A.  The way that -- did I ask her could I take
14  it?
15    Q.  Yes.
16    A.  I -- I can't recall whether I asked her could
17  I take it before I made a copy.
18    Q.  When you returned with the file, did
19  Ms. Lamar inform you that she thought you had snatched
20  the file from her and you need to show more respect
21  for management?
22    A.  That she thought I snatched it from her?
23    Q.  Did she tell you when you returned with the
24  7B personnel file to make a copy, did Ms. Lamar tell
25  you that you had snatched it and said you have to show

Page 317

1   more respect for management?
2     A.  She made a statement to that -- something to
3   that effect.  I can't say if it was the way you're
4   saying it.  But you made a statement to something
5   like that -- to that effect.
6     Q.  Okay.  Was Mr. Reams present when she said
7   that?
8     A.  Yes.
9     Q.  And what was your response, if any?
10    A.  I told her I did not take that -- I don't
11  even -- I don't know if she said you snatched the file
12  but if she said you snatched the file I said, Cynthia,
13  I did not snatch this file from you.  That's -- that's
14  all I can say about that.  That's all I can recall.
15    Q.  Do you recall any other discussion about that
16  incident?
17    A.  No.
18    Q.  Let me hand you Defendants' Exhibit #32.  And
19  tell me if you recognize this document.
20    A.  Yes, I recognize it.
21    Q.  Is Defendants' Exhibit #32 a copy of a
22  proposal to suspend that Cynthia Lamar gave you on
23  June 13th, 2005?
24    A.  I don't know if it was actually on June 13th,
25  2005.  But this is what she gave me.

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/8/2008
DEPOSITION  OF BERNETHIA JOHNSON

42 (Pages 318 to 321)

Page 318

1    Q.  On or about June 13th, 2005?
2    A.  On or about, yes.
3    Q.  And in this at the beginning she states that
4  she's proposing to suspend you from paying duty status
5  for five working days for willful and indecent conduct
6  on the job inconsistent with the standards of ethical
7  conduct for government employees; is that right?
8    A.  That's what it reads.
9    Q.  And if you go further down it discusses a
10  June 7th, 2005 meeting you had with her and alleges
11  that during that meeting you rushed towards the middle
12  of her office and forcibly gestured your erect middle
13  finger towards her face in a malicious and vindictive
14  manner.  Is that what you understand the proposal to
15  suspend to be saying?
16    A.  Yes.
17    Q.  Now, when Ms. Lamar gave this proposal to
18  you, was it in a meeting with her or was it left on
19  the desk?
20    A.  It was in a meeting.
21    Q.  Okay.  And who was present for that meeting?
22    A.  Linda Tamplin, Cynthia Lamar and myself.
23    Q.  Was Linda Tamplin present as the union rep?
24    A.  Yes.
25    Q.  Was she taking notes?

Page 319

1    A.  I don't -- I don't know if she took notes or
2  not.
3    Q.  Have you ever seen any notes about the
4  meeting where Ms. Lamar gave you this proposal to
5  suspend?
6    A.  I can't recall right now.  I can't recall
7  right now.
8    Q.  Do you know if you recorded that meeting?
9    A.  I don't know if I recorded that meeting.
10    Q.  Okay.  What do you recall -- where was that
11  meeting held?
12    A.  It was in a hearing room.
13    Q.  Okay.  What do you recall from the meeting?
14    A.  That when we got in that meeting, Linda said
15  this is a -- I mean -- Linda.  Cynthia said that she
16  was proposing to suspend me, and she said that this is
17  the reason why, you can read it.  Something like that.
18    Q.  Okay.  What else -- was anything else said?
19    A.  I was shocked that I was getting suspended.
20  I can't remember if -- no.  I can't remember if she
21  read it to me or what.  I was -- or if I sat there and
22  I read it.  But I was shocked that I was getting
23  suspended.
24    Q.  Did you say anything in response to her when
25  she gave it to you?

Page 320

1    A.  I wanted to -- I -- more than likely I would
2  have asked and I'm still in question today about
3  walking -- let me just get to that part.  Where it
4  says you then abruptly collected the file materials,
5  rushed toward the middle of my office and forcibly
6  gestured your erect middle finger towards my face in a
7  malicious and vindictive manner.  I do recall asking
8  her to show me what she was talking about.  And
9  even -- that's what I recall asking her.
10    Q.  You asked her to show you the gesture she was
11  showing you in her proposal to suspend?
12    A.  Yes.
13    Q.  Did she go ahead and do that?
14    A.  No.
15    Q.  You don't think this memorandum of proposal
16  to suspend adequately describes what she's saying you
17  did?
18    A.  I did not do it.
19    Q.  That wasn't the question.
20    A.  What was your question?
21    Q.  When you read the third paragraph here, is it
22  your testimony you don't know what she's talking
23  about?
24    A.  That is -- oh, I'm sorry.
25    Q.  You gestured your erect middle finger.  Do

Page 321

1  you know what that means?
2    A.  No, I do not.
3    Q.  You don't know what it means to give somebody
4  the middle finger?
5    A.  No, I do not.
6    Q.  Ever done it?
7    A.  Will you show me what they're talking about
8  if you understand it?
9    Q.  I'm not going to do that.
10    A.  Okay, because I keep asking and no one will
11  show me.
12    Q.  So you asked Cynthia Lamar what it meant to
13  erect your middle finger?
14    A.  I asked her to show me what she was
15  explaining -- or was describing here.
16    Q.  And she wouldn't do it?
17    A.  No.
18    Q.  What else do you recall from that meeting
19  where she gave you this proposal to suspend?
20    A.  Basically that was it.  I just wasn't
21  understanding what she was saying.
22    Q.  Now, was it your understanding after she gave
23  you this proposal to suspend that you would have ten
24  days to provide a response to Mr. Reams, who was the
25  deciding official and who would issue a decision on

Page 322

1    the proposal to suspend?
2        A.   Yes.
3        Q.   Now, after that meeting where Cynthia Lamar
4    gave you this proposal to suspend, did you have any
5    further conversation with her about the proposal?
6        A.   I don't think so.
7        Q.   Okay. And did you prepare a response to
8    submit to Paul Reams?
9        A.   Yes.
10       Q.   Let me hand you Defendants' Exhibit #33. And
11   can you tell me if Defendants' Exhibit #33 is your
12   response to Ms. Lamar's proposal to suspend?
13       A.   Yes.
14       Q.   And this is dated June 16th, 2005?
15       A.   Yes.
16       Q.   And the second page above the printed
17   Bernethia T. Johnson, are those your initials?
18       A.   Yes.
19       Q.   So did you write this response and provide it
20   to Paul Reams?
21       A.   Yes.
22       Q.   Did anyone help you prepare it?
23       A.   No.
24       Q.   Now, when you gave it to Paul Reams, was it a
25   meeting or did you just leave it in his office?

