BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.
DEPOSITION OF BERNETHIA JOHNSON

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


BERNETHIA JOHNSON,

    Plaintiff,

vs.              CASE NO. 2:06-CV-397-WKW
                     2:07-CV-59-WKW

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY, et al.,

    Defendants.



* * * * * * * * * *

CONTINUATION OF THE DEPOSITION OF BERNETHIA

JOHNSON, taken pursuant to stipulation and agreement

before Mallory M. Johnson, Court Reporter and

Commissioner for the State of Alabama at Large, at the

United States Attorney's Office, 131 Clayton Street,

Montgomery, Alabama, commencing at 9:16 a.m. on

Tuesday, July 8, 2008, and continuing on Wednesday,

July 9, 2008, and Friday, July 11, 2008.

* * * * * * * * * *

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                                                    7/11/2008
DEPOSITION OF BERNETHIA JOHNSON

2 (Pages 402 to 405)

---

Page 402

```
1              APPEARANCES
2  FOR THE PLAINTIFF:
3  Ms. Juraldine Battle-Hodge
   LAW OFFICES OF JURALDINE BATTLE-BATTLE-HODGE
4  Attorney at Law
   318 North Decatur Street
5  Montgomery, Alabama 36104
6  FOR THE DEFENDANTS:
7  Mr. James J. DuBois
   Assistant United Stats Attorney
8  OFFICE OF THE UNITED STATES ATTORNEY
   FOR THE MIDDLE DISTRICT OF ALABAMA
9  131 Clayton Street
   Montgomery, Alabama 36104
10
   Mr. Richard Blake
11 Attorney at Law
   SOCIAL SECURITY ADMINISTRATION
12 Office of General Counsel
   61 Forsyth Street
13 Atlanta, Georgia 30303
14        * * * * * * * * * *
15        (The deposition reconvened on
16        Wednesday, July 9, 2008, at
17        2:07 p.m., as follows:)
18        BERNETHIA JOHNSON
19     The witness, previously having been sworn to
20 speak the truth, testified further as follows:
21            EXAMINATION
22 BY MR. DuBOIS:
23   Q.  Back on the record.  Good afternoon,
24 Ms. Johnson.  We're continuing the deposition from
25 yesterday.  I remind you you're still under oath.  And
```

Page 403

```
1  is there any reason today that you won't be able to
2  give full and complete and honest answers to the
3  questions I'm asking you?
4    A.  No.
5    Q.  Are you on any medication this morning?
6    A.  No.
7    Q.  And where are you staying when you're in town
8  here in Montgomery?
9    A.  With friends.
10   Q.  Friends?
11   A.  Yes.
12   Q.  Did you talk to anybody last night about the
13 testimony you gave?
14   A.  No.
15   Q.  Did you review any documents last night?
16   A.  No.
17   Q.  All right.  And I want to clarify one thing
18 we talked about yesterday first.  Let me direct your
19 attention to Defendants' Exhibit #26.
20   A.  Exhibit #26.
21   Q.  It's in this stack right here.
22   A.  Yes.
23   Q.  I was asking you some questions about
24 Defendants' Exhibit #26 yesterday.
25   A.  Yes.
```

Page 404

```
1    Q.  And you mentioned that there was a second
2  typed page of names that you thought Ms. Caffey had
3  given you that should have been attached to that.  And
4  I went and looked through the EEO file, and I think I
5  found what you're talking about.  So let me make this
6  #26A.  Can you tell me, is that the second list of
7  names that you received from Ms. Caffey that you were
8  referring to yesterday?
9    A.  This is, but there was additional paperwork
10 to this.
11   Q.  Okay.  What else was with it?
12   A.  I don't know.  I submitted it to you-all.  I
13 don't know what else was to it, but there was more to
14 this.
15   Q.  Okay.
16      MR. DuBOIS:  Let's take a short break.
17         (Brief recess)
18   Q.  So let's go back on the record.  All right.
19 So I gave you a document marked as #26A, and this is a
20 list that should have been attached to Defendants'
21 Exhibit #26; is that right?
22   A.  Yes.
23   Q.  And that's a list of names you got from
24 Ms. Caffey?
25   A.  Yes.
```

Page 405

```
1    Q.  All right.  And do you have any knowledge
2  about I guess the status or any of the information or
3  documents in these files aside from what Ms. Caffey
4  states in this e-mail, which is that she did not
5  locate them?  Did you understand my question?
6    A.  No, not really.
7    Q.  Okay.  In this Defendants' Exhibit #26A,
8  Ms. Caffey writes, I could not find -- listed below
9  are the cases I could not find upon completion of this
10 month's audit.  Do you see that?
11   A.  Yes.
12   Q.  Other than Ms. Caffey stating that she could
13 not find these cases, do you have any knowledge about
14 the status of these cases or what documents were in
15 them or anything?
16   A.  No.
17   Q.  And then when I gave you #26A, you mentioned
18 that you thought perhaps there were some documents
19 attached to it.  And we went off the record, and I
20 looked through, and I couldn't find anything in the
21 EEO file that was attached after this.  What kind of
22 documents do you think were attached?
23   A.  Similar to these.  They were similar to
24 these.
25   Q.  Okay.  When you say similar to these, you're
```

Page 406

1   saying similar to the pages that are attached --
2       A.  Yes.
3       Q.  -- to the first e-mail from Ms. Caffey, which
4   is Defendants' Exhibit #26?
5       A.  Yes.  This -- yes.
6       Q.  Okay.  And the first e-mail looks to be some
7   cases that she could not locate.  And I'm referring to
8   Defendants' Exhibit #26.  It refers to the date on
9   that as April, so it's an April audit.  She could not
10  locate those files.  And then #26A is a May audit, and
11  she could not locate those files.  Is that what your
12  understanding of those two documents are?
13      A.  Yes.
14      Q.  And other than saying that the documents --
15  well, strike that.
16          When you say there were some -- do you believe
17  you presented documents #26 and #26A to Mr. Reams?
18      A.  Yes.
19      Q.  Okay.  And when you gave #26 and #26A to him,
20  did #26A have some attachments to it at that time; or
21  did you add the attachments when you submitted it to
22  EEO?
23      A.  At that time.
24      Q.  When you gave it to Mr. Reams?
25      A.  Yes.

Page 407

1       Q.  And other than -- how many pages do you think
2   were attached?
3       A.  Maybe -- three to five, maybe.  Three to
4   five.
5       Q.  Let me see Defendants' Exhibit #26.  All
6   right.  And the types of pages are attached, what are
7   these, if you can tell me?  What are these pages that
8   are attached to Defendants' Exhibit #26?
9       A.  They were tasks accomplished on April 14,
10  2004.
11      Q.  Did you prepare these pages that are
12  attached, or did Ms. Caffey prepare them?
13      A.  Ms. Caffey.
14      Q.  So the documents that are attached to
15  Defendants' Exhibit #26 and the documents that would
16  have been attached to #26A were documents prepared by
17  Ms. Caffey?
18      A.  Yes.
19      Q.  And she gave them to you?
20      A.  Yes.
21      Q.  And then you, in turn, gave them to
22  Mr. Reams?
23      A.  Yes.
24      Q.  Do you recall any discussion you had about
25  them with Mr. Reams when you gave it to him?

Page 408

1       A.  I asked him if those were the ones he were
2   talk -- was talking about or some -- no, I can't.  No.
3   I have to think.
4       Q.  Can't recall?
5       A.  No.
6       Q.  All right.  Now, I want to go -- let me
7   see -- back to Defendants' Exhibit #31, which is the
8   second complaint you filed.  We were going through
9   some of the paragraphs in there yesterday when we
10  stopped for the day.
11      A.  Okay.  Which document?
12      Q.  #31.
13      A.  #30 -- oh.
14          MR. DuBOIS:  Off the record for a second.
15              (Off-the-record discussion)
16          MR. DuBOIS:  Back on the record.
17      Q.  Now, I want to direct your attention to
18  paragraph 16 of Defendants' Exhibit #31.  And if you
19  could read that paragraph for me.  Don't read it out
20  loud.  Read it to yourself.
21      A.  (Witness complies)
22      Q.  Have you had a chance to read paragraph 16?
23      A.  I'm almost through.
24              (Brief pause)
25      A.  Okay.

Page 409

1       Q.  Paragraph 16 refers to an event you allege
2   took place on November 5th, 2004, regarding Ms. Lamar
3   and her audit and her grabbing your arm; is that
4   right?
5       A.  Yes.
6       Q.  And we talked about that yesterday?
7       A.  Yes.
8       Q.  Are you claiming that Ms. Lamar grabbed your
9   arm during that audit to retaliate toward you?
10      A.  Yes.
11      Q.  And what evidence do you have that the reason
12  she grabbed your arm was to retaliate against you?
13      A.  The fact that she grabbed me.
14      Q.  Okay.  Other than the fact that she grabbed
15  you, was there any other evidence that you relied upon
16  to allege that she grabbed you to retaliate against
17  you?
18      A.  No.
19      Q.  Let me go now to paragraph 19 of Defendants'
20  Exhibit #31.  You can read 19.  19 refers to a series
21  of e-mails regarding a hostile workplace between
22  November 10th and November 16th, 2004.  Do you see
23  that?
24      A.  Yes.
25      Q.  I believe we touched upon that yesterday.  I

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                                    7/11/2008
DEPOSITION OF BERNETHIA JOHNSON

4 (Pages 410 to 413)

Page 410

1  want to confirm that. If you could, look at
2  Defendants' Exhibit #46. Can you tell me if
3  Defendants' Exhibit #46 are the e-mails you're
4  referring to in paragraph 19 of your second complaint?
5      A. Yes.
6      Q. Okay. Let me ask you a question about the
7  middle paragraph of -- let's see. Defendants' Exhibit
8  #46 is really, I think -- well, the first page is
9  three e-mails. It starts with one from Paul Reams to
10 you, and then the second one is you to Mr. Reams, and
11 the top one is Mr. Reams to you. Do you see that?
12     A. Yes.
13     Q. I want to ask you about the middle one on the
14 first page, is the one you wrote to Mr. Reams on
15 November 8th, 2004. In the first paragraph of that
16 e-mail, you state, I have informed management of the
17 hostile work environment that exists at the Montgomery
18 OHA, but management has clearly identified these
19 incidents as merely isolated. The most recent
20 incident occurred around June 2004.
21     And then you make -- you talk about being
22 harassed on the job by Ms. Warner. You see that?
23     A. Yes.
24     Q. Are you claiming that anything Ms. Warner did
25 in that incident was retaliatory?

Page 411

1      A. I'm claiming that management did nothing.
2      Q. Did nothing in response to what?
3      A. They did not, to my knowledge, investigate or
4  anything. They did nothing.
5      Q. Okay. What happened with Ms. Warner in June
6  2004? What's the incident you're referring to in this
7  November 8th, 2004, e-mail?
8      A. I'm not sure what the date. I'll probably
9  have to look through information to make sure that
10 what I'm saying is actually the one I'm thinking of,
11 so -- June 2004, so much was happening from the side
12 of management. It's -- I can't just look at June 2004
13 and say.
14     Q. Well, can you read the rest of Defendants'
15 Exhibit #46, the e-mail you wrote on November 8th,
16 2004, when you referred to that June 2004 incident,
17 and see if it refreshes your memory as to what you're
18 referring to?
19     A. Okay. Right. Okay. I left -- I left the
20 organization to go to lunch and went to the employees'
21 parking lot, got in my car, rolled down my window.
22 And I drove around to exit the building; and -- and
23 Beverly Warner was standing there next to the guard,
24 Mr. Hudson, Bobby Hudson. And she snapped my picture
25 as I was exiting.

Page 412

1      Q. As you were driving out of the property, she
2  took your picture?
3      A. Yes.
4      Q. And who is Ms. Watson again?
5      A. Who is who?
6      Q. Ms. Watson, Beverly Watson?
7      A. Warner.
8      Q. Warner. I'm sorry.
9      A. I'm sorry. There used to be a Watson out
10 there.
11     Q. Who is Beverly Warner?
12     A. A legal assistant.
13     Q. Okay. And how long had she worked at the
14 Montgomery Social Security office?
15     A. I don't know how long.
16     Q. How often did you talk to Ms. Warner?
17     A. I only talked as necessary regarding the job.
18     Q. Prior to her taking your picture on this day,
19 had you talked to her about anything on that day?
20     A. If it had anything to do with the job.
21     Q. What kind of camera was she using?
22     A. I didn't know what kind of camera she used.
23     Q. Do you know why she was taking your picture?
24     A. No.
25     Q. Did you ever go ask her why she was taking

Page 413

1  your picture?
2      A. No.
3      Q. All right. After you saw her taking a
4  picture, did you report that incident to anyone?
5      A. Yes.
6      Q. All right. Who did you tell?
7      A. Paul Johnson and Jimmy Brown.
8      Q. And Jimmy Brown, who is Jimmy Brown?
9      A. He was a supervisor, temporary supervisor.
10 He was in some kind of program.
11     Q. Was Mr. Reams out of the office at that
12 time --
13     A. Yes.
14     Q. -- and Mr. Brown was filling in?
15     A. Yes.
16     Q. And so you talked to both Mr. Johnson and
17 Mr. Brown at the same time?
18     A. Yes.
19     Q. And what do you recall telling them?
20     A. That Beverly took my picture.
21     Q. Did you tell anything else?
22     A. I can't recall.
23     Q. Did you ask them to do anything?
24     A. I probably -- I probably told them that I did
25 not like her taking my picture.

