# EXHIBIT B

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


BERNETHIA JOHNSON,

    Plaintiff,

vs.                  CASE NO. 2:06-CV-397-WKW
                            2:07-CV-59-WKW

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY, et al,

    Defendants.



\* \* \* \* \* \* \* \* \* \*


    DEPOSITION OF PAUL WOODSON JOHNSON, taken

pursuant to stipulation and agreement before Mallory

M. Johnson, Court Reporter and Commissioner for the

State of Alabama at Large, at the United States

Attorney's Office, 131 Clayton Street, Montgomery,

Alabama, on Friday, July 11, 2008, commencing at

approximately 11:06 a.m.


\* \* \* \* \* \* \* \* \* \*

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF PAUL JOHNSON

2 (Pages 2 to 5)

---

**Page 2**

```
 1           APPEARANCES
 2  FOR THE PLAINTIFF:
 3  Ms. Juraldine Battle-Hodge
    LAW OFFICES OF JURALDINE BATTLE-HODGE
 4  Attorney at Law
    318 North Decatur Street
 5  Montgomery, Alabama  36104
 6  FOR THE DEFENDANTS:
 7  Mr. James J. DuBois
    Assistant United States Attorney
 8  OFFICE OF THE UNITED STATES ATTORNEY
    FOR THE MIDDLE DISTRICT OF ALABAMA
 9  131 Clayton Street
    Montgomery, Alabama  36104
10
    Mr. Richard Blake
11  Attorney at Law
    SOCIAL SECURITY ADMINISTRATION
12  Office of General Counsel
    61 Forsyth Street
13  Atlanta, Georgia  30303
14  ALSO PRESENT:
15  Ms. Bernethia Johnson
16       * * * * * * * * * *
17       EXAMINATION INDEX
18  PAUL WOODSON JOHNSON
      BY MS. BATTLE-HODGE          3
19
20       * * * * * * * * * * *
21       STIPULATIONS
22       It is hereby stipulated and agreed by and
23  between counsel representing the parties that the
24  deposition of PAUL WOODSON JOHNSON is taken pursuant
25  to the Federal Rules of Civil Procedure and that said
```

---

**Page 3**

```
 1  deposition may be taken before Mallory M. Johnson,
 2  Court Reporter and Commissioner for the State of
 3  Alabama at Large, without the formality of a
 4  commission; that objections to questions other than
 5  objections as to the form of the questions need not be
 6  made at this time but may be reserved for a ruling at
 7  such time as the deposition may be offered in evidence
 8  or used for any other purpose as provided for by the
 9  Federal Rules of Civil Procedure.
10       It is further stipulated and agreed by and
11  between counsel representing the parties in this case
12  that said deposition may be introduced at the trial of
13  this case or used in any manner by either party hereto
14  provided for by the Federal Rules of Civil Procedure.
15       * * * * * * * * * * *
16       PAUL WOODSON JOHNSON
17       The witness, having first been sworn to speak
18  the truth, the whole truth and nothing but the truth,
19  testified as follows.
20       EXAMINATION
21  BY MS. BATTLE-HODGE:
22    Q.  Mr. Johnson, my name is Juraldine
23  Battle-Hodge, and I represent the plaintiff,
24  Ms. Bernethia Johnson.  And today I'm going to be
25  asking you some questions that -- pertaining to
```

---

**Page 4**

```
 1  this -- these lawsuits that have been filed.
 2     I do tend to talk pretty fast.  I'm trying really
 3  hard to not speak fast.  So if you don't understand a
 4  question I have, just let me know and I'll rephrase it
 5  as best I can.  Of course, if we need to take any
 6  breaks or anything, we can do that.
 7     Have you taken -- had your deposition taken
 8  before?
 9   A.  I'm an attorney.  Yes, I'm familiar with
10  depositions.
11   Q.  Okay.  Okay.  Well, very good.  So you're
12  very familiar with what's what.  Let's start off with
13  just give me your full name and your current address.
14   A.  My name is Paul Woodson Johnson.  I live in
15  Ridgeland, Mississippi.  You want my house address?
16   Q.  That's good enough.
17   A.  Okay.
18   Q.  Are you married, Mr. Johnson?
19   A.  I'm single.
20   Q.  Okay.  Ever been married?
21   A.  No.  No.  Always been single.
22   Q.  Okay.  How long have you been in -- is it
23  Mississippi?
24   A.  Uh-huh.
25   Q.  How long have you been there?
```

---

**Page 5**

```
 1   A.  Let's see.  I've been there since March of
 2  '05.  I was there on a temporary basis in the summer
 3  of '04, but I physically bought a home there in March
 4  of '05.
 5   Q.  Okay.  There in Mississippi, do you still
 6  work for Social Security?
 7   A.  I do.  I work for the hearings office.  I'm
 8  the hearing office director.
 9   Q.  Okay.  So was this a promotion of sorts?
10   A.  Yes.  I -- when I left Montgomery, that was
11  a -- it was a promotion to a different position with
12  the same agency.
13   Q.  Okay.  Do you have any adult children?
14   A.  No.  I don't have any children.
15   Q.  Do you have any relatives who live here in
16  the Middle District?
17   A.  Of Montgomery?
18   Q.  Montgomery, Alabama.  Do you have any
19  relatives in Alabama?  Let's start with that.
20   A.  I do have relatives in Alabama.  I don't
21  think I have any relatives in Montgomery, but I have
22  relatives over in Autauga County.
23   Q.  Oh, you do in Autauga.  Who are they?
24   A.  I have -- well, let's see.  I have two
25  brothers.  There is a brother that lives in the
```

Page 6

1    Montgomery area. I have a brother in the Prattville
2    area.
3        Q. Let's just start with Montgomery. And tell
4    me who that is and how he or she is related to you.
5        A. Yeah. I'm trying to think if he's in the
6    city limits. Yeah. I have a brother named Craig
7    Johnson, and he is in the Montgomery area.
8        Q. Okay.
9        A. He has a son.
10       Q. An adult son?
11       A. No. He's a child.
12       Q. Okay.
13       A. So he's eight or nine, something like that.
14       Q. Okay. Okay.
15       A. I have another brother, Wayne Johnson. He's
16   married. His wife is Ivy.
17       Q. Ivy, okay.
18       A. And they live in Prattville, sort of on the
19   outskirts of Prattville there. They have four
20   children.
21       Q. All under --
22       A. They're all children, yes.
23       Q. Okay.
24       A. My parents are living. They live over in
25   rural Autauga County, almost toward Dallas County.

Page 7

1    Their names are Jeannie and Milton Johnson.
2        Q. Spell Jeannie for me.
3        A. And that's her sort of a nickname, but it's
4    J-E-A-N-N-I-E.
5        Q. Okay. And you said it's a nickname?
6        A. Well, her -- her formal name is Dorothy Jean.
7        Q. Okay.
8        A. But any -- any record of her would be under
9    Jeannie.
10       Q. Okay. And what's your father's name?
11       A. Milton.
12       Q. Milton. Okay. Mr. Johnson, where did you
13   grow up?
14       A. I grew up in rural Autauga County, a little
15   area called Statesville. It's a cotton farming
16   community.
17       Q. And I know you've been in Mississippi since
18   '05, March '05. Before that, where did you live?
19       A. Well, I was in school for, gosh, 19 years,
20   you know.
21       Q. Okay.
22       A. I mean going back. So I've lived actually
23   quite a number of places. Most of my life, I was in
24   Autauga County growing up, left high school, went to
25   Huntingdon College briefly. I guess a year here in

Page 8

1    Montgomery.
2        Q. Okay. When was that?
3        A. Oh, gosh. 1980 -- end of '84 to '85.
4        Q. Okay.
5        A. Then I went to Auburn, got my degree from
6    Auburn.
7        Q. Okay.
8        A. Went to Alabama to law school, Tuscaloosa.
9        Q. Okay.
10       A. And let's see. I would have been done by
11   1992, if I remember correctly.
12       Q. When did you begin practicing law?
13       A. Immediately.
14       Q. Are you licensed?
15       A. Yes. I took the bar that -- you know, when I
16   graduated. I guess the bar was in that fall and went
17   to work immediately.
18       Q. Okay.
19       A. Worked for -- go ahead.
20       Q. What degree did you get from Auburn, that you
21   received in Auburn?
22       A. I had a BS. Let's see. It would have been a
23   Bachelor of Science in public administration, I think
24   is what's on the diploma.
25       Q. Well, what is it?

Page 9

1        A. Well, I was going -- it was sort of a prelaw
2    type thing.
3        Q. Got you. Got you.
4        A. I was going on to law school. But it's
5    essentially a business -- business degree with an
6    emphasis on government type management.
7        Q. Right. Okay. Have you ever been in the
8    military?
9        A. No. No.
10       Q. Any technical schools?
11       A. No.
12       Q. Any other post terminal degrees you have
13   or --
14       A. No. Just the JD and the BS.
15       Q. Okay. Mr. Johnson, when did you begin
16   working for the Social Security -- for Social
17   Security?
18       A. I believe it was April of 1997. I -- I was
19   working with the Alabama Disabilities Advocacy program
20   and -- in Tuscaloosa.
21       Q. Okay. Let me -- okay. So --
22       A. And I moved to the Social Security
23   Administration, which was in Raleigh, North Carolina.
24       Q. Just so I'll understand, in April of 1997,
25   you started in --

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF PAUL JOHNSON

4 (Pages 10 to 13)

Page 10

1    A.  In Raleigh, North Carolina.
2    Q.  Was that your initial hire, in Raleigh?
3    A.  Yes, ma'am.  Yes, ma'am.  It was their -- the
4  same type hearing office that's here in Montgomery.
5    Q.  But it was in North Carolina?
6    A.  Yes, it was in North Carolina.
7    Q.  And when you were initially hired,
8  Mr. Johnson, what position were you --
9    A.  Hired as an attorney.  I've always --
10    Q.  Okay.
11    A.  -- every position has been some form of an
12  attorney's position.
13    Q.  Now, how long did you stay in Raleigh?
14    A.  I was in Raleigh -- I left in August of the
15  following year.  So that would be August of '98.
16    Q.  Yes.
17    A.  The chief judge in Montgomery knew of me,
18  knew I was from the area, offered me a transfer down.
19  And I came down as an attorney doing the same work.
20    Q.  Now, who was the chief judge at that time?
21    A.  Mark Kelleher was his name.  K-E-L-L-E-H-E-R,
22  I think was his -- how you spelled it.
23    Q.  Okay.
24    A.  He's retired now.
25    Q.  Okay.  He hired you in as a staff attorney;

Page 11

1  is that correct?
2    A.  Yes.  Yes.
3    Q.  Now, when you came to the agency here located
4  in Montgomery in 1998, did you -- were you an attorney
5  in that position?
6    A.  Yes.
7    Q.  The whole while?
8    A.  Well, not the entire time I was in
9  Montgomery.
10    Q.  Just tell me how you progressed.
11    A.  Yes, ma'am.  So I went through it.  I believe
12  it was July of '99 until December of '99, I had
13  another promotion.  I became what they called a senior
14  attorney.  Essentially, the only difference is -- it
15  was still writing legal decisions, but they gave me
16  what they call signature authority.  I had the
17  authority to actually issue decisions under my
18  signature saying we're going to pay this claim.  We
19  were doing disability -- disability claims.
20    And at that time, an announcement came open for
21  what they called a supervisory attorney as opposed to
22  a senior attorney.
23    Q.  Okay.
24    A.  And it was commonly thought of as a group
25  supervisor, but I was a supervisory attorney.  And --

Page 12

1    Q.  When did you --
2    A.  That was December of '99.
3    Q.  Okay.  So -- okay.
4    A.  I accepted the promotion.  And I stayed in
5  that position all the way until February of '05 in
6  terms of my permanent job title.
7    Q.  Okay.
8    A.  I did -- as I said, I did a sort of a work
9  detail back in the summer of '04.
10    Q.  Okay.  So when you -- officially, when you
11  left Montgomery, you were supervising attorney; is
12  that correct?
13    A.  Yes.  Except my title changed in February
14  from -- from group supervisor to hearing office
15  director, though, like I say, from a legal standpoint,
16  I was a supervisory attorney.  It was just a higher
17  graded position and had more responsibility.
18    Q.  Okay.  You became supervising attorney in
19  '99.  You stayed that really until you left, but I
20  know you changed title.
21    A.  Yes, ma'am.
22    Q.  So in changing the title, you had additional
23  duties, is that correct, or did you?
24    A.  Yes.  Particularly going from senior attorney
25  to supervisory attorney to hearing office director,

Page 13

1  each time there were variations on the duties.  The
2  big -- the big difference is as a supervisory attorney
3  is basically who you supervise.  And the group
4  supervisor is more of a first line kind of supervisor.
5    Q.  Okay.
6    A.  Supervising people like legal assistants,
7  more of the clerical support type staff.  When you get
8  up to the hearing office director's position, you
9  start supervising people like senior attorneys.  It's
10  because the difference is it takes a grade 14 to
11  supervise a grade 13.  And a HOD is a 14; a senior
12  attorney is a 13.  Does that make sense?  I mean, it's
13  a little complicated.  Yeah.
14    Q.  Yeah.
15    A.  But -- but --
16    Q.  I have the gist of what you're saying.  Now,
17  when did you become -- when did your title change to
18  hearing officer?
19    A.  Hearing office director would have been
20  February of '05, and I physically moved in that spot.
21    Q.  Right, that's when you physically moved.
22  Okay.  So --
23    A.  Yeah.  But I was paid and had the title in
24  February of '05.
25    Q.  Okay.  So once you got the title, you were

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.

DEPOSITION OF PAUL JOHNSON

5 (Pages 14 to 17)

Page 14

1  transferred?
2    A.  Yes, ma'am.
3    Q.  Okay.
4    A.  It took, you know, several weeks to move.
5    Q.  But --
6    A.  But yes, ma'am, I got -- I've been paid as of
7  that date.
8    Q.  Got you.  And just to be clear, you never
9  worked under the heading of hearing office director
10  while you were here in Montgomery?
11    A.  No.  Only on an acting basis if Mr. Reams, my
12  supervisor, was out.
13    Q.  Okay.  So you kind of filled in for
14  Mr. Reams?  You were his --
15    A.  I know -- there was at least one month, I
16  believe July of '04, that I did it for like a full
17  month.  Usually, it's a one-day thing.
18    Q.  Okay.
19    A.  If Paul's out, Paul Reams was out sick or
20  something, I would step in and do his work.  But the
21  regional office asked me to, you know, officially step
22  in as the acting office director.  Paul went to
23  Charleston's hearing office to help them with
24  something.  And that's the only time I remember it
25  being any kind an extended period of time, but I

Page 15

1  actually -- it was not even paid at a higher rate of
2  pay.  It was just someone to step in temporarily.
3    Q.  When you were in Montgomery, who was your --
4  did you have a supervisor or someone who --
5    A.  Mr. Reams was my first line supervisor.
6    Q.  He was your first line?
7    A.  He was the hearing office director.
8    Q.  Okay.
9    A.  And the chief judge was my second line
10  supervisor.
11    Q.  Okay.
12    A.  So I reported to both of them.  Charlie
13  Thigpen was the chief judge I guess most of that time,
14  as Judge Kelliher retired fairly early in -- when I
15  was there; but I don't remember what -- when he left.
16    Q.  Okay.  Let's just go back to -- you spent
17  quite a bit of time as supervising attorney.  Can you
18  tell me the duties, what your responsibilities were as
19  supervising attorney or group attorney?
20    A.  As group supervisor?
21    Q.  As group supervisor.
22    A.  Primary duty is -- at that period of time,
23  the office was broken up into groups.  Essentially, I
24  would have three, four judges that I was working with
25  the staff that was supporting them.  These were judges

Page 16

1  hearing primarily disability claims.  These were case
2  files.  And we had positions like legal assistant,
3  people who were preparing case files, ordering
4  evidence, assisting with the dockets to prepare for
5  hearing.  I supervised those people.
6    Q.  Okay.
7    A.  Also had paralegals and attorneys that --
8  that I would supervise, make sure their writing was
9  legally, you know, sufficient, was -- I would train
10  them, answer their questions.  I also kept up with the
11  time keeping for my group.  I made entries to make
12  sure they were paid.  You know, those were the
13  simplist of duties, I guess you could say, the basic
14  duties.
15    Q.  Okay.  Help me to, I guess, understand the
16  hierarchy.  Okay?  Instead of guessing, just tell me
17  kind of the hierarchy there at the agency.
18    A.  In terms of management, it's the chief judge
19  is the seniormost manager.
20    Q.  Okay.
21    A.  There's only one chief judge.  And there's
22  only one hearing office director.  He works directly
23  under the chief judge, is directly supervised by the
24  chief judge.
25    Q.  Okay.

Page 17

1    A.  That would have been Paul Reams.  Then
2  there's a mid-level manager.  That's the group
3  supervisors.  And that's who I was in that office, at
4  least I think at the period of time we're talking
5  about here.  There were at least three of us, I think,
6  the entire time I was there that were group
7  supervisors.  So each of us, you know, would have a
8  group of anywhere from 10 to 15 people we were keeping
9  up with.
10    That doesn't mean I directly supervised everybody
11  in the group.  I actually am not the supervisor to the
12  judges in the group.  Chief Judge Thigpen would have
13  been their supervisor.  But anyone else that was
14  working to support the judges' activities, I would
15  have been their supervisor.  Does that make sense?
16    Q.  Yes.  These three groups --
17    A.  Uh-huh.  There were three groups.
18    Q.  -- you were over one of those groups.
19    A.  Yes.
20    Q.  And so were these groups substantially the
21  same, or were they -- did they have different --
22    A.  Well, at that time, it's -- my recall, they
23  were essentially about the same size.  You know,
24  occasionally, people would leave and we would add or
25  subtract somebody from a group, try to keep them

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                              7/11/2008
DEPOSITION OF PAUL JOHNSON

6 (Pages 18 to 21)

---

Page 18

1  balanced.
2      Q.  I guess my question probably wasn't clear.
3  Did each group have basically the same
4  responsibility --
5      A.  Yes.
6      Q.  -- as in duties?
7      A.  We all had legal assistants.  We all had
8  decision writers.  Yes.
9      Q.  Location there in -- here in Montgomery,
10 about how many employees?
11     A.  Gosh.  When I first got there, it was in the
12 70s or even maybe low 80s.  That's when I came in as
13 an -- as an attorney, just a staff attorney.
14     Q.  Okay.
15     A.  But it shrank drastically over time.  That
16 office -- you know, I don't remember when I left.
17     Q.  That's fine.  Mr. Reams might have a better
18 idea.
19     A.  He would probably know.
20     Q.  Yeah.
21     A.  But it probably went to 50 or below at some
22 point.  A lot of -- when people tended to retire or
23 transfer, the agency just simply didn't have the
24 budget to rehire.
25     Q.  Okay.

---

Page 19

1      A.  We did almost no hiring.  I'm not sure we did
2  any hiring when I was there.  There might have been
3  one or two.  I just don't remember.
4      Q.  Okay.
5      A.  I wasn't -- and I wasn't involved in hiring
6  decisions.
7      Q.  Oh, you were not?
8      A.  No.  That was strictly senior management.
9      Q.  Okay.  And senior management, you mean
10 Mr. Reams?
11     A.  Mr. Reams, Mr. Thigpen.  Yeah, Judge Thigpen.
12     Q.  Okay, okay.  Now, did I understand you to say
13 that the agency here in Montgomery is organized in
14 groups?  Is that --
15     A.  It was at that time.
16     Q.  Okay.
17     A.  I haven't really had any contact with them in
18 years, so I don't know what -- you know, how it's set
19 up now.
20     Q.  Okay.
21     A.  You have to remember this was three and a
22 half years ago for me.
23     Q.  '05 seems like yesterday, but you're right,
24 years.
25     A.  And we were -- and that was the actual --

---

Page 20

1  that's actually how I became Bernethia's supervisor
2  was that they weren't using the group system when I
3  first got there.
4      Q.  Okay.
5      A.  But they were -- at that very time, they were
6  going through a national reorganization for the
7  office.  And they called it HPI, I think.
8      Q.  What's that stand for?
9      A.  I think maybe it was hearing process
10 improvement, something like that.  You know, it was
11 just one of those government acronyms.
12     Q.  Okay.
13     A.  But the reorganization essentially was to go
14 to a group system.  And so, you know, in terms of the
15 group actually forming, it was about April of 2000
16 before the groups really got organized.  Even though I
17 was promoted in December of '99, I was initially just
18 supervising attorneys and paralegals until they got
19 the group system in place.  And then -- and even some
20 of that time, I was physically in a different
21 building.  The office actually had two buildings at
22 that point.
23     Q.  Okay.  Now, you said you had groups, but do
24 you have departments as well?
25     A.  Are the groups subdivided?  Is that what you

---

Page 21

1  mean?
2      Q.  Right.  I'm trying to figure out you have --
3  for instance, the legal division or you might have --
4  is it --
5      A.  No, ma'am.
6      Q.  That's fine.
7      A.  Nothing of that nature about it.
8      Q.  And you answered -- I'll just ask the
9  question to make sure, and you can answer it again.
10 But the decisions to promote, demote, or replace at
11 the agency, that's made by whom?
12     A.  Most of it, from what I recall, was the chief
13 judge's determination.  Mr. Reams would have to tell
14 you if he had those -- I don't remember if he had
15 those powers.  But the mid-level managers did not make
16 decisions about, you know, hiring, firing, promoting,
17 that kind of thing.
18     Q.  And I know you're not 100 percent certain,
19 but you know that the chief judge had that authority?
20     A.  As far as I know.
21     Q.  As far as you know.
22     A.  I think it all rested with him.
23     Q.  Okay.
24     A.  He had the -- he was the final
25 decision-maker.

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF PAUL JOHNSON

7 (Pages 22 to 25)

Page 22

1    Q.  So would -- how would -- okay.  So would
2  Mr. Reams make recommendations to him, or did he have
3  any authority?
4    A.  I don't know.  I really wouldn't have been
5  part of those discussions.  That would have just been
6  between the two of them.
7    Q.  Okay.
8    A.  Mr. -- well, Judge Thigpen, in addition to
9  being the senior management officer, he was also a
10  practicing judge.
11    Q.  Okay.
12    A.  He held cases just like all other judges did.
13    Q.  Okay.
14    A.  So he was closely involved in the work with
15  us and our employees.  So, you know, he was always
16  aware of what was going on with our employees.  It
17  wasn't like, you know, we had to have some kind of
18  formal meeting to say, okay, you know, these employees
19  are, you know, doing this; these employees are doing
20  that; I want you to promote this one, not promote that
21  one.  There was no kind of formal structure like that.
22    Q.  Okay.  Let me ask you this.  In
23  Mississippi -- is it set up similar in Mississippi to
24  the setup that you left in Montgomery?
25    A.  It is.  The groups are not quite so well

Page 23

1  defined.  In Mississippi now -- and it has less to do
2  with the fact that I'm in Mississippi than it is just
3  the agency has slowly been changing, you know, the
4  processes again.  The groups are not quite -- the
5  lines are not so rigid in terms of what one group may
6  do.
7    For example, in my office, my writers, my
8  attorneys, my paralegals, they may write for all the
9  judges as opposed to just, you know, judges that were
10  in the group.
11    Q.  Okay.
12    A.  Does that make sense?
13    Q.  It does.  It does.  Now, you're the director
14  there in Mississippi?
15    A.  Yes.
16    Q.  Okay.  In Mississippi, as the director, do
17  you have any authority to promote, demote, or replace
18  employees?
19    A.  At this point, it's still the chief judge's
20  final decision.
21    Q.  When you say final, what do you mean?
22    A.  Well, if we were going to hire, say, some
23  type of support staff, I would be involved in
24  initiating the announcement to take in resumes.  I
25  would certainly review the resumes.  I may interview,

Page 24

1  either with the judge; I may do the initial review,
2  the judge does the final interview.  You know, we're
3  definitely working together, but he has to make the
4  final call.
5    Q.  Got you.  And the same thing if -- let's say,
6  if someone was terminated or transferred or whatever.
7  And you're there in Mississippi?
8    A.  Yeah
9    Q.  How does that work?
10    A.  I haven't had anyone terminated.  As far as I
11  know, proposals to terminate still come up from the
12  managers and the chief judge makes that decision.
13    Q.  Straight from the chief judge?
14    A.  Yeah.  I just haven't encountered that, so I
15  don't know.
16    Q.  That's fine.  What about transfers?
17    A.  Regional office actually makes that decision.
18  For me, the only kind of transfers I've seen have been
19  family hardship transfers where someone, say, has a
20  dying relative in another state and they want to be
21  near them to take care of them, that kind of thing.
22  We simply send -- we ask the employee to, you know,
23  give us as much information to support it.  We send it
24  through our field liaison officer in the regional
25  office in Atlanta.  And they let us know whether or

Page 25

1  not it's approved.
2    Q.  So does management there, let's say, in
3  Mississippi have any input into transfer whatsoever?
4    A.  They don't generally ask me anything except
5  they may ask for statistical information -- well, they
6  have not.  The receiving office oftentimes will want
7  to know, well, you know, how's this employee doing
8  and -- but that information -- systems information
9  like that is fairly readily available to any manager.
10    Q.  Okay.
11    A.  But, you know, it's pretty much, for me,
12  minimal involvement.
13    Q.  Okay.
14    A.  I simply send the recommendation -- not the
15  recommendation, the request -- the request to go over
16  to regional office.  I've had one employee -- I'm
17  trying to think about -- I think I've just had one to
18  actually leave in a dying relative situation.
19    Q.  Okay.  Okay.
20    A.  And I -- like I say, I guess I could object
21  to it if I wanted to, but I --
22    Q.  But you haven't had to?
23    A.  I have no reason to, you know, want to get
24  involved in that if somebody wants to leave for that
25  reason.

