# EXHIBIT C

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


BERNETHIA JOHNSON,

    Plaintiff,

vs.                  CASE NO. 2:06-CV-397-WKW
                            2:07-CV-59-WKW

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY, et al.,

    Defendants.



* * * * * * * * * *

DEPOSITION OF PAUL ELLISOR REAMS, taken

pursuant to stipulation and agreement before Mallory

M. Johnson, Court Reporter and Commissioner for the

State of Alabama at Large, at the United States

Attorney's Office, 131 Clayton Street, Montgomery,

Alabama, on Friday, July 11, 2008, commencing at

approximately 2:14 p.m.

* * * * * * * * * *

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.
7/11/2008
DEPOSITION OF  PAUL REAMS

2 (Pages 2 to 5)

Page 2

1             APPEARANCES
2  FOR THE PLAINTIFF:
3   Ms. Juraldine Battle-Hodge
    LAW OFFICES OF JURALDINE BATTLE-HODGE
4   Attorney at Law
    318 North Decatur Street
5   Montgomery, Alabama  36104
6  FOR THE DEFENDANTS:
7   Mr. James J. DuBois
    Assistant United States Attorney
8   OFFICE OF THE UNITED STATES ATTORNEY
    FOR THE MIDDLE DISTRICT OF ALABAMA
9   131 Clayton Street
    Montgomery, Alabama  36104
10
    Mr. Richard Blake
11  Attorney at Law
    SOCIAL SECURITY ADMINISTRATION
12  Office of General Counsel
    61 Forsyth Street
13  Atlanta, Georgia  30303
14  ALSO PRESENT:
15  Ms. Bernethia Johnson
16      * * * * * * * * * * *
17      EXAMINATION INDEX
18  PAUL ELLISOR REAMS
      BY MS. BATTLE-HODGE         3
19
20      * * * * * * * * * * *
21      STIPULATIONS
22      It is hereby stipulated and agreed by and
23  between counsel representing the parties that the
24  deposition of PAUL ELLISOR REAMS is taken pursuant to
25  the Federal Rules of Civil Procedure and that said

Page 3

1   deposition may be taken before Mallory M. Johnson,
2   Court Reporter and Commissioner for the State of
3   Alabama at Large, without the formality of a
4   commission; that objections to questions other than
5   objections as to the form of the questions need not be
6   made at this time but may be reserved for a ruling at
7   such time as the deposition may be offered in evidence
8   or used for any other purpose as provided for by the
9   Federal Rules of Civil Procedure.
10      It is further stipulated and agreed by and between
11  counsel representing the parties in this case that
12  said deposition may be introduced at the trial of this
13  case or used in any manner by either party hereto
14  provided for by the Federal Rules of Civil Procedure.
15      * * * * * * * * * * *
16      PAUL ELLISOR REAMS
17      The witness, having first been sworn to speak
18  the truth, the whole truth and nothing but the truth,
19  testified as follows
20      EXAMINATION
21  BY MS. BATTLE-HODGE:
22   Q.  Good afternoon.
23   A.  Good afternoon.
24   Q.  My name is Juraldine Battle-Hodge and I
25  represent Ms. Bernethia Johnson.  I'm going to ask you

Page 4

1   a few questions this afternoon regarding the lawsuits
2   that have been filed.
3    A.  Okay.
4    Q.  Would you state your full name, please.
5    A.  Paul Ellisor Reams.
6    Q.  Oh.  Would you spell Ellisor?
7    A.  E-L-L-I-S-O-R.
8    Q.  Okay.  The way it sounds.
9    A.  Uh-huh.
10   Q.  Okay.  What's your address, Mr. Reams?
11   A.  3029 Woodley Terrace.
12   Q.  Okay.
13   A.  It's in Montgomery.  36106.
14   Q.  Okay.  Mr. Reams, are you married?
15   A.  Yes.
16   Q.  What's your wife's name?
17   A.  Nancy.
18   Q.  And how long have you-all been married,
19  Mr. Reams?
20   A.  30 --
21   Q.  You got to know that one.
22   A.  34 years.
23   Q.  0okay.  Were you married before?  Is this
24  your first marriage, only marriage?
25   A.  Yeah.  No other time.

Page 5

1    Q.  You-all have any adult children?
2    A.  Yes, we do.
3    Q.  Okay.  What are their names?
4    A.  One child named Emily.
5    Q.  Is Emily here in Alabama?
6    A.  She lives in Birmingham.
7    Q.  Okay.
8    A.  She's 23.
9    Q.  Do you have any relatives here in -- you or
10  your wife -- here in Montgomery, Mr. Reams?
11   A.  Yes.  My mother lives here.
12   Q.  Okay.  What's her name?
13   A.  Marguerite, M-A-R-G-U-E-R-I-T-E.
14   Q.  Okay.
15   A.  And my wife's mother's name is Annesse,
16  A-N-N-E-S-S-E, Sankey.
17   Q.  Okay.  She's here in Montgomery as well?
18   A.  They live next door to each other in assisted
19  living.
20   Q.  All right.  Any other relatives here in town?
21   A.  I don't think so.
22   Q.  Okay.  What about in the Middle District,
23  this area?  Autauga County?  Elmore?
24   A.  You know, I have a cousin -- a cousin-in-law
25  in Elmore County.  I have --

Page 6

1    Q.  Is this your wife's cousin?
2    A.  No.  I'm not going to go --
3    Q.  No.  I'm saying, is it your cousin or --
4    A.  Yeah.  It's my -- my -- the widower of my
5    first cousin.
6    Q.  Okay.
7    A.  That's it.
8    Q.  That should be removed enough.
9    A.  Yeah.  Okay.
10   Q.  Mr. Reams, when did you first begin working
11   at Social Security?
12   A.  1977.
13   Q.  When you started with Social Security, what
14   was your position?
15   A.  I was a claims representative.
16   Q.  Okay.  And when did you become the -- what's
17   your current position?
18   A.  Hearing office director.
19   Q.  How long have you been the hearing office
20   director?
21   A.  Since December of 1999.
22   Q.  Okay.  Immediately before your current
23   position, what did you do?
24   A.  I was a supervisory attorney advisor.
25   Q.  Okay.  How long were you --

Page 7

1    A.  From July of '98 to December of '99.
2    Q.  Okay.  Let me ask you this.  Have you always
3    worked in the capacity of attorney until you became
4    the hearing office director?
5    A.  No.  I went to law school at night --
6    Q.  Okay.
7    A.  -- in the early '90s.
8    Q.  Okay.  That's right.  You started as claims
9    rep.
10   A.  Right.  Right.
11   Q.  Okay.  And when did you first become a -- did
12   you become a staff attorney at the --
13   A.  Yeah.  That was in 1994.
14   Q.  Okay.  Mr. Reams, in your position as
15   hearing -- is it hearings office?
16   A.  Hearing office.
17   Q.  Hearing office director?
18   A.  Uh-huh.
19   Q.  In that position, do you report to anyone?
20   A.  Yes.
21   Q.  Who would that be?
22   A.  Two people.  The hearing office chief
23   administrative law judge, is Charles Thigpen.
24   Q.  Okay.
25   A.  And the regional management officer, Gloria

Page 8

1    Bozeman.
2    Q.  Now, where is Ms. Bozeman?
3    A.  Atlanta.
4    Q.  Now, Ms. Bozeman, does she oversee a number
5    of agencies or what does -- what does she do?
6    A.  She -- she supervises the regional office,
7    which is in Atlanta.
8    Q.  Okay.
9    A.  Plus oversees the field office, the field
10   hearing offices that's in the Atlanta region.  And
11   that's about 32 offices.
12   Q.  What states?  Are they states?
13   A.  Yeah.  In the South.  Sure.  It's
14   North Carolina, South Carolina, Georgia, Florida,
15   Alabama, Tennessee, Kentucky, and Mississippi.
16   Q.  Okay.  As hearing office director, what are
17   your duties?
18   A.  To supervise the staff and organize the work
19   and make sure that the work moves through the office.
20   Q.  Do you have any direct contact with the
21   employees?
22   A.  Sure.
23   Q.  Okay.  And what capacity is that?
24   A.  Well, there's some folks I directly
25   supervise.

Page 9

1    Q.  Oh.  Who are those people?
2    A.  I directly supervise three senior attorneys,
3    three group supervisors, the systems person in the
4    office, and the administrative assistant.
5    Q.  That's the administrative assistant for the
6    whole agency or --
7    A.  For the whole office.
8    Q.  The whole office.
9    A.  Yeah, the whole office.
10   Q.  Who is that?
11   A.  Teresa.  Her name is Frazier.
12   Q.  Okay.
13   A.  I'm first line supervisor of those people.
14   Q.  First line.  Okay.
15   A.  The supervisors, of course, have groups of
16   people -- you know, groups of people they supervise
17   that are in groups.
18   Q.  So the hierarchy would be kind of like you
19   said.  Judge Thigpen -- at the office.
20   A.  Yeah.  Yeah.
21   Q.  Would you kind of go through that?
22   A.  Yeah.  The people that I don't supervise are
23   the judges.
24   Q.  Okay.  Everyone else would be under your
25   supervision?

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF  PAUL REAMS

4 (Pages 10 to 13)

| Page 10 |
|---|
| 1    A.  Right.  Either directly or indirectly, right. |
| 2    Q.  Okay.  Are you familiar with Ms. Bernethia |
| 3  Johnson, Mr. Reams? |
| 4    A.  Oh, yes. |
| 5    Q.  Tell me how you're familiar with her. |
| 6    A.  We started out being coworkers in 1994, I |
| 7  believe. |
| 8    Q.  Okay. |
| 9    A.  So, you know, I -- I knew her as a coworker. |
| 10  And that's when I first -- first met her. |
| 11    Q.  When did you begin -- well, I understand now |
| 12  you direct or indirectly supervise everyone with the |
| 13  exception of Judge Thigpen; is that correct? |
| 14    A.  Right. |
| 15    Q.  When did you begin supervising her, either |
| 16  directly or indirectly? |
| 17    A.  December of '99. |
| 18    Q.  When you became senior? |
| 19    A.  Hearing office director. |
| 20    Q.  Okay.  That's right.  Okay.  When you became |
| 21  hearing office director -- |
| 22    A.  Yeah. |
| 23    Q.  -- who was your senior -- who's directly |
| 24  under you?  You said you have -- |
| 25    A.  That group of people. |

| Page 11 |
|---|
| 1    Q.  Okay.  Who were those three senior attorneys? |
| 2    A.  In 1999? |
| 3    Q.  1999. |
| 4    A.  The -- I -- I -- what happened was the -- |
| 5  there was a reorganization of our office structure. |
| 6    Q.  Okay. |
| 7    A.  It was done in like 1999.  The positions, we |
| 8  fill -- filled those positions probably in January or |
| 9  February of 2000.  The people that first got those |
| 10  jobs were Laura Robinson. |
| 11    Q.  Okay. |
| 12    A.  Renita Barnett-Jefferson, which came later. |
| 13  That was probably in the summer of 2000. |
| 14    Q.  Okay. |
| 15    A.  The third person I think that was around that |
| 16  same time was Mary Helmer. |
| 17    Q.  And these are your three senior attorneys? |
| 18    A.  Senior attorneys, right. |
| 19    Q.  And then you had three group attorneys? |
| 20    A.  Group supervisors. |
| 21    Q.  Group supervisors, pardon me. |
| 22    A.  Right.  Because they don't have to be |
| 23  attorneys. |
| 24    Q.  They don't have to be attorneys.  Now, who |
| 25  were they? |

| Page 12 |
|---|
| 1    A.  Paul Johnson. |
| 2    Q.  Okay. |
| 3    A.  These people all got promoted in December of |
| 4  '99. |
| 5    Q.  Right. |
| 6    A.  Right about when I did. |
| 7    Q.  Right.  Right. |
| 8    A.  Paul Johnson, Cynthia Lamar, and Pam |
| 9  Davenport. |
| 10    Q.  Okay.  What was Ms. Johnson's position, |
| 11  before she was transferred, in the office? |
| 12    A.  Legal assistant. |
| 13    Q.  Was that always her position as far as you |
| 14  know, during your tenure? |
| 15    A.  Yes. |
| 16    Q.  Okay.  What are the primary duties of legal |
| 17  assistants? |
| 18    A.  They do a lot of the development of the cases |
| 19  before the judge actually gets the case to -- you |
| 20  know, to review and go to hearing.  And then after the |
| 21  hearing, they do whatever is necessary to get the case |
| 22  processed through after the case has been written. |
| 23  I'll give you some specifics. |
| 24    Q.  Okay. |
| 25    A.  They do something that's called working up |

| Page 13 |
|---|
| 1  files, which is -- means taking the -- a file, |
| 2  organizing it by date order as far as like the medical |
| 3  evidence. |
| 4    Q.  Okay. |
| 5    A.  Organizing it according to the type of |
| 6  evidence.  You put like notices in one section, the |
| 7  medical evidence in another section.  Any kind of |
| 8  nonmedical evidence goes in another section.  They do |
| 9  all that and then prepare an exhibit list. |
| 10    Q.  Okay. |
| 11    A.  Now, that's before the hearing. |
| 12    Q.  Okay.  This is what we call pre or -- |
| 13    A.  Well, that's not pre, but that's what we call |
| 14  working up a case, workup. |
| 15    Q.  Working up.  That would be all entailed in |
| 16  that. |
| 17    A.  Yeah, it's in a status called WKUP, working |
| 18  up a case.  Okay.  Now, pre is also their |
| 19  responsibility. |
| 20    Q.  Okay. |
| 21    A.  Pre would be like if the judge requested |
| 22  evidence prior to the hearing, that these people would |
| 23  be the ones who would be actually -- who sent out the |
| 24  letters or who requested the evidence, who controlled |
| 25  the file when the evidence came in.  They would add it |

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF PAUL REAMS

5 (Pages 14 to 17)

| Page 14 |
| --- |

1  in as an exhibit, you know, that kind of stuff. Their
2  status is called post, same thing except after the
3  hearing, you know.
4      Q.  Okay.
5      A.  And then there's people -- people in the same
6  job position take the case when it's completely
7  finished; make photocopies of the hearing decision;
8  send -- you know, physically mail the cases to the
9  representative, to the claimant; send them over to the
10  hearing -- I mean, not the hearing office -- the field
11  office where the claim was originated from. They're
12  also responsible for sending the file wherever it
13  needs to go, whether it's a favorable decision or
14  unfavorable decision. People in this job position
15  will bring the files into the office. When they were
16  paper files, it would be physically bringing them in,
17  preparing a cover sheet, putting into the computer
18  system that the file was here, putting them in
19  proper status.
20      And I guess that's about -- about covers it.
21      Q.  Let me ask you this. Are you aware of any
22  EEO complaints or activities that Ms. Johnson has been
23  involved in?
24      A.  Certainly, yes.
25      Q.  Can you list the ones that you recall?

| Page 15 |
| --- |

1      A.  Okay. In around -- I'm aware of one that was
2  filed before I ever got into management; because when
3  I became a manager, I was asked some questions about
4  it.
5      Q.  Okay.
6      A.  So I know about that one. I know that --
7      Q.  Do you have any idea when that was?
8      A.  I know when I knew about it.
9      Q.  When did you know about it?
10      A.  In the summer of 2000.
11      Q.  Okay.
12      A.  That's when I got involved.
13      Q.  Okay. That's the first when you know about
14  it. Okay. You got involved.
15      A.  That's when I got involved.
16      Q.  Because of your position now?
17      A.  Right. Right.
18      Q.  Okay.
19      A.  Okay. I was aware that she had filed an EEO
20  complaint after not being promoted into a writer's
21  job. I -- I think that was around 2002, 2003,
22  sometime in there.
23      Q.  Okay.
24      A.  I was aware that she had filed an EEO I think
25  relating to a reprimand, which would have been in

| Page 16 |
| --- |

1  2004.
2      Q.  Okay.
3      A.  And I know there was one more filed.
4  That's -- that's all I know about it.
5      Q.  Okay. Did you ever discuss any of those EEO
6  activities or complaints with Ms. Johnson?
7      A.  We certainly discussed -- let me see if I can
8  remember. A lot of this was done through
9  investigators, things like that. There was a certain
10  amount of time that was given to an employee when they
11  were doing responses for her or preparing for EEOs,
12  EEOCs.
13      Q.  Okay.
14      A.  And we had to coordinate that.
15      Q.  Okay. So is that pretty much --
16      A.  That's pretty much it.
17      Q.  Okay. Did you or have you ever requested
18  any -- that you -- any member of management scrutinize
19  Ms. Johnson's work?
20      MR. DuBOIS: Object to the form.
21      A.  Scrutinize --
22      THE WITNESS: I'm sorry.
23      MR. DuBOIS: I was objecting. You can answer
24  if you can.
25      A.  Scrutinize her work?

| Page 17 |
| --- |

1      Q.  Yes.
2      A.  That's the job of a supervisor.
3      Q.  Okay. So yes?
4      A.  Yes.
5      Q.  Okay. I got it. What about any bargaining
6  unit employee?
7      MR. DuBOIS: Object to the form. I'm just
8  objecting. You go ahead and answer.
9      THE WITNESS: Okay. I'm sorry.
10      A.  To scrutinize her work?
11      Q.  To over -- to look at -- to, I guess, look at
12  it and -- and report back to you or anything like
13  that.
14      A.  Well, we have a job called a lead --
15      Q.  Okay.
16      A.  -- that's a bargaining unit job.
17      Q.  Okay.
18      A.  Those people at times have been responsible
19  for, you know, making sure that work that was within
20  their purview, like in these groups, was being moved
21  timely and things like that. But, you know, no, there
22  was no specific instructions to look at her work.
23      Q.  Okay. What's the policy or the procedure if
24  an employee requests time off for medical purposes?
25      A.  We grant sick leave without basically any

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF  PAUL REAMS

6 (Pages 18 to 21)

Page 18

1  question --
2     Q.  Okay.
3     A.  -- if a person is going to be -- if a person
4  is gone less than three days.
5     Q.  Okay.
6     A.  If a person is going to be gone longer than
7  three days or has been gone longer than three days,
8  there needs to be some sort of a written document from
9  a medical source showing that that's -- the person had
10  a legitimate reason to be gone.
11    Q.  What if an employee is asking for special
12  accommodations because of an impairment or something
13  like that?  Are there any procedures for that?
14    A.  Yes.
15    Q.  What are those?
16    A.  Those have to be approved by the central
17  office.
18    Q.  Okay.
19    A.  So we would write up -- the employee would
20  request some sort of reason for reasonable
21  accommodation.  You know, we try to figure out what
22  could be done to give somebody a reasonable
23  accommodation and -- and send it through the regional
24  office, and then it would go up to the central office.
25    Q.  Okay.  Are you familiar with Louise -- and

Page 19

1  I'm sure I'm going to pronounce the last name wrong.
2  Is it Chevalier?
3     A.  Chevalier.
4     Q.  Chevalier.
5     A.  Uh-huh.
6     Q.  Who is that?
7     A.  She's a legal assistant.
8     Q.  She's a legal assistant.  Did she or does she
9  have an hearing impairment that you're aware of?
10    A.  Yes, she does.
11    Q.  Were any accommodations made for her with
12  regard to that?
13    A.  She's not been made to sit at the front
14  desk.
15    Q.  Okay.  And what was required of her in order
16  to give her that accommodation?
17    A.  Medical doc --
18        MR. DuBOIS:  Object to the form.
19    A.  Medical documentation.
20    Q.  And this was with documentation written?
21    A.  Uh-huh.
22    Q.  Don't laugh at me.
23    A.  I'm sorry.  I'm sorry.
24    Q.  Have you ever -- what about -- who is Rosey
25  Howell?

Page 20

1     A.  She's a former employee of the office.
2     Q.  Okay.  Has Ms. Howell ever required or
3  requested -- been absent for more than three days
4  because of medical reasons or --
5        MR. DuBOIS:  Object to the form.
6     A.  This -- this is something that she -- I can't
7  remember specifically.
8     Q.  Okay.
9     A.  She -- she had a -- I know she had a back
10  injury at one point.
11    Q.  Okay.
12    A.  There was a time that she was certainly out
13  for longer than --
14    Q.  Yeah.  Okay.
15    A.  -- three days.
16    Q.  Okay.  Do you recall what was required of her
17  when she was out more than three days?
18    A.  No.  No, I don't.
19    Q.  Okay.  Have you ever required Ms. Johnson to
20  provide written or signed statement from a doctor when
21  she's requested to be off for medical purposes?
22    A.  Yes.
23    Q.  Are you familiar with the time period when
24  Ms. Johnson was a union steward?
25    A.  Yes.

Page 21

1     Q.  Do you recall when that was?
2     A.  Well, it was in the -- maybe the late '90s.
3     Q.  Okay.
4     A.  Early 2000.
5     Q.  Okay.
6     A.  If I had to guess, I'd say 2002 maybe.
7     Q.  Do you recall if, while she was union
8  steward, she grieved any of your actions?
9     A.  Well, I don't think she actually ever grieved
10  any of the actions.
11    Q.  Okay.  Explain it to me, then.
12    A.  Well, as a -- if you have an employee file a
13  grievance, the union representative can assist them.
14    Q.  Okay, okay.
15    A.  And she certainly assisted some employees.
16    Q.  Do you remember any specifically?
17    A.  No.  No.  I mean, I remember -- I remember
18  dealing with her -- with Ms. Johnson with another
19  employee -- and several employees.  But I don't -- she
20  was there when I think reprimands were given to this
21  employee.  I know there were some grievances done,
22  but --
23    Q.  Do you know who the employee was?
24    A.  I know Monique Caffey was one of the
25  employees.

