# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| BERNETHIA JOHNSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) Case No. 2:06-cv-397-WKW |
| v. | ) 2:07-cv- 59-WKW |
| | ) |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| COMMISSIONER OF | ) |
| SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

## DECLARATION OF PAUL JOHNSON

I, Paul Johnson, pursuant to 28 U.S.C. § 1746(2), declare under penalty of perjury that the following statement is true and correct based on my personal knowledge:

1.

From December 1999 to February 2005, I was a Group Supervisor with the Social Security Administration ("Agency" or "SSA"), Office of Disability Adjudication and Review ("ODAR" or "Hearing Office"), in Montgomery, Alabama. My direct supervisor during this time was Paul Reams, the Hearing Office Director. In February 2005, I transferred to my current position, Hearing Office Director for an ODAR office in Jackson, Mississippi.

2.

I served as the direct supervisor of Bernethia Johnson, a Legal Assistant, from approximately April 2000 to May 2, 2004. During this time, I also supervised Bonita McWilliams, Mary Traff, and Denise Crowell (who were all Legal Assistants) and Brenda McAnnally (a Lead Legal Assistant).

1

3.

The work-up process is a primary duty of a Legal Assistant, and involves organizing all the different documents in a file (from social security claimants, medical providers, and other sources) to remove duplicates and place them in chronological order in the appropriate sections. The final part of working-up a case is typing an exhibit list. Once a case is worked-up, a Legal Assistant indicates it is worked-up in the office computerized tracking system (known at the time as the Hearing Office Tracking System, or "HOTS") and should place the files in the appropriate file cabinets indicating they are ready for a hearing. While I supervised Ms. Johnson, she was the least productive Legal Assistant in the office in that she worked up the least number of cases and made the most errors. I was constantly meeting with her about her cases and various errors that I personally observed or heard about from staff members or Administrative Law Judges.

4.

In October 2003, I conducted an audit and discovered some cases that Ms. Johnson had moved from work-up status but which did not have exhibit lists. Ms. Johnson should not have moved the cases from work-up without having typed the exhibit lists. I found this especially troublesome because I had run a report in September that showed Ms. Johnson's pending work-up cases were getting old and shared it with her, and this appeared to be an attempt to reduce the age of her pending work and give me the impression that she had completed more work. I told her that her moving these incomplete cases was against office procedures. Ms. Johnson told me that someone had told her it was okay to move the cases, but would not give me a name and later told me it had been some sort of misunderstanding. I told her that she could face disciplinary action if she

moved incomplete cases again. To emphasize the importance of not moving cases until they were completely worked-up, I held a group meeting to discuss the matter in October and sent an email to all the Legal Assistants in my Group clearly stating the policy. A true and accurate copy of my email is attached as Exhibit A.

5.

In March 2004, during an another audit, I discovered unworked cases that Ms. Johnson had indicated in HOTS had been fully worked-up on February 27, the last day of the production month. The cases, which I found on Ms. Johnson's desk, did not have the exhibit lists. I checked the office word processing system to see if Ms. Johnson had typed the exhibit lists but had forgotten to print them or misplaced them and I could not find them in the system. It appeared to me that Ms. Johnson had again moved incomplete work to boost her productivity numbers and reduce the age of her pending work-up cases. I also found two incomplete cases on her desk, missing exhibit lists, that Ms. Johnson had indicated had been fully worked-up in HOTS on February 20.

6.

I talked to Ms. Johnson as I was investigating these cases and left her some notes about the cases with questions, but she was working the front desk during March, took annual leave, and took leave to attend a funeral, so I was not able to have a sit down meeting to discuss them with her prior to an alleged incident between the two of us on April 19. Based on my findings, and the fact that I had talked to Ms. Johnson about moving incomplete work in HOTS in October, I began drafting a written reprimand.

7.

On or about April 19, I was talking to Cynthia Lamar in her office when Ms. Johnson

asked her, from near the door, for some additional cases. I told her that she was supposed to request cases on Fridays, except in unusual circumstances, and she left the office. A short time later, there was a second meeting in Ms. Lamar's office with myself, Ms. Lamar, Ms. Johnson, and Ms. Hall, a union representative. The meeting did not involve a disciplinary issue, so Ms. Johnson was not entitled to union representation, and I am not sure why Ms. Johnson asked Ms. Hall to be present. During that meeting, I asked Ms. Johnson if she needed additional work and she did not answer my questions and would not speak to me during the meeting.

8.

