# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| BERNETHIA JOHNSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| ) | Case No. 2:06-cv-397-WKW |
| V. ) | 2:07-cv- 59-WKW |
| ) | |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| COMMISSIONER OF ) | |
| SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

## DECLARATION OF CYNTHIA LAMAR

I, Cynthia Lamar, pursuant to 28 U.S.C. § 1746(2), declare under penalty of perjury that the following statement is true and correct based on my personal knowledge:

1.

From December 1999 until my retirement in March 2007, I was a Group Supervisor with the Social Security Administration ("Agency" or "SSA"), Office of Disability Adjudication and Review ("ODAR" or "Hearing Office"), in Montgomery, Alabama. My direct supervisor during this time was Paul Reams, the Hearing Office Director. I had been with the Agency for 34 years in various positions at the time I retired.

2.

On Monday, April 19, 2004, Ms. Johnson came to my office twice on the same day. The first time, she asked me for more work-up cases to be assigned to her but she withdrew the request in the same meeting without giving any reason. Ms. Johnson's supervisor at the time, Paul Johnson, was seated in my office in the corner and I do not believe Ms. Johnson knew he was there. He reminded

her that she was supposed to ask for cases on Fridays, except in unusual circumstances, and she said okay and left the office. A little bit later, I received a telephone call from Lynda Hall, the union representative, and she began to ask me questions about whether Ms. Johnson had been in my office asking for work. I could hear Ms. Johnson in the background telling Ms. Hall what to ask me, so I told Ms. Hall to have Ms. Johnson come to my office so we could talk. Ms. Johnson eventually came to my office with Ms. Hall. During this second meeting, Paul Johnson asked Ms. Johnson if she needed any more work and Ms. Johnson did not respond. In fact, she did not talk during the entire meeting.

3.

On April 21, 2004, Mr. Reams asked me if Paul Johnson had yelled or stood up during the meeting on the prior day. I found this to be a shocking allegation, as Mr. Johnson was very soft-spoken and well-liked in the office. It would have been completely out of character for him to stand up and yell. I told him that I had not seen Mr. Johnson yell or stand up and I wrote a statement for him about the prior day's meetings. A true and accurate copy of my statement is attached as Exhibit A to this declaration, and I attest that the information contained therein is true and correct based on my personal knowledge.

4.

On April 30, 2004, I attended a meeting as a witness with Mr. Reams, Ms. Johnson, and Carl Warren (present by speaker phone as union representative), where Mr. Reams informed Plaintiff that he had investigated her complaint against Mr. Johnson and found nothing to support it. He also told her that he found that she had been insubordinate during the April 20, 2004, meeting because she had refused to answer the work-related questions from her supervisor. After the meeting, Mr. Reams told

Ms. Johnson that he wanted to discuss something in private with her and provided her at that time with an Employee Assistance Program ("EAP") brochure. Ms. Johnson asked for union representation, and Mr. Reams explained that this was a private matter, no discipline was at issue, and she was not entitled to any representation. Ms. Johnson then began writing a statement, asked to use the restroom, and returned with a statement she asked Mr. Reams and me to sign. I did not sign it. Mr. Reams then tried to call Mr. Warren, but he did not answer the telephone. There were no raised voices and I did not see Mr. Reams treat Ms. Johnson with anything but respect.

5.

From May 2, 2004, through approximately October 2, 2005, I was the direct supervisor of Bernethia Johnson, and four other Legal Assistants. When I supervised her, the Legal Assistants in my section included Christine Smith, Louise Chevalier, Beverly Warner, and Tammy Martin. I also supervised Debbie Rambo, who was a Lead Legal Assistant. Throughout the time that I supervised her, Ms. Johnson was the slowest performing Legal Assistant in my section and the least productive in the office. I unsuccessfully met with her to try to help her improve her performance and be a more productive member of the Office. From the very beginning, however, I found Ms. Johnson to be a very defensive, irrational, and emotionally unstable individual with whom it was impossible to have a casual meeting or conversation about any matter without her constantly writing things down and having an interpretation of events that was different from those of all others involved in the same set of circumstances. She questioned and opposed all my suggestions about improving her work, and insisted on union representation regarding every matter. She also began to display increasing aggression and disrespect towards me, culminating in her giving me the middle finger.

6.

When I was employed with the Hearing Office, I had a handicap placard and would park my car in one of the two handicap parking spots on one side of the building. Ms. Theresia Weeks (aka Frazer) also had a handicap placard and generally parked next to me. It is my understanding that Ms. Johnson parked in the spot I generally used in January 2005 and Mr. Reams asked her to move.

7.

