# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| BERNETHIA JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | Case No. 2:06-cv-397-WKW |
| V. | ) | 2:07-cv- 59-WKW |
| | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF LINDA TAMPLIN

I, Linda Tamplin, in lieu of an affidavit, as permitted by 28 U.S.C. § 1746, make the following declaration based on my personal knowledge:

(1)
I am currently the Information Technology ("IT") Specialist for the Social Security Administration ("Agency" or "SSA"), Office of Disability Adjudication and Review ("ODAR"), in Montgomery, Alabama. I have held this position since April of 2007. I have worked in the Montgomery hearing office since June of 2001. I previously held the position of Hearing Office Systems Administrator ("HOSA"). From 2004 through April of 2007, I served as a local union steward for the American Federation of Government Employees ("AFGE"). As a union steward, I attended several meetings as a representative between another employee, Bernethia Johnson, and management. During this period, Lynda Hall (Holley) was back-up union representative and attended meetings when I could not. During the meetings, I took notes and provided copies to Ms. Johnson.

(2)
On a Saturday in April, 2004, Paul Johnson, a Group Supervisor in our office, asked me to observe while he reviewed files on Ms. Johnson's desk. The files had been marked as "worked-up" in the HOTS tracking system. I observed that they did not have exhibit lists. A legal assistant was only supposed to move a case from work-up status in HOTS once the exhibit list was typed. I later confirmed to Paul Reams, Hearing Office Director, what I had observed.

(3)

On June 21, 2004, I attended a meeting with Paul Reams and Ms. Johnson about a written reprimand that Ms. Johnson had been given. I took detailed notes of this meeting, and true and accurate copies of my notes are attached to this declaration (Attachment A). The issue in question was whether Ms. Johnson had performed work on case files that she indicated was done. During this meeting, there was some discussion of the difference between the WORD date of creation and date created screens. I provided my opinion, as the HOSA, that the "date of creation" may not be wholly reliable to show when a document had been created in WORD. I stated that I had telephoned the help desk for a more precise explanation of the dates. The dates in both the date of creation and date created would show when someone had gone in and worked on the document.

(4)

In 2001 or 2002, Mr. Reams held a meeting with the staff and advised the employees that the office had two handicap parking spots on one side of the employee parking lot. He stated that these spots were reserved for those with handicap permits, but the three spots on the other side of the building, though they had a handicap sign, were available on a first-come, first-serve basis. I do not recall if Ms. Johnson was present. I am aware that the office had two employees with handicap permits in 2005, Cynthia Lamar and Teresa Frazer (then Weeks). In January of 2005, Ms. Johnson came to me and complained that Mr. Reams had asked her to move her car from one of the handicap parking spaces where Ms. Lamar and Ms. Weeks usually parked. She asked me to discuss this with Mr. Reams. I discussed this with Mr. Reams, and then sent Ms. Johnson an email reminding her about the earlier meeting. Mr. Reams subsequently sent an email reminding employees not to park in those two particular spots and removed the handicap sign from the area with 3 parking spaces.

(5)

On January 24, 2005, I attended a meeting with Ms. Johnson and Ms. Lamar. The purpose of this meeting was to discuss Ms. Johnson's workload and performance. I tape recorded this meeting in order to transcribe accurate notes. I placed the tape recorder on a desk and neither Ms. Lamar nor Ms. Johnson objected to being recorded. During the meeting, Ms. Lamar specifically asked Ms. Johnson improve the timeliness of her casework. After the meeting, I transcribed the notes from the recording and provided a copy of the notes to Ms. Johnson. About a week after the meeting, Ms. Johnson complained to the Union about the fact I taped the meeting and I was told not to tape any additional meetings.

(6)

In June or July of 2005, I attended a meeting with Mr. Reams and Ms. Johnson during which an allegation by Ms. Lamar that Ms. Johnson had given her the middle finger was discussed. Ms. Johnson repeatedly asked Mr. Reams to demonstrate the gesture and he refused. Ms. Johnson then demonstrated the gesture to Mr. Reams in my presence and asked him if this was the type of gesture that Ms. Lamar was accusing her of making.

(7)

I receive an annual Equal Employment Opportunity ("EEO") training conducted by the Social Security Administration. The training covers what conduct is prohibited and explain how employees may file complaints and the time-frame for filing the complaints. There are also posters in the hearing office with this information. I have never filed an EEO complaint. I have never heard any racially offensive comments made by Mr. Reams, Ms. Johnson, Ms. Davenport, or Ms. Lamar, or any other employees in the office. I have not seen any racially offensive pictures or emails in the office. I have not heard anyone make any negative comments about anyone using the Agency's EEO process

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct in accordance with 28 U.S.C. § 1746.

Executed this, the 21st day of August, 2008.

*Linda Tamplin* (signature)

Linda Tamplin
Social Security Administration, ODAR
3381 Atlanta Highway
Montgomery, AL 36109

# ATTACHMENT A

Meeting between Paul Reams, HOD, and Bernethia Johnson, LA,
Monday, June 21, 2004
Observed by Linda Tamplin, Union Steward

The meeting began at 5:50 p.m. and ended at 6:45 p.m.