Page 323

1        A.   I don't know. I don't -- I -- I think -- no,
2    I don't. I can't recall.
3        Q.   So you don't recall how you got it to Paul
4    Reams. You don't know if it was a meeting or you left
5    it in his office?
6        A.   I probably -- I probably -- I don't -- I
7    can't recall. But I more than likely left it in his
8    office.
9        Q.   Now, subsequently Paul Reams issued a final
10   decision in his proposal to suspend, right?
11       A.   Yes.
12       Q.   Did you ever talk to him in person before he
13   issued that final decision?
14       A.   I think we talked, yes.
15       Q.   Do you know when it was? Was it when he gave
16   you the final decision or was it when you gave the
17   response?
18       A.   I don't know if I gave him this response or
19   if it was left in his office. And I say that because
20   if -- if Paul Reams' door is locked or something, I
21   will slide things under the door. That's why I'm
22   saying that.
23       Q.   Turning to your response Defendants'
24   Exhibit #33, you have the bottom of the first
25   paragraph, I deny the allegation and strongly demand

Page 324

1    the substantial evidence be provided. What did you
2    mean by that statement?
3        A.   I wanted to -- I wanted to know
4    what evidence he had that I did this. Paul Reams said
5    that the fact that she told him was evidence. So,
6    that was it.
7        Q.   But besides Ms. Lamar, what evidence are you
8    asking for? You strongly demand substantial evidence,
9    what are you asking besides -- I mean, you have the
10   proposal to suspend where Ms. Lamar says you did that.
11   What else are you asking for?
12       A.   I wanted to know -- whatever evidence they
13   had to support what Ms. Lamar was saying, that's the
14   evidence I was asking for.
15       Q.   And the second paragraph of your response, it
16   looks like you describe a meeting that took place in
17   Ms. Lamar's meeting on June 7th? And this is the
18   meeting where she alleges that you forcefully erected
19   your middle finger, right?
20       A.   Yes.
21       Q.   And we go to that -- let's see. June 7th you
22   met with her. You have you entered her office and
23   shut the door behind you. Is that what happened?
24       A.   Yes.
25       Q.   Why did you shut the door behind you?

Page 325

1        A.   I always shut the door behind me.
2        Q.   Was anyone else present for the meeting?
3        A.   Oh. No, it was just Ms. Lamar and I talking
4    about that case.
5        Q.   Okay. And you have the Amy Ward case is the
6    case you were discussing?
7        A.   Yes.
8        Q.   So you had -- I'm referring to Defendants'
9    Exhibit #33 according to you, you entered the office,
10   shut the door, she got up, opened the door and
11   returned to her desk. Is that what happened?
12       A.   Yes.
13       Q.   And you asked are you afraid of me. She
14   responded afraid -- afraid. Now -- you always closed
15   the door in the past when talking to Cynthia; is that
16   what you're saying?
17       A.   Yes.
18       Q.   And you're saying on this particular occasion
19   she opened it?
20       A.   Yes.
21       Q.   Had she always opened it?
22       A.   Never.
23       Q.   So this was the first time she ever opened it
24   after you closed it?
25       A.   Yes.

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/8/2008
DEPOSITION OF BERNETHIA JOHNSON

44 (Pages 326 to 329)

Page 326

1    Q.  Did she indicate she was afraid of you?
2    A.  She said afraid?  Afraid?
3    Q.  Were you afraid of Cynthia Lamar?
4    A.  Yes.
5    Q.  If you were afraid of her, why did you shut
6  the door?
7    A.  I always shut the door.
8    Q.  So you shut the door with someone you're
9  afraid of?
10   A.  I prepared my children every day that I went
11  to work at OHA Montgomery that if anything should
12  happen to me how they were to handle things.  Every
13  day I went to work I was always afraid of not
14  returning.
15   Q.  Okay.  This says after Cynthia Lamar opened
16  the door you talked about the Amy Ward case.  Do you
17  see that?  I'm referring to Defendants' Exhibit #33.
18   A.  I'm sorry, what did you say?
19   Q.  On Defendants' Exhibit #33 it says after
20  Ms. Lamar opened the door, you proceeded to talk with
21  her about the Amy Ward case?
22   A.  Yes.
23   Q.  What do you recall talking to her about the
24  Amy Ward case about that?
25   A.  Again, it was because she was saying that

Page 327

1  Judge Thigpen -- she wasn't sure what Judge Thigpen
2  wanted.  I was trying to get an understanding because
3  Judge Thigpen to the best of my knowledge was
4  requesting that we send copies or something to a
5  psychological specialist.  In the hearing of the Amy
6  Ward case, there was never a psychological specialist
7  assigned to sit in on that case.  All of a sudden, I
8  am to come up with a psychological specialist to send
9  Amy Ward case to get comment on but no one was -- no
10  psychological specialist was aware of the case because
11  no one sat in on it.
12   Q.  Okay.  So you told her no one had requested
13  one?
14   A.  I explained to her that there had not been a
15  psychological -- a psychological expert assigned to
16  the case.
17   Q.  Okay.  And Ms. Lamar -- I'm going back to
18  Defendants' Exhibit #33 -- asked you to leave the file
19  with her.  Is that right?
20   A.  Yes.
21   Q.  And at that point you asked to go make a
22  copy?
23   A.  Ms. Lamar said, leave the file with me
24  because I did not -- I have not reviewed the case.
25  Okay.  I'm going to leave it like that.  That's what

Page 328

1  she said.
2    Q.  Now, at that point did you take the file from
3  her and go make a copy?
4    A.  When I saw Ms. Lamar push herself away from
5  her desk, I grabbed things and walked with them -- the
6  file and walked out quickly.
7    Q.  So you took the file with you?
8    A.  After I saw her push herself from my -- from
9  the desk, yes.
10   Q.  Did she advise you that making a copy was a
11  waste of time and resources?
12   A.  She did say that.
13   Q.  Did you say anything in response?
14   A.  I don't -- I don't recall if I said anything
15  in response to that.
16   Q.  And going back to Defendants' Exhibit #33,
17  you reference hearing anger in her voice.  What made
18  you think there was anger in her voice?
19   A.  Her -- she -- she -- Cynthia is a very
20  softspoken young lady.  And Cynthia voice was not as
21  soft as Cynthia was.  Cynthia I could tell was getting
22  frustrated if she wasn't already frustrated.
23   Q.  So you thought she was getting frustrated
24  with you?
25   A.  Yes.