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.
DEPOSITION OF BERNETHIA JOHNSON

7/11/2008

5 (Pages 414 to 417)

---

Page 414

1    Q.  Okay.  Going back to the e-mail, there's a
2  reference to "promises to do me bodily harm" -- do you
3  see that -- in regard to Defendants' Exhibit #46, the
4  e-mail you wrote on November 8th, 2004?
5    A.  Okay.
6    Q.  Do you know what that's referring to?  Is
7  that something --
8    A.  Where are -- where are you?  I'm sorry.
9    Q.  If I go to --
10    A.  Oh, okay.  I see it.
11    Q.  Do you see what I'm talking about?
12    A.  Okay.  Now, what was your question?
13    Q.  Well, I'm trying to understand what happened
14  and what you told to Mr. Johnson and Mr. Brown.  So
15  besides telling them that -- that Ms. Warner had taken
16  your picture, did you make any reference to bodily
17  harm like you have in this e-mail?
18    A.  I also made reference to where it talks about
19  Ms. Brown being -- Ms. Warner being in my work area,
20  my picture and being in my work area.
21    Tamika Watkins told me that Beverly was all into
22  my work area and she was talking about what she was
23  going to do to me and how she was taking a picture of
24  everything.  And I reported that to Paul Johnson and
25  Jimmy Brown.  And Paul Johnson said, oh, Bernethia,

---

Page 415

1  please don't get Tamika involved; she's just a child.
2    Q.  And who is Tamika Watkins?
3    A.  Tamika Watkins was a law student, and so she
4  was a -- on some kind of -- she was a student that was
5  working on some kind of a program.
6    Q.  Like an intern there?
7    A.  Yes.
8    Q.  How long was she in the office?  I mean --
9    A.  I don't know.
10    Q.  -- a couple of months, or was it a --
11    A.  I don't know.
12    Q.  And she told you that she had seen Ms. Warner
13  in your work area?
14    A.  Yes.
15    Q.  And that Ms. Warner had said things?
16    A.  Yes.
17    Q.  Threats?  What did she tell you exactly that
18  Ms. Warner had said?
19    A.  She said that Ms. Warner was saying that --
20  what she was going to do to me and how she was taking
21  pictures and just all over my desk.
22    Q.  Okay.  Did she -- did Ms. Watkins elaborate
23  about what she heard Ms. Warner saying she was going
24  to do to you?
25    A.  If she did, I really can't recall all that.

---

Page 416

1    Q.  Okay.  And you told Ms. -- Paul Johnson and
2  Jimmy Brown what Ms. Watkins had told you?
3    A.  Yes.
4    Q.  And did you ask them to do anything?
5    A.  I don't know.  I can't recall.
6    Q.  Do you know, in fact, whether or not Paul
7  Johnson subsequently went and talked to Ms. Warner?
8    A.  I don't know.
9    Q.  You weren't involved in any conversation
10  between the two of them?
11    A.  No.
12    Q.  And did you ever talk to Ms. Warner about
13  this incident?
14    A.  No.
15    Q.  And Ms. Warner never inflicted bodily harm on
16  you?
17    A.  No.
18    Q.  Did she ever take any more pictures of you?
19    A.  She could have.  I don't know.
20    Q.  You never noticed her?
21    A.  I never noticed her taking any more pictures.
22    Q.  Okay.  Let me direct your attention now to
23  paragraph 20 of Defendants' Exhibit #31.
24    A.  #31.
25    Q.  Which is your complaint.

---

Page 417

1    A.  Okay.  And which one?
2    Q.  Paragraph 20.  In this paragraph, you make
3  some allegations regarding Mr. Reams asking you to
4  remove your car from a handicapped parking space
5  behind the building.  Do you see that?
6    A.  Yes.
7    Q.  Are you alleging that Mr. Reams asked you to
8  move your car to retaliate against you?
9    A.  Yes.
10    Q.  Now, at that point in time -- and we're
11  talking January 7th, 2005 -- how many handicapped
12  parking spaces were there behind the Social Security
13  building?
14    A.  Approximately five.  Well, five.
15    Q.  And were they in two different blocks, one
16  set of three and one set of two?
17    A.  Correct.
18    Q.  And had you ever parked in a handicapped
19  space before?
20    A.  No.
21    Q.  Do you have a handicapped placard in your
22  car?
23    A.  No.
24    Q.  Why on that day did you park in a handicapped
25  spot?

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                              7/11/2008
DEPOSITION OF BERNETHIA JOHNSON

6 (Pages 418 to 421)

Page 418

1    A.  If the handicapped -- if the space was
2  vacant, you could park there.
3    Q.  When you parked in a spot on that day, did
4  you park -- which spot in the back did you park in?
5  Was it in the set of three or the set of two?
6    A.  Two.
7    Q.  And how long had you been parked there before
8  Mr. Reams came up and asked you to move?
9    A.  I don't know what time I got to work that
10  morning.
11    Q.  Do you know how he found out you were parked
12  there?
13    A.  I don't.
14    Q.  Are you aware of any employees in the office
15  who had handicapped placards in their car?
16    A.  No.
17    Q.  Had you ever seen Ms. Lamar or Ms. Weeks with
18  handicapped placards in their car?
19    A.  No.
20    Q.  Do you know if they ever had them?
21    A.  No.
22    Q.  Where did you usually park your car?
23    A.  In the parking lot, wherever there was a
24  vacant space.
25    Q.  The employees' parking lot?

Page 419

1    A.  Yes.
2    Q.  How much closer to the door is the
3  handicapped parking spot than the regular parking
4  spot?
5    A.  Next to the door.
6    Q.  How many feet?
7    A.  I'm sorry.  I don't know.
8    Q.  What do you recall from the conversation when
9  Mr. Reams asked you to remove your car from the
10  handicapped spot?
11    A.  Mr. Reams came to me.  He stood on the side
12  where Tamika's desk would have -- was, her work area
13  was.  And he came with his facial expression and his
14  tone of voice and said, You move your car from that
15  parking spot, from the handicapped or something like
16  that.  And I said, Gosh, Paul, why did you have to
17  come at me like that?
18        Do you hear me?
19        I said, I'm going to move it.
20        Now.
21        So I said, I need to turn off my computer.  And
22  he walked away.
23    Q.  And that conversation was at your cubicle?
24    A.  Yes.
25    Q.  Was anyone else present at the time?

Page 420

1    A.  Not that I know of.
2    Q.  And at that point, did you go move your car?
3    A.  Yes.
4    Q.  And where did you move it to?
5    A.  To a vacant -- another vacant spot.
6    Q.  In the employee parking lot?
7    A.  Yes.
8    Q.  Do you have any evidence that Mr. Reams knew
9  of other employees who weren't handicapped parking in
10  those two particular spots and didn't ask them to
11  move?
12    A.  The only evidence I will have is the fact
13  that he parked back there on a daily basis and that
14  you -- you could not overlook cars that were parked in
15  the parking lot -- in the handicapped parking lot
16  because to enter either side of the building, you had
17  to pass that area.
18    Q.  You're saying -- so you have no personal
19  knowledge whether or not Mr. Reams ever saw someone
20  who was not handicapped park in those spots.  Is that
21  your statement?
22    A.  Personal knowledge as far as me seeing him?
23    Q.  Seeing him or talking to him about it.
24    A.  Seeing him pass the employee -- the cars that
25  were parked in the handicapped parking lot?  I saw --

Page 421

1  I've seen him walk past them many of times.
2    Q.  You've seen him walk past --
3    A.  Vehicle --
4    Q.  -- cars parked in the handicapped parking
5  spot?
6    A.  That is correct.
7    Q.  Which set of handicapped spots did he walk by
8  with cars parked in them?
9    A.  Both sets.
10    Q.  And do you know, at the times he walked by,
11  whether any of those cars had handicapped stickers?
12    A.  Never.  I'm saying they never had handicapped
13  on them.
14    Q.  Did you go look?
15    A.  You could see them when you walked past the
16  window.  The windows to the vehicles are clear, and
17  you can see through the windows, and you can see
18  whether or not any placard is hanging.
19    Q.  Did you go talk to Mr. Reams and ever tell
20  him, complain about people parking in those
21  handicapped spots?
22    A.  No.
23    Q.  And the day he asked you to move, you have no
24  idea how he found out you were parked in that spot, do
25  you?

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                                    7/11/2008
DEPOSITION OF BERNETHIA JOHNSON

Page 422

1    A.  No.
2    Q.  And when you say you saw him walk by people
3 parked in those handicapped spots, do you know whose
4 vehicles were parked in those spots?
5    A.  Different people, different employees.
6    Q.  Can you tell me the names of what employees
7 you saw parked in those spots on the days you saw him
8 walking by them?
9    A.  You would have Beverly Warner park -- well,
10 yeah, park there.
11    Q.  And where did you see Ms. Warner's car?
12 Where did you see Ms. Warner's car parked?  Which set
13 of spots?
14    A.  The two.
15    Q.  The two.  Okay.  And you saw Mr. Reams walk
16 by it?
17    A.  On that day?  No, not on that day.  No.  So
18 the answer is I don't know.  I can't recall.  I can't
19 recall names.
20    Q.  So you can't recall any of the people's cars
21 who were in the handicapped spots when you saw
22 Mr. Reams in the back parking lot walking by them?
23    A.  No.
24    Q.  And you never reported any incidents when you
25 thought someone was improperly parked in a handicapped

Page 423

1 parking spot?
2    A.  Not until he asked me to move.
3    Q.  Okay.  So after he asked you to move, did you
4 subsequently go and tell him -- strike that.
5    Okay.  What happened -- did you have a
6 conversation with him about the handicapped parking
7 spots after he asked you to move?
8    A.  No.
9    Q.  Were you ever present at a meeting where
10 Mr. Reams had explained to the office that the
11 handicapped spots in the back, two of them -- that the
12 set of two were reserved for people who actually had
13 handicapped stickers and anyone could park in the
14 three on a first come, first serve basis?
15    A.  No.
16    Q.  You weren't present for that meeting?
17    A.  There was not a meeting, to the best of my
18 knowledge, that he put that information out.
19    Q.  Do you recall Ms. Tamplin -- making a
20 complaint to Ms. Tamplin and Ms. Tamplin coming back
21 to you and telling you that Mr. Reams had referred her
22 to that meeting?
23    A.  I talked with Ms. Tamplin, but she did not
24 say that Mr. Reams referred her to that meeting.
25    Q.  What do you recall from that conversation

Page 424

1 with Ms. Tamplin?
2    A.  I wanted to know why was it that he allowed
3 other employees to stay -- to remain in the
4 handicapped parking lot -- I mean in the handicapped
5 parking space.
6    Q.  Did you ask Ms. Tamplin to do anything?
7    A.  To talk -- to talk to Mr. Reams.
8    Q.  Okay.  And were you present at any
9 conversations she had with Mr. Reams?
10    A.  No.
11    Q.  Did she subsequently come back to you and
12 tell you she had talked to him?
13    A.  Either that or she sent me an e-mail.  I
14 think she sent me an e-mail.
15    Q.  Let me give -- let's see.  Defendants'
16 Exhibit #54.  Tell me, is this the e-mail you received
17 from Ms. Tamplin after you asked her to talk to
18 Mr. Reams about the handicapped parking?  And I guess
19 that would be the first page.  It's actually --
20    A.  Yes, it's the first.
21    Q.  -- two e-mails.
22    A.  Yes.
23    Q.  Defendants' Exhibit #54 is two e-mails.  And
24 the first one is one dated January 28th from
25 Ms. Tamplin to you, and that's the e-mail that she

Page 425

1 wrote back to you after you asked her to talk to
2 Mr. Reams.
3    A.  That is correct.
4    Q.  And she makes a reference in that e-mail.  It
5 says, Since you do not remember the staff meeting
6 whereby he limited only the west end ones, presumably
7 others also may not remember the meeting.
8    Do you know what that refers to?
9    A.  What does what refer to?
10    Q.  Ms. Tamplin refers to a staff meeting in her
11 January 28th e-mail.  Do you see that?
12    A.  Yes.
13    Q.  You don't recall that staff meeting?
14    A.  No.
15    Q.  Did you ever ask Ms. Tamplin about that staff
16 meeting?
17    A.  No.
18    Q.  Did you go talk to anybody else in the office
19 to ask them about that staff meeting?
20    A.  Yes.
21    Q.  Who did you talk to?
22    A.  I just talked to other employees.  I asked
23 Tammy Martin.
24    Q.  Who is Tammy Martin?
25    A.  Legal assistant.

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.

DEPOSITION OF BERNETHIA JOHNSON

7/11/2008

8 (Pages 426 to 429)

Page 426

1  Q.  What did you ask Ms. Martin?
2  A.  Is she aware of any meeting where management
3  put out that we were not allowed to park in the
4  parking spaces of the handicapped.
5  Q.  And what did she say in response?
6  A.  She said no.
7  Q.  She wasn't aware of any meeting?
8  A.  She was not aware of any meeting.
9  Q.  Who else did you talk to?
10  A.  Renee Bridges.
11  Q.  Okay.  And what did you ask Ms. Bridges?
12  A.  The same thing.
13  Q.  Were these separate conversations or the same
14  conversation?
15  A.  Separate conversation.
16  Q.  Was anyone present when you talked to
17  Ms. Martin?
18  A.  No.
19  Q.  Do you know when that conversation took
20  place?
21  A.  After -- after this incident.
22  Q.  Okay.  Where it took place?
23  A.  At -- at her cubicle.
24  Q.  And how about Ms. Bridges?  Where did you
25  talk to her?