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                7/11/2008
DEPOSITION OF PAUL JOHNSON

8 (Pages 26 to 29)

Page 26

1    Q.  Right.  Okay.  You've already mentioned a
2  little bit about your supervising Ms. Johnson at some
3  point?
4    A.  Uh-huh.
5    Q.  When did that -- when did you first start
6  supervising Ms. Johnson?
7    A.  As best I remember, it was around the
8  reorganization in April of 2000.  And I think it was
9  exactly four years.  Because, you know, Bernethia and
10  I were working together in our group.  I think it --
11  you know, it sort of came to an end the end of April
12  of '04 and I -- I believe it was official like May 2nd
13  of '04 or something like that.
14    Q.  Okay.
15    A.  So it was essentially a four-year period.
16    Q.  So --
17    A.  2000.  April of 2000 to basically April of
18  2004.
19    Q.  Okay.  I know you, I guess, officially were
20  group supervising attorney in December of '99; but you
21  told me that it really didn't --
22    A.  Yeah.
23    Q.  -- get --
24    A.  Groups didn't form -- at that point, the
25  person that was the supervisory attorney under the old

Page 27

1  system was promoted.  And so, they made me the
2  supervisory attorney, which meant I supervised
3  attorneys and paralegals only.  And then when the
4  group system came into being in the spring of '04,
5  that's when I began to supervise more support,
6  clerical type staff in addition to just the --
7    Q.  Oh, in addition to.  Okay.
8    A.  -- in addition to the paralegals and the
9  attorneys.
10    Q.  Okay.  So all but I guess a few months,
11  December '99, you supervised Ms. Johnson in your
12  capacity as supervising attorney, group supervising
13  attorney, from -- you became in '99, so during your
14  tenure there at --
15    A.  I started with -- I -- my first recollection
16  of working with Bernethia was about April of '04.
17    Q.  Oh, '04.  Where did I get 2000?
18    A.  I'm sorry.  April -- April 2000 to April of
19  '04.  Not in '99.  I don't remember having --
20    Q.  Right.  December.  But it -- just to make
21  sure, April of 2000; is that correct?
22    A.  Yes, ma'am.  I sorry.  I may have misspoke.
23    Q.  Go ahead.
24    A.  I was trying to think.  Like I said, the
25  long -- when I -- when I got there, for the longest

Page 28

1  time, I was not actually even in the building with
2  Bernethia.
3    Q.  Okay.
4    A.  Bernethia was in the primary building, and I
5  was in sort of a secondary building across the street.
6  So, you know, other than just probably saying hello to
7  each other, I don't think we had any contact until
8  about April.  And if I remember correctly, I think
9  Bernethia was somehow involved in the reorganization.
10  She served as some type of spokesman when they were
11  trying to sell the program, but -- so we really just
12  weren't having any contact.
13    Q.  Got.  And you got to Montgomery August '98?
14    A.  Yes, ma'am.  August of '98.
15    Q.  So for about the first year or so, you didn't
16  really have any contact.
17    A.  Right.  I'm certain Bernethia was there; but
18  I just don't remember, you know, other than saying
19  hello to her and that kind of things.
20    Q.  Okay.  Now, with Ms. Johnson working, she
21  reported directly to you, is that correct, during that
22  time period?
23    A.  Yes, ma'am.  I was her first line supervisor.
24    Q.  What were her duties?
25    A.  She was a legal assistant.

Page 29

1    Q.  Okay.
2    A.  I think, you know, common -- one of the other
3  common titles is senior case technician.  Primary
4  duties were pulling, preparing case files for hearing
5  for the judges, ordering evidence, things like
6  consulting exams, medical records.  She would add
7  information to the case file.  I think at that time,
8  she would have probably been preparing invoices where
9  we were paying independent contractors that would have
10  been coming to assist with hearings, things like
11  vocational experts, hearings -- I think hearing
12  reporters.
13    Let me see if there is anything else that would
14  have been a primary duty.  Like I said, it mainly was
15  about development and file preparation.  She would
16  have had -- sent letters, you know, generated letters
17  to claimants, to representatives about what was going
18  on, when hearings were scheduled.
19    I think at that time, we were doing case
20  summaries on at least cessation cases, people who were
21  already receiving benefits and they would -- I'm
22  trying to remember back that far.  The legal assistant
23  would take a look at the case and just do a brief
24  synopsis of what was going on in the file.  Because
25  this was someone who was receiving a benefit.  We were

7/11/2008

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.
DEPOSITION OF PAUL JOHNSON

9 (Pages 30 to 33)

---

Page 30

1  concerned that if they were denied, they would end up
2  owing money back to the government.  And so these
3  cases were what you think of as sort of a priority
4  type case.
5      And the legal assistants, to give them a little
6  writing experience, would give a little -- most of
7  the -- most times a little short blurb about what was
8  going on in the case.  That was one of the duties.  I
9  think they still do that.  I think they were still
10 doing it when I left, but I just don't remember.
11     Q.  Okay.  How many legal assistants did you
12 supervise?
13     A.  Gosh.  The number changed over time.  It --
14 at one point, I'm sure it would have been at least
15 five or six.  People I remember working with -- do you
16 want me to give you names?  Would that help you?
17     Q.  That would be wonderful, yes.
18     A.  I remember working most with Denise Crowell,
19 C-R-O-W-E-L-L.  There was a lady Bonita McWilliams.
20 Lynda Simmons, at one point, most of the time was a
21 legal assistant.  At some point, I worked with Mary
22 Traff.
23     Q.  Mary Traff?
24     A.  T-R-A-F-F.  I think when I first met her, she
25 was Mary Clinger, C-L-I-N-G-E-R.

---

Page 31

1      Q.  Okay.
2      A.  At some point, I supervised a lady named
3  Rosemary Howell, H-O-W-E-L-L.  I supervised Brenda
4  McAnnally I think the entire time.  I'm sure it was
5  the entire time I was there.  Brenda McAnnally was --
6  she was promoted to what they call a lead legal
7  assistant, lead case technician, I think about the
8  time that I became a group supervisor; but she was a
9  different type of legal assistant but, again, a legal
10 assistant.
11     At the very end there, Monique -- Monique Caffey,
12 C-A-F-F-E-Y.  I don't think Monique was ever a legal
13 assistant.  I think she had some other kind of title.
14 She was sort of an entry level, lower graded employee.
15 Our legal assistants, I think, for the most part were
16 grade 8s.  Monique was maybe a grade 3 or 4.  And --
17     Q.  That's Monique Caffey?
18     A.  Uh-huh.  M-O-N-I-Q-U-E, I think.
19     Q.  Okay.
20     A.  But she was only -- only toward the very
21 end.  I actually didn't have much contact with her in
22 terms of supervision.
23     Q.  Okay.
24     A.  That's everybody I can think of off the top
25 of my head.

---

Page 32

1      Q.  Okay.  Let's move to 2004.
2      A.  I can remember more then.
3      Q.  Okay.  And in particular, I'll just ask you
4  do you recall an incident where Ms. Johnson complained
5  to Mr. Reams about your being disrespectful or
6  what-have-you with her?
7      A.  On April 19th?
8      Q.  April 19th.  That's exactly what I'm talking
9  about.
10     A.  Yeah.
11     Q.  Can you tell me about that?
12     A.  Well, I'm not exactly sure what you want to
13 know.  About the meeting that -- that I had with
14 Bernethia?  Is that what you mean?
15     Q.  Let's talk about --
16     A.  What I'm -- I guess what I'm asking is are
17 you asking about what Mr. Reams and I talked about, or
18 are you asking about did Bernethia and I have a
19 meeting and talk -- you're asking me about what I had
20 a meeting about with Bernethia is what you're asking?
21     Q.  Yes.  Let's do the first one first.
22     A.  Okay.
23     Q.  What you had the meeting about with
24 Bernethia.
25     A.  Right.  On or about April 19th of '04, I

---

Page 33

1  had -- well, I think it may be helpful to me to back up
2  one week.
3      Q.  That's fine.
4      A.  Because there had been some discussion about
5  Flexiplace, which is an employee's opportunity to work
6  at home.  The government has a contract with the union
7  that represents the legal assistants and all of the
8  support staff that says that twice a year, you can
9  enroll in a program that would allow you to go work at
10 home if the office has work available.  And it's three
11 set days, Monday, Tuesday, Wednesday, if I remember
12 correctly.
13     And Bernethia had enrolled in the program several
14 times over the years but had never actually decided to
15 participate, that I remember.  And when the enrollment
16 period came open again -- I think it would have been
17 February of that year -- she did not re-enroll.
18     Q.  Of '04?
19     A.  Yes, ma'am, of '04.  And it was some days
20 before April 19th, she came to me and said that she
21 wanted to -- that she would be going home for
22 two days.  And I told her I did not understand what
23 she was talking about because I -- at the time, I
24 wasn't aware of any legal assistants working at home
25 two days a week.  I didn't remember any doing that.

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF PAUL JOHNSON

10 (Pages 34 to 37)

Page 34

1  The -- the writers were going home two or three days,
2  but the legal assistants were typically going home one
3  day.
4      And also, she had not -- like I said, had not
5  enrolled in the program back -- the deadline had
6  passed. And from what I recall in the conversation, I
7  told her, you know, that I didn't have a problem with
8  her enrolling in the program late, I felt Paul Reams
9  would approve it, and -- but we would have to talk to
10 Paul about the two day -- the two day business.
11     And so I talked to Paul later that day; and he
12 said that he had had a staff meeting -- apparently, I
13 was not there at that staff meeting -- had told the
14 legal assistants that if they wanted to -- if they
15 would do a rotation of the front desk -- I think the
16 receptionist was gone at that point -- and they would
17 go up there for one month, that the following month,
18 that they could go home and work at home for two days
19 under the Flexiplace program.
20     So I told him that was fine with me. He said he
21 had already worked it out with Bernethia and that
22 there was some problem relating to whether or not
23 she -- I think she wanted to go on a Thursday, if I
24 remember correctly. And I told him, I said, well, you
25 know, I don't think the contract allowed for that; but

Page 35

1  whatever he wanted to work out between Bernethia and
2  the regional office was fine with me; but she still
3  needed to enroll in the program. He would -- he
4  needed to decide was he going to waive the fact that
5  she had not enrolled in the program.
6      And it was not just to say I want to enroll in
7  the program. There was quite a bit of paperwork
8  involved that we had to start tracking what she was
9  taking home for security reasons. She had to give
10 us -- she had to show us that she had a locking
11 container that she could secure the materials to go
12 home. She had to have a locking container at home, I
13 think a fire extinguisher, a computer. We were all
14 just -- there was, you know, a certain number of
15 requirements to participate in that program. And
16 that's what the paperwork was about.
17     That was -- as far as I know, that was the end of
18 it. I accepted it to the extent that I had told Paul,
19 told Bernethia, too, I thought -- I thought Flexiplace
20 was a good idea for her. And by that point, Bernethia
21 was clearly very unhappy.
22     Q. And this is still April of '04?
23     A. Yes, ma'am. April '04. She had -- and she
24 had made it quite clear to me that she was just
25 miserable at the office. And as best I can tell,

Page 36

1  she -- it related to a nonselection of a position she
2  had applied for. And so I thought going home was a
3  great idea. I thought she would -- you know, it would
4  give her a chance to just relax. She seemed very
5  uncomfortable in the office. And -- and I think
6  that's -- you know, I can't speculate why Paul
7  approved what he did; but I told him I thought it was
8  a good idea, I thought she should go home if she
9  wanted to. I told him I didn't think she would
10 actually stay with that program.
11     Because you're supposed to sign up for six
12 months, do the program for six months, and then re --
13 you know, redetermine if you want to continue on.
14     Q. Okay. Let me -- and I'm just going to cut
15 you off little bit. Let me back up a little bit just
16 for clarity. Now, was she allowed to take the two
17 days before she actually worked up front?
18     A. She had not enrolled in that program.
19     Q. When you say enrolled, I mean, I guess we're
20 talking semantics here. Did she actually work up
21 front?
22     A. Yes, ma'am.
23     Q. Okay.
24     A. As far as I remember, that she worked up
25 front in March.

Page 37

1      Q. Okay. In March.
2      A. And so this was April, which would have been
3  the month after her front desk duty, which would have
4  been the month she would do the two days. Because it
5  was just two days you would go home for the month
6  following the days that you worked up front.
7      Q. Got you. April is the month following the
8  month that she worked?
9      A. That -- following the month that she was on
10 the front desk, yeah.
11     Q. Okay.
12     A. So she was on the front desk in March. Paul
13 had told them -- you know, I don't know if you would
14 call it a reward. He was trying to make it feel --
15 make them feel better about having to do it, which is
16 sort of a, you know, difficult position is to sit up
17 at the front desk and listen to people complain all
18 day -- that he would allow them to do that.
19     But, you know, what concerned me about the
20 conversation is Bernethia didn't actually say that to
21 me. I --
22     Q. When you say that to you, what do you mean?
23     A. About that she was going to go home because
24 she had served at the front desk and Paul had said she
25 could do two days.

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.
DEPOSITION OF PAUL JOHNSON

Page 38

1    Q.  Well, let me -- now, I'm sorry to keep
2  interrupting.  So when she worked at the front desk in
3  March, you're telling me --
4    A.  She was not participating in Flexiplace.
5    Q.  Okay.  Just so I'll be clear, she would have
6  had to work at the receptionist desk anyway whether
7  she was a part of the program or not; is that correct?
8    A.  Yes, ma'am.  Every legal assistant was
9  rotating up at the front desk, yes.
10   Q.  Okay.  So being --
11   A.  But she -- you know, I -- the reason I
12 hesitate when I answer that is, you know, had
13 something been going on, I don't have any doubt we
14 could have gotten someone to switch with her if March
15 was going to be a bad month.  But what they did is
16 they simply -- you know, we had a -- we just got a
17 list and said, okay, here's all 10, 15 people that do
18 this job, and each one would do one month up there.
19 Yeah.
20   Q.  So your list, how did you come about doing
21 that?  Did you say from January to December, have --
22 let's say Ms. Johnson is going to January,
23 Ms. McWilliams would do February?  How did you -- how
24 was that decided?
25   A.  That came from Paul.  I -- I don't --

Page 39

1    Q.  So was there a list?
2    A.  Yes, ma'am.
3    Q.  Okay.
4    A.  And I -- you know, you knew in advance.  And,
5  you know, the manager would always remind the person.
6  I'm sure at some point, I would have gone to Bernethia
7  and said don't forget, you know, your month's coming
8  up; but -- but I didn't create the list.  Yeah.
9    Q.  Okay.  So -- but you are familiar that -- you
10 do know that -- you do have personal knowledge that
11 there was a list; is that correct?
12   A.  Yes, ma'am.  I knew who was going up there
13 which month.
14   Q.  Right.
15   A.  You know, like I said, again, that was not a
16 permanent thing because at some point, you know, they
17 would have hired a receptionist, you know --
18   Q.  Right.
19   A.  -- or made other provisions.  That was just a
20 temporary.
21   Q.  At that time.
22   A.  Yes, ma'am.
23   Q.  So when was Ms. Johnson scheduled to work the
24 front desk?
25   A.  March.

Page 40

1    Q.  She was scheduled to work the front desk in
2  March?
3    A.  As far as I recall, that -- I know that's
4  when she worked it.  I mean, she -- I mean, and I base
5  that on the fact that it was the following month that
6  she wanted to do the two -- two days at home, but I
7  don't -- you know, I don't have a copy of the list.
8    Q.  Okay.  That's fair enough.  So you have --
9  let me ask you this.  Let me just ask you this because
10 I'm trying to make sense of the order.  Do you recall
11 that Ms. Johnson was placed at the receptionist desk
12 in March because another LA, legal assistant, who was
13 scheduled -- actually scheduled on the list, she
14 had -- there was a reason she couldn't work it?
15   A.  I'm sorry.  I don't remember anything about
16 that period of time.  I don't -- all I can say is I
17 don't remember Bernethia ever coming to me and saying
18 she couldn't do it.  I think she had a week off during
19 March, and we still approved that she still took the
20 week off, but I don't even remember what the week off
21 was for.
22   Q.  Okay.  That's fine.  That's fine.  I'm just
23 trying to figure out if she was actually -- and I
24 think I hear you telling me you're not sure, that
25 whether she was actually scheduled to work March or

Page 41

1  not.
2    A.  I just remember that she was actually there.
3    Q.  Okay.
4    A.  I don't remember any discussions, her asking
5  for some alternative.  And like I say, I do remember
6  that she -- maybe about the third week of March or so,
7  that she was going to be off.
8    Q.  Okay.
9    A.  And, you know, we didn't disturb that.  She
10 still -- still took the time off.
11   Q.  Let's say -- well, if someone, a legal
12 assistant, was scheduled to work -- I'll just use
13 March because that month is out there -- in March --
14 and let's say Ms. Johnson -- you're saying she took
15 the last week of March off.  Who would make the
16 decision of getting someone to -- substituting someone
17 for her?
18   A.  Paul Reams.
19   Q.  Okay.
20   A.  Yeah.  I -- I don't remember being involved
21 in those discussions.  I -- it's possible he had a
22 backup list.  I just don't remember how he did it.
23   Q.  Okay.
24   A.  Like I say, you know, all I can recall about
25 that situation is that, you know, unexpected things

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF PAUL JOHNSON

12 (Pages 42 to 45)

Page 42

1   happen and you always had to sort of have contingency
2   plans. Because people died, got sick, you know, had
3   to leave town for various reasons. And I think he --
4   I think they went to the next person on the list, but
5   I just do not remember.
6       Q.  Okay. That's fine.
7           MR. DuBOIS: Juraldine, when you come to a
8   good place, can we take a short break?
9           MS. BATTLE-HODGE: Yeah. Just let me ask a
10  couple more questions, then yeah.
11      Q.  When you would communicate with your legal
12  assistants, and Ms. Johnson in particular, how would
13  you communicate? Would you do it via e-mail or how
14  would you communicate?
15      A.  Group meeting. In a staff meeting would be
16  the primary means of communication. We certainly sent
17  e-mails to each other. E-mails generally had to do
18  with either we were trying to reemphasize something
19  that had already been discussed, wanted to be very
20  clear with what we were saying. And we would meet on
21  occasion. We didn't really have a lot of one-on-one
22  meetings, not any kind of a formal meeting; but most
23  of the time, I would just go to their workstation
24  and -- and we would discuss whatever the case of the
25  day was, you know, the issue of the day.

Page 43

1           MS. BATTLE-HODGE: This is a good time to
2   stop.
3           (Brief recess)
4       Q.  Okay. Once Mr. Reams was notified about the
5   ongoings of this April meeting and whatnot, what was
6   the outcome of -- what was the end result?
7           MR. DuBOIS: Object to the form of the
8   question.
9       Q.  You can answer.
10      A.  I'm not sure I understand the question, to be
11  honest.
12      Q.  Okay. Do you recall what Ms. Johnson asked
13  Mr. Reams -- if she asked him to discipline you or
14  talk to you about the -- well, the April 20th meeting
15  that you-all had because of the way that she felt the
16  conversation went between the two of you-all?
17          MR. DuBOIS: Objection.
18      A.  Are you asking did I speak to my supervisor
19  about the meeting?
20      Q.  Right. Right. Well, did she ask him to
21  discipline you?
22      A.  I don't know what she asked Mr. Reams.
23      Q.  Well, what was the outcome of the meeting
24  that you had with Mr. Reams regarding this matter?
25          MR. DuBOIS: Objection.

Page 44

1       A.  Like I say, I'm not sure.
2       Q.  Did Mr --
3       A.  The outcome is that she changed groups. Is
4   that what you mean?
5       Q.  If that's an outcome. Well, let me ask you
6   this. Were you found to be wrong with the way
7   Ms. Johnson put forth the -- you know, talked
8   about how that -- Ms. Johnson said that you were
9   demeaning her and did all kinds of things. Did you
10  receive any disciplinary action because of that,
11  because of the allegation?
12      A.  No.
13      Q.  Okay. I'm going to move on.
14          MS. BATTLE-HODGE: Bad question? No, I'm
15  just having problems with questions.
16      Q.  Let's go back to the receptionist.
17      A.  Okay.
18      Q.  What are the duties of the receptionist?
19      A.  I don't supervise the receptionist. I
20  mean --
21      Q.  Okay. So that's --
22      A.  -- the primary receptionist duties are to
23  answer the telephone, be at the front desk; but I
24  don't have any direct involvement in that job.
25      Q.  Fair enough. So when you would assign your

Page 45

1   legal assistants in that job, did you give them any
2   directions or did you just tell them to go up there
3   and do whatever or how did that work?
4       A.  Anytime -- a legal assistant's position would
5   include any type of duties that would -- would involve
6   dealing with the public. I mean it's -- they speak to
7   the public on the telephone; they deal with attorneys,
8   non-attorney representatives. And that's the kind of
9   work you would be doing at the front desk. In terms
10  of something that would be different, they would go
11  and get -- someone would come in and, say, ask for a
12  case file. You know, the receptionist would either go
13  get the case file or ask someone to get the case file
14  for them.
15      Q.  Okay.
16      A.  But, again, it's not what I would call any
17  kind of specialized training to be a receptionist.
18      Q.  Okay.
19      A.  A receptionist in Montgomery at that time
20  would have been a grade 3 or 4, essentially
21  entry-level type position. My legal assistants were
22  grade 8s. They were -- you know, you're talking four
23  and five grade levels higher, far more skill and
24  capable of performing those duties.
25      Q.  Okay. So what you've just given me are the

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.