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF PAUL REAMS

7 (Pages 22 to 25)

Page 22

1    Q. McMonee?
2    A. Monique.
3    Q. Oh, Monique. I'm sorry. Monique Caffey.
4    A. Caffey.
5    Q. Okay. Who is Monique Caffey?
6    A. She's a former employee.
7    Q. Okay. How long was Monique employed with --
8    A. I'd have to look. I don't -- I don't recall.
9    It was in the '90s and --
10   Q. Okay. Do you remember when she -- her
11   employment ended or was terminated?
12   A. It was in either -- I think it was 2004.
13   Q. 2004. Do you remember if it was spring or
14   Summer?
15   A. It was in the -- it was probably May or June.
16   Q. Okay. Now, when you say May or June, was
17   that -- let me ask you -- strike that.
18   Is there a -- when Ms. Caffey was recommended for
19   termination, did she immediately leave her employment,
20   or how does that work, or did she appeal it or what
21   happened? Do you recall?
22       MR. DuBOIS: Object to the form.
23   A. She -- as far as I can recall, she didn't
24   appeal anything.
25   Q. Okay.

Page 23

1    A. There was a -- this is just -- there was a
2    period of time when she was suspended, I believe.
3    Q. Okay. Is that a usual thing until the final?
4    A. Yeah. It was strictly following procedure in
5    the 2000 AFGE agreement, step by step.
6    Q. Do you recall -- the day that Ms. Caffey's
7    termination was recommended, do you recall if she was
8    escorted off of the premises that day?
9    A. I don't recall that.
10   Q. Are employees ever escorted away from -- once
11   they're --
12   A. The general procedure, I believe, is to go
13   ahead and ask them to leave that day, I think.
14   Q. Okay. So it's not -- they don't have to be
15   escorted, but is that something -- is that general
16   policy?
17       MR. DuBOIS: Object to the form.
18   A. You're asking me something I really don't
19   recall.
20   Q. Okay. That's fine. Are you familiar with --
21   we're still in 2004.
22   A. Okay.
23   Q. The period of time April 2004 when -- not
24   April but n 2004, say that late spring, when
25   Ms. Johnson was questioned or her -- the files, 11

Page 24

1    files in particular, they were questioned about being
2    missing or that whole incident? Do you recall that
3    incident?
4        MR. DuBOIS: Object to the form.
5    A. Yes, I do.
6    Q. Okay. Would you -- tell me how that came
7    about.
8        MR. DuBOIS: Object to the form.
9    A. We have a -- we have categories of cases that
10   you put work into, and you're not supposed to move it
11   out of that category until you've finished working on
12   the case. So we have a category called workup, WKUP.
13   If a case is put into that category, the employee, the
14   legal assistant, has to organize the file, put
15   everything in date order, then make an exhibit list,
16   and then change the status of the file when they get
17   finished doing that. So it's organizing the file,
18   making an exhibit list. These people have specific
19   instructions not to move the case until they have done
20   both of those tasks.
21   In this situation, it appeared that Ms. Johnson
22   was moving cases out of that category before she
23   finished working on them. Now, that's --
24   Q. So that -- okay. Have any -- have any other
25   employees been accused of doing something similar to

Page 25

1    that?
2    A. Certainly.
3    Q. Who were they?
4    A. Well, Karen Burton comes to mind.
5    Q. Okay.
6    A. Michael Chamlee.
7    Q. Who is that?
8    A. An attorney.
9    Q. Okay.
10   A. A woman named Debbie Rambo. She's a lead
11   legal assistant.
12   Q. Okay.
13   A. That's the only three I'm remembering right
14   now.
15   Q. Okay. Do you recall what happened in the
16   case of Karen Burton when she was -- when this type
17   think happened in her case?
18   A. She received an oral warning.
19   Q. Okay. What about Michael --
20   A. Chamlee?
21   Q. Chamlee, yes.
22   A. He received a reprimand.
23   Q. Was it written or --
24   A. Written.
25   Q. Okay. What about Debbie Rambo?

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF  PAUL REAMS

8 (Pages 26 to 29)

---

Page 26

1    A.  Written reprimand.
2    Q.  Okay.  I'm going to look at Defendants'
3  Exhibit #26, which is a list that was provided by
4  Ms. Monique Caffey.
5    A.  Uh-huh.
6    Q.  Are you familiar -- and #26A, which is --
7  actually, it should have been attached to #26, but --
8    A.  Okay.
9    Q.  -- Counselor, when he discovered it, he just
10  put it in the next day.
11    A.  Okay.
12    Q.  Are you familiar with this document?
13    A.  I've seen this document.
14    Q.  You've seen this document?
15    A.  Yes.
16    Q.  Can you explain what this is?
17    A.  Monique Caffey was a case tech in our office.
18  We perform routine audits of cases and of what status
19  they're in.  We have thousands of cases in our -- in
20  our office.  So we have to go through and we audit in
21  case things have been misfiled, things like that, or
22  if somebody has put a case in a status and the case
23  has not been put where it's supposed to be.
24    This is a status called ready to schedule or
25  ready to hear.  And these -- this status is after the

---

Page 27

1  person -- after a legal assistant has worked on the
2  file, the file is physically taken and put into this
3  category.  And so in order to keep up with what we've
4  got, we have clerical people do audits.  A lot of
5  times we do them on the weekends, which is what
6  happened this time.
7    Q.  I think you're correct.
8    A.  Because people are not there moving files in
9  and out of the file cabinets and it's much easier to
10  conduct an audit on the weekend.  And that's -- this
11  is my understanding is this is a result of an audit.
12  And these are cases that she said could not be found
13  during the audit.  And she sent this to Paul Johnson,
14  who was her supervisor.
15    Q.  Okay.  Do you recall -- I'll represent to you
16  these are just some documents that are attached I
17  guess pertaining to this.
18    A.  Uh-huh.
19    Q.  There are two lists here.  Are you aware of
20  any other list that she would have e-mailed?  Would
21  these be the only two?
22    A.  As far as the time period you're taking
23  about.
24    Q.  Right.
25    A.  Now, of course, you know, we're still doing

---

Page 28

1  audits.
2    Q.  Right.  I understand.
3    A.  So I could give you lots of lists.  That's
4  all I know about it.
5    Q.  Do you know if these -- the individuals who
6  are listed here, these are -- are those legal
7  assistants or who are these people?
8    A.  Those are -- those are people who have claims
9  pending with us.
10    Q.  Okay.  A better question, I guess, would
11  legal assistants be working on these cases?
12    A.  These cases were supposed to be sitting in a
13  file cabinet, having already been worked.
14    Q.  Do you know if these cases were investigated
15  or --
16    A.  Yes, definitely.
17    Q.  Do you know whether they were found or what
18  happened to the legal assistants who had the missing
19  cases?
20      MR. DuBOIS:  Object to the form.
21    A.  The -- the cases -- I -- I'm aware of a
22  couple of these cases that were located on
23  Ms. Johnson's desk and they had -- had not been
24  finished.  They were not done.
25    Q.  Were those --

---

Page 29

1    A.  The exhibit lists were not done.
2    Q.  Okay.  Were those the only cases where the
3  exhibit lists were not done?
4    A.  Yes.
5    Q.  So you checked every other case on here?
6    A.  Yeah.  All of the cases were located.  I did
7  not check them myself.
8    Q.  But your --
9    A.  The people that worked for me did.
10    Q.  Now, did Ms. Johnson present you with this
11  list as --
12    A.  I -- I believe at some point, she gave the
13  list.  Maybe in June of '04.
14    Q.  Did you speak with Ms. Caffey about giving
15  these lists to Ms. Johnson?
16    A.  I don't believe so.
17    Q.  Why was Ms. Caffey terminated?
18    A.  Because she threatened to strangle me.  She
19  threatened to put sugar in my gas tank.  This followed
20  a long series of problems we had had with her as far
21  as being rude to the public.  Just, you know, various
22  things, taking leave when it wasn't approved, a long
23  series of conduct issues.
24    The -- I'm not sure of exactly the date, but
25  there was a -- an incident that occurred when she was

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF  PAUL REAMS

9 (Pages 30 to 33)

| Page 30 | Page 32 |
|---|---|
| 1  supposed to work the front desk.  And she -- and I<br>2  talked -- I told her it was time for her to go to the<br>3  front desk, and she refused to go.  And I told her<br>4  that she had to go to the front desk.  Following that<br>5  incident, she told another employee that she said that<br>6  she did -- hated me or something and made a choking<br>7  indication with her hands.  She told her supervisor<br>8  that -- that she wanted to hit me.<br>9    Q.  Not to interrupt, but who was her supervisor?<br>10   A.  Paul Johnson.<br>11   Q.  Okay.<br>12   A.  You know, we took those threats seriously.<br>13  We received guidance from labor management in Atlanta,<br>14  decided that this was a serious enough threat<br>15  following a long history of misconduct, that she<br>16  should be terminated.  That's why she was terminated.<br>17   Q.  Going back just a step back regarding the<br>18  11 cases with Ms. Johnson.<br>19   A.  Uh-huh.<br>20   Q.  How were you notified?  How were you made<br>21  aware that the cases -- there was a concern about<br>22  these particular cases?<br>23   A.  Her supervisor.<br>24   Q.  Okay.<br>25   A.  And Paul Johnson was her supervisor until | 1   A.  I remember he referred to the specific<br>2  cases.  Whether he attached them at that moment or<br>3  not, I don't remember.<br>4   Q.  Okay.<br>5   A.  I don't recall.<br>6   Q.  Okay.<br>7   A.  It all came very quickly.<br>8   Q.  Let me ask -- look at Defendants' Exhibits<br>9  #20 and #21.  If you notice, the date of this one is<br>10  5/28/04.<br>11   A.  Uh-huh.  Right.<br>12   Q.  And we kind of talked about it.  I'm sure<br>13  that's when it was actually printed or --<br>14   A.  That's when it was printed, right.<br>15   Q.  Right.  And the date here is 4/27/04.<br>16   A.  Right.<br>17   Q.  Why are there two?<br>18   A.  I printed these.<br>19   Q.  You printed this?<br>20   A.  Yes.<br>21   Q.  Okay.  You printed -- this is -- the later<br>22  one, you printed?<br>23   A.  It's not really later.<br>24   Q.  I know.  At a later time.<br>25   A.  The records are the same. |
| **Page 31** | **Page 33** |
| 1  April the 30th of '04.<br>2   Q.  Okay.<br>3   A.  This kind of overlapped the time that he was<br>4  her supervisor and then after April the 30th, when<br>5  Cynthia Lamar became her supervisor.<br>6   Q.  Okay.<br>7   A.  So I was notified by her supervisors.<br>8   Q.  Okay.  Do you recall when that was?<br>9   A.  We knew there was an issue in April.  I think<br>10  something had showed up in even as early as March,<br>11  that there was some cases in February that had been<br>12  moved apparently without being completed by<br>13  Ms. Johnson.  Again, it happened in April.  And I was<br>14  notified by -- by Paul Johnson at that point.<br>15   Q.  Okay.<br>16   A.  He sent me a very detailed memo.<br>17   Q.  Did he present you with case histories on<br>18  these cases?<br>19   A.  Case histories as in HOTS records?<br>20   Q.  I guess so, yes, sir.<br>21   A.  Yes.<br>22   Q.  Do you recall when he did that?<br>23   A.  Sometime in April or May.<br>24   Q.  Okay.  Do you know if they were a part of<br>25  that detailed memo or -- | 1   Q.  No, no, no.  I'm not questioning you.<br>2   A.  Yeah.  Okay.<br>3   Q.  When I say later, I mean in May.<br>4   A.  Yes.<br>5   Q.  You printed --<br>6   A.  Is that May?<br>7   Q.  Yes, May.  So you personally printed these?<br>8   A.  Yes.<br>9   Q.  Okay.  What's that HO code?  That's just<br>10  the --<br>11   A.  That's the office code, hearing office code.<br>12   Q.  Okay.  So your belief about -- who do you<br>13  think printed these?<br>14   A.  Probably Paul Johnson is what I would guess.<br>15   Q.  So this is for your personal -- this is your<br>16  personal pulling here, I guess.<br>17   A.  Yeah.  I went into the system.  My<br>18  recollection is Bernethia requested the records that<br>19  we based the reprimand on, and that's my note:<br>20  Bernethia, here are the HOTS records that you<br>21  requested yesterday.  And they're --<br>22   Q.  And so these are just the ones you already<br>23  had?<br>24   A.  Right.<br>25   Q.  And you went in and pulled these? |

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF  PAUL REAMS

10 (Pages 34 to 37)

Page 34

1    A.  Right.
2    Q.  Do you recall Paul Johnson giving you these
3  on 4/27/04?
4    A.  That's about when the memo came, I believe.
5    Q.  Okay.
6    A.  That's --
7    MR. DuBOIS:  I just want to know for the
8  record which one?  #20 and #19 you're saying?
9    MS. BATTLE-HODGE:  Yes.  Yes.  #20 was pulled
10  on May 28th, '04.  #21 was pulled on April 27th, '04.
11    Q.  Okay.  And then are these what we refer to as
12  HOTS, from HOTS?
13    A.  It's called the Hearing Office Tracking
14  System.  Those are HOTS documents, right.
15    Q.  Did you run any on your CPMS system?
16    A.  That did not exist that the time.
17    Q.  When did that system come into being?
18    A.  About two years ago.
19    Q.  Okay.  What's the difference between HOTS and
20  the CPMS system?
21    A.  Okay.  The CPMS stands for Case Processing
22  Management System.  It's a much more sophisticated
23  system.  This is a DOS-based system, which is a
24  computer term that's -- it just gathers data.  It's a
25  local program.

Page 35

1    Q.  Okay.
2    A.  So nobody outside of the Montgomery office
3  could have pulled this list.  This is a strictly local
4  tracking system.
5    Q.  Local.  Okay.
6    A.  The Case Processing Management System is a
7  much more sophisticated system.  Anybody can pull it from anywhere in the
8  system.  Anybody can pull it from anywhere in the
9  country.  It's much more detailed.  It -- it allows
10  for -- like you go into the Case Processing Management
11  System under a certain case.  You can connect it to
12  the e-file, the electronic file.  Back here we didn't
13  have electronic folders.  It was a -- it was a system
14  that was designed to shift from paper files to
15  electronic files.  And that was the first step in that
16  shift.
17    And so this -- this tracked local cases.  The
18  Case Processing Management System gathers much more
19  statistics.  You could go into it and, for instance,
20  ask it for every case that's been in status for too
21  long, over 30 days.  It will give you every case in
22  the office.  It's just a much more sophisticated
23  system.  This is -- this is very primitive.  This is
24  probably 20 years old.
25    Q.  Are you-all using HOTS at all now?

Page 36

1    A.  Not at all.
2    Q.  With regard to HOTS, tell me how it worked.
3  If a legal assistant or anyone were to go into the
4  system, how would you get into it?
5    A.  Well, our computer system is completely
6  secure.  You have to have a password.  You also have
7  to have a PIN, a personal identification number.  If
8  you have that, then you can access our system.  So any
9  employee could go into the system.
10    Q.  So are you referring to even -- are we
11  starting with HOTS or are we talking now?
12    A.  Even now.
13    Q.  HOTS.  Okay.
14    A.  Yeah.  HOTS, yeah.  But it's designed so
15  that, you know, anybody outside of the agency can't go
16  into people's personal records.  We have contained all
17  sorts of private data that we're charged to protect.
18  So we, first of all, have a secure system where you
19  have to be an employee to go into that -- into the
20  HOTS system.
21    Q.  Okay.  So did you say each employee has a
22  code or --
23    A.  Yeah.  There's a -- you have a -- each
24  employee has their own password that no one else
25  knows.

Page 37

1    Q.  Okay.
2    A.  Then they have a personal identification
3  number that's assigned to them by the agency.
4    Q.  Okay.
5    A.  So -- you know, that's -- that's the way it
6  works.
7    Q.  Okay.  I noticed on the HOTS document that
8  the legal assistants or whomever went into the system,
9  their initials.
10    A.  Right.
11    Q.  How does that -- how are the initials placed
12  there?
13    A.  It's by whoever is in the system at the time
14    Q.  Okay.
15    A.  If you -- if you are -- if you go in and
16  change the status of a case, whoever's PIN, whoever is
17  logged on the computer, those initials show up on the
18  transfer.
19    Q.  So do the initials -- are they placed
20  automatically, or are they manually put in there, in
21  HOTS?
22    MR. DuBOIS:  Object to the form.
23    A.  A couple of years old now as far as my
24  information, but I -- I think it's automated,
25  automatic.

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF PAUL REAMS

11 (Pages 38 to 41)

| Page 38 | Page 40 |
|---|---|
| 1    Q. Okay. This is -- are you sure? | 1   others to that file? |
| 2    A. Well, I mean it's -- it has been several | 2    A. It could be assigned to another legal |
| 3   years since we used this system, but it's -- it's -- | 3   assistant by another employee. |
| 4   let me look at one. | 4    Q. While this employee still has that file, is |
| 5     Yeah. It's -- it's placed automatically. | 5   it possible for someone to go into that system? |
| 6   Whoever makes the status change, their initials are | 6      MR. DuBOIS: Object to the form. |
| 7   placed on it. | 7    A. Go into the HOTS system? |
| 8    Q. Okay. Whoever uses their personal -- the | 8    Q. Yes. The HOTS system on that particular |
| 9   password and the information number -- | 9   file. |
| 10    A. Right. | 10    A. Yeah. You could pull up any file you wanted |
| 11    Q. -- the computer just -- okay. | 11   to. |
| 12    A. The computer automatically assigns it here, | 12    Q. Can any -- can changes be made? |
| 13   also where it shows what kind of status the case is. | 13    A. If you make a change, it would certainly -- |
| 14   It also assigns down here whoever last opened up the | 14   are you talking about changes in status? |
| 15   document, last did any kind of entry in HOTS, their | 15    Q. Or whatever, yes. |
| 16   initials are automatically placed there. | 16    A. That's all this is, is a tracking system. |
| 17    Q. Okay. How are the legal assistants given | 17    A. Yes, sir. |
| 18   their passwords and personal identification numbers? | 18    A. I could access any -- any employee's -- you |
| 19    A. They -- they make up their own passwords. | 19   know, I could go into a file that's been assigned to |
| 20    Q. Okay. | 20   another employee. I could assign it to another |
| 21    A. And the personal identification numbers are | 21   employee. |
| 22   assigned by the -- the regional office. | 22    Q. Okay. |
| 23    Q. Okay. | 23    A. But, you know, that's -- that's all the HOTS |
| 24    A. Those stay with you forever, though, the | 24   is, is just a tracking system. |
| 25   whole time you're an employee. | 25    Q. Okay. Was Ms. Johnson ever given a key to |

| Page 39 | Page 41 |
|---|---|
| 1    Q. The personal identification number? | 1   the office, to the -- you know, the building? |
| 2    A. Right. | 2    A. The entire office? |
| 3    Q. Okay. So the password, that's -- that's the | 3    Q. Yes. |
| 4   individual thing; is that correct? | 4    A. I think at some point. |
| 5    A. Correct. You can make up your own password. | 5    Q. Okay. Do you recall when that was? |
| 6    Q. Let's say a legal assistant is terminated or | 6    A. Not particularly. What we -- what we would |
| 7   resigns or whatever and you have another person coming | 7   do is at times if management was not going to be there |
| 8   in to work those files that she was working. | 8   to either open or close the office, a non-management |
| 9    A. Uh-huh. | 9   employee would have a key -- would be given a key to |
| 10    Q. How is that person able to get into the files | 10   open or close it. |
| 11   that she was working before? | 11    Q. So that wasn't a long-term thing? Maybe a |
| 12    A. Having the -- | 12   day or was that something -- |
| 13      MR. DuBOIS: Object to the form. | 13    A. I actually don't recall specifically her |
| 14    A. A password, that -- that doesn't keep you | 14   giving -- being given a key, but almost every employee |
| 15   from going into a file. | 15   in the building has been given a key at one time or |
| 16    Q. Okay. | 16   another. |
| 17    A. It doesn't keep you from going into HOTS. So | 17    Q. So if an employee -- just an employee is |
| 18   they would just -- they would just use their own | 18   given a key to lock up because there's no management, |
| 19   password and personal identification number and go | 19   is that a -- do they turn the key back in the next day |
| 20   into the case, go into HOTS. | 20   or sometime shortly thereafter or -- |
| 21    Q. Okay. | 21    A. We had some employees that were routinely |
| 22    A. You know, with a paper file, you would just | 22   staying late all the time. And then there were some |
| 23   take the paper file and hand it to the new employee. | 23   employees that we -- that were not in management that |
| 24    Q. Okay. If a workup case is assigned to a | 24   had keys. |
| 25   particular legal assistant, could changes be made by | 25    Q. Okay. |

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF  PAUL REAMS

12 (Pages 42 to 45)

---

Page 42

1    A.  The judges all have keys.  The systems
2  administrator always has a key.
3    Q.  Okay.
4    A.  The -- administrative assistant always has a
5  key.
6    Q.  Okay.
7    A.  As far as various other employees, you know,
8  right now there's a writer that comes in at 6:30 in
9  the morning on Saturdays.  I've given her a key.  She
10 has it assigned to her.
11   Q.  So, generally, legal assistants don't have
12 keys?
13   A.  Well, some do; some don't.  I mean --
14   Q.  Which ones would?
15   A.  -- it just depends.  Well, right now, I don't
16 think any have for right now.
17   Q.  But it does happen?
18   A.  It certainly -- sure, sure.  Yeah.
19   Q.  Does the agency offer overtime, or did it at
20 the time Ms. Johnson was there?
21   A.  There are times when overtime is offered and
22 times when it's not.
23   Q.  Okay.
24   A.  Usually, we receive an allotment of overtime
25 at the beginning of the year.  And it's up to

---

Page 43

1  management to determine when overtime is offered.
2    Q.  Okay.
3    A.  But -- I lost track of your question.  You
4  said --
5    Q.  You answered it.
6    A.  Okay.
7    Q.  You answered it.
8    A.  Okay.
9    Q.  If an employee works overtime, is there a --
10 even a cutoff for that?  Do they work until twelve
11 o'clock in the morning, or is there a time that
12 everyone must be out of the building?
13   A.  We have routinely required that the building
14 be closed at six o'clock.
15   Q.  Okay.
16   A.  There are certainly exceptions.
17   Q.  Okay.  What would those be?
18   A.  If we have some kind of overwhelming
19 workload, if we're installing new computer systems.
20 We've worked all night at times doing that.  But
21 the -- the normal is we all go home at six o'clock.
22   Q.  Okay.  You stated that sometimes there's
23 overwhelming work where you have to get it out.
24   A.  Sure.
25   Q.  Have you had, in the last five years, a

---

Page 44

1  situation where there was just overwhelming work?
2  When I say work, I mean case workups or something, or
3  is that ever an issue?
4        MR. DuBOIS:  Object to the form.
5    A.  It was normally not an issue until October of
6  2007.
7    Q.  Okay.  So just recently.
8    A.  Yeah.
9    Q.  Okay.  Before that?
10   A.  We usually had enough cases worked up to
11 supply the judges with the cases they needed.
12   Q.  Okay.
13   A.  But, you know, you're talking about, you
14 know, eight and a half years of me being a manager.
15   Q.  I understand.  I'm just -- just only what you
16 know personally.
17   A.  Okay.
18   Q.  How often did Ms. Johnson work overtime?
19   A.  I really couldn't tell you.
20   A.  Couldn't tell me.  Okay.  Are you familiar
21 with the span of time when Ms. Johnson sought a
22 hardship transfer?
23        MR. DuBOIS:  Object to the form.
24   A.  I'm aware of some of the time.
25   Q.  Okay.  What time are you aware of?