Shortly thereafter, Mr. Reams advised me that Ms. Johnson had alleged that I had yelled at her and stood up and approached her on the previous day and that he was investigating the allegation. I told him these allegations were not true and told him what had taken place, including the fact that Ms. Johnson had not answered my questions during the meeting. I also sent him a statement regarding what had happened. A true and accurate copy of my email statement that I sent to Mr. Reams is attached as Exhibit B, and I attest that the contents therein are true and correct and based upon my personal knowledge. At a later time, Mr. Reams told me that he had investigated the allegations and concluded they were false. I believe Ms. Johnson made the false allegations against me because she was trying to deflect attention away from the fact that she had moved incomplete cases in HOTS and was facing a disciplinary action.

9.

The routine April 2004 audit disclosed that some of Ms. Johnson's cases that she had listed as fully worked-up in HOTS were not in the RTH/RTS cabinets. On Saturday,

4

April 24, 2004, I found the missing files on Ms. Johnson's desk, without the exhibit lists. I had Ms. Tamplin, the computer systems administrator, who was in the office, come and look at the cases and computer entries to verify that Ms. Johnson had listed them as worked-up in HOTS even though they were missing their exhibit lists. We also ran a search of the office computer system and found no exhibit lists for the cases in the system. Since Ms. Johnson had indicated these cases had been worked-up in HOTS, they should have had exhibit lists. On Monday, April 26, 2004, first thing in the morning, I had Pam Davenport, another Group supervisor, review the files on Ms. Johnson's desk that Ms. Johnson had listed in HOTS as having been worked up. She reviewed the case files and did not find any exhibit lists.

10.

I subsequently found out that Ms. Johnson was to be reassigned to Ms. Lamar's Group. I had asked for the reassignment because of the false accusations Ms. Johnson had made against me. On April 29, 2004, I prepared a report for my supervisor of my findings regarding Ms. Johnson's act of indicating in HOTS that cases were worked-up when, in fact, they were still missing their exhibit lists. I attached to my report case histories showing when Ms. Johnson had moved the various incomplete cases from HOTS, without exhibit lists. To corroborate my statement that I had seen the cases on her desk with no exhibit list and not seen any exhibit lists in the computer system after they had been moved in HOTS. I also attached some WORD screen prints showing what appeared to be the date these exhibit lists had been created in WORD. The "date of creation" for all of them was after the date Ms. Johnson had indicated in HOTS the cases had been worked-up. My findings were based on files that I personally observed on Ms. Johnson's

desk. I physically handled each of the cases and looked through the files and the computer system but did not find any exhibit list despite Ms. Johnson having indicated in HOTS that the cases had been worked-up. I later discussed my findings and what I had seen with Mr. Reams when he was deciding how to proceed with the matter.

11.

The routine May 2004 audit once again disclosed one of Ms. Johnson's cases that she had listed as fully worked-up in HOTS missing from the RTH/RTS cabinets. I found the case on Ms. Johnson's desk, without any exhibit list, that she had indicated in HOTS has been worked up. I also forwarded this information by email to Mr. Reams.

12.

I am not aware of any other Legal Assistants in my Group indicating in HOTS that cases had been worked up when they had not yet completed the exhibit list for the case. While my audits sometimes revealed other Legal Assistants had cases that were missing from the RTH/RTS file cabinets, when I found those files, they were always complete, with the exhibit lists.

13.

On or about July 21, 2004, I announced at a staff meeting that we had a missing time sheet. After the meeting, Ms. Johnson asked to speak with me, Chief Judge Thigpen, and Lynda Hall, and she told me that she had found the missing time sheet among her documents at her home a few days earlier and thought she was being "framed." I have no idea why she did not return the time sheet earlier. Beverly Warner, a Legal Assistant, told management she thought Ms. Johnson had taken the time sheet. I investigated the matter and discussed it with Chief Judge Thigpen, and we decided to not take any disciplinary

action against Ms. Johnson.

14.

Ms. Johnson later stated that Ms. Warner had taken her picture and might be planning on hiring a hit man to kill her. I talked to Ms. Johnson about this matter and asked her why she thought Ms. Warner might do that and when she had last talked to her. She could not tell me about any interaction between the two of them and could not recall any specific conversations with Ms. Warner. I also talked to the security guard about the matter and then Ms. Warner when she came to work the next day. Ms. Warner told me the two of them had not talked in a long time. I found no basis to support Ms. Johnson's hit-man fears. I told Ms. Warner not take Ms. Johnson's picture. I submitted a report to Mr. Reams, who was out of the office at the time. A true and accurate copy of my report is attached as Exhibit C.

15.