In February 2005, I heard that Ms. Johnson had alleged that someone had keyed her car in the parking lot. I have no knowledge of this incident, other than hearing about it after the fact, and had nothing to do with it. There was no evidence that anyone in the office had done it.

8.

In early 2005, during one of my meetings with Ms. Johnson about her performance. She wanted to use my office telephone to page her union representative. Ms. Johnson had obvious cold symptoms, and I told her not to use my telephone and that she could use her telephone which was right around the corner in her cubicle. Despite my direct statement, she came around behind my desk and aggressively took the telephone from my hand and paged the union representative. I found her conduct to be unprofessional and disrespectful. I have never had another employee ignore my instructions like Ms. Johnson.

9.

In April 2005, Ms. Johnson made an error regarding basic routing of materials that every Legal Assistant should know when she mailed some documents to the wrong office. A large box of materials mailed by Ms. Johnson to the wrong office was returned to our office. Brenda McAnnally is a Lead Legal Assistant who at the time had been delegated the responsibility of

ensuring that Legal Assistants mailed materials to the appropriate offices. I met with Ms. Johnson and Ms. McAnnally, and asked Ms. McAnnally to explain the routing chart to Ms. Johnson and Ms. McAnnally read from it. I believed Ms. Johnson needed this refresher training. I asked Ms. McAnnally to read from the document to be assured that Ms. Johnson understood these basic procedures and to facilitate discussion about it. I did not mean to imply that Ms. Johnson could not read. I knew Ms. Johnson could read.

10.

In April 2005, during Ms. Johnson's mid-year review, she forcefully took her personnel file out of my hand to make a copy of it. When she was gone, I asked Mr. Reams to come to my office as a witness and gave Ms. Johnson an oral warning about this inappropriate behavior and the need to treat her supervisor with respect. I have never had another employee aggressively grab a file from me like Ms. Johnson or have so little respect for me as a manager.

11.

On June 7, 2005, Ms. Johnson came to my office to discuss a case. After listening to her concerns about the case, I decided that I could better discuss the matter with her if I reviewed the case so I asked her to leave it with me. She agreed to do so, but insisted that she make a photocopy of the case first. I told her that I viewed copying the file as a waste of time and resources. There was absolutely no need to make a copy of the claimant's file. Ms. Johnson, showing what I saw as obvious dissatisfaction with me, abruptly collected the case materials and rushed toward the door while forcing the erect middle finger of her left (and dominant) hand towards my face as she exited. In common parlance, Ms. Johnson's hand gesture can be described as "giving me the finger."

12.

I have never had an employee give me the finger and have never even heard of such conduct in the workplace. I was shocked and offended by the gesture and immediately rushed to Mr. Reams to report it. I subsequently submitted to Mr. Reams a Proposal to Suspend Ms. Johnson for her act of giving me an obscene, offensive, and disrespectful hand gesture. A true and accurate copy of my Proposal to Suspend is attached as Exhibit B.

13.

When I gave the Proposal to Suspend to Ms. Johnson, she claimed that she did not know what she was being accused of and asked me to describe the obscene gesture she had made. I found this request to be offensive, and told her I would not repeat the gesture. Mr. Reams was the deciding official for the discipline, and he considered Ms. Johnson's response to my proposal and ultimately issued a 3-day suspension for Ms. Johnson.

14.

In her response to my Proposal to Suspend, Ms. Johnson accused me of grabbing her arm briefly during an inventory I had performed of her cases on November 5, 2004. I did perform an inventory of her cases on that day in close quarters in her cubicle, but I did not grab her arm in any way.

15.

Ms. Johnson had a history of falsely accusing her supervisors of actions, including her false accusation that Mr. Johnson had stood up and yelled at her in April 2004, and her later assertion that a meeting that Reams and I had with her in April 2004 about EAP was like being raped. Furthermore, when I talked to her about issues, she often had a different view of reality or

conversations than anyone else. I generally held open door meetings with my employees, while Ms. Johnson would try to meet with me alone with the door closed. Eventually, to protect myself from false accusations, I would ask Ms. Johnson to keep the door open. There was no reason to have the door closed to discuss work and this did not interfere with any work flow in the office.

16.

Our Agency requires employees to sign in on the appropriate time and attendance roster when arriving for work. Ideally, the time an individual signs in should match the time on the clock. As a supervisor, one of my duties is to monitor employee's time to ensure it is accurate and to question them when there appear to be inaccuracies or errors. Ms. Johnson requested 4 1/4 leave for June 27, 2005, and I granted her request. Ms. Johnson was not charged any extra leave on that day. To the extent I asked Ms. Johnson about her arrival time prior to granting her leave, I had reason to believe she had arrived after 10 AM on that day because I had arrived at the office at 10 AM and signed in but did not see her name on my employee time and attendance roster or see her in her cubicle. However, I accepted her representation as true and granted her leave request exactly as she made it.