Mr. Reams and Ms. Johnson each had copies of screenshots taken of MS Word document summary properties of cases done by Ms. Johnson. Ms. Johnson also had a sheet with approximately 11 samples for each of the other case techs, showing somewhat similar dates and times. Considerable discussion as to the discrepancies between the times shown for creation of documents in the 'General' and 'Summary' tabs was held, with no definite conclusion. I was asked my opinion (as the Computer Assistant) as to the reliability of the dates on the summary items and I stated that I had telephoned the Help Desk for a more precise explanation of how the dates were set by the program, and that I could not feel wholly sure the dates were reliable without more research.

Mr. Reams then stated that he would not consider the screenshots as documentation at this point, and would consult the people who had seen the unfinished folders on Ms. Johnson's desk. Ms. Johnson asked who the people were, and Mr. Reams stated that they were supervisors.

Mr. Reams stated that the issue in question was whether Ms. Johnson had performed the work that she had indicated was done. Mr. Reams stated that folders which were coded in the computer as having been completed as a 'workup' case and in the 'RTS' category were still on Ms. Johnson's desk with no exhibit list done, as much as 3 months later in at least 1 folder and at least 1 month later in others, and asked why.

Ms. Johnson asked the exact dates in question and was told that they ranged from February to April, whereupon Ms. Johnson stated that she only had 3 days, or approximately 3 days, notice at the end of February that her scheduled month in the Receptionist rotation would be moved to March. At that point, she switched job duties and did not work on anything on her desk during the month of March.

Mr. Reams asked why she had indicated (by computer input) that the work on the folders was completed and then left them on her desk rather than filing in the designated cabinets per policy. Ms. Johnson responded that she felt sure that all were in fact completed but had either been left there or retrieved in order to perhaps send attorney letters, perhaps with copies of exhibit lists. She stated that she did not like to make assumptions and did not remember having any on her desk.

Ms. Johnson then stated that she did not appreciate being accused of cheating and not being permitted to have Union representation. Mr. Reams asked her to explain what she meant, and Ms. Johnson became agitated and stated that he and Cynthia Lamar (her current supervisor) had asked her to meet with them, making a 'bunch of lies,' and had refused to let her have Union representation. When Mr. Reams made no comment, Ms. Johnson asked did he not remember and agree that he did not allow her to have someone.

Mr. Reams asked whether she wanted this discussed with the Union representative, and she asked, "Why not?" and Mr. Reams asked whether she wanted to discuss that matter in my presence, since it was not involving the current issue and was in fact a private, personal matter. She asked whether he did or did not 'drag out' and slowly inquire as to whether she truly wanted Carl Warren involved. He again asked whether she wanted it discussed in front of me, and then asked whether she fully understood when Weingarten applies. Ms. Johnson said that yes, she understood – that management must allow Union representation if a meeting could reasonably be expected to involve reprimand or other discipline, and that she wanted him to state why he did not want her to have the representation.

Mr. Reams then stated that he did not necessarily object to representation being present, but that it was not required that he permit it in that particular meeting because the issue being discussed was that they were suggesting that she contact the Employee Referral Service. He further stated that he had given her a pamphlet. When Ms. Johnson said nothing, Mr. Reams asked whether she remembered and agreed that they had referred her to the Employee Referral Service and she stated that yes, they had given her a brochure.

Mr. Reams then stated that the reason that he didn't think she wanted the Union involved was because it wasn't appropriate in that case. There was no anticipated disciplinary action, no adverse action, and it was regarding a private matter – the referral to Employee Referral Service.

Ms. Johnson said, "But then, you started again about things that could become disciplinary, without anybody on my side – you covered up the real reason you wanted to see me, that you were punishing me for filing the EEOC action."

Mr. Reams asked, "So, do you believe that?"

Ms. Johnson responded, "Yes, you and Cynthia are trying to intimidate me by taking the action against Monique, you bully people." Mr. Reams interjected, "I can't discuss Monique with you, that's none of your business." Ms. Johnson stopped, and then asked, "What happens if you prove what you're trying to prove?"

Mr. Reams said, "What do you mean? This is about work, your saying it's finished when it is not. When the audits were done, the cases were not in the RTS cabinets."

Ms. Johnson said, "Neither were the others on Monique's list," and handed him a typed list. She continued, "They were ready. I came in on Saturday and did them because Monique said there was to be an audit."

Mr. Reams asked, "What list is this?"

Ms. Johnson said, "The May list. I wasn't the only one who had cases that weren't found in the RTS cabinets."

Mr. Reams stated, "But when we checked the others, they all had the pulling work completed, with exhibit lists done, and were out of the cabinets for other development. Yours did not have the exhibit lists typed – and it was first noticed in February and March, not May."

Ms. Johnson commented that she should have been asked about it when it was discovered, rather than waiting until she would have forgotten. Mr. Reams answered that she took 10 days off at that time.

Ms. Johnson then asked, "Please tell me, what will happen? How will you prove that the exhibit lists weren't in the folders?"

Mr. Reams answered, "I'll talk with the supervisors who saw the folders on your desk."

Ms. Johnson said, "But you are all lying. How can I prove that they were done then? But, we will have another meeting after you talk with the others?"

Mr. Reams said, "Yes, there will be another meeting."

Ms. Johnson indicated that she had expected to be able to finish in 10 minutes but that the meeting had lasted almost an hour, and asked how we were to handle on the timesheet.

Mr. Reams said that it was a business-related issue and that we were to sign for overtime.

Ms. Johnson asked why she didn't get the overtime sheets when she was given the timesheets, and Mr. Reams stated that they are kept in a different binder and he just didn't think of them. Ms. Johnson asked if she could also have copies of those as well, and Mr. Reams said yes.

The meeting was ended.