Page 329

1    Q.  And you took the file and left the office?
2    A.  I picked up the file and quickly walked out,
3  yes.
4    Q.  Okay.  And going down to the next paragraph,
5  to the third paragraph in Defendants' Exhibit #33, you
6  said during Ms. Lamar expression of anger I truly
7  believe she may have mistakenly envisioned such
8  action.  Now, are you saying here that Ms. Lamar may
9  have mistaken you giving an erect middle finger to
10  her?
11   A.  I am saying that she may have mistaken what
12  she was accusing me of, yes.
13   Q.  She was accusing you of giving her the middle
14  finger?
15   A.  That is -- she was accusing me of erecting my
16  middle finger towards her face, yes.  That was what I
17  was speaking of.
18   Q.  And it's your suggestion that she maybe made
19  a mistake when she said she thought -- did you make
20  some kind of gesture that she might have mistaken or
21  interpreted; is that what you're saying?
22   A.  Not that I know of.  All I know is it did not
23  happen and I felt that she was getting angry and I
24  don't know.  She is -- she's -- go ahead.
25   Q.  You're saying it may have been a mistake on

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/8/2008
DEPOSITION  OF BERNETHIA JOHNSON

45 (Pages 330 to 333)

---

Page 330

1  her part?
2    A.  On her part?
3    Q.  Yes.  That's what I'm trying to --
4    A.  Is that what you said, on her part?
5    Q.  I'm trying to understand what you mean when
6  you say during Ms. Lamar's expression of anger I truly
7  believe she may have mistakenly envisioned such
8  action?
9    A.  Yes.  I'm just trying to say what -- what she
10 is accusing me of, it did not happen.
11   Q.  So you're trying to say I did not erect my
12 middle finger and maybe she just made a mistake and
13 mistakenly saw me do that?
14   A.  What -- what I was trying to get to
15 understand was someone please show me what she's
16 talking about so that I will have something to talk
17 about.  I knew nothing.
18   Q.  Let me direct your attention to footnote 3.
19   A.  Okay.  3.  Okay.
20   Q.  You say also -- you say, I truly believe she
21 may have mistakenly envisioned such action, referring
22 to her allegation that you raised the middle finger
23 towards her.  And you also say, Ms. Lamar also erred
24 in relating a telephone number that she alluded to.
25 What are you referring to there?

---

Page 331

1    A.  That Ms. Lamar makes mistakes so maybe she
2  made another mistake.  That's what I was referring to.
3    Q.  Okay.  And what -- what is that, she had
4  given you a wrong telephone number; is that what
5  you're saying?
6    A.  Yes.  What I was saying was -- oh, yes.
7  That's the response.
8    Q.  All right.  Let me go to footnote 3.  This is
9  on the first page of Defendants' Exhibit #33.  You
10 have a reference there to an event you claim took
11 place November 5th, 2004, during inventory.  Do you
12 see that?
13   A.  Yes.
14   Q.  Now, this was at your cubicle?
15   A.  Yes.
16   Q.  Was anyone else present?
17   A.  No.
18   Q.  And you say, she grabbed your left arm?
19   A.  Yes.
20   Q.  What did she grab?
21   A.  Excuse me.
22   Q.  What part of your left arm did she grab?
23   A.  Right here.  (indicating)
24   Q.  You're touching the bicep on your left arm?
25   A.  Yes.

---

Page 332

1    Q.  And how long did she hold it for?
2    A.  Seconds.
3    Q.  Did it leave marks?
4    A.  Did it leave marks?  Yes.
5    Q.  Says I looked at her and told her to turn me
6  loose.  She then released my arm.  Before she -- you
7  claim she grabbed your upper left arm on November
8  2004, what were you talking about?
9    A.  Now, say that again.
10   Q.  Before you claim that she grabbed your upper
11 left arm on November 5th, 2004, what were the two of
12 you talking about at your cubicle?
13   A.  That was the day that Cynthia Lamar and --
14 she was doing an inventory on my work.  Cynthia Lamar
15 and I was talking about that inventory, the inventory.
16 That's what we were talking about.
17   Q.  Were you trying to take anything?  What
18 immediately happened before she grabbed your upper
19 left arm?
20   A.  What immediately -- what happened before she
21 grabbed my arm?  Cynthia had gone through and thrown
22 all of my -- gone through the file cabinets that were
23 assigned to me and threw them as she would call -- as
24 she would call file, like -- as she would call a
25 claimant's name, she would throw it on the floor and

---

Page 333

1  it was piling up.  It was -- it was piling up.  All
2  the files I had work on, she was throwing them on the
3  floor.
4    Q.  Did you say something to her about it?
5    A.  Yes, I did.
6    Q.  What did you tell her?
7    A.  I told Cynthia that I have years of logistic
8  experience and I could show her a better way of doing
9  an inventory instead of throwing the files on the
10 floor.  I told her how embarrassing and how
11 humiliating it was.
12   Q.  And then what happened?
13   A.  She continued doing it.
14   Q.  Did you do anything to stop her?
15   A.  Excuse me?
16   Q.  Did you do anything to stop her?
17   A.  What could I do to -- no.  You're asking --
18 no.  I don't know what you mean.
19   Q.  Well, you're alleging that she grabbed your
20 upper left arm.
21   A.  Oh, I thought you were still talking about
22 keep her from throwing them on the floor.
23   Q.  Yeah, I'm still at that.  We're still talking
24 about the meeting on November 5th, 2004, when you
25 claim she grabbed your arm.  So she was doing an

Page 334

1  inventory. You showed up. She's throwing them on the
2  floor and you tell her you think there's a better way
3  to do it?
4      A.  No. She was not doing the inventory and then
5  I show up. No.
6      Q.  Okay. What happened?
7      A.  We were doing that inventory together.
8      Q.  Okay. You were doing an inventory with her
9  of your files?
10     A.  Yes. We were at the filing cabinets.
11 Eventually -- eventually, after they got so high, I
12 said hold on, hold on, wait a minute. I ran and I got
13 a buggy to put those cases in.
14     Q.  Okay.
15     A.  There were two young ladies at the front
16 desk. I saw them out of my peripheral vision. They
17 kept turning around and they were snickering. That
18 was very embarrassing.
19     Q.  Do you know when Ms. Lamar did inventories of
20 other employees that she threw the files on the
21 floor?
22     A.  I never saw Cynthia throw anybody else's
23 files on the floor.
24     Q.  You weren't present with her when she ever
25 did an inventory of another legal assistant, did you?

Page 335

1      A.  You could walk by and see --
2      Q.  You never did an inventory with her of
3  another legal assistant, did you?
4      A.  I did not do -- no, that's correct.
5      Q.  All right. Well, what happened immediately
6  prior to -- you claim she grabbed your upper left arm.
7  What happened immediately prior to that? You were
8  doing an inventory together and she suddenly grabbed
9  your upper left arm out of the blue; is that what
10 you're saying?
11     A.  By this time we were over at my -- we had
12 taken the cases -- I told you I went and I got a cart
13 and I put the cases in the cart and I had taken them
14 over to my area to work on. And I was standing at my
15 desk like this. This is the front of my desk. I was
16 standing at my desk. Cynthia was standing to the left
17 of me. And I can't actually remember what that
18 particular conversation was but it was regarding our
19 inventory. And she grabbed me saying, Bernethia, look
20 here or something and I looked at her and I said, turn
21 me loose.
22     Q.  And she turned you loose?
23     A.  And she released my arm.
24     Q.  What happened after that?
25     A.  She left out of my cubicle.