Page 427

1  A.  At her cubicle.
2  Q.  And you asked her the same question?
3  A.  Yes.
4  Q.  And what did she say in response?
5  A.  No.
6  Q.  She didn't recall any meeting?
7  A.  That is correct.
8  Q.  Was anyone present when you talked to her?
9  A.  No.
10  Q.  Did you ask anyone else?
11  A.  Bonita McWilliams.
12  Q.  And who is Bonita McWilliams?
13  A.  A legal assistant.
14  Q.  What did you ask her?
15  A.  The same thing.
16  Q.  Was anyone else present?
17  A.  No.
18  Q.  And what did she say in response?
19  A.  She said no.
20  Q.  She didn't recall a meeting?
21  A.  That is correct.
22  Q.  Did you ask anybody else if they recalled a
23  meeting?
24  A.  Those were the ones I particularly remember,
25  and I probably did ask other people as well.

Page 428

1  Q.  But you don't recall telling her that?
2  A.  I just can't -- yes.  I did ask other people.
3  I can't recall who they were at this time.
4  Q.  All right.  Turning to the second page of
5  Defendants' Exhibit #54, did you receive a copy of
6  this e-mail on January 29th, 2005 -- on or about
7  January 29th, 2005, from Mr. Reams stating the only
8  handicapped parking in the back lot are the two spaces
9  on the west corner of the lot next to the west
10  entrance?
11  A.  Yes.
12  Q.  These are the same two spaces that have been
13  limited to handicapped parking only for the last two
14  years.
15  A.  Sorry.
16  Q.  Did you receive that e-mail?
17  A.  Yes.
18  Q.  Okay.  After you received it, did you ever go
19  talk to Mr. Reams and ask him when he had set aside
20  those two spaces for handicapped?
21  A.  No.
22  Q.  Did you ask Ms. Tamplin about it?
23  A.  After he sent this out?
24  Q.  Yes.
25  A.  No.

Page 429

1  Q.  All right.  What makes you claim or allege in
2  this lawsuit that when Mr. Reams asked you to moved
3  your car from that handicapped parking spot, he was
4  doing so to retaliate against you?
5  A.  It was the way he did it, the way he said it.
6  Q.  And what do you mean by the way he said it?
7  A.  His facial expression, his tone in his voice.
8  Q.  What about his facial expression showed that?
9  A.  It was his facial expression that allowed --
10  that I saw where -- well, it was in his facial
11  expression as well as his tone that -- that I believe
12  he was doing it for retaliation purposes.
13  Q.  He --
14  A.  Also -- okay.
15  Q.  Well, go ahead.
16  A.  Also, he allowed for many years other
17  employees to park in that parking space, never said
18  one word.
19  Q.  Okay.  First, what is it -- what is it about
20  the facial expression and tone of voice that makes you
21  believe that when he asked you to move the car, it was
22  in retaliation for your prior EEO complaints?
23  A.  I saw anger in his face.  I heard it in his
24  voice.
25  Q.  Okay.  From how he talked and how he looked,

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.
DEPOSITION OF BERNETHIA JOHNSON

7/11/2008

9 (Pages 430 to 433)

Page 430

1  you thought he was angry?
2     A.  Yes.
3     Q.  Did he raise his voice?
4     A.  What I've come to understand is people --
5  say, for instance, the way people talk, what may be
6  raised to me may not be raised to anyone else.  So I'm
7  not -- I'm not sure what you mean by raised his voice.
8     Q.  Well, can you tell me what it is about his
9  facial expression and his voice that made you think he
10  was angry?
11     A.  It was the way he looked and the way he
12  sound.
13     Q.  Is there any better way you can describe it,
14  or is that the best you can do?
15     A.  That's the best I can do.
16     Q.  Okay.  And the second thing you said is for
17  many years, he had allowed people to park in those
18  handicapped spots.  Is that what you said?
19     A.  Yes.
20     Q.  Who do you claim he allowed to park in those
21  spots?
22     A.  Any other employees that wanted to.  Yeah, I
23  have to say that.
24     Q.  And other than the fact that you say he had
25  to walk past these spots coming in to the office, you

Page 431

1  have no knowledge of -- strike that.
2     You never talked to him about anyone parking in
3  the handicapped parking spots?
4     A.  No.
5     Q.  Never asked him to tell someone to move?
6     A.  No, not that I'm aware of.
7     Q.  And you can't recall any situation where you
8  saw him walk by someone who was parked in a
9  handicapped spot that you didn't think should be
10  there?
11     A.  On that particular day?
12     Q.  Ever.
13     A.  Yes.  I've seen him do it many of times.
14     Q.  We talked about this previously, and I asked
15  what cars -- what employee cars did you see Mr. Reams
16  walk by that didn't have handicapped spots that were
17  parked in those two spots.
18     A.  I'm sorry.  I thought you said on that day
19  when we were previously talking.
20     Q.  No.  I just -- I want to know at any point in
21  time.
22     A.  Okay.  Ms. Robinson.  I can't think of her
23  first name.
24     Q.  Ms. Robinson?
25     A.  Yes.  Karen Burton.

Page 432

1     Q.  Hold on.  Who is Ms. Robinson?
2     A.  What is her first name?  She's a senior
3  attorney.  Senior attorney.
4     Q.  Do you know when she parked in those two
5  spots?
6     A.  The majority of the time.
7     Q.  Can you give me a date?
8     A.  No.
9     Q.  And you say you saw Mr. Reams walk by her car
10  parked in that spot?
11     A.  Many of times.  Wait a minute.  You said
12  parked in that spot that I was in?
13     Q.  Yes.
14     A.  I thought you was talking about parked in any
15  of the handicapped, but you're not talking about in
16  any of the handicapped.
17     Q.  No.  I want to know -- there was a set of two
18  and a set of three; is that correct?
19     A.  Right.
20     Q.  Can you tell me of any instance when you saw
21  Mr. Reams walk by a non-handicapped employee's car in
22  one of the two spots that were set aside?
23     A.  I understand.  Beverly Warner.  Oh, disregard
24  the two names that I gave you.
25     Q.  Okay.  Ms. Warner?

Page 433

1     A.  Yes.
2     Q.  When did you see Ms. Warner parked in one of
3  those two spots?
4     A.  Nearly every day.
5     Q.  And how many times did you see Mr. Reams walk
6  by her car?
7     A.  How many times?  I never counted them.
8     Q.  Will you give me an estimate?
9     A.  No.
10     Q.  Do you have any -- you have no idea if he was
11  even paying attention to who was parked there when he
12  walked by, do you?
13     A.  No, I have no evidence of it.
14     Q.  And who else besides Ms. Warner did you see
15  parked in that spot?
16     A.  Cynthia Lamar.
17     Q.  When did you see Ms. Lamar parked in those
18  spots?
19     A.  Often.
20     Q.  Let me go back to Ms. Warner.  When you saw
21  Ms. Warner parked in those spots, did you ever go
22  check to see if there's a handicapped placard?  I
23  mean, there's two types.  There's one that hangs and
24  there's one that can be laying on the dashboard.  Did
25  you walk over to the front of the car and actually

10 (Pages 434 to 437)

Page 434

1  check?
2     A.  When you walk from the -- any space other
3  than -- if you walk from any car parking space towards
4  the building, you can see through the vehicle.  I did
5  not see any hanging.  Or if you walk -- come out of
6  the building, you could see the front of the vehicle
7  through the window.  I did not see any laying there.
8     Q.  How about Ms. Lamar's vehicle?
9     A.  No, I didn't see any.
10    Q.  Did you have any evidence -- knowledge one
11  way or the other whether Ms. Lamar actually had a
12  handicapped placard at one point in time?
13    A.  At one point in time, I believe she did.
14    Q.  Do you know when that was?
15    A.  No.
16    Q.  Did you ever -- did you -- are you saying you
17  saw Mr. Reams walk by Ms. Lamar's car parked in one of
18  those two parking spots?
19    A.  Yes.
20    Q.  Can you give me specific dates?
21    A.  No.
22    Q.  Do you have any evidence he was paying
23  attention to what cars were parked there when he
24  walked by?
25    A.  No.

Page 435

1     Q.  Besides Ms. Warner and Ms. Lamar, are there
2  any other employees that you say were non-handicapped
3  at the time they were parked in those two spots that
4  you saw Mr. Reams walk by?
5     A.  No.
6     Q.  Okay.  Have you told me all the reasons you
7  believe that Mr. Reams, when he asked you to move your
8  car on January 27th, 2005, was doing so to retaliate
9  against you?
10    A.  Not right now.  Not that I can think of right
11  here.
12    Q.  And you've told me -- you're saying you've
13  told me all you can think of at this time?
14    A.  Right now, yes.
15    Q.  Now, is there anything you could look at --
16  you're saying there might be more.  Can you think of
17  any documents you could look at that would refresh
18  your memory?
19    A.  No.  I'm just saying I can't think of any
20  right now.
21    Q.  Do you think there are?
22    A.  Possibly.
23    Q.  What makes you think there are?
24    A.  Because I don't know.  I just feel like I --
25  nothing is -- because there's just a possibility that

Page 436

1  I may think of other things that occurred that may
2  trick my mind -- trip my mind to say, oh, yeah, yeah.
3  Just like I knew other cars were there, but I can't
4  visualize what -- who that person was.
5     Q.  But after --
6     A.  There was other cars, but I can't visualize
7  who the other person was that had the vehicle parked
8  there as well.
9     Q.  But as of right now, you've told me all --
10  all the evidence you can think of that supports your
11  allegation --
12    A.  Yes.
13    Q.  -- that the request for you to move your car
14  was retaliation?
15    A.  Yes.
16    Q.  Let me direct your attention now to
17  paragraph 23.  Actually, let me step back before I do
18  that.  Do you know if Ms. Weeks ever had a handicapped
19  placard, Teresa Weeks?
20    A.  I don't know if she had a handicapped
21  placard.
22    Q.  Now, let's go to paragraph 23 of Defendants'
23  Exhibit #31.  Now, on paragraph 23, you reference
24  three vacancy announcements.  Do you see that?
25    A.  Yes.

Page 437

1     Q.  Did you apply -- submit a formal application
2  for any of these positions?
3     A.  I can't recall if I did or did not.
4     Q.  Do you recall applying for other legal
5  assistant jobs through OPM with the Social Security
6  office when you were working here in Montgomery?  I
7  mean filling out the official federal application and
8  all that.
9     A.  Yes.
10    Q.  You did apply to some?
11    A.  Yes.
12    Q.  And you don't know which ones?
13    A.  No.
14    Q.  So you have no idea whether or not you
15  applied for these three that are listed in
16  paragraph 23?
17    A.  No.
18    Q.  If you had applied, would you have retained a
19  copy of your application?
20    A.  I don't know.
21    Q.  Do you know who was hired for those three
22  positions?
23    A.  I do not.
24    Q.  Do you know who else applied?
25    A.  I do not.

## Page 438

1    Q.  Did you ever -- I guess you never heard -- if
2  you don't know whether or not you submitted an
3  application, you never heard anything from those
4  offices about any application?
5    A.  No, not that I'm aware of.
6    Q.  Are you claiming you did not receive one of
7  those three positions for retaliatory reasons?
8    A.  Excuse me?
9    Q.  Are you alleging that you weren't given or
10  hired into one of the three positions you have listed
11  in paragraph 23 of your second complaint for some
12  retaliatory reason?
13    A.  No, that's not what I'm alleging.
14    Q.  Okay.  And what are the reference -- why do
15  you have those three job announcements listed in
16  paragraph 23 of your second complaint?
17    A.  I have these job announcements listed because
18  I tried to do a hardship transfer to these offices.
19  And that was during the time frame that I was trying
20  to get a hardship transfer.
21    Q.  Okay.  Let me direct your attention now to
22  paragraph 24 of your second complaint.
23    A.  Okay.
24    Q.  Paragraph 24, you have a reference to a car
25  you purchased for your daughter being keyed on

## Page 439

1  government property.  Do you see that?
2    A.  Yes.
3    Q.  Are you alleging that your car was keyed by
4  someone to retaliate against you?
5    A.  Yes.
6    Q.  Do you know who keyed your car?
7    A.  No.
8    Q.  And what kind of car was that?
9    A.  Chevrolet.
10    Q.  Was it a 1991 Chevy Cavalier?
11    A.  A 1991?
12    Q.  Yes.
13    A.  No.
14    Q.  It wasn't a '91?
15    A.  No, it was not.
16    Q.  What year was it?
17    A.  I think it was a 2001.
18    Q.  And how did you discover this mark on your
19  car?
20    A.  I was on my way to lunch and I saw it.
21    Q.  And what exactly did you see?
22    A.  Let me just put it like this.  I was on my
23  way out to the -- to my car and I saw it.
24    Q.  And where was this scratch?
25    A.  On the hood of the vehicle.