7/11/2008

DEPOSITION OF PAUL JOHNSON

13 (Pages 46 to 49)

Page 46

1   general duties of receptionist just as far as you --
2   as far as you know?
3       A. Yes.
4       Q. At some point shortly after Ms. Johnson
5   worked the front desk as a receptionist, did you have
6   a complaint or did the agency have a complaint about
7   cases that Ms. Johnson -- that the agency said that
8   Ms. Johnson indicated she worked up cases or
9   completed cases where she actually had not completed
10  them?
11      MR. DuBOIS: Objection.
12      A. There were problems starting in February --
13      Q. Okay.
14      A. -- that went into March and April about
15  incomplete work.
16      Q. Would you tell me about that?
17      A. You're talking about case pulling issues?
18      Q. Yes, yes, yes.
19      A. There were cases that we identified that
20  reflected that they -- Bernethia had changed the
21  status from a workup status to a status that would
22  indicate that the cases were prepared for hearing.
23      Q. Okay.
24      A. The problem with the file is that I would
25  physically have the file in hand and the file would

Page 47

1   not contain the documents that would be expected to be
2   there. And there were sort of long, ongoing
3   discussions, you know, communications back and forth,
4   some of it with me and Bernethia.
5       Q. Okay. When did that begin?
6       A. I -- I think it was first brought to my
7   attention in February, the end of February.
8       Q. Okay. Who brought it to your attention?
9       A. I saw it in some auditing. One of the things
10  that a supervisor would be doing is we would be
11  checking the computer tracking system where it said
12  cases were versus where cases were actually found in
13  file cabinets. We had hundreds of file cabinets. So
14  cabinets were labeled and put in sections of the
15  office. So, for example, if the case was worked up
16  and it was moved into a ready-to-hear type status,
17  there were specific cabinets that would have those --
18  those files in them.
19      Q. So are you saying that you did an audit on
20  Ms. Johnson's cases and found problems?
21      A. Well, I audited all --
22      Q. I'm sorry.
23      A. Yes, ma'am. I audited all -- all my
24  employees. Like I said, it was just routine that we
25  would audit everyone. I did, as I recall, have some

Page 48

1   specific complaints that they were not able to find
2   some of Bernethia's cases. Some of the lead legal
3   assistants were making those comments to me. But, you
4   know, it's -- when you're having an office of 5,000
5   cases, it's not unusual for someone, you know, to
6   necessarily struggle to find a case in terms of where
7   they think it may be. So that's when a manager would
8   get involved.
9       The problem with Bernethia's cases is not that we
10  couldn't locate them -- we eventually were able to
11  locate them -- it's that they were not completed in
12  the manner that they should have been given that she
13  had moved them from the status of the workup status.
14      Q. Okay.
15      A. That's what the problem was.
16      Q. Okay. Was Ms. Johnson -- according to you,
17  those cases weren't worked up completely as she had
18  indicated?
19      A. Yes, ma'am.
20      Q. Okay. Were there any other -- any other
21  legal assistants ever had missing cases or anything?
22      A. Sure.
23      Q. Okay.
24      A. And as -- again, as I said, you know, it's
25  not unheard of that cases would not be in the cabinet

Page 49

1   that you would expect them to be in. The problem is,
2   you know, at some point, you know, you have clerical
3   staff searching for the files. And the instruction to
4   the clerical staff would be is if you can't find
5   it, come to the manager and let the manager determine
6   if there's a problem. We didn't want any kind of
7   confrontation, you know, between a -- between support
8   staff if there was going to be an issue.
9       But what we would find is usually, the problem is
10  that the list that would -- the person searching for
11  the file would be working from a list generated from
12  the computers. That list may say these cases are in
13  this particular status. They may not get to look for
14  that for two days. So that list is basically no
15  longer good. So they're looking for a case in a
16  particular file cabinet that may have moved on since
17  that list was moved. That was usually what I
18  encountered when people were missing files.
19      Occasionally there were, you know, error --
20  clerical type errors. I had an employee that, you
21  know, about that same period of time put some files in
22  a drawer beneath the drawer that it should have been
23  in. So, you know, it took some time to find them.
24  But in the cases that I'm talking about, the files
25  were not incomplete; they were simply in the wrong

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                                    7/11/2008
DEPOSITION OF PAUL JOHNSON

14 (Pages 50 to 53)

---

Page 50

1  drawer or in the wrong place.
2      The problem I had with Bernethia's cases is that
3  they weren't actually -- they weren't complete in
4  terms of what I was expecting to see in the file.
5      Q.  Okay.  If any legal assistants in your group,
6  you know, had their cases worked up where they weren't
7  actually typed --
8      A.  That -- I'm sorry.  Go ahead.
9      Q.  -- by, you know, the last Friday by -- of the
10  month, would you -- did you allow them to move those
11  incompleted work cases to the ready-to-schedule or
12  ready-to-hear --
13      MR. DuBOIS: Objection.
14      Q.  -- before completing them?
15      A.  Do you want me to answer?
16      Q.  Yes.  Did you understand it?
17      A.  I think -- are you asking me did I tell
18  employees to move things --
19      Q.  Have you ever allowed.
20      A.  I never told employees to move incomplete
21  work from the workup status.
22      Q.  Have you -- has that ever been done?
23      A.  There --
24      MR. DuBOIS: Object to the form.
25      A.  I know of at least two employees that were,

---

Page 51

1  you know, reprimanded for that, had disciplinary
2  actions for that.
3      Q.  Okay, okay.  So if -- just so I can be clear,
4  you're saying that a legal assistant has never -- or
5  you've never had a discussion with a legal assistant
6  where the case was worked up but not typed and you
7  allowed that legal assistant to move that case to
8  ready and then just finish it up?
9      A.  I didn't allow it, no.
10      Q.  Okay.
11      A.  If it was done, it was done without my
12  authorization.  Again, when I spotted that, that's
13  when -- that's when disciplinary action was taken.
14      Q.  Okay.  Who was that?  Who has done that in
15  the past that received disciplinary action?
16      A.  Bernethia Johnson.  And Karen Burton was the
17  other one.  I did not handle that.
18      Q.  Who handled that?
19      A.  I think Pam Davenport did.
20      Q.  Have you ever had occasion to handle
21  something like that?
22      MR. DuBOIS: Object to the form.
23      A.  I beg your pardon?
24      Q.  Have you ever had occasion to handle a
25  situation where a legal assistant has moved the case

---

Page 52

1  to ready and --
2      A.  It wasn't ready?
3      Q.  Right.  You're saying that if that happened,
4  that that person would be reprimanded?
5      A.  Right.
6      Q.  Right.  So I'm asking have you ever
7  reprimanded anyone for that other than Bernethia
8  Johnson?
9      MR. DuBOIS: Object to the form.
10      A.  I don't -- no, I don't think I ever had that
11  occur.  I don't remember that becoming an issue with
12  anyone else.  You know, as I said, the problem we were
13  encountering with missing files was not unusual; but
14  the problem that was unique to Bernethia's cases is
15  that she had moved large numbers of cases to this
16  status, reflecting that she had completed the work.
17      The only other situation that I recall
18  encountering at that time is we had employees on a
19  Friday afternoon, closing time, would work up a case,
20  print the exhibit list, put it in there, delete the
21  summary, and they would not have physically taken the
22  file from their desk and put it in the filing cabinet.
23  They would do it the following Monday.  And to me,
24  that's not a disciplinary issue because the work was
25  completed; it simply wasn't sitting in the filing

---

Page 53

1  cabinet.  That's the closest type situation that I
2  used to encounter and -- and even some with Bernethia
3  with that.
4      And that was not something that, you know, was
5  ever a disciplinary issue.  The reality of it is in an
6  office when you're closing at whatever time it was, at
7  6:30 or something, six o'clock, that if they need to
8  leave because the alarms are going on and stuff, that
9  it didn't bother me that someone finished their work
10  but didn't physically go get it and put it into a file
11  cabinet
12      Q.  Did you -- when you were notified that these
13  cases were missing, did you ask Ms. Johnson about
14  them?
15      A.  Yes.
16      MR. DuBOIS: Object to the form.
17      A.  Bernethia and I had conversations.
18      Q.  Conversations.  Tell me about the
19  conversations.
20      A.  These were not formal meetings.
21      Q.  Okay.
22      A.  You know, what I would do with any employee
23  that I was having trouble finding a case, I would talk
24  to the employee, sometimes an e-mail.  Most of the
25  time, I would just give them what was like a

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF PAUL JOHNSON

15 (Pages 54 to 57)

Page 54

1  transmittal form that would show when they moved the
2  case and where it was supposed to be. I'd write on
3  there or put a post-it note on there and say this is
4  the one I'm looking for. Most of the time I found it
5  myself. It was -- as I said, the usual thing was that
6  the list that the person was looking for from was
7  older by a day or so. And cases were moving very
8  quickly, so the case had simply moved from the file
9  cabinet where it was on to another person, to another
10 status.
11     Q.  Okay. So --
12     A.  And those type of issues. Again, they were
13 not really workup issues.
14     Q.  Okay. But with the cases we're talking about
15 with Ms. Johnson, did you send her, you said, a
16 transmittal sheet or something?
17     A.  I would -- you could print -- you could do a
18 print screen from our tracking system, you know, and I
19 could -- she could see what cases I was talking about.
20 I mean, you know, there were times when I would simply
21 hand write the Social Security numbers down on a piece
22 of paper. There were times, you know, it would have
23 just been, you know, hey, Bernethia, have you seen
24 so-and-so's file.
25     It -- what was unusual about that period of time

Page 55

1  there was it involved a fairly significant number of
2  cases. It wasn't, you know, Bernethia I'm looking for
3  one file. I mean, it was -- it was a significant
4  number.
5      Q.  Do you know when you first asked Ms. Johnson
6  about these cases?
7      MR. DuBOIS: Object to the form.
8      A.  It would have either been the end of February
9  or early March. I don't remember. I sent the
10 information up. You know, a question was asked me
11 years ago in a report I provided, but I don't remember
12 off the top of my head.
13     Q.  So when did you find -- let me ask you this.
14 Strike that.
15     Did you find all the cases together?
16     A.  No. I -- usually they were on her desk.
17 Sometimes -- you know, sometimes I had to search for a
18 bit. But I don't think I ever didn't find one. I'm
19 certain -- I'm certain we always found them. And that
20 was really what the problem was, is we would find the
21 file but the file wouldn't have the documentation that
22 should have been in it. And that's what I was asking
23 Bernethia about.
24     Because it appeared to me, particularly the end
25 of February, early March, that she had -- on the last

Page 56

1  day of the month had changed these cases to make her
2  production numbers look better. And we had been
3  having some issues about how long Bernethia had been
4  holding onto cases. Most cases you would expect to
5  move in a few weeks, and there were times that she had
6  cases for 50, 100 days. It just was odd. And so we
7  started having some conversations about that. And --
8  and then, like I say, a number of these cases started
9  moving pretty quickly. It wasn't usual. Bernethia --
10     Q.  Let me ask you this. When you say that --
11 when you're talking about -- when you're stating about
12 finding some of the files this time or that time
13 mostly on her desk, are we just referring to these,
14 the ones that you -- the 11 files?
15     A.  Well, no.
16     MR. DuBOIS: Object to the form.
17     A.  When I would audit, you know, what I would do
18 is I would take the judges in my group and I would
19 print all the cases that were pending for those
20 judges. We had development statuses, workup statuses,
21 scheduling statuses. And I would go put my hands on
22 all the files. And again this is what -- you know,
23 some of the support staff would be involved in this.
24 You know, this was not about taking disciplinary
25 actions. What we were doing is because, you know, in

Page 57

1  an office of 5,000 cases and you've got all these file
2  cabinets, you want to make sure everything is where
3  it's supposed to be and the statuses have been
4  properly changed.
5      So I wasn't searching necessarily for something
6  specific to Bernethia. I was searching for what was
7  not in where it was expected to be.
8      Q.  Okay. Now, you did -- you had several
9  conversations or communications, in whatever form,
10 with Ms. Johnson about these files; is that correct?
11     MR. DuBOIS: Object to the form.
12     A.  Yes.
13     Q.  Okay.
14     A.  Yes. We had conversations, communications.
15     Q.  Okay. What was her response when you asked
16 her about the files?
17     A.  She said she couldn't explain it. She said
18 she did not know. And she asked for time. And at
19 least one of the times, she said she'd need some time
20 to think about it. And so, you know --
21     Q.  I guess, what did you ask her?
22     A.  I asked her where -- why the exhibit lists
23 were missing, where were -- where were the exhibit
24 lists, where were the summary sheets. You know, like
25 I say, you could show in our tracking system that the

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF PAUL JOHNSON

16 (Pages 58 to 61)

Page 58

1  case had moved from workup status. Usually, the
2  status they would go to I think was ready-to-hear,
3  that RTH, RTS. And, you know, I -- I -- you know, I
4  wasn't immediately suspicious in terms of thinking,
5  well, she's -- didn't do them; I just -- I needed an
6  explanation of where it was.
7      Q. Let me ask you this. The questions --
8          MS. BATTLE-HODGE: Strike that.
9      Q. Did you ask -- have conversation before you
10 found file -- the files you were referring to with
11 Ms. Johnson?
12         MR. DuBOIS: Object to the form.
13     A. I wouldn't have asked a question about a file
14 that wasn't missing. Is that what you mean?
15     Q. I guess, when you answered the question, I
16 thought you said you told her that different things
17 were missing out of the file as though you had the
18 file.
19     A. Yes. Because the audit -- when it would come
20 up in the audit, I would have the file because the
21 file -- like I say, the files, most of the time, were
22 on her desk. And I would go pick the file up, open
23 the file up and go, okay, this filed moved from
24 workup, where are the documents that would be in a
25 worked up file? And we checked Word, our word

Page 59

1  processing program, to see if in fact she had simply
2  typed it and forgot to print it out.
3      Q. Okay. I guess my question is before you
4  found the file, what were the conversations -- what
5  did she respond? Did you ask her where the files
6  were?
7          MR. DuBOIS: Object to the form.
8      A. I -- you know, I can't tell you exactly when
9  we spoke. I would look for a file usually before
10 disturbing the employee, you know. I mean, if I had a
11 person asking me for a file or a list showed that a
12 file was not where it was supposed to be, I would take
13 the time to search for it first. I wouldn't have
14 gone to -- necessarily gone to an employee before I
15 thought there was a problem. Because, again, you
16 know, most of the time what you were looking at -- if
17 you have, say, a list of five or six cases that are
18 not in RTH status, the vast majority of the time, it
19 was very easy to determine where they were. It's
20 just -- again, it -- particularly if a support staff
21 person was the one starting the search, they would not
22 have the knowledge that I would have as a manager
23 about where that file might be.
24     Q. Okay. So are you saying as the group
25 supervising attorney, you would physically go look for

Page 60

1  the files?
2      A. I would be the troubleshooter, yes. I mean,
3  I would the one that would physically go and search.
4  I'd look in the judges' office. I'd look in the other
5  cabinets. Like I say, most of these is pretty obvious
6  what had happened. Usually, I could tell simply by
7  the tracking system where the file was. Because had
8  it been in, you know, RTH status when this list was
9  run when you were searching for it, two days later, it
10 says the file is in, you know, some type of prehearing
11 status, then I know -- then I know where the file is.
12 It's in prehearing status with whatever employee it's
13 assigned to.
14     Q. Okay. Earlier you -- let me ask you this.
15 Did Ms. Johnson take leave in March?
16     A. I believe she took a week off. I remember, I
17 think, at some point someone covered for her for a
18 week on the front desk. And seems like it was toward
19 the end of the month, but I --
20     Q. Do you recall if she took any time off in
21 April?
22     A. April. And there was something about we
23 tried to set up a meeting a few times. I do think she
24 took some time off. Maybe someone died at some
25 point. I think she had a funeral she had to go to,

Page 61

1  something to that effect; but I don't have any, you
2  know, detailed memories of what day she was there or
3  not there.
4      Q. Okay. The files we're referring to that
5  the -- are they kept in a secured area?
6          MR. DuBOIS: Object to the form.
7      A. You mean as to the public? You know, the
8  public can't get to the files.
9      Q. Okay.
10     A. Right. I mean, when you say the word
11 "secured," that means to me can the public get access
12 to them.
13     Q. No. Within the office. Were they -- how
14 were they --
15     A. Are file cabinets locked?
16     Q. Right.
17     A. No.
18     Q. Okay.
19     A. I mean, some can be locked. I -- I --
20     Q. Let me ask you this. Did each legal
21 assistant -- strike that.
22     Did the legal assistants all work on -- let's say
23 this is the file. Did only one legal assistant work
24 on this file, or did numerous legal assistants work on
25 this file?

7/11/2008

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.
DEPOSITION OF PAUL JOHNSON

17 (Pages 62 to 65)

Page 62

1    MR. DuBOIS: Object to the form.
2    A. For workup, it would just be one person that
3 would work up the file.
4    Q. Okay. So --
5    A. For workup. And that's a very specific term.
6    Q. Okay. Tell me about that.
7    A. What I'm saying is one person is assigned
8 workup of the file.
9    Q. Okay.
10    A. But after a case is worked up, it certainly
11 passes along to lots of different people to do
12 different things with the case.
13    Q. Okay. While the files are being worked up,
14 where are they kept?
15    A. Most of the employees kept them at their
16 workstation. I don't remember -- you know, the
17 employees have locking file cabinets. Some of them
18 have cabinets that don't lock. Some keep them stacked
19 on their desk. It's -- we don't tell them what --
20 where to put their files.
21    Q. Does everyone or most -- do all legal
22 assistants have access to the files at any given time?
23    MR. DuBOIS: Object to the form.
24    A. It just depends on where the -- where the
25 person had them.

Page 63

1    Q. When you say --
2    A. If the legal assistant had them locked up,
3 you know, they wouldn't have assess to them; but, like
4 I say, that's not something I would have tracked.
5    Q. Okay. So the way the files were secured or
6 kept, was that left up to the individual legal
7 assistant?
8    MR. DuBOIS: Object to the form.
9    A. I mean, there would -- there would be
10 limitations. You know, they shouldn't be leaving them
11 in their car, you know, that sort of thing; but in
12 terms of how they kept them on their desk, you know, I
13 didn't try to intervene. I didn't tell them what to
14 do with their -- where to physically put the file.
15    Q. When did you find the files on Ms. Johnson's
16 desk? You said --
17    MR. DuBOIS: Object to the form.
18    Q. When did you file -- the files -- the 11
19 files you said you found, I guess, ten of them on her
20 desk or most of them?
21    MR. DuBOIS: Object to the form.
22    A. This is when? In April?
23    Q. Right. We're still talking about the same
24 times. I'm sorry.
25    A. That was over a period of time. It wasn't

Page 64

1 all at one time. I mean, they were -- you know, each
2 week you would be checking for files. And, you know,
3 I don't remember if I found any off of her desk. But
4 Bernethia generally kept her files on her desk, and
5 she had -- I think she had a drawer marked workup or
6 something.
7    Q. Now, how long did you look for these files?
8    MR. DuBOIS: Object to the form.
9    A. I didn't have any trouble finding the files.
10 It was not a lengthy period of time.
11    Q. Oh, okay. Okay.
12    A. I had problems in the past, but not that time
13 in terms of trying to find the files. There were
14 times Bernethia would have to go get the files and
15 find them for me, but I don't remember in March us
16 having any trouble locating -- locating the files
17 except that they weren't in the cabinets that I would
18 have expected them to be in.
19    Q. Okay. How were legal assistants given
20 unworked -- or assigned unworked cases?
21    A. For workup?
22    Q. Yes. For workup, yes.
23    A. Yes. We sort of had what I call a first-in,
24 first-out method. The vast majority of work is
25 basically what's been pending the longest in the

Page 65

1 office is what goes to workup. We kept them -- a
2 master list of those cases that weren't worked up. It
3 was a status called UNWK. And --
4    Q. What does that mean?
5    A. It just means unworked status.
6    Q. Okay.
7    A. And it told us which case was oldest. You
8 simply print the list out. We kept the list on top of
9 the cabinet there, and we would assign -- you would
10 sign the initials as to who you gave them to. And we
11 kept it all out in the open so the employees could see
12 that, you know, we weren't skipping any of the old
13 cases. That way you could always know, you know, you
14 got just the next ones that were available.
15    Q. Okay. So who -- who issued those cases?
16    A. It was a management responsibility for me.
17 That's -- I was the one assigning them. You know, the
18 employees were certainly around, but we all had to go
19 through that list. As far as I recall, at that period
20 of time, I think we were giving them out in increments
21 of ten at a time. And, you know, again, we were going
22 by the list. You know, you may have an employee right
23 there with you. You know, there may be employees
24 involved in it, but that list was what we used.
25    Q. Okay. Is HOTS -- is that an acronym for

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF PAUL JOHNSON

18 (Pages 66 to 69)

Page 66

1  something?  What's that?
2      A.  That's the tracking system.
3      Q.  Okay.
4      A.  I don't remember.
5      Q.  Just the type of system you used?
6      A.  Hearing office case tracking system, I think.
7      Q.  Okay.  Who entered what legal assistants had
8  what cases into HOTS initially?  Who initially entered
9  those?
10      A.  Usually, it would have been me.
11      Q.  Okay.
12      A.  And that doesn't mean I wouldn't stand over
13  your shoulder and we'd do it at your workstation.
14      Q.  Okay.
15      A.  I mean, does that make sense?  I mean, it --
16  I wouldn't necessarily be sitting at my computer
17  typing it in.  It's possible.
18      Q.  You could have, but --
19      A.  I could have, right.  I mean, I could have
20  entered them at anyone's -- you know, the lead legal
21  assistant who helped me, that was her -- one of her
22  jobs to help me.  We might have made the entries
23  sitting at her computer.
24      Q.  Okay.  So the lead legal assistant also put
25  legal assistants assigned into HOTS?

Page 67

1      A.  Assignment was strictly from the list, but,
2  yes.
3      Q.  I guess --
4      A.  Other people could have actually physically
5  pressed the button and said, you know, that's going
6  into that status.
7      Q.  Okay.  The HOTS system, is that a secure
8  system?
9          MR. DuBOIS:  Object to the form.
10      A.  I don't know what you mean by that.
11      Q.  When I say that, is -- let's say some
12  information is entered into HOTS.  Is that information
13  able to be manipulated?
14      A.  I wouldn't have had the authority to --
15          MR. DuBOIS:  Object to the form.
16      A.  -- or the skills to manipulate it.  I mean,
17  when -- each employee had a password and a PIN that
18  was unique to them.  So when the employee would go in
19  the system and make a -- make the change, it would
20  reflect their initials that they made the change.  I
21  didn't have capability to go in and alter that.  I
22  couldn't delete it or hide it or anything like that.
23  So in terms of secure in that manner, yes.
24      Q.  Let me ask you this.  If you or a legal
25  assistant went into HOTS to work on a case, would that

Page 68

1  legal assistant, using that legal assistant's password
2  or whatever -- would the initials automatically be
3  assigned, or would that person have to physically put
4  those initials in?
5          MR. DuBOIS:  Object to the form.
6      A.  It was automatic.  If -- for example, if
7  Bernethia had a case that she was moving from workup
8  to RTH, she's on her workstation, logged in.  It would
9  automatically put her initials in there that she was
10  the one that moved it.
11      Q.  So she didn't actually type BJ?
12      A.  I don't think so.
13      Q.  Okay.
14      A.  I never heard that before.
15      Q.  Okay.  Okay.
16      A.  Yeah.  Because it -- I mean, what it was
17  reading was who it was assigned to in workup.  So, you
18  know, she's getting the workup credit when it moves --
19  when it moves over from one status to the next.
20      Q.  Okay.  If one legal assistant is working up a
21  case, could someone else with their password go into
22  that legal assistant's case that's being worked up?
23          MR. DuBOIS:  Object to the form.
24      A.  Anyone could see a status of a case at any
25  one time; but if they made a change, it would record

Page 69

1  it that someone else made that change, from what I
2  remember of the system.  So --
3      Q.  But are you sure?
4      A.  I don't --
5          MR. DuBOIS:  Object to the form.
6      A.  I never saw anything counter to that.
7      Q.  Earlier you mentioned something about
8  production numbers.
9      A.  Okay.
10      Q.  Did you ever discuss production numbers with
11  legal assistants or -- well, with Ms. Johnson?
12      A.  Sure.
13      Q.  Okay.
14      A.  We often gave out monthly reports.  The
15  employees wouldn't know which employee, you know,
16  pulled how many cases, prepared how many cases; but
17  we -- we readily made that action available to them.
18  Now, the employee -- we would tell the employee how
19  many they worked up.
20      Q.  Okay.
21      A.  And the goal there was basically trying to
22  determine, you know, what an office average is,
23  what's -- what's high, what's low.  But, yeah.
24      Q.  Okay.
25      A.  And anytime we did any kind of audit reviews,

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.    7/11/2008
DEPOSITION OF PAUL JOHNSON

19 (Pages 70 to 73)

Page 70

1 which was pretty common in the group, we would talk
2 about, you know, how are you doing over a three-month
3 period, a four-month period, that kind of thing.
4     Q.  When were cases issued?  What day?
5     A.  At that time?
6     Q.  Uh-huh.
7     A.  From what I remember, it was typically on a
8 Friday.
9     Q.  Okay.
10    A.  That was -- it all depended -- depended on
11 the employee's schedule.
12    Q.  Okay.
13    A.  Employee -- well, if the employee wasn't
14 there that day, you know, you're going to -- you give
15 them a case whenever they came back, or if they told
16 you before they left.  If the employee ran out of
17 work, you know, you might pull it on a different day;
18 but we tried to stick with one day.
19    Q.  Okay.
20    A.  We were trying to stick with one day at that
21 time because we didn't want -- we didn't want someone
22 to be able to go to the file cabinets and say, ah,
23 look, the next ten cases look better than the ten
24 cases after that.  And so when you did it all on the
25 same day, you know, there -- you didn't have this sort

Page 71

1 of picking and choosing of -- potential picking and
2 choosing of your work.
3     Q.  You stated it was typically Friday, but it
4 wasn't -- it didn't have to be Friday?
5     A.  Well, that was -- at that time, that's what
6 the memo was to the staff.  You know, I had some notes
7 about that, that we told them we were going to do it
8 on Friday absent some unusual circumstances.  And what
9 I considered unusual circumstances is if you were
10 absent that day, obviously, you and I can't have a
11 conversation on Friday about what work you need.  So
12 you would -- I would give them the cases -- usually, I
13 would give them to them the day before, like on
14 Thursday.
15    Q.  So is that the only reason you would give a
16 legal assistant a -- issue a legal assistant cases
17 other than Friday?
18    MR. DuBOIS:  Object to the form.
19    A.  The only reason?
20    Q.  Yes.
21    A.  Like I say, I never really defined what
22 absent unusual circumstances were; but the only thing
23 I can recall coming up has to do with absences.
24    Q.  You mentioned your work --
25    A.  And if you ran out of work.