---

Page 45

1    A.  In -- in the summer of 2004, Ms. Johnson
2  wrote a letter to the regional office.
3    Q.  Okay.
4    A.  I believe that's the right dates.
5    Q.  Okay.
6    A.  Where she made multiple charges against the
7  management in Montgomery regarding harassing her,
8  mistreating her.  She charged that employees hemmed
9  her up in corners.  I just -- generally a lot of
10 different charges to bolster her claim that she was in
11 a hostile work environment.
12     The regional office asked me to respond to that,
13 those charges.  I wrote a letter attempting to rebut
14 each charge.  I thought they were all totally false.
15 That was sent sometime in the -- probably the fall of
16 '04, something like that.  I'm aware that there was a
17 letter sent in early December by Gloria Bozeman, the
18 regional management officer, in which she concluded
19 that there was not a hostile work environment in
20 Montgomery and that Ms. Johnson's request to be
21 transferred on those grounds was denied.
22   Q.  Was she eventually transferred?
23   A.  Yes, she was.
24   Q.  Okay.  When was that?
25   A.  I believe it was in October of 2005.  I

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF  PAUL REAMS

13 (Pages 46 to 49)

Page 46

1  think.
2     Q.  So as far as you're aware, she started from
3  summer of '04 to fall of '05, a little over a year
4  that you're familiar with?
5     MR. DuBOIS:  Object to the form.
6     A.  Ms. Johnson never told me what she was doing
7  as far as requesting transfers, so I really was kind
8  of left in the dark.
9     Q.  I got it.  But the first time you're aware of
10 was the summer of '04?
11    A.  Right.
12    Q.  And you testified that you -- she transferred
13 out October of '05?
14    A.  Right.
15    Q.  Do you have any idea how many times she was
16 denied transfer, wasn't allowed to transfer?
17    A.  Not really, no.  That was a decision made in
18 the regional office.
19    Q.  Now, who did you write your rebuttal to in
20 the regional office?
21    A.  Gloria Bozeman.  Gloria Bozeman's -- she had
22 the authority to approve or deny a transfer.
23    Q.  And Ms. Bozeman is one of the -- because of
24 her position, is one of the two people that you report
25 to; is that correct?

Page 47

1     A.  Correct.
2     Q.  Okay.  Tell me what -- with Ms. Bozeman, in
3  reporting to her, what type things do you have to --
4  what responsibilities do you have to her as far as
5  your duties here in Montgomery?
6     MR. DuBOIS:  Object to the form.
7     A.  The -- she expects the office to make its
8  goals.  We have production goals.  Our office has made
9  its production goals for seven or eight years in a row
10 now.
11    Q.  Okay.
12    A.  Every month.
13    Q.  Okay.  Great.
14    A.  We -- when some sort of issue comes up --
15 obviously, this is a very busy lady.  She has 30
16 something offices to deal with, some of which are
17 really troubled places.  Normally, the only time that
18 I would hear from Ms. Bozeman would be if there was
19 some specific situation that came up that she wanted
20 me -- to discuss with me or if an office starts having
21 particular problems or we're going to receive an
22 inspection of some sort, then she would communicate
23 with me.
24    There's a staff in the regional office that
25 report to her; and, you know, I have constant contact

Page 48

1  with many of those people.  But usually --
2     Q.  So your communication to her -- you
3  communicate with her but, because of her busyness,
4  sometimes not directly.
5     A.  Yeah.  Certainly -- certainly not on even a
6  weekly basis.  I probably talk to her about once every
7  three months, something like that.
8     Q.  Okay.  You testified earlier about the
9  letter -- is this the letter you're referring -- this
10 is Defendants' Exhibit #41.  Is this the letter you're
11 referring to when you stated that Ms. Johnson asked
12 for a transfer with the allegations you're talking
13 about that you responded to?
14    A.  Yeah.  Just let me look real quickly here.
15    Q.  Yeah.  Go right ahead.
16       (Brief pause)
17    A.  Okay.  Yeah, this is -- this is the case -- I
18 mean the letter, yeah.
19    Q.  Okay.  And you said you responded to this?
20    A.  Right.
21    Q.  Have you produced your response?
22    A.  I believe so.
23    Q.  Okay.  Is it the --
24    MR. DuBOIS:  I believe it's in the EEO file.
25 And I also believe it was part of our initial

Page 49

1  disclosure.
2     Q.  Okay.  And is this the letter that you're --
3  you referred to when you said that Ms. Bozeman denied
4  the -- that first request, Defendants' Exhibit #42?
5     A.  I've never seen this letter.  This is dated
6  in October.  The letter I'm familiar with came in --
7     Q.  Okay.  Well, actually, we tried to figure
8  that out.  It's actually October of '04, I think.
9     A.  Okay.
10    Q.  And I don't know.  I can't explain that.
11    A.  I can't explain that.  No, I've never seen
12 that letter before.
13    MR. DuBOIS:  Is there a December letter in
14 there somewhere?  Oh, no.  I'm saying in the stack.
15    THE WITNESS:  The December letter is the one
16 I'm familiar with.
17    Q.  Okay.  Defendants' Exhibit #45.  This appears
18 to be a response -- well, an e-mail from Ms. Johnson
19 requesting to be transferred again to Ms. Bozeman.
20    A.  Uh-huh.
21    Q.  Okay.  This is dated November 16th, 2004.
22    A.  Okay.
23    Q.  Is that correct?
24    A.  Yeah.  I'm not privy to that one either.
25    Q.  Okay.  Do you recall stating to Ms. Johnson

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF PAUL REAMS

14 (Pages 50 to 53)

Page 50

1  that if the hardship request appeared as if you were
2  the cause of it, you wouldn't put your approval on it?
3      A.  Well, that statement is incorrect in two
4  different ways.
5      Q.  Okay.  Go ahead.
6      A.  One is I can't approve a transfer.  It's not
7  in my authority.
8      Q.  Well -- okay.
9      A.  The other is that Ms. Johnson had made
10  accusations about the management of the office and
11  about the personnel in the office that were completely
12  false.  If we were to accept this series of incorrect
13  false statements, I felt like it would amount to some
14  sort of an admission that some of them or all of them
15  were true.
16      Q.  Okay.
17      A.  I was not going to let her defame the
18  management and the other employees in the office
19  falsely.  And I -- I certainly did oppose her trying
20  to transfer out of the office based on false
21  statements about what was occurring within the office.
22      Q.  Okay.  Do you recall --
23      MS. BATTLE-HODGE:  Let's go off the record.
24          (Off-the-record discussion)
25      MS. BATTLE-HODGE:  Let's take a quick break.

Page 51

1          (Brief recess)
2      Q.  Okay.  Mr. Reams, looking at Defendants'
3  Exhibit #51, does that appear to be -- did you write
4  that letter?
5      A.  Yes, I did.
6      Q.  Okay.  And this is dated?
7      A.  June 30th, 2005.
8      Q.  So at that point, she had been trying to get
9  a transfer for about a year -- well, less than a
10  year.
11      A.  Well, less than a year that I knew of.
12      Q.  Okay.  And at this point, did she remove all
13  of the allegations that you were referring to earlier?
14      MR. DuBOIS:  Object to the form.
15      A.  Not as -- not as far as I know.
16      Q.  When you wrote this letter, you didn't think
17  that she had -- you thought that she still was asking
18  because of --
19      A.  No.  No.  Because, see, that's an
20  inappropriate -- that's an inappropriate way to --
21  that's an inappropriate avenue to request a hardship
22  transfer.  Hardship transfers are usually based on
23  personal reasons.  Normally, the hardship transfer you
24  see is someone moving to look after a sick child, a
25  sick parent, a husband's been transferred, a wife has

Page 52

1  been transferred, that kind of stuff.  You know, I
2  certainly -- as far as I was concerned, this was a
3  completely separate matter.
4      Q.  Okay.  And the next -- and I -- next
5  correspondence that we have, unless there's something
6  else out there, Exhibit #53 from Ms. Bozeman?
7      A.  Uh-huh.
8      Q.  She was granted the transfer.
9      A.  Okay.
10      Q.  Is that correct?
11      A.  I guess.  She was granted the -- I've never
12  seen this letter before.
13      Q.  Oh.  If you --
14      A.  No.  That's fine.  That's fine.  But, yeah,
15  that's obviously hers.
16      Q.  Did you state to Ms. Johnson that -- well,
17  what did Ms. -- are you aware where Ms. Johnson filed
18  to transfer to?
19      A.  Chattanooga.
20      Q.  Chattanooga.  Okay.  Did you tell Ms. Johnson
21  that she was not wanted in Chattanooga?
22      A.  I don't recall saying that.
23      Q.  You could have or --
24      A.  I -- I really was not involved in the
25  process.

Page 53

1      Q.  Okay.
2      A.  I -- you know, I do have -- I do talk to
3  people in the regional office, but I don't recall
4  saying that.
5      Q.  Did you speak -- when you say the regional
6  office, in Atlanta?
7      A.  Yeah.
8      Q.  Okay.  After Ms. Johnson transferred to
9  Chattanooga, did you -- were you informed or did you
10  hear anything about her performance at Chattanooga?
11      A.  I heard that she had retired.
12      Q.  Before then.
13      A.  No.  I -- I spoke to nobody from
14  Chattanooga.
15      Q.  Speak to Ms. Bozeman?
16      A.  No.
17      Q.  Let's move to a different subject.
18      A.  Okay.
19      Q.  Are you familiar with the policy of your
20  office here in Montgomery where legal assistants were
21  issued workup cases on Fridays?
22      A.  Yes.
23      Q.  Tell me about that.
24      A.  We had legal assistants complaining about the
25  process of allowing people to just go take whatever

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF PAUL REAMS

15 (Pages 54 to 57)

Page 54

1   cases they wanted. The concern was that some legal
2   assistants were waiting until there was a line of easy
3   cases and then they would take them. We always
4   assigned cases based on the age; the oldest cases went
5   first. And if you went and requested a -- you know, a
6   number of cases, then you would get the next however
7   many that would be -- come off of this case list that
8   was organized by age.
9       We had some legal assistants who were concerned
10  that the cases were being cherry-picked. The easy
11  cases were being taken by some folks who would wait
12  around until there was line of small cases and then
13  they would ask for cases. So in order to try to be
14  objective and do this completely fairly, we instituted
15  a policy where we would only give cases ten at a time.
16  And in order to make it where the supervisors would
17  not have to be doing this all the time, we decided we
18  would only do it on Friday. We assigned the list --
19  the old case list to one supervisor, and they rotated
20  it.
21      So the people worked at home on Mondays,
22  Tuesdays, and Wednesdays. So Friday was a logical day
23  to pick. Everybody had to be in the office either on
24  Thursday or Friday. We picked Friday as the day when
25  we would do these case assignments.

Page 55

1       Q. Were there any exceptions to issuing files on
2   Fridays?
3       A. Sure. If a person ran out of cases, they
4   could get cases some day other than Friday.
5       Q. So tell me what the procedure was if a legal
6   assistant had worked up all of her files. What would
7   she do or he do?
8       A. She would go to the supervisor that had the
9   list and say, I need more cases. And they would pull
10  ten cases and give them to the supervisor.
11      Q. And they didn't have to come to you or to
12  anyone else?
13      A. No. No.
14      Q. Do you know of any employees who asked for
15  files other than Fridays?
16      A. I'm sure everybody. I don't -- there was no
17  discussion about that. We were just trying to keep it
18  in an organized manner. But, you know, if somebody
19  ran out of work, you certainly wouldn't say, no, you
20  go over there and sit.
21      Q. That would be real hard.
22      A. Yeah.
23      Q. Do you recall the discussion with
24  Ms. Lamar -- well, with Paul Johnson where Ms. Johnson
25  indicated that she had asked Ms. Lamar for more cases

Page 56

1   other than on a Friday?
2       MR. DuBOIS: Object to the form.
3       A. What -- what time are we talking about?
4       Q. We're talking '04.
5       A. Okay.
6       Q. Well -- yeah, '04. I guess Ms. -- since you
7   said you go to the supervisor, I guess it's when she
8   became her supervisor, I guess.
9       A. No. If you're talking about the incident
10  that occurred in April of '04.
11      Q. Yeah, that's what I'm talking about. Yes,
12  sir.
13      A. Ms. Lamar was the person who had the list at
14  that time.
15      Q. Okay.
16      A. The only thing I'm really aware of as far as
17  that goes is Ms. Johnson had talked about working
18  home -- working at home two days a week I think a
19  little bit prior to that time -- I don't know exactly
20  the time frame -- but then asked for work. Apparently
21  this was a day not on Friday.
22      Q. You mean the --
23      A. When Ms. Johnson asked Ms. Lamar for work.
24  That must have been not on Friday.
25      Q. Okay.

Page 57

1       A. Because what I'm aware of about this was one
2   of the supervisors saying -- asking, you know, do you
3   need work? And it's -- you know, it's not Friday.
4   You actually need cases? And really, what I'm more
5   aware of -- I guess I should stop because that's
6   all -- that's what you asked.
7       Q. Okay. But you are aware that there was --
8   you're not sure what the conversation was, but you are
9   aware that she did ask for cases?
10      MR. DuBOIS: Object to the form.
11      A. Right.
12      Q. Okay. Were you aware that while Ms. Johnson
13  was still employed here in Montgomery, that she was
14  represented by an attorney? You weren't aware of
15  that?
16      A. No. Regarding what?
17      Q. Her EEO complaints.
18      A. Oh.
19      Q. I asked a bad question, then.
20      A. Yes. Yes. Yes. Yes. I was sitting across
21  the table from the person.
22      Q. Okay. Who was that?
23      A. I don't -- I don't know.
24      Q. What about a private attorney? Was this --
25      A. That was a private attorney, yeah.

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF  PAUL REAMS

16 (Pages 58 to 61)

Page 58

1    Q.   Okay.  Oh, you mean you were like in a
2 deposition or something sitting?  Did you work across
3 the table?
4    A.   No.  We -- no, we had a hearing.
5    Q.   Okay.
6    A.   An EEOC hearing.
7    Q.   Not at Social Security sitting across the
8 table, but --
9    A.   It was in the Social -- it was in the hearing
10 office.
11    Q.   Got you.  Okay.  Yes, sir.
12    A.   That's where the hearing was held.
13    Q.   Okay.  Are you aware that when Ms. Johnson's
14 attorney would call her, she would talk to her
15 attorney sometimes at work?  Are you aware of that?
16    MR. DuBOIS:  Object to the form.
17    A.   Again, we're talking about the EEOC?
18    Q.   Yes, yes.  Yes, sir.
19    A.   She was given a certain amount of time to
20 prepare for her EEOC on -- on government time.
21    Q.   Okay.
22    A.   She was supposed to let me know and request
23 leave -- or time off, administrative leave for those
24 periods of time.
25    Q.   Okay.

Page 59

1    A.   So certainly, I was made aware of those times
2 because she was required to request administrative
3 leave --
4    Q.   Okay.
5    A.   -- before she engaged in preparing her case.
6    Q.   Do you ever recall Ms. Johnson going to a
7 vacant office trying to use the telephone to talk to
8 her attorney?
9    MR. DuBOIS:  Object to the form.
10    A.   I'm aware that Ms. Johnson did go to vacant
11 offices to use the phone.
12    Q.   Okay.  Okay.  Are you aware that telephones
13 were removed from -- if Ms. Johnson went to a vacant
14 room to use the phone, if she walked out, when she
15 came back, the phone was gone?
16    MR. DuBOIS:  Object to the form.
17    A.   We tried to keep employees from conducting
18 personal business on government time.  We found
19 employees sometimes in the empty offices on private
20 calls.  But --
21    Q.   Is that what you were suspicious that
22 Ms. Johnson was doing?
23    MR. DuBOIS:  Object to the form.
24    A.   She was never -- a phone was never taken from
25 anywhere to keep her from talking to her EEOC

Page 60

1 attorney.
2    Q.   Has Ms. Johnson ever been in your office
3 while -- while you were -- while she worked at the
4 agency?
5    A.   Certainly.
6    Q.   Okay.  Has she ever been in your office and
7 your telephone rang?
8    A.   I -- I would assume so.
9    Q.   Okay.  Do you recall what she would do if
10 your phone would ring?
11    A.   No, I don't.
12    Q.   Okay.  On April 30th, 2004 -- that would have
13 been after that April 19th deal.
14    A.   Right.
15    Q.   After I think there was a hearing where
16 Mr. Carl -- is it Warner?
17    A.   Warren.
18    Q.   -- Warren was on the telephone and you-all --
19    A.   Right.
20    Q.   -- had whatever you had there?
21    A.   Yeah.  I presented my findings from her
22 accusations that Paul Johnson had yelled at her.
23    Q.   Right.  That's right.
24    A.   Right.
25    Q.   And after that hearing or what-have-you was

Page 61

1 completed --
2    A.   It was not a hearing.
3    Q.   Well, after the --
4    A.   It was a meeting.
5    Q.   After the meeting was completed.  Okay.  Do
6 you recall a meeting after -- after the phone was hung
7 up?
8    A.   Uh-huh.
9    Q.   Do you recall meeting with Ms. Johnson and
10 Mr. Lamar?
11    A.   Yes.  Yes.  Very specifically.
12    Q.   Okay.  Tell me about that.
13    A.   Well, Ms. Johnson had accused Paul Johnson of
14 standing and yelling at her on two separate instances
15 earlier in the month.
16    Q.   Uh-huh.
17    A.   She had come to me and complained about that.
18    Q.   Uh-huh.
19    A.   I told her I would investigate it.  I got
20 statements from all the parties who had witnessed the
21 actions.  I found that Paul Johnson had not yelled at
22 her, had not stood and moved toward her in an
23 aggressive manner, as she alleged.  My findings were
24 that her accusations against Paul Johnson were
25 unsupported.  That was what was presented when Carl

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF  PAUL REAMS

17 (Pages 62 to 65)

Page 62

1   Warren was on the telephone. That was a disciplinary
2   type issue, falsely accusing your supervisor of
3   something or accusing a supervisor of something, and
4   then being insubordinate.
5       After that phase of the meeting concluded, I told
6   Carl Warren that we were done. As soon as we hung up,
7   I talked to Ms. Johnson about a program called the
8   Employee Assistance Program, which is run by our
9   agency. My concern was that she seemed to have either
10  perceived events differently than other people, seemed
11  to not be rational. That -- that's what that meeting
12  was about.
13      Q.  Okay. In that meeting, how many times did
14  Ms. Johnson ask for a representative?
15      A.  She asked several times.
16      Q.  And how did you respond?
17      A.  At first I tried to explain to her that this
18  was not a disciplinary matter, that this was a private
19  matter, and that -- that she did not need a
20  representative because there was no possibility of
21  discipline or this was no kind -- this was not a
22  disciplinary issue at all. She asked for Mr. Warren
23  to be called a couple of times. And finally I called
24  him.
25      Q.  Okay.