During my employment, I received annual Equal Employment Opportunity ("EEO") training conducted by the Social Security Administration. The training covered what conduct is prohibited and explained how employees may file complaints and the time-frame for filing the complaints. There were also posters in the hearing office with this information.

16.

I have never heard any racially offensive comments made by Mr. Reams, Ms. Lamar, Ms. Davenport, or any other employees in the office. I have not seen any racially offensive pictures or emails in the office. I have not heard anyone make any negative comments about anyone using the Agency's EEO process. I have never made any

offensive or negative comments about anyone using the EEO process.

17.

I did not discriminate against Ms. Johnson based on her race, and I did not retaliate against her for filing any EEO Complaints.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing statement of 17 paragraphs is true and correct.

*Paul Johnson*
Paul Johnson

Executed this 18th day of August, 2008.

# EXHIBIT A

**Johnson, Paul Whitson   OHA Montgomery HO**

From: Johnson, Paul Whitson   OHA Montgomery HO
Sent: Wednesday, October 29, 2003 12:31 PM
To: #AT AL OHA Mon Sr Case Techs; #AT AL OHA Mon Lead CTs
Cc: #AT AL OHA Mon Mgt Team
Subject: Ready to Hear File Cabinets
Importance: High

Legal Assistants:

We have recently completed an audit of the Ready-to-Hear file cabinets. I'm please to report that we have been able to locate all files placed in RTH as of October 15th.

It is important to remember that you should **not** move a case from WKUP status unless you have **completely** worked up the file. This includes typing the exhibit list and completing the information on the ALJ folder. This procedure has been in place for a very long time and would not be changed without written notice.

Since this is the last week of the month, many of you will likely be moving cases to RTH over the next few days. Again, you should not change the status of a case to RTH unless you are putting the file in the RTH cabinets. If you have any questions, see your supervisor.

Exhibit 9
Page 24 of 25
Exhibits

1

# EXHIBIT B

Johnson, Paul Whitson   OHA Montgomery HO

**From:** Johnson, Paul Whitson   OHA Montgomery HO
**Sent:** Wednesday, April 21, 2004 10:10 AM
**To:** Reams, Paul E.; Thigpen, Charles A.   OHA Montgomery HO
**Subject:** Your inquiry about Bernethia Johnson

Paul:

In response to your inquiry about the on-going problems with Bernethia Johnson's work performance.

1. I have never "screamed" or "yelled" at Bernethia under any circumstances.

2. On Monday, during a meeting with her and Cynthia Lamar, I did not stand and make any type of aggressive gesture toward her. I was sitting in Cynthia's black leather chair when she entered the room with Lynda Hall (serving as a union rep), and I remained sitting until she left the room. I did not yell or scream at her during the meeting. I did use a tone of voice that I felt would convey the serious nature of the conversation and the inappropriateness of Bernethia's behavior. My comments were carefully chosen to make sure that there was no misunderstanding about what was expected of Bernethia. My comments were direct and to the point. Bernethia repeatedly refused to answer simple work-related questions during the meeting. She asked to briefly leave a few times during the meeting to confer with Lynda. I made no attempt to keep her from leaving, and they briefly spoke in front of Bonita McWilliams' cubicle several times. Cynthia Lamar and Lynda Hall were present during the entire meeting and can provide an account of my actions.

The discussion was basically about two things: Did she want to participate in the ADS/flexiplace program? If so, did she need work to take home? I told her that ADS was available to her and that it was up to her to decide if she wanted to participate. Her allegation that she has never discussed ADS with me is absurd. She initially signed up for the program with me as her supervisor. I have the initial forms with her signature and mine, dated 2/9/01. She most recently re-enrolled in the program on 10/21/03. If she intends to participate again, she needs to complete a new request form. You yourself overheard a conversation I had with her last week about ADS, and I asked you to call her to make sure that she knew what days she could work.

During the meeting, I also discussed Bernethia's failure to ask for new pulling cases on Fridays in accordance with office procedures. She had received at least three e-mails from me about this. Cynthia also asked Bernethia if she needed additional cases, and we made it clear that she could get additional work.

3. As to the allegation that there was some type of inappropriate confrontation at her cubicle. Immediately prior to the meeting with Cynthia, I went to Bernethia's cubicle and asked her to come to Cynthia's office. She indicated that she did not want to meet at that time, and I told her that we needed to meet now to resolve whatever problem she was having. She said she needed to go to the bathroom. I told her that was fine and to come to Cynthia's office when she was done. I would estimate that the conversation lasted 30 seconds or so. It was brief, and I most certainly was not "yelling" or "screaming" at any point in the conversation. I did not get close to her in her cubicle space, and I did not use my body in any way to reflect aggression or intimidation. There were several employees nearby who certainly would have heard any loud confrontation if Bernethia's allegations were true. Teresa Weeks was the closest, and she may well have overheard the conversation. Karen Burton was nearby, working in the front desk area, and I think Denise Crowell was working over by her cubicle.