17.

In September 2005, I heard that Ms. Johnson had accused Ms. Renita Barnett-Jefferson, a senior attorney in our office, of trying to hit her with her car in the parking lot. I had nothing to do with this incident.

18.

After Ms. Johnson transferred to Chattanooga in October 2005, I had no further interaction with her. I have not talked about her to anyone in Chattanooga.

19.

During my employment, I received annual Equal Employment Opportunity ("EEO") training conducted by the Social Security Administration. The training covered what conduct is prohibited and explained how employees may file complaints and the time-frame for filing the complaints. There were also posters in the hearing office with this information.

20.

I am an African-American female. I have never heard any racially offensive comments made by Mr. Reams, Mr. Johnson, Ms. Davenport, or any other employees in the office. I have not seen any racially offensive pictures or emails in the office. I have not heard anyone make any negative comments about anyone using the Agency's EEO process. I have never made any offensive or negative comments about anyone using the EEO process. In fact, I used the Agency's EEO process in 1998, about a discrete issue, and never had any problems with using it.

21.

I did not discriminate against Ms. Johnson based on her race, and I did not retaliate against her for filing any EEO Complaints.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing statement of 21 paragraphs is true and correct.

_____
Cynthia Lamar

Executed this 14 day of August, 2008.

# EXHIBIT A


It is my recollection that at or about 3:30p.m. on April 19, 2004 Bernethia Johnson presented at my office door and began speaking without entering my work area. At the time I was seated at my desk facing Paul Johnson who sat in the right corner of the room, apparently outside the scope of Bernethia's peripheral vision. As Bernethia stood at the door she looked to me and indicated that if it was alright she wished to work at her alternative duty station on Wednesday and Thursday and also wanted a new assignment of work-up cases. Bernethia seemed quite startled when she heard Paul Johnson's voice in reply. In fact she stated that she thought Paul had signed out for the day. Paul then reminded Bernethia that the assignment of work-up cases takes place on Fridays, absent unusual circumstances. Bernethia acknowledged Paul's statement in a brief and calm exchange which ended in Bernethia's final assertion that she would not go home and would not need more cases. At all times during this encounter several feet of physical space separated Paul and Bernethia. At no time did Paul scream or use any voice of threat or intimidation. I also observed Paul show no body movements that I viewed as angry or menacing.

Approximately 15 minutes following the visit just referenced I received what I thought was an informal telephone call from Lynda Hall about case workup assignment. When Lynda began asking specific questions about Bernethia, it quickly became apparent to me that Bernethia was directing Lynda's battery of questions. In fact, at one point I could hear Bernethia in the background urging Lynda to ask me whether Paul was still in my office. Upon hearing the insistence in Bernethia's voice, I responded affirmatively and asked Lynda to simply have Bernethia to come to my office so that any issues regarding case assignment could be resolved. At that point, Paul left my office for a brief time to summon Bernethia. In short order Bernethia again appeared at my office, this time accompanied by Lynda who took a seat to my right nearest the door. Bernethia sat in the corner farthest from the door, in the same chair occupied by Paul during Bernethia's first visit. Just as before, I was seated behind my desk with Paul then positioned to my left nearest the door. All 3 parties sat in clear view to me as Paul began to speak to Bernethia about case work assignment. At the same time, Paul asked Bernethia directly if she needed additional work. Lynda intervened stating that she had been asked by Bernethia to serve as Bernethia's spokesperson. Bernethia, in fact, refused to answer any of Paul's questions regarding work assignment, and on this occasion uttered no statements or responses of any kind. While I perceived Paul's statement to Bernethia to be firm, detailed, and direct, it was in no way boisterous, menacing, or hostile. It is also notable that, as he spoke, Paul was separated from Bernethia by at least 8 feet and remained in the same seated position throughout his entire presentation. The four of us were assembled in my office for less than 10 minutes during which time I observed Paul use no ultimatums nor any threatening verbal or non-verbal expressions or gestures of any kind. More specifically, I heard no screaming or yelling expressed by Paul Johnson during the course of events described, nor at any other time since I have known him. It should also be noted that on April 19, 2004, Bernethia Johnson made no direct or indirect request for case assignment that was denied by Paul Johnson or Cynthia Lamar.