Page 336

1      Q.  Was that the end of the inventory?
2      A.  Yes.
3      Q.  And you never told Paul Reams about that
4  prior to this June 16th, 2005 memorandum which is
5  marked as Defendants' Exhibit #33; is that right?
6      A.  That is correct.
7      Q.  Did you complain to anyone about that
8  incident?
9      A.  What I did was I left the job. There's --
10 and I went to I think it might be called a Pri-Med
11 down the street. I signed in to Pri-Med down the
12 street. My youngest daughter called me because she
13 was having leg cramps, leg pain, which she had --
14 still have today. And when she called me, she was
15 crying that her leg was hurting. I scratched my name
16 off of the list. I went to get her to see about her.
17 So I did not get to see a physician.
18     Q.  So you never saw a doctor about Ms. Lamar
19 grabbing your arm?
20     A.  I never saw on that day a doctor about
21 Ms. Lamar grabbing my arm.
22     Q.  Did you later go see a doctor about Ms. Lamar
23 grabbing your arm?
24     A.  When I -- when I saw a doctor I did mention
25 the fact that -- that when I saw two doctors I did

Page 337

1  mention the fact that Ms. Lamar grabbed my arm.
2      Q.  Okay. And did he diagnose you with any
3  condition or anything because of that?
4      A.  I was depressed.
5      Q.  What doctor was this?
6      A.  I talked to Dr. Smith, who was a therapist
7  with behavioral medicine about Ms. Lamar grabbing me
8  and being physical with me and I think that was Dr --
9  what is his name. I may have mentioned it to
10 Dr. Johnson, who was my gynecologist. And I may have
11 mentioned it to Dr. Leon Davis, who was my internist.
12     Q.  Do you know when you may have brought all of
13 those -- when you may have discussed this incident
14 with any of those doctors?
15     A.  It was after that event occurred.
16     Q.  Going back to this memo you wrote June
17 16th, 2005. You have I possibly discussed it with my
18 physician. Do you know for sure if you ever brought
19 it up to your physician?
20     A.  I know I talked with Dr. Smith about it and I
21 talked -- I know I talked -- yes, I'm sure I talked
22 with them about it.
23     Q.  Do you know why you wrote in this memo I
24 possibly discussed it with my physician and now you're
25 saying I did?

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/8/2008
DEPOSITION   OF BERNETHIA JOHNSON

Page 338

1    A.  I know -- because now I know I talked to
2  Dr. Smith about it.
3    Q.  But back in June 2005 you weren't sure?
4    A.  I probably wasn't sure.  Just like -- I
5  probably wasn't sure.  But I know I talked to them
6  about it.
7    Q.  You also said I later discussed this incident
8  with my attorney.  Who was your attorney at that time?
9    A.  Doctor -- what is his name.  Norell Adams.
10   Q.  And you say in this footnote because of this
11  event you claim took place November 5th, 2004, on
12  June 7th, 2005 when Ms. Lamar pushed away from her
13  desk you left her office to prevent bodily harm from
14  coming to you again?
15   A.  Yes.
16   Q.  So you're saying you rushed out of the office
17  because you were afraid?
18   A.  Yes.
19   Q.  How tall is Ms. Lamar?
20   A.  I don't know.  She's taller than me.
21   Q.  Do you know how much she weighs?
22   A.  She's heavier than me.
23   Q.  Is it your testimony that she's taller
24  heavier?
25   A.  She used to be.  She's lost weight.  She had

Page 339

1  surgery.
2    Q.  And after you somehow conveyed Defendants'
3  Exhibit #33 to Paul Reams, do you know if you had a
4  conversation with him before he gave you his decision
5  as to what he was going to do?
6    A.  I'm sure we had conversation because -- yes.
7  He told me he was going to give me two days instead of
8  three or something.
9    Q.  Let me give you -- Defendants' Exhibit #34.
10  Can you tell me if you recognize Defendants'
11  Exhibit #34?
12   A.  Yes.
13   Q.  Is Defendants' Exhibit #34 a copy of I guess
14  a July 21st, 2005 decision from Mr. Reams, as
15  responding to Ms. Lamar's proposal to suspend?
16   A.  Yes.
17   Q.  Now, when you received Defendants'
18  Exhibit #34, how did you get a copy of Defendants'
19  Exhibit #34?
20   A.  I don't recall.
21   Q.  Do you know if there was a meeting with
22  Mr. Reams?
23   A.  Possibly there was a meeting with Mr. Reams.
24   Q.  But you don't recall actually meeting with
25  him and talking about the proposal to suspend and your

Page 340

1  response?
2    A.  I -- I want to say that there was a meeting
3  unless it's in here where he said -- I'm sure -- I'm
4  certain there was a meeting with Mr. Reams so he
5  probably gave it to me then.
6    Q.  So you're not sure?
7    A.  I'm sure.
8    Q.  Okay.  Well, if he gave it to you in a
9  meeting, do you know where he gave it to you?
10   A.  In his office.
11   Q.  Was anyone else present?
12   A.  Linda Tamplin.
13   Q.  Was she there as a union rep?
14   A.  Yes.
15   Q.  Did you secretly record that meeting?
16   A.  I -- I don't recall.  I don't -- I can't
17  recall.
18   Q.  Have you seen any typed notes by Linda
19  Tamplin relating that meeting?
20   A.  Have I seen any?
21   Q.  Are you aware of any?
22   A.  I think that maybe she did write something
23  up, yes.
24   Q.  Do you have those in your possession?
25   A.  I thought I submit everything I had to

Page 341

1  you-all..
2    Q.  I have not seen a copy of this.  I'm asking
3  if you do --
4        MS. BATTLE-HODGE:  Well, whatever I have,
5  I've given to you.
6        MR. DUBOIS:  You've given me everything you
7  have?  Okay.
8    Q.  So if it hasn't produced then you don't have
9  one?
10   A.  Well, if -- if it hasn't been produced, then
11  there's -- I -- I produced so much.  There's just so
12  much I can't recall what all was sent.  I apologize.
13   Q.  Did you recall anything from that meeting
14  about what was discussed?  He gave you this memo.
15   A.  Yes.  There was a meeting because I asked
16  Paul to please show me what did Ms. Lamar mean by
17  extending my finger that -- what she accused me.  And
18  he said, he was not going to show it to me because it
19  was -- what word.  There was a word he used.  For lack
20  of not knowing his word because he was saying it was
21  derogatory in nature and he was not going to show me.
22  No one would show me.
23   Q.  At any point did you raise your middle finger
24  and say is this what Cynthia Lamar was saying I did?
25   A.  Yes.  That -- and that happened in the

Page 342

1  meeting that we had. I raised my finger asking him
2  so, yes.
3      Q. So you raised your middle finger at Paul
4  Reams and asked is this what Cynthia Lamar is talking
5  about?
6      A. Yes.
7      Q. What did he say in response to that?
8      A. I don't know what he said. I think -- I
9  don't know but I remember asking him, trying to figure
10 out -- well, I remember asking him to please -- to
11 show me what they were talking about. He refused to
12 show me. I said, well, is this what she's talking
13 about. I don't know if he gave me any indication that
14 that was what she was talking about or not.
15     Q. Do you recall anything else in that meeting
16 besides you asked him to display the gesture -- you
17 displayed the gesture and asked him if that's what was
18 being referenced here? Anything else?
19     A. No.
20     Q. Did you understand after reading Defendants'
21 Exhibit #34 that Mr. Reams was concluding that
22 Ms. Lamar was being truthful when she claims you made
23 this gesture and did not believe your account?
24     A. Yes.
25     Q. And now, do you have -- turn to the last page