## Page 440

1    Q.  Did you subsequently submit, I guess, a
2  police report about this?
3    A.  Yes.
4    Q.  And if that police report listed the car as a
5  1991 Chevy Cavalier, are you saying that's wrong?
6    A.  Yes.
7    Q.  You're saying it should be a 2001 Chevy
8  Cavalier?
9    A.  Yes.
10    Q.  All right.  What did you do when you
11  noticed -- when was the last time you looked at the
12  hood of your car before you walked out at lunch and
13  saw this?
14    A.  The morning I drove my car to the vehicle
15  (sic) and I got out of my car at work.
16    Q.  Was it raining that morning?
17    A.  No.
18    Q.  And when you got out of the car, you went
19  around and looked at your hood?
20    A.  I looked -- looked at it and kept walking by.
21  I looked at my car, and my car includes the hood.
22    Q.  And where were you parked exactly?
23    A.  In the parking lot, employees' parking lot.
24    Q.  Which part of the employees' parking lot?
25    A.  I don't know what you're talking about.

## Page 441

1    Q.  Well, was it on one certain side?  Was it
2  closer to the building?  Further from the building?
3  As you walk out, was it on the right or the left?  Was
4  it in the back?
5    A.  It was not in the handicapped parking area of
6  parking spaces.  It was behind the employee -- I mean,
7  behind the handicapped parking spaces, you have
8  another set of parking spaces; and attached to that is
9  another set of parking spaces.  And I was in that set
10  of parking spaces.
11    Q.  Were there cars parked around you?
12    A.  Employees were there at work, so yes.
13    Q.  And after you discovered this scratch on your
14  car, what did you do?
15    A.  I called the police.
16    Q.  Did you file a police report?
17    A.  Yes.
18    Q.  Okay.  I'm going to give you Defendants'
19  Exhibit #55.  Tell me, is this the police report you
20  filed about the scratch you discovered on the car?
21    A.  Yes.
22    Q.  And did you talk to a police officer that
23  came?
24    A.  Yes.
25    Q.  And you estimated the damage at $150?

Page 442

1     A.  He estimated or it was estimated.
2     Q.  The police officer did?
3     A.  Yes.
4     Q.  And you're saying at the bottom here where it
5   has a 1991 Chevy Cavalier, gold, the 1991 is
6   incorrect?
7     A.  Correct.
8     Q.  How long had you owned this car?
9     A.  Maybe a day or two.
10    Q.  And you had purchased it for your daughter?
11    A.  Yes.
12    Q.  Why were you driving it that day?
13    A.  I purchased it for my daughter.  She was away
14  at college.  I was waiting for her -- or either -- let
15  me see.  Either she was going to come home and get it
16  or I was going to take it to her.
17    Q.  After you filed this police report, did you
18  ever hear anything further from the police about it?
19    A.  No.
20    Q.  Do you know if any arrests were made?
21    A.  No.
22    Q.  Did you file an insurance claim?
23    A.  No.
24    Q.  Did you ever have it repaired?
25    A.  Eventually.  She got another hood.

Page 443

1     Q.  Do you know when that was?
2     A.  No.
3     Q.  Did you ask -- do you recall sending an
4   e-mail to Mr. Reams asking him for the government to
5   pay for the cost of this keying?
6     A.  Yes.  I recall sending an e-mail to Mr. Reams
7   regarding the vehicle.
8     Q.  Did you ever talk to him in person about
9   this -- this scratch on your vehicle, or did you just
10  send him an e-mail?
11    A.  I don't recall sending him -- I don't recall
12  talking to him in person about it.
13    Q.  Let me hand you Defendants' Exhibit #56 now.
14  Can I see that?  I think I have -- I meant to
15  just give you the first page.
16    Okay.  I hand you Defendants' Exhibit #56.  Can
17  you tell me if the bottom e-mail -- let me start over.
18  Defendants' Exhibit #56 is two e-mails; is that
19  correct?
20    A.  Yes.
21    Q.  Do you recognize those two e-mails?
22    A.  Yes.
23    Q.  And the bottom one is one that you wrote to
24  Mr. Reams and a number of other individuals on
25  February 23rd?

Page 444

1     A.  And a number of other individuals, yes.
2     Q.  Okay.  And this tells them about what
3   happened to the car and asks them to pay.  Is that
4   what you're doing in this e-mail?
5     A.  Yes.
6     Q.  And Mr. Reams' response is the top e-mail,
7   Defendants' Exhibit #56?
8     A.  Yes.
9     Q.  And he says the government's not going to
10  pay.  Is that what it says?  There's a statement, I'm
11  not aware of any obligation for the agency to pay for
12  its repair.
13    A.  That's correct.
14    Q.  After receiving this e-mail, did you have any
15  further communication with Mr. Reams or anyone else
16  about this issue?
17    A.  I can't recall.  I can't recall.
18    Q.  Did you ever file any kind of administrative
19  complaint to the Social Security Administration
20  seeking payment for this damage?
21    A.  No.
22    Q.  Are you aware of anyone else's vehicle being
23  damaged in the employee parking lot?
24    A.  No.
25    Q.  Are you claiming that Mr. Reams' statement

Page 445

1   the agency wouldn't pay for repairing your vehicle was
2   retaliation?
3     A.  What I'm doing is showing that conversation
4   did take place, e-mail did take place between me and
5   Mr. Reams, and that he was informed of the situation.
6     Q.  Okay.  What about this incident are you
7   claiming was retaliatory?
8     A.  Yes.
9     Q.  And what do you mean by yes?
10    A.  I'm claiming that it's retaliatory.
11    Q.  His decision or his statement in that e-mail
12  that the agency won't pay to repair the car?
13    A.  Yes.
14    Q.  Okay.  Let's take you back first.  What is
15  your evidence or what are -- you made an allegation
16  earlier that the fact your car was keyed was
17  retaliatory.  What is your evidence that that was
18  retaliatory?
19    A.  That it was -- it was done.
20    Q.  And you have no evidence who did it?
21    A.  No.
22    Q.  Let's go next to the statement by Mr. Reams,
23  the agency wouldn't pay for the cost of the repair.
24  What is your evidence or what supports your allegation
25  that that act was retaliatory?

Page 446

1    A.  They didn't pay.
2    Q.  Are you aware of Mr. Reams authorizing
3  payment to repair any other car that was damaged on
4  the property?
5    A.  No.
6    Q.  Was there anything else that made you believe
7  it was retaliatory?
8    A.  As -- as -- as a manager, I feel that -- I
9  believe that Mr. Reams could have sought more -- more
10  information to possibly provide me.  He's just saying
11  that he wasn't aware of any obligation.  He's not even
12  trying to investigate anything to try to find out
13  anything.
14    Q.  What did you want him to do?
15    A.  Could the agency somehow pay.  If he didn't
16  know, maybe he -- he's got other avenues he could use.
17  He -- you know, he could have possibly told me that I
18  don't know, I'll make contact with LMR or some of the
19  other higher echelon to find out what we could do in
20  this instance.
21    Q.  Okay.  But after receiving his e-mail on
22  Defendants' Exhibit #56, you never spoke to him or
23  wrote him or communicated with him again about this
24  issue?
25    A.  Not -- to the best of my knowledge, I did

Page 447

1  not.
2    Q.  And you never asked him if there was anything
3  else that could be done?
4    A.  To the best of my knowledge, no.
5    Q.  Did you file anything with the union about
6  this incident?
7    A.  I -- I called Carl Warren.  I believe I
8  called him and asked him, I believe.  I -- I'm sorry.
9  What was your question?
10    Q.  Did you talk to the union or contact the
11  union about this incident?
12    A.  Yes.
13    Q.  What did the union say?
14    A.  He said that -- that there was nothing he
15  could do.
16    Q.  Have you told me all the reasons that you can
17  think of that any of the events or acts referenced in
18  paragraph 24 of your second complaint were taken for
19  retaliatory reasons?
20    A.  I've given you those things I can think of
21  right now.
22    Q.  And you can't think of anything further?
23    A.  Not right now.
24    Q.  And can you think of any document or anything
25  that might refresh your memory on that point?

Page 448

1    A.  No.
2    Q.  Let me direct your attention to paragraph 25
3  of Defendants' Exhibit #31.  If you can read that
4  paragraph.
5    A.  (Witness complies)  Okay.
6    Q.  Is there anything in paragraph 25 of your
7  second complaint that you allege was retaliation?
8    A.  You know, I'm sorry.  What I end up doing was
9  I read from page 6 and I went to page 8.  So I have to
10  finish reading.  I picked -- when I turned the page, I
11  turned the page 6 and page 7 together.  So I need to
12  finish reading, if you don't mind.
13    Q.  That's fine.
14    A.  Okay.
15        (Brief pause)
16    A.  Okay.
17    Q.  Have you read paragraph 25?
18    A.  Yes.
19    Q.  Is there anything in paragraph 25 that you're
20  claiming in this lawsuit was retaliatory?
21    A.  Yes.
22    Q.  And what is that?
23    A.  That Ms. Lamar had Ms. Brenda McAnnally, who
24  was a lead from another group, to read to me.
25    Q.  And what did Ms. McAnnally read to you on

Page 449

1  that day?
2    A.  She read -- I don't -- I'm not sure what she
3  read.
4    Q.  Okay.  And was this a meeting in Ms. Lamar's
5  office --
6    A.  Yes.
7    Q.  -- on April 4th, 2005?
8    A.  Yes.
9    Q.  Was anyone else present besides you and
10  Ms. Lamar and Ms. McAnnally?
11    A.  Ms. Linda Tamplin.
12    Q.  Was she present as a union steward?
13    A.  Yes.
14    Q.  And what took place at that meeting?
15    A.  I was made to sit there and listen to Brenda
16  McAnnally read to me.
17    Q.  Did Ms. Lamar ask Ms. McAnnally to read
18  something to you?
19    A.  Yes.
20    Q.  And what is wrong with Ms. McAnnally reading
21  something to you?
22    A.  I'm not illiterate.
23    Q.  Are you saying that the fact that Ms. Lamar
24  asked Ms. McAnnally to read something out loud to you
25  suggests that she thought you were illiterate?

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF BERNETHIA JOHNSON

14 (Pages 450 to 453)

---

Page 450

1  A. Definitely implied.
2  Q. So what upset you about this incident was --
3  A. How to --
4  Q. Your allegation is that by asking
5  Ms. McAnnally to read the document, Ms. Lamar was
6  implying you were illiterate?
7  A. Yes.
8  Q. Did you ask Ms. Lamar to read the document?
9  A. No. I may have. I may have said I -- yes.
10 I told her I can read.
11 Q. And what did she say in response?
12 A. She wanted Ms. McAnnally to read it.
13 Q. Do you think Ms. Lamar thought you couldn't
14 read?
15 A. What other reason would she have another
16 person from another group in there to read to me?
17 Q. Had you ever read documents before in her
18 presence?
19 A. In whose presence?
20 Q. Ms. Lamar's presence.
21 A. Yes.
22 Q. Did Ms. McAnnally read out loud?
23 A. Yes.
24 Q. So, Ms. Lamar could hear it, too?
25 A. Yes.

---

Page 451

1  Q. And how long did she read for?
2  A. I don't know.
3  Q. Do you believe Ms. McAnnally or Ms. Tamplin
4  also thought you were illiterate?
5  A. I don't know what they thought.
6  Q. Other than the fact that Ms. Lamar had
7  Ms. McAnnally read this document, you have an
8  allegation here, I guess, that this was extremely
9  degrading, belittling, and tremendously humiliating to
10 plaintiff. I'm referring to paragraph 25 of your
11 second complaint. Other than the fact that Ms. Lamar
12 asked Ms. McAnnally to read these documents to you,
13 what else are you claiming, if anything, was extremely
14 degrading, belittling, and tremendously humiliating at
15 that meeting?
16 A. At the meeting?
17 Q. Yes.
18 A. Having me called into the office and someone
19 read. I know you said other than that. Having
20 another person from another group to do that.
21 Q. Do you know if Ms. Lamar ever had legal
22 assistants read documents or provide training to other
23 legal assistants?
24 A. No.
25 Q. Did you ever complain to anyone after this

---

Page 452

1  incident that you thought Ms. Lamar thought you were
2  illiterate?
3  A. I believe I only talked to the union steward
4  about it.
5  Q. That being Ms. Tamplin?
6  A. Yes.
7  Q. What did you tell her?
8  A. The reason that she did that was -- I believe
9  was to belittle me and it was retaliatory.
10 Q. And what did Ms. Tamplin say?
11 A. It was degrading, humiliating, embarrassing,
12 and that they were doing whatever they could possibly
13 do to get rid of me.
14 Q. You told Ms. Tamplin this after this meeting?
15 A. Yes.
16 Q. Was anyone else present?
17 A. No.
18 Q. What did Ms. Tamplin say in response?
19 A. I can't recall.
20 Q. Okay. Besides being embarrassed, are you
21 claiming you were harmed in any way by the fact that
22 Ms. McAnnally read this document out loud?
23 A. Besides of being --
24 Q. Embarrassed.
25 A. Humiliated?

---

Page 453

1  Q. Yes.
2  A. Is that a harm?
3  Q. You say you were humiliated. Besides that,
4  are you claiming you were harmed in any other way?
5  A. Frustrated.
6  Q. Besides that?
7  A. Degraded.
8  Q. Anything else?
9  A. I was left crying.
10 Q. Did you start crying during the meeting?
11 A. I left and went into the bathroom to cry.
12 Q. How long did you cry for?
13 A. I don't know.
14 Q. Did anyone see you crying?
15 A. No.
16 Q. Did you cry before or after you spoke to
17 Ms. Tamplin?
18 A. After.
19 Q. Any other way you claim you were harmed by
20 the fact that Ms. Lamar asked Ms. McAnnally to read
21 these documents?
22 A. My reputation.
23 Q. How do you claim your reputation was harmed?
24 A. By Ms. Lamar asking that this be done, she
25 was harming my reputation.