Page 72

1     Q.  So if -- and I'm not real sure about how it
2 works; but let's say if I'm done with my files on
3 Monday; so on Tuesday or Monday evening, afternoon, I
4 could come in and request?
5     A.  Uh-huh.  More.
6     Q.  And you would give them?
7     A.  Absolutely.
8     Q.  Anyone ever do that?
9     A.  I'm -- you know, I don't remember for sure.
10 My lead was very, very productive.  My lead legal
11 assistant, she would often get -- instead of 10, we
12 would have given her 20 or 30.  So, I mean, it
13 certainly wasn't out of the question that someone
14 would ask -- would give out of work.  But most of the
15 time, employees would keep at least ten on their
16 desk.  Just most of the time, people would generally
17 have just large numbers of cases.  And case workup is
18 actually not, you know, the only duty.  So the
19 employees are not really looking for us -- generally
20 were not looking for us to give them more case pulling
21 to do, because they would simply turn to one of their
22 other duties and do those duties.
23    Q.  You stated that you ran a list of the cases
24 of Ms. Johnson's initials when you began to search for
25 the files?

Page 73

1     MR. DuBOIS:  Object to the form.
2     Q.  Is that what you --
3     A.  Can you ask -- can you ask that again?
4     Q.  Yeah.  When you were looking for the files
5 that were missing --
6     A.  Uh-huh.
7     Q.  -- did you run a list of those files?  Was
8 there a list of those?
9     MR. DuBOIS:  Object to the form.
10    A.  Anytime anything was missing would have been
11 based on -- you know, I can't say that I actually ran
12 a list and printed it, but it would come from our
13 tracking system.
14    Q.  Okay.
15    A.  I mean, I would be looking at every case
16 sitting in a particular category, and then I would go
17 physically look for each of those files.
18    Q.  Okay.  When did the agency change over to
19 CPMS?
20    A.  I don't know.  I'm sorry.  It was -- I don't
21 know.
22    Q.  You don't know.  What is CPMS?
23    A.  It's just -- it's a different case tracking
24 system.  It might have been the summer of '04, but I
25 just don't remember.  It was -- HOTS was in place

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF PAUL JOHNSON

20 (Pages 74 to 77)

Page 74

1  during all of this. I wasn't -- we weren't using
2  CPMS.
3     Q.  So it was after this incident here?
4     A.  Yeah. Yeah. CPMS came in after all this.
5     Q.  Have you ever located any of Ms. Johnson's
6  case files in Ms. Cynthia Lamar's office when you were
7  her supervisor?
8        MR. DuBOIS: Object to the form.
9     A.  No. I -- I don't know of any connection
10  between Cynthia and Bernethia's cases.
11     Q.  Well, I didn't say connection. I'm just
12  asking, have you ever found any of her cases in her
13  office?
14     A.  No, not that I know. I don't remember if --
15  like I say, I don't remember ever having any trouble
16  finding Bernethia's cases, you know.
17     Q.  No. I guess, the question is have you --
18     A.  Okay. No. I don't remember that, no.
19     Q.  Did Ms. Johnson complain to you about other
20  employees tampering with her work?
21     A.  She complained to me that she felt like
22  people would come over to her desk. And, you know,
23  what I would say to her is that, you know, there was
24  no right to personal privacy when it came to case
25  files; that, you know, this was the office's work, not

Page 75

1  her personal work; and that, you know, as a manager or
2  a lead or a coworker, they will have reasons to come
3  get case files. The usual reason, you know, why
4  someone would be at her desk would be that someone
5  came to the front desk from the public, came in
6  requesting the file. And standard practice is that
7  you have to release that case file. Anything that's
8  evidence related to the public, they would copy it,
9  give us the file back; it would go back to Bernethia's
10  desk.
11     But, you know, Bernethia never could show me
12  where anything had ever been tampered with or damaged.
13  And she really didn't get into specifics with me. She
14  said she just felt uncomfortable that people were in
15  her area. And I told her that, yes, people were
16  probably quite commonly in all of our work areas
17  because of the way the work flowed.
18     But in relation to the problems with her cases is
19  it wasn't simply that the file did not have the
20  information; she could not present the information in
21  our word processing programs either. There was no
22  record, you know, that she had ever done the work,
23  either electronically or physically.
24     Q.  Okay.
25     A.  And, you know, I don't know if the

Page 76

1  conversation about -- I think the conversation about
2  she felt like somebody had been in her work area was
3  actually far later than this. It seems like that was
4  more the summer of '04.
5     Q.  Okay. Tell me about that.
6     A.  That was on a day where she asked to contact
7  the police. And she said that -- that she felt like
8  that one of her coworkers was going to put a hit out
9  on her and that she was worried about her physically
10  harming her and she felt that people had been over in
11  her area.
12     Q.  Okay. Let's -- okay. When you say summer,
13  that's not where we are now, late spring.
14     A.  Right. But like I say, that's when the
15  conversation came up about I think, you know, that she
16  felt like people had been in her area.
17     Q.  So did she make any complaints during the
18  period of time we're talking about, late spring?
19     A.  I don't remember any specific during that
20  time.
21     Q.  Okay.
22     A.  But like I say, Bernethia certainly over time
23  had made comments to me that she always felt
24  uncomfortable. And my response about it is that
25  anything personal should be locked away in the locking

Page 77

1  file cabinets. Anything work related would not be
2  locked up.
3     Q.  And moving to the incident you're talking
4  about with the police report and all of that, did you
5  investigate that?
6     A.  Yes --
7     Q.  Tell me what was the outcome.
8     A.  -- to the -- the extent it was investigated.
9  Bernethia, another manager, and I went into a hearing
10  room and had a private conversation about it. She
11  asked for leave. She wanted to call the police. I
12  told her I would give her the leave. I think at the
13  end, she actually didn't -- didn't submit leave. She
14  just went on her lunch break. And she said that she
15  was -- I think she felt convinced that one of her
16  coworkers was trying to have her killed and was going
17  to try to harm her. And she asked could she park in
18  the front of the building. And I asked her a series
19  of questions about what kind of interaction she had
20  had with this person. And her response was that she
21  had not spoken to her for years and not had any kind
22  of contact with her with the exception she said
23  that -- that she thought that this employee had taken
24  her picture -- a picture of her car, I think, maybe a
25  picture of her. I don't remember.

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.
DEPOSITION OF PAUL JOHNSON

21 (Pages 78 to 81)

Page 78

1    Q.  This is the same employee who was threatening
2  her with the gun incident?  Is this the same thing
3  you're talking about, or are we talking about
4  something --
5        MR. DuBOIS: Object to the form.
6    A.  I don't know anything about a gun incident.
7    Q.  I thought you said -- okay.  I might be
8  wrong.  Okay.  Okay.  I'm wrong.  I'm in my criminal
9  cases.
10   A.  To finish what I was saying.
11   Q.  Yeah.
12   A.  She -- she asked to park in the front.  And I
13 told her, you know, based on the fact that she had not
14 had any contact with this person, that -- that she
15 couldn't recall any -- any kind of physical
16 confrontations or verbal confrontations, that I could
17 not change office policy.  The employees parked in the
18 back for safety reasons.  We did not want the
19 employees getting out of their cars at the same place
20 that the disability claimants were getting out,
21 concerned about -- because we were dealing with people
22 with mental illnesses, physical illnesses.  And that I
23 would need more to base that on.
24     I did offer to move her across to the other side
25 of the building if she -- they weren't really close to

Page 79

1  each other in proximity either in terms of their
2  workstations; but I suggested that, you know, if she
3  wanted to even lessen the awkward chance that she
4  would see her, she could go across to the other
5  workstations.
6    Q.  Let me ask you this.  Did you investigate it?
7    A.  Uh-huh.  Yeah.  I talked to -- I talked to
8  the security guard to see if he felt anything was
9  threatening going on.  He did not.  I talked to
10 Jimmy --
11   Q.  Who was the security guard?
12   A.  I'm sorry.  I don't remember the man's name.
13 It was an elderly, retired gentleman that was there.
14 I talked to the other manager.  She had actually
15 brought the initial complaint to a different manager,
16 a fellow named Jimmy Brown.
17   Q.  That's the other manager?
18   A.  He was the -- a group supervisor at that
19 time, temporary group supervisor there on -- he was on
20 loan from a field office while Paul Reams was in -- in
21 Charleston.  Jimmy and I both told her the same thing,
22 that, you know, if there were -- if there was anything
23 to reflect that she was in any kind of danger or any
24 kind of threats, anything physical, verbal, that we
25 wouldn't tolerate it.  And she couldn't articulate

Page 80

1  anything except this comment about the -- about the
2  picture.
3      So I talked to the guard.  I talked to -- talked
4  to Bernethia.  And I talked to the lady that she
5  was -- Beverly Warner was her name.
6    Q.  That's who she was complaining about?
7    A.  Yes, ma'am.  The lady she was talking about
8  was not there that day, which, you know, also was sort
9  of odd because she was -- Bernethia was quite -- quite
10 upset that day, but the employee she was upset about
11 wasn't there.
12   Q.  Let me ask.  Did she say she did it that day?
13   A.  Did what?
14   Q.  Whatever she's complaining about, her --
15   A.  That she had hired a hit man?
16   Q.  Right.
17   A.  I don't think she ever said when she thought
18 she had hired a hit man.  Or she never could
19 articulate to me, like I say, any kind of
20 confrontation with this person other than the fact
21 that she made this comment about this camera.  So
22 Ms. Warner, Beverly, was not there that day.  So I
23 talked to Beverly the next day and had a very brief
24 conversation with her.
25     Beverly had made some statements about Bernethia

Page 81

1  involving a missing time sheet, and -- and it all
2  seemed to be related to that.  And, you know, my
3  response to Beverly was I thought that she needed
4  to -- she needed to let management deal with the time
5  sheet issue.  Because I think Beverly was being very
6  vocal with the staff that she thought Bernethia had
7  taken this time sheet and was going to get fired and
8  that kind of thing.  And I told her that -- that, you
9  know, Bernethia was upset, that -- I don't think I
10 told Beverly that Bernethia said she thought she had a
11 hit man after her, but I did tell her that Bernethia
12 was very upset and that I wouldn't tolerate any bad
13 behavior between the two of them.  And she said the
14 same thing Bernethia did.  She said, I haven't
15 spoken to her.  She said, I haven't been around her in
16 years.
17     I remember telling -- I have notes.  I don't
18 remember the word-for-word conversation; but I told
19 her, I said -- I knew she had a camera.  A lot of
20 employees actually had cameras, taking pictures of
21 each other, scrapbooks and stuff.  I told her, I said,
22 do not take a picture of Bernethia.  I said, I don't
23 want you to even do anything that could be remotely
24 provocative.  And she said that -- she said that she
25 would not, and she said that she had no intention of

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF PAUL JOHNSON

22 (Pages 82 to 85)

Page 82

1  talking to Bernethia or bothering her.
2      So that was essentially it. I left for Jackson,
3  Mississippi, right after that. So I wrote all this
4  down, gave it to Paul Reams.
5      Q. Do you -- do you have a copy of it still?
6      A. It was an incident report.
7      Q. Did you -- did you --
8      A. I turned it over to my supervisor. He would
9  have it.
10     Q. Okay.
11     A. It -- it would have simply basically start
12 with the missing time sheet incident, then it talks
13 about Bernethia's conversation with Jimmy Brown. That
14 was on a Friday. My conversation with Bernethia was
15 on I think the following Monday. And then Beverly
16 came back would have been a Tuesday. So, I mean, it's
17 over several days.
18     Q. You don't know whether Paul turned it over to
19 the attorney?
20     MS. BATTLE-HODGE: Did he?
21     A. I think it was a part of --
22     MR. DuBOIS: I think it's part of the EEO
23 file.
24     A. That's what I was going to say.
25     MS. BATTLE-HODGE: I should already have it.

Page 83

1      A. It came up during that EEO -- one of those
2  investigations.
3      Q. That's fine. You suggested to Ms. Johnson
4  that she might, you know, move? You offered to move
5  her?
6      A. Yes. She was -- you know, she was very
7  anxious. I didn't -- you know, like I say --
8      Q. Let me ask you, did you offer -- did you move
9  Ms. Warner, or did you --
10     A. I don't know -- I don't know if we talked
11 about that. Beverly's response was that there was no
12 problem between -- between her and Bernethia.
13     Q. Okay. But that never --
14     A. I don't remember.
15     Q. Did you consider moving Ms. Warner?
16     A. I didn't see any need for that. I didn't see
17 any need for that. I didn't see any need to move
18 Bernethia. I just wanted to give her some options if
19 she thought being, you know, all the way across the
20 other side of the building would make her feel more
21 comfortable. I didn't see the basis for anything
22 after having the discussions with the various parties
23 involved.
24     Q. Who is Tamika Watkins?
25     A. Who is who?

Page 84

1      Q. Tamika Watkins? do you recall that
2  individual?
3      A. I'm sorry. I don't -- I don't know that
4  name. Can you give me some context?
5      Q. Yes. I'm thinking -- correct me if I'm
6  wrong -- that she was a law student that you-all had.
7      A. Yeah. There was a -- there was a Tamika, I
8  think, for some months there.
9      Q. Right.
10     A. There was a student.
11     Q. Right. Student, right. Do you recall
12 talking to Ms. Watkins about this incident?
13     A. I think Tamika was across the desk from
14 Bernethia. I don't remember her being involved in
15 this.
16     Q. Okay.
17     A. But when I got there that -- that morning --
18 and Bernethia was talking very loudly, and she was
19 obviously very emotional, upset. I thought she was
20 talking to somebody, but Tamika was at her desk. And
21 that was the student. She was across the workstation
22 from Bernethia. I don't remember her being greatly
23 involved in it.
24     Q. Did you speak -- did you ask her anything
25 about it?

Page 85

1      A. I just don't remember. It would -- if it was
2  anything of significance, I would have put it in my
3  report.
4      Q. Okay.
5      A. I think Bernethia was talking to Tamika when
6  I was standing there. But I just don't remember the
7  gist of the conversation except that -- you know, it
8  could -- it could have been the question about -- I
9  think it was at that same time. That was when
10 Bernethia was saying, oh, she was worried that people
11 were always around her desk. That could have been
12 part of that conversation, but I don't remember too
13 great a detail about that. You know, again, Bernethia
14 and I sort of had that conversation a number of times
15 about, you know, it's not unusual for people to be
16 around her desk or my desk, for that matter.
17     Q. So you're saying that Ms. Johnson made that
18 complaint to you a number of times or that statement
19 to you a number of times?
20     A. She -- well, I don't know if I would call it
21 a complaint. She said she was always uncomfortable
22 that she felt like, you know, that people could be
23 around her workstation.
24     Q. So did you always -- did you look into them,
25 or did you discuss some of them?

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.
DEPOSITION OF PAUL JOHNSON

Page 86

1    A.  Well, she never gave -- she never gave me an
2  incident of anything actually having been damaged or
3  tampered with or stolen or broken.  I mean, there was
4  nothing to investigate.  And I would ask her.  I said,
5  you know, is there something missing?  Is there -- you
6  know, she just -- she said she just always had this
7  feeling that -- you know, that she was very --
8  she's -- she seemed concerned, you know; but like I
9  say, I didn't have anything to investigate.
10    Q.  Okay.  Let's move back.  I know you like 2004
11  better.
12    A.  Okay.
13    Q.  But do you recall an audit that was done
14  October of '03?
15    A.  Yes.  There was auditing going on in the fall
16  of '03.
17    Q.  Did you provide Ms. Johnson with a copy of
18  that audit?
19    A.  She would have received -- what I would give
20  Bernethia when we were doing audits is something I'd
21  give to all the employees is we would go through the
22  cases, if this was -- I think the one in October is
23  what I call a full audit, which means I pulled every
24  case that every employee in the group had as opposed
25  to just auditing, say, the RTH cabinets.

Page 87

1    Q.  Okay.
2    A.  And that we pulled all her cases.  And we
3  spent hours.  We would go through the cases.  Usually,
4  I would look at them in advances; and then I would
5  make a copy of, say, the front page; and I would put
6  my notes on the front page of what was wrong.  And
7  sometimes I used post-it notes.  And that's the
8  information.  We would go case by case what was wrong
9  with the case.
10    Now, I have, you know, my notes as a manager that
11  I would not have necessarily turned over to her; but I
12  believe those notes -- I believe they ended up getting
13  submitted to the -- excuse me -- the EEO investigator.
14    Q.  As far as you know, they should be a part of
15  the record?
16    A.  Yeah.  I -- well, and it could have been a
17  part of my statement.  I just remember that at some
18  point, I was contacted by an EEO investigator who
19  asked me very detailed questions about the audit from
20  October of '03.
21    Q.  Okay.  What was significant about the
22  audit -- this audit with regard to Ms. Johnson?
23    A.  In '03?
24    Q.  Yes.
25    A.  A lot of it was the usual type problems.

Page 88

1  And, you know --
2    Q.  When you saw the usual type problems --
3    A.  About timeliness.  You know, some piece of
4  evidence had come in, but she had not moved it on to
5  the -- to the next status.  She was supposed to order
6  some type of evidence, had not actually gotten it
7  ordered in a timely manner.  I think that was an audit
8  where maybe she had written a letter to a claimant
9  about scheduling an exam, but we weren't actually
10  scheduling the exam.  I mean there were -- a lot of it
11  was typical clerical type errors.
12    The thing that was significant about it, though,
13  was that she had a large number of cases that I could
14  not locate and I never could physically find them.
15  And Bernethia brought them to me in a cart and -- and
16  said, you know, here they are.  And I think the
17  majority -- the majority of them were in pre status,
18  so they had moved from workup to pre.  But once again,
19  you know, we open the files up, there was no exhibit
20  list in there; or in some of the cases, the little
21  summary sheet that they would complete during workup
22  wasn't completed.  And her response to me was that she
23  had been told by someone that it was okay for her to
24  move that work from workup status even though she
25  hadn't completed it.  And --

Page 89

1    Q.  And what was your response to that?
2    A.  I told her that, you know, I certainly would
3  not have made that kind of a policy change.  I mean,
4  it certainly had the appearance that she was hiding
5  incomplete work.  And -- but I told her that I
6  would -- she was going to think about it, check into
7  it.  I told her I would talk to the group, see if
8  anybody had any misunderstandings about, you know, why
9  something would be in pre -- prehearing development,
10  which was a category used when you were ordering
11  evidence or exams.
12    And she -- you know, and you have to understand
13  these meetings -- these went on for hours.  I mean,
14  the audits went on for hours, not the meetings about
15  the missing exhibit list.  I mean it was, between
16  several days, probably three or four hours of meeting.
17    But to make this a little shorter, at some point,
18  she finally came back to me and said -- after I talked
19  to my other legal assistants and things.  None of them
20  said anything except what I expected them to say, is
21  they were expected to work up the file, have the
22  exhibit list in there, complete the summary before
23  they move the case to -- to a different status.  And
24  Bernethia at some point came back and said she was
25  just confused and had made some mistakes.  And she

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                                7/11/2008
DEPOSITION OF PAUL JOHNSON

24 (Pages 90 to 93)

Page 90

1  never would identify the person she talked to and said
2  that she was just wrong. And I -- and I told her, I
3  said, you know, it gave me the impression that she was
4  hiding incomplete work. It did concern me.
5      Q. Have you had that type of concern or that
6  issue with the files of -- with any of your other
7  legal assistants?
8      A. Not with those audits there.
9      Q. Not -- well, just in general.
10     A. No. I -- I was not having problems with
11  people moving cases to -- to a pre status that weren't
12  worked up.
13     Q. Okay. So Ms. Johnson was the only?
14     A. The people I'm supervising. Like I say --
15     Q. So you're saying it was -- under your
16  supervision, that was -- Ms. Johnson was the only
17  person?
18     A. Yes. I -- you know, as a manager, you know,
19  these were discussions that we were discussing with
20  other managers. And other managers had issues.
21     Q. Right. I understand what you're saying,
22  maybe. But in your group --
23     A. The people that I was supervising, yes,
24  that's -- that was where the problem lie.
25     Q. Okay.

Page 91

1      A. And, you know, it's -- I didn't try to do a
2  suspension or a written reprimand but, you know,
3  basically told her -- you know, I warned her. I said,
4  if you do this type of thing again, knowing what I'm
5  telling you today, then it's going to become -- you
6  know, it's going to become a serious matter. And I
7  ended up having a group meeting, sent out an e-mail.
8  I said, you know, this is to be specific, be perfectly
9  clear, don't move your case from workup to this other
10  status unless you complete your exhibit list.
11     Q. Oh, you had a general meeting with your legal
12  assistants?
13     A. I did.
14     Q. When did you have that meeting?
15     A. I think it was like the next day or so.
16  It's --
17     Q. Did you put anything in writing?
18     A. The e-mail. And I turned that over to the --
19     Q. Oh, we should have the e-mail to that?
20     A. Yes, ma'am. I turned the e-mail over.
21     Q. When was that?
22     A. I don't remember the date on it.
23     Q. What year? Do you have a year?
24     A. Well, it would have been October of '03.
25     Q. Oh, after this audit?

Page 92

1      A. Yes. It was right --
2      Q. Okay.
3      A. And we have to understand that it wasn't just
4  her audit that was going on.
5      Q. Right.
6      A. I was auditing all -- there was probably four
7  or five of them at the time.
8      Q. And Ms. Johnson was the only one that you --
9      A. That did --
10     Q. -- had a problem.
11     A. -- that did that. So, but what I do is after
12  I do a pretty in-depth audit like that, I would have a
13  group meeting and I would go over -- I wouldn't tell
14  people, you know, you did this, you did that; but we
15  would go over what I found and the kinds of problems
16  that we needed to work on. And like I say, at this
17  point, you know, in my mind, you know, I -- well,
18  there's no point in speculating about it. But
19  basically, Bernethia and I, I think -- I thought we
20  had reached an agreement that she clearly understood
21  the policy and that she wouldn't do it again.
22     Q. We'll move on. Did you -- your group,
23  did the legal assistants exchange work?
24     A. In what way?
25     Q. I guess switching. I'm not sure. When you

Page 93

1  say what way, did -- let's say one legal assistant is
2  assigned these files or this or a certain duties. Did
3  you have a, I guess -- what do you call it -- cross,
4  just kind of exchange files or whatnot?
5          MR. DuBOIS: Object to the form.
6      A. I really don't understand the question. I'm
7  sorry. Can you give me something specific as to what
8  you mean, why a case would change hands?
9      Q. Well, case might be wrong. I might be using
10  the wrong wording. Did work -- did you rotate work
11  between legal assistants?
12     A. We're talking workup? It would be unusual
13  for a file in workup to change hands.
14     Q. And I'm probably using the wrong words. I'm
15  sorry. GPS -- are you -- okay. Management -- and
16  she's helping me out because I'm using the wrong
17  words.
18     A. Okay.
19     Q. Management would have groups exchange work.
20  And I guess that's what I said, but maybe I didn't
21  make it. Did groups exchange work?
22         MR. DuBOIS: Object to the form.
23     A. I don't -- what kind of work are you
24  referring to?
25     Q. Well, I don't know what kind of work. Did

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.
DEPOSITION OF PAUL JOHNSON

25 (Pages 94 to 97)

Page 94

1  groups exchange work? Any work, if they did.
2      A.  Could one group do the work of a different
3  group's judge?
4      Q.  I guess pre, post --
5      A.  Yeah.  I mean if -- if there was an imbalance
6  in the workload --
7      Q.  But management didn't --
8      A.  I wouldn't routinely take work from another
9  group and bring it in to my group, if that's what you
10  mean.
11      Q.  Okay.
12      A.  But I'm just not really sure what your
13  question is.
14      Q.  Okay.  That's okay.  It's probably just a bad
15  question.
16      A.  That's all right.
17      Q.  Okay.  Let's go look at one.  I'm about done.
18  And we're going to take a short break and we're about
19  done.  I just want you to, if you would, Defendants'
20  Exhibit #25 -- and I made another copy, but it's in
21  here.  #25.  I think all of them are generally --
22  they're different ones, but I'm looking at basically
23  the categories here.  Can you tell me the difference
24  between the created date and the date created?
25  Because there are differences.