Page 63

1       A.  He was no longer at his desk.
2       Q.  Okay. Do you recall, did you call him right
3   away or --
4       A.  I probably explained to her two times.
5       Q.  Okay. After you explained, did you just pick
6   the phone up and immediately call or --
7       A.  Yeah, I called.
8       Q.  Do you -- let me just ask you this. Do you
9   recall slowly --
10      A.  No.
11      Q.  No what?
12      A.  I don't recall any slow motion actions.
13  Yeah.
14      Q.  So have you heard that before?
15      A.  Yeah.
16      Q.  Where did you hear that?
17      A.  In the letter that she sent to Gloria Bozeman
18  in 2004, she cited that as one of the points where she
19  was being harassed.
20      Q.  Okay. In this -- go ahead. I'm sorry.
21      A.  That did not happen.
22      Q.  All right. Did Ms. Johnson ask Ms. Lamar any
23  questions in this meeting?
24          MR. DuBOIS: Object to the form.
25      A.  She asked -- I think she -- I -- from what I

Page 64

1   recall, she directed some questions, at least one
2   question toward her. And Ms. Lamar said something
3   like I don't recall or something.
4       Q.  Okay. Did you -- do you have any idea what
5   that question was?
6       A.  I don't -- I don't recall.
7       Q.  Well --
8       A.  We were discussing the incident with Paul
9   Johnson and the yelling and all that. Ms. Lamar
10  witnessed some of that.
11      Q.  Okay.
12      A.  Maybe that's what the question was about.
13      Q.  Could it have been about Ms. -- well, let me
14  ask you. After your -- I'm just asking you, do you --
15  does it refresh your memory when I say Ms. Johnson
16  asked Ms. Lamar about asking her for cases -- did that
17  come up in that conversation -- on a day other than
18  Friday?
19      A.  I don't -- I don't recall that.
20      Q.  Okay.
21      A.  I do recall one thing, that Ms. Johnson left
22  the room and came back and had a statement for each of
23  us to sign saying that we had refused to let her
24  talk -- you know, have I guess union representation or
25  something. And I believe she asked Cynthia to sign

Page 65

1   that also.
2       Q.  I'm thinking that might be in here. Okay.
3   Have you ever told Ms. Johnson that you believe she
4   had an emotional or mental problem?
5       A.  I don't -- what I remember about the
6   conversation was that I told her that I was concerned
7   that she came away from meetings with people or
8   conversations with people, with a completely different
9   version than what other people had.
10      Q.  Okay.
11      A.  I remember that she said I am not paranoid.
12  As far as what her motivation for having different
13  recollections or stating things differently than
14  everyone else thought, I don't want to speculate; but,
15  you know, I think the referral to employee
16  counseling -- I did not know what her motivation was.
17  I guess --
18      Q.  Okay. Tell me what the employee -- tell
19  me -- explain what that program is.
20      A.  It's for people that are, you know, having
21  issues at work, where they're having problems doing
22  the work because of outside problems at times. People
23  can be under stress, things like that.
24      Q.  So is it -- is it psychological?
25      A.  It -- I guess it can be. It can be, yeah.

Page 66

1    Q.  It can be.  Okay.
2    A.  You know, there was certainly a question in
3  my mind about -- about Ms. Johnson's stability.
4    Q.  Do you recall Ms. Johnson reporting to you
5  that her desk lamp was broken in 2003?
6    A.  I -- I --
7       MR. DuBOIS:  Object to the form.
8    A.  I know about that incident, certainly.
9    Q.  Were you involved in that at all?
10    A.  Yeah.  I tried to repair it myself several
11  times.  I tried to find out who we could contact to
12  come in and replace a lamp like that.
13    Q.  Uh-huh.  Not to interrupt you, but what type
14  lamp was it?
15    A.  It's a -- it was a lamp that was on about
16  three levers.  And it -- so it was made so that you
17  could bend the lamp over to whatever height you wanted
18  to have it.  You could stand it straight up.  It had
19  arms that had springs in them.  And Ms. Johnson's lamp
20  had come completely apart.  At the various places
21  where they're joined together and those elbows are, it
22  had come apart.
23    Q.  So you did eventually repair it?
24    A.  I eventually replaced it.
25    Q.  Oh, you replaced it.

Page 67

1    A.  I replaced it.  I couldn't -- I was
2  unsuccessful in my attempts to repair it.
3    Q.  So you didn't -- okay.  How long did it take
4  you to replace it?
5    A.  I -- she sent me a follow-up e-mail and said
6  that her lamp that she had brought from home, which
7  was a desk lamp, was too hot.  At that point, I went
8  and took a lamp from another workstation.  And this is
9  not easy because there's a wall right next to the --
10  or a partition right next to where they butt up.
11  Everything is all bolted together.  So I -- I went
12  under there, unbolted a bunch of stuff, took that lamp
13  out, and crawled up under her workstation and
14  maneuvered around and loosened it up enough that I
15  could get the lamp in there.  And I did -- I replaced
16  it, but I -- I never was able to fix her lamp.
17    Q.  That's why you got that job.
18    A.  Yeah, that's right.
19    Q.  Because you can do all that stuff.
20    A.  That's right.
21    Q.  Pardon me.  Okay.  So, but you eventually
22  replaced it, but you're not sure how long it was?
23    A.  She sent me an e-mail, and she told me that
24  it had been like six months since she had asked about
25  it.  You know, I -- I had worked on it a couple of

Page 68

1  times.  She had a lamp there.  I didn't consider that
2  a real, you know, work stoppage issue or anything.
3  But when she did follow up, I did go in there and fix
4  it.
5    Q.  Okay.  Moving back to the files, where are
6  the workup files that the legal assistants are
7  assigned -- where are they kept?
8    A.  They're kept at the -- at the legal
9  assistant's -- in their work area, where there's file
10  cabinets that are kept there.
11    Q.  Who has access to those file cabinets?
12    A.  Anybody.
13    Q.  Anybody?
14    A.  Yeah.
15    Q.  Okay.  So just any employees?
16    A.  Yeah.  You know, we constantly -- like if
17  mail comes in and it needs to be associated with that
18  file, the employee that's working the mail would go
19  into HOTS, identify the -- where the file was located,
20  take the piece of mail over to the file and associate
21  it.
22    Q.  Okay.
23    A.  So, you know, that's -- that's just routine.
24    Q.  Did you, along with Ms. Lamar and/or at
25  different times Mr. Johnson, ever together, the two --

Page 69

1  you and Mr. Johnson or you and Ms. Lamar, ever
2  approach Ms. Johnson regarding her workup files
3  together?
4       MR. DuBOIS:  Object to the form.
5    A.  I don't recall specifically.
6    Q.  Okay.
7    A.  Can you tell me more specifically what
8  you're --
9    Q.  Well, no, no, no.  I'm -- well, I guess --
10  okay.  Let me ask the next question, then.
11    A.  Okay.
12    Q.  Is it customary in your position that you --
13  if there's a problem with workup files, that you would
14  go along with the manager or supervisor to talk to the
15  employee?
16       MR. DuBOIS:  Object to the form.
17    A.  If we -- if -- if a supervisor wants me to
18  accompany them, then, certainly I would.
19    Q.  Okay.  Have you done that with Ms. Johnson?
20    A.  I -- I don't recall.
21    Q.  Okay.  So have you done it with any employees
22  that you recall?
23       MR. DuBOIS:  Object to the form.
24    A.  We -- the times I'm usually involved in a
25  situation like that is when an employee is suspected

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                   7/11/2008
DEPOSITION OF  PAUL REAMS

---

**Page 70**

1  of having claimed credit for work they haven't done.
2     Q.  Okay.
3     A.  And whether -- I really don't remember being
4  specifically involved in approaching Ms. Johnson about
5  that.
6     Q.  Any other employee?
7     A.  Certainly.
8     Q.  Who -- who would that be?
9     A.  Well, the one that comes to mind is Debbie
10 Rambo.
11    Q.  Okay.  Again, you told me what her position
12 is.
13    A.  She's a lead --
14    Q.  Lead legal --
15    A.  Lead legal assistant.
16    Q.  Who did you approach her with?
17    A.  Ms. Lamar.
18    Q.  Do you recall the time that Ms. Johnson was
19 accused of taking time sheets of other employees?
20    A.  I certainly know about that instance.
21    Q.  Tell me what you know about it.
22    A.  I know that some time sheets turned up
23 missing and that she later told Paul Johnson that
24 someone had put them in her work and she found them at
25 home.

---

**Page 71**

1     Q.  Do you recall if a meeting or anything was
2  had?
3     A.  I was in Charleston at the time.
4     Q.  So you --
5     A.  Paul -- Paul was -- Paul Johnson was the
6  acting HOD.
7     Q.  Do you know if he --
8     A.  What I know, I -- this has -- I'm not very
9  specific about this because I wasn't there.  I do know
10 they asked me if they could move all the time sheets
11 to one location.
12    Q.  Did Ms. Johnson report that those time sheets
13 were in her work, or did someone question her about
14 those?  How did that come up?
15    A.  I don't know.
16    Q.  Okay.  If an employee reports an incident
17 that they -- that he or she feels is, whatever, that
18 they've been wronged in some way or someone has done
19 something to them, does management investigate that?
20        MR. DuBOIS:  Object to the form.
21    A.  Yes.
22    Q.  Okay.  Does management always investigate?
23    A.  It depends on how serious, you know, whether
24 there's something -- I would assume if it's something
25 you could easily prove right or wrong right there.

---

**Page 72**

1     Q.  Uh-huh.
2     A.  So I guess that would be an investigation.
3     Q.  Right.
4     A.  So I'd say yes.
5     Q.  Okay.  Did Ms. Johnson ever complain to you
6  about a hostile work environment?
7         MR. DuBOIS:  Object to the form.
8     A.  Are you talking about just generally?
9     Q.  Well --
10    A.  I -- I'm certainly --
11    Q.  General --
12    A.  I'm certainly aware of the letter that she
13 wrote to Gloria Bozeman.
14    Q.  Okay.
15    A.  As far as any other specifics, I would like a
16 specific.
17    Q.  I guess my question is are you aware of any
18 complaints that she made?
19    A.  I am aware that she complained in November of
20 '04 to the regional office that we had two employees
21 and one had threatened the other.  And she had said
22 that was an indication of the hostile work environment
23 in Montgomery.  She never -- she never came to me
24 about that.
25    Q.  Okay.  So -- okay.

---

**Page 73**

1     A.  I tried to investigate it by talking to her,
2  and she refused to give me any information about what
3  she knew.  Now, I do recall that specific instance.
4     Q.  Okay.  To give you some specifics --
5     A.  Okay.
6     Q.  -- was an incident reported to you involving
7  Ms. Johnson nearly being hit by a vehicle on the
8  premises?
9     A.  That incident -- I am aware of that.  I don't
10 remember exactly when it occurred.
11    Q.  Okay.
12    A.  Ms. Johnson had started refusing to park in
13 the employee parking lot.  She started parking at a
14 business in the front of the building next door.
15    Q.  Okay.
16    A.  She's the only employee who has ever done
17 that.  Ms. Johnson told our guard that she had almost
18 been hit while she was walking across our front
19 parking lot going to her car, which was off of our
20 premises, by another employee.
21    Q.  Okay.
22    A.  The guard reported that to his or her
23 superior.
24    Q.  Okay.
25    A.  The Federal Protective Service was called.

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                          7/11/2008
DEPOSITION OF   PAUL REAMS

20 (Pages 74 to 77)

Page 74

1   Q.   Okay.  Who called the Federal Protective
2  Service.
3   A.   I would think the guard.
4   Q.   Okay.
5   A.   See, that's who they really work for.
6   Q.   Okay.
7   A.   Okay.  The inspector for almost all of
8  Alabama came and interviewed Ms. Johnson and
9  interviewed Renita Barnett-Jefferson, the woman that
10 Ms. Johnson thought was trying to run over her.  He
11 took statements from both.  The -- the incident -- the
12 total incident, according to him -- because he came
13 and told me about it -- was that --
14   Q.   When you say him, you're talking security
15 guard and the --
16   A.   No.  Horak, Inspector Horak.
17   Q.   Okay.
18   A.   He came and told me that Ms. Johnson was
19 walking across the parking lot.  Renita
20 Barnett-Jefferson pulled into the parking lot, stopped
21 her car; and that was it.  There was -- he said there
22 was just absolutely nothing to this.
23   Q.   Okay.
24   A.   There was a pedestrian walking across the
25 parking lot.  The person driving the car stopped.  He

Page 75

1  said there was nothing to report.  But I did know what
2  was going on.
3   Q.   Okay.  So there was -- go ahead.
4   A.   That's it.  The Federal Protective Service
5  investigated and found nothing to it.
6   Q.   Okay.  Did you personally investigate?
7   A.   No.
8   Q.   The agency security guard you referred to,
9  did he go on leave following the incident?  Are you
10 aware of that?
11   A.   No.  There was --
12   Q.   Okay.
13   A.   I have no idea whether that's related.
14   Q.   Okay.  Were you notified that Ms. Johnson's
15 car had been scratched?
16   A.   Ms. Johnson called the police without
17 contacting anyone about management -- in management.
18   Q.   Did she report it to you?
19   A.   At some point, she requested -- the way she
20 reported it to me was she sent me an e-mail and
21 requested that the government or the agency pay for
22 the damages to her car and that she be allowed to park
23 in the visitors parking lot in the front of the
24 building.  So I -- I was aware of it that way.  She
25 did not contact management before calling the police.

Page 76

1  She never involved us at all with the police.
2   Q.   Okay.  And once you learned, did you
3  investigate it?
4       MR. DuBOIS:  Object to the form.
5   A.   As far as investigating it, I talked to
6  Bernethia.  She -- she thought an employee in the
7  building had scratched the car.  I found out that the
8  car was a new car to her that had been purchased I
9  think over the weekend.  And she had just -- you know,
10 she was -- it was new to our parking lot.  I had --
11 you know, my conclusion or response to her was that if
12 somebody had scratched the car, some kind of criminal
13 act had occurred back in the parking lot, that I had
14 no -- that there was no way that I thought the agency
15 was responsible for repairing the damage based on
16 some, you know, improper action.
17    I never had any indication of who did it except
18 for just the accusation by Ms. Johnson.  She asked to
19 have the -- to start parking in front of the building.
20 And we don't have space out there even for the
21 visitors now.
22   Q.   Okay.
23   A.   Many times the parking lot is full and people
24 are parking illegally in several different places on
25 the curb.  So I -- and I was also concerned about

Page 77

1  having employees coming in and out through --
2  commingling with the public.  And so I denied her
3  request to park out front.
4   Q.   Okay.  Did she report a situation of her
5  picture being taken to you -- by another employee?
6   A.   I don't recall that one.
7   Q.   Okay.
8   A.   What picture are we talking about?
9   Q.   Another employee.
10   A.   Oh.  Oh, I'm sorry.  I misunderstood you.  I
11 thought you meant a photograph had been taken --
12   Q.   Oh, no, no, no.  I'm sorry.
13   A.   I misunderstood.
14   Q.   Okay.
15   A.   Yes, I am aware of that.  I -- again, I was
16 in Charleston when that happened.
17   Q.   Okay.
18   A.   But I was told by Paul Johnson.  He sent me
19 an e-mail and told me that -- that that had happened
20 and that he had told the employee not to take any more
21 pictures, you know, and it was -- it was a true -- it
22 was true that the employee had taken a picture of her
23 and was standing in front of the building.  And we
24 told that employee not to ever do that again.  Paul
25 Johnson told the employee.  I later told the employee

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF  PAUL REAMS

21 (Pages 78 to 81)

---

Page 78

1  the same thing.
2     Q.  You did?
3     A.  Yes.
4     Q.  Okay.  Did Ms. Johnson ever report a gun
5  situation to you?
6     A.  That's the -- if we're talking about the --
7  do you know what months we're talking about?
8     Q.  I don't.  Well -- I don't.  I'm thinking it's
9  April, May.  I'm not sure.  Are you familiar with
10 any -- ever having anything to do with regard to a
11 gun?
12    A.  I'm familiar with the situation that I told
13 you about earlier that happened in November of '04
14 when we had two employees that got into a dispute over
15 baby clothes.
16    Q.  No.
17    A.  No?  That's not --
18    Q.  We didn't talk about that, I don't think.
19    A.  Well, I'm being -- I'm giving you more detail
20 than I gave you before.
21    Q.  Okay.
22    A.  Ms. Johnson wrote a letter to the regional
23 office alleging that she was in a hostile work
24 environment and that employees had guns.  I certainly
25 did investigate that.

---

Page 79

1     Q.  Okay.
2     A.  That's the -- that's -- that's when I sent
3  Ms. Johnson an e-mail asking her about what
4  information she had since she knew -- apparently knew
5  about it and had also gone and talked to our guard out
6  front about it.  That's when Ms. Johnson refused to --
7  she said, as for whatever, I have no comment.  And I
8  responded that I regretted that she was not
9  cooperating in an investigation.
10       The employees involved, there was a woman that
11 worked there that said something about I have a piece
12 in my car or I have a piece, you know, or something,
13 some kind of a comment like that.  I directly asked
14 her if she actually had a gun in her car, and she
15 denied it.  I then sought guidance from the regional
16 office as whether we could prevent employees from
17 bringing guns in their own cars onto the parking lot
18 and was advised that I could not.
19    Q.  I'm going to move back to those cases that
20 you had a problem with, the 11 cases.
21    A.  Right.
22    Q.  Okay.  Did you discuss with Ms. Johnson --
23 well, let me back up.  Do you recall that Ms. Johnson
24 worked the receptionist area March of '04?
25    A.  Yes.

---

Page 80

1     Q.  Okay.  Did you discuss any of the incomplete
2  cases with Ms. Johnson while she was performing
3  receptionist duty?
4     A.  I didn't.  As far as I can recall, I did not.
5     Q.  Well, let me ask you this.  Do you recall
6  bringing a sheet of paper or a list or anything about
7  cases to Ms. Johnson when she was at the front desk,
8  asking her why the -- why the case was returned?
9     A.  Returned?
10       MR. DuBOIS:  Object to the form.
11    A.  Returned to what?  Returned from where?
12    A.  Let me just read the whole question.
13    A.  Okay.  Okay.  Okay.
14    Q.  Bad question.  Let me just scratch that.  You
15 don't remember any conversations whatsoever about any
16 files while Ms. Johnson was at the front desk?
17    A.  Well, I just -- I would like to make a
18 general statement.  We talk about work every day with
19 all sorts of employees.  I -- you know, I don't
20 specifically recall any instance.
21    Q.  Okay.
22    A.  I do understand that there was a question
23 about the work that she had done in February, whether
24 that work had actually been completed or not.  I
25 learned about that later.

---

Page 81

1     Q.  Okay.
2     A.  But I don't -- I do know also that some of
3  the cases that she was working on at the end of
4  February were assigned to another employee because
5  Ms. Johnson was about to be sitting on the front desk
6  for the entire month of March.
7     Q.  Okay.
8     A.  And would not be, you know, there to work on
9  the cases.
10    Q.  Okay.  Has Ms. Johnson ever parked in a
11 handicapped parking space that you're aware of?
12    A.  Yes, I am aware of one instance.
13    Q.  Okay.  Would you explain?
14    A.  Ms. Johnson's supervisor, Cynthia Lamar, has
15 a handicapped sticker for her car.  She has bad knees.
16 She -- she parked in the handicapped place, which was
17 right next to the back door where she came in, closest
18 door to her office.
19    One day when I got to work Ms. Johnson was parked
20 in Ms. Lamar's usual parking place in the handicapped
21 parking space.  It appeared to me to be some sort of
22 confrontational -- I had no idea why she would choose
23 to park in a place where all employees knew that her
24 supervisor routinely parked.  So she -- she had no
25 authority to park there.  That's a handicapped place.

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF PAUL REAMS

22 (Pages 82 to 85)

Page 82

1   Her supervisor parked there every day. I couldn't
2   understand why she would, all of a sudden, park in
3   that parking spot.
4       Q.   Okay.
5       A.   So I went and told her to move, move the car.
6       Q.   How many parking spaces are there?
7       A.   There's -- on the east side of the building,
8   there are two.
9       Q.   Okay. The area you're talking about.  Okay.
10      A.   Two. Oh, you're talking about in general in
11  the parking lot?
12      Q.   Well, no, no, no. You answered.
13      A.   Handicapped parking?
14      Q.   Yes, sir.
15      A.   There's two.
16      Q.   Would it have been a problem if she had
17  parked in the second parking space?
18      A.   We had two employees that parked -- that
19  parked in -- routinely parked in those two parking
20  spaces.
21      Q.   Who is the second employee?
22      A.   Teresa Frazer.
23      Q.   She has a --
24      A.   She has a handicapped placard also.
25      Q.   Has any other employee, other than Teresa and

Page 83

1   Ms. Lamar, ever -- ever parked in those parking
2   spaces?
3       A.   Yes.  Yes.
4       Q.   Okay.  Who would that be?
5       A.   Well, I remember specifically asking Beverly
6   Warner to move. One of our judges, Michael Anderson,
7   routinely would sometimes park across the line. And
8   if -- if one of the people that were parking in the
9   parking lot said I can't -- I don't have enough room
10  here, I would ask him to move, to re-park.
11      Q.   I guess I'm asking about those two parking
12  spaces.
13      A.   Yes.
14      Q.   So a judge --
15      A.   He would sometimes park over the line.
16      Q.   Okay.  But in one of those two parking
17  spaces?
18      A.   It would be in the -- in the place, yes.  So
19  he -- we've asked him --
20      Q.   Is he handicapped?
21      A.   No.  We asked him to move.
22      Q.   Only -- was it because he was parked over the
23  line --
24      A.   Yes.
25      Q.   -- or because he was there?