If you need additional information, please let me know.

Paul Johnson

Exhibit 9
Page 2 of 25

1

# EXHIBIT C



SOCIAL SECURITY ADMINISTRATION                Office of Hearings & Appeals

# MEMORANDUM

Date:      July 29, 2004

From:      Paul W. Johnson
           Group Supervisor

Subject:   Bernethia Johnson Incident Report

To:        Paul E. Reams, Hearing Office Director

Bernethia Johnson asked to meet with me and Judge Thigpen in the IVT room following a general staff meeting on Friday, July 23, 2004. Lynda Hall was present as the acting union steward at Bernethia's request. Bernethia presented me with a Group B overtime attendance roster for Tuesday, July 20. Beverly Warner had reported the sheet missing to Cynthia Lamar at COB on July 20. According to Beverly, Bernethia was the only other employee on her side of the building at closing and was, therefore, the person who most likely took the OT sheet. Bernethia denied taking the sheet and said she was being framed. She said she found the sheet at home in her cases while working ADS on Wednesday. She provided no explanation as to why she failed to report having the OT sheet to management until Friday, July 23. I reminded Berenthia that no one but timekeepers had permission to remove time sheets from the sign in area.

Following the meeting with Bernethia, Judge Thigpen asked me to try and find a centralized location to keep all time sheets. On Saturday, July 24, Teresa and I prepared an area for all time sheets outside the HOD's office.

During the afternoon of July 23, Jimmy Brown spoke with me regarding Bernethia. He subsequently sent an e-mail explaining a conversation he had with her after lunch. The e-mail stated as follows:

> On 07/23/04, Bernethia Johnson came into my office to report something that had happened at lunch. Bernethia stated that she might be paranoid for being concerned about what happened and she realized that there might not be anything that "Management" could do about it, but she wanted to report it anyway. She said that she drove around to the front of the office on her way to lunch and that "Beverly Warner" was standing outside with the "Security Guard" and she snapped a Picture of her. Bernethia stated that she did not want Beverly taking pictures of her and that for all she knew Beverly might be taking the picture to "put a Hit" out on her. She said that she has heard that Beverly wants to "beat her up". I told her that Management would not tolerate any Physical or verbal confrontations and that any confrontations might result in "disciplinary actions" being taken.

Exhibit 9
Page 21 of 25
Exhibit 3

2

On Monday, July 26, I walked by Bernethia's workstation. She was being inappropriately loud and was obviously agitated. She did not appear to be speaking to anyone in particular though Tamika was working at her computer. Bernethia was saying that she needed to leave the office and seek police protection. I told her that I would approve any requested leave and suggested that we speak in private before she left. Jimmy Brown and I met with Bernethia in Judge Thigpen's hearing room. Bernethia elected to speak without a union steward present. She stated several times that she felt Beverly was going to hurt her and likely had a "hit" out on her. She said she was going to get the police to help her. I asked her why she thought Beverly was going to hurt her or have her killed. She simply stated that Beverly had taken a picture of her leaving in her car on Friday. She reported no specific interaction between the two of them. She admitted that Beverly had not recently spoken to her or approached her at work. In fact, she could not recall specifically speaking to Beverly since we moved into this building several years ago. Bernethia stated that she wanted to park in the front of the building in the claimant's parking lot to protect herself and her car from Beverly. I denied the request as Bernethia could provide no basis for the request except that Beverly had allegedly taken her picture on Friday. I offered to move Bernethia to the opposite side of the building to be further away from Beverly's workstation. She declined the offer and stated that it was not necessary. I told her that Beverly was not in the building that day and that I would instruct Beverly not to directly take any pictures of her on Federal property once she returned to work on Tuesday. She asked for no further assistance but stated she felt the staff was "messing" with the cases on her desk and was out to get her. She stated that she could not identify any specific incident as a basis for her fears except that Tomika had allegedly once seen Beverly near her desk. I told her that cases were not her personal property and that management often reviewed work in the legal assistants' workstations. Bernethia indicated that she was having a difficult time from an emotional standpoint. I reminded Bernethia about the availability of the Employee Assistance Program and again offered to approve any leave request. She left for lunch soon thereafter and did not request any leave.

I spoke to Beverly on July 27. I instructed her to not take any pictures of Bernethia on Federal property.

Exhibit 9
Page 22 of 25