Signed _____

Date 4/20/04

Exhibit: 2
Page 15 of 68

# EXHIBIT B



# Memorandum

Date: June 13, 2005
From: Cynthia Lamar
Subject: Proposal to Suspend
To: Bernethia Johnson

This is notice of my proposal to suspend you from pay and duty status for 5 working days for willful and indecent conduct on the job, inconsistent with the Standards of Ethical Conduct for Government Employees.

More specifically, I am recommending your suspension for an offensive hand gesture which, by itself, constitutes obscene, disrespectful, and insubordinate behavior. This proposal follows an oral warning issued to you for inappropriate conduct towards your supervisor during your midyear review in April, 2005.

Specifically: On the afternoon of June 7, 2005, you came to my office seeking assistance in deciding the proper handling of a delayed development request assigned to you. After some discussion, I determined that I could better respond to your inquiry following a quick review of the case. You agreed to leave the file with me, but insisted upon making copies of the case before doing so. I advised you that taking time to copy a file already stagnated in process since October 2004, was a waste of time and resources. Showing obvious dissatisfaction with my statement, you concluded that you would proceed without my assistance. You then abruptly collected the file materials, rushed toward the middle of my office, and forcefully gestured your erect middle finger towards my face in a malicious and vindictive manner. There were no further expressions of any kind exchanged between the two of us during this encounter.

As a government employee you must conduct yourself with propriety in all dealings with supervisors, co-workers, and the public. In proposing this action, I have considered the severity of this breach of your duty to adhere to Agency guidelines regarding appropriate behavior on the job.

Your failure to exhibit courtesy and respect towards your supervisor constitutes insubordination, and is strictly prohibited by the Agency. It is my hope that this proposed suspension will be sufficient to correct your behavior and thereby promote the efficiency of the service.
If a decision is made to effectuate this suspension, it will occur no earlier that fifteen calendar days from the date of this notice.

You have the right to reply to the deciding official both orally and in writing within 10 calendar days after you receive this proposal. Any replies must be presented to Paul Reams, Hearing Office Director. You have the right to be represented in making your reply and to receive a written decision regarding the proposal. For a complete explanation of your rights, please refer to the attached Explanation of Rights.



Exhibit B
Page 11 of 22

You may contact Paul Reams in writing or by telephone (334)223-7503, Ext. 3005. Any written reply may be forwarded to the following address:

> Paul Reams
> Hearing Office Director
> Office of Hearings and Appeals
> 3381 Atlanta Highway
> Montgomery, Alabama 36109

*Cynthia Lamar,*
Group Supervisor

Attachment: Explanation of Rights

Exhibit 02
Page 12 of 15

## EXPLANATION OF RIGHTS
### (Bargaining Unit)

Entitlement to a Proposal

The advance notice is a proposal to take action. No decision to effect the proposed action will be made until there has been the opportunity for you to make written and oral replies and the deciding official has considered any reply.

Right to Representation

You have the right to be represented and advised by a union representative.

Freedom to Prepare and Present

You and your representative are assured freedom from restraint, interference, coercion, discrimination, or reprisal in preparing and presenting your case in these proceedings.

Right to Review Supporting Material

You and your representative have the right to review material relied upon to support the reasons given in the notice of proposed action. To review this material contact your first line supervisor to review this material.

Right to Make Written Reply

A written reply to the proposal may be made to the deciding official within a time limit stated in the advance notice. This right includes the right to submit affidavits and other documentary evidence in support of your written reply. An affidavit is a sworn statement in writing by yourself or by others. Your reply may include any reasons for requesting that the action not be taken.

Right to Make Oral Reply

The right to make oral reply means the right to make an oral presentation to the deciding official within the time limit stated in the advance notice. The right to make an

oral presentation in separate from and in addition to the right to make a written reply. You may submit affidavits and other documentary evidence in support of your oral reply. You are not required to limit you oral answer to refutation of the reasons given in the advance notice for the proposed action. You may, if you wish, set forth mitigating circumstances and give other reasons why you believe the proposed action should not be taken. If you wish to reply orally, you should contact the deciding official for an appointment.

Official Duty Time

If you are in a duty status, you may request a reasonable amount of official time to review the material relied on to support the proposed action, prepare and present written and oral replies, and secure affidavits and other evidence. You should contact your first line supervisor to arrange for such official time.

Time Limits

The time limits given you in the advance notice refer to calendar days. If the last day falls on a Saturday, Sunday, or official holiday, the time limit is automatically extended to the next calendar day that is not a Saturday, Sunday, or official holiday. The time limits may be extended for good cause upon written request from you or your representative. They will not be extended unless the reason is compelling. Such a request may be made to your first line supervisor.