Page 343

1  of Defendants' Exhibit #34. You see there's a receipt
2  acknowledgement and date?
3      A. Yes.
4      Q. Did you sign a copy of this or do you have a
5  copy that has a signature?
6      A. I don't know. I sent you all what I had. I
7  don't know if there's a signed copy or not.
8      Q. Did you ever file a grievance regarding the
9  suspension, a union grievance?
10     A. A union grievance. No.
11     Q. And Mr. Reams reduced your suspension from
12 the five days proposed by Cynthia Lamar to three days;
13 is that right?
14     A. Yes.
15     Q. And then I guess you served the three day
16 suspension on July 25th, 26th, and 27th, 2005; is that
17 right?
18     A. Yes.
19     Q. Did you have any further discussion at any
20 point in time that either Mr. Reams or Ms. Lamar
21 regarding this gesture you made to Ms. Lamar or about
22 the suspension?
23     A. I don't -- I don't recall.
24     Q. So to your recollection after Mr. Reams gave
25 you Defendants' Exhibit #34, you served the suspension

Page 344

1  with no further discussion of it?
2      A. With -- with another person but not
3  Mr. Reams.
4      Q. Not with Mr. Reams or Ms. Lamar? No further
5  discussion with them; is that right?
6      A. With them, not that I can recall.
7      Q. Who did you talk to about the suspension?
8      A. I e-mailed Jacey Therman. J-A-C-E-Y is how I
9  think that's spelled. Jacey Therman.
10     Q. About the suspension?
11     A. Yes.
12     Q. Okay. And what did you say in that e-mail?
13     A. I asked if his office could call my -- call
14 me during the days and I gave him those specific dates
15 if they could -- that I asked him -- told him. Get it
16 together. I contacted him by e-mail asking that he
17 will allow a telephone conference and that I was --
18 would be at home the three days that I was suspended.
19     Q. Did his office call you?
20     A. Yes.
21     Q. And what do you recall from that conversation?
22 Strike that. Who is Jacey Therman?
23     A. He's a -- all I know he's in Washington,
24 somewhere, somewhere like that. He's --
25     Q. Someone with Social Security Administration

Page 345

1  in Washington?
2      A. Yes. He's at a higher level.
3      Q. Did his office call you while you were
4  serving suspension?
5      A. Yes.
6      Q. And what do you recall from that
7  conversation?
8      A. I just informed them that I felt that I was
9  in a hostile environment. I was trying to get a
10 transfer. That I was now being suspended. That the
11 agency, that management is getting worse. They're
12 hostile doing all kind of things to me. And I was
13 trying to see if he could help me get that transfer.
14     Q. And what was his response?
15     A. It was not him. It was an assistant.
16     Q. And what was the response?
17     A. She said that she would inform Mr. Therman
18 about it.
19     Q. Do you recall anything else from that
20 conversation?
21     A. No.
22     Q. Now, in your second lawsuit you allege this
23 three day suspension was retaliatory, right?
24     A. Yes.
25     Q. Okay. What makes you believe that it was

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/8/2008
DEPOSITION  OF BERNETHIA JOHNSON

49 (Pages 346 to 349)

---

Page 346

1  retaliation?
2      A.  Because it didn't happen.  It didn't happen.
3  Ms. Lamar as much as one wouldn't want to say
4  Ms. Lamar is a liar or is incorrect in what she does,
5  she does not ever want to be wrong, make a mistake or
6  anything like that.  I felt that she had made several
7  errors.  I would e-mail her to keep her abreast of
8  what was going on.  Since it -- since she was always
9  coming to my desk asking me to come into her office, I
10  tried to keep her abreast on whatever was going on.
11  So I really think that she was already angry about the
12  Amy Ward case because Cynthia was -- although she had
13  the position, she -- she wasn't the greatest
14  supervisor.
15      Q.  Anything else that made you believe that this
16  three day suspension was retaliation?
17      A.  That was factored that I have evidence of,
18  no.  But --
19      Q.  And you're not aware of any other employees
20  who Cynthia Lamar accused to Paul Reams of giving her
21  the middle finger, are you?
22      A.  No.
23          MR. DUBOIS:  Let's take a short break.
24              (Brief recess)
25      Q.  All right.  Now, I want to direct your

---

Page 347

1  attention to the time period when you started
2  reporting to Cynthia Lamar on May 1st, 2004 onward,
3  May 2nd, somewhere in there.  Now, when you arrived at
4  the Social Security office for work in the morning you
5  would sign in the time sheet book; is that correct?
6      A.  Yes.
7      Q.  And where was that sign-in sheet book
8  located?
9      A.  In front of -- kind of like in front of Paul
10  Reams and Teresa's desk.
11      Q.  Was it in a three-ring binder or something?
12      A.  Yes.
13      Q.  And when you arrived in the morning, did you
14  put your name and the time you arrived?
15      A.  Yes.
16      Q.  And at the end of the day you would sign out;
17  is that right?
18      A.  Yes.
19      Q.  And you put your name and the time you left?
20      A.  Yes.
21      Q.  Now you were an hourly employee; is that
22  right, so you had to request overtime?
23      A.  Yes.
24      Q.  And did you try to be accurate when you were
25  filling out the time sheet?

---

Page 348

1      A.  I tried to be.
2      Q.  Let me give you Defendants' Exhibit #35.  Are
3  you telling me this is the attendance roster for
4  June 27th, 2005?
5      A.  Yes.
6      Q.  Okay.  #35.  All right.  And going to line 7,
7  on Defendants' Exhibit #35, are those your initials?
8      A.  Yes.
9      Q.  And you wrote that indicating you arrived at
10  10 in the morning?
11      A.  Yes.
12      Q.  And in the periods of absence section you
13  wrote you were absent from 9:30 to 10 and 12:20 to
14  4:05; is that right?
15      A.  Either that's a 4:05 or 4:03.
16      Q.  And you calculated that as being four hours
17  and 15 minutes of I guess leave; is that right?  Four
18  and a quarter?
19      A.  Yes.
20      Q.  Okay.  Which would be the 30 minutes for 9:30
21  to 10 a.m. and then three hours and 45 minutes from to
22  12:20 to 4:05, right?
23      A.  Excuse me, say that again.
24      Q.  The four hours and 15 minutes of leave would
25  be the half hour from 9:30 to 10 and the three hours

---

Page 349

1  and 45 minutes from 12:20 to 4:05; is that right?
2      A.  It was half an hour from 9:30 to 10 and it
3  was from 12 to 4:05?  Yeah.  Well, two, three, four.
4  It was four and a half, four and one quarter minute
5  for from twelve o'clock to 4:05.
6      Q.  That 12:20 to 4:05 would be three hours and
7  45 minutes, right?
8      A.  Three hours and 45 minutes?
9      Q.  My math is probably wrong.
10      A.  I'm sorry.  Say that again.  From twelve
11  o'clock to 4:05.
12      Q.  Is three hours and 45 minutes?
13      A.  Well, from twelve o'clock to one o'clock, one
14  o'clock to two o'clock, two o'clock to three o'clock,
15  three o'clock to four o'clock.  I was thinking that
16  was four hours there, and the five minutes would be a
17  quarter of an hour.  And then from 9:30 to ten
18  o'clock, that's a half an hour.
19          MS. BATTLE-HODGE:  So you cheated yourself if
20  that's right.
21      Q.  Well, one o'clock to two o'clock is one hour;
22  two o'clock to three o'clock is another hour, and
23  three o'clock to four o'clock is another hour.  So
24  three hours?
25      A.  Okay.  I'm sorry.