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF BERNETHIA JOHNSON

Page 454

1    Q.  Among who?
2    A.  The employees.
3    Q.  The only employees present were Ms. Tamplin
4  and Ms. McAnnally; is that right?
5    A.  Yes.  And -- Ms. Lamar and Ms. Tamplin,
6  Brenda McAnnally.
7    Q.  Are you claiming your reputation was damaged
8  by anyone else besides those three?
9    A.  Yes.
10    Q.  How?
11    A.  People talk.
12    Q.  So you later heard some gossip?
13    A.  Just -- yeah, about it.
14    Q.  What did you hear?
15    A.  It was not intended for me to hear, but they
16  were talking and laughing.
17    Q.  What did you hear?
18    A.  That this situation took place.
19    Q.  Well, specifically, what did you hear and who
20  did you hear it from?
21    A.  I couldn't say.  They were just standing in a
22  group.  And I acted like I didn't hear and walked on
23  by.
24    Q.  Who was in the group?
25    A.  I don't know who all they were.  I just

Page 455

1  walked on by.
2    Q.  What did you hear them saying?
3    A.  They were laughing that this situation had
4  taken place.
5    Q.  Can you specifically tell me what you heard
6  them say?  You heard some laughter?
7    A.  Yes.
8    Q.  Did you hear anything else?
9    A.  No.
10    Q.  And you don't know who was in that group?
11    A.  No.
12    Q.  How do you know it related to this specific
13  incident?
14    A.  It probably could have just been maybe the
15  fact that it happened and then I heard it maybe.  I
16  don't know.  I don't know.
17    Q.  You don't know for sure what they were
18  talking about, do you?
19    A.  Possibly not.  No, I don't know for sure what
20  they were talking about.
21    Q.  Okay.  Is there any other way you claim you
22  were harmed by Ms. Lamar asking Ms. McAnnally to read
23  this document other than what you told me?
24    A.  No.
25    Q.  And what is your basis for alleging that

Page 456

1  Ms. Lamar's request that Ms. McAnnally read this
2  document was to retaliate against you?
3    A.  That it occurred.
4    Q.  Anything else?
5    A.  No.
6        MR. DuBOIS:  Let's take a very short break.
7        (Brief recess)
8    Q.  Let me direct your attention now to
9  paragraph 28 of Defendants' Exhibit #31.  And there
10  you refer to I guess an incident on June 3rd, 2005.
11  Do you see that?
12    A.  Yes.
13    Q.  It says you're standing in the doorway of
14  Mr. Reams' office and discussing some general concerns
15  with him.  Do you know what you were talking about
16  that day?
17    A.  Getting a key to the front door or getting a
18  key to the building, the front door.
19    Q.  You're requesting a key to the front door?
20    A.  I was -- I was requesting a key.
21    Q.  Did all employees have a key?
22    A.  Not that I know of.
23    Q.  Why were you requesting a key?
24    A.  Well, now, let me -- let me back off and say
25  I can't recall what we were talking about.

Page 457

1    Q.  Okay.  You can't recall what the general --
2  you were just talking to Mr. Reams about something on
3  June 3rd, 2005?
4    A.  Yes.
5    Q.  And then you mention in this paragraph that
6  you entered his office and shut the door behind him --
7  behind you to discuss a personal matter with him.
8    A.  Yes.
9    Q.  Do you see that?  What personal matter did
10  you want to discuss with him?
11    A.  I'm not sure.
12    Q.  Okay.  And after you shut the door, he asked
13  you to open the door?
14    A.  Yes.
15    Q.  Now, do you claim anything in paragraph 28
16  was retaliatory?
17    A.  Yes.
18    Q.  And what are you claiming was retaliatory?
19    A.  That he said that -- that he might do -- that
20  I might do something to him.
21    Q.  Okay.  And you're referring to paragraph 28.
22  You have an allegation that he asked you to open the
23  door.  You opened it.  You asked him what's wrong.
24  And you said Mr. Reams responded that plaintiff might
25  do something to him and that plaintiff was not to come

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                          7/11/2008
DEPOSITION OF BERNETHIA JOHNSON

16 (Pages 458 to 461)

Page 458

1  in his office without a witness. Is that what you're
2  referring to?
3      A.  Yes.
4      Q.  What -- what exactly do you recall? Is there
5  anything else you recall being discussed at that
6  point?
7      A.  No.
8      Q.  And you're saying -- what exactly are you
9  alleging there is retaliatory? The fact that he
10  wouldn't talk to you in his office with the door
11  closed without a witness?
12      A.  The fact that he told me he thought that I
13  would do something to him and not to come into his
14  office without having another person there -- there to
15  witness what was being said or whatever.
16      Q.  Okay. How did that harm you in any way?
17      A.  That I had to discuss what maybe I did not
18  want other people to know. I had to discuss my
19  business in front of other people.
20      Q.  You're saying there might possibly be some
21  issue in the future where you want to talk privately
22  with Mr. Reams?
23      A.  Possibly.
24      Q.  All right. And when he told you this, what
25  did you do?

Page 459

1      A.  I left out of his -- oh, I told him, I said,
2  please don't make me -- something -- please don't make
3  me out of something that I'm not. And I left his
4  office.
5      Q.  Okay. And then it looks like according to
6  this, you got Ms. Tamplin and went back?
7      A.  Yes.
8      Q.  Was there any further discussion about this
9  issue?
10      A.  Yes.
11      Q.  What do you recall being discussed?
12      A.  That -- that I told her that I was not
13  allowed to talk to Mr. Reams without having someone
14  there in his office with me.
15      Q.  And what did Ms. Tamplin say?
16      A.  I can't recall.
17      Q.  Now, you could still talk to Mr. Reams about
18  things as long as his door was open; is that right?
19      A.  Not that -- as long as it's open and I stand
20  out where my -- where other people could hear my
21  conversation, I guess that was right; but I was not
22  allowed in his office.
23      Q.  With the door shut --
24      A.  I was not --
25      Q.  -- without a witness?

Page 460

1      A.  I was not allowed in his office without a
2  witness.
3      Q.  So is your complaint that you weren't allowed
4  to go talk to your second level supervisor and shut
5  his door without having someone else present?
6      A.  Yes.
7      Q.  Why would you ever have to close the door to
8  talk to him about any work-related manner?
9      A.  I always have.
10      Q.  But you could still discuss work-related
11  matters with the door open; is that right?
12      A.  Yes.
13      Q.  And if you wanted to talk to him about
14  another issue, you could always bring a union
15  representative in with you; is that right?
16      A.  Yes. I'm sorry. Repeat that.
17      Q.  If you wanted to talk to him about another
18  issue, nonwork-related or work-related, you could
19  always go in with a union representative; isn't that
20  right?
21      A.  Yes.
22      Q.  And you often did ask Ms. Tamplin or Ms. Hall
23  to accompany you?
24      A.  Yes. Did you say I always had Ms. Tamplin to
25  accompany me?

Page 461

1      Q.  I said do you often have.
2      A.  Oh, often. Okay. Yes.
3      Q.  All right. And what makes you believe that
4  Mr. Reams' request that you open the door and don't
5  close unless someone else is present was retaliation
6  for any prior EEO complaints?
7      A.  To the best of my -- I'm sorry. Please
8  repeat that.
9          MR. DuBOIS: Could you repeat it?
10             (The court reporter read the
11             pending question.)
12      Q.  Let me kind of rephrase that, then. You're
13  alleging that Mr. Reams' request that you don't talk
14  to him in his office with a closed door without
15  someone else present was retaliation for your prior
16  EEO complaints; is that right?
17      A.  Yes.
18      Q.  What do you base that on?
19      A.  I don't -- the fact that he asked me not to
20  do that. I've always done it. And I don't know what
21  made that -- I had always done it, talked with him
22  with the door shut. If it was a personal matter or
23  just periodically.
24      Q.  Anything else?
25      A.  No.

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.    7/11/2008
DEPOSITION OF BERNETHIA JOHNSON

17 (Pages 462 to 465)

---

Page 462

1    Q.  Prior to this occasion on June 3rd, 2005, do
2  you recall the last personal matter you had talked to
3  Mr. Reams about with his office door shut?
4    A.  Prior to June 3rd?
5    Q.  Yes.
6    A.  April 13th or around or about April 13th.
7    Q.  April 13 of 2005?
8    A.  Yes.
9    Q.  You went into Mr. Reams --
10   A.  It may have been 2004, 2005, somewhere like
11  that.
12   Q.  You went into Mr. Reams' office and closed
13  the door and talked to him about a personal matter?
14   A.  I was -- I was asked into Mr. Reams' office,
15  and the door was shut and we talked about personal
16  matters.
17   Q.  What did you talk about on that day?
18   A.  We talked about the fact that Mr. Paul
19  Johnson had come to him asking about why I wanted to
20  work at home two days a week.
21   Q.  Okay.  Do you consider that a personal
22  matter?
23   A.  I felt like it was work-related.
24   Q.  And are you referring to your request in
25  April 2004 to work at home that you made to

---

Page 463

1  Mr. Johnson and Mr. Reams came and approved it?  Is
2  that what you're referring to?
3    A.  Yes.
4    Q.  And we talked about that yesterday?
5    A.  Yes.
6    Q.  Can you think of any other instance prior to
7  June 3rd, 2005, when you had a conversation you
8  consider personal or on a personal matter in
9  Mr. Reams' office with the door closed?
10   A.  Yes.  Many times when I went to him as a
11  union steward.
12   Q.  You consider that as a personal matter?
13   A.  Work-related.  Okay.
14   Q.  That's work.  I'm looking for personal
15  matters.
16   A.  Okay.  Which one are we talking about?  Let
17  me read that again.
18   Q.  Paragraph 28 of your second complaint.
19   A.  Okay.  When I went to -- okay.  No, no
20  personal matter.  So I think that everything I've said
21  up to this point, I was just looking at work-related
22  issues, not personal matter.
23   Q.  Okay.  And you were able to talk to him about
24  work-related issues at any time with the door open; is
25  that right?

---

Page 464

1    A.  I was able to talk with him anytime about?
2    Q.  Work-related issues with his door open.
3    A.  Yes.
4    Q.  Let me direct you now to paragraphs 37
5  through 39 of your second complaint, Defendants'
6  Exhibit #31.  Could you read those three paragraphs?
7    A.  (Witness complies)  Okay.
8    Q.  Okay.  Have you read paragraphs 37 through 39
9  of Defendants' Exhibit #31?
10   A.  Yes.
11   Q.  And those paragraphs appear to relate to an
12  instance on July 15th, 2005, when you were in the
13  restroom and the alarm was set off at the Social
14  Security office?
15   A.  Yes.
16   Q.  Are you alleging or claiming anything in
17  those three paragraphs is retaliatory?
18   A.  Yes.
19   Q.  What are you claiming was retaliatory?
20   A.  I was -- I'm claiming that the fact that he
21  put out an e-mail about it, that other employees were
22  often in the building past six o'clock and that he
23  never e-mailed the entire staff about it.  That's what
24  I'm claiming retaliatory.
25   Q.  Okay.  On July 15th, 2005, you were in the

---

Page 465

1  restroom and the alarm went off?
2    A.  Yes.
3    Q.  Was anyone else in the building on that day?
4    A.  Not that I know of.
5    Q.  And did Mr. Reams come back to the office?
6  Did you exit the restroom and talk to Mr. Reams?
7    A.  When I -- when -- when I exit --
8    Q.  Let me just strike that.  Tell me what
9  happened.
10   A.  Okay.  Gosh.  Okay.  Thank you.  When I -- on
11  my way out the door, I stopped and went to the
12  restroom.  And when I got through in the restroom, I
13  went to exit the door; and the door was locked.  So
14  the only other thing I could do is go back to my desk
15  to call Paul Reams.  My desk sat next to a window.  So
16  I happened to look out the window and I saw Paul Reams
17  exiting.
18   Now, Paul Reams saw my vehicle, so he
19  automatically turned around and came back.  And there
20  I was at my desk.  I told him, I was just getting
21  ready to call you, Paul.  And I told him why I was
22  still in the building.
23   Q.  Now, at that point, your car was not parked
24  in the employee parking lot, right?
25   A.  That's correct.