Page 95

1      A.  I don't -- I don't know what any of this is.
2  I don't recognize it.  It's not any of my work.
3      Q.  Well, let me give you your official one
4  there.  There are different dates.  Here you go.  #23.
5  That one is kind of bad copies, but --
6      A.  No, I don't -- this is not any of my work
7  either.
8      Q.  Well, that's from your computer.  So are you
9  familiar with that?
10          MR. DuBOIS:  Object to the form.
11      A.  I don't know, unless it's a really bad copy
12  of something I printed.  I don't recognize it.  But, I
13  mean, I generally know what you're talking about in
14  terms of HOTS that --
15      Q.  Okay.
16      A.  -- with the -- with the creation of exhibit
17  lists.  What would happen is when exhibit lists were
18  missing, Bernethia never took the position with me
19  that she actually created the exhibit list.
20      Q.  Okay.
21      A.  But I -- I thought, you know, that maybe she
22  did create the exhibit lists and that she had put
23  them, you know, in some strange place.  And so what I
24  did was -- is I -- we had a word processing program
25  that I did a search on our -- in our computers.  You

Page 96

1  have to understand there's a -- there's place exhibit
2  lists go when they're created.  They're saved.  And
3  I -- the exhibit lists were -- you know, were not
4  there on the computer when we were doing the audits.
5      Q.  Okay.
6      A.  So the problem was, is I was trying to give
7  Bernethia the benefit of the doubt.  I thought, well,
8  maybe she did create them and she doesn't remember she
9  created them or she stuck them in some strange place.
10  So I searched the word processing program to look to
11  see if I could find any evidence of any exhibit lists
12  ever having been created.  And so word processing,
13  there was nothing under claimants' names or Social
14  Security numbers.  I tried various variations on it.
15  They were not where they would normally be.
16      But again, you know, neither in October nor in
17  February, March and April, did Bernethia ever come up
18  with the exhibit lists.  And so Paul Reams -- when the
19  groups changed, I was in process of preparing a
20  written reprimand.
21      Q.  Okay.
22      A.  So what I did -- and like I said, I can't
23  tell if those are the documents that I was looking at
24  with Paul.
25      Q.  Yeah.  This is just a bad copy.

Page 97

1      A.  But what I did was, you know, I explained to
2  him that, you know, physically, the files did not have
3  the documents we were looking for; the word processing
4  program did not have the documents we were looking
5  for; Bernethia never came up with the documents we
6  were looking for.  And what he was looking at and what
7  I was looking at is trying to determine at what point
8  did we think Bernethia might have finally created the
9  exhibit lists.  And I think that's what you're
10  referring to is that there was this screen that
11  reflected that at some point, Bernethia would create
12  the exhibit lists.
13      Q.  Okay.  So let me ask you.  And if you don't
14  know, that's fine.  This created date here, are you
15  saying that's -- what do you think that is?
16      A.  I think that that is a date, yeah, that that
17  document was created or that was being worked on.  I
18  don't have any kind of in-depth knowledge about that.
19      Q.  Okay.
20      A.  But, you know, to again say what I'm saying
21  to you is --
22      Q.  Right.  You're speculating.  Is that what
23  you're saying?
24      A.  -- those -- no.  What I'm saying is that's
25  not what the basis of the disciplinary action was for

Page 98

1   with me.
2       Q.  No, no, no, no.  I'm trying to figure out in
3   reading these documents.
4       A.  From what I remember of HOTS, a create date
5   is when a document was created.
6       Q.  And then the date created, which is putting
7   out a different date on some of them.
8       A.  It would -- the only -- well, like I say,
9   you're not going to want me speculating about it.
10      Q.  Well, yeah.  I'm just trying to --
11          MR. DuBOIS:  Objection.
12      A.  As far as I know, a create date is when the
13  person was creating the document.
14      Q.  Okay.  So --
15      A.  Again, you know, you're asking me about stuff
16  I wasn't using.
17      Q.  That's fine.  That's fine.  And Mr. Reams
18  might know, but I'm just trying to figure out.  So if
19  you don't know, that's fine.  Could this be a specific
20  thing that you're trying to figure out?
21          MR. DuBOIS:  Object to the form.
22      Q.  Is this the whole document?
23          MR. DuBOIS:  Object to the form.
24      Q.  You don't know?
25      A.  I was not using that information --

Page 99

1       Q.  Okay.  That's fine.  That's fine.
2       A.  -- during the disciplinary proceeding.  But
3   what I'd like to say is the reason that ended up
4   coming up is when Paul -- when Paul was questioning me
5   about, you know, my findings --
6       Q.  Okay.
7       A.  -- it really was coming down to he said
8   versus she said, you know, my word against Bernethia's
9   that, you know, the documents weren't there.  So I had
10  two responses to that.  One has to do with create
11  date.
12      Q.  Okay.
13      A.  To briefly tell you, the other response is by
14  April, when things, you know, were getting contentious
15  about this -- this, you know, alleged incident on
16  April 19th, is as that was going on, I was asking to
17  be -- for a group change for Bernethia, not to
18  supervise her directly.  And when cases would come up
19  missing in terms of exhibit lists and the documents, I
20  asked other people to look at the files, to search for
21  the same information, to give a second person, a third
22  person to see, you know, is it just me, am I missing
23  something here.  You know, again, none of this time
24  did Bernethia ever tell me that she created exhibit
25  lists.

Page 100

1       Q.  Okay.  I think you've answered.
2       A.  And nor did she ever give me an exhibit list.
3       Q.  We'll move on.  I think you've answered it.
4       A.  No, I don't think I've answered your
5   question.
6       Q.  You have.  You don't understand what the
7   difference between the created date and the date
8   created.  Is that --
9           MR. DuBOIS:  Object to the form.
10      Q.  I'm asking.
11      A.  I don't know in the context of what you're
12  asking me.
13      Q.  My question was what's the difference between
14  created date and date created?
15          MR. DuBOIS:  Object to the form.
16      A.  I don't know what you're talking about.
17      Q.  Okay.  That's the answer.  Okay.  Are you
18  aware if any meetings that were held with Ms. Johnson
19  were tape-recorded by management?
20      A.  I never recorded any conversation with
21  anybody.
22      Q.  That's fine.  Okay.  Monique Caffey.
23      A.  I -- can I say something about create date?
24  You know, I just want to say that it's not that I've
25  never heard of the term "create date."

Page 101

1       Q.  No, no.  I'm just trying -- and we can go off
2   the record.
3           (Off-the-record discussion)
4       A.  You said something about Monique Caffey?
5       Q.  Thank you.  You did supervise Ms. Monique
6   Caffey at some point; is that correct?
7       A.  I did, yeah, for a short time.
8       Q.  Okay.  Are you -- from your observation or
9   person -- personal knowledge, did Ms. Caffey and
10  Ms. Johnson -- were they friends?
11      A.  Not that I know of.
12      Q.  Okay.  Okay.
13      A.  Ms. Johnson filed some complaints against
14  Ms. Caffey that led to some disciplinary action, but I
15  don't know what their connection was.  They could have
16  been, yeah.  I didn't -- I didn't keep an eye on that
17  kind of thing.
18      Q.  Okay.  Did Ms. Caffey do any -- and I might
19  be using the wrong word.  Audit any files or cases?
20      A.  Sure.
21      Q.  Okay.
22      A.  She's, I mean, one of many employees that
23  would have helped me.  She -- again, she was not a
24  senior case technician.  She was at a different --
25  different position, different level.  So what --

---

Page 102

1    usually what I did with Monique is I would run the
2    list of cases that I was looking for. I'd run all the
3    list of cases in a certain category and say, okay,
4    Monique, sometime this week, go to the file cabinet
5    and see if you see any of these not in that cabinet.
6    And then she'd bring me the list. She usually
7    e-mailed it to me. And she would say, okay, these are
8    the six that I didn't see. And then I would be the
9    one that would go and see if I could determine, you
10   know, what the problem was.
11       And most of the time, what it usually was, was
12   the -- you know, by the time she started looking in
13   the drawers for the cases, the cases had already just
14   moved on to the next status.
15       Q.  Okay.
16       A.  So, yeah, she was -- she was definitely
17   involved in that process.
18       Q.  Okay, okay. Is Ms. Caffey still employed
19   with the Social Security Administration?
20       A.  I don't know. I don't think so.
21       Q.  Okay.
22       A.  She was terminated from Montgomery's
23   employment.
24       Q.  Okay.
25       A.  But I don't know anything beyond that.

---

Page 103

1    Q.  Okay. When was she terminated, as far as you
2    know?
3    A.  I'm sorry. I don't remember.
4    Q.  Was she terminated before you left
5    Montgomery?
6    A.  I think so. I think it was official by the
7    time I left.
8    Q.  Okay, okay. And when did you leave
9    Montgomery?
10   A.  Well, the reason I say that is because, like
11   I say, I went on a detail in the summer of '04; and I
12   officially left in March of '05.
13   Q.  Okay. And to the best of your recollection,
14   she was terminated before you left officially?
15   A.  I think so.
16   Q.  Okay.
17   A.  I just haven't looked at that stuff in years.
18   Q.  Okay. That's fine. Okay. Are you aware
19   that Ms. Caffey, before she was terminated, gave
20   Ms. Johnson a list of -- or did she give management a
21   list of files that she had audited and some problems
22   that might be going on with those files?
23       MR. DuBOIS: Object to the form.
24   A.  I mean, yes, there was constant flow of
25   information between Monique and all the staff about

---

Page 104

1    whatever we were looking for at any particular time.
2    Q.  Okay.
3    A.  You know, just the reason I hesitate is I
4    wouldn't say Monique was doing the audit.
5    Q.  Okay.
6    A.  Monique -- Monique would take a list of cases
7    that I would give her. And I would say, Monique,
8    would you go see if these are in that particular file
9    cabinet. And Monique would e-mail me back and say
10   these are the ones I didn't see. And then I would
11   actually go to see if they were actually in the
12   cabinet or if they had already moved on to the next
13   status and that sort of thing. But, yeah, that was --
14   it was a very common kind of practice, but it just
15   wasn't Monique.
16       I mean all the staff was involved in that
17   process. I mean, that was information that would
18   have -- particularly if it got to the point where I
19   was struggling to figure out what was going on
20   with it, I would go to the employee and show them the
21   list and say, you know, can you tell me what's going
22   on with that particular case and figure out what was
23   going on.
24       Q.  Do you recall why Ms. Caffey was terminated?
25       A.  Well, I didn't supervise her during the vast

---

Page 105

1    majority of it. The part that I was involved in, I
2    believe she had some multiple warnings. She had some
3    warnings and written reprimands. I think she had two
4    short-term suspensions and a long-term suspension.
5    And then when it got to me, my involvement in it,
6    she -- she was terminated after another disciplinary
7    action.
8    Q.  These were different actions?
9    A.  They were all different actions involving --
10   Q.  What are some of the --
11   A.  Like I say, I didn't involve -- I wasn't
12   involved in the early stuff.
13   Q.  But the stuff that you were involved in?
14   A.  The stuff I was involved in had to do with
15   her behavior in the office, making -- she made
16   threatening comments and things to some of her
17   coworkers.
18   Q.  Did you hear her?
19   A.  She made some of them to me, too, yes, but
20   it -- you know, again, I haven't looked at that stuff
21   in years, but it had to do with behavior. I think a
22   lot of it did over the years. Maybe some of it had to
23   do with time keeping. But I don't even remember who
24   her -- I think Paul Reams may have been her supervisor
25   before me, but I was involved in the very end.

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF PAUL JOHNSON

28 (Pages 106 to 109)

Page 106

1    Q.  The very end, I know all of those
2  disciplinary actions had been taken against her.  By
3  the time it got to you, it was pretty much at the end;
4  is that correct?
5    A.  Yes.  They -- she was -- Paul asked her to
6  come into my group really trying to give her, you
7  know, one more shot.  And we tried giving her some
8  different duties because, again, the problem had to do
9  how she was interacting with other people.  And -- and
10  in fact, that's one of the ways she was involved in
11  the -- you know, helping me look for files.  Because I
12  was trying to spend some one-on-one kind of time with
13  her to see if it might make a difference, but --
14    Q.  Okay.  And you indicated earlier that the
15  termination was a process.  Are you saying that
16  because did she appeal or was it --
17      MR. DuBOIS:  Object to the form.
18    Q.  Did you recommend her for termination?
19    A.  Yes, I was involved in it.
20    Q.  Okay.
21    A.  I couldn't tell you the formalities of it.
22    Q.  Oh, that's fine.
23    A.  But, you know, there -- there was -- there
24  were incidents, you know, that using the progressive
25  disciplinary process, the next step was termination.

Page 107

1    Q.  Okay.
2    A.  I was involved in that.  As far as I know,
3  when she was actually terminated, she never appealed
4  it.  No one ever contacted me saying --
5    Q.  So when did you make the recommendation?
6    A.  I'm sorry.  I don't remember the time frame.
7    Q.  What year was it?
8    A.  It -- it would have -- it would have been
9  after -- I don't know.  It would have probably been
10  '04 would be my guess.
11    Q.  Okay.  Was she still -- so once you make the
12  recommendation, did she go home or does she stay there
13  until it's finalized?
14    A.  Yes.  The process, if I remember, at that
15  time is when you get a termination recommendation,
16  that you go home until -- you get paid.  What do you
17  call that?
18    Q.  Administrative?
19    A.  You're on like administrative leave and
20  you're paid until the -- until the decision is made.
21    Q.  Okay.  Was she -- I think you said you were
22  on some type of what -- I know you left Montgomery May
23  of --
24    A.  March '05.
25    Q.  Okay.  March of '05.  So do you know if you

Page 108

1  started the process in -- it was in '04, right?
2    A.  I think so.
3    Q.  Do you recall if it was spring, summer, end
4  of the year?
5    A.  I'm sorry.
6    Q.  But it was sometime '04.  Was it the first
7  part of the year?
8    A.  I just don't -- very little memory.  You
9  know, there are reports that certainly would be, I
10  guess, discoverable.  I don't -- I don't have that
11  information.
12    Q.  Okay.
13    A.  No one has ever asked me.
14    Q.  And this is -- just for your reference, this
15  is Defendant's #26.
16    A.  What year?
17    Q.  On this date, she was employed.  So it was
18  sometime after April of '04.
19    A.  Yeah.  She sent me an e-mail in April of '04.
20  She was obviously still there in April of '04.
21    Q.  So we can agree, then, that it was sometime
22  after.
23    A.  Certainly possible.
24      MS. BATTLE-HODGE:  Can we take just a couple
25  of minutes?

Page 109

1      (Brief recess)
2      MS. BATTLE-HODGE:  I think that's going to do
3  it for us.
4    A.  Okay.
5      MR. DuBOIS:  I don't have any questions.
6      (The deposition concluded at
7        1:24 p.m.)
8      * * * * * * * * * *
9      FURTHER DEPONENT SAITH NOT
10      * * * * * * * * * * *

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.

7/11/2008

## DEPOSITION OF PAUL JOHNSON

29 (Pages 110 to 111)

Page 110

1       REPORTER'S CERTIFICATE
2   STATE OF ALABAMA
3   MONTGOMERY COUNTY
4       I, Mallory M. Johnson, Certified Court Reporter
5   and Commissioner for the State of Alabama at Large,
6   hereby certify that on Friday, July 11, 2008, I
7   reported the deposition of PAUL WOODSON JOHNSON, who
8   was first duly sworn or affirmed to speak the truth in
9   the matter of the foregoing cause, and that pages 3
10  through 109 contain a true and accurate transcription
11  of the examination of said witness by counsel for the
12  parties set out herein.
13      I further certify that I am neither of kin nor of
14  counsel to any of the parties to said cause, nor in
15  any manner interested in the results thereof.
16      This 30th day of July, 2008.
17
18      _____
19      MALLORY M. JOHNSON, COURT REPORTER
        And Commissioner for the
        State of Alabama at Large
20      Alabama License Number: 443
        Expires 09/30/08
21
        MY COMMISSION EXPIRES: 2/24/09
22
23
24
25

Page 111

1       SIGNATURE OF WITNESS
2       I, PAUL WOODSON JOHNSON, hereby certify that
3   I have read the transcript of my deposition consisting
4   of pages 3 through 109, and except for the corrections
5   listed below, certify that it is a true and correct
6   transcription.
7
8       _____
        PAUL WOODSON JOHNSON
9
10  SWORN TO AND SUBSCRIBED before me
11  this _____ day of _____, 2008.
12
        _____
13  NOTARY PUBLIC
14      * * * * * * * * * * *
15  Page  Line  Correction and reason therefor
16
17
18
19
20
21
22
23
24
25

**WORD INDEX**

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.
DEPOSITION OF PAUL JOHNSON

7/11/2008

Page 1

**A**

able 48:1,10 67:13
  70:22
absences 71:23
absent 71:8,10,22
Absolutely 72:7
accepted 12:4
  35:18
access 61:11 62:22
accurate 110:10
acronym 65:25
acronyms 20:11
acting 14:11,22
action 44:10 51:13
  51:15 69:17
  97:25 101:14
  105:7
actions 51:2 56:25
  105:8,9 106:2
activities 17:14
actual 19:25
add 17:24 29:6
addition 22:8 27:6
  27:7,8
additional 12:22
address 4:13,15
administration
  2:11 8:23 9:23
  102:19
administrative
  107:18,19
adult 5:13 6:10
advance 39:4
advances 87:4
Advocacy 9:19
affirmed 110:8
afternoon 52:19
  72:3
agency 5:12 11:3
  16:17 18:23
  19:13 21:11 23:3
  46:6,7 73:18
ago 19:22 55:11
agree 108:21
agreed 2:22 3:10
agreement 1:18

92:20
ah 70:22
ahead 8:19 27:23
  50:8
al 1:9
Alabama 1:2,20,22
  2:5,8,9 3:3 5:18
  5:19,20 8:8 9:19
  110:2,5,19,20
alarms 53:8
allegation 44:11
alleged 99:15
allow 33:9 37:18
  50:10 51:9
allowed 34:25
  36:16 50:19 51:7
alter 67:21
alternative 41:5
announcement
  11:20 23:24
answer 16:10 21:9
  38:12 43:9 44:23
  50:15 100:17
answered 21:8
  58:15 100:1,3,4
anxious 83:7
anybody 89:8
  100:21
anyone's 66:20
anytime 45:4
  69:25 73:10
anyway 38:6
apparently 34:12
appeal 106:16
appealed 107:3
appearance 89:4
APPEARANCES
  2:1
appeared 55:24
applied 36:2
approve 34:9
approved 25:1
  36:7 40:19
approximately
  1:23
April 9:18,24

20:15 26:8,11,17
  26:17 27:16,18
  27:18,18,21 28:8
  32:7,8,25 33:20
  35:22,23 37:2,7
  43:5,14 46:14
  60:21,22 63:22
  96:17 99:14,16
  108:18,19,20
area 6:1,2,7 7:15
  10:18 61:5 75:15
  76:2,11,16
areas 75:16
articulate 79:25
  80:19
asked 14:21 43:12
  43:13,22 55:5,10
  57:15,18,22
  58:13 76:6 77:11
  77:17,18 78:12
  87:19 99:20
  106:5 108:13
asking 3:25 32:16
  32:17,18,19,20
  41:4 43:18 50:17
  52:6 55:22 59:11
  74:12 98:15
  99:16 100:10,12
assess 63:3
assign 44:25 65:9
assigned 60:13
  62:7 64:20 66:25
  68:3,17 93:2
assigning 65:17
Assignment 67:1
assist 29:10
assistant 2:7 16:2
  28:25 29:22
  30:21 31:7,9,10
  31:13 38:8 40:12
  41:12 51:4,5,7,25
  61:21,23 63:2,7
  66:21,24 67:25
  68:1,20 71:16,16
  72:11 93:1
assistants 13:6

18:7 30:5,11
  31:15 33:7,24
  34:2,14 42:12
  45:1,21 48:3,21
  50:5 61:22,24
  62:22 64:19 66:7
  66:25 69:11
  89:19 90:7 91:12
  92:23 93:11
assistant's 45:4
  68:1,22
assisting 16:4
ASTRUE 1:8
Atlanta 2:13 24:25
attention 47:7,8
attorney 2:4,7,8,11
  4:9 10:9,19,25
  11:4,14,21,22,25
  12:11,16,18,24
  12:25 13:2,12
  15:17,19,19
  18:13,13 26:20
  26:25 27:2,12,13
  59:25 82:19
attorneys 13:9
  16:7 20:18 23:8
  27:3,9 45:7
attorney's 1:21
  10:12
Auburn 8:5,6,20
  8:21
audit 47:19,25
  56:17 58:19,20
  69:25 86:13,18
  86:23 87:19,22
  87:22 88:7 91:25
  92:4,12 101:19
  104:4
audited 47:21,23
  103:21
auditing 47:9
  86:15,25 92:6
audits 86:20 89:14
  90:8 96:4
August 10:14,15
  28:13,14

Autauga 5:22,23
  6:25 7:14,24
authority 11:16,17
  21:19 22:3 23:17
  67:14
authorization
  51:12
automatic 68:6
automatically 68:2
  68:9
available 25:9
  33:10 65:14
  69:17
average 69:22
aware 22:16 33:24
  100:18 103:18
awkward 79:3
a.m 1:23

**B**

Bachelor 8:23
back 7:22 12:9
  15:16 29:22 30:2
  33:1 34:5 36:15
  44:16 47:3 70:15
  75:9,9 78:18
  82:16 86:10
  89:18,24 104:9
backup 41:22
bad 38:15 44:14
  81:12 94:14 95:5
  95:11 96:25
balanced 18:1
bar 8:15,16
base 40:4 78:23
based 73:11 78:13
basic 16:13
basically 13:3 18:3
  26:17 49:14
  64:25 69:21
  82:11 91:3 92:19
  94:22
basis 5:2 14:11
  83:21 97:25
Battle-Hodge 2:3,3
  2:18 3:21,23 42:9
  43:1 44:14 58:8

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF PAUL JOHNSON
Page 2

82:20,25 108:24
109:2
becoming 52:11
beg 51:23
began 27:5 72:24
behavior 81:13
105:15,21
believe 9:18 11:11
14:16 26:12
60:16 87:12,12
105:2
beneath 49:22
benefit 29:25 96:7
benefits 29:21
Bernethia 1:5 2:15
3:24 26:9 27:16
28:2,4,9,17 32:14
32:18,20,24
33:13 34:21 35:1
35:19,20 37:20
39:6 40:17 46:20
47:4 51:16 52:7
53:2,17 54:23
55:2,23 56:3,9
57:6 64:4,14 68:7
75:11 76:22 77:9
80:4,9,25 81:6,9
81:10,11,14,22
82:1,14 83:12,18
84:14,18,22 85:5
85:10,13 86:20
88:15 89:24
92:19 95:18 96:7
96:17 97:5,8,11
99:17,24
Bernethia's 20:1
48:2,9 50:2 52:14
74:10,16 75:9
82:13 99:8
best 4:5 26:7 35:25
103:13
better 18:17 37:15
56:2 70:23 86:11
Beverly 80:5,22,23
80:25 81:3,5,10
82:15

Beverly's 83:11
beyond 102:25
big 13:2,2
bit 15:17 26:2 35:7
36:15,15 55:18
BJ 68:11
Blake 2:10
blurb 30:7
Bonita 30:19
bother 53:9
bothering 82:1
bought 5:3
break 42:8 77:14
94:18
breaks 4:6
Brenda 31:3,5
brief 29:23 43:3
80:23 109:1
briefly 7:25 99:13
bring 94:9 102:6
broken 15:23 86:3
brother 5:25 6:1,6
6:15
brothers 5:25
brought 47:6,8
79:15 88:15
Brown 79:16 82:13
BS 8:22 9:14
budget 18:24
building 20:21
28:1,4,5 77:18
78:25 83:20
buildings 20:21
Burton 51:16
business 9:5,5
34:10
button 67:5

———————
C
cabinet 48:25
49:16 52:22 53:1
53:11 54:9 65:9
102:4,5 104:9,12
cabinets 47:13,13
47:14,17 57:2
60:5 61:15 62:17
62:18 64:17

70:22 77:1 86:25
Caffey 31:11,17
100:22 101:4,6,9
101:14,18 102:18
103:19 104:24
call 11:16 24:4
31:6 37:14 45:16
64:23 77:11
85:20 86:23 93:3
107:17
called 7:15 11:13
11:21 20:7 65:3
camera 80:21
81:19
cameras 81:20
capability 67:21
capable 45:24
capacity 27:12
car 63:11 77:24
care 24:21
Carolina 9:23 10:1
10:5,6
cars 78:19
cart 88:15
case 1:7 3:11,13
16:1,3 29:3,4,7
29:19,23 30:4,8
31:7 42:24 45:12
45:13,13 46:17
47:15 48:6 49:15
51:6,7,25 52:19
53:23 54:2,8 58:1
62:10,12 65:7
66:6 67:25 68:7
68:21,22,24
70:15 72:17,20
73:15,23 74:6,24
75:3,7 86:24 87:8
87:8,9 89:23 91:9
93:8,9 101:24
104:22
cases 22:12 29:20
30:3 46:7,8,9,19
46:22 47:12,12
47:20 48:2,5,9,17
48:21,25 49:12