Page 84

1       A.   No.  Because he was over the line. He was
2   not in -- he was not in the place totally. He was
3   just across the line.
4       Q.   I got you.  Okay.  Anyone else?
5       A.   Not that I can recall.  Now, just to kind of
6   try to clarify the situation, in the afternoon, if --
7   if someone -- you know, if, say, Ms. Frazer left work
8   at three o'clock and somebody had left for some
9   reason, I didn't enforce that if Ms. Frazer was gone.
10  I mean, she could -- she could come.
11      Q.   Was Ms. Lamar there when you asked
12  Ms. Johnson to move?
13      A.   I don't think she had gotten to work yet.
14      Q.   What time was it?
15      A.   I -- I really don't recall this incident.  I
16  think it was -- if I had to speculate, I would say it
17  was in the morning. It's possible it was at lunch.
18  But it was sometime when Ms. Lamar had -- was out of
19  that space and Ms. Johnson pulled into the space.
20      Q.   Yes, sir. There have been occasions when one
21  of those employees was not there and the other people
22  parked there.  You didn't have a problem with it; is
23  that correct?
24           MR. DuBOIS: Object to the form.
25      A.   If -- this would usually happen in the

Page 85

1   afternoon, you know, after these people had routinely
2   left. If somebody came in, you know, late in the
3   afternoon, had gone on some errand or something, that
4   would not bother me.
5       Q.   The handicapped -- were there placards that
6   they had in their cars?  How were they displayed, the
7   handicapped decals?
8       A.   These people both had placards.  Now, you
9   know, whether they displayed them every time they ever
10  parked there, that was not required.  I -- you know, I
11  know these people both have handicapped placards.
12  Everyone in the office knew they had handicapped
13  placards. This was not something that had just
14  recently occurred.  This was something that had gone
15  on for years.
16      Q.   Okay.  At some point, did you forbid
17  Ms. Johnson to enter your office and close the door?
18      A.   Yes.
19      Q.   Okay.  Why is that?
20      A.   This was in about June of '05.  By that
21  point, she had gone through a -- accusing one of her
22  supervisors of standing and yelling at her when there
23  was -- apparently it didn't happen. She had been in a
24  meeting with me and Cynthia Lamar and had
25  characterized that meeting as leaving -- as being

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                7/11/2008
DEPOSITION OF PAUL REAMS

23 (Pages 86 to 89)

| Page 86 |
| --- |

1  mentally terrorized and intimidated and feeling as if
2  she had been raped by management.  She had accused --
3  well, Cynthia -- in April in '05, Cynthia had reported
4  to me that she had gone behind her desk in Cynthia's
5  office and had taken the phone and made a phone call
6  while Cynthia was telling her not to do it.
7      Q.  When was that?
8      A.  In April of '05.
9      Q.  Okay.
10     A.  Later in April of '05, she -- it was reported
11  to me that she had snatched a file out of Cynthia's
12  hands while they were discussing a performance
13  appraisal, the midyear performance appraisal.  It
14  seemed like we were getting this escalating hostility
15  from Ms. Johnson.  It seemed that she was not above
16  making false accusations.
17      We consulted with the regional office and were
18  found -- and we determined that for our own -- it's
19  not necessarily safety, because we didn't fear her
20  physically; but because of concern about false
21  accusations, what might occur behind closed doors that
22  she would accuse us of regardless of the facts, it
23  would be just safer to always have a witness.  We also
24  had problems with her remembering events differently
25  from what anybody else that was there.

| Page 87 |
| --- |

1      So we decided that we would meet with her either
2  more than one person, with a witness, or that we would
3  ask her to leave the front -- leave the door open to
4  the office.
5      Q.  Okay.  Did you -- was this just your policy,
6  or was it all management?  Ms. Lamar, Mr. Johnson,
7  anyone, all of management --
8          MR. DuBOIS:  Object to the form.
9      Q.  -- had to do this?
10     A.  It was primarily -- and I can't recall about
11  the other two because they were no longer involved
12  with Ms. Johnson.  You know, Paul Johnson had not been
13  her supervisor for, at this point, over a year.
14     Q.  Okay.
15     A.  Pam -- Pam Davenport had not really had much
16  involvement with her, and she was on the other side of
17  the building.  But it was primarily Ms. Lamar and me
18  that were dealing with Ms. Johnson fairly routinely.
19     Q.  Okay.
20     A.  And that's -- so it was -- you know, I
21  don't -- what I don't recall is whether I, you know,
22  talked to Pam about this or not; but it was definitely
23  something that Cynthia and I, along with the guidance
24  from the regional office, thought was appropriate.
25     Q.  So Ms. Lamar wouldn't allow her in her office

| Page 88 |
| --- |

1  either?
2          MR. DuBOIS:  Object to the form.
3      A.  No, not -- not allow her in the office --
4      Q.  Well, right.
5      A.  -- but we wanted the door open.
6      Q.  Okay.  Do you recall denying Ms. Johnson
7  leave when she attempted to vote?  I think it was in
8  '03?
9      A.  I -- I -- that has -- I had no recollection
10  until that issue was raised last week.
11     Q.  Okay.
12     A.  Since that time, I've found out that the
13  election we were talking about in October of '03 was a
14  Montgomery city election.
15     Q.  Okay.
16     A.  The -- the employees are supposed to be given
17  a three-hour window as far as voting, either three
18  hours before we come to work, three hours after we
19  come to work.  If during -- if -- if the poles are
20  opened during that three-hour window -- and in
21  Montgomery, the poles were open between 7 and 7 --
22  then no leave is granted.  We start having issues when
23  we're dealing with employees that live in far away
24  places where poles close earlier and all that.  That
25  was not the situation here.  I decided that we would

| Page 89 |
| --- |

1  not grant any voting leave for that day.
2      Q.  So no employee received -- who lived in
3  Montgomery -- any voting leave for that day?
4      A.  No employee received voting leave for that
5  day.
6          MR. DuBOIS:  Can we take a short break?
7          MS. BATTLE-HODGE:  Well, I actually have a
8  couple more questions.  We can take a short break, if
9  you want to; and we might be able to wrap up.
10         (Brief recess)
11     Q.  I just have a couple of questions, and we'll
12  be finished.  And you probably can't answer this, but
13  I'm going to ask it anyway.  This document #25, do you
14  know the difference -- let me give it to you.  Well,
15  it's not #25 on your history.  This is a very bad
16  copy.
17     A.  Yeah.  Okay.
18     Q.  That says date created, date modified, and --
19  what's that -- accessed.  And this is the same file.
20  And then we have another date created.  Do you know
21  the difference?  Because on some of these, the date --
22     A.  There's a create date.
23     Q.  -- the create date --
24     A.  April the 12th.
25     Q.  Okay.  Then on some of these, the date

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF PAUL REAMS

24 (Pages 90 to 93)

Page 90

1  created is a different date. Is that -- do you know
2  the difference in that?
3      A.  No.  That's part of -- that issue was raised
4  at the time that Ms. Johnson was receiving a
5  reprimand, and I found that to be confusing on a lot
6  of them, and I just left it alone.
7      Q.  So we don't really have a real answer.
8      A.  No.  No.  Never really got that resolved.
9      Q.  Okay.  All the meetings that you had with
10  Ms. Johnson, management, are you aware if any of the
11  meetings were taped by management?
12      A.  There was absolutely no recording done by
13  management.
14      Q.  What is the lunch policy at the agency?
15      A.  At the agency?  Employees are allowed to go
16  to lunch for an hour.
17      Q.  Okay.
18      A.  We can go between 11 and 2.
19      Q.  Okay.  Is there an official policy?  What's
20  the policy if an employee returns from lunch late?
21      MR. DuBOIS:  Object to the form.
22      A.  It's they should take leave.
23      Q.  Are any employees allowed to take -- or did
24  employees take longer than an hour lunch break and not
25  required to take leave?

Page 91

1      MR. DuBOIS:  Object to the form.
2      A.  We've had employees go to, sometimes, like
3  birthday parties and I won't make them take leave.
4  There is certainly no policy that employees can take
5  longer than an hour and not take leave.
6      Q.  Okay.  But are you saying that there are some
7  instances where that --
8      A.  There certainly have been some instances,
9  like our holiday party.
10      Q.  Okay.
11      A.  We've had situations in the past where when
12  the office makes goal, we've let everybody go to lunch
13  longer, things like that.  There are no employees --
14  there's no -- there's no group of employees that can
15  go to lunch for an hour and a half where other
16  employees cannot go to lunch for an hour and a half.
17      Q.  Okay.  Did you regularly take your lunch
18  break with any employees that -- any employees at the
19  agency?
20      A.  Yes.
21      Q.  Okay.  Who were they?
22      A.  I think you're probably talking about Laura
23  Robinson.
24      Q.  I am.
25      A.  Okay.

Page 92

1      Q.  Yeah.
2      A.  I -- that's who I routinely went to lunch
3  with most days.
4      Q.  Okay.  Now, what's her position?
5      A.  She's a senior attorney.
6      Q.  Okay.  Do attorneys have the same one-hour
7  lunch break?
8      A.  Exactly.
9      Q.  So did she sometimes take longer than an
10  hour?
11      A.  I -- I would assume everybody at some time
12  has taken longer than an hour.  Certainly not
13  routinely.
14      Q.  So on occasion?
15      A.  Not that I -- not that I can recall without
16  leave being taken.
17      Q.  Okay.  Go to lunch with any other --
18      A.  Certainly.
19      Q.  Well, yeah, I'm sure from time to time,
20  but more regularly than once a month or so.
21      A.  I would say probably not.
22      Q.  Okay.
23      A.  But, you know, I -- we go to lunch with the
24  management at times.
25      Q.  Okay.  What about Ms. Chevalier?

Page 93

1      A.  Chevalier?
2      Q.  Chevalier, yes.
3      A.  I have gone to lunch with her.
4      Q.  How often would you go to lunch with her?
5      A.  I would say not once a month.
6      Q.  Has she ever taken longer than an hour and
7  didn't take leave?
8      A.  You know, not that I'm aware of.
9      Q.  Has anyone -- did anyone complain to you
10  about Ms. Johnson and Ms. McMillan (sic) and in
11  particular about them having extended conversation and
12  you met with them about that?
13      MR. DuBOIS:  Object to the form.
14      A.  McMillan?
15      Q.  McWilliams.
16      A.  I think there was at least one time that I
17  asked them to break up their conversation.
18      Q.  Okay.  Why was that?
19      A.  When employees are standing around and not
20  working, what I normally do is, if they're there for
21  an extended period of time, ask them to stop and go
22  back to work.
23      Q.  Did you meet with these two ladies?
24      A.  I don't specifically recall that.  I
25  certainly could have.

Page 94

1    Q.  Okay.
2    A.  If there was something that I needed to say
3  to them besides go back to work, we routinely did not
4  do any kind of discussion like that in public.  We try
5  not to embarrass one another.
6    Q.  Okay.  Do you recall informing or relating to
7  Ms. McMillan that the employees didn't like that she
8  was associated with Ms. Johnson?
9         MR. DuBOIS: Object to the form.
10    A.  I think you're talking about Ms. McWilliams.
11    Q.  Yeah, I am.
12    A.  I don't recall a conversation like that.
13        MS. BATTLE-HODGE: Okay.  Let's take a short
14  break.  Just a couple of minutes.
15          (Brief recess)
16    Q.  Okay.  Backing up way back to April '04.
17    A.  Okay.
18    Q.  Before the -- I think it was April 30th
19  meeting where you had the meeting with Carl on the
20  phone.
21    A.  Right.
22    Q.  This is a -- do you recall in your
23  investigating, you gathered statements from certain
24  people?
25    A.  That's correct.

Page 95

1    Q.  Okay.  Do you recall -- well, I'm going to
2  list these people.  You tell me whether you got
3  statements from them.
4    A.  Okay.
5    Q.  Ms. Weeks, which is now Ms. Frazer.
6    A.  Right.  Yes.
7    Q.  Ms. McAnnally?
8    A.  McAnnally, yes.  Right.
9    Q.  Karen Burton?
10    A.  Yes.
11    Q.  Ms. --
12    A.  Chevalier?
13    Q.  -- Chevalier?
14    A.  Yeah.
15    Q.  Did you ask Ms. McWilliams for a statement?
16    A.  I believe so.
17    Q.  Did she give it to you?
18    A.  I'd have to go back and look.  I believe -- I
19  believe she did.
20    Q.  Okay.  Did you -- have you ever produced that
21  statement she gave?
22    A.  I -- I'm aware of what she said.
23    Q.  What did she say?
24    A.  She said that she -- all she heard was Paul
25  Johnson saying, I'm your supervisor.

Page 96

1    Q.  Okay.  She didn't say how he said it or
2  anything, just -- that's all she said she heard?  That
3  was it?
4    A.  I think I -- that's basically it.
5    Q.  Okay.
6    A.  I mean, she -- she was outside the door.
7    Q.  Okay.
8    A.  And sitting in a workstation very close by.
9    Q.  So that was -- that was a written statement?
10    A.  I can't swear to that.  I don't -- I don't --
11  I don't --
12    Q.  Can you look to see if you -- if you have any
13  statements?
14    A.  But for some reason -- for some reason, I
15  know that.  I do know that.
16    Q.  But you have those statements that they gave
17  you?
18    A.  I have them, yes.
19    Q.  Would you mind looking to see if --
20    A.  I don't have them with me.
21    Q.  No, no, no.
22    A.  Okay.  Yes, I'll be glad to.
23    Q.  When you get back.  And if you have it, would
24  you produce it to your attorney?
25    A.  Sure.

Page 97

1    Q.  Okay.  Okay.
2         (Off-the-record discussion)
3         MS. BATTLE-HODGE: We're going to end our
4  questioning.
5         MR. DuBOIS:  I have no questions.
6         MS. BATTLE-HODGE: Okay.
7          (The deposition concluded at
8           4:31 p.m.)
9          * * * * * * * * * *
10         FURTHER DEPONENT SAITH NOT
11          * * * * * * * * * *
12
13
14
15
16
17
18
19
20
21
22
23
24
25

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                                    7/11/2008
DEPOSITION OF  PAUL REAMS

26 (Pages 98 to 99)

Page 98

1        REPORTER'S CERTIFICATE
2    STATE OF ALABAMA
3    MONTGOMERY COUNTY
4        I, Mallory M. Johnson, Certified Court Reporter
5    and Commissioner for the State of Alabama at Large,
6    hereby certify that on Friday, July 11, 2008, I
7    reported the deposition of PAUL ELLISOR REAMS, who was
8    first duly sworn or affirmed to speak the truth in the
9    matter of the foregoing cause, and that pages 3
10   through 97 contain a true and accurate transcription
11   of the examination of said witness by counsel for the
12   parties set out herein.
13       I further certify that I am neither of kin nor of
14   counsel to any of the parties to said cause, nor in
15   any manner interested in the results thereof.
16       This 30th day of July, 2008.
17
18       _____
         MALLORY M. JOHNSON, COURT REPORTER
19       And Commissioner for the
         State of Alabama at Large
20       Alabama License Number: 443
         Expires 09/30/08
21
         MY COMMISSION EXPIRES:  2/24/09
22
23
24
25

Page 99

1        SIGNATURE OF WITNESS
2        I, PAUL ELLISOR REAMS, hereby certify that I
3    have read the transcript of my deposition consisting
4    of pages 3 through 97, and except for the corrections
5    listed below, certify that it is a true and correct
6    transcription.
7
8        _____
         PAUL ELLISOR REAMS
9
10   SWORN TO AND SUBSCRIBED before me
     this _____ day of _____, 2008.
11
12   _____
     NOTARY PUBLIC
13
14       * * * * * * * * * * *
15   Page  Line  Correction and reason therefor
16
17
18
19
20
21
22
23
24
25

WORD INDEX

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008

## DEPOSITION OF  PAUL REAMS

### A

able 39:10 67:16 89:9
absent 20:3
absolutely 74:22 90:12
accept 50:12
access 36:8 40:18 68:11
accessed 89:19
accommodation 18:21,23 19:16
accommodations 18:12 19:11
accompany 69:18
accurate 98:10
accusation 76:18
accusations 50:10 60:22 61:24 86:16,21
accuse 86:22
accused 24:25 61:13 70:19 86:2
accusing 62:2,3 85:21
act 76:13
acting 71:6
action 76:16
actions 21:8,10 61:21 63:12
activities 14:22 16:6
add 13:25
address 4:10
ADMINISTRA... 2:11
administrative 7:23 9:4,5 42:4 58:23 59:2
administrator 42:2
admission 50:14
adult 5:1
advised 79:18
advisor 6:24
affirmed 98:8
AFGE 23:5

afternoon 3:22,23 4:1 84:6 85:1,3
age 54:4,8
agencies 8:5
agency 9:6 36:15 37:3 42:19 60:4 62:9 75:8,21 76:14 90:14,15 91:19
aggressive 61:23
ago 34:18
agreed 2:22 3:10
agreement 1:16 23:5
ahead 17:8 23:13 48:15 50:5 63:20 75:3
al 1:9
Alabama 1:2,18,20 2:5,8,9 3:3 5:5 8:15 74:8 98:2,5 98:19,20
allegations 48:12 51:13
alleged 61:23
alleging 78:23
allotment 42:24
allow 87:25 88:3
allowed 46:16 75:22 90:15,23
allowing 53:25
allows 35:9
amount 16:10 50:13 58:19
Anderson 83:6
and/or 68:24
Annesse 5:15
answer 26:13 17:8 89:12 90:7
answered 43:5,7 82:12
anybody 35:8 36:15 68:12,13 86:25
anyway 89:13
apart 66:20,22

apparently 31:12 56:20 79:4 85:23
appeal 22:20,24
appear 51:3
APPEARANCES 2:1
appeared 24:21 50:1 81:21
appears 49:17
appraisal 86:13,13
approach 69:2 70:16
approaching 70:4
appropriate 87:24
approval 50:2
approve 46:22 50:6
approved 18:16 29:22
approximately 1:21
April 23:23,24 31:1,4,9,13,23 34:10 56:10 60:12,13 78:9 86:3,8,10 89:24 94:16,18
area 5:23 68:9 79:24 82:9
arms 66:19
asked 15:3 45:12 48:11 55:14,25 56:20,23 57:6,19 62:15,22 63:25 64:16,25 67:24 71:10 76:18 79:13 83:19,21 84:11 93:17
asking 18:11 23:18 51:17 57:2 64:14 64:16 79:3 80:8 83:5,11
assign 40:20
assigned 37:3 38:22 39:24 40:2 40:19 42:10 54:4

54:18 68:7 81:4
assignments 54:25
assigns 38:12,14
assist 21:13
Assistance 62:8
assistant 2:7 9:4,5 12:12 19:7,8 24:14 25:11 27:1 36:3 39:6,25 40:3 42:4 56:6 70:15
assistants 12:17 28:7,11,18 37:8 38:17 42:11 53:20,24 54:2,9 68:6
assistant's 68:9
assisted 5:18 21:15
associate 68:20
associated 68:17 94:8
assume 60:8 71:24 92:11
ASTRUE 1:8
Atlanta 2:13 8:3,7 8:10 30:13 53:6
attached 26:7 27:16 32:2
attempted 88:7
attempting 45:13
attempts 67:2
attorney 2:4,7,8,11 6:24 7:3,12 25:8 57:14,24,25 58:14,15 59:8 60:1 92:5 96:24
attorneys 9:2 11:1 11:17,18,19,23 11:24 92:6
Attorney's 1:19
audit 26:20 27:10 27:11,13
audits 26:18 27:4 28:1
Autauga 5:23
authority 46:22 50:7 81:25

automated 37:24
automatic 37:25
automatically 37:20 38:5,12,16
avenue 51:21
aware 14:21 15:1 15:19,24 19:9 27:19 28:21 30:21 44:24,25 45:16 46:2,9 52:17 56:16 57:1 57:5,7,9,12,14 58:13,15 59:1,10 59:12 72:12,17 72:19 73:9 75:10 75:24 77:15 81:11,12 90:10 93:8 95:22
A-N-N-E-S-S-E 5:16

### B

baby 78:15
back 17:12 20:9 30:17,17 35:12 41:19 59:15 64:22 68:5 76:13 79:19,23 81:17 93:22 94:3,16 95:18 96:23
Backing 94:16
bad 57:19 80:14 81:15 89:15
bargaining 17:5,16
Barnett-Jefferson 11:12 74:9,20
based 33:19 50:20 51:22 54:4 76:15
basically 17:25 96:4
basis 48:6
Battle-Hodge 2:3,3 2:18 3:21,24 34:9 50:23,25 89:7 94:13 97:3,6
beginning 42:25
belief 33:12