Page 350

1    Q.  And to 4:05 is five minutes.  And 40 minutes
2  from 12:20 to one.  So it's three hours and 45
3  minutes.
4    A.  Okay.
5    Q.  And the morning you had the half hour, so the
6  total would be four and a quarter; is that right?  And
7  that's what you were -- that's what you put as you
8  were absent, four and a quarter?
9    THE WITNESS:  I'm sorry.  Can you ask to go
10  off the record for a minute?  I've got to look at this
11  again.
12    MR. DUBOIS:  We can take a short break off
13  the record.
14    (Off-the-record discussion)
15    Q.  So back on the record.  The total time of
16  absence you're listing was four hours and -- four and
17  a quarter?
18    A.  Four --
19    Q.  Four hours and 15 minutes.
20    A.  Yes.
21    Q.  And then let's see.  Going to this June 27th,
22  2005 time sheet Exhibit #35, you signed out for the
23  day at 6 p.m.; is that what it says?
24    A.  Yes.
25    Q.  Now, when you took annual leave or had a

Page 351

1  period of absence I guess you had to submit a leave
2  form to your supervisor, right?
3    A.  Yes.
4    Q.  Let me hand you Defendants' Exhibit #36.
5  Defendants' Exhibit #36.  Can you tell me if
6  Defendants' Exhibit #36 is a copy of the application
7  for leave you submitted for June 27th, 2005?
8    A.  Yes.
9    Q.  And is that your handwriting where it has the
10  name and the times?
11    A.  Yes.
12    Q.  And on this leave form you were asking for
13  four hours -- four and a quarter hours of leave; is
14  that right?
15    A.  Yes.
16    Q.  And on the remarks, then would cover back up,
17  the 9:30 to 10 and 12:20 to 4:05, right, which is the
18  time we have list on Defendants' Exhibit #35?
19    A.  Four and one quarter.
20    Q.  So basically Defendants' Exhibit #36 is the
21  annual leave request you submitted for the time that
22  you listed you were absent on Defendants' Exhibit #35;
23  is that right?
24    A.  Yes.
25    Q.  And what do you have on the remarks?  Is that

Page 352

1  your handwriting in the remarks column of Defendants'
2  Exhibit #36?
3    A.  Yes.
4    Q.  What does that say?
5    A.  That I want to a doctor's appointment.
6    Q.  It says doctor's appointment?
7    A.  Yes.
8    Q.  And then this leave request was approved by
9  Cynthia Lamar on June 29th, 2005?
10    A.  Yes.
11    Q.  So Ms. Lamar granted your request for that
12  leave of four hours and 15 minutes?
13    A.  Yes.
14    Q.  #37.  I hand you Defendants' Exhibit #37 and
15  tell me if you recognize this document.
16    A.  I do.
17    Q.  Is this a series of e-mails between you and
18  Ms. Lamar on June 28th?
19    A.  Yes.
20    Q.  And this is the day before Ms. Lamar approved
21  your request for the four and one quarter hours of
22  leave?
23    A.  That is correct.  You said before -- that's
24  correct.
25    Q.  Now at the bottom the last e-mail that kind

Page 353

1  of starts the chain, you mentioned she had given you a
2  note which said correct the T&A roster and your SSA 71
3  to reflect four and a half hours.  Do you see that?
4    A.  I'm sorry.  Say that again.
5    Q.  Let me direct you to the bottom of
6  Defendants' Exhibit #37, the first page.
7    A.  Okay.
8    Q.  The first e-mail that starts this e-mail
9  chain.
10    A.  Okay.
11    Q.  It's an e-mail from you to Ms. Lamar on
12  June 28th, 2005, 11:34 a.m.  Do you see that?
13    A.  Yes.
14    Q.  And you referenced a note that Ms. Lamar gave
15  you which asked you to correct your T&A roster to
16  reflect four and a half hours of leave for June 27th.
17  Do you see that?
18    A.  Yes.
19    Q.  Do you have a copy of that note?
20    A.  Do I have a copy of that note?  No.  If I did
21  not submit it, I don't have a copy of it.
22    Q.  And in response you wrote back saying,
23  telling Ms. Lamar that it should only be four and one
24  quarter.  Right?
25    A.  Yes.

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                                    7/8/2008
DEPOSITION  OF BERNETHIA JOHNSON

51 (Pages 354 to 357)

---

Page 354

1     Q.  And that is the amount you're ultimately
2  charged, four and a quarter?
3     A.  Four and one quarter.  Yes.
4     Q.  Were there any other e-mails exchanged with
5  Ms. Lamar about this time and attendance roster for
6  June 27th other than Defendants' Exhibit #37?
7     A.  No.
8     Q.  Did you ever have any discussion with her in
9  person about this time attendance issue.
10    A.  I don't recall having one.
11    Q.  And did you ask Ms. Tamplin to go talk to
12 Ms. Lamar about your arrival time?
13    A.  Yes.
14    Q.  Do you recall Ms. Tamplin writing you back an
15 e-mail saying she talked to Ms. Lamar, that Ms. Lamar
16 accepted your arrival time?
17    A.  Yes.
18    Q.  Now, I direct your attention back to your
19 second lawsuit which I forgot the exhibit.  #31.
20 Defendants' Exhibit #31.  Do you have that?
21    A.  #31.  Yes.
22    Q.  Now, in paragraph 52 you allege you were
23 charged an additional one quarter hour of leave for
24 June 27th, 2005.  Now, what are you referring to
25 there?

---

Page 355

1     A.  52 you said?
2     Q.  Yes.
3     A.  Okay.  This was -- when I wrote this up
4  initially, I was saying that Ms. Lamar is trying to
5  accuse me of anything that she can possibly accuse me
6  of.  Had Ms. Lamar -- had Ms. Lamar have a security
7  guard not called his supervisor to inform and his
8  supervisor call and inform management that the
9  security guard could attest to my coming, she would
10 have used me as -- accused me of lying on my time
11 sheet.
12    Q.  What evidence do you have that there was any
13 conversation between Ms. Lamar or management or any
14 security guard?
15    A.  He told me by word of mouth.  That's how I
16 found out.
17    Q.  Security guard told you what?
18    A.  That he contacted his supervisor.
19    Q.  Did you talk to the security guard
20 supervisor?
21    A.  No.
22    Q.  And what did the security guard say he told
23 the supervisor?
24    A.  About the -- about the situation and said his
25 supervisor then called management.