Page 466

```
1    Q.  You were parked at a business next door?
2    A.  Yes.
3    Q.  So Mr. Reams, I guess, would not have seen it
4  until he circled the building and was about to turn on
5  Atlanta Highway?
6    A.  That is correct.
7    Q.  And that's when you looked out the window and
8  saw him turning around?
9    A.  He -- yes.  He had not pulled out of the
10 parking -- out of -- he had -- he was still in the
11 claimants' parking area.  He had not left the grounds.
12   Q.  He had come around from the back of the
13 building and was in front of the Social Security
14 office --
15   A.  Yes.
16   Q.  -- when he came back inside?
17   A.  Yes.
18   Q.  You weren't disciplined for setting off the
19 alarm, were you?
20   A.  No.
21   Q.  Do you know if Mr. Reams generally set the
22 alarm when he left the office at six o'clock on
23 workdays?
24   A.  Most of the time, he wouldn't leave at six
25 o'clock.
```

Page 467

```
1    Q.  Who -- what was your understanding of the
2  alarm policy?
3    A.  I don't have any understanding of the alarm
4  policy.
5    Q.  Okay.  It was never your job to set the
6  alarm?
7    A.  No.
8    Q.  Do you know -- do you know whose job it was
9  to set the alarm?
10   A.  Well, let me -- let me say this.  There was
11 once when I was given a key -- one time I was given a
12 key by Paul Reams, and I could set the alarm and
13 things.  We all -- well, I had a code to put in the
14 system.
15   Q.  And when was that?
16   A.  Since I've been with the Social Security
17 Administration Office of Hearings and Appeals.
18   Q.  Was it on -- was it on one particular day?
19   A.  At that location, yes.
20   Q.  At the Atlanta Highway location?
21   A.  That's correct.
22   Q.  There was one time that you were given a key
23 and had to set the alarm?
24   A.  Yes.
25   Q.  Do you know why that was?
```

Page 468

```
1    A.  I was going to be the last person in the
2  office.
3    Q.  Okay.  Defendants' Exhibit #57.  I give that
4  to you.  Can you tell me if you recognize this series
5  of e-mails that make up Defendants' Exhibit #57?
6    A.  Yes.
7    Q.  Okay.  And earlier you said that there was an
8  e-mail that Mr. Reams sent about this incident that
9  you claim was retaliatory.  Is that the bottom e-mail
10 in Defendants' Exhibit #57?
11   A.  Yes.
12   Q.  Now, this e-mail doesn't mention you by name,
13 does it?
14   A.  No.
15   Q.  What is it about this e-mail that you claim
16 is retaliatory?
17   A.  Tammy -- well, of course, he sent it out to
18 the entire agency.  Tammy Martin came to my desk
19 laughing and said, that was you, wasn't it, ha-ha-ha.
20 And then she went and told -- she talked to Renee
21 about it.  And Freida Goldsmith also approached me
22 about the e-mail and that it was me.
23   Q.  Who's Tammy Martin?
24   A.  Legal assistant.
25   Q.  Did she tell you why she thought it might
```

Page 469

```
1  have been you?
2    A.  She didn't thought it might have been me.
3  She knew it was me.
4    Q.  Did she say how she found out?
5    A.  No.  I didn't ask her.
6    Q.  Okay.  How about any other people?  You
7  mentioned Renee, Freida.
8    A.  Freida.  They knew it was me.  Office talk.
9    Q.  They came up to you and said -- they said
10 something to you?
11   A.  Freida did.
12   Q.  What --
13   A.  I think Renee may have.  They were all
14 laughing.
15   Q.  What do you recall them saying to you?
16   A.  That it was me, they knew it was me.
17   Q.  Was anyone else present?
18   A.  No.
19   Q.  Are you aware of any other employees setting
20 off the alarm at the Social Security office by staying
21 late?
22   A.  No.
23   Q.  All right.  And going up -- you wrote a
24 response after Mr. Reams sent out this e-mail about
25 the alarm policy, which is at the bottom of
```

Page 470

1  Defendants' Exhibit #57. And that's the middle
2  e-mail; is that right?
3    A.  #57, middle. Okay.
4    Q.  Is the middle e-mail on Defendants'
5  Exhibit #57 a response you wrote to Mr. Reams, to his
6  e-mail at the bottom?
7    A.  Yes.
8    Q.  Did you have any conversation with him in
9  person, or did you just send an e-mail?
10   A.  Sent an e-mail.
11   Q.  And this explains why you were in the
12 building?
13   A.  Reiterated.
14   Q.  And you make a reference to -- let me see.
15 Many times when you allow Ms. Chevalier or Laura
16 Robinson or others to remain in the building after
17 six. Do you see that?
18   A.  Yes.
19   Q.  You're not aware of either of them or any
20 other individuals setting off the alarm; is that
21 right?
22   A.  Correct.
23   Q.  And then Mr. Reams wrote you back, which is
24 the top e-mail on Defendants' Exhibit #57, explaining
25 why he sent out the e-mail. Do you see that?

Page 471

1    A.  Yes.
2    Q.  Is there anything objectionable about the
3  response he wrote to you?
4    A.  Objection?
5    Q.  Objectionable.
6    A.  Objectionable? No.
7    Q.  Okay. Do you claim you were harmed by
8  Mr. Reams sending out the e-mail which is at the
9  bottom of Defendants' Exhibit #57?
10   A.  Yes.
11   Q.  How do you claim you were harmed?
12   A.  Humiliated, embarrassed.
13   Q.  Any other way you claim you were harmed?
14   A.  Degraded.
15   Q.  And anything else?
16   A.  My health was affected. My -- my health was
17 also affected.
18   Q.  Okay. How do you claim your health was
19 affected by the e-mail that's at the bottom of
20 Defendants' Exhibit #57?
21   A.  Further degration (sic), humiliation,
22 embarrassment, and anything else that could cause
23 people to know -- management as well -- as well as
24 employee to know that -- that -- I'll leave it like
25 that. Further degration, humiliation, embarrassment.

Page 472

1  And all this affected my health. All it was, was a
2  constant add on to what was already going on with
3  management and me -- management to me.
4    Q.  Besides Ms. Martin and Ms. Goldsmith, did you
5  talk to anyone else about the e-mail that's at the
6  bottom of Defendants' Exhibit #57?
7    A.  No.
8    Q.  And what is your basis for alleging that
9  Mr. Reams sent that e-mail to retaliate against you?
10   A.  That it happened.
11   Q.  Okay. Anything else?
12   A.  I'm sorry. Repeat that, please.
13      MR. DuBOIS: Read it back.
14      (The court reporter read from the
15        record.)
16   A.  The way -- hold on.
17 Yesterday our alarm was set off by an
18 employee. Was that even necessary? That was
19 embarrassing to me. People knew -- well, that was
20 embarrassing.
21   Q.  It's embarrassment the fact that he mentioned
22 in the e-mail that an employee had set off the alarm?
23   A.  An employee, yes. They knew who it was
24 without a question because individuals would not have
25 come to me laughing about it.

Page 473

1    Q.  And you have no idea how those individuals,
2  Ms. Martin and Ms. Goldsmith, found out?
3    A.  No.
4    Q.  You never had set off the alarm before, had
5  you?
6    A.  Not that I recall.
7    Q.  Did you ever set it off afterwards?
8    A.  Not that I recall.
9    Q.  All right. Is there any other reason you
10 believe Ms. Reams --
11   A.  I apologize. There was a time when there --
12 when I set off the alarm, yes. The time that Paul
13 Reams gave me a key. And he had given me a key, and I
14 thought no one else was in the building. I went
15 through and I checked everywhere, and I secured the
16 building. The next day I got in, Paul Reams told me
17 that the alarm was set off because Teresa Weeks was
18 still in her office. Yeah. I forgot about that time.
19   Q.  Okay. Do you know when that was?
20   A.  No.
21   Q.  Can you give me an approximate year?
22   A.  No.
23   Q.  Was anyone else present during that
24 conversation?
25   A.  No.

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF BERNETHIA JOHNSON

20 (Pages 474 to 477)

Page 474

1   Q.  Was anything else discussed?
2   A.  No.
3   Q.  Did you --
4   A.  Oh.  That -- who was it?  Oh, no.  No.  I was
5   going to say that someone was contacted, but no.
6   Q.  Did you receive any discipline for setting
7   off the alarm when someone was still in the building?
8   A.  No.
9   Q.  Any particular reason why you left the
10  building without making sure that everyone had left?
11  A.  I made sure.
12  Q.  You're saying you made sure that Ms. Weeks
13  wasn't in there?
14  A.  I'm not saying I made sure that Ms. Weeks was
15  not in there.  I checked as many offices as I could.
16  And I went through and I turned off the lights in the
17  whole building, the mail room, checked attorneys'
18  offices to make sure the lights were off and all of
19  that.
20  Q.  And you didn't see Ms. Weeks?
21  A.  I saw no one else in the building.
22  Q.  Did you ever talk to Ms. Weeks about that
23  incident?
24  A.  No.
25  Q.  Did you ever talk to anyone about that

Page 475

1   incident?
2   A.  Paul Reams talked to me about it.
3   Q.  Besides Mr. Reams.
4   A.  No.
5   Q.  Any other reason you believe that Mr. Reams
6   sent this e-mail which is at the bottom of Defendants'
7   Exhibit #57 to retaliate against you?
8   A.  He didn't do it on the first time it
9   happened.
10  Q.  Any other reason?
11  A.  No, not that I can think of right now.
12  Q.  All right.  Let me direct you now to
13  paragraph 45 of your second complaint, which is
14  Defendants' Exhibit #31.  In that paragraph, you
15  allege that on September 2nd, 2005, you were almost
16  hit by a vehicle on government property driven by
17  Ms. Barnett-Jefferson.  Do you see that?
18  A.  Yes.
19  Q.  And who is Ms. Barnett-Jefferson?
20  A.  Senior -- senior attorney.
21  Q.  And where were you when you were almost hit
22  by this vehicle?
23  A.  I was walking towards the door, the front
24  door, in the claimants' parking area.
25  Q.  Had you parked in the business next-door, in

Page 476

1   front of the Social Security office?
2   A.  The business next-door.  Like in front --
3   okay.  I had to picture that.  Yes.
4   Q.  If you're looking at the front of the Social
5   Security building, the business to the left of the
6   Social Security building.
7   A.  The business to the right?
8   Q.  The left.
9   A.  Oh, as you're standing in front of it.
10  Q.  Yes.  You're standing --
11  A.  Okay.  I'm standing at my desk looking, so
12  I'm in the opposite -- that's correct.
13  Q.  You're walking from where you parked your car
14  to the front door of the Social Security office --
15  A.  Yes.
16  Q.  -- crossing the claimants' parking lot?
17  A.  Yes.
18  Q.  And Ms. Renita Jefferson came around from the
19  employee parking lot?
20  A.  From -- from Atlanta Highway.
21  Q.  Tell me what happened at that point.
22  A.  She had come into the area.  There were no
23  cars parked at all in the parking lot.  And she came
24  straight at me.
25  Q.  She turned in from Atlanta Highway?

Page 477

1   A.  She turned in from Atlanta Highway into
2   the -- onto the premises of the agency, and she came
3   straight to me.
4   Q.  And she stopped?
5   A.  Yes.
6   Q.  Okay.  Are you claiming anything about this
7   incident is retaliation?
8   A.  Yes.
9   Q.  What about it are you claiming is
10  retaliatory?
11  A.  That Ms. -- Ms. Jefferson -- well, let me put
12  it like this.  Ms. Lamar is the godmother of
13  Ms. Barnett-Jefferson's children.  And with
14  Ms. Barnett-Jefferson and Ms. Lamar being so close, I
15  believe that Ms. Jefferson did that with retaliation
16  purposes.
17  Q.  What are you saying Ms. Barnett-Jefferson did
18  with retaliation purposes?
19  A.  Came towards my body in an attempt to do
20  whatever she was doing to me with her vehicle.
21  Q.  Are you claiming she was trying to hit you?
22  A.  Yes.
23  Q.  But she stopped the car and didn't hit you?
24  A.  She stopped it close enough.
25  Q.  You weren't hit or injured by the car, were

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF BERNETHIA JOHNSON

21 (Pages 478 to 481)

**Page 478**

1  you?
2      A.  Not by the car, no.
3      Q.  Were you injured by anything else?
4      A.  Does an injury have to be a physical mark?
5  Could it be like damage that's done to the inside of
6  the body, nerves shaking?  Could that be damage or
7  harm?
8      Q.  I'm asking you how you were -- how you were
9  injured.  You're saying you were --
10     A.  That is how I was injured.
11     Q.  Okay.  Do you know -- you're not aware of any
12 conversation between Ms. Lamar and
13 Ms. Barnett-Jefferson about driving a car into you,
14 are you?
15     A.  No.
16     Q.  You were not ever involved in any discussion
17 between the two of them about you, were you?
18     A.  No.
19     Q.  Do you have any evidence at all that
20 Ms. Lamar even knew about this incident prior to it
21 happening?
22     A.  No.
23     Q.  Do you have any evidence at all that
24 Ms. Barnett-Jefferson did it on purpose?
25     A.  From what I saw.  That's the evidence I use.

**Page 479**

1      Q.  And what is your evidence that she did it on
2  purpose?
3      A.  That she just sat right in the car and stared
4  at me.
5      Q.  How do you know she even saw you when she
6  turned off Atlanta Highway?
7      A.  I was in -- I was in her sight.  It wasn't
8  like I was just walking there.  I didn't just jump in
9  front of the car or anything.  She saw me.
10     Q.  You can't say for sure she saw you.
11     A.  She saw me.
12     Q.  And what do you base that on?  Just your --
13     A.  The fact that she came towards me when there
14 were empty parking.  No cars were in the parking lot.
15 You had parking space in front of me as well as behind
16 me.
17     Q.  Do you know at what point she saw you?
18     A.  No.
19     Q.  Did you ever talk to Ms. Jefferson,
20 Ms. Barnett-Jefferson, about this incident?
21     A.  Yes.  She talked to me.
22     Q.  When did you talk to her?
23     A.  When I entered into the building, I was
24 talking to the security guard.  And the security card
25 took this matter to Paul Reams.  And shortly

**Page 480**

1  thereafter, Bonita -- not Bonita --
2  Ms. Barnett-Jefferson came out there to where the
3  security guard was and she saw me.  And that's when
4  the -- where and when the conversation took place.
5      Q.  Who else was present?
6      A.  The security guard.
7      Q.  And what do you recall from that
8  conversation?
9      A.  She told me that she -- she came in and told
10 Paul Reams what happened.
11     Q.  Did she say anything else?
12     A.  She said that her -- she said, I don't know
13 if you've ever driven a stick shift before.  My -- my
14 brakes -- my -- what is it -- my gas pedal.  My gas
15 pedal got stuck or something like that, my
16 acceleration pedal got stuck.
17     Q.  Got you.  Did she say anything else?
18     A.  She said, surely you don't think that I tried
19 to hit you, did you?
20     Q.  And do you recall anything else?
21     A.  Then she said, well, surely you do.
22     Q.  Anything else?
23     A.  No.
24     Q.  Did you say anything to her during that
25 conversation?