49:24 50:2,6,11
52:14,15 53:13
54:7,14,19 55:2,6
55:15 56:1,4,4,6
56:8,19 57:1
59:17 64:20 65:2
65:13,15 66:8
69:16,16 70:4,23
70:24 71:12,16
72:17,23 74:10
74:12,16 75:18
78:9 86:22 87:2,3
88:13,20 90:11
99:18 101:19
102:2,3,13,13
104:6
categories 94:23
category 73:16
89:10 102:3
cause 110:9,14
certain 21:18
28:17 35:14
55:19,19 93:2
102:3
certainly 23:25
42:16 62:10
65:18 72:13
76:22 89:2,4
108:9,23
CERTIFICATE
110:1
Certified 110:4
certify 110:6,13
111:2,5
cessation 29:20
chance 36:4 79:3
change 13:17
67:19,20 68:25
69:1 73:18 78:17
89:3 93:8,13
99:17
changed 12:13,20
30:13 44:3 46:20
56:1 57:4 96:19
changing 12:22
23:3

Charleston 79:21
Charleston's 14:23
Charlie 15:12
check 89:6
checked 58:25
checking 47:11
64:2
chief 10:17,20 15:9
15:13 16:18,21
16:23,24 17:12
21:12,19 23:19
24:12,13
child 6:11
children 5:13,14
6:20,22
choosing 71:1,2
circumstances
71:8,9,22
city 6:6
Civil 2:25 3:9,14
claim 11:18
claimant 88:8
claimants 29:17
78:20 96:13
claims 11:19 16:1
clarity 36:16
Clayton 1:21 2:9
clear 14:8 18:2
35:24 38:5 42:20
51:3 91:9
clearly 35:21 92:20
clerical 13:7 27:6
49:2,4,20 88:11
Clinger 30:25
close 78:25
closely 22:14
closest 53:1
closing 52:19 53:6
College 7:25
come 24:11 38:20
42:7 45:11 49:5
58:19 72:4 73:12
74:22 75:2 88:4
96:17 99:18
106:6
comfortable 83:21

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.
DEPOSITION OF PAUL JOHNSON

7/11/2008

Page 3

coming 29:10 39:7 40:17 71:23 99:4 99:7
commencing 1:22
comment 80:1,21
comments 48:3 76:23 105:16
commission 3:4 110:21
Commissioner 1:9 1:19 3:2 110:5,19
common 29:2,3 70:1 104:14
commonly 11:24 75:16
communicate 42:11,13,14
communication 42:16
communications 47:3 57:9,14
community 7:16
complain 37:17 74:19
complained 32:4 74:21
complaining 80:6 80:14
complaint 46:6,6 79:15 85:18,21
complaints 48:1 76:17 101:13
complete 50:3 88:21 89:22 91:10
completed 46:9,9 48:11 52:16,25 88:22,25
completely 48:17
completing 50:14
complicated 13:13
computer 35:13 47:11 66:16,23 95:8 96:4
computers 49:12 95:25

concern 90:4,5
concerned 30:1 37:19 78:21 86:8
concluded 109:6
confrontation 49:7 80:20
confrontations 78:16,16
confused 89:25
connection 74:9,11 101:15
consider 83:15
considered 71:9
consisting 111:3
constant 103:24
consulting 29:6
contact 19:17 28:7 28:12,16 31:21 76:6 77:22 78:14
contacted 87:18 107:4
contain 47:1 110:10
container 35:11,12
contentious 99:14
context 84:4 100:11
contingency 42:1
continue 36:13
contract 33:6 34:25
contractors 29:9
conversation 34:6 37:20 43:16 58:9 71:11 76:1,1,15 77:10 80:24 81:18 82:13,14 85:7,12,14 100:20
conversations 53:17,18,19 56:7 57:9,14 59:4
convinced 77:15
copies 95:5
copy 40:7 75:8 82:5 86:17 87:5

94:20 95:11 96:25
correct 11:1 12:12 12:23 27:21 28:21 38:7 39:11 57:10 84:5 101:6 106:4 111:5
Correction 111:15
corrections 111:4
correctly 8:11 28:8 33:12 34:24
cotton 7:15
counsel 2:12,23 3:11 110:11,14
counter 69:6
County 5:22 6:25 6:25 7:14,24 110:3
couple 42:10 108:24
course 4:5
Court 1:1,19 3:2 110:4,18
covered 60:17
coworker 75:2
coworkers 76:8 77:16 105:17
CPMS 73:19,22 74:2,4
Craig 6:6
create 39:8 95:22 96:8 97:11 98:4 98:12 99:10 100:23,25
created 94:24,24 95:19 96:2,9,12 97:8,14,17 98:5,6 99:24 100:7,8,14 100:14
creating 98:13
creation 95:16
credit 68:18
criminal 78:8
cross 93:3
Crowell 30:18
current 4:13

cut 36:14
Cynthia 74:6,10
C-A-F-F-E-Y 31:12
C-L-I-N-G-E-R 30:25
C-R-O-W-E-L-L 30:19

**D**

Dallas 6:25
damaged 75:12 86:2
danger 79:23
date 14:7 91:22 94:24,24 97:14 97:16 98:4,6,7,12 99:11 100:7,7,14 100:14,23,25 108:17
dates 95:4
Davenport 51:19
day 34:3,10,10,11 37:18 42:25,25 54:7 56:1 61:2 70:4,14,17,18,20 70:25 71:10,13 76:6 80:8,10,12 80:22,23 91:15 110:16 111:11
days 33:11,19,22 33:25 34:1,18 36:17 37:4,5,6,25 40:6 49:14 56:6 60:9 82:17 89:16
deadline 34:5
deal 45:7 81:4
dealing 45:6 78:21
Decatur 2:4
December 11:12 12:2 20:17 26:20 27:11,20 38:21
decide 35:4
decided 33:14 38:24
decision 18:8 23:20 24:12,17

41:16 107:20
decisions 11:15,17 19:6 21:10,16
decision-maker 21:25
Defendants 1:10 2:6 94:19
Defendant's 108:15
defined 23:1 71:21
definitely 24:3 102:16
degree 8:5,20 9:5
degrees 9:12
delete 52:20 67:22
demeaning 44:9
demote 21:10 23:17
denied 30:1
Denise 30:18
departments 20:24
depended 70:10,10
depends 62:24
DEPONENT 109:9
deposition 1:17 2:24 3:1,7,12 4:7 109:6 110:7 111:3
depositions 4:10
desk 34:15 37:3,10 37:12,17,24 38:2 38:6,9 39:24 40:1 40:11 44:23 45:9 46:5 52:22 55:16 56:13 58:22 60:18 62:19 63:12,16,20 64:3 64:4 72:16 74:22 75:4,5,10 84:13 84:20 85:11,16 85:16
detail 12:9 85:13 103:11
detailed 61:2 87:19
determination

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                                    7/11/2008
DEPOSITION OF PAUL JOHNSON
Page 4

21:13
**determine** 49:5
   59:19 69:22 97:7
   102:9
**development** 29:15
   56:20 89:9
**died** 42:2 60:24
**difference** 11:14
   13:2,10 94:23
   100:7,13 106:13
**differences** 94:25
**different** 5:11
   17:21 20:20 31:9
   45:10 58:16
   62:11,12 70:17
   73:23 79:15
   89:23 94:2,22
   95:4 98:7 101:24
   101:25,25 105:8
   105:9 106:8
**difficult** 37:16
**diploma** 8:24
**direct** 44:24
**directions** 45:2
**directly** 16:22,23
   17:10 28:21
   99:18
**director** 5:8 12:15
   12:25 13:19 14:9
   14:22 15:7 16:22
   23:13,16
**director's** 13:8
**Disabilities** 9:19
**disability** 11:19,19
   16:1 78:20
**disciplinary** 44:10
   51:1,13,15 52:24
   53:5 56:24 97:25
   99:2 101:14
   105:6 106:2,25
**discipline** 43:13,21
**discoverable**
   108:10
**discuss** 42:24
   69:10 85:25
**discussed** 42:19

**discussing** 90:19
**discussion** 33:4
   51:5 101:3
**discussions** 22:5
   41:4,21 47:3
   83:22 90:19
**disrespectful** 32:5
**District** 1:1,2 2:8
   5:16
**disturb** 41:9
**disturbing** 59:10
**division** 1:3 21:3
**dockets** 16:4
**document** 97:17
   98:5,13,22
**documentation**
   55:21
**documents** 47:1
   58:24 96:23 97:3
   97:4,5 98:3 99:9
   99:19
**doing** 10:19 11:19
   22:19,19 25:7
   29:19 30:10
   33:25 38:20 45:9
   47:10 56:25 70:2
   86:20 96:4 104:4
**Dorothy** 7:6
**doubt** 38:13 96:7
**drastically** 18:15
**drawer** 49:22,22
   50:1 64:5
**drawers** 102:13
**DuBois** 2:7 42:7
   43:7,17,25 46:11
   50:13,24 51:22
   52:9 53:16 55:7
   56:16 57:11
   58:12 59:7 61:6
   62:1,23 63:8,17
   63:21 64:8 67:9
   67:15 68:5,23
   69:5 71:18 73:1,9
   74:8 78:5 82:22
   93:5,22 95:10
   98:11,21,23

100:9,15 103:23
   106:17 109:5
**duly** 110:8
**duties** 12:23 13:1
   15:18 16:13,14
   18:6 28:24 29:4
   30:8 44:18,22
   45:5,24 46:1
   72:22,22 93:2
   106:8
**duty** 15:22 29:14
   37:3 72:18
**dying** 24:20 25:18

———————————
**E**
**earlier** 60:14 69:7
   106:14
**early** 15:14 55:9,25
   105:12
**easy** 59:19
**EEO** 82:22 83:1
   87:13,18
**effect** 61:1
**eight** 6:13
**either** 3:13 24:1
   42:18 45:12 55:8
   75:21,23 79:1
   95:7
**elderly** 79:13
**electronically**
   75:23
**emotional** 84:19
**emphasis** 9:6
**employed** 102:18
   108:17
**employee** 24:22
   25:7,16 31:14
   49:20 53:22,24
   59:10,14 60:12
   65:22 67:17,18
   69:15,18,18
   70:13,13,16
   77:23 78:1 80:10
   86:24 104:20
**employees** 18:10
   22:15,16,18,19
   23:18 47:24

50:18,20,25
   52:18 62:15,17
   65:11,18,23
   69:15 72:15,19
   74:20 78:17,19
   81:20 86:21
   101:22
**employee's** 33:5
   70:11
**employment**
   102:23
**encounter** 53:2
**encountered** 24:14
   49:18
**encountering**
   52:13,18
**ended** 87:12 91:7
   99:3
**enroll** 33:9 35:3,6
**enrolled** 33:13
   34:5 35:5 36:18
   36:19
**enrolling** 34:8
**enrollment** 33:15
**entered** 66:7,8,20
   67:12
**entire** 11:8 17:6
   31:4,5
**entries** 16:11 66:22
**entry** 31:14
**entry-level** 45:21
**error** 49:19
**errors** 49:20 88:11
**essentially** 9:5
   11:14 15:23
   17:23 20:13
   26:15 45:20 82:2
**et** 1:9
**evening** 72:3
**eventually** 48:10
**everybody** 17:10
   31:24
**evidence** 3:7 16:4
   29:5 75:8 88:4,6
   89:11 96:11
**exactly** 26:9 32:8

32:12 59:8
**exam** 88:9,10
**examination** 2:17
   3:20 110:11
**example** 23:7
   47:15 68:6
**exams** 29:6 89:11
**exception** 77:22
**exchange** 92:23
   93:4,19,21 94:1
**excuse** 87:13
**exhibit** 52:20
   57:22,23 88:19
   89:15,22 91:10
   94:20 95:16,17
   95:19,22 96:1,3
   96:11,18 97:9,12
   99:19,24 100:2
**expect** 49:1 56:4
**expected** 47:1 57:7
   64:18 89:20,21
**expecting** 50:4
**experience** 30:6
**experts** 29:11
**Expires** 110:20,21
**explain** 57:17
**explained** 97:1
**explanation** 58:6
**extended** 14:25
**extent** 35:18 77:8
**extinguisher** 35:13
**eye** 101:16
**e-mail** 42:13 53:24
   91:7,18,19,20
   104:9 108:19
**e-mailed** 102:7
**e-mails** 42:17,17

———————————
**F**
**fact** 23:2 35:4 40:5
   59:1 78:13 80:20
   106:10
**fair** 40:8 44:25
**fairly** 15:14 25:9
   55:1
**fall** 8:16 86:15
**familiar** 4:9,12

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.

DEPOSITION OF PAUL JOHNSON

7/11/2008

Page 5

**family** 24:19
**far** 21:20,21 24:10
  29:22 35:17
  36:24 40:3 45:23
  46:1,2 65:19 76:3
  87:14 98:12
  103:1 107:2
**farming** 7:15
**fast** 4:2,3
**father's** 7:10
**February** 12:5,13
  13:20,24 33:17
  38:23 46:12 47:7
  47:7 55:8,25
  96:17
**Federal** 2:25 3:9
  3:14
**feel** 37:14,15 83:20
**feeling** 86:7
**fellow** 79:16
**felt** 34:8 43:15
  74:21 75:14 76:2
  76:7,10,16,23
  77:15 79:8 85:22
**field** 24:24 79:20
**figure** 21:2 40:23
  98:2,18,20
  104:19,22
**file** 29:7,15,24
  45:12,13,13
  46:24,25,25
  47:13,13 49:11
  49:16 50:4 52:22
  53:10 54:8,24
  55:3,21,21 57:1
  58:10,13,17,18
  58:20,21,22,23
  58:25 59:4,9,11
  59:12,23 60:7,10
  60:11 61:15,23
  61:24,25 62:3,8
  62:17 63:14,18
  70:22 75:6,7,9,19
  77:1 82:23 89:21
  93:13 102:4
  104:8

**filed** 4:1 58:23
  101:13
**files** 16:2,3 29:4
  47:18 49:3,18,21
  49:24 52:13
  56:12,14,22
  57:10,16 58:10
  58:21 59:5 60:1
  61:4,8 62:13,20
  62:22 63:5,15,18
  63:19 64:2,4,7,9
  64:13,14,16 72:2
  72:25 73:4,7,17
  74:6,25 75:3
  88:19 90:6 93:2,4
  97:2 99:20
  101:19 103:21,22
  106:11
**filing** 52:22,25
**filled** 14:13
**final** 21:24 23:20
  23:21 24:2,4
**finalized** 107:13
**finally** 89:18 97:8
**find** 48:1,6 49:4,9
  49:23 55:13,15
  55:18,20 63:15
  64:13,15 88:14
  96:11
**finding** 53:23
  56:12 64:9 74:16
**findings** 99:5
**fine** 18:17 21:6
  24:16 33:3 34:20
  35:2 40:22,22
  42:6 83:3 97:14
  98:17,17,19 99:1
  99:1 100:22
  103:18 106:22
**finish** 51:8 78:10
**finished** 53:9
**fire** 35:13
**fired** 81:7
**firing** 21:16
**first** 3:17 13:4 15:5
  15:6 18:11 20:3

26:5 27:15 28:15
  28:23 30:24
  32:21,21 47:6
  55:5 59:13 108:6
  110:8
**first-in** 64:23
**first-out** 64:24
**five** 30:15 45:23
  59:17 92:7
**Flexiplace** 33:5
  34:19 35:19 38:4
**flow** 103:24
**flowed** 75:17
**following** 10:15
  34:17 37:6,7,9
  40:5 52:23 82:15
**follows** 3:19
**foregoing** 110:9
**forget** 39:7
**forgot** 59:2
**form** 3:5 10:11
  26:24 43:7 50:24
  51:22 52:9 53:16
  54:1 55:7 56:16
  57:9,11 58:12
  59:7 61:6 62:1,23
  63:8,17,21 64:8
  67:9,15 68:5,23
  69:5 71:18 73:1,9
  74:8 78:5 93:5,22
  95:10 98:21,23
  100:9,15 103:23
  106:17
**formal** 7:6 22:18
  22:21 42:22
  53:20
**formalities** 106:21
**formality** 3:3
**forming** 20:15
**Forsyth** 2:12
**forth** 44:7 47:3
**found** 44:6 47:12
  47:20 54:4 55:19
  58:10 59:4 63:19
  64:3 74:12 92:15
**four** 6:19 15:24

26:9 45:22 89:16
  92:6
**four-month** 70:3
**four-year** 26:15
**frame** 107:6
**Friday** 1:22 50:9
  52:19 70:8 71:3,4
  71:8,11,17 82:14
  110:6
**friends** 101:10
**front** 34:15 36:17
  36:21,25 37:3,6
  37:10,12,17,24
  38:2,9 39:24 40:1
  44:23 45:9 46:5
  60:18 75:5 77:18
  78:12 87:5,6
**full** 4:13 14:16
  86:23
**funeral** 60:25
**further** 3:10 109:9
  110:13

_____

      **G**

**general** 2:12 46:1
  90:9 91:11
**generally** 25:4
  42:17 64:4 72:16
  72:19 94:21
  95:13
**generated** 29:16
  49:11
**gentleman** 79:13
**Georgia** 2:13
**getting** 41:16
  68:18 78:19,20
  87:12 99:14
**gist** 13:16 85:7
**give** 4:13 24:23
  30:5,6,16 35:9
  36:4 45:1 53:25
  70:14 71:12,13
  71:15 72:6,14,20
  75:9 77:12 83:18
  84:4 86:19,21
  93:7 95:3 96:6
  99:21 100:2

103:20 104:7
  106:6
**given** 45:25 48:12
  62:22 64:19
  72:12
**giving** 65:20 106:7
**go** 8:19 15:16
  20:13 24:20
  25:15 27:23 33:9
  34:17,18,23
  35:11 36:8 37:5
  37:23 42:23
  44:16 45:2,10,12
  50:8 53:10 56:21
  58:2,22,23 59:25
  60:3,25 64:14
  65:18 67:18,21
  68:21 70:22
  73:16 75:9 79:4
  86:21 87:3,8
  92:13,15 94:17
  95:4 96:2 101:1
  102:4,9 104:8,11
  104:20 107:12,16
**goal** 69:21
**goes** 65:1
**going** 3:24 7:22 9:1
  9:4 11:18 12:24
  20:6 22:16 23:22
  29:17,24 30:8
  33:21,21 34:1,2
  35:4 36:2,14
  37:23 38:13,15
  38:22 39:12 41:7
  44:13 49:8 53:8
  65:21 67:5 70:14
  71:7 76:8 77:16
  79:9 81:7 82:24
  86:15 89:6 91:5,6
  92:4 94:18 98:9
  99:16 103:22
  104:19,21,23
  109:2
**good** 4:11,16 35:20
  36:8 42:8 43:1
  49:15

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF PAUL JOHNSON
Page 6

gosh 7:19 8:3
  18:11 30:13
gotten 38:14 88:6
government 9:6
  20:11 30:2 33:6
GPS 93:15
grade 13:10,11
  31:16,16 45:20
  45:22,23
graded 12:17
  31:14
graduated 8:16
great 36:3 85:13
greatly 84:22
grew 7:14
group 11:24 12:14
  13:3 15:19,20,21
  16:11 17:2,6,8,11
  17:12,25 18:3
  20:2,14,15,19
  23:5,10 26:10,20
  27:4,12 31:8
  42:15 50:5 56:18
  59:24 70:1 79:18
  79:19 86:24 89:7
  90:22 91:7 92:13
  92:22 94:2,9,9
  99:17 106:6
groups 15:23
  17:16,17,18,20
  19:14 20:16,23
  20:25 22:25 23:4
  26:24 44:3 93:19
  93:21 94:1 96:19
group's 94:3
grow 7:13
growing 7:24
guard 79:8,11 80:3
guess 7:25 8:16
  15:13 16:13,15
  18:2 25:20 26:19
  27:10 32:16
  36:19 57:21
  58:15 59:3 63:19
  67:3 74:17 92:25
  93:3,20 94:4

107:10 108:10
guessing 16:16
gun 78:2,6

─────── H ───────
half 19:22
hand 46:25 54:21
handle 51:17,20,24
handled 51:18
hands 56:21 93:8
  93:13
happen 42:1 95:17
happened 52:3
  60:6
hard 4:3
hardship 24:19
harm 77:17
harming 76:10
head 31:25 55:12
heading 14:9
hear 40:24 105:18
heard 68:14
  100:25
hearing 5:8 10:4
  12:14,25 13:8,18
  13:19 14:9,23
  15:7 16:1,5,22
  20:9 29:4,11
  46:22 66:6 77:9
hearings 5:7 29:10
  29:11,18
held 22:12 100:18
hello 28:6,19
help 14:23 16:15
  30:16 66:22
helped 66:21
  101:23
helpful 33:1
helping 93:16
  106:11
hereto 3:13
hesitate 38:12
  104:3
hey 54:23
hide 67:22
hiding 89:4 90:4
hierarchy 16:16,17

high 7:24 69:23
higher 12:16 15:1
  45:23
hire 10:2 23:22
hired 10:7,9,25
  39:17 80:15,18
hiring 19:1,2,5
  21:16
hit 76:8 80:15,18
  81:11
HOD 13:11
holding 56:4
home 5:3 33:6,10
  33:21,24 34:1,2
  34:18,18 35:9,12
  35:12 36:2,8 37:5
  37:23 40:6
  107:12,16
honest 43:11
HOTS 65:25 66:8
  66:25 67:7,12,25
  73:25 95:14 98:4
hours 87:3 89:13
  89:14,16
house 4:15
Howell 31:3
how's 25:7
HPI 20:7
hundreds 47:13
Huntingdon 7:25
H-O-W-E-L-L
  31:3

─────── I ───────
idea 18:18 35:20
  36:3,8
identified 46:19
identify 90:1
illnesses 78:22,22
imbalance 94:5
immediately 8:13
  8:17 58:4
impression 90:3
improvement
  20:10
incident 32:4 74:3
  77:3 78:2,6 82:6

82:12 84:12 86:2
  99:15
incidents 106:24
include 45:5
incomplete 46:15
  49:25 50:20 89:5
  90:4
incompleted 50:11
increments 65:20
independent 29:9
INDEX 2:17
indicate 46:22
indicated 46:8
  48:18 106:14
individual 63:6
  84:2
information 24:23
  25:5,8,8 29:7
  55:10 67:12,12
  75:20,20 87:8
  98:25 99:21
  103:25 104:17
  108:11
initial 10:2 24:1
  79:15
initially 10:7 20:17
  66:8,8
initials 65:10 67:20
  68:2,4,9 72:24
initiating 23:24
input 25:3
instance 21:3
instruction 49:3
intention 81:25
interacting 106:9
interaction 77:19
interested 110:15
interrupting 38:2
intervene 63:13
interview 23:25
  24:2
introduced 3:12
investigate 77:5
  79:6 86:4,9
investigated 77:8
investigations 83:2

investigator 87:13
  87:18
invoices 29:8
involve 45:5
  105:11
involved 19:5
  22:14 23:23
  25:24 28:9 35:8
  41:20 48:8 55:1
  56:23 65:24
  83:23 84:14,23
  102:17 104:16
  105:1,12,13,14
  105:25 106:10,19
  107:2
involvement 25:12
  44:24 105:5
involving 81:1
  105:9
in-depth 92:12
  97:18
issue 11:17 42:25
  49:8 52:11,24
  53:5 71:16 81:5
  90:6
issued 65:15 70:4
issues 46:17 54:12
  54:13 56:3 90:20
Ivy 6:16,17

─────── J ───────
J 1:8 2:7
Jackson 82:2
James 2:7
January 38:21,22
JD 9:14
Jean 7:6
Jeannie 7:1,2,9
Jimmy 79:10,16,21
  82:13
job 12:6 38:18
  44:24 45:1
jobs 66:22
Johnson 1:5,17,19
  2:15,18,24 3:1,16
  3:22,24 4:14,18
  6:7,15 7:1,12

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.