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF  PAUL REAMS
Page 2

**believe** 10:7 23:2
23:12 29:12,16
34:4 45:4,25
48:22,24,25
64:25 65:3 95:16
95:18,19
**bend** 66:17
**Bernethia** 1:5 2:15
3:25 10:2 33:18
33:20 76:6
**better** 28:10
**Beverly** 83:5
**Birmingham** 5:6
**birthday** 91:3
**bit** 56:19
**Blake** 2:10
**bolster** 45:10
**bolted** 67:11
**bother** 85:4
**Bozeman** 8:1,2,4
45:17 46:21,23
47:2,18 49:3,19
52:6 53:15 63:17
72:13
**Bozeman's** 46:21
**break** 50:25 89:6,8
90:24 91:18 92:7
93:17 94:14
**Brief** 48:16 51:1
89:10 94:15
**bring** 14:15
**bringing** 14:16
79:17 80:6
**broken** 66:5
**brought** 67:6
**building** 41:1,15
43:12,13 73:14
75:24 76:7,19
77:23 82:7 87:17
**bunch** 67:12
**Burton** 25:4,16
95:9
**business** 59:18
73:14
**busy** 47:15
**busyness** 48:3

**butt** 67:10
_____
_____ **C** _____
**cabinet** 28:13
**cabinets** 27:9
68:10,11
**Caffey** 21:24 22:3
22:4,5,18 26:4,17
29:14,17
**Caffey's** 23:6
**call** 13:12,13 58:14
63:2,6 86:5
**called** 12:25 13:17
14:2 17:14 24:12
26:24 34:13 62:7
62:23,23 63:7
73:25 74:1 75:16
**calling** 75:25
**calls** 59:20
**capacity** 7:3 8:23
**car** 73:19 74:21,25
75:15,22 76:7,8,8
76:12 79:12,14
81:15 82:5
**Carl** 60:16 61:25
62:6 94:19
**Carolina** 8:14,14
**cars** 79:17 85:6
**case** 1:7 3:11,13
12:19,21,22
13:14,18 14:6
24:12,13,19
25:16,17 26:17
26:21,22,22 29:5
31:17,19 34:21
35:6,10,11,18,20
35:21 37:16
38:13 39:20,24
44:2 48:17 54:7
54:19,25 59:5
80:8
**cases** 12:18 14:8
24:9,22 26:18,19
27:12 28:11,12
28:14,19,21,22
29:2,6 30:18,21
30:22 31:11,18

32:2 35:17 44:10
44:11 53:21 54:1
54:3,4,4,6,10,11
54:12,13,15 55:3
55:4,9,10,25 57:4
57:9 64:16 79:19
79:20 80:2,7 81:3
81:9
**categories** 24:9
**category** 24:11,12
24:13,22 27:3
**cause** 50:2 98:9,14
**central** 18:16,24
**certain** 16:9 35:11
58:19 94:23
**certainly** 14:24
16:7 20:12 21:15
25:2 40:13 42:18
43:16 48:5,5
50:19 52:2 55:19
59:1 60:5 66:2,8
69:18 70:7,20
72:10,12 78:24
91:4,8 92:12,18
93:25
**CERTIFICATE**
98:1
**Certified** 98:4
**certify** 98:6,13
99:2,5
**Chamlee** 25:6,20
25:21
**change** 24:16
37:16 38:6 40:13
**changes** 39:25
40:12,14
**characterized**
85:25
**charge** 45:14
**charged** 36:17
45:8
**charges** 45:6,10,13
**Charles** 7:23
**Charleston** 71:3
77:16
**Chattanooga**

52:19,20,21 53:9
53:10,14
**check** 29:7
**checked** 29:5
**cherry-picked**
54:10
**Chevalier** 19:2,3,4
92:25 93:1,2
95:12,13
**chief** 7:22
**child** 5:4 51:24
**children** 5:1
**choking** 30:6
**choose** 81:22
**cited** 63:18
**city** 88:14
**Civil** 2:25 3:9,14
**claim** 14:11 45:10
**claimant** 14:9
**claimed** 70:1
**claims** 6:15 7:8
28:8
**clarify** 84:6
**Clayton** 1:19 2:9
**clerical** 27:4
**close** 41:8,10 85:17
88:24 96:8
**closed** 43:14 86:21
**closest** 81:17
**clothes** 78:15
**code** 33:9,11,11
36:22
**come** 34:17 54:7
55:11 61:17
64:17 66:12,20
66:22 71:14
84:10 88:18,19
**comes** 25:4 42:8
47:14 68:17 70:9
**coming** 39:7 77:1
**commencing** 1:20
**comment** 79:7,13
**commingling** 77:2
**commission** 3:4
98:21
**Commissioner** 1:9

1:17 3:2 98:5,19
**communicate**
47:22 48:3
**communication**
48:2
**complain** 72:5
93:9
**complained** 61:17
72:19
**complaining** 53:24
**complaint** 15:20
**complaints** 14:22
16:6 57:17 72:18
**completed** 31:12
61:1,5 80:24
**completely** 14:6
36:5 50:11 52:3
54:14 65:8 66:20
**computer** 14:17
34:24 36:5 37:17
38:11,12 43:19
**concern** 30:21 54:1
62:9 86:20
**concerned** 52:2
54:9 65:6 76:25
**concluded** 45:18
62:5 97:7
**conclusion** 76:11
**conduct** 27:10
29:23
**conducting** 59:17
**confrontational**
81:22
**confusing** 90:5
**connect** 35:11
**consider** 68:1
**consisting** 99:3
**constant** 47:25
**constantly** 68:16
**consulted** 86:17
**contact** 8:20 47:25
66:11 75:25
**contacting** 75:17
**contain** 98:10
**contained** 36:16
**controlled** 13:24

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                     7/11/2008
DEPOSITION OF PAUL REAMS

conversation 57:8
  64:17 65:6 93:11
  93:17 94:12
conversations 65:8
  80:15
cooperating 79:9
coordinate 16:14
copy 89:16
corners 45:9
correct 10:13 27:7
  39:4,5 46:25 47:1
  49:23 52:10
  84:23 94:25 99:5
Correction 99:15
corrections 99:4
correspondence
  52:5
counsel 2:12,23
  3:11 98:11,14
counseling 65:16
Counselor 26:9
country 35:9
County 5:23,25
  98:3
couple 28:22 37:23
  62:23 67:25 89:8
  89:11 94:14
course 9:15 27:25
Court 1:1,17 3:2
  98:4,18
cousin 5:24 6:1,3,5
cousin-in-law 5:24
cover 14:17
covers 14:20
coworker 10:9
coworkers 10:6
CPMS 34:15,20,21
crawled 67:13
create 89:22,23
created 89:18,20
  90:1
credit 70:1
criminal 76:12
curb 76:25
current 6:17,22
customary 69:12

cutoff 43:10
Cynthia 12:8 31:5
  64:25 81:14
  85:24 86:3,3,6
  87:23
Cynthia's 86:4,11

          D
damage 76:15
damages 75:22
dark 46:8
data 34:24 36:17
date 13:2 24:15
  29:24 32:9,15
  89:18,18,20,21
  89:22,23,25 90:1
dated 49:5,21 51:6
dates 45:4
Davenport 12:9
  87:15
day 23:6,8,13
  26:10 41:12,19
  54:22,24 55:4
  56:21 64:17
  80:18 81:19 82:1
  89:1,3,5 98:16
  99:10
days 18:4,7,7 20:3
  20:15,17 35:21
  56:18 92:3
deal 47:16 60:13
dealing 21:18
  87:18 88:23
Debbie 25:10,25
  70:9
decals 85:7
Decatur 2:4
December 6:21 7:1
  10:17 12:3 45:17
  49:13,15
decided 30:14
  54:17 87:1 88:25
decision 14:7,13,14
  46:17
defame 50:17
Defendants 1:10
  2:6 26:2 32:8

48:10 49:4,17
  51:2
definitely 28:16
  87:22
denied 45:21 46:16
  49:3 77:2 79:15
deny 46:22
denying 88:6
depends 42:15
  71:23
DEPONENT
  97:10
deposition 1:15
  2:24 3:1,7,12
  58:2 97:7 98:7
  99:3
designed 35:14
  36:14
desk 19:14 28:23
  30:1,3,4 63:1
  66:5 67:7 80:7,16
  81:5 86:4
detail 78:19
detailed 31:16,25
  35:9
determine 43:1
determined 86:18
development 12:18
difference 34:19
  89:14,21 90:2
different 45:10
  50:4 53:17 65:8
  65:12 68:25
  76:24 90:1
differently 62:10
  65:13 86:24
direct 8:20 10:12
directed 64:1
directly 8:24 9:2
  10:1,16,23 48:4
  79:13
director 6:18,20
  7:4,17 8:16 10:19
  10:21
disciplinary 62:1
  62:18,22

discipline 62:21
disclosure 49:1
discovered 26:9
discuss 16:5 47:20
  79:22 80:1
discussed 16:7
discussing 64:8
  86:12
discussion 50:24
  55:17,23 94:4
  97:2
displayed 85:6,9
dispute 78:14
District 1:1,2 2:8
  5:22
DIVISION 1:3
doc 19:17
doctor 20:20
document 18:8
  26:12,13,14 37:7
  38:15 89:13
documentation
  19:19,20
documents 27:16
  34:14
doing 16:11 24:17
  24:25 27:25
  43:20 46:6 54:17
  59:22 65:21
door 5:18 73:14
  81:17,18 85:17
  87:3 88:5 96:6
doors 86:21
DOS-based 34:23
driving 74:25
DuBois 2:7 16:20
  16:23 17:7 19:18
  20:5 22:22 23:17
  24:4,8 28:20 34:7
  37:22 39:13 40:6
  44:4,23 46:5 47:6
  48:24 49:13
  51:14 56:2 57:10
  58:16 59:9,16,23
  63:24 66:7 69:4
  69:16,23 71:20

72:7 76:4 80:10
  84:24 87:8 88:2
  89:6 90:21 91:1
  93:13 94:9 97:5
duly 98:8
duties 8:17 12:16
  47:5
duty 80:3

          E
earlier 48:8 51:13
  61:15 78:13
  88:24
early 7:7 21:4
  31:10 45:17
easier 27:9
easily 71:25
east 82:7
easy 54:2,10 67:9
EEO 14:22 15:19
  15:24 16:5 48:24
  57:17
EEOC 58:6,17,20
  59:25
EEOCs 16:12
EEOs 16:11
eight 44:14 47:9
either 3:13 10:1,15
  22:12 41:8 49:24
  54:23 62:9 87:1
  88:1,17
elbows 66:21
election 88:13,14
electronic 35:12,13
  35:15
Ellisor 1:15 2:18
  2:24 3:16 4:5,6
  98:7 99:2,8
Elmore 5:23,25
embarrass 94:5
Emily 5:4,5
emotional 65:4
employed 22:7
  57:13
employee 16:10
  17:6,24 18:11,19
  20:1 21:12,19,21

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF  PAUL REAMS
Page 4

21:23 22:6 24:13
30:5 36:9,19,21
36:24 38:25
39:23 40:3,4,20
40:21 41:9,14,17
41:17 43:9 62:8
65:15,18 68:18
69:15,25 70:6
71:16 73:13,16
73:20 76:6 77:5,9
77:20,22,24,25
77:25 81:4 82:21
82:25 89:2,4
90:20
**employees** 8:21
21:15,19,25
23:10 24:25
41:21,23 42:7
45:8 50:18 55:14
59:17,19 68:15
69:21 70:19
72:20 77:1 78:14
78:24 79:10,16
80:19 81:23
82:18 84:21
88:16,23 90:15
90:23,24 91:2,4
91:13,14,16,18
91:18 93:19 94:7
**employee's** 40:18
**employment** 22:11
22:19
**empty** 59:19
**ended** 22:11
**enforce** 84:9
**engaged** 59:5
**entailed** 13:15
**enter** 85:17
**entire** 41:2 81:6
**entry** 38:15
**environment** 45:11
45:19 72:6,22
78:24
**errand** 85:3
**escalating** 86:14
**escorted** 23:8,10

23:15
**et** 1:9
**events** 62:10 86:24
**eventually** 45:22
66:23,24 67:21
**everybody** 54:23
55:16 91:12
92:11
**evidence** 3:7 13:3,6
13:7,8,22,24,25
**exactly** 29:24
56:19 73:10 92:8
**examination** 2:17
3:20 98:11
**exception** 10:13
**exceptions** 43:16
55:1
**exhibit** 13:9 14:1
24:15,18 26:3
29:1,3 48:10 49:4
49:17 51:3 52:6
**Exhibits** 32:8
**exist** 34:16
**expects** 47:7
**Expires** 98:20,21
**explain** 21:11
26:16 49:10,11
62:17 65:19
81:13
**explained** 63:4,5
**extended** 93:11,21
**e-file** 35:12
**E-L-L-I-S-O-R** 4:7
**e-mail** 49:18 67:5
67:23 75:20
77:19 79:3
**e-mailed** 27:20

**F**
**facts** 86:22
**fairly** 54:14 87:18
**fall** 45:15 46:3
**false** 45:14 50:12
50:13,20 86:16
86:20
**falsely** 50:19 62:2
**familiar** 10:2,5

18:25 20:23
23:20 26:6,12
44:20 46:4 49:6
49:16 53:19 78:9
78:12
**far** 12:13 13:2
22:23 27:22
29:20 37:23 42:7
46:2,7 47:4 51:15
52:2 56:16 65:12
72:15 76:5 80:4
88:17,23
**favorable** 14:13
**fear** 86:19
**February** 11:9
31:11 80:23 81:4
**Federal** 2:25 3:9
3:14 73:25 74:1
75:4
**feeling** 86:1
**feels** 71:17
**felt** 50:13
**field** 8:9,9 14:10
**figure** 18:21 49:7
**file** 13:1,25 14:12
14:18 21:12
24:14,16,17 27:2
27:2,9 28:13
35:12 39:15,22
39:23 40:1,4,9,10
40:19 48:24 68:9
68:11,18,19,20
86:11 89:19
**filed** 4:2 15:2,19,24
16:3 52:17
**files** 13:1 14:15,16
23:25 24:1 27:8
35:14,15 39:8,10
55:1,6,15 68:5,6
69:2,13 80:16
**fill** 11:8
**filled** 11:8
**final** 23:3
**finally** 62:23
**find** 66:11
**findings** 60:21

61:23
**fine** 23:20 52:14,14
**finished** 14:7 24:11
24:17,23 28:24
89:12
**first** 3:17 4:24 6:5
6:10 7:11 9:13,14
10:10,10 11:9
15:13 35:15
36:18 46:9 49:4
54:5 62:17 98:8
**five** 43:25
**fix** 67:16 68:3
**Florida** 8:14
**folders** 35:13
**folks** 8:24 54:11
**follow** 68:3
**followed** 29:19
**following** 23:4
30:4,15 75:9
**follows** 3:19
**follow-up** 67:5
**forbid** 85:16
**foregoing** 98:9
**forever** 38:24
**form** 3:5 16:20
17:7 19:18 20:5
22:22 23:17 24:4
24:8 28:20 37:22
39:13 40:6 44:4
44:23 46:5 47:6
51:14 56:2 57:10
58:16 59:9,16,23
63:24 66:7 69:4
69:16,23 71:20
72:7 76:4 80:10
84:24 87:8 88:2
90:21 91:1 93:13
94:9
**formality** 3:3
**former** 20:1 22:6
**Forsyth** 2:12
**found** 27:12 28:17
59:18 61:21
70:24 75:5 76:7
86:18 88:12 90:5

**frame** 56:20
**Frazer** 82:22 84:7
84:9 95:5
**Frazier** 9:11
**Friday** 1:20 54:18
54:22,24,24 55:4
56:1,21,24 57:3
64:18 98:6
**Fridays** 53:21 55:2
55:15
**front** 19:13 30:1,3
30:4 73:14,18
75:23 76:19 77:3
77:23 79:6 80:7
80:16 81:5 87:3
**full** 4:4 76:23
**further** 3:10 97:10
98:13

**G**
**gas** 29:19
**gathered** 94:23
**gathers** 34:24
35:18
**general** 2:12 23:12
23:15 72:11
80:18 82:10
**generally** 42:11
45:9 72:8
**Georgia** 2:13 8:14
**getting** 86:14
**give** 12:23 18:22
19:16 28:3 35:21
54:15 55:10 73:2
73:4 89:14 95:17
**given** 16:10 21:20
38:17 40:25 41:9
41:14,15,18 42:9
58:19 88:16
**giving** 29:14 34:2
41:14 78:19
**glad** 96:22
**Gloria** 7:25 45:17
46:21,21 63:17
72:13
**go** 6:2 9:21 12:20
14:13 17:8 18:24

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.

7/11/2008

DEPOSITION OF  PAUL REAMS

Page 5

23:12 26:20 30:2
30:3,4 35:10,19
36:3,9,15,19
37:15 39:19,20
40:5,7,19 43:21
48:15 50:5,23
53:25 55:8,20
56:7 59:10 63:20
68:3,18 69:14
75:3,9 90:15,18
91:2,12,15,16
92:17,23 93:4,21
94:3 95:18
**goal** 91:12
**goals** 47:8,8,9
**goes** 13:8 56:17
**going** 3:25 6:2 18:3
18:6 19:1 26:2
30:17 39:15,17
41:7 47:21 50:17
59:6 73:19 75:2
79:19 89:13 95:1
97:3
**Good** 3:22,23
**gotten** 84:13
**government** 58:20
59:18 75:21
**grant** 17:25 89:1
**granted** 52:8,11
88:22
**Great** 47:13
**grievance** 21:13
**grievances** 21:21
**grieved** 21:8,9
**grounds** 45:21
**group** 9:3 10:25
11:19,20,21
91:14
**groups** 9:15,16,17
17:20
**guard** 73:17,22
74:3,15 75:8 79:5
**guess** 14:20 17:11
21:6 27:17 28:10
31:20 33:14,16
52:11 56:6,7,8

57:5 64:24 65:17
65:25 69:9 72:2
72:17 83:11
**guidance** 30:13
79:15 87:23
**gun** 78:4,11 79:14
**guns** 78:24 79:17

_____
**H**
**half** 44:14 91:15
91:16
**hand** 39:23
**handicapped**
81:11,15,16,20
81:25 82:13,24
83:20 85:5,7,11
85:12
**hands** 30:7 86:12
**happen** 42:17
63:21 84:25
85:23
**happened** 11:4
22:21 25:15,17
27:6 28:18 31:13
77:16,19 78:13
**harassed** 63:19
**harassing** 45:7
**hard** 55:21
**hardship** 44:22
50:1 51:21,22,23
**hated** 30:6
**hear** 26:25 47:18
53:10 63:16
**heard** 53:11 63:14
95:24 96:2
**hearing** 6:18,19
7:4,15,16,17,22
8:10,16 10:19,21
12:20,21 13:11
13:22 14:3,7,10
14:10 19:9 33:11
34:13 58:4,6,9,12
60:15,25 61:2
**hearings** 7:15
**height** 66:17
**held** 58:12
**Helmer** 11:16

**hemmed** 45:8
**hereto** 3:13
**hierarchy** 9:18
**histories** 31:17,19
**history** 30:15
89:15
**hit** 30:8 73:7,18
**HO** 33:9
**HOD** 71:6
**holiday** 91:9
**home** 43:21 54:21
56:18,18 67:6
70:25
**Horak** 74:16,16
**hostile** 45:11,19
72:6,22 78:23
**hostility** 86:14
**hot** 67:7
**HOTS** 31:19 33:20
34:12,12,14,19
35:25 36:2,11,13
36:14,20 37:7,21
38:15 39:17,20
40:7,8,23 68:19
**hour** 90:16,24 91:5
91:15,16 92:10
92:12 93:6
**hours** 88:18,18
**Howell** 19:25 20:2
**hung** 61:6 62:6
**husband's** 51:25

_____
**I**
**idea** 15:7 46:15
64:4 75:13 81:22
**identification** 36:7
37:2 38:18,21
39:1,19
**identify** 68:19
**illegally** 76:24
**immediately** 6:22
22:19 63:6
**impairment** 18:12
19:9
**improper** 76:16
**inappropriate**
51:20,20,21

**incident** 24:2,3
29:25 30:5 56:9
64:8 66:8 71:16
73:6,9 74:11,12
75:9 84:15
**incomplete** 80:1
**incorrect** 50:3,12
**INDEX** 2:17
**indicated** 55:25
**indication** 30:7
72:22 76:17
**indirectly** 10:1,12
10:16
**individual** 39:4
**individuals** 28:5
**information** 37:24
38:9 73:2 79:4
**informed** 53:9
**informing** 94:6
**initial** 48:25
**initials** 37:9,11,17
37:19 38:6,16
**injury** 20:10
**inspection** 47:22
**inspector** 74:7,16
**installing** 43:19
**instance** 35:19
70:20 73:3 80:20
81:12
**instances** 61:14
91:7,8
**instituted** 54:14
**instructions** 17:22
24:19
**insubordinate**
62:4
**interested** 98:15
**interrupt** 30:9
66:13
**interviewed** 74:8,9
**intimidated** 86:1
**introduced** 3:12
**investigate** 61:19
71:19,22 73:1
75:6 76:3 78:25
**investigated** 28:14

75:5
**investigating** 76:5
94:23
**investigation** 72:2
79:9
**investigators** 16:9
**involved** 14:23
15:12,14,15
52:24 66:9 69:24
70:4 76:1 79:10
87:11
**involvement** 87:16
**involving** 73:6
**issue** 31:9 44:3,5
47:14 62:2,22
68:2 88:10 90:3
**issued** 53:21
**issues** 29:23 65:21
88:22
**issuing** 55:1