---

Page 356

1     Q.  Okay.  So the security guard told you his
2  supervisor called management?
3     A.  Yes.
4     Q.  Did the security guard say who his supervisor
5  called in particular?
6     A.  No.
7     Q.  And going back to the lawsuit, your
8  allegation is not that you were actually charged this
9  additional quarter hour.  It's that Ms. Lamar
10 questioned your time and that ultimately --
11    A.  Accused me.
12    Q.  Accused you of not properly listing your time
13 on the time sheet?
14    A.  Of trying to cheat.
15    Q.  But then she did accept your account and you
16 weren't charged any leave?
17    A.  That is correct.
18    Q.  Other than what you asked to be charged?
19    A.  That is correct.
20    Q.  So are you saying she accused you of lying on
21 the time sheet; is that really what the allegation is?
22    A.  That's what this allegation is all about.
23    Q.  Okay.  Now, do you claim that she questioned
24 your arrival time on this June 27th, 2005 time and
25 attendance roster to retaliate against you?

---

Page 357

1     A.  Yes.
2     Q.  And what is your basis for alleging it was
3  retaliatory?
4     A.  I felt that she was trying to do whatever it
5  take to get me out of -- to fire me -- to get me out
6  of that -- well, to fire me.
7     Q.  And what was that based on?
8     A.  What was it based on?
9     Q.  What made you believe that her questioning
10 your arrival time on this date was some attempt to
11 fire you?
12    A.  I questioned the fact that Ms. Lamar in -- in
13 the year of 2000, why would she go down -- I
14 questioned the fact that why would Ms. Lamar go down
15 eight employees, seven or eight employees name, give
16 all of them four cases -- seven employees and give all
17 of them four cases.  The one in front of me, she
18 reduced that case -- that -- that -- that person's
19 caseload down to three file cabinets and then
20 increased mine.  I questioned everything that
21 Ms. Lamar did.  I questioned the fact -- well.
22    Q.  That was that event you're talking then you
23 discussed that previous, that was back in 2000 I
24 believe?
25    A.  Yes.  I questioned the fact that -- well.

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/8/2008
DEPOSITION  OF BERNETHIA JOHNSON

52 (Pages 358 to 361)

---

**Page 358**

1  That was it.  That's the answer to that.
2      Q.  Is there anything else that you base your
3  allegation that Ms. Lamar's questioning of your
4  arrival time on June 27th, 2005 was to retaliate
5  against you?
6      A.  I questioned -- okay.  Say it -- say it
7  again.  Go back.
8          MR. DUBOIS:  Can you repeat the question?
9              (The court reporter read the
10                 pending question.)
11      A.  I questioned or why was it that Ms. Lamar,
12  whenever I went and asked for cases, I questioned why
13  she would never -- the majority of the time she would
14  never give me cases.  I questioned why Ms. Lamar did a
15  lot of what she did to me.
16      Q.  Okay.  My question relates solely to this
17  allegation concerning the June 27th, 2005 time chart.
18      A.  And ask it one more time.
19      Q.  What supports your allegation that her
20  questioning of your arrival time on June 27th, 2005,
21  was retaliatory?
22      A.  What other reason was she -- that was the
23  only reason I could imagine, she was trying to get rid
24  of me. I don't -- I don't know.
25      Q.  Did you find anything -- is there any

---

**Page 359**

1  objectionable about a supervisor requesting employees
2  to be accurate in signing in for the day?
3      A.  No.
4      Q.  Do you know if she ever questioned anyone
5  else's arrival time?
6      A.  No.
7      Q.  So she could have but you don't know.  One
8  way or another you don't know if she did?
9      A.  I don't know.
10      Q.  Okay.  Now, she accepted your statement that
11  you arrived at 10 and gave you the leave you
12  requested.  So how were you harmed by her questioning
13  your arrival time?
14      A.  She did not accept my statement.  She
15  accepted somebody else's statement after I guess they
16  realized that they could validate that I came in --
17  the time that I came in.  She did not accept my
18  statement.
19      Q.  Do you have any evidence that Ms. Lamar
20  discussed your arrival time with anybody besides
21  yourself --
22      A.  No.
23      Q.  -- in this e-mail exchange, which is
24  Defendants' Exhibit #37?
25      A.  No.  The only thing I can say is that the

---

**Page 360**

1  security guard informed me.
2      Q.  Okay.  Other than what the security guard
3  told you, you have no evidence that she discussed it
4  with anybody?
5      A.  No.
6      Q.  Now, you didn't lose any pay, you weren't
7  charged any extra time, right?
8      A.  That is correct.
9      Q.  Let me hand you Defendants' Exhibit #38.  And
10  can you tell me if you recognize Defendants'
11  Exhibit #38?
12      A.  I recognize it.
13      Q.  And is Defendants' Exhibit #38 a copy of the
14  formal EEO complaint you filed alleging retaliation
15  concerning the three day suspension you received and
16  the allegation you made about being questioned about
17  this June 27th, 2005, time sheet?
18      A.  Yes.
19      Q.  Now, the first complaint, the first page of
20  Defendants' #38 looks to be an EEO complaint form; is
21  that right?
22      A.  Yes.
23      Q.  And is that your signature at the bottom,
24  Bernethia T. Johnson?
25      A.  Yes.

---

**Page 361**

1      Q.  And is that the date you signed it, 8/9/05?
2      A.  Yes.
3      Q.  And number 3 on the first page of Defendants'
4  Exhibit #38 says, I wish to file a formal EEO
5  complaint, a copy of the EEO counseling report
6  outlining the issues and basis of my --
7      A.  I'm sorry.  Number 3?
8      Q.  Yeah.  You see number 3 there?
9      A.  Right down here.  Oh, wait a minute.  I'm
10  sorry.  That's number 5.  Number 3.  I see it.  I'm
11  sorry.
12      Q.  So is it your understanding, I guess, you
13  were making an EEO complaint; and the basis of your
14  complaint was outlined in the attached EEO counseling
15  report; is that right?
16      A.  Yes.
17      Q.  And turning the page, you attached to your
18  complaint a copy of an EEO counseling report?
19      A.  Yes.
20      Q.  Okay.  And this counseling report indicates
21  that you first contacted an EEO counselor on
22  June 29th, 2005.  Do you see that?  It's in the top
23  right corner?
24      A.  Oh, on the second page.  6/29/05, yes.
25      Q.  Is that date accurate?

Page 362

1    A.  I'm bad with dates.
2    Q.  Do you have any reason to think it's not
3  accurate?
4    A.  No.
5        MR. DUBOIS: Let's stop for a second.
6        (Brief recess)
7        MR. DUBOIS: Back on the record.
8    Q.  I just want to note that we redacted
9  Ms. Johnson's Social Security number from Defendants'
10  Exhibit #38. Going to the second page of Defendants'
11  Exhibit #38 which is the first page of the EEO
12  counseling report. Paragraph or section 8 lists the
13  type of discrimination as retaliation; is that right?
14    A.  Yes.
15    Q.  And then if you look at section 12, which is
16  on the following page of Defendants' Exhibit #38,
17  that's a description of the complaint you were making;
18  is that fair to say?
19    A.  That I was making?
20    Q.  Yes.
21    A.  Yes.
22    Q.  And then on section 13, is that your
23  signature under the statement, aggrieved signature
24  acknowledging receipt of rights and description of
25  issues to be counseled?