**Page 481**

1      A.  I told her that I don't know what's going on,
2  but that she is a mother just like I am a mother.
3      Q.  Anything else?
4      A.  And that she looked really pretty.
5      Q.  Okay.  Anything further?
6      A.  No.
7      Q.  Did you ever go talk to Mr. Reams about this
8  incident?
9      A.  No.
10     Q.  Did you ever talk to Ms. Lamar about this
11 incident?
12     A.  No, not that I can recall.
13     Q.  Who else did you talk to about this incident
14 besides Ms. Barnett-Jefferson?
15     A.  Tresalyn Collier.
16     Q.  And what did the two of you discuss?
17     A.  She had heard about it and just asked me
18 about it.
19     Q.  Anyone else?
20     A.  No, not that I can recall.
21     Q.  Let me direct your attention now to -- let's
22 see.  Paragraph 46, you reference a Federal Protective
23 Service report you filed.  Do you see that?
24     A.  Yes.
25     Q.  Did you file a complaint against

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.

7/11/2008

DEPOSITION OF BERNETHIA JOHNSON

22 (Pages 482 to 485)

Page 482

1  Ms. Barnett-Jefferson about this incident?
2      A.  Yes.
3      Q.  With the Federal Protective Service?
4      A.  Yes.
5      Q.  When did you file that complaint?
6      A.  Shortly thereafter.
7      Q.  Let me hand you Defendants' Exhibit #58. Can
8  you tell me if Defendants' Exhibit #58 is a copy of
9  the Federal Protective Service complaint you filed?
10     A.  Yes.
11     Q.  After you filed this complaint, was there
12  ever any resolution?
13     A.  No.
14     Q.  Do you know who -- who did you deal with at
15  the Federal Protective Service?
16     A.  Mr. Horak.  I think that's how you pronounce
17  his name.
18     Q.  Mr. Horak?
19     A.  Horek or Horak.  I'm not -- something like
20  that.
21     Q.  Do you know who he is?
22     A.  A member of the federal protective agency.
23     Q.  How did you find out -- what made you decide
24  to make a complaint to this particular agency, the
25  Federal Protective Service?

Page 483

1      A.  The security guard, I guess -- I don't know,
2  but -- I don't know how I came about doing that.
3      Q.  Did you ever file a police report with the
4  regular police about this incident?
5      A.  No.
6      MR. DuBOIS:  Let's take a minute break.
7          (Brief recess)
8      MS. BATTLE-BATTLE-HODGE:  Before get started, I
9  go back on the record, we are not going to require
10  that Ms. Johnson read the deposition before signing.
11     Q.  (Mr. DuBois continuing:)  Ms. Johnson, I now
12  want to refer you to both Defendants' Exhibit #9 and
13  Defendants' Exhibit #31, which are the two complaints
14  you filed in this lawsuit.  If you look at both of
15  them, count three of the first complaint, which is
16  towards the end, and count two of the second complaint
17  allege that you were subjected to a retaliatory,
18  hostile work environment at the Social Security
19  office.
20     A.  Okay.
21     Q.  I had previously asked you about both of
22  those, and you said that all of the acts of alleged
23  harassment were covered in your two complaints.  Is
24  that right?
25     A.  Yes.

Page 484

1      Q.  All right.  Is there -- I want to ask you
2  about the claims.  Is there anything that I haven't
3  discussed that you claim made your work environment a
4  hostile work environment for retaliatory reasons that
5  we haven't talked about?  And you can read through
6  both complaints if you want.
7      A.  That are in here?
8      Q.  Yes.
9      A.  Okay.  Not anything that's not --
10     Q.  I guess my question would be -- I want to
11  make sure we've covered everything that you claim is
12  part of this retaliatory, hostile work environment
13  that are alleged in the two lawsuits.  And I've gone
14  through a number of things in the two complaints.  So
15  do you want to look at them?
16     My question is, is there anything else that you
17  claim took place during your employment with the
18  Montgomery Social Security office that you claim made
19  it a hostile work environment for retaliatory reasons?
20     A.  Yes, there is.
21     Q.  Okay.  What else is there?
22     A.  When I went to Cynthia Lamar's office -- I
23  was contacted by Linda Tamplin as the computer person.
24  They needed some information so that they could
25  complete the Morris -- MAR, M-A-R, or Morris -- I'm

Page 485

1  not sure which way it is -- report.  I went to Cynthia
2  Lamar's office to discuss some information with her so
3  that I could get the information back to Linda
4  Tamplin.  And while I was in there, the phone rang.
5  And when the telephone ring, I normally leave out of a
6  person's office.
7      And so when the telephone rang, I got up out of
8  the chair and I stepped outside the door to wait for
9  Ms. Lamar to finish that conversation.  And so
10  Renee -- Renee -- Renita Barnett-Jefferson came up,
11  and I was standing outside the door.  I said,
12  Bernethia, are you waiting for Cynthia?  I said, yes,
13  she's on the phone, so I'm just waiting for her to --
14  to finish.  So she walked into -- she, being Renita,
15  walked into Ms. Lamar's office.
16     So I knocked on -- she walked -- Renita walked
17  into Ms. Lamar's office with a picture frame in her
18  hand.  And I knocked on the door, and Ms. Lamar came
19  to the door.  And I said, Cynthia, I was standing here
20  waiting for you to finish your conversation so that I
21  could finish discussing this matter.  She said, well,
22  go back to your desk and I'll come and get you.  And I
23  said, well, I need to finish this information.  She
24  said, Renita had an appointment with me, so I'll
25  get -- you go back to your desk until I notify you.

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.
7/11/2008
DEPOSITION OF BERNETHIA JOHNSON

Page 486

1   And I said, do I need to make an appointment with you
2   to discuss this?  She said, no, just go back and wait.
3      I think that was retaliatory as well.
4      Q.  Did Ms. Lamar later come and talk to you
5   about what you were talking about when Ms. Renita
6   Jefferson arrived?
7      A.  Eventually, she finally got around to coming
8   back to me.
9      Q.  And what makes you believe -- what do you
10  claim is retaliatory about that act?
11     A.  The fact that -- what is retaliatory.  That I
12  was unable to finish discussing business with her and
13  the fact that she allowed someone else to come in
14  before me, that was retaliatory.
15     Q.  Did you ever express those concerns to
16  anybody?
17     A.  I don't -- I don't know.
18     Q.  Was Ms. Tamplin also part of that meeting?
19     A.  I don't think, no.  I don't -- I -- I don't
20  know if I ever mentioned it to Linda Tamplin or not.
21     Q.  I think you said Ms. Tamplin was present when
22  you arrived at Ms. Lamar's office to start this
23  particular meeting.
24     A.  No.
25     Q.  She was not?

Page 487

1      A.  She was not present.
2      Q.  Okay.  It was just you and Ms. Lamar?
3      A.  Oh.  I know how you got Linda Tamplin's name
4   because Linda Tamplin called me requesting some
5   information so that she could complete her MAR report.
6      Q.  Okay.  And you went to Ms. Lamar's office?
7      A.  Yes.
8      Q.  And then the phone rang, you stepped out, and
9   Ms. Renita Jefferson came in.
10     A.  Yes.
11     Q.  And then later, at a later time, Ms. Lamar
12  came and you finished up your meeting?
13     A.  She started questioning me about why I had
14  not done the information that I was trying to get to
15  her to give to Linda.  She started questioning me
16  about that.  And I told her that was what I was trying
17  to discuss with her.
18     Q.  And did you eventually provide that
19  information?
20     A.  Eventually, I did.
21     Q.  When was this, approximately?
22     A.  I can't recall right off.
23     Q.  How were you harmed by this act?
24     A.  Further humiliation.
25     Q.  In front of who?

Page 488

1      A.  Miss Renita.
2      Q.  Anything else?
3      A.  And, of course Cynthia.  Degration,
4   everything that -- well, humiliation, frustration,
5   degration, embarrassment.  My health was affected.
6      Q.  And what makes you allege that --
7      A.  Excuse me.  Let me -- let me add continual
8   anxiety as well.
9      Q.  Anything further?
10     A.  I would say the fact that I took -- I took
11  my -- what is that called.  Yeah.  Prevacid.  Further
12  agitation to my health, my condition.
13     Q.  You took some Prevacid?
14     A.  Yes.  I took Prevacid a lot when situations
15  happened with me.
16     Q.  On this particular day, you took a Prevacid?
17     A.  I can't say if it was on that particular day.
18  I'm not even -- yeah.  I can't say if it was on that
19  particular day.
20     Q.  Okay.  And what you're saying was so
21  humiliating and degrading was the fact that Ms. Lamar
22  talked to Ms. Renita Jefferson before she finished the
23  meeting with you?
24     A.  Yes.  It was the way the whole situation
25  went, yes.

Page 489

1      Q.  And what is your basis for claiming that any
2   of Ms. Lamar's actions on that day were retaliatory or
3   were designed to retaliate against you?
4      A.  That she allowed -- that she allowed what
5   happened to happen.
6      Q.  Anything further?
7      A.  No.
8      Q.  Are there any other acts that you claim made
9   your work at the Social Security office here in
10  Montgomery a hostile work environment due to
11  retaliation that we haven't talked about?
12     A.  I would like to talk about the cases that
13  were found in Ms. Lamar's office that belonged to --
14  to me.
15     Q.  Okay.  What are you referring to there?
16     A.  At two different times, management were
17  looking for cases that were -- that belonged to me.
18  And the first time it happened, Paul Johnson was
19  looking for it.  And he finally found it on Cynthia
20  Lamar's desk.  Paul Johnson was my supervisor.  And
21  Paul Johnson came to me and told me he found my cases
22  and he wanted to know why was it in on Cynthia's desk.
23  So that, I could not understand.
24     And then Paul Reams called me at home looking for
25  a case that they could not find of mine, and I was

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF BERNETHIA JOHNSON

24 (Pages 490 to 493)

Page 490

1  informed that he found it in Cynthia Lamar's office.
2      Q.  Okay.  When did these two instances occur?
3      A.  I don't know.
4      Q.  Can you tell me the year?
5      A.  No.
6      Q.  Did they both occur when you were working for
7  Paul Johnson as your direct supervisor?
8      A.  Yes, I believe.  I believe so, yes.  Yes,
9  they definitely did occur.
10     Q.  And what about these are you claiming --
11     A.  Oh, I'm sorry.  The one I'm very certain,
12  when Paul Johnson was looking for it.  The second one,
13  I'm not certain if I was -- I'm almost certain I was
14  working for Paul Johnson as well.  I don't know.
15     Q.  Did you know if those cases were eventually
16  located on Cynthia Lamar's desk?
17     A.  Yes.
18     Q.  Do you have any idea how they got there?
19     A.  I don't know how the first one got there.
20  The second one I did put there.  I gave it to Cynthia
21  because some of the information on the ALJ file was
22  incomplete or needed to be corrected.  Oh, yeah.
23  It -- it needed to be corrected.  So I gave it to
24  Cynthia Lamar.  In the note, I told her that the
25  hearing was scheduled for the next morning.

Page 491

1      Q.  And what about these two particular instances
2  are you claiming was retaliatory?
3      A.  I feel that, in particularly, the first case
4  was because no one could understand why my work was --
5  why my file was in her office.
6      Q.  Okay.  You're saying it was retaliatory
7  because no one knew why the file was in Cynthia
8  Lamar's office?
9      A.  Yes.
10     Q.  And you never suffered any discipline as a
11  result of either of these two acts, did you?
12     A.  No.
13     Q.  What makes you believe that any of those --
14  any -- anything you just told me about was due to
15  retaliation?
16     A.  I -- we -- I couldn't understand why my work
17  would be in her office.  And neither could management,
18  Paul Johnson.
19     Q.  One of the times, you placed it in her
20  office, right?
21     A.  One of the times, I did.
22     Q.  The other time --
23     A.  The very first time, yes.
24     Q.  The other time, you don't know how it got
25  there?