DEPOSITION OF PAUL JOHNSON

7/11/2008

Page 7

9:15 10:8 26:2,6
27:11 28:20 32:4
38:22 39:23
40:11 41:14
42:12 43:12 44:7
44:8 46:4,7,8
48:16 51:16 52:8
53:13 54:15 55:5
57:10 58:11
60:15 69:11
74:19 83:3 85:17
86:17 87:22
90:13,16 92:8
100:18 101:10,13
103:20 110:4,7
110:18 111:2,8
**Johnson's** 47:20
63:15 72:24 74:5
**judge** 10:17,20
15:9,13,14 16:18
16:21,23,24
17:12 19:11
21:19 22:8,10
24:1,2,12,13 94:3
**judges** 15:24,25
17:12,14 22:12
23:9,9 29:5 56:18
56:20 60:4
**judge's** 21:13
23:19
**July** 1:22 11:12
14:16 110:6,16
**Juraldine** 2:3,3
3:22 42:7
**J-E-A-N-N-I-E** 7:4

**K**

**Karen** 51:16
**keep** 17:25 38:1
62:18 72:15
101:16
**keeping** 16:11 17:8
105:23
**Kelleher** 10:21
**Kelliher** 15:14
**kept** 16:10 61:5
62:14,15 63:6,12

64:4 65:1,8,11
**killed** 77:16
**kin** 110:13
**kind** 13:4 14:13,25
16:17 21:17
22:17,21 24:18
24:21 28:19
31:13 42:22 45:8
45:17 49:6 69:25
70:3 77:19,21
78:15 79:23,24
80:19 81:8 89:3
93:4,23,25 95:5
97:18 101:17
104:14 106:12
**kinds** 44:9 92:15
**knew** 10:17,18
39:4,12 81:19
**know** 4:4 7:17,20
8:15 12:20 14:4
14:15,21 16:9,12
17:7,23 18:16,19
19:18,18 20:10
20:14 21:16,18
21:19,20,21 22:4
22:15,17,18,19
23:3,9 24:2,11,15
24:22,25 25:7,7
25:11,23 26:9,11
26:19 28:6,18
29:2,16 32:13
34:7,25 35:14,17
36:3,6,13 37:13
37:13,16,19
38:11,12,16 39:4
39:5,7,10,15,16
39:17 40:3,7 41:9
41:24,25 42:2,25
43:22 44:7 45:12
45:22 46:2 47:3
48:4,5,24 49:2,2
49:7,19,21,23
50:6,9,25 51:1
52:12 53:4,22
54:18,20,22,23
55:2,5,10,17

56:17,22,24,25
57:18,20,24 58:3
58:3 59:8,10,16
60:8,10,11,11
61:2,7 62:16 63:3
63:10,11,12 64:1
64:2 65:12,13,13
65:17,21,22,23
66:20 67:5,10
68:18 69:15,15
69:22 70:2,14,17
70:25 71:6 72:9
72:18 73:11,20
73:21,22 74:9,14
74:16,22,23,25
75:1,3,11,22,25
75:25 76:15 78:6
78:13 79:2,22
80:8 81:2,9 82:18
83:4,6,7,10,10,19
84:3 85:7,13,15
85:20,22 86:5,6,7
86:8,10 87:10,14
88:1,3,16,19 89:2
89:8,12 90:3,18
90:18 91:1,2,3,6
91:8 92:14,17,17
93:25 95:1,11,13
95:21,23 96:3,16
97:1,2,14,20
98:12,15,18,19
98:24 99:5,8,9,14
99:15,22,23
100:11,16,24
101:11,15 102:10
102:12,20,25
103:2 104:3,21
105:20 106:1,7
106:11,23,24
107:2,9,22,25
108:9
**knowing** 91:4
**knowledge** 39:10
59:22 97:18
101:9
**K-E-L-L-E-H-E...**

10:21

**L**

**LA** 40:12
**labeled** 47:14
**lady** 30:19 31:2
80:4,7
**Lamar's** 74:6
**large** 1:20 3:3
52:15 72:17
88:13 110:5,19
**late** 34:8 76:13,18
**law** 2:3,4,11 8:8,12
9:4 84:6
**lawsuits** 4:1
**lead** 31:6,7 48:2
66:20,24 72:10
72:10 75:2
**leave** 17:24 25:18
25:24 42:3 53:8
60:15 77:11,12
77:13 101:8
107:19
**leaving** 63:10
**led** 101:14
**left** 5:10 7:24 10:14
12:11,19 15:15
18:16 22:24
30:10 63:6 70:16
82:2 103:4,7,12
103:14 107:22
**legal** 11:15 12:15
13:6 16:2 18:7
21:3 28:25 29:22
30:5,11,21 31:6,9
31:9,12,15 33:7
33:24 34:2,14
38:8 40:12 41:11
42:11 45:1,4,21
48:2,21 50:5 51:4
51:5,7,25 61:20
61:22,23,24
62:21 63:2,6
64:19 66:7,20,24
66:25 67:24 68:1
68:1,20,22 69:11
71:16,16 72:10

89:19 90:7 91:11
92:23 93:1,11
**legally** 16:9
**lengthy** 64:10
**lessen** 79:3
**letter** 88:8
**letters** 29:16,16
**let's** 4:12 5:1,19,24
6:3 8:10,22 15:16
24:5 25:2 32:1,15
32:21 38:22
41:11,14 44:16
61:22 67:11 72:2
76:12 86:10 93:1
94:17
**level** 31:14 101:25
**levels** 45:23
**liaison** 24:24
**License** 110:20
**licensed** 8:14
**lie** 90:20
**life** 7:23
**limitations** 63:10
**limits** 6:6
**line** 13:4 15:5,6,9
28:23 111:15
**lines** 23:5
**list** 38:17,20 39:1,8
39:11 40:7,13
41:22 42:4 49:10
49:11,12,14,17
52:20 54:6 59:11
59:17 60:8 65:2,8
65:8,19,22,24
67:1 72:23 73:7,8
73:12 88:20
89:15,22 91:10
95:19 100:2
102:2,3,6 103:20
103:21 104:6,21
**listed** 111:5
**listen** 37:17
**lists** 57:22,24 95:17
95:17,22 96:2,3
96:11,18 97:9,12
99:19,25

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF PAUL JOHNSON
Page 8

| | | | | |
|---|---|---|---|---|
| little 7:14 13:13 26:2 30:5,6,7 36:15,15 88:20 89:17 108:8 | lots 62:11 loudly 84:18 low 18:12 69:23 lower 31:14 lunch 77:14 Lynda 30:20 | Mark 10:21 marked 64:5 married 4:18,20 6:16 Mary 30:21,23,25 master 65:2 | 89:16 91:7,11,14 92:13 meetings 42:22 53:20 89:13,14 100:18 memo 71:6 | 100:22 101:4,5 102:1,4 103:25 104:4,6,6,7,9,15 Montgomery 1:21 2:5,9 5:10,17,18 |
| live 4:14 5:15 6:18 6:24 7:18 | | materials 35:11 | memories 61:2 | 5:21 6:1,3,7 8:1 |
| lived 7:22 | _____ M _____ | matter 43:24 85:16 | memory 108:8 | 10:4,17 11:4,9 |
| lives 5:25 | M 1:19 3:1 110:4 | 91:6 110:9 | mental 78:22 | 12:11 14:10 15:3 |
| living 6:24 | 110:18 | ma'am 10:3,3 | mentioned 26:1 | 18:9 19:13 22:24 |
| loan 79:20 | majority 59:18 | 11:11 12:21 14:2 | 69:7 71:24 | 28:13 45:19 |
| locate 48:10,11 88:14 | 64:24 88:17,17 105:1 | 14:6 21:5 27:22 28:14,23 33:19 | met 30:24 method 64:24 | 103:5,9 107:22 110:3 |
| located 11:3 74:5 | making 48:3 | 35:23 36:22 38:8 | MICHAEL 1:8 | Montgomery's |
| locating 64:16,16 | 105:15 | 39:2,12,22 47:23 | Middle 1:2 2:8 | 102:22 |
| Location 18:9 | Mallory 1:18 3:1 | 48:19 80:7 91:20 | 5:16 | month 14:15,17 |
| lock 62:18 | 110:4,18 | McAnnally 31:4,5 | mid-level 17:2 | 34:17,17 37:3,4,5 |
| locked 61:15,19 | man 80:15,18 | McWilliams 30:19 | 21:15 | 37:7,8,9 38:15,18 |
| 63:2 76:25 77:2 | 81:11 | 38:23 | military 9:8 | 39:13 40:5 41:13 |
| locking 35:10,12 | management 9:6 | mean 7:22 13:12 | Milton 7:1,11,12 | 50:10 56:1 60:19 |
| 62:17 76:25 | 16:18 19:8,9 22:9 | 17:10 19:9 21:1 | mind 92:17 | monthly 69:14 |
| logged 68:8 | 25:2 65:16 81:4 | 23:21 32:14 | minimal 25:12 | months 27:10 |
| long 4:22,25 10:13 | 93:15,19 94:7 | 36:19 37:22 40:4 | minutes 108:25 | 36:12,12 84:8 |
| 27:25 47:2 56:3 | 100:19 103:20 | 40:4 44:4,20 45:6 | miserable 35:25 | month's 39:7 |
| 64:7 | manager 16:19 | 54:20 55:3 58:14 | missing 48:21 | morning 84:17 |
| longer 49:15 | 17:2 25:9 39:5 | 59:10 60:2 61:7 | 49:18 52:13 | move 14:4 32:1 |
| longest 27:25 | 48:7 49:5,5 59:22 | 61:10,19 63:9 | 53:13 57:23 | 44:13 50:10,18 |
| 64:25 | 75:1 77:9 79:14 | 64:1 65:4 66:12 | 58:14,17 73:5,10 | 50:20 51:7 56:5 |
| long-term 105:4 | 79:15,17 87:10 | 66:15,15,19 | 81:1 82:12 86:5 | 78:24 83:4,4,8,17 |
| look 29:23 49:13 | 90:18 | 67:10,16 68:16 | 89:15 95:18 | 86:10 88:24 |
| 56:2 59:9,25 60:4 | managers 21:15 | 72:12 73:15 | 99:19,22 | 89:23 91:9 92:22 |
| 60:4 64:7 70:23 | 24:12 90:20,20 | 82:16 86:3 88:10 | Mississippi 4:15 | 100:3 |
| 70:23 73:17 | manipulate 67:16 | 89:3,13,15 93:8 | 4:23 5:5 7:17 | moved 9:22 13:20 |
| 85:24 87:4 94:17 | manipulated 67:13 | 94:5,10 95:13 | 22:23,23 23:1,2 | 13:21 47:16 |
| 96:10 99:20 | manner 3:13 48:12 | 101:22 103:24 | 23:14,16 24:7 | 48:13 49:16,17 |
| 106:11 | 67:23 88:7 | 104:16,17 | 25:3 82:3 | 51:25 52:15 54:1 |
| looked 103:17 | 110:15 | means 42:16 61:11 | misspoke 27:22 | 54:8 58:1,23 |
| 105:20 | man's 79:12 | 65:5 86:23 | mistakes 89:25 | 68:10 88:4,18 |
| looking 49:15 54:4 | March 5:1,3 7:18 | meant 27:2 | misunderstandi... | 102:14 104:12 |
| 54:6 55:2 59:16 | 36:25 37:1,12 | medical 29:6 | 89:8 | moves 68:18,19 |
| 72:19,20 73:4,15 | 38:3,14 39:25 | meet 42:20 | Monday 33:11 | moving 54:7 56:9 |
| 94:22 96:23 97:3 | 40:2,12,19,25 | meeting 22:18 | 52:23 72:3,3 | 68:7 77:3 83:15 |
| 97:4,6,6,7 102:2 | 41:6,13,13,15 | 32:13,19,20,23 | 82:15 | 90:11 |
| 102:12 104:1 | 46:14 55:9,25 | 34:12,13 42:15 | money 30:2 | multiple 105:2 |
| lot 18:22 42:21 | 60:15 64:15 | 42:15,22 43:5,14 | Monique 31:11,11 | M-O-N-I-Q-U-E |
| 81:19 87:25 | 96:17 103:12 | 43:19,23 60:23 | 31:12,16,17 | 31:18 |
| 88:10 105:22 | 107:24,25 | | | _____ N _____ |

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF PAUL JOHNSON

Page 9

**name** 3:22 4:13,14
7:6,10 10:21
79:12 80:5 84:4
**named** 6:6 31:2
79:16
**names** 7:1 30:16
96:13
**national** 20:6
**nature** 21:7
**near** 24:21
**necessarily** 48:6
57:5 59:14 66:16
87:11
**need** 3:5 4:5 53:7
57:19 71:11
78:23 83:16,17
83:17
**needed** 35:3,4 58:5
81:3,4 92:16
**neither** 96:16
110:13
**never** 14:8 33:14
50:20 51:4,5
68:14 69:6 71:21
75:11 80:18
83:13 86:1,1
88:14 90:1 95:18
97:5 100:20,25
107:3
**nickname** 7:3,5
**nine** 6:13
**nonselection** 36:1
**non-attorney** 45:8
**normally** 96:15
**North** 2:4 9:23
10:1,5,6
**NORTHERN** 1:3
**NOTARY** 111:13
**note** 54:3
**notes** 71:6 81:17
87:6,7,10,12
**notified** 43:4 53:12
**number** 7:23 30:13
35:14 55:1,4 56:8
85:14,18,19
88:13 110:20

**numbers** 52:15
54:21 56:2 69:8
69:10 72:17
96:14
**numerous** 61:24

**O**

**object** 25:20 43:7
50:24 51:22 52:9
53:16 55:7 56:16
57:11 58:12 59:7
61:6 62:1,23 63:8
63:17,21 64:8
67:9,15 68:5,23
69:5 71:18 73:1,9
74:8 78:5 93:5,22
95:10 98:21,23
100:9,15 103:23
106:17
**Objection** 43:17
43:25 46:11
50:13 98:11
**objections** 3:4,5
**observation** 101:8
**obvious** 60:5
**obviously** 71:10
84:19 108:20
**occasion** 42:21
51:20,24
**occasionally** 17:24
49:19
**occur** 52:11
**October** 86:14,22
87:20 91:24
96:16
**odd** 56:6 80:9
**offer** 78:24 83:8
**offered** 3:7 10:18
83:4
**office** 1:21 2:8,12
5:7,8 10:4 12:14
12:25 13:8,19
14:9,21,22,23
15:7,23 16:22
17:3 18:16 20:7
20:21 23:7 24:17
24:25 25:6,16

33:10 35:2,25
36:5 47:15 48:4
53:6 57:1 60:4
61:13 65:1 66:6
69:22 74:6,13
78:17 79:20
105:15
**officer** 13:18 22:9
24:24
**OFFICES** 2:3
**office's** 74:25
**official** 26:12 95:3
103:6
**officially** 12:10
14:21 26:19
103:12,14
**Off-the-record**
101:3
**oftentimes** 25:6
**oh** 5:23 8:3 19:7
27:7,17 64:11
85:10 91:11,19
91:25 106:22
**okay** 4:11,11,17,20
4:22 5:5,9,13 6:8
6:12,14,14,17,23
7:5,7,10,12,21
8:2,4,7,9,18 9:7
9:15,21,21 10:10
10:13,23,25
11:23 12:3,3,7,10
12:18 13:5,22,25
14:3,13,18 15:8
15:11,16 16:6,15
16:16,20,25
18:14,25 19:4,9
19:12,12,16,20
20:4,12,23 21:23
22:1,7,11,13,18
22:22 23:11,16
25:10,13,19,19
26:1,14,16,19
27:7,10 28:3,20
29:1 30:11 31:1
31:19,23 32:1,2,3
32:22 36:14,23

37:1,11 38:5,10
38:17 39:3,9 40:8
40:22 41:3,8,19
41:23 42:6 43:4
43:12 44:13,17
44:21 45:15,18
45:25 46:13,23
47:5,8 48:14,16
48:20,23 50:5
51:3,3,10,14
53:21 54:11,14
57:8,13,15 58:23
59:3,24 60:14
61:4,9,18 62:4,6
62:9,13 63:5
64:11,11,19 65:6
65:15,25 66:3,7
66:11,14,24 67:7
68:13,15,15,20
69:9,13,20,24
70:9,12,19 73:14
73:18 74:18
75:24 76:5,12,12
76:21 78:7,8,8
82:10 83:13
84:16 85:4 86:10
86:12 87:1,21
88:23 90:13,25
92:2,22 93:15,18
94:11,14,14,17
95:15,20 96:5,21
97:13,19 98:14
99:1,6,12 100:1
100:17,17,22
101:8,12,12,18
101:21 102:3,7
102:15,18,18,21
102:24 103:1,8,8
103:13,16,18,18
104:2,5 106:14
106:20 107:1,11
107:21,25 108:12
109:4
**old** 26:25 65:12
**older** 54:7
**oldest** 65:7

**once** 13:25 43:4
88:18 107:11
**ones** 56:14 65:14
94:22 104:10
**one-day** 14:17
**one-on-one** 42:21
106:12
**ongoing** 47:2
**ongoings** 43:5
**open** 11:20 33:16
58:22 65:11
88:19
**opportunity** 33:5
**opposed** 11:21
23:9 86:24
**options** 83:18
**order** 40:10 88:5
**ordered** 88:7
**ordering** 16:3 29:5
89:10
**organized** 19:13
20:16
**outcome** 43:6,23
44:3,5 77:7
**outskirts** 6:19
**owing** 30:2
**o'clock** 53:7

**P**

**page** 87:5,6 111:15
**pages** 110:9 111:4
**paid** 13:23 14:6
15:1 16:12
107:16,20
**Pam** 51:19
**paper** 54:22
**paperwork** 35:7
35:16
**paralegals** 16:7
20:18 23:8 27:3,8
**pardon** 51:23
**parents** 6:24
**park** 77:17 78:12
**parked** 78:17
**part** 22:5 31:15
38:7 82:21,22
85:12 87:14,17

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF PAUL JOHNSON
Page 10

105:1 108:7
participate 33:15
  35:15
participating 38:4
particular 32:3
  42:12 49:13,16
  73:16 104:1,8,22
particularly 12:24
  55:24 59:20
  104:18
parties 2:23 3:11
  83:22 110:12,14
party 3:13
passed 34:6
passes 62:11
password 67:17
  68:1,21
Paul 1:17 2:18,24
  3:16 4:14 14:19
  14:22 17:1 34:8
  34:10,11 35:18
  36:6 37:12,24
  38:25 41:18
  79:20 82:4,18
  96:18,24 99:4,4
  105:24 106:5
  110:7 111:2,8
Paul's 14:19
pay 11:18 15:2
paying 29:9
pending 56:19
  64:25
people 13:6,9 16:3
  16:5 17:8,24
  18:22 29:20
  30:15 37:17
  38:17 42:2 49:18
  62:11 67:4 72:16
  74:22 75:14,15
  76:10,16 78:21
  85:10,15,22
  90:11,14,23
  92:14 99:20
  106:9
percent 21:18
perfectly 91:8

performing 45:24
period 14:25 15:22
  17:4 26:15 28:22
  33:16 40:16
  49:21 54:25
  63:25 64:10
  65:19 70:3,3
  76:18
permanent 12:6
  39:16
person 26:25 39:5
  42:4 49:10 52:4
  54:6,9 59:11,21
  62:2,7,25 68:3
  77:20 78:14
  80:20 90:1,17
  98:13 99:21,22
  101:9
personal 39:10
  74:24 75:1 76:25
  101:9
pertaining 3:25
physical 78:15,22
  79:24
physically 5:3
  13:20,21 20:20
  46:25 52:21
  53:10 59:25 60:3
  63:14 67:4 68:3
  73:17 75:23 76:9
  88:14 97:2
pick 58:22
picking 71:1,1
picture 77:24,24
  77:25 80:2 81:22
pictures 81:20
piece 54:21 88:3
PIN 67:17
place 20:19 42:8
  50:1 73:25 78:19
  95:23 96:1,9
placed 40:11
places 7:23
plaintiff 1:6 2:2
  3:23
plans 42:2

point 18:22 20:22
  23:19 26:3,24
  30:14,20,21 31:2
  34:16 35:20 39:6
  39:16 46:4 49:2
  60:17,25 87:18
  89:17,24 92:17
  92:18 97:7,11
  101:6 104:18
police 76:7 77:4,11
policy 78:17 89:3
  92:21
position 5:11 10:8
  10:11,12 11:5
  12:5,17 13:8 36:1
  37:16 45:4,21
  95:18 101:25
positions 16:2
possible 41:21
  66:17 108:23
post 9:12 94:4
post-it 54:3 87:7
potential 71:1
powers 21:15
practice 75:6
  104:14
practicing 8:12
  22:10
Prattville 6:1,18
  6:19
pre 88:17,18 89:9
  90:11 94:4
prehearing 60:10
  60:12 89:9
prelaw 9:1
preparation 29:15
prepare 16:4
prepared 46:22
  69:16
preparing 16:3
  29:4,8 96:19
present 2:14 75:20
pressed 67:5
pretty 4:2 25:11
  56:9 60:5 70:1
  92:12 106:3

primarily 16:1
primary 15:22
  28:4 29:3,14
  42:16 44:22
print 52:20 54:17
  54:18 56:19 59:2
  65:8
printed 73:12
  95:12
priority 30:3
privacy 74:24
private 77:10
probably 18:2,19
  18:21 28:6 29:8
  75:16 89:16 92:6
  93:14 94:14
  107:9
problem 34:7,22
  46:24 48:9,15
  49:1,6,9 50:2
  52:12,14 55:20
  59:15 83:12
  90:24 92:10 96:6
  102:10 106:8
problems 44:15
  46:12 47:20
  64:12 75:18
  87:25 88:2 90:10
  92:15 103:21
Procedure 2:25 3:9
  3:14
proceeding 99:2
process 20:9 96:19
  102:17 104:17
  106:15,25 107:14
  108:1
processes 23:4
processing 59:1
  75:21 95:24
  96:10,12 97:3
production 56:2
  69:8,10
productive 72:10
program 9:19
  28:11 33:9,13
  34:5,8,19 35:3,5

35:7,15 36:10,12
  36:18 38:7 59:1
  95:24 96:10 97:4
programs 75:21
progressed 11:10
progressive 106:24
promote 21:10
  22:20,20 23:17
promoted 20:17
  27:1 31:6
promoting 21:16
promotion 5:9,11
  11:13 12:4
properly 57:4
proposals 24:11
provide 86:17
provided 3:8,14
  55:11
provisions 39:19
provocative 81:24
proximity 79:1
public 8:23 45:6,7
  61:7,8,11 75:5,8
  111:13
pull 70:17
pulled 69:16 86:23
  87:2
pulling 29:4 46:17
  72:20
purpose 3:8
pursuant 1:18 2:24
put 44:7 47:14
  49:21 52:20,22
  53:10 54:3 56:21
  62:20 63:14
  66:24 68:3,9 76:8
  85:2 87:5 91:17
  95:22
putting 98:6
p.m 109:7

_____
          Q
question 4:4 18:2
  21:9 43:8,10
  44:14 55:10
  58:13,15 59:3
  72:13 74:17 85:8

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.
DEPOSITION OF PAUL JOHNSON

93:6 94:13,15 100:5,13
**questioning** 99:4
**questions** 3:4,5,25 16:10 42:10 44:15 58:7 77:19 87:19 109:5
**quickly** 54:8 56:9
**quite** 7:23 15:17 22:25 23:4 35:7 35:24 75:16 80:9 80:9

**R**

**Raleigh** 9:23 10:1 10:2,13,14
**ran** 70:16 71:25 72:23 73:11
**rate** 15:1
**reached** 92:20
**read** 111:3
**readily** 25:9 69:17
**reading** 68:17 98:3
**ready** 51:8 52:1,2
**ready-to-hear** 47:16 50:12 58:2
**ready-to-schedule** 50:11
**real** 72:1
**reality** 53:5
**really** 4:2 12:19 19:17 20:16 22:4 26:21 28:11,16 42:21 54:13 55:20 71:21 72:19 75:13 78:25 93:6 94:12 95:11 99:7 106:6
**Reams** 14:11,14,19 15:5 17:1 18:17 19:10,11 21:13 22:2 32:5,17 34:8 41:18 43:4,13,22 43:24 79:20 82:4 96:18 98:17 105:24
**reason** 25:23,25

38:11 40:14 71:15,19 75:3 99:3 103:10 104:3 111:15
**reasons** 35:9 42:3 75:2 78:18
**recall** 17:22 21:12 32:4 34:6 40:3,10 41:24 43:12 47:25 52:17 60:20 65:19 71:23 78:15 84:1 84:11 86:13 104:24 108:3
**receive** 44:10
**received** 8:21 51:15 86:19
**receiving** 25:6 29:21,25
**receptionist** 34:16 38:6 39:17 40:11 44:16,18,19,22 45:12,17,19 46:1 46:5
**recess** 43:3 109:1
**recognize** 95:2,12
**recollection** 27:15 103:13
**recommend** 106:18
**recommendation** 25:14,15 107:5 107:12,15
**recommendations** 22:2
**record** 7:8 68:25 75:22 87:15 101:2
**recorded** 100:20
**records** 29:6
**redetermine** 36:13
**reemphasize** 42:18
**reference** 108:14
**referring** 56:13 58:10 61:4 93:24 97:10

**reflect** 67:20 79:23
**reflected** 46:20 97:11
**reflecting** 52:16
**regard** 87:22
**regarding** 43:24
**regional** 14:21 24:17,24 25:16 35:2
**rehire** 18:24
**related** 6:4 36:1 75:8 77:1 81:2
**relating** 34:22
**relation** 75:18
**relative** 24:20 25:18
**relatives** 5:15,19 5:20,21,22
**relax** 36:4
**release** 75:7
**remember** 8:11 14:24 15:15 18:16 19:3,21 21:14 26:7 27:19 28:8,18 29:22 30:10,15,18 32:2 33:11,15,25 34:24 36:24 40:15,17,20 41:2 41:4,5,20,22 42:5 52:11 55:9,11 60:16 62:16 64:3 64:15 66:4 69:2 70:7 72:9 73:25 74:14,15,18 76:19 77:25 79:12 81:17,18 83:14 84:14,22 85:1,6,12 87:17 91:22 96:8 98:4 103:3 105:23 107:6,14
**remind** 39:5
**remotely** 81:23
**reorganization** 20:6,13 26:8 28:9