_____
**J**
**J** 1:8 2:7
**James** 2:7
**January** 11:8
**job** 14:6,14 15:21
17:2,14,16 67:17
**jobs** 11:10
**Johnson** 1:5,17
2:15 3:1,25 10:3
12:1,8 14:22 16:6
20:19,24 21:18
23:25 24:21
27:13 29:10,15
30:10,18,25
31:13,14 33:14
34:2 40:25 42:20
44:18,21 45:1
46:6 48:11 49:18
49:25 50:9 52:16
52:17,20 53:8
55:24,24 56:17
56:23 57:12 59:6
59:10,13,22 60:2
60:22 61:9,13,13
61:21,24 62:7,14
63:22 64:9,15,21

65:3 66:4 68:25
69:1,2,19 70:4,18
70:23 71:5,12
72:5 73:7,12,17
74:8,10,18 75:16
76:18 77:18,25
78:4,22 79:3,6,22
79:23 80:2,7,16
81:5,10,19 84:12
84:19 85:17
86:15 87:6,12,12
87:18 88:6 90:4
90:10 93:10 94:8
95:25 98:4,18
**Johnson's** 12:10
16:19 28:23
45:20 58:13 66:3
66:19 75:14
81:14
**joined** 66:21
**judge** 7:23 9:19
10:13 12:19
13:21 83:14
**judges** 9:23 42:1
44:11 83:6
**July** 1:20 7:1 98:6
98:16
**June** 22:15,16
29:13 51:7 85:20
**Juraldine** 2:3,3
3:24

**K**

**Karen** 25:4,16
95:9
**keep** 27:3 39:14,17
55:17 59:17,25
**Kentucky** 8:15
**kept** 68:7,8,10
**key** 40:25 41:9,9
41:14,15,18,19
42:2,5,9
**keys** 41:24 42:1,12
**kin** 98:13
**kind** 9:18,21 13:7
14:1 31:3 32:12
38:13,15 43:18

46:7 52:1 62:21
76:12 79:13 84:5
94:4
**knees** 81:15
**knew** 10:9 15:8
31:9 51:11 73:3
79:4,4 81:23
85:12
**know** 4:21 5:24
9:16 10:9 12:14
12:20 14:1,3,8
15:6,6,8,9,13
16:3,4 17:19,21
18:21 20:9 21:21
21:23,24 27:25
28:4,5,14,17
29:21 30:12
31:24 32:24 34:7
36:15 37:5 39:22
40:19,23 41:1
42:7 44:13,14,16
47:25 49:10
51:15 52:1 53:2
54:5 55:14,18
56:19 57:2,3,23
58:22 64:24
65:15,16,20 66:2
66:8 67:25 68:2
68:16,23 70:20
70:21,22 71:7,8,9
71:15,23 75:1
76:9,11,16 77:21
78:7 79:12 80:19
81:2,8 84:7 85:1
85:2,9,10,11
87:12,20,21
89:14,20 90:1
92:23 93:8 96:15
96:15
**knows** 36:25

**L**

**labor** 30:13
**ladies** 93:23
**lady** 47:15
**Lamar** 12:8 31:5
55:24,25 56:13

56:23 61:10
63:22 64:2,9,16
68:24 69:1 70:17
81:14 83:1 84:11
84:18 85:24 87:6
87:17,25
**Lamar's** 81:20
**lamp** 66:5,12,14,15
66:17,19 67:6,7,8
67:12,15,16 68:1
**Large** 1:18 3:3
98:5,19
**late** 21:2 23:24
41:22 85:2 90:20
**laugh** 19:22
**Laura** 11:10 91:22
**law** 2:3,4,11 7:5,23
**lawsuits** 4:1
**lead** 17:14 25:10
70:13,14,15
**learned** 76:2 80:25
**leave** 17:25 22:19
23:13 29:22
58:23,23 59:3
75:9 87:3,3 88:7
88:22 89:1,3,4
90:22,25 91:3,5
92:16 93:7
**leaving** 85:25
**left** 46:8 64:21 84:7
84:8 85:2 90:6
**legal** 12:12,16 19:7
19:8 24:14 25:11
27:1 28:6,11,18
36:3 37:8 38:17
39:6,25 40:2
42:11 53:20,24
54:1,9 55:5 68:6
68:8 70:14,15
**legitimate** 18:10
**letter** 45:2,13,17
48:9,9,10,18 49:2
49:5,6,12,13,15
51:4,16 52:12
63:17 72:12
78:22

**letters** 13:24
**Let's** 39:6 50:23,25
53:17 94:13
**levers** 66:16
**License** 98:20
**line** 9:13,14 54:2
54:12 83:7,15,23
84:1,3 99:15
**list** 13:9 14:25
24:15,18 26:3
27:20 29:11,13
35:3 54:7,18,19
55:9 56:13 80:6
95:2
**listed** 28:6 99:5
**lists** 27:19 28:3
29:1,3,15
**little** 46:3 56:19
**live** 5:18 88:23
**lived** 89:2
**lives** 5:6,11
**living** 5:19
**local** 34:25 35:3,5
35:17
**located** 28:22 29:6
68:19
**location** 71:11
**lock** 41:18
**logged** 37:17
**logical** 54:22
**long** 4:18 6:19,25
22:7 29:20,22
30:15 35:21 67:3
67:22
**longer** 18:6,7
20:13 63:1 87:11
90:24 91:5,13
92:9,12 93:6
**long-term** 41:11
**look** 17:11,11,22
22:8 26:2 32:8
38:4 48:14 51:24
95:18 96:12
**looking** 51:2 96:19
**loosened** 67:14
**lost** 43:3

**lot** 12:18 16:8 27:4
45:9 73:13,19
74:19,20,25
75:23 76:10,13
76:23 79:17
82:11 83:9 90:5
**lots** 28:3
**Louise** 18:25
**lunch** 84:17 90:14
90:16,20,24
91:12,15,16,17
92:2,7,17,23 93:3
93:4

**M**

**M** 1:17 3:1 98:4,18
**mail** 14:8 68:17,18
68:20
**making** 17:19
24:18 86:16
**Mallory** 1:16 3:1
98:4,18
**management** 7:25
15:2 16:18 30:13
34:22 35:6,10,18
41:7,18,23 43:1
45:7,18 50:10,18
71:19,22 75:17
75:17,25 86:2
87:6,7 90:10,11
90:13 92:24
**manager** 15:3
44:14 69:14
**maneuvered** 67:14
**manner** 3:13 55:18
61:23 98:15
**manually** 37:20
**March** 31:10 79:24
81:6
**Marguerite** 5:13
**marriage** 4:24,24
**married** 4:14,18
4:23
**Mary** 11:16
**matter** 52:3 62:18
62:19 98:9
**McAnnally** 95:7,8

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.
7/11/2008
DEPOSITION OF PAUL REAMS

Page 7

| | | | | |
|---|---|---|---|---|
| **McMillan** 93:10 93:14 94:7 | **Mondays** 54:21 | **needed** 44:11 94:2 | 90:21 91:1 93:13 94:9 | **Off-the-record** 50:24 97:2 |
| **McMonee** 22:1 | **Monique** 21:24 22:2,3,3,5,7 26:4 26:17 | **needs** 14:13 18:8 68:17 | **objecting** 16:23 17:8 | **Oh** 4:6 9:1 10:4 22:3 49:14 52:13 57:18 58:1 66:25 77:10,10,12 82:10 |
| **McWilliams** 93:15 94:10 95:15 | **Montgomery** 1:19 2:5,9 4:13 5:10 5:17 35:2 45:7,20 47:5 53:20 57:13 72:23 88:14,21 89:3 98:3 | **neither** 98:13 | **objections** 3:4,5 | |
| **mean** 14:10 21:17 33:3 38:2 42:13 44:2 48:18 56:22 58:1 84:10 96:6 | | **never** 46:6 49:5,11 52:11 59:24,24 67:16 72:23,23 76:1,17 90:8 | **objective** 54:14 | |
| **means** 13:1 | | **new** 39:23 43:19 76:8,10 | **obviously** 47:15 52:15 | **okay** 4:3,8,10,12 4:14 5:3,7,12,14 5:17,22 6:6,9,16 6:22,25 7:2,6,8 7:11,14,24 8:8,16 8:23 9:12,14,24 10:2,8,20,20 11:1 11:6,11,14 12:2 12:10,16,24 13:4 13:10,12,18,20 14:4 15:1,5,11,13 15:14,18,19,23 16:2,5,13,15,17 17:3,5,9,15,17,23 18:2,5,18,25 19:15 20:2,8,11 20:14,16,19 21:3 21:5,11,14,14 22:5,7,10,16,25 23:3,14,20,22 24:6,24 25:5,9,12 25:15,19,25 26:2 26:8,11 27:15 28:10 29:2 30:11 30:24 31:2,6,8,15 31:24 32:4,6,21 33:2,9,12 34:5,11 34:15,19,21 35:1 35:5 36:13,21 37:1,4,7,14 38:1 38:8,11,17,20,23 39:3,16,21,24 40:22,25 41:5,25 42:3,6,23 43:2,6 43:8,15,17,22 44:7,9,12,17,20 44:25 45:3,5,24 47:2,11,13 48:8 48:17,19,23 49:2 |
| **meant** 77:11 | **month** 47:12 61:15 81:6 92:20 93:5 | **night** 7:5 43:20 | **occasion** 92:14 | |
| **medical** 13:2,7 17:24 18:9 19:17 19:19 20:4,21 | **months** 48:7 67:24 78:7 | **nonmedical** 13:8 | **occasions** 84:20 | |
| **meet** 87:1 93:23 | **morning** 42:9 43:11 84:17 | **non-management** 41:8 | **occur** 86:21 | |
| **meeting** 61:4,5,6,9 62:5,11,13 63:23 71:1 85:24,25 94:19,19 | **mother** 5:11 | **normal** 43:21 | **occurred** 29:25 56:10 73:10 76:13 85:14 | |
| | **mother's** 5:15 | **normally** 44:5 47:17 51:23 93:20 | | |
| **meetings** 65:7 90:9 90:11 | **motion** 63:12 | | **occurring** 50:21 | |
| | **motivation** 65:12 65:16 | **North** 2:4 8:14 | **October** 44:5 45:25 46:13 49:6 49:8 88:13 | |
| **member** 16:18 | **move** 24:10,19 53:17 71:10 79:19 82:5,5 83:6 83:10,21 84:12 | **NORTHERN** 1:3 | | |
| **memo** 31:16,25 34:4 | | **NOTARY** 99:12 | **offer** 42:19 | |
| **memory** 64:15 | | **note** 33:19 | **offered** 3:7 42:21 43:1 | |
| **mental** 65:4 | **moved** 17:20 31:12 61:22 | **notice** 32:9 | **office** 1:19 2:8,12 6:18,19 7:4,15,16 7:17,22 8:6,9,16 8:19 9:4,7,8,9,19 10:19,21 11:5 12:11 14:10,11 14:15 18:17,24 18:24 20:1 26:17 26:20 33:11,11 34:13 35:2,22 38:22 41:1,2,8 45:2,12 46:18,20 47:7,8,20,24 50:10,11,18,20 50:21 53:3,6,20 54:23 58:10 59:7 60:2,6 72:20 78:23 79:16 81:18 85:12,17 86:5,17 87:4,24 87:25 88:3 91:12 | |
| **mentally** 86:1 | **moves** 8:19 | **noticed** 37:7 | | |
| **met** 10:10 93:12 | **moving** 24:22 27:8 51:24 68:5 | **notices** 13:6 | | |
| **Michael** 1:8 25:6 25:19 83:6 | **multiple** 45:6 | **notified** 30:20 31:7 31:14 75:14 | | |
| **Middle** 1:2 2:8 5:22 | **M-A-R-G-U-E-...** 5:13 | **November** 49:21 72:19 78:13 | | |
| **midyear** 86:13 | | **number** 8:4 36:7 37:3 38:9 39:1,19 54:6 98:20 | | |
| **mind** 25:4 66:3 70:9 96:19 | **N** | **numbers** 38:18,21 | | |
| **minutes** 94:14 | **n** 23:24 | | | |
| **misconduct** 30:15 | **name** 3:24 4:4,16 5:12,15 9:11 19:1 | **O** | **officer** 7:25 45:18 | |
| **misfiled** 26:21 | **named** 5:4 25:10 | **Object** 16:20 17:7 19:18 20:5 22:22 23:17 24:4,8 28:20 37:22 39:13 40:6 44:4 44:23 46:5 47:6 51:14 56:2 57:10 58:16 59:9,16,23 63:24 66:7 69:4 69:16,23 71:20 72:7 76:4 80:10 84:24 87:8 88:2 | **offices** 2:3 8:10,11 47:16 59:11,19 | |
| **missing** 24:2 28:18 70:23 | **names** 5:3 | | **official** 90:19 | |
| **Mississippi** 8:15 | **Nancy** 4:17 | | | |
| **mistreating** 45:8 | **national** 35:7 | | | |
| **misunderstood** 77:10,13 | **nearly** 73:7 | | | |
| **modified** 89:18 | **necessarily** 86:19 | | | |
| **moment** 32:2 | **necessary** 12:21 | | | |
| | **need** 3:5 55:9 57:3 57:4 62:19 | | | |

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                          7/11/2008
DEPOSITION OF  PAUL REAMS
Page 8

| | | | | |
|---|---|---|---|---|
| 49:7,9,17,21,22 | opened 38:14 | 73:19 74:19,20 | 95:2 | places 47:17 66:20 |
| 49:25 50:5,8,16 | 88:20 | 74:25 75:23 | people's 36:16 | 76:24 88:24 |
| 50:22 51:2,6,12 | oppose 50:19 | 76:10,13,19,23 | perceived 62:10 | Plaintiff 1:6 2:2 |
| 52:4,9,20 53:1,8 | oral 25:18 | 76:24 79:17 | perform 26:18 | please 4:4 |
| 53:18 56:5,15,22 | order 13:2 19:15 | 81:11,20,21 82:3 | performance | Plus 8:9 |
| 56:25 57:7,12,22 | 24:15 27:3 54:13 | 82:6,11,13,17,19 | 53:10 86:12,13 | point 20:10 29:12 |
| 58:1,5,11,13,21 | 54:16 | 83:1,8,9,11,16 | performing 80:2 | 31:14 41:4 51:8 |
| 58:25 59:4,12,12 | organize 8:18 | part 31:24 48:25 | period 20:23 23:2 | 51:12 67:7 75:19 |
| 60:6,9,12 61:5,12 | 24:14 | 90:3 | 23:23 27:22 | 85:16,21 87:13 |
| 62:13,25 63:2,5 | organized 54:8 | particular 24:1 | 93:21 | points 63:18 |
| 63:20 64:4,11,20 | 55:18 | 30:22 39:25 40:8 | periods 58:24 | poles 88:19,21,24 |
| 65:2,10,18 66:1 | organizing 13:2,5 | 47:21 93:11 | person 9:3 11:15 | police 75:16,25 |
| 67:3,21 68:5,15 | 24:17 | particularly 41:6 | 18:3,3,6,9 27:1 | 76:1 |
| 68:22 69:6,10,11 | originated 14:11 | parties 2:23 3:11 | 39:7,10 55:3 | policy 17:23 23:16 |
| 69:19,21 70:2,11 | outside 35:2 36:15 | 61:20 91:3 98:12 | 56:13 57:21 | 53:19 54:15 87:5 |
| 71:16,22 72:5,14 | 65:22 96:6 | 98:14 | 74:25 87:2 | 90:14,19,20 91:4 |
| 72:25,25 73:4,5 | overlapped 31:3 | partition 67:10 | personal 33:15,16 | position 6:14,17,23 |
| 73:11,15,21,24 | oversee 8:4 | party 3:13 91:9 | 36:7,16 37:2 38:8 | 7:14,19 12:10,13 |
| 74:1,4,6,7,17,23 | oversees 8:9 | password 36:6,24 | 38:18,21 39:1,19 | 14:6,14 15:16 |
| 75:3,6,12,14 76:2 | overtime 42:19,21 | 38:9 39:3,5,14,19 | 51:23 59:18 | 46:24 69:12 |
| 76:22 77:4,7,14 | 42:24 43:1,9 | passwords 38:18 | personally 33:7 | 70:11 92:4 |
| 77:17 78:4,21 | 44:18 | 38:19 | 44:16 75:6 | positions 11:7,8 |
| 79:1,22 80:1,13 | overwhelming | Paul 1:15 2:18,24 | personnel 50:11 | possibility 62:20 |
| 80:13,13,21 81:1 | 43:18,23 44:1 | 3:16 4:5 12:1,8 | pertaining 27:17 | possible 40:5 84:17 |
| 81:7,10,13 82:4,9 | o'clock 43:11,14 | 27:13 30:10,25 | phase 62:5 | post 14:2 |
| 82:9 83:4,16 84:4 | 43:21 84:8 | 31:14 33:14 34:2 | phone 59:11,14,15 | pre 13:12,13,18,21 |
| 85:16,19 86:9 | | 55:24 60:22 | 59:24 60:10 61:6 | premises 23:8 73:8 |
| 87:5,14,19 88:6 | **P** | 61:13,21,24 64:8 | 63:6 86:5,5 94:20 | 73:20 |
| 88:11,15 89:17 | Page 99:15 | 70:23 71:5,5,5 | photocopies 14:7 | prepare 13:9 58:20 |
| 89:25 90:9,17,19 | pages 98:9 99:4 | 77:18,24 87:12 | photograph 77:11 | preparing 14:17 |
| 91:6,10,17,21,25 | Pam 12:8 87:15,15 | 95:24 98:7 99:2,8 | physically 14:8,16 | 16:11 59:5 |
| 92:4,6,17,22,25 | 87:22 | pause 48:16 | 27:2 86:20 | present 2:14 29:10 |
| 93:18 94:1,6,13 | paper 14:16 35:14 | pay 75:21 | pick 54:23 63:5 | 31:17 |
| 94:16,17 95:1,4 | 39:22,23 80:6 | pedestrian 74:24 | picked 54:24 | presented 60:21 |
| 95:20 96:1,5,7,22 | paranoid 65:11 | pending 28:9 | picture 77:5,8,22 | 61:25 |
| 97:1,1,6 | pardon 11:21 | people 7:22 9:1,13 | pictures 77:21 | pretty 16:15,16 |
| old 35:24 37:23 | 67:21 | 9:16,16,22 10:25 | piece 68:20 79:11 | prevent 79:16 |
| 54:19 | parent 51:25 | 11:9 12:3 13:22 | 79:12 | primarily 87:10,17 |
| oldest 54:4 | park 73:12 75:22 | 14:5,5,14 17:18 | PIN 36:7 37:16 | primary 12:16 |
| once 23:10 48:6 | 77:3 81:23,25 | 24:18 27:4,8 28:7 | placard 82:24 | primitive 35:23 |
| 76:2 92:20 93:5 | 82:2 83:7,15 | 28:8 29:9 46:24 | placards 85:5,8,11 | printed 32:13,14 |
| ones 13:23 14:25 | parked 81:10,16 | 48:1 53:3,25 | 85:13 | 32:18,19,21,22 |
| 33:22 42:14 | 81:19,24 82:1,17 | 54:21 62:10 65:7 | place 81:16,20,23 | 33:5,7,13 |
| one-hour 92:6 | 82:18,19,19 83:1 | 65:8,9,20,22 | 81:25 83:18 84:2 | prior 13:22 56:19 |
| open 41:8,10 87:3 | 83:22 84:22 | 76:23 83:8 84:21 | placed 37:11,19 | private 36:17 |
| 88:5,21 | 85:10 | 85:1,8,11 94:24 | 38:5,7,16 | 57:24,25 59:19 |
| | parking 73:13,13 | | | |

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF PAUL REAMS

62:18
**privy** 49:24
**probably** 11:8,13
  22:15 33:14
  35:24 45:15 48:6
  63:4 89:12 91:22
  92:21
**problem** 65:4
  69:13 79:20
  82:16 84:22
**problems** 29:20
  47:21 65:21,22
  86:24
**procedure** 2:25 3:9
  3:14 17:23 23:4
  23:12 55:5
**procedures** 18:13
**process** 52:25
  53:25
**processed** 12:22
**Processing** 34:21
  35:6,10,18
**produce** 96:24
**produced** 48:21
  95:20
**production** 47:8,9
**program** 34:25
  62:7,8 65:19
**promoted** 12:3
  15:20
**pronounce** 19:1
**proper** 14:19
**protect** 36:17
**Protective** 73:25
  74:1 75:4
**prove** 71:25
**provide** 20:20
**provided** 3:8,14
  26:3
**psychological**
  65:24
**public** 29:21 77:2
  94:4 99:12
**pull** 35:8 40:10
  55:9
**pulled** 33:25 34:9

**pulling** 33:16
**purchased** 76:8
**purpose** 3:8
**purposes** 17:24
  20:21
**pursuant** 1:16 2:24
**purview** 17:20
**put** 13:6 24:10,13
  24:14 26:10,22
  26:23 27:2 29:19
  37:20 50:2 70:24
**putting** 14:17,18
**p.m** 1:21 97:8

**Q**

**question** 18:1
  28:10 43:3 57:19
  64:2,5,12 66:2
  69:10 71:13
  72:17 80:12,14
  80:22
**questioned** 23:25
  24:1
**questioning** 33:1
  97:4
**questions** 3:4,5 4:1
  15:3 63:23 64:1
  89:8,11 97:5
**quick** 50:25
**quickly** 32:7 48:14