Page 363

1    A.  Yes.
2    Q.  And you signed that July 15th, 2005?
3    A.  Yes.
4    Q.  And then if you go -- let's see. It looks
5  like page 6 of this EEO counseling report, you got a
6  copy of it and you signed it again after it was
7  completed on August 9th, 2005?
8    A.  Yes.
9    Q.  So that's your signature on block 21?
10    A.  Yes.
11    Q.  #39. I'm going to hand you Exhibit #39. Is
12  Defendants' Exhibit #39 a copy of an EEO acceptance
13  letter outlining the two issues you filed a complaint
14  about dated September 21st, 2005?
15    A.  Yes.
16    Q.  Did you receive a copy of this letter?
17    A.  Yes.
18    Q.  And let me direct your attention now to
19  Defendants' Exhibit #31, which is a complaint you
20  filed in the second lawsuit. I'm going to go through
21  some of the paragraphs and ask you some questions. I
22  want to start with paragraph 12.
23    A.  12.
24    Q.  On paragraph 12 you have an allegation
25  regarding being denied leave to vote. Do you see

Page 364

1  that?
2    A.  Yes.
3    Q.  And what is that related to?
4    A.  It was a voting day. I went to vote and when
5  I came in I requested one hour of leave. The agents,
6  Paul Reams, the agency has always given us time to
7  vote. Paul Reams denied my request.
8    Q.  Now November 14th, 2003, there was no
9  elections. Did you mean to refer to another day?
10    A.  There was not?
11    Q.  (Shaking head)?
12    A.  There was a day when I went and vote.
13    Q.  Do you know what elections they were?
14    A.  No, I do not. Paul Reams said that --
15        MS. BATTLE-HODGE: That was presidential.
16        THE WITNESS: No. I don't know.
17        MS. BATTLE-HODGE: Four years ago?
18        THE WITNESS: No.
19        MR. DUBOIS: 2004.
20    A.  It was like for your city councilmen, things
21  of that nature. It was -- he said because it was not
22  a -- like a presidential vote, he was not going to
23  allow me to -- allow me to annual leave.
24    Q.  Did you have any discussion with Paul Reams
25  about it or was it just an e-mail exchange with Paul

Page 365

1  Johnson?
2    A.  I talked with Paul Johnson about it.
3    Q.  Paul Johnson. Okay.
4    A.  E-mailed discussion.
5    Q.  Let me give you Defendants' Exhibit #40.
6  This is a document that was produced by your counsel
7  last week relating to I guess voting leave you
8  requested on -- for the city's election on
9  October 14th, 2003. Do you see that?
10    A.  It was October 14th?
11    Q.  Defendants' Exhibit #40 is a document your
12  counsel provided last week. And it relates to a
13  question to vote to the second page on October 14th,
14  2002. Do you see that? Is that what you meant to
15  refer to?
16    A.  October 14th? October 14th. I've got
17  11/14/03.
18    Q.  Where do you see that?
19    A.  On this leave slip where -- where I signed
20  it.
21        MS. BATTLE-HODGE: Oh, okay.
22    A.  But it was 10 --
23    Q.  But it was concerning --
24    A.  It was 10/14.
25    Q.  It concerned the -- yeah, 10/14 is when you

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.    7/8/2008
DEPOSITION OF BERNETHIA JOHNSON

54 (Pages 366 to 369)

Page 366

1  requested an hour leave to vote; is that right?
2     A.  Yes.  I requested 10/14/04 and then evidently
3  I signed it 11/14/04.
4     Q.  But is this Defendants' Exhibit #40 the
5  request to vote that was denied that you were
6  referring to in paragraph 12 of your second complaint?
7     A.  Yes.
8     Q.  And do you know -- I guess it was city
9  elections.  Do you know if it was the mayoral
10 elections?
11    A.  I don't recall which one.
12    Q.  But it was a city or local election?
13    A.  Yes.
14    Q.  And you went and voted?
15    A.  Yes.
16    Q.  Prior to going to vote, did you have any
17 discussion with Paul Johnson or Paul Reams as to
18 whether or not you could take administrative leave to
19 vote on that day?
20    A.  No.
21    Q.  So after you voted, you submitted I guess the
22 application for leave which is the second page of
23 Defendants' Exhibit #40, and you ask for an hour of
24 administrative leave to vote; is that right?
25    A.  Yes.

Page 367

1     Q.  And then Paul Johnson looks like wrote you an
2  e-mail saying that Paul Reams had not approved it?
3     A.  Correct.
4     Q.  Paul Reams did not approve voting leave for
5  Tuesday's city election.  Do you know if any other
6  employee had voting leave approved for that election?
7     A.  No.
8     Q.  Now, you found out I guess on this e-mail
9  October 17th, 2003, that your request for voting leave
10 had been denied; is that right?
11    A.  Yes.
12    Q.  After that date, did you have any discussion
13 with either Paul Johnson or Paul Reams about why your
14 request was denied or about the request at all?
15    A.  No.  I think Paul Reams -- Paul Johnson sent
16 another e-mail saying something, Bernethia, I have not
17 forgotten that about your voting -- your -- your
18 voting leave.  So it was still on his mind for a
19 while.
20    Q.  Okay.  But you submitted your application for
21 leave on the second page of Defendants' Exhibit #40 is
22 dated 11/14/03?
23    A.  I submitted it 10/14/03.
24    Q.  Okay.  Do you know why your signature is
25 11/14/03 on block 8?

Page 368

1     A.  The only thing I can think of is that I was
2  so fearful in that office of doing and going in that I
3  stayed nervous all the time.  So really my way of
4  thinking wasn't always best.
5     Q.  I'm sorry.  So are you saying block 8, was
6  that an error, the 11/14, or do you --
7     A.  That's what I'm saying, it was an error.
8     Q.  You think it was an error.  It was actually
9  submitted on 10/14?
10    A.  Yes.
11    Q.  And you don't recall any further discussion
12 with Mr. Johnson or Mr. Reams about that issue?
13    A.  I think that there was -- I had -- I think
14 Mr. Johnson sent me another e-mail saying that he had
15 not forgotten, that he was still working on it.
16    Q.  Okay.  Other than that e-mail, no further
17 communication?
18    A.  No.
19    Q.  And you were charged I guess one hour leave
20 to vote?
21    A.  Yes.
22    Q.  And any particular reason you didn't vote
23 before you reported to work or at the end of the day?
24    A.  Excuse me?
25    Q.  Do you know what hours the poles were open?

Page 369

1     A.  No.
2     Q.  Now, you were allowed to vote using a voting
3  leave in the presidential elections in 2004; isn't
4  that right?
5     A.  Yes.
6     Q.  Is there any other time you claim you were
7  denied leave to vote?
8     A.  That's the only time that I was -- they ever
9  denied me and I voted every year, every time there was
10 a vote.  Every time there was something going on to
11 where we -- like a city election, presidential
12 election, I always voted.  And this was the first time
13 it was ever denied.
14    Q.  And you don't recall, you didn't have any
15 conversation with Paul Johnson or Paul Reams about
16 that?
17    A.  Not that I recall.
18    Q.  Just some e-mails?
19    A.  I think just e-mail.
20    Q.  Are you claiming you denied leave to vote on
21 October 14th, 2003 for retaliatory reasons?
22    A.  Yes.
23    Q.  And what is your basis for making that
24 allegation?
25    A.  That this was after October -- no.  This