Page 492

1      A.  No one knew how it got there.
2      Q.  Did you ever talk to Ms. Lamar about it?
3      A.  No.
4      Q.  After I guess you had a -- the first one,
5  Paul Johnson asked you where the case was; and the
6  second one was Paul Reams.  Is that right?
7      A.  Yes.
8      Q.  Besides the two instances where they asked
9  you where the cases were, did you have any further
10  communications with either one of them about those
11  files?
12     A.  No.
13     Q.  Other than what you've told me so far, are
14  there any other acts you claim made your work
15  environment at the Social Security office a hostile
16  work environment due to retaliation?
17     A.  I believe that Bonita McWilliams came to me
18  and she informed me -- she said, Bernethia, it just --
19  just seems like something is going on.  I could never
20  understand it.  Bonita told me that she pulled my
21  cases, she said, to give to an expert witness that was
22  going to be at the agency.  She said that when she got
23  the cases, she put the cases at a certain place.  So
24  she was -- Bonita was working in the reception area.
25  She said, when I came back to get those cases to place

Page 493

1  them back in their proper places, your case -- some of
2  your cases were missing.  And she said, keep your eyes
3  on -- she said, I went to Paul and told Paul that I
4  saw Beverly Warner going through your drawers; and
5  that she discussed that information that -- that
6  situation with Paul Reams.
7      She said, I've started wondering, seemed like all
8  of a sudden -- gosh -- I noticed there seems like
9  there's a lot of problems with your work going on.
10  And that was what prompted her attention, the fact
11  that half -- the files that she had pulled and was
12  going to return, someone had gone and had taken some
13  of them.
14     So she brought that up to me, and then she
15  brought up an issue with me that she went to Pam
16  Davenport.
17     Q.  Is this a separate issue you're about to tell
18  me about?
19     A.  Yes.
20     Q.  Before you get to that, let me cover this
21  one.  So --
22     A.  Oh, okay.  I'm sorry.
23     Q.  Who was Bonita McWilliams again?
24     A.  A legal -- legal assistant.
25     Q.  A legal assistant?

Page 494

1    A.  Yes.
2    Q.  Was she in the same group as you at the time?
3    A.  Yes.
4    Q.  And when, approximately, was this
5  conversation?
6    A.  I'm going to say maybe like 2004, 2005,
7  something.
8    Q.  Do you know what month?
9    A.  No.
10    Q.  Was anyone else present?
11    A.  No.
12    Q.  And she told you that she had gone to pull
13  some cases and some were missing?
14    A.  She had gone to pull some cases for an expert
15  witness.  The expert witness complete looking at them
16  and returned the file to her, the cases to her.  She
17  sat them on the table so that she could return them to
18  the appropriate holding places.  And she said when she
19  went back to get -- get the cases to put them where
20  they were -- where they belonged, that some of my
21  cases were missing.  And she said she noticed -- she
22  saw Beverly Warner going through my file cabinets and
23  things.
24    Q.  Do you have any idea what happened to your
25  cases?

Page 495

1    A.  No.
2    Q.  Were you disciplined at all?
3    A.  She also --
4    Q.  Were you disciplined at all?
5    A.  No.
6    Q.  Did you ever talk to Mr. Reams or Mr. Johnson
7  or Ms. Lamar about this incident?
8    A.  No.  I may have -- okay.  No.
9    Q.  And what about this conversation do you claim
10  was retaliatory?
11    A.  That she brought -- she brought the -- she
12  took the matter to management and management did not
13  try to do anything about it.
14    Q.  When you say "she," who are you referring to?
15    A.  Bonita McWilliams.
16    Q.  Were you involved in the conversations
17  between Ms. McWilliams and any management officials?
18    A.  I have been involved in conversations with
19  Paul Reams, Bonita, and myself in the past, yes.
20    Q.  How about on this particular issue?
21    A.  Not on that particular issue.
22    Q.  What makes you think Ms. McWilliams brought
23  this issue to their attention?
24    A.  She told me.
25    Q.  At that time or a later time?

Page 496

1    A.  She -- she had taken -- according to what she
2  told me, she had taken the matter to Paul Reams before
3  she discussed it with me.
4    Q.  Did she tell you what she told Paul Reams?
5    A.  What I just told -- told you.
6    Q.  Which is --
7    A.  That she pulled some cases from -- for an
8  expert.  Excuse me.  Excuse me.  And --
9    Q.  You want some water?
10    A.  No.  Okay.  That she pulled some cases for an
11  expert.  She had given the expert the cases.  The
12  expert completed reviewing the cases and returned the
13  cases to Bonita.  Bonita put the cases on the table
14  that was located in the reception area because Bonita
15  was working the reception desk.  When Bonita went back
16  to file my cases in the appropriate holding area,
17  Bonita noticed some of my cases were missing.
18    She said she also noted -- noticed that she saw
19  Beverly Warner going through my filing cabinets.  She
20  told me she brought -- she had taken that matter to
21  Paul Reams.
22    And that was what she told me.  She told me to
23  just keep my eyes out and watch -- just be watchful.
24    Q.  Did you know --
25    A.  I'm sorry.  She told me also that she noticed

Page 497

1  a lot of my work is coming up missing now.  And she
2  said she had started thinking about all of that, why
3  all of a sudden -- why every time you turn around, my
4  work was coming up missing.
5    Q.  Okay.  And you never talked to Mr. Reams or
6  Ms. Lamar or Mr. Johnson about this incident?
7    A.  No.
8    Q.  Do you know if any of them ever talked to
9  Ms. Warner?
10    A.  No.
11    Q.  All right.  And what makes you think this was
12  retaliatory?
13    A.  She presented the information to management;
14  and management, to the best of my knowledge, did
15  nothing about it.
16    Q.  And what did you want management to do?
17    A.  I would think management would have done some
18  kind of investigation.
19    Q.  And you don't know one way or another whether
20  they did?
21    A.  They never informed me.  They never talked to
22  me about anything.
23    Q.  You never requested one; isn't that right?
24    A.  I shouldn't have to.
25    Q.  Okay.  So is the answer no, you never

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF BERNETHIA JOHNSON

26 (Pages 498 to 501)

Page 498

1  requested one?
2     A.  That is correct.
3     Q.  And what's the second incident you
4  mentioned?  Something about Bonita McWilliams and Pam
5  Davenport.
6     A.  Bonita McWilliams asked Pam Davenport
7  about -- about a particular case.  And it was a case
8  that I evidently was -- had either worked up or was
9  supposed to have ordered the records on.  Then
10 Ms. Lamar went to Bonita McWilliams and asked Bonita
11 for that case that she took to Pam Davenport.
12    Oh, yes.  Bonita told me that Pam Davenport said
13 no, everything was okay with my case.  So Bonita said
14 she went on to do whatever she needed to do.
15    Ms. Lamar went to Bonita and asked Bonita to give
16 the case to her, and then Ms. Lamar brought the case
17 to me.  Bonita said that -- she informed me, she
18 said -- she said, I don't know why Cynthia had to get
19 in on that.  I don't even know why Pam had to notify
20 Cynthia of this when -- when Pam told me everything
21 was okay.
22    So I consider that retaliatory.
23    Q.  That's a conversation you had with
24 Ms. McWilliams?
25    A.  That is correct.

Page 499

1     Q.  When was that conversation?
2     A.  I'm going to say maybe 2004, 2005.
3     Q.  Do you know what month?
4     A.  No.
5     Q.  Anyone else present?
6     A.  No.
7     Q.  Did you ever go talk to Ms. Lamar or
8  Ms. Davenport or Mr. Reams or Mr. Johnson about that?
9     A.  No.
10    Q.  Besides all of the stuff you've told me about
11 during this deposition, is there any other act that
12 you claim made your work environment at the Social
13 Security office here in Montgomery a hostile work
14 environment due to retaliation?
15    A.  I don't know if we talked about Ms. Pam
16 Davenport calling me a bitty wench.
17    Q.  I believe you made a reference to that last
18 October.
19    A.  Okay, then.  Okay.
20       MS. BATTLE-BATTLE-HODGE:  Yeah, we did.
21       MR. DuBOIS:  Yeah.  Let me just ask.
22    Q.  And I think you produced some e-mails last
23 week regarding that.  Let me make those part of the
24 record in a second.  But besides that, is there any
25 other act that you claim made your work environment a

Page 500

1  hostile environment in the Social Security office here
2  in Montgomery?
3     A.  Okay.
4     Q.  And you can think about it.  We'll go off the
5  record, and I'll go xerox these.
6        (Off-the-record discussion)
7     Q.  Back on the record.  Let me introduce
8  Defendants' Exhibit #59.  And can you tell me if these
9  are e-mails -- two e-mails, one you sent and one you
10 received, to Ms. Davenport?
11    A.  Yes.
12    Q.  And the second page is one -- or the first
13 page is one that you wrote to Ms. Davenport
14 complaining about a comment she made.
15    A.  Yes.
16    Q.  Which is either bitty wenches or bitty
17 wenches to you and Ms. Collier?
18    A.  Yes.
19    Q.  And that was -- the comment was made during
20 the week of May 26th to May 30th, 2003?
21    A.  Okay.
22    Q.  Is that what this e-mail says?
23    A.  Yes.
24    Q.  And you wrote her this e-mail; and she wrote
25 the response, which is the second page?

Page 501

1     A.  Yes.
2     Q.  Did you have any other conversation with her
3  about this incident?
4     A.  No.
5     Q.  Did you ever talk to Mr. Reams or Mr. Johnson
6  about it?
7     A.  No.
8     Q.  And what makes you think that this comment
9  was retaliatory?
10    A.  Because it happened.
11    Q.  Do you know if Ms. Collier has filed any EEO
12 complaints?
13    A.  No.
14    Q.  No, you don't know if she has, or she hasn't?
15    A.  I don't know if she has.
16    Q.  All right.  Besides everything else you've
17 told me during this deposition, are there any other
18 acts you claim made your work environment a hostile
19 work environment due to retaliation?
20    A.  Yes.  Pam Davenport told Tresalyn Collier not
21 to socialize with me.
22    Q.  Okay.  How did you find out about this?
23    A.  Tresalyn Collier told me.
24    Q.  When was it?
25    A.  Or -- or if she didn't tell me, she testified

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.
DEPOSITION OF BERNETHIA JOHNSON

---

Page 502

1   that it occurred.
2       Q.  All right.  At some point, you're saying you
3   found out from Ms. Collier, either testimony at some
4   kind of hearing --
5       A.  Yes.
6       Q.  -- that Ms. Davenport told her not to
7   socialize with you?
8       A.  Yes.
9       Q.  At what hearing was this?
10      A.  The hearing that took place -- it was on my
11  03 -- 0375 case.
12      Q.  Okay.  You were attending a hearing on one of
13  your EEO complaints?
14      A.  Yes.
15      Q.  The one you filed in 2003?
16      A.  Yes.
17      Q.  And Ms. Collier was on the stand and she made
18  a comment about Ms. Davenport telling her not to
19  socialize with you?
20      A.  Yes.
21      Q.  Do you know the date of that hearing?
22      A.  No.
23      Q.  Okay.  And what makes you believe that that
24  was retaliatory?
25      A.  Because it took place.

---

Page 503

1       Q.  Did you ever talk to Ms. Davenport about that
2   comment?
3       A.  No.
4       Q.  Did you ever talk to Ms. Collier?
5       A.  If I did -- probably not, because I try not
6   to -- no.  I don't recall.
7       Q.  Did you talk to any other managers about the
8   comment?
9       A.  No.
10      Q.  Is there any other act that you allege is
11  part of the hostile work environment that you're
12  pursuing in these two lawsuits?
13      A.  Mr. Paul Reams conducted a meeting; and
14  Brenda McAnnally was given an award, an agency award,
15  which is one of the -- which is possibly the highest
16  award that the agency give out.  And in that meeting,
17  Mr. Reams said that he has never worked with anybody
18  who had ever received that type of award.  And I felt
19  that that was retaliatory.
20      Q.  And when was this meeting?
21      A.  I'm going to say between 2003, 2005.  I would
22  say between 2002, 2005.
23      Q.  And what was retaliatory?  What do you claim
24  was retaliatory about Mr. Reams stating he hadn't
25  worked with anybody else who had received that award?

---

Page 504

1       A.  To make -- the statement that he made, that
2   he made that statement.  And Debbie Rambo and Tammy
3   Martin approached me about it.
4       Q.  Okay.  So let me see if I understand.
5   Ms. McAnnally received an award.
6       A.  Yes.
7       Q.  Mr. Reams made a comment about that award at
8   a meeting?
9       A.  Yes.
10      Q.  And who was present at that meeting?
11      A.  Basically, other employees.
12      Q.  And what was offensive to you about
13  Mr. Reams' comment?
14      A.  Because I had received an award of that
15  nature as well.
16      Q.  You had received the same type of award?
17      A.  Yes.
18      Q.  And when did you receive it?
19      A.  Maybe 2001, 2002, somewhere like that.
20  Approximately.  I'm not -- I'm not that good with
21  years and things.
22      Q.  Can you tell me the name of the award?
23      A.  It was a citation.
24      Q.  A citation from who?
25      A.  The agency.

---

Page 505

1       Q.  The Social Security agency?
2       A.  Yes.  Not the local agency.
3       Q.  From which part of the agency?
4       A.  I don't know.
5       Q.  Is it some kind of plaque, certificate,
6   monetary award?
7       A.  Plaque, certificate.
8       Q.  That's what Ms. McAnnally received?
9       A.  I don't know if she received a plaque.  I
10  know I received a plaque and certificate.
11      Q.  You had received some kind of award back in
12  2001, 2002?
13      A.  Yes.  Approximately 2001, 2002.
14      Q.  And then Ms. McAnnally received an award.  Is
15  she a legal assistant?
16      A.  She's a lead.
17      Q.  Lead legal assistant.  And so what was
18  upsetting to you was -- was what?
19      A.  Because -- I'm sorry.
20      Q.  Go ahead.
21      A.  Because when Tammy Lamar -- Tammy Lamar.
22  When Tammy Martin and Debbie Rambo came to me and they
23  said, ooh, you -- she said -- well, Debbie asked me --
24  and they asked me at different times.  Debbie said,
25  Bernethia, I thought you got one of those; I thought