**rephrase** 4:4
**replace** 21:10 23:17
**report** 55:11 77:4 82:6 85:3
**reported** 15:12 28:21 110:7
**Reporter** 1:19 3:2 110:4,18
**reporters** 29:12
**REPORTER'S** 110:1
**reports** 69:14 108:9
**represent** 3:23
**representatives** 29:17 45:8
**representing** 2:23 3:11
**represents** 33:7
**reprimand** 91:2 96:20
**reprimanded** 51:1 52:4,7
**reprimands** 105:3
**request** 25:15,15 72:4
**requesting** 75:6
**requirements** 35:15
**reserved** 3:6
**respond** 59:5
**response** 57:15 76:24 77:20 81:3 83:11 88:22 89:1 99:13
**responses** 99:10
**responsibilities** 15:18
**responsibility** 12:17 18:4 65:16
**rested** 21:22
**result** 43:6
**results** 110:15
**resumes** 23:24,25
**retire** 18:22

**retired** 10:24 15:14 79:13
**review** 23:25 24:1
**reviews** 69:25
**reward** 37:14
**re-enroll** 33:17
**Richard** 2:10
**Ridgeland** 4:15
**right** 9:7 13:21 19:23 21:2 26:1 27:20 28:17 32:25 39:14,18 43:20,20 52:3,5,6 61:10,16 63:23 65:22 66:19 74:24 76:14 80:16 82:3 84:9 84:11,11 90:21 92:1,5 94:16 97:22 108:1
**rigid** 23:5
**room** 77:10
**Rosemary** 31:3
**rotate** 93:10
**rotating** 38:9
**rotation** 34:15
**routine** 47:24
**routinely** 94:8
**RTH** 58:3 59:18 60:8 68:8 86:25
**RTS** 58:3
**Rules** 2:25 3:9,14
**ruling** 3:6
**run** 60:9 73:7 102:1,2
**rural** 6:25 7:14

**S**

**safety** 78:18
**SAITH** 109:9
**saved** 96:2
**saw** 47:9 69:6 88:2
**saying** 11:18 13:16 28:6,18 40:17 41:14 42:20 47:19 51:4 52:3 59:24 62:7 78:10

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                                        7/11/2008
DEPOSITION OF PAUL JOHNSON
Page 12

85:10,17 90:15
90:21 97:15,20
97:23,24 106:15
107:4
**says** 33:8 60:10
**schedule** 70:11
**scheduled** 29:18
39:23 40:1,13,13
40:25 41:12
**scheduling** 56:21
88:9,10
**school** 7:19,24 8:8
9:4
**schools** 9:10
**Science** 8:23
**scrapbooks** 81:21
**screen** 54:18 97:10
**search** 55:17 59:13
59:21 60:3 72:24
95:25 99:20
**searched** 96:10
**searching** 49:3,10
57:5,6 60:9
**second** 15:9 99:21
**secondary** 28:5
**sections** 47:14
**secure** 35:11 67:7
67:23
**secured** 61:5,11
63:5
**security** 1:9 2:11
5:6 9:16,17,22
35:9 54:21 79:8
79:11 96:14
102:19
**see** 5:1,24 8:10,22
29:13 50:4 54:19
59:1 65:11 68:24
79:4,8 83:16,16
83:17,21 89:7
96:11 99:22
102:5,5,8,9 104:8
104:10,11 106:13
**seen** 24:18 54:23
**sell** 28:11
**semantics** 36:20

**send** 24:22,23
25:14 54:15
**senior** 11:13,22
12:24 13:9,11
19:8,9 22:9 29:3
101:24
**seniormost** 16:19
**sense** 13:12 17:15
23:12 40:10
66:15
**sent** 29:16 42:16
55:9 91:7 108:19
**series** 77:18
**serious** 91:6
**served** 28:10 37:24
**set** 19:18 22:23
33:11 60:23
110:12
**setup** 22:24
**sheet** 54:16 81:1,5
81:7 82:12 88:21
**sheets** 57:24
**she'd** 57:19 102:6
**short** 30:7 42:8
94:18 101:7
**shorter** 89:17
**shortly** 46:4
**short-term** 105:4
**shot** 106:7
**shoulder** 66:13
**show** 35:10 54:1
57:25 75:11
104:20
**showed** 59:11
**shrank** 18:15
**sick** 14:19 42:2
**side** 78:24 83:20
**sign** 36:11 65:10
**signature** 11:16,18
111:1
**significance** 85:2
**significant** 55:1,3
87:21 88:12
**similar** 22:23
**Simmons** 30:20
**simplist** 16:13

**simply** 18:23 24:22
25:14 38:16
49:25 52:25 54:8
54:20 59:1 60:6
65:8 72:21 75:19
82:11
**single** 4:19,21
**sit** 37:16
**sitting** 52:25 66:16
66:23 73:16
**situation** 25:18
41:25 51:25
52:17 53:1
**six** 30:15 36:11,12
53:7 59:17 102:8
**size** 17:23
**skill** 45:23
**skills** 67:16
**skipping** 65:12
**slowly** 23:3
**Social** 1:9 2:11 5:6
9:16,16,22 54:21
96:13 102:19
**somebody** 17:25
25:24 76:2 84:20
**son** 6:9,10
**sorry** 27:18,22
38:1 40:15 47:22
50:8 63:24 73:20
79:12 84:3 93:7
93:15 103:3
107:6 108:5
**sort** 6:18 7:3 9:1
12:8 26:11 28:5
30:3 31:14 37:16
42:1 47:2 63:11
64:23 70:25 80:8
85:14 104:13
**sorts** 5:9
**so-and-so's** 54:24
**speak** 3:17 4:3
43:18 45:6 84:24
110:8
**specialized** 45:17
**specific** 47:17 48:1
57:6 62:5 76:19

91:8 93:7 98:19
**specifics** 75:13
**speculate** 36:6
**speculating** 92:18
97:22 98:9
**Spell** 7:2
**spelled** 10:22
**spend** 106:12
**spent** 15:16 87:3
**spoke** 59:9
**spoken** 77:21
81:15
**spokesman** 28:10
**spot** 13:20
**spotted** 51:12
**spring** 27:4 76:13
76:18 108:3
**stacked** 62:18
**staff** 10:25 13:7
15:25 18:13
23:23 27:6 33:8
34:12,13 42:15
49:3,4,8 56:23
59:20 71:6 81:6
103:25 104:16
**stand** 20:8 66:12
**standard** 75:6
**standing** 85:6
**standpoint** 12:15
**start** 4:12 5:19 6:3
13:9 26:5 35:8
82:11
**started** 9:25 27:15
56:7,8 102:12
108:1
**starting** 46:12
59:21
**state** 1:20 3:2
24:20 110:2,5,19
**stated** 71:3 72:23
**statement** 85:18
87:17
**statements** 80:25
**States** 1:1,20 2:7,8
**Statesville** 7:15
**stating** 56:11

**statistical** 25:5
**status** 46:21,21,21
47:16 48:13,13
49:13 50:21
52:16 54:10 58:1
58:2 59:18 60:8
60:11,12 65:3,5
67:6 68:19,24
88:5,17,24 89:23
90:11 91:10
102:14 104:13
**statuses** 56:20,20
56:21 57:3
**stay** 10:13 36:10
107:12
**stayed** 12:4,19
**step** 14:20,21 15:2
106:25
**stick** 70:18,20
**stipulated** 2:22
3:10
**stipulation** 1:18
**STIPULATIONS**
2:21
**stolen** 86:3
**stop** 43:2
**Straight** 24:13
**strange** 95:23 96:9
**street** 1:21 2:4,9,12
28:5
**strictly** 19:8 67:1
**strike** 55:14 58:8
61:21
**structure** 22:21
**struggle** 48:6
**struggling** 104:19
**stuck** 96:9
**student** 84:6,10,11
84:21
**stuff** 53:8 81:21
98:15 103:17
105:12,13,14,20
**subdivided** 20:25
**submit** 77:13
**submitted** 87:13
**SUBSCRIBED**

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF PAUL JOHNSON

Page 13

111:10
**substantially**
  17:20
**substituting** 41:16
**subtract** 17:25
**sufficient** 16:9
**suggested** 79:2
  83:3
**summaries** 29:20
**summary** 52:21
  57:24 88:21
  89:22
**summer** 5:2 12:9
  73:24 76:4,12
  103:11 108:3
**supervise** 13:3,11
  16:8 27:5 30:12
  44:19 99:18
  101:5 104:25
**supervised** 16:5,23
  17:10 27:2,11
  31:2,3
**supervising** 12:11
  12:18 13:6,9
  15:17,19 20:18
  26:2,6,20 27:12
  27:12 59:25
  90:14,23
**supervision** 31:22
  90:16
**supervisor** 11:25
  12:14 13:4,4
  14:12 15:4,5,10
  15:20,21 17:11
  17:13,15 20:1
  28:23 31:8 43:18
  47:10 74:7 79:18
  79:19 82:8
  105:24
**supervisors** 17:3,7
**supervisory** 11:21
  11:25 12:16,25
  13:2 26:25 27:2
**support** 13:7 17:14
  23:23 24:23 27:5
  33:8 49:7 56:23

59:20
**supporting** 15:25
**supposed** 36:11
  54:2 57:3 59:12
  88:5
**sure** 16:8,12 19:1
  21:9 27:21 30:14
  31:4 32:12 39:6
  40:24 43:10 44:1
  48:22 57:2 69:3
  69:12 72:1,9
  92:25 94:12
  101:20
**suspension** 91:2
  105:4
**suspensions** 105:4
**suspicious** 58:4
**switch** 38:14
**switching** 92:25
**sworn** 3:17 110:8
  111:10
**synopsis** 29:24
**system** 20:2,14,19
  27:1,4 47:11
  54:18 57:25 60:7
  66:2,5,6 67:7,8
  67:19 69:2 73:13
  73:24
**systems** 25:8

————————
**T**
**take** 4:5 23:24
  24:21 29:23
  36:16 42:8 56:18
  59:12 60:15
  81:22 94:8,18
  104:6 108:24
**taken** 1:17 2:24 3:1
  4:7,7 51:13 52:21
  77:23 81:7 106:2
**takes** 13:10
**talk** 4:2 32:15,19
  34:9 43:14 53:23
  70:1 89:7
**talked** 32:17 34:11
  44:7 79:7,7,9,14
  80:3,3,3,4,23

83:10 89:18 90:1
**talking** 17:4 32:8
  33:23 36:20
  45:22 46:17
  49:24 54:14,19
  56:11 63:23
  76:18 77:3 78:3,3
  80:7 82:1 84:12
  84:18,20 85:5
  93:12 95:13
  100:16
**talks** 82:12
**Tamika** 83:24 84:1
  84:7,13,20 85:5
**tampered** 75:12
  86:3
**tampering** 74:20
**tape-recorded**
  100:19
**technical** 9:10
**technician** 29:3
  31:7 101:24
**telephone** 44:23
  45:7
**tell** 6:3 11:10 15:18
  16:16 21:13
  32:11 35:25 45:2
  46:16 50:17
  53:18 59:8 60:6
  62:6,19 63:13
  69:18 76:5 77:7
  81:11 92:13
  94:23 96:23
  99:13,24 104:21
  106:21
**telling** 38:3 40:24
  81:17 91:5
**temporarily** 15:2
**temporary** 5:2
  39:20 79:19
**ten** 63:19 65:21
  70:23,23 72:15
**tend** 4:2
**tended** 18:22
**tenure** 27:14
**term** 62:5 100:25

**terminal** 9:12
**terminate** 24:11
**terminated** 24:6,10
  102:22 103:1,4
  103:14,19 104:24
  105:6 107:3
**termination**
  106:15,18,25
  107:15
**terms** 12:6 16:18
  20:14 23:5 31:22
  45:9 48:6 50:4
  58:4 63:12 64:13
  67:23 79:1 95:14
  99:19
**testified** 3:19
**Thank** 101:5
**therefor** 111:15
**thereof** 110:15
**Thigpen** 15:13
  17:12 19:11,11
  22:8
**thing** 9:2 14:17
  21:17 24:5,21
  39:16 54:5 63:11
  70:3 71:22 78:2
  79:21 81:8,14
  88:12 91:4 98:20
  101:17 104:13
**things** 28:19 29:5
  29:10 41:25 44:9
  47:9 50:18 58:16
  62:12 89:19
  99:14 105:16
**think** 5:21 6:5 8:23
  10:22 17:4,5 20:7
  20:9 21:22 25:17
  25:17 26:8,10
  27:24 28:7,8 29:2
  29:7,11,19 30:3,9
  30:9,24 31:4,7,12
  31:13,15,18,24
  33:1,16 34:15,23
  34:25 35:13 36:5
  36:9 40:18,24
  42:3,4 47:6 48:7

50:17 51:19
  52:10 55:18
  57:20 58:2 60:17
  60:23,25 64:5
  65:20 66:6 68:12
  76:1,15 77:12,15
  77:24 80:17 81:5
  81:9 82:15,21,22
  84:8,13 85:5,9
  86:22 88:7,16
  89:6 91:15 92:19
  94:21 97:8,9,15
  97:16 100:1,3,4
  102:20 103:6,6
  103:15 105:3,21
  105:24 107:21
  108:2 109:2
**thinking** 58:4 84:5
**third** 41:6 99:21
**thought** 11:24
  35:19,19 36:2,3,7
  36:8 58:16 59:15
  77:23 78:7 80:17
  81:3,6,10 83:19
  84:19 92:19
  95:21 96:7
**threatening** 78:1
  79:9 105:16
**threats** 79:24
**three** 15:24 17:5
  17:16,17 19:21
  33:10 34:1 89:16
**three-month** 70:2
**Thursday** 34:23
  71:14
**time** 3:6,7 10:20
  11:8,20 13:1
  14:24,25 15:13
  15:17,22 16:11
  17:4,6,22 18:15
  19:15 20:5,20
  28:1,22 29:7,19
  30:13,20 31:4,5,8
  33:23 39:21
  40:16 41:10
  42:23 43:1 45:19

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF PAUL JOHNSON
Page 14

52:19 53:6,25
54:4,25 56:12,12
57:18,19 58:21
59:13,16,18
60:20,24 62:22
63:25 64:1,10,12
65:20,21 68:25
70:5,21 71:5
72:15,16 76:18
76:20,22 79:19
81:1,4,7 82:12
85:9 92:7 99:23
101:7 102:11,12
103:7 104:1
105:23 106:3,12
107:6,15
**timeliness** 88:3
**timely** 88:7
**times** 30:7 33:14
54:20,22 56:5
57:19 60:23
63:24 64:14
85:14,18,19
**title** 12:6,13,20,22
13:17,23,25
31:13
**titles** 29:3
**today** 3:24 91:5
**told** 26:21 33:22
34:7,13,20,24
35:18,19 36:7,9
37:13 50:20
58:16 65:7 70:15
71:7 75:15 77:12
78:13 79:21 81:8
81:10,18,21
88:23 89:2,5,7
90:2 91:3
**tolerate** 79:25
81:12
**top** 31:24 55:12
65:8
**town** 42:3
**tracked** 63:4
**tracking** 35:8
47:11 54:18

57:25 60:7 66:2,6
73:13,23
**Traff** 30:22,23
**train** 16:9
**training** 45:17
**transcript** 111:3
**transcription**
110:10 111:6
**transfer** 10:18
18:23 25:3
**transferred** 14:1
24:6
**transfers** 24:16,18
24:19
**transmittal** 54:1
54:16
**trial** 3:12
**tried** 60:23 70:18
96:14 106:7
**trouble** 53:23 64:9
64:16 74:15
**troubleshooter**
60:2
**true** 110:10 111:5
**truth** 3:18,18,18
110:8
**try** 17:25 63:13
77:17 91:1
**trying** 4:2 6:5 21:2
25:17 27:24
28:11 29:22
37:14 40:10,23
42:18 64:13
69:21 70:20
77:16 96:6 97:7
98:2,10,18,20
101:1 104:19
106:6,12
**Tuesday** 33:11
72:3 82:16
**turn** 72:21
**turned** 82:8,18
87:11 91:18,20
**Tuscaloosa** 8:8
9:20
**twice** 33:8

**two** 5:24 19:3
20:21 22:6 33:22
33:25 34:1,10,10
34:18 36:16 37:4
37:5,25 40:6,6
43:16 49:14
50:25 60:9 81:13
99:10 105:3
**type** 9:2,6 10:4
13:7 23:23 27:6
28:10 30:4 31:9
45:5,21 47:16
49:20 53:1 54:12
60:10 66:5 68:11
87:25 88:2,6,11
90:5 91:4 107:22
**typed** 50:7 51:6
59:2
**typical** 88:11
**typically** 34:2 70:7
71:3
**typing** 66:17
**T-R-A-F-F** 30:24

**U**

**Uh-huh** 4:24 17:17
26:4 31:18 70:6
72:5 73:6 79:7
**uncomfortable**
36:5 75:14 76:24
85:21
**understand** 4:3
9:24 16:15 19:12
33:22 43:10
50:16 89:12
90:21 92:3 93:6
96:1 100:6
**understood** 92:20
**unexpected** 41:25
**unhappy** 35:21
**unheard** 48:25
**union** 33:6
**unique** 52:14
67:18
**United** 1:1,20 2:7,8
**unusual** 48:5 52:13
54:25 71:8,9,22

85:15 93:12
**UNWK** 65:3
**unworked** 64:20
64:20 65:5
**upset** 80:10,10
81:9,12 84:19
**use** 41:12
**usual** 54:5 56:9
75:3 87:25 88:2
**usually** 14:17 49:9
49:17 55:16 58:1
59:9 60:6 66:10
71:12 87:3 102:1
102:6,11

**V**

**variations** 13:1
96:14
**various** 42:3 83:22
96:14
**vast** 59:18 64:24
104:25
**verbal** 78:16 79:24
**versus** 47:12 99:8
**vocal** 81:6
**vocational** 29:11
**vs** 1:7

**W**

**waive** 35:4
**want** 4:15 22:20
24:20 25:6,23
30:16 32:12 35:6
36:13 49:6 50:15
57:2 70:21,21
78:18 81:23
94:19 98:9
100:24
**wanted** 25:21
33:21 34:14,23
35:1 36:9 40:6
42:19 77:11 79:3
83:18
**wants** 25:24
**warned** 91:3
**Warner** 80:5,22
83:9,15

**warnings** 105:2,3
**wasn't** 18:2 19:5,5
22:17 33:24 52:2
52:25 55:2 56:9
57:5 58:4,14
63:25 70:13 71:4
72:13 74:1 75:19
80:11 88:22 92:3
98:16 104:15
105:11
**Watkins** 83:24
84:1,12
**way** 12:5 43:15
44:6 63:5 65:13
75:17 83:19
92:24 93:1
**Wayne** 6:15
**ways** 106:10
**Wednesday** 33:11
**week** 33:2,25 40:18
40:20,20 41:6,15
60:16,18 64:2
102:4
**weeks** 14:4 56:5
**went** 7:24 8:5,8,16
11:11 14:22
18:21 42:4 43:16
46:14 67:25 77:9
77:14 89:13,14
103:11
**weren't** 20:2 28:12
48:17 50:3,3,6
64:17 65:2,12
74:1 78:25 88:9
90:11 99:9
**We'll** 92:22 100:3
**we're** 11:18 17:4
24:2 36:19 54:14
61:4 63:23 76:18
93:12 94:18,18
**whatnot** 43:5 93:4
**whatsoever** 25:3
**what-have-you**
32:6
**wife** 6:16
**witness** 3:17

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF PAUL JOHNSON

110:11 111:1
**wonderful** 30:17
**Woodson** 1:17
  2:18,24 3:16 4:14
  110:7 111:2,8
**word** 58:25,25
  61:10 75:21
  95:24 96:10,12
  97:3 99:8 101:19
**wording** 93:10
**words** 93:14,17
**word-for-word**
  81:18
**work** 5:6,7 8:17
  10:19 12:8 14:20
  22:14 24:9 33:5,9
  33:10 34:18 35:1
  36:20 38:6 39:23
  40:1,14,25 41:12
  45:3,9 46:15
  50:11,21 52:16
  52:19,24 53:9
  61:22,23,24 62:3
  64:24 67:25
  70:17 71:2,11,24
  71:25 72:14
  74:20,25 75:1,16
  75:17,22 76:2
  77:1 88:24 89:5
  89:21 90:4 92:16
  92:23 93:10,10
  93:19,21,23,25
  94:1,1,2,8 95:2,6
**worked** 8:19 14:9
  30:21 34:21
  36:17,24 37:6,8
  38:2 40:4 46:5,8
  47:15 48:17 50:6
  51:6 58:25 62:10
  62:13 65:2 68:22
  69:19 90:12
  97:17
**working** 9:16,19
  15:24 17:14 24:3
  26:10 27:16
  28:20 30:15,18

33:24 49:11
  68:20
**workload** 94:6
**works** 16:22 72:2
**workstation** 42:23
  62:16 66:13 68:8
  84:21 85:23
**workstations** 79:2
  79:5
**workup** 46:21
  48:13 50:21
  54:13 56:20 58:1
  58:24 62:2,5,8
  64:5,21,22 65:1
  68:7,17,18 72:17
  88:18,21,24 91:9
  93:12,13
**worried** 76:9 85:10
**wouldn't** 22:4
  55:21 58:13
  59:13 63:3 66:12
  66:16 67:14
  69:15 79:25
  81:12 92:13,21
  94:8 104:4
**write** 23:8 54:2,21
**writers** 18:8 23:7
  34:1
**writing** 11:15 16:8
  30:6 91:17
**written** 88:8 91:2
  96:20 105:3
**wrong** 44:6 49:25
  50:1 78:8,8 84:6
  87:6,8 90:2 93:9
  93:10,14,16
  101:19
**wrote** 82:3

**Y**

**yeah** 6:5,6 13:13
  13:14,23 18:20
  19:11 24:8,14
  26:22 32:10
  37:10 38:19 39:8
  41:20 42:9,10
  68:16 69:23 73:4

74:4,4 78:11 79:7
  84:7 87:16 94:5
  96:25 97:16
  98:10 101:7,16
  102:16 104:13
  108:19
**year** 7:25 10:15
  28:15 33:8,17
  91:23,23 107:7
  108:4,7,16
**years** 7:19 19:18
  19:22,24 26:9
  33:14 55:11
  77:21 81:16
  103:17 105:21,22
**yesterday** 19:23
**you-all** 43:15,16
  84:6

**#**

**#23** 95:4
**#25** 94:20,21
**#26** 108:15

**0**

**03** 86:14,16 87:20
  87:23 91:24
**04** 5:3 12:9 14:16
  26:12,13 27:4,16
  27:17,19 32:25
  33:18,19 35:22
  35:23 73:24 76:4
  103:11 107:10
  108:1,6,18,19,20
**05** 5:2,4 7:18,18
  12:5 13:20,24
  19:23 103:12
  107:24,25
**09/30/08** 110:20

**1**

**1:24** 109:7
**10** 17:8 38:17
  72:11
**100** 21:18 56:6
**109** 110:10 111:4
**11** 1:22 56:14

63:18 110:6
**11:06** 1:23
**13** 13:11,12
**131** 1:21 2:9
**14** 13:10,11
**15** 17:8 38:17
**19** 7:19
**19th** 32:7,8,25
  33:20 99:16
**1980** 8:3
**1992** 8:11
**1997** 9:18,24
**1998** 11:4

**2**

**2nd** 26:12
**2/24/09** 110:21
**2:06-CV-397-W...**
  1:7
**2:07-CV-59-WK...**
  1:7
**20** 72:12
**20th** 43:14
**2000** 20:15 26:8,17
  26:17 27:17,18
  27:21
**2004** 26:18 32:1
  86:10
**2008** 1:22 110:6,16
  111:11

**3**

**3** 2:18 31:16 45:20
  110:9 111:4
**30** 72:12
**30th** 110:16
**30303** 2:13
**318** 2:4
**36104** 2:5,9

**4**

**4** 31:16 45:20
**443** 110:20

**5**

**5,000** 48:4 57:1
**50** 18:21 56:6

**6**

**6:30** 53:7
**61** 2:12

**7**

**70s** 18:12

**8**

**8s** 31:16 45:22
**80s** 18:12
**84** 8:3
**85** 8:3

**9**

**98** 10:15 28:13,14
**99** 11:12,12 12:2
  12:19 20:17
  26:20 27:11,13
  27:19