**R**

**raised** 88:10 90:3
**Rambo** 25:10,25
  70:10
**ran** 55:3,19
**rang** 60:7
**raped** 86:2
**rational** 62:11
**read** 80:12 99:3
**ready** 26:24,25
**real** 48:14 55:21
  68:2 90:7
**really** 23:18 32:23
  44:19 46:7,17

**Reams** 1:15 2:18
  2:24 3:16 4:5,10
  4:14,19 5:10 6:10
  7:14 10:3 51:2
  98:7 99:2,8
**reason** 18:10,20
  84:9 96:14,14
  99:15
**reasonable** 18:20
  18:22
**reasons** 20:4 51:23
**rebut** 45:13
**rebuttal** 46:19
**recall** 14:25 20:16
  21:1,7 22:8,21,23
  23:6,7,9,19 24:2
  25:15 27:15 31:8
  31:22 32:5 34:2
  41:5,13 49:25
  50:22 52:22 53:3
  55:23 59:6 60:9
  61:6,9 63:2,9,12
  64:1,3,6,19,21
  66:4 69:5,20,22
  70:18 71:1 73:3
  77:6 79:23 80:4,5
  80:20 84:5,15
  87:10,21 88:6
  92:15 93:24 94:6
  94:12,22 95:1
**receive** 42:24
  47:21
**received** 25:18,22
  30:13 89:2,4
**receiving** 90:4
**receptionist** 79:24
  80:3
**recess** 51:1 89:10
  94:15
**recollection** 33:18
  88:9
**recollections** 65:13

**recommended**
  22:18 23:7
**record** 34:8 50:23
**recording** 90:12
**records** 31:19
  32:25 33:18,20
  36:16
**refer** 34:11
**referral** 65:15
**referred** 32:1 49:3
  75:8
**referring** 36:10
  48:9,11 51:13
**refresh** 64:15
**refused** 30:3 64:23
  73:2 79:6
**refusing** 73:12
**regard** 19:12 36:2
  78:10
**regarding** 4:1
  30:17 45:7 57:16
  69:2
**regardless** 86:22
**region** 8:10
**regional** 7:25 8:6
  18:23 38:22 45:2
  45:12,18 46:18
  46:20 47:24 53:3
  53:5 72:20 78:22
  79:15 86:17
  87:24
**regretted** 79:8
**regularly** 91:17
  92:20
**related** 75:13
**relating** 15:25 94:6
**relatives** 5:9,20
**remember** 16:8
  20:7 21:16,17,17
  22:10,13 32:1,3
  65:5,11 70:3
  73:10 80:15 83:5
**remembering**
  25:13 86:24
**remove** 51:12
**removed** 6:8 59:13

**Renita** 11:12 74:9
  74:19
**reorganization**
  11:5
**rep** 7:9
**repair** 66:10,23
  67:2
**repairing** 76:15
**replace** 66:12 67:4
**replaced** 66:24,25
  67:1,15,22
**report** 7:19 17:12
  46:24 47:25
  71:12 75:1,18
  77:4 78:4
**reported** 73:6,22
  75:20 86:3,10
  98:7
**Reporter** 1:17 3:2
  98:4,18
**REPORTER'S**
  98:1
**reporting** 47:3
  66:4
**reports** 71:16
**represent** 3:25
  27:15
**representation**
  64:24
**representative**
  6:15 14:9 21:13
  62:14,20
**represented** 57:14
**representing** 2:23
  3:11
**reprimand** 15:25
  25:22 26:1 33:19
  90:5
**reprimands** 21:20
**request** 18:20
  45:20 49:4 50:1
  51:21 58:22 59:2
  77:3
**requested** 13:21,24
  16:17 20:3,21
  33:18,21 54:5

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                                    7/11/2008
DEPOSITION OF  PAUL REAMS
Page 10

75:19,21
requesting 46:7
  49:19
requests 17:24
required 19:15
  20:2,16,19 43:13
  59:2 85:10 90:25
reserved 3:6
resigns 39:7
resolved 90:8
respond 45:12
  62:16
responded 48:13
  48:19 79:8
response 48:21
  49:18 76:11
responses 16:11
responsibilities
  47:4
responsibility
  13:19
responsible 14:12
  17:18 76:15
result 27:11
results 98:15
retired 53:11
returned 80:8,9,11
  80:11
returns 90:20
review 12:20
re-park 83:10
Richard 2:10
right 5:20 7:8,10
  7:10 10:1,1,14,20
  11:18,22 12:5,6,7
  12:7 15:17,17
  25:13 27:24 28:2
  32:11,14,15,16
  33:24 34:1,14
  37:10 38:10 39:2
  42:8,15,16 45:4
  46:11,14 48:15
  48:20 57:11
  60:14,19,23,20
  60:24 63:2,22
  67:9,10,18,20

71:25,25 72:3
  79:21 81:17 88:4
  94:21 95:6,8
ring 60:10
Robinson 11:10
  91:23
room 59:14 64:22
  83:9
Rosey 19:24
rotated 54:19
routine 26:18
  68:23
routinely 41:21
  43:13 81:24
  82:19 83:7 85:1
  87:18 92:2,13
  94:3
row 47:9
rude 29:21
Rules 2:25 3:9,14
ruling 3:6
run 34:15 62:8
  74:10

                S
safer 86:23
safety 86:19
SAITH 97:10
Sankey 5:16
Saturdays 42:9
saying 6:3 34:8
  49:14 52:22 53:4
  57:2 64:23 91:6
  95:25
says 89:18
schedule 26:24
school 7:5
scratch 80:14
scratched 75:15
  76:7,12
scrutinize 16:18,21
  16:25 17:10
second 82:17,21
section 13:6,7,8
secure 36:6,18
security 1:9 2:11
  6:11,13 58:7

74:14 75:8
see 16:7 51:19,24
  74:5 96:12,19
seen 26:13,14 49:5
  49:11 52:12
send 14:8,9 18:23
sending 14:12
senior 9:2 10:18,23
  11:1,17,18 92:5
sent 13:23 27:13
  31:16 45:15,17
  63:17 67:5,23
  75:20 77:18 79:2
separate 52:3
  61:14
series 29:20,23
  50:12
serious 30:14
  71:23
seriously 30:12
Service 73:25 74:2
  75:4
set 98:12
seven 47:9
sheet 14:17 80:6
sheets 70:19,22
  71:10,12
shift 35:14,16
short 89:6,8 94:13
shortly 41:20
show 37:17
showed 31:10
showing 18:9
shows 38:13
sic 93:10
sick 17:25 51:24,25
side 82:7 87:16
sign 64:23,25
SIGNATURE 99:1
signed 20:20
similar 24:25
sir 31:20 40:17
  56:12 58:11,18
  82:14 84:20
sit 19:13 55:20
sitting 28:12 57:20

58:2,7 81:5 96:8
situation 24:21
  44:1 47:19 69:25
  77:4 78:5,12 84:6
  88:25
situations 91:11
six 43:14,21 67:24
slow 63:12
slowly 63:9
small 54:12
snatched 86:11
Social 1:9 2:11
  6:11,13 58:7,9
somebody 18:22
  26:22 55:18
  76:12 84:8 85:2
soon 62:6
sophisticated
  34:22 35:7,22
sorry 16:22 17:9
  19:23,23 22:3
  63:20 77:10,12
sort 18:8,20 47:14
  47:22 50:14
  81:21
sorts 36:17 80:19
sought 44:21 79:15
sounds 4:8
source 18:9
South 8:13,14
space 76:20 81:11
  81:21 82:17
  84:19,19
spaces 82:6,20
  83:2,12,17
span 44:21
speak 3:17 29:14
  53:5,15 98:8
special 18:11
specific 17:22
  24:18 32:1 47:19
  71:9 72:16 73:3
specifically 20:7
  21:16 41:13
  61:11 69:5,7 70:4
  80:20 83:5 93:24

specifics 12:23
  72:15 73:4
speculate 65:14
  84:16
spell 4:6
spoke 53:13
spot 82:3
spring 22:13 23:24
springs 66:19
stability 66:3
stack 49:14
staff 7:12 8:18
  47:24
stand 66:18
standing 61:14
  77:23 85:22
  93:19
stands 34:21
start 76:19 88:22
started 6:13 7:8
  10:6 46:2 73:12
  73:13
starting 36:11
starts 47:20
state 1:18 3:2 4:4
  52:16 98:2,5,19
stated 43:22 48:11
statement 20:20
  50:3 64:22 80:18
  95:15,21 96:9
statements 50:13
  50:21 61:20
  74:11 94:23 95:3
  96:13,16
states 1:1,18 2:7,8
  8:12,12
stating 49:25 65:13
statistics 35:19
status 13:17 14:2
  14:19 24:16
  26:18,22,24,25
  35:20 37:16 38:6
  38:13 40:14
stay 38:24
staying 41:22
step 23:5,5 30:17

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF PAUL REAMS

Page 11

35:15
steward 20:24 21:8
sticker 81:15
stipulated 2:22
  3:10
stipulation 1:16
STIPULATIONS
  2:21
stood 61:22
stop 57:5 93:21
stoppage 68:2
stopped 74:20,25
straight 66:18
strangle 29:18
Street 1:19 2:4,9
  2:12
stress 65:23
strictly 23:4 35:3
strike 22:17
structure 11:5
stuff 14:1 52:1
  67:12,19
subject 53:17
SUBSCRIBED
  99:10
sudden 82:2
sugar 29:19
summer 11:13
  15:10 22:14 45:1
  46:3,10
superior 73:23
supervise 8:18,25
  9:2,16,22 10:12
supervises 8:6
supervising 10:15
supervision 9:25
supervisor 9:13
  17:2 27:14 30:7,9
  30:23,25 31:4,5
  54:19 55:8,10
  56:7,8 62:2,3
  69:14,17 81:14
  81:24 82:1 87:13
  95:25
supervisors 9:3,15
  11:20,21 31:7

54:16 57:2 85:22
supervisory 6:24
supply 44:11
supposed 24:10
  26:23 28:12 30:1
  58:22 88:16
sure 8:13,19,22
  17:19 19:1 29:24
  32:12 38:1 42:18
  42:18 43:24 55:3
  55:16 57:8 67:22
  78:9 92:19 96:25
suspected 69:25
suspended 23:2
suspicious 59:21
swear 96:10
sworn 3:17 98:8
  99:10
system 14:18 33:17
  34:14,15,17,20
  34:22,23,23 35:4
  35:6,7,8,11,13,18
  35:23 36:4,5,8,9
  36:18,20 37:8,13
  38:3 40:5,7,8,16
  40:24
systems 9:3 42:1
  43:19

──────────
T
table 57:21 58:3,8
take 14:6 39:23
  50:25 53:25 54:3
  67:3 68:20 77:20
  89:6,8 90:22,23
  90:24,25 91:3,4,5
  91:17 92:9 93:7
  94:13
taken 1:15 2:24 3:1
  27:2 54:11 59:24
  77:5,11,22 86:5
  92:12,16 93:6
talk 48:6 53:2
  58:14 59:7 64:24
  69:14 78:18
  80:18
talked 30:2 32:12

56:17 62:7 76:5
  79:5 87:22
talking 36:11
  40:14 44:13
  48:12 56:3,4,9,11
  58:17 59:25 72:8
  73:1 74:14 77:8
  78:6,7 82:9,10
  88:13 91:22
  94:10
tank 29:19
taped 90:11
tasks 24:20
tech 26:17
telephone 59:7
  60:7,18 62:1
telephones 59:12
tell 10:5 24:6 36:2
  44:19,20 47:2
  52:20 53:23 55:5
  61:12 65:18,18
  69:7 70:21 95:2
telling 86:6
ten 54:15 55:10
Tennessee 8:15
tenure 12:14
Teresa 9:11 82:22
  82:25
term 34:24
terminated 22:11
  29:17 30:16,16
  39:6
termination 22:19
  23:7
Terrace 4:11
terrorized 86:1
testified 3:19 46:12
  48:8
therefor 99:15
thereof 98:15
Thigpen 7:23 9:19
  10:13
thing 14:2 23:3
  39:4 41:11 56:16
  64:21 78:1
things 16:9 17:21

26:21,21 29:22
  47:3 65:13,23
  91:13
think 5:21 11:15
  15:21,24 21:9,20
  22:12 23:13
  25:17 27:7 31:9
  33:13 37:24 41:4
  42:16 46:1 49:8
  51:16 56:18
  60:15 63:25
  65:15 74:3 76:9
  78:18 84:13,16
  88:7 91:22 93:16
  94:10,18 96:4
thinking 65:2 78:8
third 11:15
thought 45:14
  51:17 65:14
  74:10 76:6,14
  77:11 87:24
thousands 26:19
threat 30:14
threatened 29:18
  29:19 72:21
threats 30:12
three 9:2,3 11:1,17
  11:19 18:4,7,7
  20:3,15,17 25:13
  48:7 66:16 84:8
  88:17,18
three-hour 88:17
  88:20
Thursday 54:24
time 3:6,7 4:25
  11:16 16:10
  17:24 20:12,23
  23:2,23 27:6,22
  30:2 31:3 32:24
  34:16 37:13
  38:25 41:15,22
  42:20 43:11
  44:21,24,25 46:9
  47:17 54:15,17
  56:3,14,19,20
  58:19,20,23,24

59:18 70:18,19
  70:22 71:3,10,12
  84:14 85:9 88:12
  90:4 92:11,19,19
  93:16,21
timely 17:21
times 17:18 27:5
  41:7 42:21,22
  43:20 46:15 59:1
  62:13,15,23 63:4
  65:22 66:11 68:1
  68:25 69:24
  76:23 92:24
told 30:2,3,5,7 46:6
  61:19 62:5 65:3,6
  67:23 70:11,23
  73:17 74:13,18
  77:18,19,20,24
  77:25,25 78:12
  82:5
total 74:12
totally 45:14 84:2
town 5:20
track 43:3
tracked 35:17
tracking 34:13
  35:4 40:16,24
transcript 99:3
transcription
  98:10 99:6
transfer 37:18
  44:22 46:16,16
  46:22 48:12 50:6
  50:20 51:9,22,23
  52:8,18
transferred 12:11
  45:21,22 46:12
  49:19 51:25 52:1
  53:8
transfers 46:7
  51:22
trial 3:12
tried 49:7 59:17
  62:17 66:10,11
  73:1
troubled 47:17

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF  PAUL REAMS
Page 12

true 50:15 77:21
  77:22 98:10 99:5
truth 3:18,18,18
  98:8
try 18:21 54:13
  84:6 94:4
trying 50:19 51:8
  55:17 59:7 74:10
Tuesdays 54:22
turn 41:19
turned 70:22
twelve 43:10
two 7:22 27:19,21
  32:17 34:18
  46:24 50:3 56:18
  61:14 63:4 68:25
  72:20 78:14 82:8
  82:10,15,18,19
  83:11,16 87:11
  93:23
type 13:5 25:16
  47:3 62:2 66:13

**U**

Uh-huh 4:9 7:18
  19:5,21 26:5
  27:18 30:19
  32:11 39:9 49:20
  52:7 61:8,16,18
  66:13 72:1
unbolted 67:12
understand 10:11
  28:2 44:15 80:22
  82:2
understanding
  27:11
unfavorable 14:14
union 20:24 21:7
  21:13 64:24
unit 17:6,16
United 1:1,18 2:7,8
unsuccessful 67:2
unsupported
  61:25
use 39:18 59:7,11
  59:14
uses 38:8

usual 23:3 81:20
usually 42:24
  44:10 48:1 51:22
  69:24 84:25

**V**

vacant 59:7,10,13
various 29:21 42:7
  66:20
vehicle 73:7
version 65:9
visitors 75:23
  76:21
vote 88:7
voting 88:17 89:1,3
  89:4
vs 1:7

**W**

wait 54:11
waiting 54:2
walked 59:14
walking 73:18
  74:19,24
wall 67:9
want 34:7 65:14
  89:9
wanted 30:8 40:10
  47:19 52:21 54:1
  66:17 88:5
wants 69:17
Warner 60:16 83:6
warning 25:18
Warren 60:17,18
  62:1,6,22
wasn't 29:22 41:11
  46:16 71:9
way 4:8 37:5 51:20
  71:18 75:19,24
  76:14 94:16
ways 50:4
Wednesdays 54:22
week 56:18 88:10
weekend 27:10
  76:9
weekends 27:5
weekly 48:6

Weeks 95:5
went 7:5 33:17,25
  37:8 54:4,5 59:13
  67:7,11 82:5 92:2
weren't 57:14
we'll 89:11
we're 23:21 27:25
  36:17 43:19
  47:21 56:4 58:17
  78:6,7 88:23 97:3
we've 27:3 43:20
  83:19 91:2,11,12
whatsoever 80:15
what-have-you
  60:25
whoever's 37:16
widower 6:4
wife 5:10 51:25
wife's 4:16 5:15
  6:1
window 88:17,20
witness 3:17 16:22
  17:9 49:15 86:23
  87:2 98:11 99:1
witnessed 61:20
  64:10
WKUP 13:17
  24:12
woman 25:10 74:9
  79:10
Woodley 4:11
work 8:18,19
  16:19,25 17:10
  17:19,22 22:20
  24:10 30:1 39:8
  43:10,23 44:1,2
  44:18 45:11,19
  55:19 56:20,23
  57:3 58:2,15
  65:21,22 68:2,9
  70:1,24 71:13
  72:6,22 74:5
  78:23 80:18,23
  80:24 81:8,19
  84:7,13 88:18,19
  93:22 94:3

worked 7:3 27:1
  28:13 29:9 36:2
  43:20 44:10
  54:21 55:6 60:3
  67:25 79:11,24
working 6:10
  12:25 13:14,15
  13:17 24:11,23
  28:11 39:8,11
  56:17,18 68:18
  81:3 93:20
workload 43:19
works 37:6 43:9
workstation 67:8
  67:13 96:8
workup 13:14
  24:12 39:24
  53:21 68:6 69:2
  69:13
workups 44:2
wouldn't 50:2
  55:19 87:25
wrap 89:9
write 18:19 46:19
  51:3
writer 42:8
writer's 15:20
written 12:22 18:8
  19:20 20:20
  25:23,24 26:1
  96:9
wrong 19:1 71:25
wronged 71:18
wrote 45:2,13
  51:16 72:13
  78:22

**Y**

yeah 4:25 6:4,9
  7:13 8:13 9:9,20
  9:20,22 10:22
  13:17 20:14 23:4
  29:6 33:2,17
  36:14,14,23 38:5
  40:10 42:18 44:8
  48:5,14,15,17,18
  49:24 52:14 53:7

  55:22 56:6,11
  57:25 60:21 63:7
  63:13,15 65:25
  66:10 67:18
  68:14,16 89:17
  92:1,19 94:11
  95:14
year 42:25 46:3
  51:9,10,11 87:13
years 4:22 34:18
  35:24 37:23 38:3
  43:25 44:14 47:9
  85:15
yelled 60:22 61:21
yelling 61:14 64:9
  85:22
yesterday 33:21
you-all 4:18 5:1
  35:25 60:18

**#**

#19 34:8
#20 32:9 34:8,9
#21 32:9 34:10
#25 89:13,15
#26 26:3,7
#26A 26:6
#41 48:10
#42 49:4
#45 49:17
#51 51:3
#53 52:6

**0**

0okay 4:23
03 88:8,13
04 29:13 31:1
  34:10,10 45:16
  46:3,10 49:8 56:4
  56:6,10 72:20
  78:13 79:24
  94:16
05 46:3,13 85:20
  86:3,8,10
09/30/08 98:20

**1**

BERNETHIA JOHNSON v. MICHAEL J. ASTRUE, ET AL.                    7/11/2008
DEPOSITION OF  PAUL REAMS

**11** 1:20 23:25
  30:18 79:20
  90:18 98:6
**12th** 89:24
**131** 1:19 2:9
**16th** 49:21
**19th** 60:13
**1977** 6:12
**1994** 7:13 10:6
**1999** 6:21 11:2,3,7

---
**2**
---
**2** 90:18
**2/24/09** 98:21
**2:06-CV-397-W...**
  1:7
**2:07-CV-59-WK...**
  1:7
**2:14** 1:21
**20** 35:24
**2000** 11:9,13 15:10
  21:4 23:5
**2002** 15:21 21:6
**2003** 15:21 66:5
**2004** 16:1 22:12,13
  23:21,23,24 45:1
  49:21 60:12
  63:18
**2005** 45:25 51:7
**2007** 44:6
**2008** 1:20 98:6,16
  99:10
**23** 5:8
**27th** 34:10
**28th** 34:10

---
**3**
---
**3** 2:18 98:9 99:4
**30** 4:20 35:21
  47:15
**30th** 31:1,4 51:7
  60:12 94:18
  98:16
**3029** 4:11
**30303** 2:13
**318** 2:4
**32** 8:11

**34** 4:22
**36104** 2:5,9
**36106** 4:13

---
**4**
---
**4/27/04** 32:15 34:3
**4:31** 97:8
**443** 98:20

---
**5**
---
**5/28/04** 32:10

---
**6**
---
**6:30** 42:8
**61** 2:12

---
**7**
---
**7** 88:21,21

---
**9**
---
**90s** 7:7 21:2 22:9
**97** 98:10 99:4
**98** 7:1
**99** 7:1 10:17 12:4